No. 15-2056

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

**G.G.**, by his next friend and mother, **DEIRDRE GRIMM**

*Plaintiff-Appellant,*

v.

**GLOUCESTER COUNTY SCHOOL BOARD**,

*Defendant-Appellee.*

---

**On Appeal from the United States District Court
for the Eastern District of Virginia
Newport News Division**

---

**BRIEF OF PLAINTIFF-APPELLANT**

---

AMERICAN CIVIL LIBERTIES UNION
OF VIRGINIA FOUNDATION, INC.
Rebecca K. Glenberg (VSB No. 44099)
Gail Deady (VSB No. 82035)
701 E. Franklin Street, Suite 1412
Richmond, Virginia 23219
Phone: (804) 644-8080
Fax: (804) 649-2733
rglenberg@acluva.org
gdeady@acluva.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Joshua A. Block
Leslie Cooper
125 Broad Street, 18th Floor
New York, New York 10004
Phone: (212) 549-2500
Fax: (212) 549-2650
jblock@aclu.org
lcooper@aclu.org

*Counsel for Plaintiff-Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____     Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____

(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?     YES     NO

2.      Does party/amicus have any parent corporations?                          YES     NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                        YES     NO
        If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    YES    NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    YES    NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?    YES    NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: _____    Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE
*****************************

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____                    _____
        (signature)                                            (date)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ..........................................................1

INTRODUCTION ...............................................................................2

STATEMENT OF ISSUES ....................................................................3

STATEMENT OF CASE .......................................................................3

    Gender Dysphoria ........................................................................3

    G.'s Gender Dysphoria ..................................................................6

    School Response ..........................................................................7

    Aftermath .................................................................................12

    Procedural History ......................................................................15

SUMMARY OF ARGUMENT ..............................................................16

ARGUMENT ...................................................................................19

    I.  Preliminary Injunction Standard..................................................19

    II. G. Has Established a Likelihood of Success on His Title IX Claim.............20

        A. Excluding Transgender Students from Using the Same Restrooms as Other Students Discriminates Against G. on the Basis of Sex. ..............20

        B. Excluding G. from Using the Same Restrooms as Other Students Deprives Him of Equal Access to Educational Opportunity. .................25

        C. OCR's Interpretation of 34 C.F.R. § 106.33 Is Entitled to Controlling Deference Under *Auer*..........................................................31

    III.G. Has Established a Likelihood of Success on His Equal Protection Claim.....................................................................................38

    IV.   G. Has Satisfied the Remaining Preliminary Injunction Factors.............42

i

A. The Court Abused Its Discretion and Clearly Erred By Refusing to Consider G.'s Uncontested Evidence. ........................................................42

    1. Refusal to Credit Uncontested Evidence Presented By Declaration ..43

    2. Refusal to Consider Uncontested Testimony Because it Contained Hearsay ........................................................................................44

    3. Refusal to Credit G.'s Uncontested Testimony Because it Was "Self-Serving" ................................................................................46

    4. Refusal to Consider Dr. Ettner's Uncontested Expert Testimony Because She Was Retained as an Expert Witness ..............................47

B. An Injunction Is Necessary to Prevent Irreparable Harm to G. ..............49

C. The Balance of Hardships Weighs in Favor of an Injunction. .................50

D. An Injunction Is in the Public Interest ...................................................51

V. The Case Should Be Reassigned on Remand. ...............................................52

REQUEST FOR ORAL ARGUMENT ....................................................58

CONCLUSION ........................................................................................59

CERTIFICATE OF COMPLIANCE .......................................................60

CERTIFICATE OF SERVICE ...............................................................61

# TABLE OF AUTHORITIES

## Cases

*Allegheny County Sanitary Auth. v. EPA*,
   732 F.2d 1167 (3d Cir. 1984) .................................................................2

*Allfirst Bank v. Progress Rail Servs. Corp.*,
   521 F. App'x 122 (4th Cir. 2013)........................................................59

*Alliance for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ............................................................23

*Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*,
   793 F.3d 313 (3d Cir. 2015) ...............................................................57

*Auer v. Robbins*,
   519 U.S. 452 (1997) ................................................................... 20, 38

*Barnes v. City of Cincinnati*,
   401 F.3d 729 (6th Cir. 2005) ..............................................................27

*Bd. of Trustees of Univ. of Ala. v. Garrett*,
   531 U.S. 356 (2001) ...........................................................................52

*Belt v. EmCare, Inc.*,
   444 F.3d 403 (5th Cir. 2006)..............................................................44

*Brown v. Bd. of Educ.*,
   347 U.S. 483 (1954) ...........................................................................37

*Carmichael v. Galbraith*,
   574 F. App'x 286 (5th Cir. 2014).......................................................33

*Centro Tepeyac v. Montgomery Cty.*,
   722 F.3d 184 (4th Cir. 2013)..............................................................65

*Chase Bank USA, N.A. v. McCoy*,
   562 U.S. 195 (2011) ............................................................... 42, 44, 48

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
   598 F.3d 30 (2d Cir. 2010) .................................................................23

iii

*City of L.A. Dep't of Water & Power v. Manhart*,
  435 U.S. 702 (1978) ................................................................26

*Cohen v. Brown Univ.*,
  991 F.2d 888 (1st Cir. 1993) ...................................................65

*Cruzan v. Special Sch. Dist. No. 1*,
  294 F.3d 981 (8th Cir. 2002) ..................................................53

*D.L. ex rel. K.L. v. Balt. Bd. of Sch. Comm'rs*,
  706 F.3d 256 (4th Cir. 2013) ............................................ 41, 42

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ................................................................60

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
  526 U.S. 629 (1999) ...................................................... 30, 31, 46

*De'lonta v. Johnson*,
  708 F.3d 520 (4th Cir. 2013) ................................................5, 6

*Decker v. Nw. Envtl. Def. Ctr.*,
  133 S. Ct. 1326 (2013) ...................................................... 43, 44

*Doe v. Reg'l Sch. Unit 26*,
  86 A.3d 600 (Me. 2014) ..................................................... 34, 45

*Doe v. Wood Cty. Bd. of Educ.*,
  888 F. Supp. 2d. 771 (S.D.W.V. 2012) ............................ 62, 63, 65

*Elrod v. Burns*,
  427 U.S. 347 (1976) ................................................................55

*Faulkner v. Jones*,
  10 F.3d 226 (4th Cir. 1993) ...................................................49

*Finkle v. Howard County*,
  12 F. Supp. 3d 780 (D. Md. 2014) ..................................... 25, 29

*Franklin v. Gwinnett County Pub. Schs.*,
  503 U.S. 60 (1992) ................................................................24

*FTC v. Wyndham Worldwide Corp.*,
   799 F.3d 236 (3d Cir. 2015) ...................................................................43

*Glenn v. Brumby*,
   663 F.3d 1312 (11th Cir. 2011) ........................................ 27, 28, 29, 48

*Graham v. City of New York*,
   No. 08-CV-3518 MKB, 2015 WL 5258741 (E.D.N.Y. Sept. 10, 2015) ............61

*Harris v. Mayor of Balt.*,
   429 F. App'x 195 (4th Cir. 2011)..........................................................58

*Hart v. Lew*,
   973 F. Supp. 2d 561 (D. Md. 2013) ......................................................25

*Henry v. Greenville Airport Comm'n*,
   284 F.2d 631 (4th Cir. 1960) ...............................................................62

*Hill v. Tangherlini*,
   724 F.3d 965 (7th Cir. 2013) ...............................................................58

*Hobby Lobby Stores, Inc. v. Sebelius*,
   723 F.3d 1114 (10th Cir.).....................................................................55

*Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*,
   582 F.3d 721 (7th Cir. 2009)................................................................23

*In re Wolverton Assocs.*,
   909 F.2d 1286 (9th Cir. 1990)..............................................................60

*IntraComm, Inc. v. Bajaj*,
   492 F.3d 285 (4th Cir. 2007)................................................................43

*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167 (2005) .............................................................................38

*Jennings v. Univ. of N.C.*,
   482 F.3d 686 (4th Cir. 2007)................................................................24

*Kastl v. Maricopa Cty. Cmty. Coll. Dist.*,
   No. CIV.02-1531PHX-SRB, 2004 WL 2008954 (D. Ariz. June 3, 2004) .........32

*Kentuckians for the Commonwealth v. Rivenburgh*,
  317 F.3d 425 (4th Cir. 2003) ............................................................41

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) ............................................................22

*Lewis v. High Point Reg'l Health Sys.*,
  79 F. Supp. 3d 588 (E.D.N.C. 2015) ..................................................24

*Liteky v. United States*,
  510 U.S. 540 (1994) ...........................................................................65

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ............................................................62

*Mercer v. Duke Univ.*,
  190 F.3d 643 (4th Cir. 1999) ............................................................39

*Miss. Univ. for Women v. Hogan*,
  458 U.S. 718 (1982) ..................................................................... 48, 49

*Muir v. Applied Integrated Tech., Inc.*,
  No. 13-0808, 2013 WL 6200178 (D. Md. Nov. 26, 2013) ..................25

*Mullins v. City of New York*,
  626 F.3d 47 (2d Cir. 2010) ...............................................................56

*New Cingular Wireless PCS, LLC v. Finley*,
  674 F.3d 225 (4th Cir. 2012) ............................................................42

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*,
  556 F.3d 177 (4th Cir. 2009) ............................................................41

*Oncale v. Sundowner Offshore Servs., Inc.*,
  523 U.S. 75 (1998) ....................................................................... 37, 68

*Orr v. Orr*,
  440 U.S. 268 (1979) ...........................................................................50

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
  551 U.S. 701 (2007) ..................................................................... 46, 52

*Pathways, Inc. v. Dunne*,
  329 F.3d 108 (2d Cir. 2003) ................................................................1

*Pauley v. BethEnergy Mines, Inc.*,
  501 U.S. 680 (1991) .........................................................................43

*Philip Morris USA, Inc. v. Vilsack*,
  736 F.3d 284 (4th Cir. 2013) ...........................................................45

*Plessy v. Ferguson*,
  163 U.S. 537 (1896) .........................................................................37

*Price Waterhouse v. Hopkins*,
  490 U.S. 228 (1989) ................................................................... 27, 28

*Quintana-Ruiz v. Hyundai Motor Corp.*,
  303 F.3d 62 (1st Cir. 2002) ........................................................ 59, 61

*Rosa v. Park W. Bank & Trust Co.*,
  214 F.3d 213 (1st Cir. 2000) ...........................................................27

*Ross-Whitney Corp. v. Smith Kline & French Labs.*,
  207 F.2d 190 (9th Cir. 1953) ...........................................................54

*Rubin v. Coors Brewing Co.*,
  514 U.S. 476 (1995) .........................................................................50

*Rumble v. Fairview Health Servs.*,
  No. 14-CV-2037 SRN/FLN, 2015 WL 1197415
  (D. Minn. Mar. 16, 2015) ........................................................... 25, 29

*Schroer v. Billington*,
  577 F. Supp. 2d 293 (D.D.C. 2008) ........................................... 26, 29

*Schwenk v. Hartford*,
  204 F.3d 1187 (9th Cir. 2000) .................................................... 27, 28

*Scott v. Family Dollar Stores, Inc.*,
  733 F.3d 105 (4th Cir. 2013) .............................................................1

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ................................................................... 38, 46

*Smith v. City of Salem*,
  378 F.3d 566 (6th Cir. 2004) ........................................................ 27, 28

*Snyder ex rel. R.P. v. Frankfort-Elberta Area Sch. Dist.*,
  No. 1:05-CV-824, 2006 WL 3613673 (W.D. Mich. Dec. 11, 2006) .................. 32

*The Real Truth About Obama, Inc. v. FEC*,
  607 F.3d 355 (4th Cir. 2010) ........................................................ 22

*Tuan Anh Nguyen v. INS*,
  533 U.S. 53 (2001) .................................................................. 48

*United States v. Atondo-Santos*,
  385 F.3d 1199 (9th Cir. 2004) ....................................................... 66

*United States v. Guglielmi*,
  929 F.2d 1001 (4th Cir. 1991) ....................................................... 66

*United States v. Robin*,
  553 F.2d 8 (2d Cir. 1977) ........................................................... 66

*United States v. Virginia*,
  518 U.S. 515 (1996) .............................................................. 46, 48, 52

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981) ................................................................. 54

*Wengler v. Druggists Mut. Ins. Co.*,
  446 U.S. 142 (1980) .............................................................. 49, 50

*Williams v. Curtiss-Wright Corp.*,
  681 F.2d 161 (3d Cir. 1982) ......................................................... 53

*Winter v. NRDC*,
  555 U.S. 7 (2008) ................................................................... 22

**Statutes**

20 U.S.C. § 1681(a) ............................................................... 25, 31

20 U.S.C. §1686 .................................................................... 31

28 U.S.C. § 2106 .................................................................. 18, 51

**Regulations**

28 C.F.R. § 54.400(b) ...............................................................25

34 C.F.R § 106.31(b)(2)............................................................25

34 C.F.R. § 106.33 ............................................................ passim

**Other Authorities**

11A Wright & Miller, *et al.*, Fed. Prac. & Proc. Civ. § 2949 (3d ed. 2015) .......3, 43

16 Wright & Miller, *et al.*, Fed. Prac. & Proc. Juris. § 3921.1 (3d ed. 2015) ...........1

Am. Psychiatric Ass'n, *Gender Dysphoria Fact Sheet* (2013),
    http://www.dsm5.org/documents/gender%20dysphoria
    %20fact%20sheet.pdf ....................................................5, 54

Am. Psychological Ass'n, *Guidelines for Psychological Practice with
    Transgender and Gender Nonconforming People*, App. A (Aug. 5 & 7,
    2015), http://www.apa.org/practice/guidelines/transgender.pdf ..........................4

Code of Conduct for U.S. Judges, Cannon 3(A)(3) & commentary ......................55

Fed. R. Evid. 702 advisory committee notes ..........................................48

Gloucester (Va.) County School Board, Press Release, *Gloucester School
    Board Prepares to Discuss, Likely Vote at Dec. 9 Meeting on
    Restroom/Locker Room Use for Transgender Students* (Dec. 3, 2014)
    ("Dec. 3 Press Release").................................................. 11, 39

Gloucester County School Board Video Tr.,
    Dec. 9, 2014, ("Dec. 9 Video Tr."), http://gloucester.granicus.com/
    MediaPlayer.php?view_id=10&clip_id=1090 .................................. 11, 12, 28, 41

Gloucester County School Board Video Tr.,
    Nov. 11, 2014 ("Nov. 11 Video Tr."), http://gloucester.granicus.com/
    MediaPlayer.php?view_id=10&clip_id=1065 .................................9, 10

M. Dru Levasseur, *Gender Identity Defines Sex: Updating the Law to Reflect
    Modern Medical Science Is Key to Transgender Rights*, 39 Vт. L. Rev. 943,
    (2015)...............................................................................4

Recorded Minutes of the Gloucester County School Board, Nov. 11, 2014
    ("Nov. 11 Minutes"),http://gets.gc.k12.va.us/Portals/Gloucester/District/docs/
    SBAgenda2014/Minutes2014/MIN-11-11-2014.pdf ......................................9, 10

Statement of Interest, *Tooley v. Van Buren Pub. Schs.*,
    No. 2:14-cv-13466 (E.D. Mich. Feb. 24, 2015),.......................................... 32, 33

# JURISDICTIONAL STATEMENT

This action arises under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*; the Equal Protection Clause of the United States Constitution; and 42 U.S.C. § 1983. JA 3. The district court had jurisdiction pursuant to Article III and 28 U.S.C. § 1331. *Id.*

On July 27, 2015, the court granted Defendant's motion to dismiss Plaintiff's Title IX claim. JA 6. On September 4, 2015, the court denied Plaintiff's motion for preliminary injunction, which sought relief based on both Title IX and the Fourteenth Amendment. JA 136. Plaintiff filed a Notice of Appeal on September 8, 2015. JA 7.

This Court has jurisdiction to review the preliminary-injunction denial pursuant to 28 U.S.C. § 1292(a)(1) and pendent appellate jurisdiction to review the dismissal of the Title IX claim, which is "inextricably intertwined" with that order and "necessary to ensure meaningful review." *Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 111 (4th Cir. 2013). *See Pathways, Inc. v. Dunne*, 329 F.3d 108, 113 (2d Cir. 2003); *Allegheny County Sanitary Auth. v. EPA*, 732 F.2d 1167, 1173 (3d Cir. 1984); 16 Wright & Miller, *et al.*, Fed. Prac. & Proc. Juris. § 3921.1 (3d ed. 2015) ("The question whether an action should be dismissed for failure to state a claim is one of the most common issues that may be reviewed on appeal from an interlocutory injunction order.").

## INTRODUCTION

Plaintiff G.G. is a 16-year-old transgender boy who has just begun his junior year at Gloucester High School. He is a boy and lives accordingly in all aspects of his life, but the sex assigned to him at birth was female. In accordance with the standards of care for treating Gender Dysphoria, he is undergoing hormone therapy; he has legally changed his name; and his state identification card identifies him as male. In every other context outside school, he uses the boys' restrooms, just like any other boy would.[1]

During his sophomore year, with the permission of school administrators, G. used the boys' restrooms at school for seven weeks without incident. After some parents complained, however, the Gloucester County School Board (the "Board") passed a new policy that singles out transgender students for different treatment than all other students. The policy prohibits G. from using the same restrooms as other boys and relegates him to single-stall, unisex restrooms that no other student is required to use.

G. alleges that the Board's policy of excluding transgender students from the restrooms used by all other students violates his rights under Title IX and the Fourteenth Amendment by stigmatizing transgender students, depriving them of

---

[1] Photographs of G. are filed under seal with the district court. Sealed Decl. of G.G. Ex. A, ECF No. 3-1.

2

physical access to school resources, jeopardizing their health, and impairing their ability to participate equally in the educational benefits and opportunities of school.  G. seeks a preliminary injunction to stop the ongoing irreparable harm he experiences each day he is subject to the Board's policy.

## STATEMENT OF ISSUES

1. Should G. be granted a preliminary injunction to allow him to resume using the boys' restrooms during the pendency of the case?

2. Should the court's dismissal of the Title IX claim be reversed?

3. Should the case be reassigned to a different district judge on remand pursuant to 28 U.S.C. § 2106?

## STATEMENT OF CASE[2]

Gender Dysphoria

"Gender identity" is a well-established medical concept, referring to one's sense of oneself as belonging to a particular gender.  JA 36.  All human beings have a gender identity.  *Id.*  It is an innate and immutable aspect of personality that is firmly established by age four, although individuals vary in the age at which they come to understand and express their gender identity.  *Id.*  Typically, people who

---

[2] This Statement of Case is derived from uncontested declarations filed by G. and Dr. Randi Ettner in support of the motion for preliminary injunction, which are "presumed true if it is not contradicted." 11A Wright & Miller, *et al.*, Fed. Prac. & Proc. Civ. § 2949 (3d ed. 2015).

3

are designated female at birth based on their external anatomy identify as girls or women, and people who are designated male at birth identify as boys or men. *Id.* For transgender individuals, however, the sense of one's self—one's gender identity—differs from the sex assigned to them at birth. *Id.*[3]

The medical diagnosis for that feeling of incongruence is Gender Dysphoria, a serious medical condition codified in the Diagnostic and Statistical Manual of Mental Disorders (DSM-V) and International Classification of Diseases-10. *Id.* The criteria for diagnosing Gender Dysphoria are set forth in the DSM-V (302.85). JA 37. Untreated Gender Dysphoria can result in significant clinical distress, debilitating depression, and suicidal thoughts and acts. *Id.*; *see De'lonta v. Johnson*, 708 F.3d 520, 525-26 (4th Cir. 2013) (recognizing treatment for Gender Dysphoria as serious medical need under Eighth Amendment). The World Professional Association for Transgender Health has established international

---

[3] Consistent with contemporary terminology, Plaintiff refers to "sex assigned at birth" instead of "biological sex." Because research indicates that gender identity is itself rooted in biology, the term "biological sex" does not accurately distinguish between gender identity and sex assigned at birth. *See* M. Dru Levasseur, *Gender Identity Defines Sex: Updating the Law to Reflect Modern Medical Science Is Key to Transgender Rights*, 39 VT. L. REV. 943, 944 (2015) (summarizing research). The district court made a point of using the term "biological sex," citing to the American Psychological Association's use of that term in guidelines from 2011. JA 59, 149 n.12. The APA, however, replaced the 2011 guidelines with new guidelines adopted in August 2015, which no longer use that terminology. *See* Am. Psychological Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, App. A (Aug. 5 & 7, 2015), http://www.apa.org/practice/guidelines/transgender.pdf.

Standards of Care for treating people with Gender Dysphoria (the "WPATH Standards"). JA 37. Leading medical and mental health organizations, including the American Medical Association, the Endocrine Society, and the American Psychological Association, have endorsed the WPATH Standards as the authoritative standards of care. *Id.*; *see De'lonta*, 708 F.3d at 522-23.

Under the WPATH Standards, treatment for Gender Dysphoria is designed to help transgender individuals live congruently with their gender identity and eliminate clinically significant distress. JA 38. Attempting to change a person's gender identity to match the person's sex assigned at birth is ineffective and harmful to the patient. *Id.* "It is important to note that gender nonconformity is not in itself a mental disorder. The critical element of gender dysphoria is the presence of clinically significant distress associated with the condition." Am. Psychiatric Ass'n, *Gender Dysphoria Fact Sheet* 1 (2013), http://www.dsm5.org/documents/gender%20dysphoria%20fact%20sheet.pdf.

Under the WPATH Standards, social role transition—living one's life fully in accordance with one's gender identity—is a critical component of treatment for Gender Dysphoria. JA 38. For a transgender male, that typically includes dressing and grooming as a male, adopting a male name, and presenting oneself to the community as a boy or man. *Id.* The social transition takes place at home, at work or school, and in the broader community. *Id.* If any aspect of social role transition

5

is impeded, it undermines a person's entire transition. *Id.* Negating a person's gender identity poses serious health risks, including depression, post-traumatic stress disorder, hypertension, and self-harm. JA 40.

<u>G.'s Gender Dysphoria</u>

At a very young age, G. was aware that he did not feel like a girl. JA 28. By approximately age twelve, G. acknowledged his male gender identity to himself and to close friends. JA 29. By ninth grade, most of G.'s friends knew his gender identity, and they treated him as male when socializing away from home and school. *Id.*

G.'s untreated Gender Dysphoria, and the stress of concealing his gender identity from his family, caused him to experience severe depression and anxiety. *Id.* G.'s mental distress was so severe that he could not attend school in 2014 during the spring semester of his freshman year. *Id.* Instead, he took classes through a home-bound program that follows the public high school curriculum. *Id.*

In April 2014, G. told his parents that he is transgender. *Id.* At his request, he began seeing a psychologist with experience working with transgender youth. *Id.* G.'s psychologist diagnosed G. with Gender Dysphoria and, consistent with the WPATH Standards, recommended that he begin living in accordance with his male gender identity in all aspects of his life. *Id.* G.'s psychologist also provided G. with a "Treatment Documentation Letter" confirming he was receiving

6

treatment for Gender Dysphoria and, as part of that treatment, should be treated as a boy in all respects, including with respect to his use of the restroom. *Id.* G. uses the boys' restrooms in public venues such as restaurants, libraries, and shopping centers. JA 30.

In July 2014, G. successfully petitioned the Circuit Court of Gloucester County to change his legal name to G. JA 29. G. now uses that name for all purposes, and his friends and family refer to him using male pronouns. *Id.*

Also consistent with the WPATH Standards, G.'s psychologist recommended that he see an endocrinologist to begin hormone treatment. *Id.* G. has received hormone treatment since late December 2014. JA 30. Among other therapeutic benefits, the hormone treatment has deepened G.'s voice, increased his growth of facial hair, and given him a more masculine appearance. *Id.*

In June 2015, the Virginia Department of Motor Vehicles approved G.'s request for the sex designation "M" for male to appear on his driver's license or identification card. JA 60.

## School Response

In August 2014, before beginning his sophomore year, G. and his mother informed officials at Gloucester High School that G. is a transgender boy and that he had legally changed his name to G. JA 30. G. and his mother also met with the school principal and guidance counselor to explain that G. is a transgender boy and

that, consistent with his medically supervised treatment, he would be attending school as a male student.  *Id.*

G. initially agreed to use a separate restroom in the nurse's office because he was unsure how other students would react to his transition.  *Id.*  When the 2014-15 school year began, however, G. was pleased to discover that his teachers and the vast majority of his peers respected the fact that he is a boy and treated him accordingly.  JA 30-31.  G. found the separate restroom stigmatizing and inconvenient, so he asked the principal permission to use the boys' restrooms.  JA 31.  On or about October 20, 2014, the principal agreed that G. could use the boys' restrooms.  *Id.*  For approximately the next seven weeks, G. used the boys' restrooms without incident.  *Id.* [4]

Nevertheless, some adults in the community were angered when they learned that a transgender boy was attending the school and using the boys' restroom.  JA 57-58.  Those adults contacted members of the Board to demand that the transgender student be barred from using the boys' restrooms.  *Id.*

Shortly before the Board's meeting on November 11, 2014, Board member Hooks added the following policy for discussion on the agenda:

---

[4] G. was permitted to continue the home-bound program for his physical education requirement.  JA 30.

8

> Whereas the GCPS recognizes that some students question their gender identities, and
>
> Whereas the GCPS encourages such students to seek support, advice, and guidance from parents, professionals and other trusted adults, and
>
> Whereas the GCPS seeks to provide a safe learning environment for all students and to protect the privacy of all students, therefore
>
> It shall be the practice of the GCPS to provide male and female restroom and locker room facilities in its schools, and the use of said facilities shall be limited to the corresponding biological genders, and students with gender identity issues shall be provided an alternative appropriate private facility.

Gloucester County School Board Minutes, Nov. 11, 2014 ("Nov. 11 Minutes") at 4, http://gets.gc.k12.va.us/Portals/Gloucester/District/docs/SBAgenda2014/ Minutes2014/MIN-11-11-2014.pdf.

G. and his parents attended the meeting to speak against the policy. JA 31. Doing so required G. to identify himself to the entire community, including local press covering the meeting, as the student whose restroom use was at issue. *Id.* "All I want to do is be a normal child and use the restroom in peace," G. said. *See* Gloucester County School Board Video Tr., Nov. 11, 2014 ("Nov. 11 Video Tr."), at 25:47, http://gloucester.granicus.com/MediaPlayer.php?view_id=10&clip_id =1065. "I did not ask to be this way, and it's one of the most difficult things anyone can face." *Id.* 26:14. "This could be your child . . . . I'm just a human. I'm just a boy." *Id.* 27:02.

Most speakers at the meeting urged the Board to prohibit G. from using the restrooms that other boys use. *See* Nov. 11 Minutes at 3. Speakers voiced many stereotypes and misperceptions about transgender people and expressed fears that equal treatment for transgender students would lead to dire consequences. Some speakers pointedly referred to G. as a "young lady" to negate his gender identity. Nov. 11 Video Tr. 14:55; 18:07; 20:36; 1:06:48. One speaker claimed that permitting transgender students to use the same restrooms as others would lead to teenage pregnancies and sexually transmitted infections. *Id.* 34:40. Another cited the Bible and complained about "morality creep." *Id.* 53:35. And another said G.'s use of the boys' restrooms would lead to boys wearing dresses to school and demanding to use the girls' restroom for improper purposes. *Id.* 20:55.

The Board deferred voting on the policy until its meeting on December 9, 2014. *See* Nov. 11 Minutes at 4.

On December 3, 2014, the Board announced in a press release that, regardless of whether it adopted Board member Hook's policy at the upcoming meeting, the Board intended to increase privacy in student restrooms by "adding or expanding partitions between urinals in male restrooms," "adding privacy strips to the doors of stalls in all restrooms," and "designat[ing] single-stall, unisex restrooms . . . to give all students the option for even greater privacy." *See* Gloucester County School Board Press Release, Dec. 3, 2014 ("Dec. 3 Press

10

Release") at 2, http://gets.gc.k12.va.us/Portals/Gloucester/District/docs/SB/
GlouSBPressRelease120314.pdf.  Three new unisex, single-stall restrooms have
since been installed at Gloucester High School.  JA 32.  The school raised the
doors and walls around the restroom stalls and installed partitions between urinals
in the boys' restrooms, ensuring greater privacy for all students.  *Id.*

At the Board's December 9, 2014, meeting, most speakers again opposed
permitting transgender students to use the same restrooms as other students.  *See*
Gloucester County School Board Minutes, Dec. 9, 2014 ("Dec. 9 Minutes") at 3,
http://gets.gc.k12.va.us/Portals/Gloucester/District/docs/SBAgenda2014/Minutes2
014/MIN-12-09-2014.pdf.  Several speakers threatened to vote Board members out
of office if they did not require transgender students to use separate restrooms.
Gloucester County School Board Video Tr., Dec. 9, 2014, ("Dec. 9 Video Tr.")
42:34; 50:53; 59:34; 1:17:56, http://gloucester.granicus.com/MediaPlayer.
php?view_id=10&clip_id=1090.  Some speakers said allowing transgender boys to
use the boys' restroom would make the restrooms "coed."  *Id.* 39:23; 41:11.
Speakers again referred to G. as a "girl" or "young lady."  *Id.* 38:00; 1:17:40.  One
speaker who described herself as a "former lesbian" said "we have forgotten than
God created a man and a woman" and complained that prayers have been removed
from schools.  *Id.* 1:19:48.  Another called G. a "freak" and compared him to a

person who thinks he is a dog and wants to urinate on fire hydrants. *Id.* 1:22:55; 1:23:19.

The Board voted 6-1 to pass the policy prohibiting transgender students from using the same restrooms as other students. Dec. 9 Minutes at 4. According to Board member Hooks, the policy was *not* based on concerns that G.'s use of the restrooms would disrupt the learning environment, Dec. 9 Video Tr. 1:48:37, and was designed solely to protect students' privacy, *id.* 1:49:52. The dissenting Board member warned that the policy conflicted with guidance and consent agreements by the Department of Justice and U.S. Department of Education's Office of Civil Rights ("OCR"). *Id.* 2:07:02. But a Board member supporting the policy said "[w]e can't be fearful of the ACLU, the OCR, or the DOJ." *Id.* 1:58:26.

Aftermath

The public, community-wide debate about which restrooms he should use has been humiliating for G., who feels that he has been turned into "a public spectacle" in front of the entire community "like a walking freak show." JA 31.

The day after the Board adopted the new policy, the principal told G. he could no longer use the same restrooms as other boys. JA 32. G. must now use separate, private facilities instead of using the same restrooms as other students. The Board has asserted that G. may use the girls' restroom, but that is not a realistic possibility for G. or other boys who are transgender. Even before G.

12

transitioned, other students objected to his presence in the girls' restroom because they perceived him to be a boy. *Id.* Using the girls' restroom would be no more appropriate for G. than for any other boy. Forcing him to do so would also conflict with his medically necessary treatment for Gender Dysphoria. *Id.*

G. refuses to use the separate, single-stall restrooms because they are even more stigmatizing and isolating than the restroom in the nurse's office. *Id.* No other students actually use these restrooms, and only one of the restrooms is located anywhere near the restrooms used by everybody else. *Id.* Adding to the stigma, everyone knows the restrooms were installed specifically for G. so that other boys would not have to share the same restroom with him. *Id.* The separate restrooms physically and symbolically mark G. as "other," isolate G. from the rest of his peers, and brand him as unfit to share the same restrooms as other students. *Id.* Every time G. has to use the restrooms at school, other students are visibly reminded that the school considers him to be different than other students, making him feel alienated and humiliated. JA 32-33.

To escape such stigma and humiliation, G. tries to avoid using the restroom entirely while at school, and, if that is not possible, he uses the nurse's restroom. JA 32. Using the nurse's restroom still makes him feel embarrassed and humiliated, which increases his dysphoria, anxiety, and distress. JA 32-33. G. feels embarrassed that everyone who sees him enter the nurse's office knows he is

13

there because he has been prohibited from using the same boys' restrooms that the other boys use. JA 33. To avoid using the restroom, G. limits the amount of liquids he drinks and tries to "hold it" when he needs to urinate during the school day. JA 32-33. As a result, G. has repeatedly developed painful urinary tract infections and has felt distracted and uncomfortable in class. *Id.*

Dr. Randi Ettner—a psychologist and nationally recognized expert in the treatment of Gender Dysphoria in children and adolescents—recently conducted an independent clinical assessment of G. and concluded that "excluding G.G. from the communal restroom used by other boys and effectively banishing him to separate single-stall restroom facilities is currently causing emotional distress to an extremely vulnerable youth and placing G. at risk for accruing lifelong psychological harm." JA 41. Dr. Ettner determined that G. has Gender Dysphoria and that medically necessary treatment for G. includes testosterone therapy and social transition in all aspects of his life—including the use of the boys' restrooms. JA 42.

Dr. Ettner explained that ages 15-16 are particularly vulnerable years for teenagers, when nothing is more important than fitting in with one's peers. JA 39-40. That vulnerability is even greater for transgender teenagers who, because of Gender Dysphoria, already feel different and must take additional steps to fit in with their peers. JA 40. As a result of those challenges, transgender

14

students are at far greater risk for severe health consequences—including suicide—than other students, and more than 50 percent of transgender youth will have attempted suicide at least once by age 20. *Id.* Stigma also causes many transgender youth to experience academic difficulties and to drop out of school. JA 41. Transgender students' stress and victimization at school are associated with a greater risk for post-traumatic stress disorder, depression, life dissatisfaction, anxiety, and suicidality in adulthood. *Id.*

Dr. Ettner concluded that the stigma G. experiences every time he needs to use the restroom "is a devastating blow to G. and places him at extreme risk for immediate and long-term psychological harm." JA 42.

Procedural History

G. originally filed the Complaint and Motion for Preliminary Injunction on June 11, 2015, the day after the end of the 2014-15 school year, with the goal of obtaining a preliminary injunction before September 10, 2015, the first day of the 2015-16 school year. JA 25. On June 29, 2015, the United States filed a Statement of Interest in support of G.'s Motion for Preliminary Injunction based on Title IX. JA 4. On July 7, 2015, Defendant filed an opposition to the Motion for Preliminary Injunction and a Motion to Dismiss the Complaint for Failure to State a Claim. JA 5.

Senior Judge Doumar heard argument on both motions on July 27, 2015. JA 6. At the hearing, the court dismissed G.'s Title IX claim from the bench midway through oral argument based on the written filings. JA 114-16. The court did not permit argument regarding Title IX from Plaintiff's counsel or the Department of Justice. JA 114-16, 126-28.[5]

On September 4, 2015—a few days before school began—the court denied G.'s Motion for Preliminary Injunction. JA 137. After G. filed a notice of appeal, the court issued a memorandum opinion on September 17, 2015. JA 139.

## SUMMARY OF ARGUMENT

This case is not about whether schools may provide separate restrooms for male and female students. It is about how to provide transgender students with equal, non-discriminatory access to those existing restrooms, as Title IX and the Fourteenth Amendment require. A preliminary injunction is necessary to stop the ongoing irreparable harm the Board has inflicted on G. by preventing him from using the same restrooms as other students and relegating him to separate, single-stall facilities.

---

[5] Instead of allowing the DOJ attorney to address Title IX, the court spent several minutes criticizing DOJ's legal positions on unrelated issues, including the killing of enemy combatants, enforcement of marijuana laws, and "sanctuary cities." JA 124-28.

16

G. has established a likelihood of success on his Title IX claim.[6]  Title IX's prohibition on discrimination "on the basis of sex" protects transgender students from discrimination based on their transgender status or gender nonconformity. Discrimination against transgender people is necessarily discrimination based on sex because it is impossible to treat people differently based on their transgender status without taking their sex into account.  Requiring transgender students to use separate restrooms from other students violates Title IX by stigmatizing transgender students, depriving them of physical access to school resources, jeopardizing their health, and impairing their ability to participate equally in the educational benefits and opportunities of school.

Allowing G. to use the boys' restroom is fully consistent with 34 C.F.R. § 106.33, which authorizes schools to provide separate restrooms based on "sex," but does not address how to provide restrooms to transgender students whose gender identity are not congruent with the sex assigned to them at birth.  In an opinion letter, OCR has addressed that question directly and determined that the authorization to provide separate restrooms for boys and girls under 34 C.F.R. § 106.33 does not authorize schools to exclude transgender students from using the restrooms consistent with their gender identity.  JA 54-56.  OCR's interpretation of its own regulations, which is entitled to "controlling" deference under *Auer v.*

---

[6] *A fortiorari*, the dismissal of the Title IX claim should be reversed.

*Robbins*, 519 U.S. 452 (1997), is consistent with the plain text of the regulation and Title IX's guarantee of equal access to educational opportunities for all students regardless of sex.

G. has also established a likelihood of success on his Equal Protection claim. For the same reasons that excluding G. from using the same restrooms as other students violates Title IX, it also discriminates based on gender and requires heightened scrutiny under the Fourteenth Amendment. The Board has not carried its burden under heightened scrutiny to show that forcing G. to use separate restrooms substantially advances an interest in privacy or any other important governmental interest. Shortly before passing the new policy, the Board identified gender-neutral measures that address the privacy of all students equally. All students—whether transgender or not—should have the option to use the single-stall restrooms to enhance *their own* privacy. But the Board cannot stigmatize transgender students by requiring them to use separate restroom facilities to address the alleged discomfort of others.

Because G. is likely to prevail on the merits, the remaining preliminary injunction factors necessarily weigh in his favor. In evaluating those factors, the court abused its discretion and clearly erred by categorically refusing to consider the undisputed evidence in the declarations submitted by G. and Dr. Ettner.

Without the court's arbitrary and erroneous exclusions, the uncontested evidence submitted by G. easily satisfies the remaining preliminary injunction factors.

Finally, in light of Judge Doumar's statements at the motions hearing, Plaintiff respectfully submits that reassignment to a different judge on remand, pursuant to 28 U.S.C. § 2106, would "be just under the circumstances."

## ARGUMENT

### I.   Preliminary Injunction Standard.

This Court "evaluate[s] the court's decision to deny a preliminary injunction for an abuse of discretion, reviewing the court's factual findings for clear error and its legal conclusions de novo.  A court abuses its discretion when it misapprehends or misapplies the applicable law." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 1735 (2015) (internal quotation marks omitted; alterations incorporated).

To obtain a preliminary injunction, "[p]laintiffs must demonstrate that (1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public interest." *Id.* at 236 (citing *Winter v. NRDC*, 555 U.S. 7, 20 (2008)).  "While plaintiffs seeking preliminary injunctions must demonstrate

that they are likely to succeed on the merits, they need not show a certainty of success." *Id.* at 247 (internal quotation marks omitted).[7]

## II.    G. Has Established a Likelihood of Success on His Title IX Claim.

### A. Excluding Transgender Students from Using the Same Restrooms as Other Students Discriminates Against G. on the Basis of Sex.

G. is a boy and lives accordingly in all aspects of his life. He is undergoing hormone therapy; he has legally changed his name; and his state identification card identifies him as male. In every other context outside school, he uses the boys' restrooms, just like any other boy would. At school, however, the Board has singled him out for different treatment than everyone else. Most non-transgender boys would feel humiliated if they were publicly labeled as different and forced to use a separate restroom from all the other boys. G. feels that way too.

As the district court recognized, "[t]he School Board Resolution expressly differentiates between students who have a gender identity congruent with their birth sex and those who do not." JA 146. The purpose, design, and effect of the policy—which states that students with "gender identity issues" will go to "an

---

[7] Circuit precedent interpreting *Winter* precludes this panel from applying a more flexible standard. *See The Real Truth About Obama, Inc. v. FEC*, 607 F.3d 355 (4th Cir. 2010) (per curiam). To preserve the issue for further review, however, Plaintiff notes that other circuits have disagreed with this Court's precedent. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1133-35 (9th Cir. 2011); *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 n.9 (2d Cir. 2010); *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009).

alternative appropriate private facility," JA 142—is to single out transgender students and exclude them from the restrooms used by all the other students. The policy isolates G. from the rest of his peers, both literally and figuratively, and brands students with "gender identity issues" as unfit to share restrooms with other students.

By singling out G. for different and unequal treatment because he is transgender, the Board has discriminated against him based on sex, in violation of Title IX.[8] This Court has not addressed whether discrimination against transgender individuals constitutes discrimination based on sex. *See Lewis v. High Point Reg'l Health Sys.*, 79 F. Supp. 3d 588, 589 (E.D.N.C. 2015). Within this Circuit, however, two district courts have already held that discrimination against transgender people is sex discrimination, *see id.* at 589-90; *Finkle v. Howard County*, 12 F. Supp. 3d 780, 788 (D. Md. 2014), and another two have issued rulings where the defendant conceded that Title VII applied, *see Muir v. Applied Integrated Tech., Inc.*, No. 13-0808, 2013 WL 6200178, at *10 (D. Md. Nov. 26, 2013); *Hart v. Lew*, 973 F. Supp. 2d 561, 581 (D. Md. 2013).

---

[8] Federal courts—including this Court and the Supreme Court—routinely look to Title VII case law in construing Title IX. *See Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007); *Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 75 (1992).

Discrimination based on transgender status is discrimination based on sex under Title IX and other federal civil rights statutes because an individual's "transgender status is necessarily part of his 'sex' or 'gender' identity." *Rumble v. Fairview Health Servs.*, No. 14-CV-2037 SRN/FLN, 2015 WL 1197415, at *2 (D. Minn. Mar. 16, 2015). By definition, transgender individuals are people whose gender identity is not congruent with the sex assigned to them at birth. Accordingly, when an official "discriminates against someone because the person is transgender," the official necessarily "has engaged in disparate treatment related to the sex of the victim." *Mia Macy*, EEOC DOC 0120120821, 2012 WL 1435995, at *7 (Apr. 20, 2012) (internal quotation marks omitted). Just as it is impossible to discriminate against a person for being a religious convert without discriminating based on religion, it is impossible to treat people differently based on their transgender status without treating them differently based on sex. *See Schroer v. Billington*, 577 F. Supp. 2d 293, 306-07 (D.D.C. 2008); *see also City of L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702, 711 (1978) (the "simple test" for determining whether sex discrimination has occurred is whether an individual was treated "in a manner which but for that person's sex would be different") (internal quotation marks omitted).

In addition, discrimination based on a person's transgender status also inherently involves impermissible discrimination based on a person's gender

nonconformity.  Under Title IX and other federal civil rights statutes, discrimination "on the basis of sex" includes discrimination for "failing to act and appear according to expectations defined by gender." *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011); *accord Barnes v. City of Cincinnati*, 401 F.3d 729, 737 (6th Cir. 2005); *Smith v. City of Salem*, 378 F.3d 566, 573 (6th Cir. 2004); *Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213, 215-16 (1st Cir. 2000); *Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000).  For example, in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), the Supreme Court ruled that an employer discriminated on the basis of "sex" when it denied promotion to an employee based, in part, on her failure to conform to stereotypes about how women should behave.  The employee was advised that if she wanted to advance in her career she should be less "macho" and learn to "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." *Id.* at 235.  In ruling for the plaintiff, *Price Waterhouse* confirmed "that Title VII barred not just discrimination based on the fact that [the employee] was a woman, but also discrimination based on the fact that she failed 'to act like a woman.'" *Schwenk*, 204 F.3d at 1201.  *Price Waterhouse* thus "eviscerated" the reasoning of some lower court decisions that attempted to narrow Title VII by drawing a distinction between discrimination based on sex and discrimination

23

based on gendered behavior. *Smith*, 378 F.3d at 573; *accord Glenn*, 663 F.3d at 1317-18; *Schwenk*, 204 F.3d at 1202.

Under *Price Waterhouse*, it does not matter whether a plaintiff is perceived "to be an insufficiently masculine man, an insufficiently feminine woman, or an inherently gender-nonconforming transsexual." *Schroer*, 577 F. Supp. 2d at 305. Transgender individuals are people who not conform to the general assumption that a person's gender identity will correspond to the sex assigned to that person at birth. Thus, "it would seem that any discrimination against transsexuals (as transsexuals)—individuals who, by definition, do not conform to gender stereotypes—is . . . discrimination on the basis of sex as interpreted by *Price Waterhouse*." *Finkle*, 12 F. Supp. 3d at 788; *see Rumble*, 2015 WL 1197415, at *2 ("Because the term 'transgender' describes people whose gender expression differs from their assigned sex at birth, discrimination based on an individual's transgender status constitutes discrimination based on gender stereotyping."). There is inherently "a congruence between discriminating against transgender and transsexual individuals and discrimination on the basis of gender-based behavioral norms." *Glenn*, 663 F.3d at 1316.

The *Price Waterhouse* line of cases confirms what is already evident from the text of Title IX. "[I]ntentional discrimination against a transgender individual because that person is transgender is, by definition, discrimination based on sex."

*Macy*, 2012 WL 1435995, at *11 (internal quotation marks omitted; alterations incorporated).  By treating G. differently than every other boy because of the sex assigned to him at birth, the Board is treating him differently based on "sex" under Title IX.

### B. Excluding G. from Using the Same Restrooms as Other Students Deprives Him of Equal Access to Educational Opportunity.

"[W]hatever else [Title IX] prohibits, students must not be denied access to educational benefits and opportunities on the basis of gender."  *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).  Under Title IX, "[s]tudents are not only protected from discrimination, but also specifically shielded from being 'excluded from participation in' or 'denied the benefits of' any 'education program or activity receiving Federal financial assistance.'"  *Id.* (quoting 20 U.S.C. § 1681(a)).  The implementing regulations further prohibit recipients from using a student's sex as a basis for "[p]rovid[ing] different aid, benefits, or services or provid[ing] aid, benefits, or services in a different manner," or "[s]ubject[ing] any person to separate or different rules of behavior, sanctions, or other treatment."  34 C.F.R § 106.31(b)(2); 28 C.F.R. §§ 54.400(b)(2), 54.400(b)(4).  By expelling G. from the restrooms used by other students, the Board has deprived him and other transgender students of equal educational opportunities that Title IX protects.

25

At the most basic level, Title IX protects students from "physical deprivation of access to school resources" based on gender. *Davis*, 526 U.S. at 650. The Board has physically deprived G. and other transgender students of equal access to school resources by excluding them from the same restrooms used by everyone else. *See Lusardi v. McHugh*, EEOC DOC 0120133395, 2015 WL 1607756, at *8 (Apr. 1, 2015) (excluding transgender woman from restrooms used by other women deprived her of a basic term and condition of employment); *Kastl v. Maricopa Cty. Cmty. Coll. Dist.*, No. CIV.02-1531PHX-SRB, 2004 WL 2008954, at *2 (D. Ariz. June 3, 2004) ("[N]either a woman with male genitalia nor a man with stereotypically female anatomy, such as breasts, may be deprived of a benefit or privilege of employment by reason of that nonconforming trait. Application of this rule may not be avoided merely because restroom availability is the benefit at issue."); *cf. Snyder ex rel. R.P. v. Frankfort-Elberta Area Sch. Dist.*, No. 1:05-CV-824, 2006 WL 3613673, at *1 (W.D. Mich. Dec. 11, 2006) (requiring black elementary school student to use separate restroom in response to harassment from other students deprived her of "equal access to restroom facilities" in violation of the Equal Education Opportunity Act).

Moreover, as explained in the United States' Statement of Interest, excluding transgender students from the same restrooms as their peers impairs their educational opportunities more broadly. Statement of Interest at 13-16, ECF No.

26

28.  Just as Title VII "is aimed at affording equal opportunity for workers to thrive in the marketplace based on their abilities and without respect to gender identity," Title IX "aims for equal educational opportunity."  *Carmichael v. Galbraith*, 574 F. App'x 286, 294 (5th Cir. 2014) (Dennis, J., concurring).  At work and at school, equal opportunity to thrive requires equal access to restrooms.  As the Occupational Safety & Health Administration has recognized, the ability to access the restroom—and the ability of transgender people to access a restroom consistent with their gender identity—is necessary to ensure a "safe and healthy working environment."  OSHA: A Guide to Restroom Access for Transgender Workers ("OSHA Transgender Restroom Guide") 1, https://www.osha.gov/Publications/ OSHA3795.pdf.  Anxiety regarding the use of restrooms frequently causes transgender students to avoid using the restroom during the school day, which interferes with their ability to focus on learning and leads to urinary tract infections, constipation, and other health risks.  JA 39.  For example, the dysphoria and anxiety caused by having to use separate restrooms from everyone else has driven G. to hold his urine during the day, which has already resulted in several painful urinary tract infections.  JA 32-33.

Singling out G. for different treatment than all the other boys also interferes with his medically necessary treatment for Gender Dysphoria.  As Dr. Ettner explained, when authority figures deny transgender students access to the restroom

27

consistent with their gender identity, they shame those students—negating the legitimacy of their identity and posing health risks, including depression, post-traumatic stress disorder, and self-harm. JA 41. The harm caused to transgender students' physical and psychological wellbeing necessarily interferes with their ability to thrive at school. For example, the depression and anxiety G. previously experienced as a result of concealing his gender identity at school and from his parents was so great that G. could not attend school during the spring of his freshman year. JA 29. *Cf. Doe v. Reg'l Sch. Unit 26*, 86 A.3d 600, 607 (Me. 2014) (evidence "established that a student's psychological well-being and educational success depend[ed] upon being permitted to use the communal bathroom consistent with her gender identity").

Excluding G. from the same restrooms used by all other students further denies G. equal educational opportunity by publicly shaming him and physically isolating him from the rest of his peers. The policy is an official school decree marking G. and other transgender students as unequal based on other students' supposed disapproval or discomfort with them. It sends a message to G. and the entire school community that G. is not a "real" boy and should not be treated as such. *See Lusardi*, 2015 WL 1607756, at *10 ("The decision to restrict [transgender employee] to a 'single shot' restroom isolated and segregated her from other persons of her gender. It perpetuated the sense that she was not worthy

of equal treatment and respect.").  The intention and effect of the transgender policy were crystallized in the words of one of its supporters:  "[W]e have a thousand students versus one freak."  Dec. 9 Video Tr. 1:22:53.

This stigma has real consequences for G. and other transgender students. Transgender students are at far greater risk for severe health consequences— including suicide—than the rest of the student population, and more than 50 percent of transgender youth will have had at least one suicide attempt by age 20. JA 40.  The stress and victimization transgender students experience at school is associated with a greater risk for post-traumatic stress disorder, depression, anxiety, and suicidality in adulthood.  JA 41.

The district court failed to appreciate the stigma imposed on G. because it assessed the Board's policy from the wrong vantage point.  At the hearing, the judge reasoned that the separate, single-stall restrooms at Gloucester High School are not stigmatizing for G. by analogizing them to unisex restrooms the judge uses at Norfolk street fairs or at a golf course.  JA 96.  In those situations, however, the single-stall restrooms are the only restrooms available for *anyone*.  The stigma comes from the unequal treatment, not from using a single-stall restroom in the abstract.  Other students at Gloucester High School have the option to use a separate restroom for *their own* privacy, but only G. is forced to use a separate restroom because other students (or their parents) might object to his "mere

29

presence" in the restrooms with them.  JA 162.  Moreover, the uncontested evidence shows that single-stall, unisex restrooms are *not* used by the rest of the students, and only one of the restrooms is located near the restrooms used by everybody else.  JA 32.

In assessing the discriminatory nature of the exclusion, the court was required to view the transgender restroom policy from "the perspective of a reasonable person in *the plaintiff's* position, considering 'all the circumstances,'" which "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target."  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998) (emphasis added).  The purpose and effect of the transgender restroom policy is to segregate G. from other students, which visibly stigmatizes him as different every time he uses the restroom.  Title IX requires courts to take such social realities into account.  *Compare Plessy v. Ferguson*, 163 U.S. 537, 551 (1896) (assumption that racial segregation "stamps the colored race with a badge of inferiority" exists "solely because the colored race chooses to put that construction upon it"), *with Brown v. Bd. of Educ.*, 347 U.S. 483, 494 (1954) (recognizing that racial segregation of students "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone").

## C. OCR's Interpretation of 34 C.F.R. § 106.33 Is Entitled to Controlling Deference Under *Auer*.

The court dismissed G.'s Title IX claim midway through oral argument because it believed that 34 C.F.R. § 106.33, which authorizes schools to provide "separate toilet . . . facilities on the basis of sex," allows the Board to exclude transgender students from the same restrooms used by everyone else. In doing so, the court misconstrued the plain text of the regulation and failed to give proper deference to OCR's interpretation under *Auer v. Robbins*, 519 U.S. 452 (1997). Moreover, even under the less deferential standard of *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), OCR's interpretation would still have the power to persuade because it harmonizes the regulation with the statutory goal of providing equal access to educational opportunities. This case is not about whether schools may provide separate restrooms for male and female students. It is about how to provide transgender students with equal, non-discriminatory access to those existing restrooms, as Title IX requires.

"Title IX is a broadly written general prohibition on discrimination, followed by specific, narrow exceptions to that broad prohibition." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005). The statute contains exceptions for activities such as boy scouts and girl scouts, 20 U.S.C. § 1681(a)(6)(B); father-daughter dances, *id.* §1681(a)(8); scholarships for beauty pageants, *id.* §1681(a)(9); and separate living facilities, *id.* §1686. But the statute creates no exemptions for

31

school restrooms. Accordingly, in interpreting 34 C.F.R. § 106.33, the question is not whether the regulation *prohibits* schools from excluding transgender students from the same restrooms as their peers, but whether it *authorizes* them to do so. *Cf. Mercer v. Duke Univ.*, 190 F.3d 643, 646 (4th Cir. 1999) (without special regulation regarding contact sports, plain text of Title IX and implementing regulations "would require covered institutions to integrate all of their sports teams").[9]

OCR has authoritatively construed 34 C.F.R. § 106.33 in an opinion letter and determined that the exception allowing schools to assign restrooms based on sex does not also authorize schools to exclude transgender students from equal access to those restrooms. According to OCR, "when a school elects to treat students differently on the basis of sex" for purposes of 34 C.F.R. § 106.33, the school must still "treat transgender students consistent with their gender identity." JA 54-56. That interpretation is consistent with OCR's previous guidance and enforcement actions. JA 55. It is consistent with the legal position the Department of Education has taken in other cases. *See* Statement of Interest, *Tooley v. Van Buren Pub. Schs.*, No. 2:14-cv-13466 (E.D. Mich. Feb. 24, 2015),

---

[9] The court mistakenly assumed that 34 C.F.R. § 106.33 implements the statutory exception for separate living facilities under 20 U.S.C. § 1686. JA 149-50. The exception for housing facilities is implemented by a different regulation, 34 C.F.R. § 106.32.

http://www.justice.gov/crt/about/edu/documents/tooleysoi.pdf. And it is also consistent with the practice of other federal agencies, including the EEOC, the Office of Personnel Management, and the Department of Labor, which have all held that excluding transgender individuals from restrooms corresponding to their gender identity impermissibly discriminates against those individuals based on "sex." *Lusardi*, 2015 WL 1607756, at *8; Statement of Interest at 15-16, ECF No. 28.

An OCR opinion letter interpreting Title IX regulations is entitled to deference under *Auer*, and is "controlling unless it is plainly erroneous or inconsistent with the regulation." *D.L. ex rel. K.L. v. Balt. Bd. of Sch. Comm'rs*, 706 F.3d 256, 259-60 (4th Cir. 2013) (internal quotation marks omitted). "This kind of review is highly deferential" and "'[t]he reviewing court does not have much leeway.'" *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 193 (4th Cir. 2009) (quoting *Kentuckians for the Commonwealth v. Rivenburgh*, 317 F.3d 425, 439 (4th Cir. 2003)). *Auer* deference applies even when an agency interprets a regulation through informal mechanisms such as opinion letters from OCR. *D.L.*, 706 F.3d at 259-60. *Auer* deference also extends to the Statement of Interest filed in the district court. *See Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 209 (2011) (*Auer* deference applies to agency amicus brief); *New Cingular Wireless PCS, LLC v. Finley*, 674 F.3d 225, 236 n.7 (4th Cir. 2012) (same).

33

Despite this highly deferential standard of review, the court disregarded

OCR's interpretation because, in the court's view, the authorization to assign

restrooms based on "sex" necessarily authorizes schools to exclude transgender

students from those restrooms based on the sex that was assigned to them at birth,

as opposed to their gender identity. JA 150, 152-53. According to the court,

because "sex" has been interpreted to include *both* discrimination based on the sex

assigned to a person at birth *and* discrimination on the basis of gender identity, the

regulation unambiguously authorizes schools to decide for themselves whether to

use the sex assigned to a person at birth or gender identity as the criteria for

assigning restrooms to transgender students. *Id*.

That analysis turns *Auer* deference on its head. To overcome *Auer*

deference, it is not enough for a party to show that its interpretation of the

regulation is rational. It must show that its interpretation is the *only* rational

interpretation. *Cf. IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 295 (4th Cir. 2007)

(party's interpretation was reasonable but could not overcome *Auer* deference

because language did not "compel[] this reading"). Under *Auer* deference, "[i]t is

well-established that an agency's interpretation need not be the only possible

reading of a regulation—or even the best one—to prevail." *Decker v. Nw. Envtl.

Def. Ctr.*, 133 S. Ct. 1326, 1337 (2013). The interpretation "need not be the best or

most natural one by grammatical or other standards." *Pauley v. BethEnergy Mines,*

34

*Inc.*, 501 U.S. 680, 702 (1991).  Moreover, "as the agency is often free to adopt *any reasonable construction*, it may impose higher legal obligations than required by the best interpretation."  *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 252 (3d Cir. 2015).  If the text of the regulation "leave[s] open the rational interpretation" adopted by the agency, the agency's interpretation is controlling.  *Decker*, 133 S. Ct. at 1337.

The plain text of 34 C.F.R. § 106.33 allows schools to assign restrooms based on "sex" but does not resolve—or even address—whether schools may exclude transgender students from the restrooms consistent with their gender identity.  The regulation is silent "with respect to the crucial interpretive question" of how to assign restrooms based on "sex" for transgender students whose gender identity are not congruent with the sex assigned to them at birth.  *Chase Bank*, 562 U.S. at 207; *see Belt v. EmCare, Inc.*, 444 F.3d 403, 405 (5th Cir. 2006) (applying *Auer* deference where text of regulation "does not speak to the precise question" at issue).  As the Board itself argued to the district court, 34 C.F.R. § 106.33 does not "address whether sex segregated restroom facilities can, should, or must be open for use on the basis of one's gender identity."  Def. Reply in Support of Mot. to Dismiss at 9, ECF No. 46; *cf. Doe*, 86 A.3d at 605 (state statute requiring that restrooms be segregated based on "sex" does not resolve how "gender identity relates to the use of sex-separated facilities").

35

OCR's resolution of that question does not "create de facto a new regulation." JA 153. It simply resolves how the existing regulation applies when a student's gender identity is not congruent with the sex assigned to that student at birth. Moreover, because 34 C.F.R. § 106.33 is a limited *exception* to Title IX, OCR's interpretation of the regulation does not impose new regulatory burdens on recipients of federal funds. It clarifies that the existing exception should not be *broadened* to this new context by allowing schools to exclude transgender students from the same restrooms used by everyone else.[10]

Even if *Auer* deference did not apply, OCR's interpretation of 34 C.F.R. § 106.33 would still have "the power to persuade" under the less deferential standard of *Skidmore*, 323 U.S. at 140, because it harmonizes the regulation with the statutory goal of providing equal access to educational opportunities. *Cf. Davis*, 526 U.S. at 647-48 (consulting OCR guidance in construing Title IX). Providing separate restrooms for boys and girls does not usually conflict with Title IX's

---

[10] The court stated that deferring to OCR's interpretation would set a "dangerous" precedent that "could open the door to allow further attempts to circumvent the rule of law." JA 152. To illustrate the point, the court cited portions of the transcript in which the court spoke at length about the government's policies regarding enemy combatants, marijuana laws, and "sanctuary cities." *Id.* It is difficult to see what relevance these issues have to the present case. To the extent that the court believed that new agency interpretations of regulations must go through notice-and-comment rulemaking, its concerns are directed at the concept of *Auer* deference, not with OCR's particular interpretation. *See Philip Morris USA, Inc. v. Vilsack*, 736 F.3d 284, 295 (4th Cir. 2013) (applying *Auer* deference when agency had not previously taken a position on an issue).

36

mandate of equal educational opportunities because those restrooms do not ordinarily stigmatize individuals or interfere with their ability to thrive in school. In other words, sex-segregated restrooms are usually separate but truly equal. *Compare United States v. Virginia*, 518 U.S. 515, 533 n.7 (1996), *with Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 746 (2007). In contrast, the Board's policy of forcing transgender students to use different restrooms than everyone else is both stigmatizing and harmful. The separate restrooms physically and symbolically mark G. as "other," isolate G. from the rest of his peers, and brand him as unfit to share the same restrooms as other students. OCR properly concluded that 34 C.F.R. § 106.33 should not be broadened and used to undercut Title IX's promise of equal educational opportunity.[11]

As a practical matter, moreover, it is perfectly rational to conclude that assigning restrooms to transgender students in accordance with their gender identity is more consistent with social norms than placing transgender students in restrooms based on the sex assigned to them at birth. When a person walks into a restroom, no one else sees that person's genitals or chromosomes, but they do see that person's manifestation of gender identity. For many people, OCR's

---

[11] For the same reasons, the single-stall restrooms for G. are not "comparable" in form or substance to the restrooms used by all the other students. 34 C.F.R. § 106.33. In addition to the inherent stigma imposed by the different treatment, no other students actually use these restrooms, and only one of the restrooms is located anywhere near the restrooms used by other students. JA 32.

interpretation of 34 C.F.R. § 106.33 is more congruent with the social mores underlying sex-segregated restrooms than a policy that places a transgender boy in the girls' restroom. *See* OSHA Transgender Restroom Guide 2-3 (citing restroom policies from across the county).

For all these reasons, OCR's interpretation is more consistent with the text of the regulation, the purpose of Title IX, and contemporary social mores. At the very least, because "the text alone does not permit a more definitive reading" that would foreclose OCR's interpretation of the regulation, courts must defer to OCR's rational interpretation under *Auer*. *Cf. Chase Bank*, 562 U.S. at 207.

## III. G. Has Established a Likelihood of Success on His Equal Protection Claim.

For the same reasons that excluding G. from using the same restrooms as other students discriminates based on sex under Title IX, it also triggers heightened scrutiny under the Equal Protection Clause. *Glenn*, 663 F.3d at 1318-19. "[A]ll gender-based classifications today warrant heightened scrutiny." *Virginia*, 518 U.S. at 555 (internal quotation marks omitted). Heightened scrutiny applies even when discrimination is based on physical or anatomical differences. *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 60 (2001). And it applies whether the asserted justification for discrimination is benign or invidious. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). The "analysis and level of scrutiny applied to

38

determine the validity of the classification do not vary simply because the objective appears acceptable." *Id.* at 724 n.9.

In applying heightened scrutiny to this case, the question is not whether providing separate restrooms to boys and girls as a general matter serves the governmental interest in student privacy. *Cf. Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993). Separate restrooms for boys and girls already existed before the new transgender restroom policy was passed, and will continue to exist if G.'s requested relief is granted. The question is whether an important interest in privacy is substantially furthered by the new policy regulating the restroom use of transgender students. *See Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 151 (1980) ("Providing for needy spouses is surely an important governmental objective" but "the question remains whether the discriminatory means employed . . . itself substantially serves the statutory end.").

The Board cannot carry its burden of proof under this heightened-scrutiny standard. Just six days before adopting the new policy excluding transgender students from the same restrooms as their peers, the Board identified alternatives to protect the privacy of all students, such as "adding or expanding partitions between urinals in male restrooms," "adding privacy strips to the doors of stalls in all restrooms," and "[d]esignat[ing] single-stall, unisex restrooms." Dec. 3 Press Release 2. Such gender-neutral alternatives demonstrate that excluding

transgender students from the same restrooms used by everyone else is not substantially related to the asserted interest in privacy. *See Wengler*, 446 U.S. at 151 (invalidating sex-based classification where sex-neutral approach would serve the needs of both classes); *Orr v. Orr*, 440 U.S. 268, 281 (1979) (same).[12]

Despite these additional privacy measures, the district court stated that excluding transgender students from the same restrooms as other students would vindicate non-transgender students' constitutional right to bodily privacy. JA 160-62. In support, the court cited precedent regarding prisoner's privacy rights related to the involuntary exposure of genitals to members of the opposite sex. *Id.* Excluding G. from the boys' restroom, however, has no relationship to preventing exposure to nudity—especially in light of the additional privacy measures the Board has already implemented. According to the court, even with no exposure to nudity, the Board's privacy concerns also encompass students' purported

---

[12] The asserted interest in protecting student privacy is further undermined by the Board's surprising assertion that G. may use the girls' restrooms (which is impossible for G. because of his Gender Dysphoria and the severe health consequences that would result). It makes no sense to place a transgender boy in the girls' restroom in the name of protecting student privacy. Even before G. came out as transgender, girls objected to his presence in the girls' restrooms because they perceived him as male. JA 32. The Board's indifference to such concerns is powerful evidence that its policy is not substantially related to this asserted governmental interest. *Cf. Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995) ("There is little chance that [the statute] can directly and materially advance its aim, while other provisions of the same Act directly undermine and counteract its effects.").

objections to "[t]he mere presence" of a transgender person "in the restroom." JA 162. But such concerns, even if sincerely held, have nothing to do with the constitutional right to bodily privacy invoked by the court.[13]

While privacy interests may justify separate but truly equal and non-stigmatizing restroom facilities for boys and girls, they cannot justify policies that stigmatize one group of students as inherently unfit to use the same restrooms as everyone else. *Compare Virginia*, 518 U.S. at 533 n.7, *with Parents Involved*, 551 U.S. at 746. Some students may (or may not) be uncomfortable with "[t]he mere presence" of a transgender person "in the restroom." JA 162. But discomfort with transgender people is not a legitimate basis for imposing unequal or stigmatizing treatment. Impermissible discrimination often stems from an "almost instinctive mechanism to guard against people who appear to be different in some respects from ourselves" or who "might at first seem unsettling." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374-75 (2001) (Kennedy, J., concurring).

---

[13] This case does not involve access to locker rooms or the restrooms contained within those locker rooms. But even in that context, there are many ways to provide added privacy. Guidelines from the Virginia Department of Education already require "private showers with enclosed dressing rooms." Va. Dep't of Educ. Guidelines for Sch. Facilities in Va. Public Schools 20 (2013), http://www.doe.virginia.gov/support/facility_construction/school_construction/regs_guidelines/guidelines.pdf. These private areas already exist at Gloucester High School. *See* Dec. 9 Video Tr. 1:36:38. Moreover, according to one Board member, students do not actually shower at Gloucester High School because the water for showers was cut off several years ago. *See id.* 2:12:37.

Ultimately, if other students are not comfortable using a restroom with a transgender person present, they have the option—like any other student—to use one of the new single-stall unisex facilities the Board has installed. But the Board cannot place the burden on transgender students to use separate restroom facilities to address other students' discomfort with their "mere presence." JA 162. *Cf. Cruzan v. Special Sch. Dist. No. 1*, 294 F.3d 981, 984 (8th Cir. 2002) (employee who did not want to use same restroom as a transgender employee was free to use unisex restroom instead); *Lusardi*, 2015 WL 1607756, at *9 ("Some co-workers may be confused or uncertain about what it means to be transgender, and/or embarrassed or even afraid to share a restroom with a transgender co-worker. But supervisory or co-worker confusion or anxiety cannot justify discriminatory terms and conditions of employment.").

## IV.    G. Has Satisfied the Remaining Preliminary Injunction Factors.

### A. The Court Abused Its Discretion and Clearly Erred By Refusing to Consider G.'s Uncontested Evidence.

"It has long been recognized that a preliminary injunction may issue on the basis of affidavits and other written evidence, without a hearing, if the evidence submitted by both sides does not leave unresolved any relevant factual issue." *Williams v. Curtiss-Wright Corp.*, 681 F.2d 161, 163 (3d Cir. 1982). The Board did not dispute a single factual allegation made in G.'s declaration or the expert declaration of Dr. Ettner regarding the irreparable harm G. experiences as a result

42

of being prohibited from using the same restrooms that other students are permitted to use. The court, however, created its own contested issues of fact by arbitrarily declaring it would not consider G.'s uncontested evidence. The court's justifications for excluding or refusing to credit G.'s uncontested evidence were clearly erroneous and constituted an abuse of discretion.

### 1. Refusal to Credit Uncontested Evidence Presented By Declaration

"[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "A requirement of oral testimony would in effect require a full hearing on the merits and would thus defeat one of the purposes of a preliminary injunction which is to give speedy relief from irreparable injury." *Ross-Whitney Corp. v. Smith Kline & French Labs.*, 207 F.2d 190, 198 (9th Cir. 1953). Accordingly, for purposes of a preliminary injunction, uncontested factual testimony presented in affidavits is usually "taken as true." *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976). *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1146 (10th Cir.) (en banc), *aff'd*, 134 S. Ct. 2751 (2014); 11A Wright & Miller, *et al.*, Fed. Prac. & Proc. Civ. § 2949 (3d ed. 2015) ("[W]ritten evidence is presumed true if it is not contradicted.").

Despite the usual practice, Judge Doumar apparently has a policy of "never grant[ing] a preliminary injunction without first hearing oral testimony." JA 155. Before issuing its opinion, however, the court never informed the parties of this idiosyncratic practice. G.'s request for a hearing advised the court that "Plaintiff anticipates that, *unless the Court indicates a preference for witness testimony*, only oral argument will be necessary." JA 51 (emphasis added). If the court had informed G. that it did not grant injunctions without oral testimony, G. would have made appropriate arrangements. Moreover, G. attended the hearing and could have answered any questions about his written testimony if asked. The court's belated announcement of an unwritten rule requiring live testimony effectively sandbagged G. and denied him an opportunity to make the evidentiary showing the court required. That was an abuse of discretion.

### 2. Refusal to Consider Uncontested Testimony Because It Contained Hearsay

The court also clearly erred and abused its discretion by categorically refusing to consider any information in G.'s declarations containing hearsay. The court's exclusion was based on its mistaken belief that declarations in support of a preliminary injunction "must conform to the rules of evidence." JA 154. To the contrary, every court of appeals to consider the issue has held that the Federal Rules of Evidence do not apply and hearsay may be introduced in support of a motion for preliminary injunction. *Mullins v. City of New York*, 626 F.3d 47, 52

44

(2d Cir. 2010) (collecting cases). "The admissibility of hearsay under the Federal Rules of Evidence goes to weight, not preclusion, at the preliminary injunction stage. To hold otherwise would be at odds with the summary nature of the remedy and would undermine the ability of courts to provide timely provisional relief." *Id.* The court's categorical refusal to consider such evidence even when undisputed was an abuse of discretion. *See Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 325 (3d Cir. 2015).

The court also abused its discretion by applying its ban on hearsay evidence in an arbitrary and inconsistent manner. Although no one contests that G. has been diagnosed with Gender Dysphoria, the court refused to consider testimony about G.'s diagnosis or his treatment in accordance with the WPATH Standards of Care. The court declared "these allegations are hearsay and will not be considered." JA 163. In contrast, the court relied heavily on the declaration from Board member Andersen, which stated that the Board received numerous complaints from parents regarding G.'s restroom use. JA 159, 161. The content of such complaints, which have never been produced or even described to opposing counsel or the court, are, of course, hearsay. The court abused its discretion by applying this double-standard.

### 3.  Refusal to Credit G.'s Uncontested Testimony Because it Was "Self-Serving"

The court clearly erred in refusing to credit G.'s uncontested and admissible testimony because it was allegedly "self-serving."  JA 161.  There is "no rule against 'self-serving' affidavits."  *Harris v. Mayor of Balt.*, 429 F. App'x 195, 198 n. 5 (4th Cir. 2011).  "Deposition testimony, affidavits, responses to interrogatories, and other written statements by their nature are self-serving."  *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) (en banc).  "[T]he term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story."  *Id.*

Because it arbitrarily labeled G.'s testimony as "self-serving," the court refused to credit G.'s own testimony about the psychological distress and humiliation he feels as a result of being singled out and prohibited from using the same restrooms other students are permitted to use.  The court also refused to credit G.'s declaration, based on his own personal experience, that the separate, single-stall restrooms are located in inconvenient places, and that other students do not use the new restrooms created for transgender students.  Instead, the court faulted G. for not submitting "a layout of the school building" to corroborate these uncontested allegations.  JA 163.  Refusing to credit G.'s testimony for these uncontested facts was clearly erroneous.

46

### 4. Refusal to Consider Dr. Ettner's Uncontested Expert Testimony Because She Was Retained as an Expert Witness

The court also abused its discretion and clearly erred by refusing to consider the uncontested expert declaration of Dr. Ettner, who personally met with G. and confirmed his Gender Dysphoria diagnosis. JA 163. In her expert declaration, Dr. Ettner provided detailed expert testimony about the standards of care for treating Gender Dysphoria, the medical necessity of being able to access restrooms consistent with a person's gender identity, and scientific studies documenting how interference with transgender adolescents' social role transition increases their risk of serious and lifelong health consequences. JA 34-41. Dr. Ettner's expert declaration meets all the criteria for expert testimony under Rule 702. Her testimony was uncontested, and the court had no basis to question its accuracy or credibility.

The court clearly erred in refusing to consider Dr. Ettner's admissible expert testimony. "A court certainly has discretion to reject expert testimony, but it may not arbitrarily fail to consider it." *Allfirst Bank v. Progress Rail Servs. Corp.*, 521 F. App'x 122, 129 (4th Cir. 2013) (citations omitted); *see Quintana-Ruiz v. Hyundai Motor Corp.*, 303 F.3d 62, 76-77 (1st Cir. 2002) (factfinder "not at liberty to disregard arbitrarily the unequivocal, uncontradicted and unimpeached testimony of an expert witness where the testimony bears on technical questions beyond the competence of lay determination.") (alterations incorporated); *In re*

47

*Wolverton Assocs.*, 909 F.2d 1286, 1296 (9th Cir. 1990) (factfinder "may not act arbitrarily in disregarding entirely probable testimony of expert witnesses whose judgments have not been discredited").

The court refused to credit Dr. Ettner's declaration regarding the standards of care for treating Gender Dysphoria because she was not G.'s treating physician and was retained as an expert witness for purposes of litigation.  JA 163.  But "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993).  "[E]xperts might instruct the factfinder on the principles of thermodynamics, or bloodclotting, or on how financial markets respond to corporate reports, without ever knowing about or trying to tie their testimony into the facts of the case."  Fed. R. Evid. 702 advisory committee notes.  Similarly, there is nothing unusual or improper in retaining expert medical providers to present testimony in litigation.  "Expert witnesses, including doctors retained to evaluate physical and mental injuries, are routinely retained in anticipation of litigation."  *Graham v. City of New York*, No. 08-CV-3518 MKB, 2015 WL 5258741, at *20 (E.D.N.Y. Sept. 10, 2015).  The fact that an expert has been retained by a party and paid an hourly rate is not a legally sufficient basis for the factfinder to reject her unimpeached and undisputed testimony.  *Quintana-Ruiz*,

303 F.3d at 76.  The court's refusal to consider or credit Dr. Ettner's testimony was clearly erroneous and an abuse of discretion.

### B.  An Injunction Is Necessary to Prevent Irreparable Harm to G.

Because G. is likely to succeed on the merits, he has also established irreparable harm. "[T]he deprivation of constitutional rights unquestionably constitutes irreparable injury."  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation marks omitted); *accord Henry v. Greenville Airport Comm'n*, 284 F.2d 631, 633 (4th Cir. 1960) ("The District Court has no discretion to deny relief by preliminary injunction to a person who clearly establishes by undisputed evidence that he is being denied a constitutional right.").  The violation of G.'s rights under Title IX also constitutes irreparable harm that cannot be compensated by monetary damages.  *Cf. Doe v. Wood Cty. Bd. of Educ.*, 888 F. Supp. 2d 771, 777 (S.D.W.V. 2012) (collecting cases).

In this case, moreover, G. faces irreparable harm with serious medical consequences.  After arbitrarily excluding testimony regarding G.'s diagnosis of Gender Dysphoria and the accepted standards of care for treating that condition, the court disparaged G.'s own testimony about his psychological distress as unsubstantiated and uncorroborated.  JA 163-64.  The expert declaration by Dr. Ettner, however, was more than sufficient to corroborate G.'s testimony about the psychological distress he experiences as a result of being singled out for

49

different treatment than every other boy at Gloucester High School and forced to use separate single-stall restroom facilities. Excluding G. from the same restrooms as other students increases G.'s risk of depression, anxiety, and self-harm. JA 33, 40. It impairs his ability to perform well academically. JA 33, 41. It subjects him to physical pain associated with avoiding the restroom. JA 32-33. And, at a time of life when fitting in with peers is all-important, it publicly labels him as different from every other student in his school. JA 39-40. These harms are irreparable.

## C. The Balance of Hardships Weighs in Favor of an Injunction.

The balance of hardships weighs strongly in favor of a preliminary injunction. *Cf. Doe*, 888 F. Supp. 2d at 778 (balance of harms favors Title IX plaintiffs who "will experience their middle school years only once during their life"). As explained earlier, allowing G. to resume using the boys' restrooms will not affect privacy interests related to nudity. Any student with privacy concerns based on G.'s "mere presence" in the restroom has the option of using the new single-stall restrooms instead. JA 162. The Board cannot credibly argue that using separate single-stall restrooms would be too burdensome for other students but is not a hardship for G.[14]

---

[14] Any hypothetical students who "sometimes turn [from the urinal] while closing their pants" can also protect their privacy by closing their pants before turning from the urinal. JA 162.

The court distorted its analysis of the balance of harms by drawing a false equivalence between the burden imposed on G. from being relegated to using a separate restroom and the burden that would be imposed on students who choose to use a separate restroom in order to avoid the "mere presence" of G. The court stated, "It does not occur to G. that other students may experience feelings of exclusion when they can no longer use the restrooms they were accustomed to using because they feel that G.'s presence in the male restroom violates their privacy." JA 162. There is simply no equivalence on this record between the burden placed on a student who chooses to use a separate restroom in order to avoid G. and the stigma and isolation caused by singling out G. and forcing him to use separate restrooms that no other student is required to use.[15]

### D. An Injunction Is in the Public Interest.

An injunction in favor of G. is in the public interest. It is always in the public interest to "uphold[] constitutional rights." *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013) (en banc) (internal quotation marks omitted). Similarly, the "public interest is certainly served by promoting compliance with Title IX." *Doe*, 888 F. Supp. 2d at 778; *accord Cohen v. Brown*

---

[15] The court's speculation about other students' "feelings of exclusion" stands in sharp contrast to its analysis of G.'s own testimony, which the court refused to credit because it allegedly did not "describe[] his hardship in concrete terms" or with sufficient corroborating support. JA 162-64.

*Univ.*, 991 F.2d 888, 906 (1st Cir. 1993) ("[T]he overriding public interest l[ies] in the firm enforcement of Title IX.").

**V.    The Case Should Be Reassigned on Remand.**

"Federal appellate courts' ability to assign a case to a different judge on remand rests not on the recusal statutes alone, but on the appellate courts' statutory power to 'require such further proceedings to be had as may be just under the circumstances,' 28 U.S.C. § 2106." *Liteky v. United States*, 510 U.S. 540, 554 (1994).  The broader discretion to reassign cases pursuant to 28 U.S.C. § 2106 authorizes the appellate court to reassign cases in "unusual circumstances" even when a judge's bias or appearance of bias is not at issue.  *United States v. Robin*, 553 F.2d 8, 10 (2d Cir. 1977).  In deciding whether to reassign pursuant to 28 U.S.C. § 2106, this Court considers the same factors enunciated by the Second Circuit in *Robin*:

> (1)    whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected,
>
> (2)    whether reassignment is advisable to preserve the appearance of justice, and
>
> (3)    whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*United States v. Guglielmi*, 929 F.2d 1001, 1007 (4th Cir. 1991).  "Because factors one and two [of the *Robin* test] are of equal importance, a finding of either factor

52

supports remand to a different court judge." *United States v. Atondo-Santos*, 385 F.3d 1199, 1201 (9th Cir. 2004). In this case, all three factors weigh strongly in favor of reassignment.

First, the transcript of the motions hearing indicates that the court has preexisting views about medical science in general—and medical science regarding gender and sexuality in particular—that the court may have substantial difficulty putting aside. Most significantly, in support of the notion that allowing G. to use the boys' restroom would lead to "mating," the court strongly asserted its own scientific opinions without any foundation in the record. JA 85-86. According to the court: "There are only two instincts—two. Everything else is acquired—everything. That is, the brain only has two instincts. One is called self-preservation, and the other is procreation." JA 85. "All of that is accepted by all medical science, as far as I can determine in reading information." JA 86.

At the same time the court asserted its own preexisting views about what "is accepted by all medical science," the court refused to consider the uncontested expert testimony about Gender Dysphoria that has actually been submitted in the case. JA 99-102; 163. The court's medical opinions even extended to unfounded skepticism that a person could develop a urinary tract infection from delaying using the restroom. JA 110-12, 117-18. *Contra* OSHA Transgender Restroom Guide 1 (identifying "urinary tract infections" as health risk from lack of restroom

53

access). In short, the record reflects that the court has strong opinions about medical issues and may be inordinately suspicious of the modern medical consensus regarding sex and gender if that consensus conflicts with its preexisting views. The court's arbitrary refusal in its memorandum opinion to consider the harms to G. in light of the accepted standards of care for treating Gender Dysphoria enhances those concerns. JA 163.

Second, reassignment is advisable to preserve the appearance of justice. Regardless of the outcome of this case, the public in general, and transgender people in particular, should have confidence the proceedings are not based on mistaken assumptions that continue to stigmatize transgender people, even if unintentionally. That is especially true in a case like this, which "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale*, 523 U.S at 81-82. Several statements by the court undermine that public confidence.

The court's repeated assertions at the hearing that G. has a "mental disorder" are particularly troubling. The American Psychiatric Association has made clear that Gender Dysphoria should not be described as a "disorder" because that terminology improperly stigmatizes transgender people. *Gender Dysphoria Fact Sheet* 1. At the hearing, however, the court stated that Gender Dysphoria is a "mental disorder" because it is listed in the DSM, and the court did not allow

counsel to clarify that misconception unless the relevant section of the DSM had
been specifically quoted in the Complaint. JA 88-91.[16]  Later, the court
gratuitously repeated that G. has a "mental disorder" for no apparent purpose.
JA 101.  It is understandable that the court might mistakenly refer to Gender
Dysphoria as a disorder in the first instance.  But the court's disinterest in what the
DSM actually says, and its repeated and gratuitous labeling of G. with a "mental
disorder," does not reflect the sensitivity or care the public should expect from
courts addressing these issues.  It undermines public confidence in the fairness of
the proceedings if courts appear unwilling to ensure that statements from the bench
do not carelessly stigmatize transgender people.  *Cf.* Code of Conduct for U.S.
Judges, Cannon 3(A)(3) & commentary (duty to be "be patient, dignified,
respectful, and courteous" designed to "promote public confidence in judiciary").

Equally troubling is the court's insistence that Plaintiff's counsel are acting
contrary to G's best interest by "broadcast[ing] to the world" that G. is transgender.
JA 94.  The court berated counsel at the hearing for filing the initial complaint
using G.'s full name, as permitted by Federal Rule of Civil Procedure 5.2(h).

---

[16] The Complaint alleged that G. was diagnosed with Gender Dysphoria, but
did not specifically cite the DSM-V.  JA 9, 11-13.  Although the court refused to
consider the DSM-V when referenced at oral argument, the court's memorandum
decision took judicial notice of other portions of the DSM-V.  JA 140 n.2.

JA 91-94.[17]  The court even asserted that the length of the Complaint (16 pages including the signature page) reflected an improper purpose to attract media attention.  JA 91 ("I looked at the complaint. I tried to read it thoroughly.  It took me one hour to read this complaint—one hour—and it's a simple situation. . . . It's a very simple situation, and it took an hour to read the complaint? You know, what it is is—were you more interested in obtaining publicity or in obtaining a judgment?").  Later in the hearing, the court reiterated: "I'm having a huge problem with everybody knowing that he desires to be a male and, in fact, his attorney advertising that to the world."  JA 123.  "And that really set me off when I read this case.  Why did they do that?  The only thing I could figure out is if they didn't they wouldn't get any publicity."  *Id.*

The court's criticisms appear rooted in a belief that G. is stigmatized by the public's knowledge that he is transgender as opposed to the discriminatory policy he is challenging.  The court repeated that assertion many times despite several

---

[17] Because G.'s identity was already widely known as a result of his appearance at the Board meetings, he attempted to waive the privacy protections provided by Rule 5.2(a) in accordance with Rule 5.2(h) in order to humanize himself in court documents.  The court held that Local Rule 7(c)(1)—which provides that "[r]edaction of personal identifiers is governed by Fed. R. Civ. P. 5.2 unless the Court directs otherwise"—prohibits parties from waiving the redaction protection without first obtaining court approval.  But Rule 5.2 includes subsection 5.2(h).  The Local Rule does not say subsection 5.2*(a)* applies unless a court directs otherwise.

attempts by counsel to explain that the stigma was not the fact that G. is transgender, but that he is being forced to use a separate restroom than everyone else. JA 94-107, 110, 113, 116-17. Even opposing counsel had to correct the court's mischaracterization. JA 119-20. The court's assertions that G. should not be "broadcast[ing] to the world" that he is transgender perpetuates the harmful notion that a person's transgender status is something to be embarrassed about or keep "in the closet." JA 94.

The court's diatribe against DOJ for policies that have no relevance to this case raises additional concerns about public confidence in the fairness of the proceedings. JA 124-28. According to its memorandum opinion, the court's disagreement with DOJ's policies regarding enemy combatants, drug laws, and immigration influenced its decision not to defer to OCR's interpretation of its own regulations. JA 153. The court's statements create the appearance that its rejection of OCR's interpretation was intended to "send a message" to DOJ for reasons unrelated to this case.

Finally, reassignment would not entail any waste or duplication. This case is at its infancy, and no further proceedings have taken place since the court's rulings challenged in this appeal. Another district judge would be able to conduct proceedings on remand based on this Court's mandate without any duplication or inefficiency. Any concern about waste or duplication weighs in favor of

reassignment now, before additional time and effort is expended.

For all these reasons, Plaintiff respectfully submits that reassignment on remand is appropriate.

## REQUEST FOR ORAL ARGUMENT

Plaintiffs respectfully requests oral argument pursuant to Local Rule 34(a).

## CONCLUSION

For the foregoing reasons, the denial of Plaintiff's motion for preliminary injunction should be reversed, the dismissal of the Title IX claim should be reversed, and the case should be reassigned on remand.

Respectfully submitted,

AMERICAN CIVIL LIBERTIES UNION
OF VIRGINIA FOUNDATION, INC.

/s/

Rebecca K. Glenberg (VSB No. 44099)
Gail Deady (VSB No. 82035)
701 E. Franklin Street, Suite 1412
Richmond, Virginia 23219
Phone: (804) 644-8080
Fax: (804) 649-2733
rglenberg@acluva.org
gdeady@acluva.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

Joshua A. Block
Leslie Cooper
125 Broad Street, 18th Floor
New York, New York 10004
Phone: (212) 549-2500
Fax: (212) 549-2650
jblock@aclu.org
lcooper@aclu.org

*Counsel for Plaintiff-Appellant*

Dated: October 21, 2015

59

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because This brief contains 13,803 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman.

Dated:  October 21, 2015                    _____/s/_____

Rebecca K. Glenberg (VSB No. 44099)
American Civil Liberties Union
        Foundation of Virginia, Inc.
701 E. Franklin Street, Suite 1412
Richmond, Virginia 23219
Phone: (804) 644-8080
Fax: (804) 649-2733
rglenberg@acluva.org

# CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of October, 2015, I filed the foregoing

brief as well as the Joint Appendix filed herewith with the Clerk of the Court using

the CM/ECF system, which will automatically serve electronic copies upon all

counsel of record.

_____/s/_____
Rebecca K. Glenberg (VSB No. 44099)
American Civil Liberties Union
     Foundation of Virginia, Inc.
701 E. Franklin Street, Suite 1412
Richmond, Virginia 23219
Phone: (804) 644-8080
Fax: (804) 649-2733
rglenberg@acluva.org

61