**RECORD NO. 15-2338**

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

JAMES KLEMIC; JOAN KLEMIC;
CHARLOTTE REA; PETER J. OSBORNE; KAREN F. OSBORNE,

*Plaintiffs - Appellants,*

v.

DOMINION TRANSMISSION, INC.;
ATLANTIC COAST PIPELINE LLC, a/k/a ACP,

*Defendants - Appellees,*

COMMONWEALTH OF VIRGINIA,

*Intervenor/Defendant - Appellee,*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT CHARLOTTESVILLE

## OPENING BRIEF OF APPELLANTS

Neal L. Walters
SCOTT KRONER, PLC
418 East Water Street
P.O. Box2737
Charlottesville, VA 22902
(434) 296-2161

*Counsel for Plaintiffs-Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No.  15-2338        Caption:  Klemic v. Dominion Transmission, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

James Klemic
(name of party/amicus)


who is _____ Appellant _____ , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?                             ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                                 ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /S/ Neal L. Walters _____   Date: ___11/12/2015___

Counsel for: Appellants _____

## CERTIFICATE OF SERVICE
**************************

I certify that on ___11/12/2015___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/S/ Neal L. Walters _____       ___11/12/2015___
(signature)                                              (date)

### UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
### DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __15-2338__        Caption: __Klemic v. Dominion Transmission, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Joan Klemic__
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?  ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /S/ Neal L. Walters                    Date:    11/12/2015

Counsel for: Appellants

## CERTIFICATE OF SERVICE
**************************

I certify that on ____11/12/2015____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/S/ Neal L. Walters                              11/12/2015
        (signature)                                 (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __15-2338__    Caption: __Klemic v. Dominion Transmission, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Charlotte Rea__
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?  ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /S/ Neal L. Walters _____    Date: ___11/12/2015___

Counsel for: Appellants _____

## CERTIFICATE OF SERVICE
***************************

I certify that on ___11/12/2015___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/S/ Neal L. Walters _____    ___11/12/2015___
(signature)                                                    (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __15-2338__    Caption: Klemic v. Dominion Transmission, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Karen Osborne
(name of party/amicus)


who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations? ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /S/ Neal L. Walters                    Date: 11/12/2015

Counsel for: Appellants

## CERTIFICATE OF SERVICE
**************************

I certify that on ____11/12/2015____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/S/ Neal L. Walters                              11/12/2015
(signature)                                         (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __15-2338__          Caption: Klemic v. Dominion Transmission, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Peter Osborne
(name of party/amicus)


who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations? ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:



3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
     If yes, identify any trustee and the members of any creditors' committee:

Signature: /S/ Neal L. Walters _____   Date: ___11/12/2015___

Counsel for: Appellants _____

## CERTIFICATE OF SERVICE
**************************

I certify that on ___11/12/2015___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/S/ Neal L. Walters _____          ___11/12/2015___
        (signature)                                   (date)

# TABLE OF CONTENTS

CORPORATE DISCLOSURE

TABLE OF AUTHORITIES ........................................................................ iii

JURISDICTIONAL STATEMENT ................................................................ 1

STATEMENT OF ISSUES ............................................................................ 2

STATEMENT OF THE CASE ...................................................................... 3

SUMMARY OF ARGUMENT .................................................................... 11

ARGUMENT ............................................................................................... 15

I. THE DISTRICT COURT ERRED IN FINDING THE AS APPLIED CLAIMS TO BE UNRIPE BECAUSE THE PLAINTIFFS' INJURIES WERE NOT CONTINGENT UPON ACTUAL ENTRY ONTO THEIR PROPERTIES ................................................................................ 16

II. THE DISTRCT COURT ERRED IN DISMISSING THE PLAINTIFFS' FACIAL CHALLENGES BECAUSE THE PLAINTIFFS' SET FORTH FACTS STATING A PLAUSIBLE CLAIM THAT VA. CODE ANN. § 56-49.01 VIOLATES THE FEDERAL AND VIRGINIA CONSTITUTIONS. ....................................................................... 19

A. The District Court incorrectly applied the "no set of circumstances" language from *United States v. Salerno* when analyzing the Plaintiffs' facial claims. ..................................................................... 21

B. The right to exclude others is a fundamental property right protected by the Federal and Virginia Constitutions and a privilege to enter for surveying has not been extended outside of the eminent domain context ............................................................................... 26

C. The actions of Dominion permitted under the statute result in cognizable constitutional injury to the Plaintiffs' rights under the Fifth Amendment and the Virginia Constitution ................................... 38

D. The recent amendments to the Virginia Constitution, which significantly narrowed the scope of the power of eminent domain, are violated by Va. Code Ann. § 56-49.01 ................................................... 48

i

E.   The Fourth Amendment's prohibition of unreasonable seizures protects the Plaintiffs' properties and the required balancing of interests shows that the seizure effected by Va. Code Ann. § 56-49.01 is unreasonable .......................................................................... 50

F.   The Fourteenth Amendment is violated where, as in this case, the means selected by the government to do not serve a legitimate purpose. .......................................................................... 55

CONCLUSION ........................................................................... 57

CERTIFICATE OF COMPLIANCE ........................................................................... 58

CERTIFICATE OF SERVICE ........................................................................... 59

ADDENDUM ........................................................................... 60

<u>**TABLE OF AUTHORITIES**</u>

<u>**CASES**</u>

*Alliance Pipeline L.P. v. Smith*,
  833 N.W.2d 464 (N.D. 2013)........................................................................31

*Allred v. Harris*,
  18 Cal. Rptr. 2d 530 (Cal. Ct. App. 1993) ................................................45

*Arkansas Game & Fish Comm'n v. United States*,
  ___ U.S. ___, 133 S. Ct. 511 (2012) ..........................................................41

*Aziz v. Alcolac, Inc.*,
  658 F.3d 388 (4th Cir. 2011)......................................................................20

*Birmingham-Trussville Iron Co. v. Allied Engineers*,
  144 So. 1 (Ala. 1932) ........................................................................... 30, 46

*Blades v. New York State Low-Level Radioactive Waste Siting Comm'n*,
  560 N.Y.S.2d 555 (N.Y. App. Div. 1990) .................................................30

*Board of Cty. Comm'rs v. Roberts*,
  159 P.3d 800 (Colo. Ct. App. 2006) ..........................................................47

*Bowen v. Kendrick*,
  487 U.S. 589 (1988) ...................................................................................23

*Brown v. Entertainment Merchs. Ass'n*,
  ___ U.S. ___, 131 S.Ct. 2729 (2011) ........................................................23

*Burson v. Freeman*,
  504 U.S. 191 (1992) ...................................................................................23

*Citizens United v. FEC*,
  558 U.S. 310 (2010) ............................................................................ 22, 23

*City of Chicago v. Morales*,
  527 U.S. 41 (1999) .............................................................................. 23, 24

*City of Keene v Armenta*,
  651 A.2d 924 (N.H. 1994) ..........................................................................30

*Coastal Marine Serv. of Texas, Inc. v. City of Port Neches*,
  11 S.W.3d 509 (Tex. Ct. App. 2000) .........................................................31

*Creek Ranch, Inc. v. New Jersey Tpk. Auth.*,
  383 A.2d 148 (N.J. Super. Ct. App. Div. 1976), *rev'd on other grounds*,
  383 A.2d 110 (1978) ..................................................................................30

*Dancy v. Alabama Power Co.*,
  73 So. 901 (Ala. 1916) ...............................................................................46

*Davis v. FEC*,
    554 U.S. 724 (2008) ....................................................................23
*Doe v. City of Albuquerque*,
    667 F.3d 1111 (10th Cir. 2012)............................................. 22, 24
*Doe v. Virginia Dep't of State Police*,
    713 F.3d 745 (4th Cir. 2013)....................................................16
*Edwards v. Aguillard*,
    482 U.S. 578 (1987) ...................................................................23
*Edwards v. Law*,
    71 N.Y.S. 1097 (App. Div. 1901) ...............................................32
*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011).....................................................25
*Florida v. Jardines*,
    ___ U.S. ___, 133 S. Ct. 1409 (2013) .........................................51
*Frisby v. Schultz*,
    487 U.S. 474 (1988) ...................................................................23
*Hill v. Colorado*,
    530 U.S. 703 (2000) ...................................................................23
*Hoffman Family, L.L.C. v. City of Alexandria*,
    634 S.E.2d 722 (Va. 2006) .........................................................49
*Hudson Cty. Land Imp. Co. v. Seymour*,
    35 N.J.L. 47 (N.J. Sup. Ct. 1871)..............................................32
*I.P. Farms v. Exxon Pipeline Co.*,
    646 S.W.2d 544 (Tex. Ct. App. 1982) ........................................31
*Indiana & Michigan Elec. Co. v. Stevenson*,
    363 N.E.2d 1254 (Ind. Ct. App. 1977)......................................47
*Jacobsen v. Superior Court of Sonoma Cty., Dep't No. 2*,
    219 P. 986 (Cal. 1923) ................................................. 28, 29, 47
*Kaiser Aetna v. United States*,
    444 U.S. 164 (1979) ........................................................ passim
*Kane v. City of Elmhurst Nat'l Bank*,
    443 N.E.2d 1149 (Ill. Ct. App. 1984)...................................30, 47
*Kelo* v. *City of New London*,
    545 U.S. 469 (2005) ...................................................................48
*King v. Power Auth.*,
    353 N.Y.S.2d 547 (N.Y. App. Div. 1974), *aff'd*,
    343 N.E.2d 767 (N.Y. 1975) ......................................................31

iv

*Lemon v. Kurtzman*,
    403 U.S. 602 (1971) .......................................................................23

*Litchfield v. Bond*,
    78 N.E. 719 (N.Y. 1906) ..............................................................32

*Lucas v. South Carolina Coastal Council*,
    505 U.S. 1003 (1992) ........................................ 26, 27, 31, 38, 40

*Lyon v. Green Bay & M. Ry. Co.*,
    42 Wis. 538 (1877) ........................................................................31

*Miller v. Brown*,
    462 F.3d 312 (4th Cir. 2006) .........................................................16

*Missouri Highway & Transportation Comm'n v. Eilers*,
    729 S.W.2d 471 (Mo. Ct. App.1987) ............................................47

*National Advertising Co. v. City of Raleigh*,
    947 F.2d 1158 (4th Cir. 1991) ......................................................18

*National Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) ......................................................................23

*National Treasury Employees Union v. Von Raab*,
    489 U.S. 656 (1989) ......................................................................54

*New Jersey v. T.L.O.*,
    469 U.S. 325 (1985) ......................................................................54

*Northville Dock Pipe Line Corp. v. Fanning*,
    237 N.E.2d 220, *reargument denied, remittitur amended*,
    238 N.E.2d 920 (N.Y. 1968) .........................................................31

*O'Connor v. Smith*,
    49 S.E.2d 310 (Va. 1948) ........................................................ 34-35

*Oglethorpe Power Corp. v. Goss*,
    322 S.E.2d 887 (Ga. 1984) ...........................................................47

*Oliver v. United States*,
    466 U.S. 170 (1984) ......................................................................52

*Orr v. Quimby*,
    54 N.H. 590 (1874) .......................................................................30

*Ottofaro v. City of Hampton*,
    574 S.E.2d 235 (Va. 2003) ............................................................49

*Owens v. Baltimore City State's Attorneys Office*,
    767 F.3d 379 (4th Cir. 2014) ........................................................20

*Phillips v. Foster*,
    211 S.E.2d 93 (Va. 1975) ..............................................................49

*Planned Parenthood v. Casey*,
    505 U.S. 833 (1992) .............................................................23

*Pogue v. Kamo Elec. Co-op, Inc.*,
    795 S.W.2d 566 (Mo. Ct. App. 1990) ..........................................30

*Presley v. City of Charlottesville*,
    464 F.3d 480 (2006) ........................................................ 50, 52

*PruneYard Shopping Ctr. v. Robins*,
    447 U.S. 74 (1980) ................................................ 42, 44, 45, 54

*Root v. Kamo Elec. Co-op., Inc.*,
    699 P.2d 1083 (Okla. 1985) ...................................................31

*Rothe Dev. Corp. v. Department of Defense*,
    413 F.3d 1327 (Fed. Cir. 2005).................................................25

*Rumber v. District of Columbia*,
    487 F.3d 941 (D.C. Cir. 2007) .................................................38

*Santa Fe Indep. Sch. Dist. v. Doe*,
    530 U.S. 290 (2000) ..........................................................23

*Slevin v. Home Depot*,
    120 F. Supp. 2d 822 (N.D. Cal. 2000) ..................................... 44, 45

*Soldal v. Cook Cty.*,
    506 U.S. 56 (1992) ........................................................ 52, 54

*South Carolina State Educ. Assistance Auth. v. Cavazos*,
    897 F.2d 1272 (4th Cir. 1990) .................................................26

*Square Butte Elec. Coop. v. Dohn*,
    219 N.W.2d 877 (N.D. 1974) ...................................................31

*State Highway Com'r v. Hooker Furniture Corp.*,
    198 S.E.2d 649 (Va. 1973).....................................................37

*State v. Dist. Court of Second Judicial Dist.*,
    73 P. 230 (Mont. 1903) .......................................................32

*Tate v. Ogg*,
    195 S.E. 496 (Va. 1938).......................................................26

*Thomas v. City of Horse Cave*,
    61 S.W.2d 601 (Ky. 1933) .....................................................30

*Trader Joe's Co. v. Progressive Campaigns*,
    86 Cal. Rptr. 2d 442 (Cal. Ct. App. 1999) ............................... 44, 45

*United States v. Causby*,
    328 U.S. 256 (1946) ...................................................... 39, 40, 42

*United States v. Jones*,
    ___ U.S. ___, 132 S. Ct. 945 (2012) ...........................................51

vi

*United States v. Place*,
    462 U.S. 696 (1983) ................................................................ 50-51
*United States v. Playboy Entm't Grp., Inc.*,
    529 U.S. 803 (2000) .....................................................................23
*United States* v. *Salerno*,
    481 U. S. 739 (1987) ............................................................ passim
*United States v. Stevens*,
    559 U.S. 460 (2010) .....................................................................22
*Walker v. City of Warner Robbins*,
    422 S.E.2d 555 (Ga. 1992) ...........................................................30
*Washington State Grange v. Washington State Republican Party*,
    552 U.S. 442 (2008) ............................................................. 21, 24
*Western Farmers Elec. Co-op. v. Willard*,
    726 P.2d 361 (Okla. Ct. App. 1986) ............................................31

## STATUTES

2 Va. Rev. Code ch. 234, § 7 (1819) ...................................................32
28 U.S.C. § 1291 (2015) .......................................................................1
28 U.S.C. § 1343 (2015) .......................................................................1
28 U.S.C. § 1367 (2015) .......................................................................1
42 U.S.C. § 1983 (2015) ................................................................. 1, 11
Va. Code Ann. § 25.1-203 (West 2015) ........................................ 35, 36
Va. Code Ann. § 25.1-223 (West 2015) ........................................ 35, 36
Va. Code Ann. § 25.1-224 (West 2015) ...............................................35
Va. Code Ann. § 3866(a) (1930) .........................................................33
Va. Code Ann. § 3866a (1946 Cum. Supp.) .........................................33
Va. Code Ann. § 56-49.01 (West 2015) ....................................... passim
Va. Code, tit. 17, ch. 56,§ 4 (1860).....................................................32
XI William Walter Hening, Statutes at Large 27 (1823)........................32

## RULES

Fed. R. App. P. 4.................................................................................1
Fed. R. Civ. P. 12 ........................................................................ passim

## **CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. IV ............................................................... passim

U.S. Const. amend. V ................................................................. passim

U.S. Const. amend. XIV ............................................................. passim

Va. Const. Article I, § 11 .................................... 3, 11, 19, 26, 48

# JURISDICTIONAL STATEMENT

## Basis for Jurisdiction in the District Court

The Plaintiffs filed suit under 42 U.S.C. § 1983 (2015), as well as bringing claims under state law. The United States District Court for the Western District of Virginia (the "District Court") had jurisdiction over the federal claims pursuant to 28 U.S.C. § 1343(a)(3)-(4) (2015), and had supplemental jurisdiction to review the state law claims under 28 U.S.C. § 1367 (2015).

## Basis for Jurisdiction in the Court of Appeals

The District Court entered its final order, which disposed of all of the claims at issue between the parties, on September 30, 2015. (JA 7, 382). The Plaintiffs filed a notice of appeal on October 29, 2015. (JA 7, 383-84). Because the notice of appeal was filed within thirty days of the entry of the District Court's final order, it was timely. *See* Fed. R. App. P. 4(a)(1). Because the notice of appeal was timely, this Court has jurisdiction to review the judgment of the District Court under 28 U.S.C. § 1291 (2015).

## STATEMENT OF ISSUES

**I. WHETHER THE PLAINTIFFS' "AS APPLIED" CLAIMS WERE RIPE WHEN THE INJURY TO THE PLAINTIFFS' CONSTITUTIONAL RIGHTS WAS NOT CONTINGENT UPON THE DEFENDANT ACTUALLY ENTERING ONTO THEIR PROPERTY**

**II. WHETHER THE PLAINTIFFS STATED A PLAUSIBLE CLAIM THAT THEIR FEDERAL AND STATE CONSTITUTIONAL RIGHTS WERE VIOLATED BY VA. CODE ANN. § 56-49.01 WHICH ABROGATES THEIR RIGHT TO EXCLUDE SURVEYORS FROM THEIR PROPERTY WHEN THE SURVEYS ARE NOT ANTECEDENT TO EMINENT DOMAIN PROCEEDINGS AND INSTEAD SIMPLY FOSTER THE DEFENDANT'S PRIVATE BUSINESS INTERESTS**

# STATEMENT OF THE CASE

This is an appeal from the District Court's dismissal, pursuant to Fed. R. Civ. P. 12(b)(1) and (6), of the Plaintiffs' claims that Va. Code Ann. § 56-49.01 (West 2015), which authorizes entry upon private property by natural gas companies for "survey" purposes without the owner's consent and without compensation, violates their rights under the Fourth, Fifth and Fourteenth Amendments of the United States Constitution, and under Article I, § 11 of the Virginia constitution (a cognate of the Fifth Amendment).

## Facts

James and Joan Klemic are the fee simple owners, either individually or jointly, of six parcels of real estate located in Nelson County, Virginia, containing collectively approximately 196 acres. The Klemics acquired the parcels over a period of years beginning in 1998. (JA 12). The Klemic parcels contain some cleared fields with the balance in woodland. (*Id*.) One of the parcels is the site of the Klemics' home, which was designed by them and intended to be the home in which they would live for as long as they were physically able. (*Id*.) The Klemic parcels contain two Civil War era cemeteries, one of which is surrounded by a stone wall constructed by the Civilian Conservation Corps during the Great Depression. (*Id*.) A

3

number of streams traverse the Klemic parcels and feed into the Rockfish River. (*Id*.) The Klemic parcels are posted, and no commercial operation of any kind takes place on them. (*Id*.)

Charlotte Rea is the fee simple owner of three parcels of real estate located in Nelson County containing collectively approximately 30 acres. (*Id*.) Ms. Rea has owned the parcels since 2003. (*Id*.) Ms. Rea served twenty-six years in the United States military without being stationed in the same location for more than two and one-half years, and devoted her life savings to the acquisition of the Rea parcels after retirement from military service. (*Id*. at 13)  She acquired the Rea parcels with the intent of gaining a retreat in nature and a place to settle down after a lifetime of moving in the service of her country. (*Id*.) Ms. Rea's home sits on the center parcel. The property is mostly wooded and approximately two-thirds of it is forested wetland along the North Fork of the Rockfish River. (*Id*.) The house sits on the raised part of the property that overlooks the floodplain where the forested wetlands lie. Ms. Rea has done considerable landscaping to the property around the home. A forest management plan is in place for the property. (*Id*.) The Rea parcels are posted, and no commercial activity of any kind takes place on them. (*Id*.)

Peter and Karen Osborne are the fee simple owners of a parcel of real estate located in Nelson County containing approximately 101.2 acres. (*Id*.) The

4

Osbornes have owned the parcel since 1979. (*Id*.) This area is heavily wooded with two springs.   Located on the Osborne parcel is a pre-Civil War slave cemetery. (*Id*.) The Osborne parcel is improved with the Osbornes' home, which they occupy as their primary residence.   (*Id*.) It is the Osbornes' intention to subdivide parcels from the Osborne parcel to convey to their children for their children to use for the construction of their own homes. (*Id*. at 13-14) The Osborne parcel is posted, and while they have occasionally sold timber from the property, no commercial activity takes place on the parcel. (*Id*. at 14).

The Plaintiffs' properties are located in the study corridor of the "Atlantic Coast Pipeline Project" ("the Project"), which is a natural gas pipeline project. The Project stretches approximately 550 miles through West Virginia, North Carolina, and Virginia. (*Id*.) The Virginia segment of the Project is approximately 300 miles in length and will pass through Nelson County. (*Id*.) The Project was, at the time the lawsuit was commenced, being carried out by Defendant Dominion Transmission, Inc. ("DTI"). (JA 352). During the pendency of the case, control of the Project was transferred from DTI to Atlantic Coast Pipeline, LLC ("ACP").[1] (JA 353).

---

[1]In order to adhere to the nomenclature used in the pleadings in the District Court, which were all filed before the transfer of responsibility to ACP, the non-governmental Defendants will hereafter be referred to collectively as "Do-

Each of the Plaintiffs received one or more letters from Dominion informing the Plaintiffs that it intended to enter upon their private property without their permission, to conduct "surveys and studies" for the purposes of determining a route through their property for the Project. (JA 14). The notices did not in any fashion indicate that the entry upon the Plaintiffs' private property was contingent upon any other event, or that entry was unlikely to occur. (*Id.*) To the contrary, the notices recited that Dominion "intends to enter upon" the Plaintiffs properties "on or after" a date certain set forth in the notice. (*Id.*) The notices implied that multiple entries would take place on different occasions, involving different agents or employees of Dominion. (*Id.*).

Attached to the letter was a "Notice of Intent to Enter Property" (the "Notice") which indicated that entry would be made on or after certain dates and provided greater detail regarding Dominion's proposed actions upon the Plaintiffs' properties. (*Id.*). The Notice states, in part:

> [T]he first step will be for a contract survey crew to mark or "flag" the anticipated right of way. A traditional survey crew will follow and locate the route using transits and other surveying equipment. Accompanying this crew or shortly behind it will be technicians who will study the proposed route for any historical or archeological significance, endangered species, soil types, and other similar conditions.

---

minion" unless differentiation is necessary.

6

> During this process, there may be very minor earth disturbance during the search for historical artifacts. Any such disturbance will be promptly refilled and repaired. Our surveyors may also need to clear pathways through brush or other growth.

(JA 14, 23-24).

Subsequent to the filing of the Complaint, Dominion sent an additional notice providing greater detail about the surveying. This further notice indicated that five separate crews will enter on the Plaintiffs' properties. Initially there will be a flagging crew which will typically consist of five people. This crew "must" clear a path on the property sufficient for the crew to "see ahead and walk." This will be followed by a survey crew that will typically consist of six people. This crew may need to walk outside the pipeline route so as to check boundaries. An environmental crew consisting of two people will then traverse an area 100' to 200' on each side of the pipeline route. A cultural resource crew consisting of five to six people will also traverse an area 100' to 200' on each side of the pipeline route. This crew will dig test areas approximately 1.5' wide and 1.5' deep "every 50 feet or so" along the pipeline route. Finally there will be a soil resistivity crew consisting of two to three people who will traverse the pipeline route. The notice gave no indication of how long it will take to complete this work.

7

Dominion relied upon Va. Code Ann. § 56-49.01 (West 2015), for its asserted right to enter upon the Plaintiffs' private property. (JA 15). The full text of this statute is set forth in the Addendum.

The Plaintiffs, wishing to maintain the privacy and non-commercial nature of their property, responded to the correspondence from Dominion by explicitly denying permission for Dominion to enter. Dominion responded with additional correspondence indicating that it would obtain a court order before entering the Plaintiffs' properties. (*Id.*)

Dominion may exercise the power of eminent domain to acquire private property for the Project only after receiving a Certificate of Public Convenience and Necessity ("CPCN") from the Federal Energy Regulatory Commission ("FERC") declaring that the Project is for the public benefit. Dominion has not received a CPCN from FERC declaring that the Project is for the public benefit. (*Id.* at 18).

During the pendency of the case Dominion informed the District Court that it had made a change to the proposed route of the pipeline and that it no longer would run through the Plaintiffs' properties. Thus, Dominion no longer had an intention to enter the properties and conduct surveys for the Project. (JA 353). But it

also stated that it could not guarantee that it would not change the route back in the future. (*Id*.)

## Course of Proceedings

The Plaintiffs filed their Complaint on September 30, 2014. (JA 3, 8-25). At the time the Complaint was filed there was only one named Defendant, Dominion Transmission, Inc. ("DTI"). On October 29, 2014, DTI moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) on ripeness grounds, and pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim (JA 3, 26-28).

The case was originally assigned to United States District Judge Glen E. Conrad.   By order entered December 1, 2014, the case was reassigned to United States District Judge Michael F. Urbanski (JA 5).

The Commonwealth of Virginia was granted leave to intervene in the case as a party Defendant on January 20, 2105 (JA 30-31), and filed a memorandum in support of the constitutionality of the challenged statute. (JA 4).

Judge Urbanski heard argument on the motion to dismiss on February 5, 2015 (JA 5, 255-94).

Due to corporate changes that occurred during the pendency of the case, the parties consented to an order permitting the addition of Atlantic Coast Pipeline, LLC, as an additional Defendant on July 10, 2015 (JA 6).

The case was again reassigned, this time to United States District Judge Elizabeth K. Dillon (JA 6). Judge Dillon permitted additional briefing and argument, and the parties were again heard on August 4, 2015 (JA 6).

On September 30, 2015, the District Court issued a memorandum opinion and entered a judgment order dismissing all of the Plaintiffs' claims. (JA 7, 347-81, 382).

The Plaintiffs filed a timely notice of appeal to this Court. (JA 383-84).

### Rulings Presented for Review

The District Court in its memorandum opinion ruled that the Plaintiffs' "as applied" challenges to Va. Code Ann. § 56-49.01 were not ripe and these were dismissed without prejudice under Rule 12(b)(1). The District Court found that the facial claims were ripe, but dismissed them on the merits under Rule 12(b)(6) for failure to state a claim. Both the dismissal under Rule 12(b)(1) of the as applied claims and the dismissal of the facial claims under Rule 12(b)(6) are before the Court on this appeal.

# SUMMARY OF ARGUMENT

The Plaintiffs filed suit under 42 U.S.C. § 1983 (2015), as well as bringing claims under state law, challenging the validity of Va. Code Ann. § 56-49.01, which permits natural gas companies to enter onto private property to conduct "surveys" without requiring that such surveys be in any way connected with an eminent domain proceeding. The Plaintiffs contend that § 56-49.01 effects an uncompensated taking in violation of the Fifth Amendment and Article I, Section 11 of the Virginia Constitution, that it results in an unreasonable seizure in violation of the Fourth Amendment, and that it deprives them of their property interests without due process of law in violation of the Fourteenth Amendment.

The Plaintiffs challenged the statute both as applied and on its face. The District Court concluded that the as applied claims were unripe and dismissed them. The District Court did so because it concluded that such claims could not be ripe until Dominion actually entered onto the Plaintiffs' properties and Dominion had disavowed any present intention of doing so. However, this Court has held that when a statute deprives owners of their property rights the damage has been done and the claims are ripe even if the actual appropriation of the property does not occur until

11

later. Accordingly, the District Court's dismissal of the as applied challenges must be reversed.

The District Court addressed the facial challenges on the merits and dismissed them all, finding that the Plaintiffs had failed to state a claim. In making its decision the District Court applied the "no set of circumstances" test from *United States v. Salerno* and concluded that because it could conceive of circumstances in which the challenged statute would be valid, the Plaintiffs could not prevail. Substantial Supreme Court precedent demonstrates that the *Salerno* test is not applicable. Instead, the proper methodology is to apply the regularly applicable standard for the constitutional claims that have been presented. Because the District Court applied the incorrect test, its decision should be reversed.

The trial court found that the property rights of Virginia citizens do not include the right to exclude surveyors from their property when such surveys are antecedent to eminent domain proceedings, and it determined that § 56-49.01 was limited to surveys antecedent to condemnation proceedings. While the District Court was correct that the right to survey antecedent to eminent domain has been widely recognized, it erred in concluding that § 56-49.01 is limited to such cases. To the contrary, the language of the statute, and of related provisions of the Virginia Code, demonstrates that § 56-49.01 is in fact intended to be used solely in situations where

condemnation proceedings are not going to take place. Because a link to condemnation proceedings is essential to the privilege to enter for surveying, the District Court's decision was incorrect and must be reversed.

The District Court made an alternative ruling on each of the Plaintiffs' claims, concluding that even if the Plaintiffs had a protected property interest the effects of § 56-49.01 were not unconstitutional. With respect to the Fifth Amendment takings claim, the court concluded that the proposed surveys were of sufficiently short duration and de minimis nature that no constitutionally cognizable injury had occurred.  However, relevant case law demonstrates that the violation authorized by § 56-49.01 is permanent in nature and significantly impacts the Plaintiffs' use of their property. Therefore the District Court's conclusion to the must be overturned.

The District Court found that there was no Fourth Amendment violation because, it stated, the Fourth Amendment's protections with respect to real property do not extend beyond the curtilage of the home, and it concluded that the surveys in this case would not enter the curtilage. The Supreme Court has made clear, though, that when the claim involves a seizure, rather than a search, the privacy analysis which undergirds search cases and limits the Amendment's protec-

tions to the curtilage is inapplicable and all of a plaintiff's property is protected. As a result, the District Court's conclusion was in error and must be reversed.

In rejecting the Plaintiffs' Fourteenth Amendment claims the District Court concluded that the public's interest in surveying property before condemning it outweighed the Plaintiffs' right to exclude and that the statute was not arbitrary or capricious in effecting the public interest. However, as the foregoing analysis demonstrates, there is no public interest in surveying outside of the eminent domain context and the District Court's balancing was thus incorrect.

Accordingly, the decision below should be reversed.

14

# ARGUMENT

In the present case Dominion sent notices to the Plaintiffs stating that it was going to send five crews of workers, totaling some twenty-two people, across the Plaintiffs' large, rural, private parcels. It indicated that these people were going to clear a path 200' to 400' wide, conduct various tests, take measurements, and dig possibly hundreds of holes on their properties. These "surveys" were going to require the presence of this small army of workers on the Plaintiffs' properties over a number of days. Dominion further informed the Plaintiffs that by virtue of Va. Code Ann. § 56-49.01 the Plaintiffs' permission for this incursion was not required.   The only basis given for the surveys was that they would be useful for Dominion's application to the Federal Energy Regulatory Commission for approval of a gas pipeline.

The Plaintiffs, believing that their fundamental right to exclude others from their private property protected them from such an intrusion, brought suit to challenge the validity of § 56-49.01. The District Court, in a decision that should deeply concern any property owner, concluded that § 56-49.01 was not unconstitutional and that property owners in Virginia have no right to bar Dominion from intruding upon their property solely for its own business convenience. For the reasons

15

set forth below this decision is wrong in a number of fundamental ways and should be reversed.

## I.    THE DISTRICT COURT ERRED IN FINDING THE AS APPLIED CLAIMS TO BE UNRIPE BECAUSE THE PLAINTIFFS' INJURIES WERE NOT CONTINGENT UPON ACTUAL ENTRY ONTO THEIR PROPERTIES

The Plaintiffs challenged Va. Code Ann. § 56-49.01 both on its face and as applied. While the District Court addressed the merits of the facial claims, it dismissed the as applied claims as unripe. For the reasons set forth below this was incorrect and the case should be remanded for review of the as applied claims.

<u>Standard of Review</u>

This Court reviews de novo a district court's dismissal under Rule 12(b)(1) for lack of ripeness. *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006). A claim is unripe if the plaintiff has not yet suffered injury and any future impact remains wholly speculative. *Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013). In determining ripeness, a court balances the "fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." *Id.* A case is fit for judicial decision when "the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Id.*

16

The Plaintiffs alleged that they had received notices from Dominion stating that Dominion was going to enter on their property on or after a date certain, and detailing what actions were going to take place after that entry. The Plaintiffs did acknowledge in the Complaint that Dominion had subsequently agreed that it would not enter until it got court approval for doing so, but Dominion never withdrew the notices or stated that it was not going to enter once court approval was obtained.

At the supplemental hearing on August 4, 2015, counsel for Dominion stated to the court that it had altered the route of the Project so that it no longer traversed the Plaintiffs' properties, but at the same time acknowledged that it could not say that in the future the route would not return to the Plaintiffs' properties. While the District Court found that the admission that the route could return in the future prevented the claims from being moot (JA 354-55), the court nonetheless found counsel's statements sufficient to make the as applied claims not ripe (JA 357). This was error.

The District Court's analysis rests solely upon its apparent conclusion that "injury" could be suffered by the Plaintiffs only after Dominion actually entered onto their property, and therefore Dominion's statement that it had no present intention of entering made any injury contingent upon a future event that might never occur. (JA 357). This ignores the gravamen of the Complaint. The Plaintiffs are not

17

seeking damages for trespass by Dominion; the Plaintiffs claim they were damaged by the Commonwealth taking away their right to keep gas companies from entering onto their private property. That taking, and the resultant damage to their constitutional rights, is complete; whether Dominion or any other gas transmission company ever takes the Commonwealth up on the invitation to go onto the Plaintiffs' private property is immaterial.

This Court's decision in *National Advertising Co. v. City of Raleigh*, 947 F.2d 1158 (4th Cir. 1991), is informative. The plaintiff in *National Advertising* brought a § 1983 action challenging a local ordinance requiring that nonconforming billboards be removed five and one-half years after enactment of the ordinance. An issue on appeal was when the plaintiff's § 1983 claim had accrued. This Court held that the plaintiff's "as applied" claims accrued upon enactment of the ordinance even though the government could take no action against the offending billboards for more than five years. *Id.* at 1164. Though ripeness per se was not addressed, a claim cannot accrue if it is not ripe and the decision in *National Advertising* thus stands for the proposition that where legislation results in a taking, no further action by the government to actually appropriate the property need occur for the property owner's claim to be ripe.

Whether Dominion ever comes onto the Plaintiffs' property has no impact on the fact that an uncompensated taking of the Plaintiffs' fundamental right to exclude others has already occurred. If the Plaintiffs were seeking actual damages for entry by Dominion, then such claims might well not be ripe, but that is not the present case. A claim is ripe when "the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." The question of the validity Va. Code Ann. § 56-49.01 is purely legal and not dependent on any future uncertainties. The District Court's dismissal of the Plaintiffs' as applied challenges was improper and the case should be remanded for consideration of these claims.

## II.    THE DISTRCT COURT ERRED IN DISMISSING THE PLAINTIFFS' FACIAL CHALLENGES BECAUSE THE PLAINTIFFS' SET FORTH FACTS STATING A PLAUSIBLE CLAIM THAT VA. CODE ANN. § 56-49.01 VIOLATES THE FEDERAL AND VIRGINIA CONSTITUTIONS.

The Plaintiffs contend that § 56-49.01 violates their rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 11, of the Virginia Constitution. The District Court found that these facial challenges were ripe, addressed them on the merits, and dismissed them under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. With respect to each of the claims the court initially ruled that the Plaintiffs had failed to establish the existence of a pro-

19

tected property interest and then made an alternative ruling that even if there were a protected property interest the Plaintiffs failed to state a claim for other reasons. The District Court analyzed each claim to determine whether there was some scenario in which the statute might be proper and concluded that there was; consequently the District Court dismissed the claims. For the reasons set forth below this analysis was flawed in a number of respects and the District Court's decision should be vacated and the case remanded for further consideration.

## Standard of Review

This Court reviews de novo a district court's dismissal under Rule 12(b)(6) for failure to state a claim. *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 391 (4th Cir. 2011). On a motion to dismiss under Rule 12(b)(6) the court must "accept as true all of the factual allegations contained in the complaint, and draw all reasonable inferences in favor of the plaintiff.  To prevail, [a plaintiff] must state a claim to relief that is *plausible* on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 388 (4th Cir. 2014) (internal citations and quotation marks omitted).

### A. The District Court incorrectly applied the "no set of circumstances" language from *United States v. Salerno* when analyzing the Plaintiffs' facial claims.

The District Court framed its analysis as follows: "To succeed in a facial challenge, the plaintiff must "'establish[] that no set of circumstances exists under which the [statute] would be valid,' *i.e.*, that the law is unconstitutional in all of its applications," citing *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States* v. *Salerno,* 481 U. S. 739 (1987) (JA 361). The court returned to this "no set of circumstances" test throughout its analysis, placing the burden on the Plaintiffs to show that there was "no other landowner" to whom the statute could not be constitutionally applied.   *See* JA 369 ("plaintiffs must show that it does so for every other parcel of property," JA 376 ("plaintiffs fail to allege sufficient facts to establish the application of the Fourth Amendment to …every other landowner's property, as they must do to prevail on a facial challenge."). As it reviewed each of the Plaintiffs' claims the District Court simply determined whether it could imagine hypothetical situations in which § 56-49.01 could possibly be constitutionally applied, concluded that it could, and then rejected the claim accordingly. Such analysis completely divorces review of the constitutionality of a statute from the terms of the statute itself, and instead im-properly requires a court to engage in hypothetical musings about potentially valid

*applications* of the statute. This approach has been rejected by other courts, *see, e.g., Doe v. City of Albuquerque*, 667 F.3d 1111, 1122-27 (10th Cir. 2012), and should be rejected by this Court as well.

Contrary to the District Court's approach, it has not been established that the *Salerno* "no set of circumstances" test applies to facial challenges not based on overbreadth. The Supreme Court has left this question open, as have other courts. *See United States v. Stevens*, 559 U.S. 460, 473 (2010)   ("Which standard applies in a typical case is a matter of dispute that we need not and do not address…."). Indeed, there is no one test that applies to all facial challenges. In *Citizens United* the Supreme Court determined that "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United v. FEC*, 558 U.S. 310, 331 (2010). Instead, the Court concluded that the distinction "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Id*. Thus, the fact that the Plaintiffs bring a facial challenge does not automatically compel the application of a specific test, much less the *Salerno* formulation.

The argument that the Supreme Court applies the "no set of circumstances" test to every facial challenge is readily disproved by the fact that subsequent to *Sa-*

*lerno* the Court has repeatedly considered facial challenges simply by applying the relevant constitutional test to the challenged statute without attempting to determine whether or not there is a hypothetical situation in which application of the statute might be valid.[2]

Indeed, in *City of Chicago v. Morales*, a plurality of the Court asserted that "[t]o the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in

---

[2]*See, e.g., Brown v. Entertainment Merchs. Ass'n*, ___ U.S. ___, 131 S.Ct. 2729, 2738, 2742 (2011) (applying strict scrutiny analysis in facial challenge); *Citizens United*, 558 U.S. at 340, 348–62, 365 (same); *Davis v. FEC*, 554 U.S. 724, 729, 736–37, 740–44 (2008) (applying heightened scrutiny in facial challenge); *Hill v. Colorado*, 530 U.S. 703, 707, 725–30 (2000) (applying *Ward* test in upholding statute on facial challenge); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 301, 313–16 (2000) (applying the test set forth in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), when addressing facial challenge); *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 806–07, 813 (2000) (applying strict scrutiny in addressing facial challenge); *National Endowment for the Arts v. Finley*, 524 U.S. 569, 572–73, 585 (1998) (noting that even though statute providing for NEA funding could be constitutionally applied in certain situations, "these permissible applications would not alone be sufficient to sustain the statute against respondents' First Amendment challenge,"); *Planned Parenthood v. Casey*, 505 U.S. 833, 869–901 (1992) (upholding certain provisions of a Pennsylvania abortion statute and striking down the spousal-notification provision without applying *Salerno*); *Burson v. Freeman*, 504 U.S. 191, 193–94, 198, 211 (1992) (applying strict scrutiny in addressing facial challenge); *Bowen v. Kendrick*, 487 U.S. 589, 593, 602 (1988) (applying *Lemon* test in upholding statute on facial challenge); *Frisby v. Schultz*, 487 U.S. 474, 476, 481–88 (1988) (applying *Ward* test in upholding town ordinance banning picketing "before or about" any residence); *Edwards v. Aguillard*, 482 U.S. 578, 580–83 (1987) (applying *Lemon* test in invalidating statute on facial challenge).

any decision of this Court, including *Salerno* itself." *City of Chicago v. Morales*, 527 U.S. 41, 55 n. 22 (1999) (plurality opinion).

The District Court cited the decision in *Washington State Grange* to support its contention that the *Salerno* "no set of circumstances" test applies to this case; however, the decision in *Washington State Grange* is in fact a good example of how the Supreme Court does not apply *Salerno*. In *Washington State Grange* the Court determined that the proper test to apply depended on how significantly the initiative burdened the associational rights at issue: if the burden was severe, strict scrutiny applied; if the burden was modest, a reasonableness standard applied. *Id*. at 451–52. The Court made clear that "[i]n determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Id*. at 449–50 (emphasis added). The Court further noted the criticism of *Salerno* and indicated that it was not relying on this test. *Id*. at 449.

Thus, *Washington State Grange* merely supports an approach to facial challenges which involves an examination of whether the terms of the statute itself "measured against the relevant constitutional doctrine, and independent of the constitutionality of particular applications, contain[] a constitutional infirmity that invalidates the statute in its entirety." *Doe*, 667 F.3d at 1127. Indeed, a facial challenge

24

is just that—a challenge to the terms of the statute, not hypothetical applications. *Salerno's* language thus is accurately understood not as setting forth a test for facial challenges, but rather as describing the result of a facial challenge in which a statute fails to satisfy the appropriate constitutional standard. In other words, where a statute fails the relevant constitutional test (such as strict scrutiny, the *Ward* test, or reasonableness review), it can no longer be constitutionally applied to anyone—and thus there is "no set of circumstances" in which the statute would be valid. *Id*. The relevant constitutional test, however, remains the proper inquiry.[3]

The District Court applied the wrong test, asking whether there could be hypothetical situations in which the statute might be valid rather than asking whether the statute as written was invalid. An analysis of the Plaintiffs' claims under the correct standards reveals that the Complaint did state a plausible claim for relief.

---

[3]*See also Ezell v. City of Chicago*, 651 F.3d 684, 698–99 (7th Cir. 2011) ( "In a facial challenge like this one, the claimed constitutional violation inheres in the terms of the statute, not its application.... [A] successful facial attack means the statute is wholly invalid and cannot be applied to anyone. Chicago's law, if unconstitutional, is unconstitutional without regard to its application—or in all its applications, as *Salerno* requires."); *Rothe Dev. Corp. v. Department of Defense*, 413 F.3d 1327, 1337–38 (Fed. Cir. 2005) ("*Salerno* is of limited relevance here, at most describing a conclusion that could result from the application of the strict scrutiny test.

25

**B.    The right to exclude others is a fundamental property right protected by the Federal and Virginia Constitutions and a privilege to enter for surveying has not been extended outside of the eminent domain context.**

The Fourth, Fifth and Fourteenth Amendments to the United States Constitution, as well as Article I, Section 11, of the Virginia Constitution protect private property from certain government action. The District Court concluded that the right to exclude surveyors antecedent to eminent domain proceedings is not part of the bundle of rights defined as "property" under Virginia law and that the abrogation of the right to exclude contained in Va. Code Ann. § 56-49.01 is limited to surveys before eminent domain proceedings. While the District Court's initial conclusion may be correct, its determination of the limits of § 56-49.01 was in error.

While generally speaking property rights protected by the Constitution are created by state law, *see Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1030 (1992), the Supreme Court and this Court have identified the right to exclude others as inhering in the very concept of private property. *See Kaiser Aetna v. United States*, 444 U.S. 164, 179 (1979) (stating that the "right to exclude" others from one's property "is universally held to be a fundamental element of the property right, [and] falls within th[e] category of interests that the Government cannot take without compensation"); *South Carolina State Educ. Assistance Auth. v. Cavazos*, 897 F.2d

26

1272, 1276 (4th Cir. 1990) (stating "[t]he essential aspects of private property are 'free use, enjoyment and disposal,' and the 'right to exclude others'" (citations omitted).

The decision in *Lucas* notwithstanding, neither *Kaiser* nor *Cavazos* made any effort to ground the right to exclude others in the specific state law at issue in those cases; to the contrary, both decisions appear simply to assume that the right to exclude others inheres in the concept of private property and precedes and any right of the state to define it away. Regardless of whether the right to exclude others is a creature of state law, or inherent in the concept of private property, Virginia law is in accordance with the statements in *Kaiser* and *Cavazos* in holding the right to exclude to be an integral part of property law in the Commonwealth. *See Tate v. Ogg*, 195 S.E. 496, 498 (Va. 1938) (acknowledging that the right to bring an action for trespass to land was part of the common law of England and has been the law of the Commonwealth since its founding and stating that this action derives from the "general principle of law, [that] every person is entitled to the exclusive and peaceful enjoyment of his own land, and to redress if such enjoyment shall be wrongfully interrupted by another.").

It has long been recognized, however, that this right to exclude is subject to the sovereign's power of eminent domain. As the California Supreme Court stated almost a century ago:

> The petitioners herein are the sole owners of each of their respective properties and as such hold their rights to be protected in the exclusive enjoyment of every portion thereof under the express guaranty of both the state and federal Constitutions, which declare that 'no person shall be deprived of life, liberty or property without due process of law.' State Constitution, § 13, art. 1; U. S. Constitution, art. 5, Amendments. These constitutional guaranties are among the most sacred inheritances of the American people, derived as they are from those earlier English Constitutions going back to Magna Charta and being reaffirmed in those succeeding petitions, declarations, and bills of right which form the fundamental background of the British Constitution. These rights, which the petitioners herein thus had to the undisturbed possession and use of their respective holdings, they held, of course, subject to the superior right of eminent domain existing in the state or its representatives to take their property, or so much thereof as was necessary for public uses. This public right, however, has always and everywhere been limited and safeguarded by express provisions of the Constitutions and statutes of the several states, and it has been uniformly held that being in invitum and in derogation of the common right, its exercise is strictly defined and limited by the express terms of the Constitution or statute creating it.

*Jacobsen v. Superior Court of Sonoma Cty., Dep't No. 2*, 219 P. 986, 989 (Cal. 1923).

28

As the District Court found, for a number of practical reasons courts have held that concurrent with the right of the sovereign to condemn private property is a privilege to enter upon private property "preliminary to instituting an eminent domain proceeding" (JA 363, 364, 365) to conduct surveys to determine the scope of the taking. Such power, though, being in derogation of the common law, is narrowly construed. The government cannot otherwise come upon private property simply because it is useful or convenient.[4]

Private entities, unlike the sovereign, have no right to enter onto private property without the owner's consent except in limited circumstances that, again, the District Court did not find applicable in this case. The sovereign may transfer its right to eminent domain to private entities, but these entities receive no greater power than the sovereign had to convey.

The necessity of linking the right to enter for survey to contemplated or pending eminent domain proceedings derives from the very nature of the right to exclude and the limited power to override that right granted to the sovereign. *See, e.g., Jacobsen*, 219 P. at 989. The necessity of forthcoming eminent domain proceedings to the validity of the right to enter is explicitly noted in almost every single

---

[4]Though certain other situations have been recognized over the years which give the sovereign the power to enter private property (e.g., pursuit of criminals, regulatory inspections, and the like), the District Court did not find any of these other exceptions applicable to the present case.

29

one of the cases cited by the Defendants and relied upon by incorporation by the

District Court.[5]

_____

[5]The District Court in its opinion faulted the Plaintiffs for not having "rebutted" the authorities cited by the Defendants. (JA 367). With all due respect to the District Court, the Plaintiff did rebut the Defendants' authorities but often did so by referring to them broadly rather than addressing every single one. In order to avoid the same pitfall on appeal, and at an unfortunate cost to the environment in additional paper, the Plaintiffs will address all of the Defendants authorities in the footnotes to this Brief. Accordingly, *see, e.g., Birmingham-Trussville Iron Co. v. Allied Engineers*, 144 So. 1, 3 (Ala. 1932) (stating "The temporary  right, and consequent limited immunity, [to enter for surveying] conferred by this statute, *is necessarily incident to, and preliminary of, authorized proceedings to condemn*) (emphasis added; citation omitted); *Walker v. City of Warner Robbins*, 422 S.E.2d 555, 556-67 (Ga. 1992) (stating "*a prospective condemning body* has the right, *incidental to its power of eminent domain*, to enter private property in order to survey...) (emphasis added); *Kane v. City of Elmhurst Nat'l Bank*, 443 N.E.2d 1149, 1152 (Ill. Ct. App. 1984) (stating "The power of entry and survey granted by …[statute] *is in aid of the County's power … to acquire property, by condemnation* if necessary, for highway construction purposes") (emphasis added); *Thomas v. City of Horse Cave*, 61 S.W.2d 601, 604 (Ky. 1933) (stating "the right of entry … for … survey …is a necessary right and *incident preliminary of the right ... to condemnation*.") (Emphasis added); *Pogue v. Kamo Elec. Co-op, Inc.*, 795 S.W.2d 566, 569 (Mo. Ct. App. 1990) (stating "such a survey *must be necessary to a condemnation that is planned and anticipated in good faith*.") (Emphasis added); *City of Keene v Armenta*, 651 A.2d 924, 927 (N.H. 1994) (stating "*Power to condemn is a condition precedent to entry*") (emphasis added); *Orr v. Quimby*, 54 N.H. 590, 596 (1874) (stating "No constitutional principle, however, is violated by a statute which allows private property to be entered upon and temporarily occupied for the purpose of a survey …, with a view to judging and determining whether the public needs require the appropriation or not."); *Creek Ranch, Inc. v. New Jersey Tpk. Auth.*, 383 A.2d 148, 151 (N.J. Super. Ct. App. Div. 1976) (stating "it has long been the rule that one having a right to condemn could enter on property, in good faith, to make preliminary surveys and plans *as a necessary incident to the right to condemn*."), *rev'd on other grounds*, 383 A.2d 110 (N.Y. 1978); *Blades v. New York State Low-Level Radioactive Waste Siting Comm'n*, 560 N.Y.S.2d 555, 556 (N.Y. App. Div. 1990)

Neither the sovereign nor private entities have the right to enter and conduct surveys unless they are antecedent to eminent domain proceedings; there is no free floating right to survey simply because it would be helpful or convenient to the government's ongoing operations.[6]

---

(stating that "The Legislature has long recognized the necessity for entry upon private property for the purpose of making surveys and examinations *prior to construction of public improvements*"); *King v. Power Auth.*, 353 N.Y.S.2d 547, 549 (N.Y. App. Div. 1974), *aff'd*, 343 N.E.2d 767 (N.Y. 1975) (same); *Root v. Kamo Elec. Co-op., Inc.*, 699 P.2d 1083, 1090 (Okla. 1985) (stating "*Accordingly, pre-condemnation surveying is not only necessary to the exercise of the right of eminent domain, it is a part of eminent domain.*"); *Western Farmers Elec. Co-op. v. Willard*, 726 P.2d 361, 364 (Okla. Ct. App. 1986) (same); *Coastal Marine Serv. of Texas, Inc. v. City of Port Neches*, 11 S.W.3d 509, 513 (Tex. Ct. App. 2000) (stating "*the right of entry on property, in good faith, for the purpose of making a preliminary survey and investigation with the view of condemnation is a necessary incident of the right to condemn*"); *I.P. Farms v. Exxon Pipeline Co.*, 646 S.W.2d 544, 545 (Tex. Ct. App. 1982) (stating "*Ancillary to such power [of eminent domain]* was the authority to enter upon the land to make a preliminary survey"); *Lyon v. Green Bay & M. Ry. Co.*, 42 Wis. 538, 544 (1877) (stating, in dictum, "It would seem that a railroad company must, of necessity, be permitted to go upon lands for the purpose of surveying and locating the line of its road; *for, until the line is located, condemnation is impossible.*"); *see also Alliance Pipeline L.P. v. Smith*, 833 N.W.2d 464, 469-70 (N.D. 2013) (noting that statute under consideration was part of chapter of state code dealing with eminent domain and applied in cases where land is "required for public use," and concluding that preliminary survey was permissible even if as a result no condemnation proceedings were ever commenced); *Square Butte Elec. Coop. v. Dohn,* 219 N.W.2d 877, 883-84 (N.D. 1974) (same); *Northville Dock Pipe Line Corp. v. Fanning*, 237 N.E.2d 220, 221, *reargument denied, remittitur amended*, 238 N.E.2d 920 (N.Y. 1968) (concluding that preliminary survey was permissible even if as a result no condemnation proceedings were ever commenced).

[6]Several of the cases identified by the Defendants below did provide for a right of entry for survey in contexts outside the eminent domain realm, but none of them identified any situation that would apply in the present context or that would

31

The Virginia authorities relied upon by the Defendants and the District Court are fully in line with those discussed above. *See* XI William Walter Hening, Statutes at Large 27-28 (1823) (ch. II) (JA 55-56) (allowing surveyors to enter on land to survey certain identified roads but prohibiting such surveys during the growing season where damage to crops might occur); 2 Va. Rev. Code ch. 234, § 7 (1819) (JA 59) (authorizing the creation of turnpike companies to construct public road-ways and permitting the companies as part of this process to "enter upon all lands … to make the said road" provided that no "dwelling house, yard, garden nor curtilage of any person be invaded without his consent"); Va. Code, tit. 17, ch. 56, § 4 (1860) (JA 68) (permitting any "company incorporated for the work of internal improve-ment" may enter onto lands for "surveying" provided that no injury be done to the owner…," but prohibiting the company from "throw[ing] open any fences or en-closures" or "in any way injur[ing] the property of the owner … without his con-sent."); Va. Code Ann. § 1105f(3) (1904) (JA 70-71) (a portion of the eminent

---

support a claim of a general exception to the right to exclude. *See, e.g., State v. District Court of Second Judicial Dist.*, 73 P. 230, 235, 237 (Mont. 1903) (con-struing state statute which permitted access to land for survey purposes as part of pre-trial discovery process); *Litchfield v. Bond*, 78 N.E. 719, 723-24 (N.Y. 1906) (concluding that entry for surveying pursuant to statute authorizing creation of maps is neither a trespass nor a taking of property); *Edwards v. Law*, 71 N.Y.S. 1097, 1098 (N.Y. App. Div. 1901) (same); *Hudson Cty. Land Imp. Co. v. Seymour*, 35 N.J.L. 47, 53 (N.J. Sup. Ct. 1871) (same).

domain statute which states that stating that any company "which is authorized … to condemn lands" may "enter upon any lands … for the purpose of examining the same, and surveying" provided that "no injury be done the owner…."); Va. Code Ann. § 3866(a) (1930) (JA 73) (giving public service corporations the power to cause to be made "such examinations and surveys for its proposed line or location of its works as may be necessary to the selection of the most advantageous locations, route or routes, or for the improvement or straightening of its line, or works, or change of location or construction, or providing additional facilities"); Va. Code Ann. § 3866a (1946 Cum. Supp.) (same).

These authorities demonstrate that the General Assembly has over the years created narrow exceptions permitting surveys antecedent to the creation of roads and other public works, oftentimes severely limiting the actions that may be taken by surveyors in the process. It has otherwise, though, protected a private property owner's right to exclude.

The District Court's analysis of the federal constitutional claims proceeds initially along unremarkable lines. It identifies the underlying privilege of the sovereign to enter upon private property "preliminary to instituting an eminent domain proceeding" to conduct surveys, it finds that this privilege to enter upon private property "preliminary to instituting an eminent domain proceeding" has been rec-

ognized in a large majority of the states, and it then concludes that Virginia law accords with this general law. Up to this point the parties are, perhaps, in agreement.

The District Court then finds that § 56-49.01 is not unconstitutional. (JA 361-81). The District Court reaches this conclusion due to a fatal error, stating that § 56-49.01 "is limited to … the *sole purpose of conducting surveys before exercising eminent domain authority*." (JA 370) (Emphasis added). This conclusion is plainly incorrect.

The language of the statute itself makes no reference to any link to eminent domain proceedings, let alone a limitation of its use to only such proceedings. In relevant part § 56-49.01 (A) states only as follows:

> Any … natural gas company … may make such … surveys for its proposed line or location of its works *as are necessary (i) to satisfy any regulatory requirements and (ii) for the selection of the most advantageous location or route, the improvement or straightening of its line or works, changes of location or construction, or providing additional facilities.…*

Va. Code Ann. § 56-49.01(A) (emphasis added). The statute identifies the reasons for which a gas company may avail itself of the power to enter and none of them are linked to eminent domain proceedings. In Virginia "the well-settled rule of construction is that even though a statute be remedial, when, at the same time, it is also in derogation of common law, it must be strictly construed." *O'Connor v. Smith*, 49

34

S.E.2d 310, 313 (Va. 1948); consequently, the powers granted in § 56-49.01(A) must be strictly limited to what is set forth in the statute.

On the other hand, Virginia does have a specific and long-standing statutory scheme that addresses the power of a condemnor to enter upon private land in relation to eminent domain proceedings. Under Virginia's traditional "slow take" procedure the condemnor simply cannot enter onto the owner's land until it files a condemnation petition and an application for entry, and the application has been granted. Va. Code Ann. § 25.1-223 (West 2015). The application cannot be granted until twenty-one days after it has been served on the landowner and a hearing has been held. Va. Code Ann. § 25.1-224 (West 2015).

When the powers of eminent domain are being, or "may be," exercised under Virginia's "quick take" procedures, the Code provides for preliminary entry for inspection in a manner almost identical to that provided for in § 56-49.01. Va. Code Ann. § 25.1-203 (West 2015). Section 25.1-203 is particularly instructive because it demonstrates that when the General Assembly intends to link the right to enter for survey to eminent domain proceedings it knows how to do so. Section 25.1-203(A) states: "*In connection with any project wherein the power of eminent domain may be exercised*, any locality or any petitioner exercising the procedure set forth in Chapter 3 (§ 25.1-300 et seq.) of this title, acting through its duly authorized officers, agents

35

or employees, may enter upon any property without the written permission of its owner." Va. Code Ann. § 25.1-203 (emphasis added). Having not used this language in drafting § 56-49.01, rules of statutory construction obligate the Court to assume that the General Assembly did not intend to create a link to eminent domain proceedings in § 56-49.01.[7]

Furthermore, the texts of the relevant statutory sections make clear that § 25.1-203 and 223 apply where the surveying is antecedent to eminent domain proceedings and § 56-49.01 applies in situations where surveying is being done for some other reason.  Specifically, § 25.1-203(F) states that "The requirements of this section *shall not apply* to the practice of land surveying, … when such surveying is *not involved in any eminent domain or any proposed eminent domain matter.*" (Emphasis added).   While § 56-49.01(D) states, in relevant part, "Nothing in this section shall impair or limit any right of a natural gas company obtained by (i) *the power of eminent domain*…." (Emphasis added). "It is well established that statutes conferring the power of eminent domain are to be strictly construed against the grant, and the authority conferred by such statutes must be exercised in the manner

---

[7]Further indication that § 56-49.01 is not applicable to eminent domain cases comes from the fact is that it is not located within the chapter of the Virginia Code dealing with eminent domain.

provided by law." *State Highway Comm'r v. Hooker Furniture Corp.*, 198 S.E.2d 649, 650 (Va. 1973).

On its face, and directly contrary to the District Court's holding, § 56-49.01 is only applicable to situations *other than those where eminent domain proceedings are pending or contemplated*. This severing of the link between the right to enter for surveying and a pending or forthcoming eminent domain proceeding is fatal to its validity. Section 56-49.01 does not require a connection to eminent domain proceedings and is, in fact, intended to apply entirely outside of the eminent domain context. Because there is no situation in which the sovereign can enter to conduct surveys outside of the eminent domain context, the Plaintiffs' underlying fundamental right to exclude others remains intact, and there is "no set of circumstances" under which the statute would be valid.   Accordingly, the District Court's decision should be reversed.

Despite the fact that § 56-49.01 does not require a link to eminent domain proceedings and thus cannot trump the Plaintiffs' fundamental right to exclude, it would still not result in any constitutional injury to the Plaintiffs if it did not also result in a taking under the Fifth Amendment, an unreasonable seizure under the Fourth Amendment, or an impermissible deprivation of property under the Fourteenth Amendment, or if it did not violate the Virginia Constitution. The District

37

Court addressed these issues in its alternative ruling, dismissing them all. There are

significant errors in this analysis as well.

### C.    The actions of Dominion permitted under the statute result in cognizable constitutional injury to the Plaintiffs' rights under the Fifth Amendment and the Virginia Constitution.

The Fifth Amendment to the United States Constitution provides, in relevant

part, that "No person shall ... be deprived of ... property, without due process of law;

nor shall private property be taken for public use, without just compensation." U.S.

Const. amend. V. The Fifth Amendment prohibits takings of private property for a

public purpose "without just compensation *and* takings for a private purpose."

*Rumber v. District of Columbia*, 487 F.3d 941, 943-44 (D.C. Cir. 2007) (emphasis

added).

There is no dispute that § 56-49.01 authorizes a physical "invasion" of the

Plaintiffs' properties. With respect to invasion cases, "[i]n general (at least with

regard to permanent invasions), no matter how minute the intrusion, and no matter

how weighty the public purpose behind it, we have required compensation."  *Lu-*

*cas,* 505 U.S. at 1015. "[T]emporary limitations on the right to exclude," on the

other hand, do not always require compensation. *Id.* at 436 n.12. Accordingly, if the

invasion in the present case is permanent, then the Fifth Amendment has been vio-

lated because no compensation has been paid; if the invasion is only temporary then

38

the interference with the owner's property interest must be more than de minimis before compensation is required.

In the present case the District Court found that the "the *access* permitted under § 56-49.01 is temporary" (JA 370) (emphasis added), and concluded that this also meant the taking was temporary. (*Id.*). The District Court cites no authority for its conclusion (*id.*), and it is contradicted by Supreme Court precedent.

In *Lucas,* the Supreme Court cited *Kaiser Aetna* and *United States v. Causby*, 328 U.S. 256 (1946), as examples of "permanent" invsaions. 505 U.S. at 1015. In both of these cases, though, the invasion itself was only intermittent. In *Kaiser Aetna* the property at issue was a pond which had been operated for many years as a private marina.  As a result of modifications made by the owner, the government asserted that the pond had been rendered a navigable waterway and was subject to a navigational servitude in favor of the public.  The government did not install any equipment or facilities or in any other way occupy any portion of the property.  The only result of the navigational servitude was the permission of transitory entry of the public by boat into the pond.  There was no indication how frequent such entries would be or their duration, though it is certainly reasonable to assume that since nonpaying members of the public would not be permitted to use the owner's facili-

ties their visits would be of short duration.[8]   Nonetheless, in *Lucas* the Court iden-

tified *Kaiser Aetna* as an example of a "permanent" invasion case.

In *Causby* the taking claim arose from airplane flights over the plaintiff's

property.   The flights occurred pursuant to a six-month lease renewable until the

end of the war.   The runway at issue was used only 4% of the time for takeoffs and

7% of the time for landings.   The passage of aircraft over the plaintiff's property

was by its nature brief, the runway creating the problem was used for only a very

small percentage of takeoffs and landings, and flights involved no actual contact

with the property.   In addition to this, because of the short term nature of the lease,

there was a clear endpoint to the taking.   The Court in *Lucas*, however, identified

*Causby* as an example of a "permanent" invasion.

The decisions in *Causby* and *Kaiser Aetna,* and their citation by the Court in

*Lucas* as examples of permanent takings, demonstrate that whatever the Supreme

Court means by permanent, it does not mean a constant invasion of the plaintiff's

property twenty-fours a day, seven days a week.   Fact patterns where the actual

---

[8]In point of fact, there is no indication in the opinion that there had been any entry by the public at all. Contrary to the statement of the District Court in its opinion that the owner of the marina sued the United States to block public access to the marina (JA 370), the Supreme Court's opinion states that the United States brought suit to gain public access, *Kaiser Aetna*, 444 U.S. at 168, which strongly implies that any access by the public up to that point had been limited at best. This is reinforced by the Supreme Courts statement that the owner used patrol boats to "control access" and "maintain the privacy." *Id*.

physical invasion is only intermittent nonetheless can produce "permanent" invasions.

Because the interference with the Plaintiffs' rights in this case is permanent and no compensation was paid, the Fifth Amendment has been violated. However, even if the invasion in this case were only temporary, the District Court's finding that it was only "de minimis," and therefore did not require compensation, was also incorrect.

The Supreme Court's decisions "confirm, [that] if government action would qualify as a taking when permanently continued, temporary actions of the same character may also qualify as a taking . . . [and] takings temporary in duration can be compensable. *Arkansas Game & Fish Comm'n v. United States*, ___ U.S. ___, ___, 133 S. Ct. 511, 519 (2012). The Court has recognized "that no magic formula enables a court to judge, in every case, whether a given government interference with property is a taking. In view of the nearly infinite variety of ways in which government actions or regulations can affect property interests, the Court has recognized few invariable rules in this area." *Arkansas Game & Fish Comm'n,* ___ U.S. at ___, 133 S. Ct. at 522. Instead, a number of factors have been deemed relevant such as the duration, whether the invasion was intentional and the character of the land at issue. *Id.*

41

The District Court, referring to *Kaiser Aetna* and *Causby,* found that the damage in this case was insufficient to result in cognizable injury. The District Court points to the finding in *Causby* that the flights had resulted in the total "destruction of the use of the [owners'] property as a commercial chicken farm" and finds the injury in the present case, by comparison, to come up short. Of course, *Causby* is a dramatic example; as set forth below, violations have been found in far less drastic situations. The District Court also relied heavily on the Supreme Court's decision in *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 81 (1980), for its conclusion that the Plaintiffs' ability to use their property had not been sufficiently impaired.

In *PruneYard* the plaintiff owned a shopping mall and the California Supreme Court interpreted the California constitution as permitting private parties to enter into the shopping mall and distribute literature without the owner's consent. The owner of the shopping center challenged this ruling under the Fifth Amendment.

The Court noted that a resolution of whether a taking has occurred is a fact specific determination. *Id*. at 83. It emphasized that it was dealing with a commercial property: "[i]t bears repeated emphasis that we do not have under consideration the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment." *Id*. at 78. The Court contrasted the facts in the case

42

before it with those in *Kaiser Aetna*.  The Court noted that in *Kaiser Aetna* the owners of a private pond had invested substantial amounts of money in developing it into a marina, and the Government sought to compel free public use of the private marina. The Court stated that the Government's attempt to create a public right of access to the improved pond interfered with Kaiser Aetna's "reasonable investment backed expectations."

The Court found that the appellants had failed to demonstrate that the right to exclude others is so "essential to the use or economic value of their property" that the state-authorized limitation of it amounted to a taking.   As the Court phrased it, "[t]here is nothing to suggest that preventing appellants from prohibiting this sort of activity will unreasonably impair the value *or use* of their property *as a shopping center*."   *Id*. at 83 (emphasis added).

Critical to the decision of the majority, as well as three of the four concurrences, was the recognition that a shopping center is a specialized type of private property being both commercial in nature and one which members of the public are invited to enter. *Id*. at 77, 83, 89 (Marshall, J., concurring), 95 (White, J., concurring), 96 (Powell, J., concurring). A person's home is obviously quite different from a shopping mall. The Complaint alleges that all of the Plaintiffs have acquired their properties for use as their personal residences, that they have sought out privacy as a

refuge, that they have actively excluded others from entering on their property by posting, and that they have not permitted commercial operations on their properties. The "reasonable investment backed expectations" of a person purchasing a private residence, particularly one located in a rural area on a large parcel, include the expectation that he or she will be able to enjoy the right to exclude others.

The District Court acknowledged that there were differences between a regional shopping mall and a private residence, but nonetheless concluded that these differences do "not take away from the Supreme Court's holding that a temporary, nonexclusive physical invasion that does not unreasonably impair a property's value or use is not a compensable taking" and concluded that the "plaintiffs [in the present case] make no allegations establishing that § 56-49.01 unreasonably impairs the value or use of their properties." This conclusion is contrary to those of other courts interpreting *PruneYard.*

Even in cases involving commercial real estate, many courts have found a constitutionally significant distinction between the regional shopping mall in *PruneYard* sufficient to tip the balance in favor of the owner of private property as against the right of public access. *See, e.g., Slevin v. Home Depot,* 120 F. Supp. 2d 822, 835 (N.D. Cal. 2000) (holding that under *PruneYard* the owner of a Home Depot store did not have to allow public access for soliciting voters); *Trader Joe's*

44

*Co. v. Progressive Campaigns*, 86 Cal. Rptr. 2d 442, 449 (Cal. Ct. App. 1999) (finding that under *PruneYard* balancing test a stand-alone grocery store owner's property rights would be infringed if it were required to permit persons soliciting signatures onto its property); *Allred v. Harris*, 18 Cal. Rptr. 2d 530, 535 (Cal. Ct. App. 1993) (concluding that under *PruneYard* balancing test the owner of a private medical center was not required to allow access by picketers). If the right to exclude retained by the owner of a Home Depot megastore prevails over the right of access of the public, then the right to exclude retained by the owner of a private residence must as well.

Also central to the analysis is the nature of the intrusion. *PruneYard* involved leafletting, in *Slevin* and *Trader Joe's* the intruders were simply standing around and asking passersby for their signatures, and in *Allred* the picketers were carrying signs. The courts in each of these cases found that these activities imposed too great a burden on the private property rights of the owners. In the present case it is alleged that a path from 200' to 400' wide would be cleared across the Plaintiffs' parcels, which are quite large. Then, over a period of multiple days, between 20 and 22 people will traverse this path engaging in various activities. Some of these people will dig holes 1.5 cubic feet in size every 50 feet along the entire length of the path over the property. How much more intrusive this is than soliciting signatures

may not be capable of precise measurement, but more intrusive it certainly is. At the end of the day the Plaintiffs need only plead facts showing that such an outcome is plausible, and they have done so in this case.

The District Court's conclusion is that clearing a 200' wide path, digging holes and the other actions proposed are of no constitutional import because "surveys" are permitted ignores the "fact specific" nature of the inquiry. Neither the Defendants nor the District Court made any effort to identify the scope of the "surveys" permitted by the sources they rely upon.  The District Court's implicit conclusion is that regardless of how substantial or intrusive the actions are, provided they are characterized as merely a "survey" by the entity carrying them out, then a property owner has no right to prohibit them.

The case law cited by the Defendants in their briefs and referred to by the District Court paints a much more nuanced and accurate picture, indicating that what is understood to be permitted by "survey" statutes varies from jurisdiction to jurisdiction and requires fact finding by a trial court before a decision can be made.[9]

---

[9]*See, e.g., Dancy v. Alabama Power Co.,* 73 So. 901, 902 (1916) (surveying "may include the tramping down of herbage and the minimum of injury to growing crops; but in no event can it rightfully include the injury or destruction of any form or character or amount of growing trees or timber."); *Birmingham-Trussville Iron Co.*, 144 So. at 3 (1932) ("the right to survey does not permit cutting trees: Of course, the statute does not undertake to, and does not, justify or authorize any permanent injury to, or destruction of, standing timber, or trees, by the corporation

46

Cutting saplings and brush, conducting soil surveys and digging holes, all of which are permitted under Va. Code Ann. § 56-49.01, have all been held to be outside the scope of constitutionally permissible "surveying." The statements by Dominion about what was going to be included in the "surveys" is more than sufficient to create a plausible claim that the injuries were going to be more than de minimis, and the District Court's decision to the contrary should be reversed.

---

so entering upon the land, in the exercise of this right of examination and survey conferred by the statute. To place such a construction upon the statute would make it violative of the … Constitution"); *Jacobsen*, 219 P. at 991 ("it is clear that whatever entry upon or examination of private lands is permitted by the terms of this section cannot amount to other than such innocuous entry and superficial examination as would suffice for the making of surveys or maps and as would not in the nature of things seriously impinge upon or impair the rights of the owner to the use and enjoyment of his property."); *Oglethorpe Power Corp. v. Goss,* 322 S.E.2d 887, 890-91 (Ga. 1984) (same); *Missouri Highway & Transportation Comm'n v. Eilers*, 729 S.W.2d 471 (Mo. Ct. App.1987) (holding that a survey requiring drilling and use of heavy machinery on private property would amount to a taking); *Board of Cty. Comm'rs v. Roberts*, 159 P.3d 800, 805-06 (Colo. Ct. App. 2006) (access to defendants' property as often as seventeen times during seventeen days of a three-week period with a maximum of five individuals entering the property at any given time, consisting of two two-man crews and the surveyor himself, would not constitute a taking); *Kane,* 443 N.E.2d at 1152 (holding that statute granting power to make "surveys" did not include power to make subsurface soil and geological studies and construing the statute as permitting this would require the court to declare the statute unconstitutional); *Indiana & Michigan Elec. Co. v. Stevenson*, 363 N.E.2d 1254, 1259-60 (Ind. Ct. App. 1977) (stating the entry for survey statute could not permit the company "to destroy trees, crops, brush, or any other portions of the realty in carrying out those activities," and stating that cutting 23 saplings would be unconstitutional).

47

### D. The recent amendments to the Virginia Constitution, which significantly narrowed the scope of the power of eminent domain, are violated by Va. Code Ann. § 56-49.01

In *Kelo* v. *City of New London*, 545 U.S. 469 (2005), the Supreme Court upheld the power of states under the Fifth Amendment to take property from one private owner and convey it to another private owner for ostensibly "public" purposes such as economic development.   The *Kelo* decision provoked outrage and in the aftermath Virginia, along with forty-one other states, adopted statutory or constitutional changes designed to prevent *Kelo*-style takings at the state level.

As amended, the relevant portion of the Virginia Constitution now provides:

> That the General Assembly shall pass no law whereby private property, the right to which is fundamental, shall be damaged or taken except for public use. No private property shall be damaged or taken for public use without just compensation to the owner thereof. No more private property may be taken than necessary to achieve the stated public use. . . . A public service company … exercises the power of eminent domain for public use when such exercise is for the authorized provision of utility, common carrier, or railroad services. In all other cases, a taking or damaging of private property is not for public use if the primary use is for private gain, private benefit, private enterprise, increasing jobs, increasing tax revenue, or economic development, except for the elimination of a public nuisance existing on the property.

Va. Const. art. I, § 11.

48

The change that the amendment intended to bring about cannot be overstated. The relevant provision prior to the 2012 Amendment stated, in its entirety, as follows: "that the General Assembly shall not pass any law … whereby private property shall be taken or damaged for public uses, without just compensation, the term 'public uses' to be defined by the General Assembly." Not the least of the changes was the citizens' decision to remove from the General Assembly the power to determine what constitutes a public use.

This constitutional tightening must also be viewed in the context of Virginia's already constricted eminent domain jurisprudence. The determination whether a locality's intended use of property to be condemned qualifies as a "public use" must be made upon consideration of the facts and circumstances of the particular case. *Hoffman Family, L.L.C. v. City of Alexandria*, 634 S.E.2d 722, 729 (Va. 2006). The Virginia Supreme Court has stated that "the *public use* implies a possession, occupation, and enjoyment of the land by the public at large, or by public agencies; and a due protection to the rights of private property will preclude the government from seizing it [from] the hands of the owner, and turning it over to another on vague grounds of public benefit to spring from the more profitable use to which the latter may devote it."*Phillips v. Foster,* 211 S.E.2d 93, 96 (Va. 1975). *See Ottofaro v. City of Hampton*, 574 S.E.2d 235, 237-38 (Va. 2003) (same).

49

The applicable FERC regulations do not require Dominion to conduct surveys before submitting its application, nor do they require any specific method by which Dominion must acquire the information that it submits. Stripped of its rhetoric, Dominion wants to conduct the surveys because it believes that by doing so it will have a business advantage when it submits its application; a more finely-detailed application, it hopes, will be more likely to result in approval. This is precisely the type of private profit driven basis for taking that the citizens of the Commonwealth sought to preclude when amending their constitution, and the District Court's finding that Dominion's convenience was a proper "public use" and did not violate Article I, Section 11 of the Virginia Constitution was in error and must be reversed.

> **E.    The Fourth Amendment's prohibition of unreasonable seizures protects the Plaintiffs' properties and the required balancing of interests shows that the seizure effected by Va. Code Ann. § 56-49.01 is unreasonable.**

The Fourth Amendment provides that "[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable … seizures, shall not be violated." U.S. Const. amend. IV. The Fourth Amendment's protections extend to real property. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (2006). A seizure occurs whenever there has been a "meaningful interference with an individual's possessory interests in that property." *United States v. Place*, 462 U.S.

50

696, 705 (1983). The District Court rejected the Fourth Amendment claim for three reasons: it found, for the reasons articulated in its Fifth Amendment ruling, (1) -that the Plaintiff had no possessory interest in excluding surveyors; (2) the Plaintiffs' properties were not protected by the Fourth Amendment; and (3) any seizure was not unreasonable. For the reasons set forth above, the finding that there was no possessory interest is incorrect.   The District Court's two additional conclusions are also incorrect.

The District Court based its conclusion that the Plaintiffs' properties were not protected by the Fourth Amendment on the assertion that the Fourth Amendment's "protections against unreasonable seizures extend to real property …[but] are, however, limited to the home and its curtilage or the area 'immediately surrounding and associated with the home.'" (JA 376-77) (Citations omitted).   Finding that the Plaintiffs all owned large parcels and that the area seized would be outside the curtilage it ruled that no Fourth Amendment claim would be stated. (JA 376-78).

All of the cases upon which the District Court relies to support the limitation of the Fourth Amendment to the curtilage are cases dealing with the *searches* under the Fourth Amendment, not *seizures*. *See Florida v. Jardines*, ___ U.S. ___, ___, 133 S. Ct. 1409, 1414 (2013); *United States v. Jones*, ___ U.S. ___, ___, 132 S. Ct.

51

945, 953 (2012); *Oliver v. United States*, 466 U.S. 170, 180 (1984).[10] There is, however, a crucial difference between the Supreme Court's analysis in search cases and its analysis in seizure cases which demonstrates that the District Court's conclusion is incorrect.

The rationale for the limitation of the Fourth Amendment to the home and its curtilage in *search* cases is based upon the privacy interests that inhere in the home and its immediate environs. *Oliver*, 466 U.S. at 177-84. Outside of the curtilage a property owner has no legitimate expectation of privacy and thus the Fourth Amendment does not protect against searches of these areas. *Id*.

The unanimous Supreme Court, however, has rejected any role for notions of privacy when the Fourth Amendment's protections against *seizures* are at issue, holding instead that the Fourth Amendment protects possessory interests as well as privacy interests. "The Amendment protects the people from unreasonable searches and seizures of 'their persons, houses, papers, and effects.' *Soldal v. Cook Cty.*, 506 U.S. 56, 62 (1992). "[O]ur cases unmistakably hold that the Amendment protects property as well as privacy." *Id*. "We thus are unconvinced that any of the Court's

---

[10]In *Presley* this Court stated that in seizure cases the Fourth Amendment "may not" protect real property other "than a house and its surrounding curtilage." 464 F.3d at 484 n.3 However, it noted conflicting authority on this point and concluded that it did not need to resolve the issue. *Id.*

prior cases supports the view that the Fourth Amendment protects against unreasonable seizures of property only where privacy or liberty is also implicated." *Id*. at 65.

The Supreme Court's decision in *United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993), is instructive. In this case the government seized and sold real property consisting of a home and four acres of surrounding land pursuant to federal drug asset forfeiture laws. The Supreme Court held that the seizure violated the Fourth Amendment without ever determining whether the four acres were part of the curtilage. Importantly, in the course of its ruling the Court stated that "[[t]he constitutional limitations we enforce in this case apply to real property in general, not simply to residences." *Id*. at 61. At common law only a "dwelling house" possessed a curtilage and the Court's statement would thus seem to preclude any argument that the Fourth Amendment's protections against seizure of property extend only to the home and the curtilage.

Because the Supreme Court extends the Fourth Amendment protection against unreasonable seizures to all real property, not just that within the curtilage, the District Court's finding to the contrary is incorrect and must be reversed.

The final basis for the District Court's rejection of the Fourth Amendment claim was its conclusion that any seizure was not "unreasonable." The reasonable-

ness of a seizure is determined by a "careful balancing of governmental and private interests." *See Soldal,* 506 U.S. at 71 (quoting *New Jersey v. T.L.O.*, 469 U.S. 325 (1985)). When, as in this case, the government does not act "to serve the ordinary needs of law enforcement," the balancing of these interests is done "without reference to [the] usual presumption in favor of the procedures specified in the [Fourth Amendment's] Warrant Clause." *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 679 (1989).

For the same reasons discussed above with respect to the Fifth Amendment, particularly the cases addressing the *PruneYard* balancing test and limits on what may constitute a permissible "survey," the owner's right to exclude others is a fundamental one that is rarely outweighed by the rights of the public or other private parties. Likewise, for the reasons set forth above, utility companies do not have a free floating right to survey outside of the eminent domain context. Thus, phrased correctly as determining the balance between the fundamental right to exclude on the one hand and a non-existent right to enter for surveys unrelated to eminent domain on the other, the search in this case was unreasonable and the District Court's finding to the contrary was in error.

54

### F.    The Fourteenth Amendment is violated where, as in this case, the means selected by the government to do not serve a legitimate purpose.

The Fourteenth Amendment provides, in relevant part, that "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law. . . ."   U.S. Const. amend. XIV. To state a procedural due process claim, a plaintiff must allege that (1) "he had a constitutionally cognizable life, liberty, or property interest," (2) that "some form of state action" deprived him of that interest; and (3) "that the procedures employed were constitutionally inadequate." *Id.* (Internal quotation marks and citations omitted).

The District Court rejected the Fourteenth Amendment claim finding (1) that there was no cognizable property interest and (2) that Plaintiffs had not adequately alleged that "§ 56-49.01 is unreasonable, arbitrary, or capricious, or that the means selected are unrelated to the objective sought to be attained." (JA 380-81).

For the reasons set forth above regarding the Fifth and Fourth Amendment claims, the Plaintiffs do have a fundamental property interest in excluding the Defendants from their property.

As to the second part of the analysis the District Court determined that Va. Code Ann. § 56-49.01 was not arbitrary or capricious because "the statute serves a

legitimate state interest in facilitating the supply of natural gas, and it gives a natural gas company only a limited right of entry in furtherance of that interest." (JA 381).

As set forth above neither the District Court nor the Defendants have provided any authority establishing the existence of a legitimate interest in "facilitating the supply of natural gas" by permitting surveys outside of eminent domain proceedings. It is hard to conceive of how the District Court's determination would not immediately lead to absurd results. Its theory is, in essence, that anything that a gas company does that facilitates its business operations is in furtherance of a legitimate state interest and thus justifies an intrusion on private property by a gas company. Needless to say, there is no existing authority which supports such an expansive view. Accordingly, the District Court's dismissal of this claim should be reversed.

56

## CONCLUSION

Virginia Code Ann. § 56-49.01 is intended to provide a convenient method for natural gas companies to obtain information for their own private business advantage at the expense of the rights of private property owners. For the reasons set forth above this statute violates both federal and state law. The decision of the District Court, which sanctions this violation of the Plaintiffs' rights, should be reversed and the case remanded for further proceedings in accordance with the correct legal principles.

Respectfully submitted,

JAMES KLEMIC, et al.,

by counsel

/s/ Neal L. Walters, Esq.
Neal L. Walters, Esq. (VSB No. 32048)
Scott/Kroner, PLC
418 East Water Street
P.O. Box 2737
Charlottesville, VA 22902
(804) 296-2161

Counsel for Appellant.

57

## CERTIFICATE OF COMPLIANCE WITH
## TYPEFACE AND LENGTH LIMITATIONS

Counsel for the Appellant certifies:

1. That this brief has been prepared using Word 2010, and the typeface Times New Roman 14 point.
2. That exclusive of the table of contents, table of authorities, and certification of service, the brief contains 13,565 words.

   Counsel for the Appellant understands that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

/s/ Neal L. Walters, Esq.
Neal L. Walters, Esq.

58

CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25, I hereby certify that I have this 19th day of January, 2016, filed the required copies of the Appellant's Brief and Joint Appendix in the Clerk's Office of the United States Court of Appeals for the Fourth Circuit via hand delivery and electronically using the Court's CM/ECF system which will send notification of such filing to:

Richard D. Holzheimer, Jr.
Stephen P. Mulligan
Mark E. Shaffer
John D. Wilburn
MCGUIREWOODS LLP
Suite 1800
1750 Tysons Boulevard
Tysons Corner, VA 22102
(703) 712-5000

Brian D. Schmalzbach
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-4746

Counsel for Defendants-Appellees

Stuart A. Raphael
Trevor Stephen Cox
OFFICE OF THE ATTORNEY
GENERAL OF VIRGINIA
900 East Main Street
Richmond, VA 23219
(804) 786-2071
*Counsel for Intervenor/Defendant-Appellee*

/s/ Neal L. Walters, Esq.
Neal L. Walters, Esq.

59

ADDENDUM

Va. Code Ann. § 56-49.01 (West 2015)

A. Any firm, corporation, company, or partnership, organized for the bona fide purpose of operating as a natural gas company as defined in 15 U.S.C. § 717a, as amended, may make such examinations, tests, hand auger borings, appraisals, and surveys for its proposed line or location of its works as are necessary (i) to satisfy any regulatory requirements and (ii) for the selection of the most advantageous location or route, the improvement or straightening of its line or works, changes of location or construction, or providing additional facilities, and for such purposes, by its duly authorized officers, agents, or employees, may enter upon any property without the written permission of its owner if (a) the natural gas company has requested the owner's permission to inspect the property as provided in subsection B, (b) the owner's written permission is not received prior to the date entry is proposed, and (c) the natural gas company has given the owner notice of intent to enter as provided in subsection C. A natural gas company may use motor vehicles, self-propelled machinery, and power equipment on property only after receiving the permission of the landowner or his agent.

B. A request for permission to inspect shall (i) be sent to the owner by certified mail, (ii) set forth the date such inspection is proposed to be made, and (iii) be made not less than 15 days prior to the date of the proposed inspection.

C. Notice of intent to enter shall (i) be sent to the owner by certified mail, (ii) set forth the date of the intended entry, and (iii) be made not less than 15 days prior to the date of mailing of the notice of intent to enter.

D. Any entry authorized by this section shall not be deemed a trespass. The natural gas company shall make reimbursement for any actual damages resulting from

60

such entry. Nothing in this section shall impair or limit any right of a natural gas company obtained by (i) the power of eminent domain, (ii) any easement granted by the land-owner or his predecessor in title, or (iii) any right-of-way agreement, lease or other agreement by and between a natural gas company and a landowner or their predecessors in title or interest.

61