No. 17-1351

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

INTERNATIONAL REFUGEE ASSISTANCE PROJECT, a project of the Urban Justice Center, Inc., on behalf of itself; HIAS, INC., on behalf of itself and its clients; MIDDLE EAST STUDIES ASSOCIATION OF NORTH AMERICA, INC., on behalf of itself and its members; MUHAMMED METEAB; PAUL HARRISON; IBRAHIM AHMED MOHOMED; JOHN DOES #1 & 3; JANE DOE #2,

*Plaintiffs – Appellees*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; DEPARTMENT OF STATE; OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE; JOHN F. KELLY, in his official capacity as Secretary of Homeland Security; REX W. TILLERSON, in his official capacity as Secretary of State; DANIEL R. COATS, in his official capacity as Director of National Intelligence,

*Defendants – Appellants*.

On Appeal from the United States District Court
for the District of Maryland, Southern Division
(8:17-cv-00361-TDC)

---

### BRIEF FOR APPELLANTS

JEFFREY B. WALL
*Acting Solicitor General*

EDWIN S. KNEEDLER
*Deputy Solicitor General*

CHAD A. READLER
*Acting Assistant Attorney General*

ROD J. ROSENSTEIN
*United States Attorney*

AUGUST E. FLENTJE
*Special Counsel to the Assistant Attorney General*

DOUGLAS N. LETTER
SHARON SWINGLE
H. THOMAS BYRON III
LOWELL V. STURGILL JR.
*Attorneys, Appellate Staff*
*Civil Division, Room 7241*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-2689*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................. 1

STATEMENT OF JURISDICTION.................................................... 4

STATEMENT OF THE ISSUE........................................................... 4

STATEMENT OF THE CASE ........................................................... 5

    A.    Statutory Background.........................................................5

    B.    The Revoked Order ...........................................................7

    C.    Litigation Challenging the Revoked Order ........................8

    D.    The Order ..........................................................................8

        1.    Temporary entry suspension for six countries............9

        2.    Temporary refugee suspension and cap....................11

    E.    District Court Injunction .................................................12

    F.    Subsequent Decisions......................................................14

SUMMARY OF ARGUMENT ......................................................... 15

STANDARD OF REVIEW .............................................................. 17

ARGUMENT .................................................................................... 18

I.    Plaintiffs' Challenge To Section 2(c) Of The Order Is Not Justiciable ....... 18

    A.    Plaintiffs' Claims Do Not Satisfy Standing And Ripeness Requirements........................................................18

        1.    The individual plaintiffs whose relatives seek visas allege only speculative, non-imminent injuries...................19

        2.    The waiver process does not cause any cognizable injury .......21

3.    Plaintiffs' claimed stress is not an Article III injury................23

4.    None of the remaining plaintiffs has standing .........................25

B.    Consular Nonreviewability Principles Bar Plaintiffs' Claims ...........26

II.    Plaintiffs Are Not Likely To Succeed On The Merits.................................. 27

A.    The Order Is A Valid Exercise Of The President's Statutory Authority .......................................................................................27

1.    The Order falls squarely within the President's broad authority under Sections 1182(f) and 1185(a) ........................28

2.    Section 1152(a)(1)(A) does not require issuance of visas to aliens denied entry under the Order, and cannot justify the injunction in any event .............................................................30

B.    The Order Does Not Discriminate On The Basis Of Religion ..........35

1.    Plaintiffs' constitutional claim fails under *Mandel* because the Order rests on a facially legitimate, bona fide reason.........35

2.    The district court erred by declining to apply *Mandel* .............39

3.    The entry suspension complies with the Establishment Clause .................................................................42

a.  The Order's text and purpose are religion-neutral...............42

b.  The Order cannot be enjoined based on campaign statements and other unofficial comments..............................425

III.    The Balance Of Equities Weighs Strongly Against Enjoining The Order... 53

IV.    The District Court's Nationwide Injunction Is Improper ............................. 55

CONCLUSION ..................................................................... 57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                 **Page(s)**

*Abourezk v. Reagan*,
  785 F.2d 1043 (D.C. Cir. 1986),
  *aff'd*, 484 U.S.1 (1987) ................................................................ 26, 29

*Allen v. Wright*,
  468 U.S. 737 (1984) ...................................................................... 21, 24

*Allende v. Shultz*,
  845 F.2d 1111 (1st Cir. 1988) ............................................................ 27

*Am. Ins. Ass'n v. Garamendi*,
  539 U.S. 396 (2003) ............................................................................ 40

*Beck v. McDonald*,
  848 F.3d 262 (4th Cir. 2017) ............................................................... 20

*Buckeye Cablevision, Inc. v. United States*,
  438 F.2d 948 (6th Cir. 1971) ............................................................... 34

*Bustamante v. Mukasey*,
  531 F.3d 1059 (9th Cir. 2008) ............................................................. 27

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) ....................................................................... 43, 48

*Clapper v. Amnesty Int'l USA*,
  133 S. Ct. 1138 (2013) ........................................................................ 19

*Dep't of the Navy v. Egan*,
  484 U.S. 518 (1988) ............................................................................ 55

*Direx Isr., Ltd. v. Breakthrough Med. Corp.*,
  952 F.2d 802 (4th Cir. 1991) ............................................................... 53

*DKT Mem'l Fund v. Agency for Int'l Dev.*,
  887 F.2d 275 (D.C. Cir. 1989) ............................................................. 23

*Elrod v. Burns*,
  427 U.S. 347 (1976) ............................................................................ 54

*Fiallo v. Bell*,
 430 U.S. 787 (1977) ....................................................................... 26, 36, 39, 41

*Franklin v. Massachusetts*,
 505 U.S. 788 (1992) .................................................................................40

*Glassman v. Arlington County*,
 628 F.3d 140 (4th Cir. 2010) ..................................................................49

*Glassroth v. Moore*,
 335 F.3d 1282 (11th Cir. 2003) ..............................................................52

*Haig v. Agee*,
 453 U.S. 280 (1981) .................................................................................54

*Harisiades v. Shaughnessy*,
 342 U.S. 580 (1952) .................................................................................36

*Holder v. Humanitarian Law Project*,
 561 U.S. 1 (2010) .....................................................................................55

*Jackson v. Okaloosa County*,
 21 F.3d 1531 (11th Cir. 1994) .................................................................22

*Johnson v. Whitehead*,
 647 F.3d 120 (4th Cir. 2011) ............................................................. 39, 41

*Kentuckians for the Commonwealth, Inc. v. Rivenburgh*,
 317 F.3d 425 (4th Cir. 2003) ..................................................................56

*Kerry v. Din*,
 135 S. Ct. 2128 (2015) .......................................................................27, 38

*Kleindienst v. Mandel*,
 408 U.S. 753 (1972) ....................................................................... *passim*

*Kowalski v. Tesmer*,
 543 U.S. 125 (2004) .................................................................................22

*Landon v. Plasencia*,
 459 U.S. 21 (1982) .....................................................................................3

*Larson v. Valente*,
  456 U.S. 228 (1982) ...................................................................43

*League of Women Voters v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) .................................................18

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State,
  Bureau of Consular Affairs*,
  45 F.3d 469 (D.C. Cir. 1995),
  *vacated on other grounds*, 519 U.S. 1 (1996) ......................27

*Lemon v. Kurtzman*,
  403 U.S. 602 (1971) ...............................................................42

*Lewis v. Casey*,
  518 U.S. 343 (1996) ...............................................................56

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ......................................................... 18, 25

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ...............................................................56

*Maryland v. King*,
  567 U.S. 1301 (2012) .............................................................54

*McCreary County v. ACLU*,
  545 U.S. 844 (2005) ........................... 42, 43, 46, 47, 48, 49, 51

*Mississippi v. Johnson*,
  71 U.S. (4 Wall.) 475 (1867) .............................................. 40, 55

*Modrovich v. Allegheny County*,
  385 F.3d 397 (3d Cir. 2004) ..................................................49

*Moss v. Spartanburg Cty. Sch. Dist. Seven*,
  683 F.3d 599 (4th Cir. 2012) .............................................. 22, 23

*In re Navy Chaplaincy*,
  534 F.3d 756 (D.C. Cir. 2008)............................................ 22, 24

*Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. Jacksonville*,
    508 U.S. 656 (1993) .......................................................22

*Neighborhood TV Co. v. FCC*,
    742 F.2d 629 (D.C. Cir. 1984)...............................................34

*New Motor Vehicle Bd. v. Orrin W. Fox Co.*,
    434 U.S. 1345 (1977) .......................................................54

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982) ................................................ 40, 41, 46

*O Centro Espirita Beneficiente Uniao de Vegetal v. Ashcroft*,
    314 F.3d 463 (10th Cir. 2002) ..............................................54

*Palmer v. Thompson*,
    403 U.S. 217 (1971) ........................................................47

*PBM Prods., LLC v. Mead Johnson & Co.*,
    639 F.3d 111 (4th Cir. 2011) ...............................................18

*Phelps v. Hamilton*,
    59 F.3d 1058 (10th Cir. 1995) ..............................................50

*Raines v. Byrd*,
    521 U.S. 811 (1997) ........................................................18

*Rajah v. Mukasey*,
    544 F.3d 427 (2d Cir. 2008) ................................................37

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ............................................... 37, 46, 55

*Republican Party of Minn. v. White*,
    536 U.S. 765 (2002) ........................................................49

*Saavedra Bruno v. Albright*,
    197 F.3d 1153 (D.C. Cir. 1999).............................................26

*Salazar v. Buono*,
    559 U.S. 700 (2010) ........................................................47

vi

*Sale v. Haitian Ctrs. Council, Inc.*,
  509 U.S. 155 (1993) ........................................................... 29, 54

*Sarsour v. Trump*,
  No. 17-120 (E.D. Va. Mar. 24, 2017) .......................................... 15, 51

*Suhre v. Haywood County*,
  131 F.3d 1083 (4th Cir. 1997) ................................................ 23, 24

*Texas v. United States*,
  523 U.S. 296 (1988) ...........................................................18

*United States v. Abu Ali*,
  528 F.3d 210 (4th Cir. 2008) ..................................................54

*United States v. Armstrong*,
  517 U.S. 456 (1996) ..........................................................45

*United States v. Chem. Found., Inc.*,
  272 U.S. 1 (1926) ............................................................45

*United States v. Curtiss-Wright Exp. Corp.*,
  299 U.S. 304 (1936) ..........................................................40

*United States ex rel. Knauff v. Shaughnessy*,
  338 U.S. 537 (1950) ....................................................... 36, 40

*United States v. Nixon*,
  418 U.S. 683 (1974) ....................................................... 41, 46

*United States v. Salerno*,
  481 U.S. 739 (1987) ..........................................................55

*United States v. Verdugo-Urquidez*,
  494 U.S. 259 (1990) ..........................................................23

*United Transp. Union v. S.C. Pub. Ry. Comm'n*,
  130 F.3d 627 (4th Cir. 1997) .................................................17

*Va. Soc'y for Human Life, Inc. v. FEC*,
  263 F.3d 379 (4th Cir. 2001) .................................................56

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982) ................................................ 22, 23

*Washington v. Trump*,
2017 WL 462040 (W.D. Wash. Feb. 3, 2017) ..................................... 8
847 F.3d 1151 (9th Cir. 2017) .................................................. 8, 14
2017 WL 1045950 (W.D. Wash. Mar. 16, 2017) .................................. 9
Amended Order, No. 17-35105 (9th Cir. Mar. 17, 2017) ........................... *passim*

*Weinbaum v. City of Las Cruces*,
541 F.3d 1017 (10th Cir. 2008) .......................................... 49

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........................................................ 53

*Zhenli Ye Gon v. Holt*,
774 F.3d 207 (4th Cir. 2014) .......................................... 20

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
135 S. Ct. 2076 (2015) ................................................ 40

**Constitution:**

U.S. Const. art. II, § 1, cl. 8 ........................................ 51

U.S. Const. art. II, § 3 .............................................. 45

**Statutes:**

Foreign Relations Authorization Act of 1979,
Pub. L. No. 95-426, § 707(a), 92 Stat. 963 .......................... 30

Immigration and Nationality Act:

8 U.S.C. § 1101 *et seq.* ............................................ 5

8 U.S.C. § 1101(a)(15) .............................................. 31

8 U.S.C. § 1101(a)(20) .............................................. 31

8 U.S.C. § 1101(a)(42) .............................................. 6

8 U.S.C. § 1104(a)(1) ............................................... 26

8 U.S.C. § 1152(a) ................................................................13

8 U.S.C. § 1152(a)(1)(A).......................... 16, 28, 30, 31, 32, 33, 34

8 U.S.C. § 1152(a)(1)(B) ...................................................... 33, 34

8 U.S.C. § 1157 ....................................................................6

8 U.S.C. § 1157(a)(2) ...........................................................6

8 U.S.C. § 1157(a)(3) ...........................................................6

8 U.S.C. § 1157(c)(1) ...........................................................6

8 U.S.C. § 1181 ....................................................................4

8 U.S.C. § 1181(c) ...............................................................6

8 U.S.C. § 1182(a)(7)(A)(i) ..................................................5

8 U.S.C. § 1182(a)(7)(B)(i)(II) .............................................5

8 U.S.C. § 1182(a)(7)(B)(iv) .................................................5

8 U.S.C. § 1182(f) ....................................................... *passim*

8 U.S.C. § 1185(a)............................... 1, 7, 14, 16, 28, 29

8 U.S.C. § 1185(a)(1) ..................................................... 7, 28, 30

8 U.S.C. § 1187 ....................................................................5

8 U.S.C. § 1187(a)(12)(A)(i)................................................5

8 U.S.C. § 1187(a)(12)(A)(ii)...............................................5

8 U.S.C. § 1187(a)(12)(D)(i)................................................6

8 U.S.C. § 1187(a)(12)(D)(ii)...............................................6

8 U.S.C. § 1201(a)(1) ...........................................................5

8 U.S.C. § 1201(a)(1)(A).......................................................31

8 U.S.C. § 1201(a)(1)(B).......................................................31

8 U.S.C. § 1201(g) ...................................................................32

8 U.S.C. § 1201(h) ...............................................................5, 32

8 U.S.C. § 1201(i) ...................................................................26

8 U.S.C. § 1202(h) ...................................................................5

8 U.S.C. § 1203 .........................................................................5

8 U.S.C. § 1204 .........................................................................5

8 U.S.C. § 1225(a) ....................................................................5

Pub. L. No. 89-236, §§ 1-2, 79 Stat. 911 (1965) ....................31

War Time Passport Act, ch. 81, Pub. L. No. 65-154,
   § 1(a), 40 Stat. 559 (1918) ..................................................30

6 U.S.C. § 236(b)(1) ...............................................................26

6 U.S.C. § 236(c)(1) ...............................................................26

6 U.S.C. § 236(f) .....................................................................26

28 U.S.C. § 1292(a)(1) ..............................................................4

28 U.S.C. § 1331 ........................................................................4

28 U.S.C. § 1343 ........................................................................4

**Regulations:**

22 C.F.R. § 42.62 ......................................................................5

22 C.F.R. § 42.81(a) ................................................................20

Exec. Order No. 12,807 (May 24, 1992)
   57 Fed. Reg. 21,133 (June 1, 1992) .....................................29

Exec. Order No. 13,769 (Jan. 27, 2017),
   82 Fed. Reg. 8977 (Feb. 1, 2017) ................................. *passim*

Exec. Order No. 13,780 (Mar. 6, 2017),
   82 Fed. Reg. 13,209 (Mar. 9, 2017) ............................. *passim*

Proclamation 5517 (Aug. 22, 1986),
  51 Fed. Reg. 30,470 (Aug. 26, 1986) ...................................................29

Proclamation 5829 (June 10, 1988),
  53 Fed. Reg. 22,289 (June 114, 1988) ..................................................29

Proclamation 5887 (Oct. 22, 1988),
  53 Fed. Reg. 43,185 (Oct. 26, 1988) ...................................................29

Proclamation 6958 (Nov. 22, 1996),
  61 Fed. Reg. 60,007 (Nov. 26, 1996) ...................................................29

Proclamation 8342 (Jan. 16, 2009),
  74 Fed. Reg. 4093 (Jan. 22, 2009) ......................................................29

Proclamation 8693 (July 24, 2011),
  76 Fed. Reg. 44,751 (July 27, 2011) ...................................................29

**Other Authorities:**

Dep't of Homeland Sec., *DHS Announces Further Travel Restrictions
  for the Visa Waiver Program* (Feb. 18, 2016), https://www.dhs.gov/
  news/2016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-
  program ................................................................................................6

Dep't of Homeland Security, *Q&A: Protecting the Nation from
  Foreign Terrorist Entry to the United States* (Mar. 6, 2017),
  https://www.dhs.gov/news/2017/03/06/qa-protecting-nation-
  foreign-terrorist-entry-united-states ...................................................11

Charles Gordon et al., *Immigration Law and Procedure* (2016) .............................32

Joint Ltr. to President (Mar. 6, 2017), https://www.dhs.gov/sites/
  default/files/publications/17_0306_S1_DHS-DOJ-POTUS-letter_0.pdf ..............8

MESA, *2017 Annual Meeting*,
  http://www.mesana.org/annual-meeting/index.html ...........................................25

Pew-Templeton Global Religious Futures Project, *Muslim Population
  by Country* (2010), http://www.globalreligiousfutures.org/religions/
  muslims ..............................................................................................44

*A Sitting President's Amenability to Indictment and Criminal Procecution*, 24 Op. O.L.C. 222 (2000) .............................................................41

U.S. Dep't of State, *County Reports on Terrorism 2015* (June 2016), https://www.state.gov/documents/organization/258249.pdf .................................5

U.S. Dep't of State, *Executive Order on Visas* (Mar. 22, 2017), https://travel.state.gov/content/travel/en/news/important-announcement.html ................................................................................... 11

U.S. Dep't of State, *Foreign Affairs Manual* (2016) https://fam.state.gov/FAM/09FAM/09FAM030214.html ...................................33

U.S. Dep't of State, *Report of the Visa Office 2015*, https://travel.state.gov/content/visas/en/law-and-policy/statistics/annual-reports/report-of-the-visa-office-2015.html .............................................32

U.S. Dep't of State, *Report of the Visa Office 2016*, https://travel.state.gov/content/visas/en/law-and-policy/statistics/annualreports/report-of-the-visa-office-2016.html ..............................................32

U.S. Dep't of State, *Visa Bulletin* (March 2017), https://travel.state.gov/content/dam/visas/Bulletins/visabulletin_March2017.pdf ...........................19

## INTRODUCTION

The district court's order in this case is extraordinary. The court entered a nationwide preliminary injunction against an Executive Order issued by the President of the United States, pursuant to express statutory authority, that temporarily suspends the entry of aliens from six countries of substantial terrorism-related concern. The court acknowledged that, consistent with the Executive's constitutional authority over foreign affairs and national security, Sections 1182(f) and 1185(a) of Title 8 authorize the President to suspend or restrict entry of any class of aliens when in the national interest. For the past 30 years, every President has invoked that power to protect the Nation by suspending entry of categories of aliens. Here, after consulting with the Attorney General and the Secretaries of State and Homeland Security, the President issued Executive Order No. 13,780 (2017) (Order), Section 2(c) of which suspends the entry of certain foreign nationals from Iran, Sudan, Syria, Libya, Somalia, and Yemen for 90 days, while the new Administration reviews the Nation's screening and vetting procedures to ensure that they adequately detect terrorists.

The district court did not dispute that the President's national-security determination provides "a facially legitimate and bona fide reason" for Section 2(c). *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972). The court simply declined to apply *Mandel*, holding instead that Section 2(c) likely violates the Establishment Clause

of the First Amendment. The court did so, however, not because the Order refers to, or distinguishes on the basis of, religion: the Order applies to all nationals of the listed countries, without regard to their religion. Nor did the court enjoin the President's action because the Order's focus on a handful of Muslim-majority countries is unprecedented: in 2015 and 2016, Congress and the Executive excluded individuals with certain connections to these six countries (as well as Iraq) from travel under the Visa Waiver Program because of heightened terrorism concerns, thereby requiring additional review before admitting them to our country. Here, the President determined in the interest of national security to take an additional step and place a temporary pause on entry of aliens from these same countries, subject to case-by-case waivers, while vetting procedures are reviewed.

The district court enjoined the facially neutral Order on the rationale "that the travel ban on citizens from the designated countries is President Trump's fulfillment of his campaign promise to ban Muslims from entering the United States." Appendix (A.) 628. The court largely based its decision on campaign statements made by then-candidate Donald Trump while running for public office. That is unprecedented. Even in the domestic setting, courts judge the legitimacy of a law by what it says and does, and occasionally by the official context that surrounds it— not by what supposedly lies in the hearts of its drafters. The decision below goes even further: it enjoins an action by the President of the United States because of

2

his statements as a private citizen—before he swore an oath to support and defend the Constitution, formed his Administration, assumed the responsibilities of governance, and consulted with Executive officials responsible for legal, national-security, foreign-relations, and immigration matters.

The court should have focused on official acts, not perceived subjective motivations. The Order replaces former Executive Order No. 13,769 (2017) (Revoked Order). After the Ninth Circuit declined to stay a nationwide injunction against the Revoked Order, the President decided to issue a new Order, in part to address that court's concerns. The new Order does not apply to lawful permanent residents or foreign nationals in the United States, but only to certain aliens outside the United States who lack a valid visa—individuals who "ha[ve] no constitutional rights regarding" their admission. *Landon v. Plasencia*, 459 U.S. 21, 32 (1982). Even as to them, the Order includes a comprehensive waiver process to mitigate any undue hardship. And it contains no preference for refugees who are religious minorities. The Order thus represents the President's good-faith effort to accommodate courts' concerns while simultaneously fulfilling his constitutional duty to protect the Nation.

To be sure, the Order has been the subject of heated political debate. But the precedent set by this case will long transcend this Order, this President, and this constitutional moment. The decision below openly second-guesses and enjoins the

3

President's national-security judgment—even though the plaintiffs' claims are not justiciable (Part I), their claims are not likely to succeed on the merits (Part II), only the government faces imminent and irreparable injury from its inability to effectuate the Order (Part III), and plaintiffs are plainly not entitled to a nationwide injunction that extends beyond any individual harms they have shown (Part IV). In cases that spark such intense disagreement, it is critical to adhere to foundational principles concerning justiciability, statutory and constitutional interpretation, and the scope of injunctive relief. Applying those principles here, the injunction below should be reversed.

## STATEMENT OF JURISDICTION

The district court's jurisdiction was invoked under 28 U.S.C. §§ 1331 and 1343. A.43. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1). The district court entered its order granting a preliminary injunction on March 16, 2017. A.647. Defendants filed a timely notice of appeal on March 17, 2017. A.650.

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in entering a nationwide preliminary injunction barring enforcement of Section 2(c) of the Order.

4

# STATEMENT OF THE CASE

## A.    Statutory Background

The Immigration and Nationality Act (INA or Act), 8 U.S.C. §§ 1101 *et seq.*, governs admission of aliens into the United States. Admission normally requires a valid immigrant or nonimmigrant visa, absent an exception to the general rule. *Id.* §§ 1181, 1182(a)(7)(A)(i), (B)(i)(II), 1203. The process of obtaining a visa typically includes an in-person interview and results in a decision by a State Department consular officer. *Id.* §§ 1201(a)(1), 1202(h), 1204; 22 C.F.R. § 42.62. Although a visa often is necessary for admission, it does not guarantee admission; the alien still must be admissible upon arriving at a port of entry. 8 U.S.C. §§ 1201(h), 1225(a).

Congress has created a Visa Waiver Program enabling nationals of approved countries to seek temporary admission for tourism or certain business purposes without a visa. 8 U.S.C. §§ 1182(a)(7)(B)(iv), 1187. In 2015, Congress excluded from travel under the Program aliens who are dual nationals of or had recently visited Iraq or Syria, where "[t]he Islamic State of Iraq and the Levant (ISIL) * * * maintain[s] a formidable force," and nationals of and recent visitors to countries designated by the Secretary of State as state sponsors of terrorism (currently Iran, Sudan, and Syria).[1]    *Id.*  § 1187(a)(12)(A)(i)-(ii).    Congress authorized the

---

[1] U.S. Dep't of State, *Country Reports on Terrorism 2015*, at 6, 299-302 (June 2016), https://www.state.gov/documents/organization/258249.pdf.

Department of Homeland Security (DHS) to designate additional countries of concern, considering whether a country is a "safe haven for terrorists," "whether a foreign terrorist organization has a significant presence" in the country, and "whether the presence of an alien in the country * * * increases the likelihood that the alien is a credible threat to" U.S. national security. *Id*. § 1187(a)(12)(D)(i)-(ii). Applying those criteria, in February 2016, DHS excluded recent visitors to Libya, Somalia, and Yemen from travel under the Program.[2]

Separately, the U.S. Refugee Admissions Program (Refugee Program) allows aliens who fear persecution on account of race, religion, nationality, or other specified grounds to seek admission. 8 U.S.C. §§ 1101(a)(42), 1157. Refugees are screened for eligibility and admissibility abroad; if approved, they may be admitted without a visa. *Id.* §§ 1157(c)(1), 1181(c). Congress expressly authorized the President to determine the maximum number of refugees to be admitted each fiscal year. *Id.* § 1157(a)(2)-(3).

Although Congress created these various avenues to seek admission, it accorded the Executive broad discretion to suspend or restrict admission of aliens. Section 1182(f) provides:

---

[2] DHS, *DHS Announces Further Travel Restrictions for the Visa Waiver Program* (Feb. 18, 2016), https://www.dhs.gov/news/2016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-program.

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may * * * for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). In addition, Section 1185(a)(1) grants the President broad general authority to adopt "reasonable rules, regulations, and orders" governing entry of aliens, "subject to such limitations and exceptions as [he] may prescribe." *Id.* § 1185(a)(1).

## B.    The Revoked Order

On January 27, 2017, the President issued the Revoked Order. It directed the Secretaries of Homeland Security and State to assess current screening procedures to determine whether they were sufficient to detect individuals who were seeking to enter this country to do it harm. Revoked Order § 3(a)-(b). While that review was ongoing, the Revoked Order suspended for 90 days entry of foreign nationals of the seven countries already identified as posing heightened terrorism-related concerns in the context of the Visa Waiver Program. *Id.* § 3(c). It authorized the Secretaries to make case-by-case exceptions to the suspension. *Id.* § 3(g). It similarly directed a review of the Refugee Program, and, pending that review, suspended entry under the Program for 120 days, subject to case-by-case waivers. *Id.* § 5(a). It also suspended admission of Syrian refugees indefinitely and directed agencies to

7

prioritize refugee claims premised on religious-based persecution if the religion was "a minority religion in the individual's country of nationality." *Id.* § 5(b)-(c).

## C.    Litigation Challenging the Revoked Order

The Revoked Order was challenged in multiple courts.  On February 3, 2017, a district court in Washington enjoined enforcement nationwide of Sections 3(c), 5(a)-(c), and (e).  *Washington v. Trump*, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017).  On February 9, following accelerated briefing and argument, a Ninth Circuit panel declined to stay the Washington district court's injunction pending appeal. *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) (per curiam).  Although acknowledging that the injunction may have been "overbroad," the court declined to narrow it, concluding that "[t]he political branches are far better equipped" to do so. *Id.* at 1166-67.

## D.    The Order

Responding to the Ninth Circuit's invitation, on March 6—in accordance with the joint recommendation of the Attorney General and Secretary of Homeland Security—the President issued the Order.[3]  The Order, which took effect on March 16, 2017, and replaces the Revoked Order, adopts significantly revised provisions, in part to address the Ninth Circuit's concerns.  As the Washington district court that

---

[3] *See* Joint Ltr. to President (Mar. 6, 2017), https://www.dhs.gov/sites/default/files/publications/17_0306_S1_DHS-DOJ-POTUS-letter-0.pdf.

8

had enjoined the Revoked Order noted, the new Order differs in "substantial" respects from the Revoked Order. *Washington v. Trump*, 2017 WL 1045950, at *3 (W.D. Wash. Mar. 16, 2017) (holding that injunction against Revoked Order does not extend to new Order).

### 1.    Temporary entry suspension for six countries

At issue here is Section 2(c) of the Order, which temporarily suspends entry of nationals from six countries—Iran, Libya, Somalia, Sudan, Syria, and Yemen. The suspension's explicit purpose is to enable the President—based on the recommendation of the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence—to assess whether current screening and vetting procedures are adequate to detect terrorists seeking to infiltrate the Nation.  Order § 1(f).  As the Order explains, each of the designated countries "is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones," which is why Congress and the Executive previously designated them. *Id.* § 1(b)(i), (d).  The Order details the circumstances of each country that both give rise to "heightened risks" of terrorism and diminish those foreign governments' "willingness or ability to share

or validate important information about individuals seeking to travel to the United States" to screen them properly. Order § 1(d)-(e).[4]

The Order "suspend[s] for 90 days" the "entry into the United States of nationals of" those six countries. Order § 2(c). Addressing concerns the Ninth Circuit raised, however, the Order clarifies that the suspension applies only to aliens who (1) are outside the United States on the Order's effective date, (2) do not have a valid visa on that date, and (3) did not have a valid visa on the effective date of the Revoked Order (January 27, 2017). *Id.* § 3(a). It excludes other categories of aliens, some of which had concerned the Ninth Circuit, including (among others) any lawful permanent resident and any foreign national admitted to or paroled into the United States or granted asylum or refugee status. *See id.* § 3(b).

The Order also contains a detailed waiver provision, which permits consular officials to grant case-by-case waivers where denying entry "would cause undue hardship" and "entry would not pose a threat to national security and would be in the national interest." Order § 3(c). The waiver provision enumerates illustrative circumstances for which waivers could be appropriate, including:

---

[4] Although the Revoked Order also extended the entry suspension to Iraq, the new Order omits Iraq from the suspension because of "the close cooperative relationship between" the U.S. and Iraqi governments, and the fact that, since the Revoked Order, "the Iraqi government has expressly undertaken steps" to supply the information necessary to help identify possible threats. Order § 1(g); *see id.* § 4.

- individuals who seek entry "to visit or reside with a close family member (*e.g.*, a spouse, child, or parent) who is a [U.S.] citizen, lawful permanent resident, or alien lawfully admitted on a valid nonimmigrant visa";

- individuals who were previously "admitted to the United States for a continuous period of work, study, or other long-term activity" but are currently outside the country and seeking to reenter; and

- individuals who seek entry for "significant business or professional obligations."

*Id.* Requests for waivers can be made during the visa-issuance process, and will be acted on by a consular officer "as part of [that] process." *Id.*; *see* DHS, *Q&A: Protecting the Nation from Foreign Terrorist Entry to the United States* (Mar. 6, 2017); U.S. Dep't of State, *Executive Order on Visas* (Mar. 22, 2017) (State Guidance).[5]

### 2. Temporary refugee suspension and cap

Other provisions of the Order, not at issue here, suspend adjudication of applications under the Refugee Program for 120 days, subject to case-by-case waivers, and limit to 50,000 the number of refugees admitted in fiscal year 2017. Order § 6(a)-(c). Unlike the Revoked Order, the Order does not prioritize refugee claims by religious minorities.

---

[5] https://www.dhs.gov/news/2017/03/06/qa-protecting-nation-foreign-terrorist-entry-united-states; https://travel.state.gov/content/travel/en/news/important-announcement.html.

11

## E.    District Court Injunction

On February 7, 2017, plaintiffs filed this action, challenging provisions of the Revoked Order relating to refugees.  On March 10, after the new Order was issued, plaintiffs filed their operative complaint and moved to "enjoin[] [the Order] in its entirety."  D. Ct. Doc. 95 (Mot.), at 1; J.A.258.

Plaintiffs are three organizations and six individuals.  As relevant here, they challenge the Order under the INA and the Establishment Clause.  J.A.254-58.  Two organizations—the International Refugee Assistance Project (IRAP) and HIAS, Inc.—principally provide services to refugees in the resettlement process; they allege that the temporary suspension of the Refugee Program will harm their ability to provide services to refugees and in turn decrease their funding.  J.A.210-13, 235-43.  The third organization, the Middle East Studies Association (MESA), alleges that the temporary entry suspension will prevent its members abroad from traveling to the United States for conferences, deter U.S. members from conducting work abroad, and prevent foreign scholars from attending MESA's annual meeting in the United States.  J.A.213, 243-45.

The individual plaintiffs are U.S. citizens or lawful permanent residents who claim that the Order will prevent or delay foreign-national family members from entering the United States.  Four plaintiffs—John Doe #1, Jane Doe #2, John Doe #3, and Paul Harrison—allege that Section 2(c) would prevent family members from

obtaining visas. J.A.213-14, 245-52. The remaining two individuals—Muhammed Meteab and Ibrahim Mohomed—claim that family members would be denied or delayed admission as refugees. J.A.214, 249-50, 252.

After expedited briefing and argument, the district court entered a nationwide preliminary injunction barring enforcement of Section 2(c), but not other challenged provisions. J.A.814-15. The court held that three individual plaintiffs have standing to challenge Section 2(c) under 8 U.S.C. § 1152(a), which prohibits discrimination on the basis of nationality in the issuance of immigrant visas. J.A.781-85. The court also held that at least three individual plaintiffs—all Muslim lawful permanent residents—have standing to assert Establishment Clause claims. J.A.785-87. Those plaintiffs, the court noted, allege "stress" and "anxiety" resulting from the Order, and two allege that their foreign spouses will be denied entry under Section 2(c). *Id.*

The district court further held that the plaintiffs are likely to succeed at least in part on their statutory and Establishment Clause claims. As to the statute, the court recognized that 8 U.S.C. § 1182(f) authorizes the President to suspend entry of "any class of aliens," including based on nationality. J.A.788-90. The court acknowledged that the Order's 90-day suspension on entry for nationals of six countries does not itself conflict with 8 U.S.C. § 1152(a), which regulates only the issuance of immigrant visas. J.A.789-90. The court held, however, that implementing Section 2(c) "would have the specific effect of halting the issuance of

13

visas" to persons from the six countries.  J.A.790.  And it concluded that neither Section 1182(f) nor 8 U.S.C. § 1185(a) empowers the President to bar issuance of immigrant visas based on nationality.  J.A.790-93.

As to the Establishment Clause, the district court rejected defendants' argument that the Order should be upheld because it is based on a "facially legitimate and bona fide reason" under *Mandel*, 408 U.S. at 770.  The court deemed *Mandel* inapplicable to "the 'promulgation of sweeping immigration policy' at the 'highest levels of the political branches.'"  J.A.806 (quoting *Washington*, 847 F.3d at 1162). Although the court acknowledged that the Order "is facially neutral in terms of religion," it relied principally on statements made by then-candidate Donald Trump and his aides to conclude that the Revoked Order was motivated by "animus towards Muslims" and that the President "intended to effectuate a partial Muslim ban." J.A.797-800.

The court also held that the balancing of harms favors the plaintiffs, reasoning that a violation of the Establishment Clause necessarily imposes irreparable injury and that the government would not suffer harm from a nationwide injunction. J.A.807-11.  The court declined to stay its ruling pending appeal.  J.A.814.

## F.    Subsequent Decisions

Meanwhile, the Ninth Circuit in *Washington*, acting *sua sponte*, denied rehearing en banc over the dissent of five judges, who issued three separate opinions.

14

Amended Order, *Washington v. Trump*, No. 17-35105 (9th Cir. Mar. 17, 2017).

Judge Bybee explained that *Mandel* provides the governing "test for judging executive and congressional action [for] aliens who are outside our borders and seeking admission." *Id.*, slip op. at 11 (Bybee, J., dissenting from denial of rehearing en banc) (*Washington* Bybee Dissent).  Judge Kozinski opined that using campaign and other unofficial statements made outside the process of "crafting an official policy" to establish "unconstitutional motives" is improper, unprecedented, "unworkable," and would produce "absurd result[s]." *Id.*, slip op. at 5-7 (Kozinski, J., dissenting from denial of rehearing en banc) (*Washington* Kozinski Dissent).

On March 24, another district court in this Circuit denied a preliminary injunction against the Order.  *Sarsour v. Trump*, No. 17-120 (E.D. Va. Mar. 24, 2017).  The court concluded as relevant here that plaintiffs were not likely to succeed on the merits of their statutory and Establishment Clause challenges to the Order, and that the balance of equities weighed against injunctive relief.  *Id.* at 10-32.

## SUMMARY OF ARGUMENT

**I.**    The district court's preliminary injunction should be vacated because plaintiffs' claims are not justiciable.  The individual plaintiffs' claims are speculative and not ripe.  None of them has established a concrete, imminent injury traceable to Section 2(c) of the Order.  The district court correctly declined to find that any of

15

the organizational plaintiffs faces such injury. In any event, plaintiffs' claims are foreclosed by the doctrine of consular nonreviewability.

**II.**    The injunction also should be vacated because plaintiffs' claims are not likely to succeed on the merits. The district court held that plaintiffs are likely to prevail in showing that implementation of Section 2(c) exceeds the President's statutory authority, but two separate statutes, 8 U.S.C. §§ 1182(f) and 1185(a), authorize his action. The court concluded that another statute, 8 U.S.C. § 1152(a)(1)(A), prohibits exercising that authority to deny immigrant visas based on nationality. That interpretation is incorrect. Even on its own terms, the court's interpretation cannot support its broad injunction. And it would senselessly require issuance of visas to individuals under Section 1152(a)(1)(A), only for them to be denied entry upon their physical arrival at the Nation's borders.

The district court further incorrectly held that plaintiffs' Establishment Clause claim is likely to succeed. This Court may not overturn the Executive's exclusion of aliens if it is based on a "facially legitimate and bona fide reason." *Mandel*, 408 U.S. at 770. Section 2(c) easily clears that threshold: as the district court recognized, the Order "is facially neutral in terms of religion." J.A.800. The court erred in declining to apply *Mandel*'s standard. In any event, plaintiffs' claims fail even under domestic Establishment Clause precedents. The court held that Section 2(c) is likely unconstitutional not based on what it says or does, but based on an

16

assertedly improper motive inferred primarily from campaign statements. The Supreme Court has rejected that approach: only the official purpose of government action counts, and here Section 2(c) is religion-neutral.

**III.** The balance of equities weighs strongly against an injunction. Plaintiffs have not demonstrated any constitutionally cognizable injury, much less that they will suffer irreparable harm without an injunction while Section 2(c)'s temporary pause would be in effect. By contrast, an injunction would impose substantial, irreparable harm on the government and the public by blocking a national-security measure that the President deems necessary—a predictive judgment that merits the highest degree of deference.

**IV.** At the very least, the district court's nationwide injunction is overbroad in multiple respects. It improperly attempts to enjoin the President himself, which Supreme Court precedent forbids. It enjoins Section 2(c) on its face, even though that provision has many manifestly constitutional applications. And it violates Article III and well-settled equitable principles by granting sweeping, nationwide relief that is far broader than necessary to redress plaintiffs' purported injuries.

## STANDARD OF REVIEW

This Court "review[s] the grant of a preliminary injunction for abuse of discretion." *United Transp. Union v. S.C. Pub. Ry. Comm'n*, 130 F.3d 627, 631 (4th Cir. 1997). "A district court abuses its discretion when it misapprehends or

misapplies the applicable law." *League of Women Voters of N.C. v. North Carolina*,

769 F.3d 224, 235 (4th Cir. 2014). "[T]he court will vacate an injunction if it is

broader in scope than that necessary to provide complete relief to the plaintiff or if

an injunction does not carefully address only the circumstances of the case." *PBM*

*Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 128 (4th Cir. 2011).

## ARGUMENT

### I.    Plaintiffs' Challenge To Section 2(c) Of The Order Is Not Justiciable

Plaintiffs' claims fail to satisfy the bedrock requirements of Article III

standing and ripeness. Moreover, their claims are foreclosed by the well-established

doctrine of consular nonreviewability. Accordingly, this Court should reverse the

preliminary injunction, wholly apart from the merits.

### A.    Plaintiffs' Claims Do Not Satisfy Standing And Ripeness Requirements

None of the plaintiffs has demonstrated that Section 2(c) of the Order causes

an "imminent," "concrete and particularized" injury, *Lujan v. Defs. of Wildlife*,

504 U.S. 555, 560-61 (1992), that is "legally and judicially cognizable," *Raines v.*

*Byrd*, 521 U.S. 811, 819 (1997). At a minimum, plaintiffs' claimed injuries are not

ripe because they rest on "contingent future events that may not occur as anticipated,

or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1988).

### 1.  The individual plaintiffs whose relatives seek visas allege only speculative, non-imminent injuries

The district court held that three individual plaintiffs (Does #1-3) whose relatives are seeking immigrant visas are injured by Section 2(c) because the anticipated "delay or denial of the issuance of [those] visas" will cause "continued separation from their family members." J.A.781-82.  The court's rationale is wrong for two independent reasons.[6]

*First*, plaintiffs failed to carry their burden of showing imminent, "certainly impending" injury.  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013). Section 2(c) merely imposes a 90-day suspension of entry for certain nationals of six countries.  Nothing in it suspends consideration of visa applications; indeed, its waiver process is integrated into the existing visa-adjudication procedure.  Plaintiffs offer nothing to substantiate their fear that this short pause will delay the issuance of their relatives' visas.  Doe #2's petition sponsoring her sister's visa has not yet been granted, J.A.318-19, and even if it is granted, there is a multi-year backlog for immigrant visas for U.S. citizens' siblings.[7]  Likewise, Doe #1's wife did not have

---

[6]  A fourth plaintiff, Harrison, also sought a visa for his fiancé, but his claim now appears to be moot, as defendants informed the district court.  J.A.711-12, 715. We are informed by the State Department that the fiancé's visa was issued on March 15, 2017, and subsequently collected.

[7]  U.S. Dep't of State, *Visa Bulletin* (March 2017), https://travel.state.gov/content/dam/visas/Bulletins/visabulletin_March2017.pdf  (F-4  visa  numbers currently available for petitions filed before February 2004).

her visa interview scheduled before the Revoked Order took effect, and had already been waiting roughly six weeks, making it similarly speculative whether the 90-day pause will affect her. *See* J.A.305. Doe #3's wife allegedly completed her visa interview in May 2016 and was told that administrative processing would take two or three months, but ten months later (in March 2017) she still had not been approved. J.A.309. If her visa has not already been denied, *cf.* 22 C.F.R. § 42.81(a) ("consular officer must either issue or refuse the visa" once application is executed before him), it is at least uncertain whether or how the 90-day pause would affect her. Accordingly, none of the plaintiffs has established an "imminent" risk of delay. *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017).

*Second*, plaintiffs' claim that Section 2(c) will prevent their relatives from ultimately receiving visas is also speculative. The Order provides that "[c]ase-by-case waivers could be appropriate" for "close family member[s]" of a "United States citizen" or "lawful permanent resident." Order § 3(c)(iv). Unless and until plaintiffs' relatives request and are denied waivers, plaintiffs' asserted injuries are not ripe, because they assume "contingent future events that * * * may not occur at all." *Zhenli Ye Gon v. Holt*, 774 F.3d 207, 221 (4th Cir. 2014). Any suit must await final agency action on a request for a visa and waiver.

20

**2.    The waiver process does not cause any cognizable injury**

The district court further held that "the waiver process" itself would injure these three plaintiffs.   J.A.785.   Neither of the court's bases for that holding withstands scrutiny.

*First*, the court reasoned that the waiver process "presents an additional hurdle that would delay reunification."   J.A.785.   There is no record basis for that speculation.  Plaintiffs' relatives may each seek a waiver during their visa interviews with consular officers.  *See* Order § 3(c); State Guidance, *supra*.  Plaintiffs offered no evidence that the visa process would be delayed by further inquiries a consular officer makes.  *See* Order § 3(c)(iv).  Nor could they, because they rushed to court without allowing the State Department to process waiver requests when the Order was to take effect.  Moreover, any delay would be immaterial unless these plaintiffs' relatives would otherwise have received their visa during the 90-day suspension, which plaintiffs have not shown.

*Second*, the court reasoned that the waiver process "is illegal whether or not it might have been surmounted."  J.A.785.  But the Supreme Court "has repeatedly held that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court."  *Allen v. Wright*, 468 U.S. 737, 754 (1984).  Here, plaintiffs themselves are not subject to the Order, and accordingly they have no "judicially cognizable" injury.  *Id.*  Contrary to the

21

district court's suggestion (J.A.785), *Jackson v. Okaloosa County*, 21 F.3d 1531 (11th Cir. 1994), does not hold otherwise. There, the denial of equal treatment to minority residents regarding public housing was itself a legally cognizable injury. *See id.* at 1537-41; *Ne. Fla. Chapter, Associated Gen. Contractors v. Jacksonville*, 508 U.S. 656, 666 (1993). Section 2(c), in contrast, does not operate against plaintiffs themselves and does not deny them equal treatment based on their nationality or religion. They therefore have not suffered "any personal injury" based on non-discriminatory treatment. *Valley Forge Christian College v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485-86 (1982).

At most, plaintiffs are attempting to vindicate "the legal rights or interests of third parties," which courts generally do not allow, *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004), even for Establishment Clause claims. *See Moss v. Spartanburg Cty. Sch. Dist. Seven*, 683 F.3d 599, 606 (4th Cir. 2012) (mother and child lacked standing to challenge school policy awarding academic credit for private religious instruction, because they were not "the targets or victims of * * * alleged religious intolerance" given that the child had not been "pressured or encouraged to attend the course"); *In re Navy Chaplaincy*, 534 F.3d 756, 764-65 (D.C. Cir. 2008) (plaintiffs lacked standing to "complain[] about employment discrimination suffered by other[] [co-religionists], not by the plaintiff himself"). Such a rationale for standing is especially improper here because plaintiffs' foreign relatives—the actual subjects of

22

the alleged discriminatory treatment—do not possess Establishment Clause rights, *see United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990); *DKT Mem'l Fund v. Agency for Int'l Dev.*, 887 F.2d 275, 285 (D.C. Cir. 1989), or any constitutional rights regarding entry into this country, *see Mandel*, 408 U.S. at 762.  Nor does the INA afford third parties any judicially cognizable interest in the issuance or denial of a visa to an alien abroad.  *Infra* pp. 26-27.

### 3.    Plaintiffs' claimed stress is not an Article III injury

The district court also held that at least three individual plaintiffs—Doe #1, Doe #3, and Meteab—are injured by "stress" caused by their perception that Section 2(c) reflects "anti-Muslim" government policy.  J.A.785-86.  The Supreme Court has squarely held, however, that "the psychological consequence presumably produced by observation of conduct with which one disagrees * * * is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms."  *Valley Forge*, 454 U.S. at 485-86.  Likewise in *Moss*, this Court held that the plaintiffs "lack[ed] standing to challenge the School District's released time policy" based merely on their "abstract knowledge" of the policy and their perception that it was "offensive" and reflected "intolerance."  683 F.3d at 606.

To be sure, a plaintiff can sometimes suffer personal intangible injuries to his "spiritual, value-laden beliefs" from alleged Establishment Clause violations.  *Suhre v. Haywood County*, 131 F.3d 1083, 1086 (4th Cir. 1997).  For instance, *Suhre*

23

reaffirmed that plaintiffs who are exposed to "unwelcome direct contact with a religious display that appears to be endorsed by the state" have standing because they are either "subjected to unwelcome religious exercises" or "forced to assume special burdens to avoid them." *Id.* But Section 2(c) itself does not expose plaintiffs personally to any religious display, message, or practice; it says nothing about religion.

Nor can Plaintiffs evade Article III by "re-characteriz[ing]" their challenge to "government *action*" that "allegedly violates the Establishment Clause" as a challenge to "a governmental *message* [concerning] religion." *Navy Chaplaincy*, 534 F.3d at 764. That approach would "eviscerate well-settled standing limitations" and would "allow anyone who becomes aware of a government action that allegedly violates the Establishment Clause to sue over it on the ground that they are offended by the allegedly unconstitutional 'message' communicated by that action." *Id.*; *see Allen*, 468 U.S. at 755 ("[S]tigmatizing injury * * * accords a basis for standing only to those persons who are personally denied equal treatment.") (quotation marks omitted). The district court's logic would mean that Section 2(c) could be challenged by any Muslim in this country.

The district court tried to limit its mental-distress holding by emphasizing that the plaintiffs also "have family members" who are subject to Section 2(c). J.A.787. But plaintiffs cannot transform non-cognizable mental distress about Section 2(c)

24

into cognizable injury by pointing to an effect on their foreign-national relatives. The allegedly discriminatory treatment of those third parties does not violate plaintiffs' own Establishment Clause rights. *Supra* pp. 22-23.

### 4.    None of the remaining plaintiffs has standing

The district court correctly did not suggest that any of the other individual plaintiffs or any of the organizational plaintiffs has standing. The other individuals (Meteab and Mohomed) and two of the organizations (IRAP and HIAS) asserted standing based on the Order's provisions regarding refugees, but the district court did not enjoin those portions, and they are not at issue here. J.A.264, 273, 313-14, 321.[8] The third organizational plaintiff, MESA, claims that Section 2(c) will inhibit members from attending its annual meeting, J.A.298, but the meeting is scheduled for November 2017—long after Section 2(c)'s 90-day suspension. MESA, *2017 Annual Meeting*, http://www.mesana.org/annual-meeting/index.html. MESA conclusorily asserts that one foreign member will be prevented from traveling to the United States during the suspension, but it does not allege that this member has any "concrete plans" to do so. *Lujan*, 504 U.S. at 564.

---

[8] To the extent IRAP and HIAS provide services to visa applicants, neither alleges, much less shows, that Section 2(c) will affect any particular client. Any such claims would be speculative and unripe like those of the individual plaintiffs.

25

**B.     Consular Nonreviewability Principles Bar Plaintiffs' Claims**

Consular nonreviewability also bars plaintiffs' claims.  "[T]he power to expel or exclude aliens" is "a fundamental sovereign attribute exercised by the Government's political departments" and thus "largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977).  "[T]he doctrine of consular nonreviewability," which long predated the INA, provides that the "decision to issue or withhold a visa," or to revoke one, "is not subject to judicial review * * * unless Congress says otherwise." *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999); *see id.* at 1158-60 (citing authorities).  Far from saying otherwise, Congress has reaffirmed the doctrine:  it has expressly forbidden "judicial review" of visa revocation (subject to narrow exceptions), 8 U.S.C. § 1201(i), and it has not authorized any judicial review of visa denial, *see, e.g.*, 6 U.S.C. § 236(b)(1), (c)(1), (f); 8 U.S.C. § 1104(a)(1).

Without acknowledging this well-established body of law, the district court cited a handful of cases in which courts reviewed claims by a U.S. citizen challenging the denial of an alien's visa.  J.A.782-83.  These cases at most recognize that limited review may be available to a U.S. citizen alleging that his own constitutional rights have been violated by the denial of an alien's visa. *See, e.g.*, *Saavedra Bruno*, 197 F.3d at 1163-64 (distinguishing *Mandel* and *Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986), *aff'd by equally divided Court*, 484 U.S. 1

26

(1987) (per curiam), on these grounds); *see also Kerry v. Din*, 135 S. Ct. 2128 (2015) (distinguishable on same grounds); *Bustamante v. Mukasey*, 531 F.3d 1059 (9th Cir. 2008) (same). Even that limited review is not available here, because plaintiffs raise only (i) a statutory claim and (ii) a constitutional claim that the Order discriminates against others—*i.e.*, non-resident visa applicants, who have no First Amendment rights.[9]

## II.    Plaintiffs Are Not Likely To Succeed On The Merits

Even if plaintiffs' challenges to Section 2(c) are justiciable, the district court erred in concluding that plaintiffs are likely to prevail on their claims that Section 2(c) exceeds the President's statutory authority and violates the Establishment Clause. Neither claim withstands scrutiny.

### A.    The Order Is A Valid Exercise Of The President's Statutory Authority

The Order is a valid exercise of the President's broad statutory authority to "suspend" "the entry of any aliens or of any class of aliens" (Section 1182(f)) and to

---

[9] Although the district court cited two cases that reviewed U.S. citizens' statutory claims concerning aliens' visa denials, the first one engaged in no analysis of the reviewability question, *Allende v. Shultz*, 845 F.2d 1111, 1114 nn.4-5 (1st Cir. 1988), and the second was vacated on other grounds after the government successfully petitioned for certiorari on the reviewability question, *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*, 45 F.3d 469 (D.C. Cir. 1995), *vacated on other grounds*, 519 U.S. 1 (1996) (per curiam).

prescribe "reasonable rules, regulations, and orders," as well as "limitations and exceptions," regarding entry (Section 1185(a)(1)).  The district court correctly held that Section 1182(f) authorizes the Order's suspension of the entry of certain nationals of six countries and properly rejected the bulk of plaintiffs' statutory arguments.  The court concluded, however, that a different statute, 8 U.S.C. § 1152(a)(1)(A), prevents the government from implementing that suspension through the denial of immigrant visas.  That interpretation is incorrect, and in any event cannot support the court's grant of injunctive relief.

### 1.    The Order falls squarely within the President's broad authority under Sections 1182(f) and 1185(a)

"[T]he power to exclude aliens is inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers—a power to be exercised exclusively by the political branches of [the] government."  *Mandel*, 408 U.S. at 765.  Because the power to decide whether and on what terms aliens may enter the country is integral to the President's conduct of the Nation's foreign affairs and protection of national security, Congress has granted the President expansive authority in this area— including in two statutory provisions the Order expressly invokes, Sections 1182(f) and 1185(a).  Order § 2(c).

*First*, Section 1182(f) provides that, "[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be

detrimental to the interests of the United States, he may * * * for such period as he shall deem necessary, suspend the entry of all aliens or [of] any class of aliens as immigrants or nonimmigrants," or "impose on the entry of aliens any restrictions he may deem to be appropriate." "The President's sweeping proclamation power" under Section 1182(f) "provides a safeguard against the danger posed by any particular case or class of cases that is not covered by one of the [inadmissibility] categories in [S]ection 1182(a)." *Abourezk*, 785 F.2d at 1049 n.2. Every President over the last thirty years has invoked that authority to suspend or restrict entry of classes of aliens, including in some instances based on nationality.[10]

*Second*, Section 1185(a) broadly authorizes the President to prescribe "reasonable rules, regulations, and orders," as well as "limitations and exceptions," governing the entry of aliens. Section 1185(a) is the latest in a line of statutory grants of authority tracing back nearly a century. *See* Pub. L. No. 65-154, § 1(a), 40 Stat. 559 (1918). That authority was previously limited to times of war or declared

---

[10] *See, e.g.*, Proclamation 5517 (1986) (Reagan; Cuban nationals as immigrants); Proclamation 5829 (1988) (Reagan; certain Panamanian nationals); Proclamation 5887 (1988) (Reagan; Nicaraguan government officers and employees); Exec. Order No. 12,807 (1992) (George H.W. Bush; undocumented aliens traveling by sea, upheld in *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993)); Proclamation 6958 (1996) (Clinton; Sudanese government officials and armed forces); Proclamation 8342 (2009) (George W. Bush; government officials who impeded antihuman-trafficking efforts); Proclamation 8693 (2011) (Obama; aliens subject to U.N. Security Council travel bans).

29

national emergency, but Congress removed that limitation in 1978.  Pub. L. No. 95-426, § 707(a), 92 Stat. 963, 992-93 (1978).  Thus, beyond the President's power to suspend entry of particular classes of aliens when in the national interest, Congress accorded him additional authority to establish rules, limitations, and exceptions governing entry and departure of aliens more broadly.

Those provisions amply encompass the Order's 90-day suspension of entry of certain aliens from six countries that the President—in consultation with the Attorney General and the Secretaries of State and Homeland Security—concluded require special precautions during a review of existing screening and vetting protocols.  That temporary measure is a paradigmatic exercise of the President's authority to "suspend the entry" of "any class of aliens" he finds may be "detrimental to the interests of the United States," 8 U.S.C. § 1182(f), and to prescribe "limitations" on entry, *id.* § 1185(a)(1).  The district court thus correctly rejected plaintiffs' claim that the Order's suspension on entry exceeds the President's statutory authority.  J.A.793-94.

### 2. Section 1152(a)(1)(A) does not require issuance of visas to aliens denied entry under the Order, and cannot justify the injunction in any event

**a.**    Although the district court recognized the President's statutory authority to suspend the entry of the aliens covered by the Order, the court held that Section 1152(a)(1)(A) prevents the government from implementing that suspension

30

by denying immigrant visas. There is no reason to issue a visa to an alien whose entry is barred by a valid invocation of the President's Section 1182(f) authority—and nothing in Section 1152(a)(1)(A) compels such a fruitless exercise.

Section 1152(a)(1)(A) provides that, with certain exceptions, "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa" based on characteristics including "nationality." Immigrant visas are issued to persons seeking admission to the United States for lawful permanent residence. 8 U.S.C. §§ 1101(a)(15), (20), 1201(a)(1)(A). Those seeking admission for other purposes, such as business or tourism, typically receive nonimmigrant visas. *Id.* §§ 1101(a)(15), 1201(a)(1)(B). Section 1152(a)(1)(A) was enacted in 1965, when Congress abolished the country's prior system of nationality-based immigration quotas and replaced it with uniform, per-country percentage limits. Pub. L. No. 89-236, §§ 1-2, 79 Stat. 911, 911-12. Section 1152(a)(1)(A) makes clear that the per-country limits are the only restrictions on the number of immigrant visas issued to nationals of any country.

The district court correctly recognized that, because the two provisions "address different activities handled by different government officials," Section 1152(a)(1)(A)'s prohibition on nationality discrimination in allocating immigrant visas does not disable the President from drawing nationality-based distinctions in exercising his Section 1182(f) authority to suspend "entry." J.A.789-90. The court

31

also recognized that Section 1152(a)(1)(A) is limited to *immigrant* visas and thus is irrelevant to the large majority of the aliens affected by the Order, who seek admission as *nonimmigrants*.    J.A.793.[11]    But the court held that Section 1152(a)(1)(A) requires that covered aliens seeking admission as immigrants be issued visas and then be denied entry upon physical arrival at the Nation's borders. J.A.790-91.  That conclusion is mistaken for two reasons.

*First*, Section 1152(a)(1)(A) does not compel the issuance of a visa to an alien who is validly barred from entering the country.  Visas are issued by consular officers, and a visa allows an alien to "obtain transportation to the United States" and seek admission at a port of entry.  1 Charles Gordon et al., *Immigration Law and Procedure* § 8.04[1] (2016).  A visa does not entitle the alien to be admitted if, upon arrival, "he is found to be inadmissible."  8 U.S.C. § 1201(h).  It would be pointless to issue a visa to an alien who the consular officer already knows is barred from entering the country.  Congress thus directed that a visa may not be issued if the applicant "is ineligible to receive a visa * * * under [S]ection 1182." *Id.* § 1201(g).

---

[11] Over the last two fiscal years, approximately 70% of visas issued to nationals of the six countries covered by the Order were nonimmigrant visas. *See* U.S. Dep't of State, *Report of the Visa Office 2016*, Tbl. III, XVIII https://travel. state.gov/content/visas/en/law-and-policy/statistics/annualreports/report-of-the-vi sa-office-2016.html; U.S. Dep't of State, *Report of the Visa Office 2015*, Tbl. III, XVIII https://travel.state.gov/content/visas/en/law-and-policy/statistics/annual-reports/report-of-the-visa-office-2015.html.

The State Department has accordingly long treated aliens covered by exercises of the President's Section 1182(f) authority as ineligible for visas. *See* U.S. Dep't of State, 9 *Foreign Affairs Manual* 302.14-3(B) (2016). Thus, when an alien subject to the Order is denied an immigrant visa, he is not suffering discrimination on the basis of nationality of the sort prohibited by Section 1152(a)(1)(A); instead, he is being denied a visa because he has been validly barred from entering the country.

*Second*, Congress specifically provided that Section 1152(a)(1)(A) does not "limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications or where such applications will be processed." 8 U.S.C. § 1152(a)(1)(B). The implementation of Section 2(c)'s temporary pause on entry falls squarely within that exception for rules governing immigrant-visa "procedures." The suspension's central purpose is to facilitate a review of existing procedures "for the screening and vetting of foreign nationals" in the visa process. Order § 2(c). The district court concluded that the exception for "procedures" does not cover "temporal adjustments" like the suspension. J.A.792. But it cited no authority for that cramped understanding of "procedures." In fact, that term readily encompasses matters of timing—including, as courts have held in other contexts, a temporary suspension of administrative proceedings. *See, e.g.*, *Neighborhood TV Co. v. FCC*, 742 F.2d 629, 638 (D.C. Cir. 1984) (agency's temporary freeze on category of applications was a rule of "procedure" under

33

Administrative Procedure Act (APA)); *Buckeye Cablevision, Inc. v. United States*, 438 F.2d 948, 953 (6th Cir. 1971) (same). Section 1152(a)(1)(B) therefore authorizes temporarily suspending the issuance of immigrant visas to aliens covered by the Order.[12]

**b.** Even if the district court's interpretation of Section 1152(a)(1)(A) were correct, it would not justify injunctive relief, much less enjoining Section 2(c) wholesale. That interpretation cannot support any injunctive relief regarding applicants for nonimmigrant visas, to whom Section 1152(a)(1)(A) by its terms does not apply. Even as to aliens seeking immigrant visas, on the district court's reading, Section 1152(a)(1)(A) does not entitle those affected aliens to *enter*. The district court's statutory interpretation thus provides no basis for barring enforcement of Section 2(c)'s entry suspension as to all aliens, including those seeking nonimmigrant visas.

At most, the district court's interpretation of Section 1152(a)(1)(A) would require that aliens who otherwise qualify for immigrant visas be issued such visas, so that they could travel to this country only to be denied entry upon arrival. That

---

[12] The district court also deemed Section 1152(a)(1)(B)'s exception inapplicable because it "applies to the Secretary of State," not the President. J.A.792. But the President's Order does not, by its terms, bar the issuance of visas; instead, it invokes his authority to suspend "entry." Order § 2(c). The State Department would implement that suspension by declining to issue visas to aliens who are covered by the Order and who are not found eligible for a waiver.

34

would make no sense, and an injunction requiring it would be contrary to equitable principles and do nothing to redress plaintiffs' asserted injuries, all of which stem from the denial of entry to the affected aliens. J.A.781-87. The district court appeared to recognize that point: its analysis of the other injunction factors focused solely on plaintiffs' Establishment Clause claims. J.A.807-09. Its statutory analysis thus cannot support the injunction it imposed.

### B.    The Order Does Not Discriminate On The Basis Of Religion

The district court also held that plaintiffs are likely to succeed on their claim that Section 2(c) violates the Establishment Clause. J.A.794-807. The court erred at the outset by applying the wrong legal standard. It should have analyzed and upheld the Order's temporary suspension under *Mandel* because it is based on a facially legitimate, bona fide reason. *See* 408 U.S. at 770. In any event, the court's analysis is equally untenable under domestic Establishment Clause precedent.

### 1.    Plaintiffs' constitutional claim fails under *Mandel* because the Order rests on a facially legitimate, bona fide reason

The Supreme Court has made clear that "[w]hen the Executive exercises" its authority to exclude aliens from the country "on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the" asserted constitutional rights of U.S. citizens. *Mandel*, 408 U.S. at 770. This rule reflects the Constitution's

allocation of power over immigration matters, which is "to be exercised exclusively by the political branches of the government." *Id.* at 765. Control of the borders is "vitally and intricately interwoven with" matters at the heartland of the President's inherent authority, including "the conduct of foreign relations" and "the war power." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952). Immigration matters therefore "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Id.* at 589; *see United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950).

*Mandel*'s rule governs plaintiffs' claims that the Executive's decision suspending entry of aliens violates plaintiffs' asserted constitutional rights. *Mandel* itself rejected a claim that the Executive's exclusion of an alien violated the First Amendment rights of U.S. citizens who sought to "hear[] and meet[] with" the alien. 408 U.S. at 760, 763-70. Because the Attorney General had a "facially legitimate and bona fide" reason for denying the waiver—that the alien had violated the conditions of prior visas—the Court declined to "look behind the exercise of that discretion" or "test it by balancing its justification against the [plaintiffs'] First Amendment interests." *Id.* at 769-70. And *Fiallo* applied that same rule to reject a claim that an Act of Congress unconstitutionally discriminated against certain aliens based on their sex and the legitimacy of their children. 430 U.S. at 792-96. Courts of appeals have applied the same standard to reject claims that immigration policies

36

unlawfully discriminated on the basis of "religion, ethnicity, gender, and race." *Rajah v. Mukasey*, 544 F.3d 427, 438 (2d Cir. 2008); *Washington* Bybee Dissent 16-18 (collecting cases).

*Mandel*'s rule compels rejection of plaintiffs' claims. The Order's entry suspension is expressly premised on a facially legitimate, bona fide purpose: protecting national security. The President determined that a review of the Nation's screening and vetting procedures is necessary, and that a temporary pause in entry from six countries of concern is important to "prevent infiltration by foreign terrorists" and "reduce investigative burdens" while the review is ongoing. Order § 2(c). The six countries were chosen because they present heightened risks, which the Order explains; Congress or the Executive had previously identified each as presenting terrorism-related concerns. The risk of continued entry from those countries during the review was, in the President's judgment, "unacceptably high." *Id.* § 1(f).

Plaintiffs urged the district court to reject the Order's "proffered reason" because it was "given in bad faith." Mot. 29. But when "[t]he Executive * * * deem[s] nationals of a particular country a special threat," "a court would be ill equipped to determine the[] authenticity and utterly unable to assess the[] adequacy" of that determination. *Reno v. Am.-Arab Anti-Discrimination Comm. (AAADC)*, 525 U.S. 471, 491 (1999). *Mandel* itself thus declined to "look behind" a facially

37

legitimate, bona fide reason in search of ulterior motives.  408 U.S. at 770.   At the very most, separate opinions in one Supreme Court case have suggested that a court may question a consular officer's stated reason for denying a visa upon "an affirmative showing of bad faith on the part of the consular officer," and even then only where denial of the alien's visa is alleged to violate a U.S. citizen's fundamental rights.  *Din*, 135 S. Ct. at 2141 (Kennedy, J., concurring in the judgment); *id.* at 2141-47 (Breyer, J., dissenting).  That circumstance is far removed from plaintiffs' broadside challenge to a formal national-security determination by the President of the United States, pursuant to express statutory authority and in accordance with the recommendations of the Attorney General and the Secretary of Homeland Security.

In any event, plaintiffs have not established that the Order's stated purpose was given in bad faith.  To the contrary, the President's actions in response to concerns raised by courts regarding the Revoked Order—and taken after consultation with the Executive officers responsible for legal, foreign-relations, national-security, and immigration matters—demonstrate *good faith*.  As the Order explains, the Revoked Order had two provisions addressing religion that were aimed at aiding victims of religious persecution.  Order § 1(b)(iv).  When the Ninth Circuit and other courts expressed concern that the provisions might draw improper religious distinctions, the President removed them to make clear that national

security, not religion, is the Order's focus. That accommodation of courts' concerns is the exact opposite of bad faith.

### 2. The district court erred by declining to apply *Mandel*

The district court declined to apply *Mandel*'s rule. J.A.806. The court asserted that "[t]he *Mandel* test" is "most typically applied when a court is asked to review an executive officer's decision to deny a visa," and "does not apply to the promulgation of sweeping immigration policy at the highest levels of the political branches." *Id.* The court instead evaluated the Order under Establishment Clause case law addressing wholly distinct, domestic issues. That is mistaken for at least three reasons.

*First*, the district court's assertion that immigration-policy decisions made "at the highest levels" of government deserve less deference than those by lesser officials is both foreclosed by controlling precedent and profoundly contrary to the constitutional structure. *Mandel* upheld a decision by the Attorney General. 408 U.S. at 759, 769-70. And both *Fiallo*, 430 U.S. at 794-95, and *Johnson v. Whitehead*, 647 F.3d 120, 127 (4th Cir. 2011), applied *Mandel* to uphold immigration-policy decisions made by Congress. More fundamentally, the district court's position that courts "cannot look behind the decision of a consular officer, but can examine the decision of the President[,] stands the separation of powers on its head" and "cannot withstand the gentlest inquiry." *Washington* Bybee Dissent

39

13. "The President's unique status under the Constitution distinguishes him from other executive officials," and his singular "constitutional responsibilities and status" call for added "judicial deference and restraint." *Nixon v. Fitzgerald*, 457 U.S. 731, 750, 753 (1982). And in few areas is the President's authority greater than in matters involving foreign relations and national security. *See, e.g.*, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414-15 (2003); *Knauff*, 338 U.S. at 542; *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936). The President's power in this area "is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2083-84 (2015).

In short, the President's "unique constitutional position" and "respect for the separation of powers" compel even greater solicitude for policy decisions made by the President himself than those made by his subordinates. *Franklin v. Massachusetts*, 505 U.S. 788, 800 (1992). For example, unlike agencies' actions, the President's policy decisions are not reviewable under the APA, and courts generally "ha[ve] no jurisdiction * * * to enjoin the President in the performance of his official duties." *Id.* at 800-03 (plurality op.) (quoting *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867)); *id.* at 823-28 (Scalia, J., concurring in part and concurring in the judgment). For similar reasons, a sitting President is absolutely immune from suits for damages "based on [his] official acts," *Fitzgerald*, 457 U.S.

40

at 754, and from criminal prosecution, *see A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 222-23 (2000). And "[p]residential communications" are subject to a "presumptive privilege," which is "fundamental to the operation of Government and inextricably rooted in the separation of powers." *United States v. Nixon*, 418 U.S. 683, 708 (1974). The fact that the Order was issued by the President means that it should be afforded greater, not lesser, deference than the decision of a consular officer.

*Second*, the district court's assertion that *Mandel* does not apply to broad policy decisions, and governs only review of decisions regarding "individual aliens," also lacks merit. J.A.806. Both the Supreme Court and this Court have applied *Mandel*'s test to immigration policies adopted by Congress, which are inherently categorical and not specific to any particular alien. *See Fiallo*, 430 U.S. at 794-95; *Johnson*, 647 F.3d at 127. Moreover, withholding deference when the political branches make broad policy decisions—and according it only when they make individualized, alien-specific determinations—would be senseless. "[T]he promulgation of broad policy is precisely what we expect the political branches to do; Presidents rarely, if ever, trouble themselves with decisions to admit or exclude individual visa-seekers." *Washington* Bybee Dissent 13. It is in prescribing general policies where the political branches' expertise and constitutional prerogatives are at their zenith.

41

*Third,* the Establishment Clause precedents that the district court applied in disregard of *Mandel*—addressing domestic questions involving local religious displays, school subsidies, and the like—have no proper application to foreign-policy, national-security, and immigration judgments of the President.  The district court offered no justification for exporting *McCreary County v. ACLU*, 545 U.S. 844 (2005), and *Lemon v. Kurtzman*, 403 U.S. 602 (1971), to this context.   The "unreasoned assumption that courts should simply plop Establishment Clause cases from the domestic context over to the foreign affairs context ignores the realities of our world."  *Washington* Bybee Dissent 8 n.6.  Indeed, the court's reasoning would appear to extend to "every foreign policy decision made by the political branches, including our dealings with various theocracies across the globe."  *Washington* Kozinski Dissent 3 n.2.  This Court should reject such extensive "intrusion of the judicial power into foreign affairs" committed to the political branches.  *Id.*

### 3.    The entry suspension complies with the Establishment Clause

#### a.    The Order's text and purpose are religion-neutral

The district court's conclusion that the Order likely violates the Establishment Clause fails even on its own terms.  "The touchstone" of Establishment Clause analysis is that the "First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion."  *McCreary*, 545 U.S.

at 860. Section 2(c) fully comports with that principle. The district court did not suggest that the Order draws any "explicit and deliberate distinctions" based on religion. *Larson v. Valente*, 456 U.S. 228, 246 n.23 (1982). To the contrary, the court acknowledged that the "Order is facially neutral in terms of religion." J.A.800. The only provisions in the Revoked Order touching on religion—provisions addressing the Refugee Program that were intended to assist victims of religious persecution—were removed.

The entry suspension also was not adopted "with the ostensible and predominant purpose of advancing religion." *McCreary*, 545 U.S. at 860. Its explicit, religion-neutral objective is to address the risk that potential terrorists might exploit possible weaknesses in the Nation's screening and vetting procedures while the review of those procedures is underway. *Supra* pp. 9-10. That express "secular purpose" for a facially neutral policy cannot properly be deemed a "sham" or "merely secondary to a religious objective." *McCreary*, 545 U.S. at 864. In judging the government's true "object," the Supreme Court has looked to the law's "operation," because "the effect of a law in its real operation is strong evidence of its object." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993). Here, the suspension's "operation" confirms its stated purpose. As the Order itself explains, it applies to six countries based on risk, not religion; and in those six countries, the suspension applies irrespective of any alien's religion.

43

The district court noted that each of the six countries "has a predominantly Muslim population." J.A.773. But that fact does not establish that the suspension's object is to single out Islam. Those countries were previously identified by Congress and the Executive for reasons that Plaintiffs do not contend were religiously motivated: each "is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones." Order § 1(d). In addition, those countries represent a small fraction of the world's 50 Muslim-majority nations and approximately 10% of the global Muslim population.[13] And the suspension covers *every* national of those countries, including many non-Muslim individuals, if they meet the Order's criteria. Moreover, to regard the dominant religion of a foreign country as evidence of an Establishment Clause violation could intrude on "every foreign policy decision made by the political branches." *Washington* Kozinski Dissent 3 n.2. Such measures often address particular nations with a dominant religion. *See Washington* Bybee Dissent 16-18 (collecting cases rejecting challenges to National Security Entry-Exit Registration System, which applied to certain nationals of 24 Muslim-majority nations and North Korea).

---

[13] Pew-Templeton Global Religious Futures Project, *Muslim Population by Country* (2010), http://www.globalreligiousfutures.org/religions/muslims.

**b.    The Order cannot be enjoined based on campaign statements and other unofficial comments**

The district court nevertheless held plaintiffs were likely to succeed on their Establishment Clause challenge based on extrinsic evidence that, in the court's view, suggests that the Order was motivated by religious animus.  Specifically, the court reasoned that statements by the President—nearly all before assuming office, while still a private citizen and political candidate—and informal remarks of his aides imply that the entry suspension is intended to target Muslims based on their religion.  J.A.795-803.  The court's reliance on such statements in the face of a religion-neutral Order is wrong for at least three reasons.

**i.**    Under the Constitution's structure and its separation of powers, courts evaluating a presidential policy directive should not second-guess the President's stated purpose by looking beyond the policy's text and operation.  The "presumption of regularity" that attaches to all federal officials' actions, *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926), applies with the utmost force to the President himself.  Indeed, that presumption applies to subordinate Executive officials precisely "because they are designated * * * as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'"  *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting U.S. Const. art. II, § 3).

45

Moreover, *Mandel*'s justifications for accepting the Executive's facially legitimate, bona fide judgments regarding the exclusion of aliens equally counsel crediting the text and operation of the President's Order. Probing the President's grounds for immigration policies would thrust "ill equipped" courts into the untenable position of evaluating the "adequacy" and "authenticity" of the Executive's reasons underlying its foreign-affairs and national-security judgments. *AAADC*, 525 U.S. at 491. Such a rule also would invite impermissible intrusion on privileged internal Executive Branch deliberations, *see Nixon*, 418 U.S. at 708, and potentially litigant-driven discovery that would disrupt the President's execution of the laws, *see Fitzgerald*, 457 U.S. at 749-50. Indeed, the plaintiffs in *Washington* have notified the government that they want nearly a year of discovery, including up to 30 depositions of White House staff and Cabinet-level officials. This Court should reject a rule that permits probing the Chief Executive's subjective views in this intrusive fashion.

**ii.** Even in the domestic context, courts evaluate whether official action has an improper religious purpose by looking at "the 'text, legislative history, and implementation of the statute,' or comparable official act," not through "judicial psychoanalysis of a drafter's heart of hearts," *McCreary*, 545 U.S. at 862-63. Searching for governmental purpose outside the operative terms of governmental action and official pronouncements is fraught with practical "pitfalls" and "hazards"

46

that would make courts' task "extremely difficult."  *Palmer v. Thompson*, 403 U.S. 217, 224 (1971).  And it makes no sense in the Establishment Clause context, because it is only an "official objective" of favoring or disfavoring religion gleaned from "readily discoverable fact" that implicates the Clause.  *McCreary*, 545 U.S. at 862; *see Salazar v. Buono*, 559 U.S. 700, 715 (2010) (plurality op.) (rejecting finding that Congress' stated purpose for land-transfer statute was "illicit" because the court "took insufficient account of the context in which the statute was enacted and the reasons for its passage").

Despite acknowledging this important limitation on Establishment Clause analysis, the district court did not apply it.  Instead, it effectively misread *McCreary* to allow inquiry into "the veiled psyche" of the President and his advisors.  545 U.S. at 863; *see* J.A.795-96.  *McCreary* involved display of the Ten Commandments, which have explicitly religious content.  Even then, *McCreary*'s analysis centered on the text of the resolutions the counties serially adopted authorizing the displays, objective features of those displays, and materials that government actors deliberately made part of the official record, such as testimony of the county executive's pastor.  545 U.S. at 868-74.  The religious purpose of the original Ten Commandments display was readily evident at the outset from the very nature of the resolution authorizing it.  *Id.* at 868-69.  The counties' second resolution compounded the problem, making the religious aim even more explicit.  *Id.* at 870.

47

The counties' third and final display was created "without a new resolution or repeal of the old one," the display itself still displayed a "sectarian spirit," and it "quoted more of the purely religious language of the Commandments than the first two had done." *Id.* at 870, 872.

*McCreary* thus held that the final display's "purpose * * * need[ed] to be understood in light of context," and the context of the counties' prior official actions made their objective clear. 545 U.S. at 874. Even then, the Court disclaimed any holding that "the Counties' past actions forever taint any effort on their part to deal with the subject matter." *Id.* at 873-74. Moreover, the Court expressly described its previous cases as resting on analysis of objective facts directly related to the law at issue: "In each case, the government's action was held unconstitutional only because openly available data"—a law's text or obvious effects, the policy it replaced, official public statements of the law's purpose, or "comparable official act[s]"—"supported a commonsense conclusion that a religious objective permeated the government's action." *Id.* at 862-63; *see Lukumi*, 508 U.S. at 534-35 (gleaning impermissible purpose from ordinances' "text" and "operation"). The Order, in contrast, conveys no religious message and was revised to eliminate any misperception of religious purpose. And it reflects the considered views of the Secretary of State, the Secretary of Homeland Security, and the Attorney General,

whose motives have not been impugned.  Official context thus confirms that it is religion-neutral.

**iii.**    Even if courts could look beyond official acts and statements to identify governmental purpose, they should not rely (as the district court did here) on statements by political candidates made as private citizens before assuming office. Statements by private persons cannot reveal "the government's ostensible object." *McCreary*, 545 U.S. at 860.  This Court and others have accordingly (and correctly) declined to rely on private communications that "cannot be attributed to any government actor" to impute an improper purpose to government action.  *Glassman v. Arlington County*, 628 F.3d 140, 147 (4th Cir. 2010); *see Modrovich v. Allegheny County*, 385 F.3d 397, 411-12 (3d Cir. 2004); *Weinbaum v. City of Las Cruces*, 541 F.3d 1017, 1031 (10th Cir. 2008).

Using comments by political candidates to question the stated purpose of later official action is particularly problematic.  Statements of what candidates might attempt to achieve if elected, which are often simplified and imprecise, are not "official act[s]." *McCreary*, 545 U.S. at 862.  They are made without the benefit of advice from an as-yet-unformed Administration, and they cannot bind elected officials who later conclude that a different course is warranted.  *See Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002); *see also Washington* Kozinski Dissent 4-5. Permitting campaign statements to contradict official pronouncements

49

of the government's objectives would inevitably "chill political debate during campaigns." *Phelps v. Hamilton*, 59 F.3d 1058, 1068 (10th Cir. 1995) (declining to rely on campaign statements).

It also would encourage scrutiny of the past religion-related statements of all manner of government officials. Throughout American history, politicians have invoked religious doctrines and texts on the campaign trail in support of positions on a host of issues. If a candidate's religiously related campaign statements could form the basis of an Establishment Clause challenge to a facially neutral law, numerous important laws could be subject to colorable Establishment Clause challenges. And it would suggest that it is somehow improper for elected representatives to base their support for legislation in part on religious beliefs.

The district court reasoned that the fact that statements were made "during a campaign does not wipe them from the 'reasonable memory' of a 'reasonable observer.'" J.A.802. That observation misses the point. The problem with campaign statements is not that they may be forgotten, but that they do not prove anything about the official objective underlying subsequent action. Attempting to assess what campaign statements reveal about the motivation for later action would "mire [courts] in a swamp of unworkable litigation," forcing them to wrestle with intractable questions, including the level of generality at which a statement must be made, by whom, and how long after its utterance the statement remains probative.

50

*Washington* Kozinski Dissent 5. That approach would inevitably devolve into the "judicial psychoanalysis" of a candidate's "heart of hearts" that *McCreary* repudiated. 545 U.S. at 862.

This case illustrates these difficulties. Virtually all of the President's statements on which the district court relied were made before he assumed office—before he took the prescribed oath to "preserve, protect and defend the Constitution," U.S. Const. art. II, § 1, cl. 8. Taking that oath marks a profound transition from private life to the Nation's highest public office, and manifests the singular responsibility and independent authority to protect the welfare of the Nation that the Constitution necessarily reposes in the Office of the President. Virtually all of the statements also preceded the President's formation of a new Administration, including Cabinet-level officials who recommended adopting the Order. And they predated the President's decision—made after courts expressed concern regarding the Revoked Order—to avoid further litigation and instead to adopt the new, revised Order in response to courts' concerns. As another district court in this Circuit recently held, "the substantive revisions reflected in [the Order] have reduced the probative value of the President's [past] statements" and undercut plaintiffs' argument that "the predominate purpose of [the Order] is to discriminate against Muslims based on their religion." *Sarsour*, slip op. at 24.

51

This case thus differs starkly from the district court's only authority for its reliance on campaign materials, *Glassroth v. Moore*, 335 F.3d 1282 (11th Cir. 2003). *Glassroth* did not involve a facially neutral policy, but an explicitly religious display—a massive Ten Commandments monument—erected in the state supreme court's rotunda at the direction of the chief justice. *Id.* at 1284-85. The chief justice not only campaigned as the "Ten Commandments Judge," but made the monument's religious purpose explicit after assuming office in his speech at its unveiling and "conce[ded]" its religious message again in his court testimony. *Id.* at 1284-85, 1297. Here, the Order does not convey a religious message, it no longer contains any reference to religion, and its secular, national-security purpose is set forth at length in the Order.

If the Court considers "informal statements" at all, it should reject "open season on anything a politician or his staff may have said," and instead should "[l]imit[] the evidentiary universe to activities undertaken while crafting [the] official policy" at issue. *Washington* Kozinski Dissent 6. Here, none of the statements the district court canvasses was part of the Executive's process of developing the Order. Most were made long before even the Revoked Order that the Order replaced. None refers to Section 2(c)'s 90-day entry suspension, and none in substance corresponds to that policy: a short, temporary suspension of entry of nationals from specific countries previously identified by Congress and the

52

Executive as presenting special concerns bears no resemblance to a "Muslim ban." J.A.799.   None of the statements at issue therefore provides a reliable basis for disregarding the Order's stated secular objective.

## III.   The Balance Of Equities Weighs Strongly Against Enjoining The Order

The remaining factors independently render the district court's preliminary injunction improper.   Plaintiffs were required but failed to "demonstrate that irreparable injury is *likely* in the absence of an injunction" during the short period the suspension is in effect.   *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).   The closest plaintiffs come to alleging concrete harm is their claim that the Order will prevent their foreign-national family members from entering the United States during the temporary suspension of entry.   Even if that asserted harm to plaintiffs constitutes a cognizable Article III injury, *but see supra* pp. 18-25, mere delay in entry alone does not amount to *irreparable* harm.   Moreover, unless and until the family members meet the otherwise-applicable visa requirements and seek and are denied a waiver, even those claimed harms are too "remote" and "speculative" to merit injunctive relief.   *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991).

The district court in fact did not find that the Order will cause any of the plaintiffs any concrete irreparable injury.   It reasoned instead that plaintiffs' alleged "loss of First Amendment freedoms" standing alone "constitutes irreparable injury."

53

J.A.807 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  As the district court acknowledged, however, although this Court has applied that principle in "cases involving the freedom of speech and expression," it has not extended it to claims under the Establishment Clause.  J.A.808.  In any event, that principle has no application here:  the First Amendment does not confer any constitutional rights on the only persons subject to the Order—aliens abroad—and the Order does not affect the plaintiffs' own First Amendment rights.  *Supra* pp. 22-23.

On the other side of the scales, the injunction causes direct, irreparable injury to the government and public interest.  "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *accord New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers); *see, e.g.*, *O Centro Espirita Beneficiente Uniao de Vegetal v. Ashcroft*, 314 F.3d 463, 467 (10th Cir. 2002).  *A fortiori*, the same principle applies to a national-security judgment of the President made pursuant to express statutory authorization.  "[N]o governmental interest is more compelling than the security of the Nation," *Haig v. Agee*, 453 U.S. 280, 307 (1981); *see United States v. Abu Ali*, 528 F.3d 210, 240 (4th Cir. 2008), and "the President has unique responsibility" in this area, *Sale*, 509 U.S. at 188.

54

The district court discounted the harm its injunction poses to the governmental and public interest based on its own view that the Order is not "necessary" to "maintain[]" national security. J.A.809. But the Supreme Court has made clear that the political branches' "[p]redictive judgment[s]" on matters of foreign policy and national security are entitled to the greatest possible deference. *Dep't of the Navy v. Egan*, 484 U.S. 518, 529 (1988). Courts should not second-guess the Executive's determination that "a preventive measure" in this area is necessary to address a particular risk. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 35 (2010); *see AAADC*, 525 U.S. at 491.

## IV. The District Court's Nationwide Injunction Is Improper

As explained in defendants' stay motion, even if some injunctive relief were appropriate, the nationwide injunction that the district court entered is improper for at least three reasons. *First*, the injunction violates the 150-year-old rule that federal courts cannot issue an injunction that runs against the President himself. *Johnson*, 71 U.S. (4 Wall.) at 501. *Second*, the district court could not validly enjoin Section 2(c) on the premise that it is facially unlawful because plaintiffs have not carried their burden of showing that "no set of circumstances exists under which the [Order] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). The Order is clearly lawful as applied to some aliens—for example, aliens abroad with no significant connection to the country or to a U.S. citizen or resident.

55

*Third*, the district court's injunction barring enforcement of the Order as to all persons violates the well-settled rule that injunctive relief must be limited to addressing the individual plaintiffs' own injuries caused by violation of their own rights. Article III requires that "[t]he remedy" a plaintiff may seek, including injunctive relief, "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). Bedrock principles of equity independently impose the same rule that injunctive relief should not be broader "than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

The injunction here contravenes that rule. The district court identified three individual plaintiffs who it said were harmed by Section 2(c) because their foreign-national family members may be unable to enter the country on visas. J.A.781-87. Those putative injuries would be fully redressed by enjoining the Order's application to those plaintiffs' family members. The injunction barring enforcement of Section 2(c) as to *any* foreign national thus is "far broader than necessary to provide [plaintiffs] complete relief." *Kentuckians for the Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425, 436 (4th Cir. 2003). At a minimum, the injunction thus should be narrowed to apply only to these plaintiffs' relatives. *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 392-94 (4th Cir. 2001) (vacating injunction that barred FEC from "enforcing its regulation against any party" nationwide on

constitutional grounds, because that scope was unnecessary to provide plaintiffs complete relief and interfered with other courts' ability to address same issues).

## CONCLUSION

For these reasons, the district court's preliminary injunction should be vacated. At a minimum, the case should be remanded with instructions to narrow the preliminary injunction to apply only to the plaintiffs whom this Court holds have standing.

Respectfully submitted,

/s/ Jeffrey B. Wall

JEFFREY B. WALL
  *Acting Solicitor General*

EDWIN S. KNEEDLER
  *Deputy Solicitor General*

CHAD A. READLER
  *Acting Assistant Attorney General*

ROD J. ROSENSTEIN
  *United States Attorney*

AUGUST E. FLENTJE
  *Special Counsel to the Assistant*
  *Attorney General*

DOUGLAS N. LETTER
SHARON SWINGLE
H. THOMAS BYRON III
LOWELL V. STURGILL JR.
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7241*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-2689*

MARCH 2017

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-face requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-volume limitations of Rule 32(a)(7)(B). The brief contains 12,973 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(a)(7)(iii).

/s/ Sharon Swingle
Sharon Swingle

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2017, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Sharon Swingle
Sharon Swingle