No. 17-1351

# In the United States Court of Appeals for the Fourth Circuit

INTERNATIONAL REFUGEE ASSISTANCE PROJECT, A PROJECT OF THE URBAN
JUSTICE CENTER, INC., ON BEHALF OF ITSELF; HIAS, INC., ON BEHALF OF
ITSELF AND ITS CLIENTS; MIDDLE EAST STUDIES ASS'N OF NORTH AMERICA,
INC., ON BEHALF OF ITSELF AND ITS MEMBERS; MUHAMMED METEAB; PAUL
HARRISON; IBRAHIM AHMED MOHOMED; JOHN DOES #1 & 3; JANE DOE #2,

Plaintiffs-Appellees,

*v.*

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE
UNITED STATES; DEPARTMENT OF HOMELAND SECURITY; DEPARTMENT OF
STATE; OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, JOHN F.
KELLY, IN HIS OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY;
REX W. TILLERSON, IN HIS OFFICIAL CAPACITY AS SECRETARY OF STATE;
DANIEL R. COATS, IN HIS OFFICIAL CAPACITY AS ACTING DIRECTOR OF
NATIONAL INTELLIGENCE,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Maryland

**BRIEF FOR THE STATES OF TEXAS, ALABAMA, ARIZONA,
ARKANSAS, FLORIDA, KANSAS, LOUISIANA, MONTANA,
OKLAHOMA, SOUTH CAROLINA, SOUTH DAKOTA, AND
WEST VIRGINIA, AND GOVERNOR PHIL BRYANT OF THE
STATE OF MISSISSIPPI AS AMICI CURIAE IN SUPPORT OF
APPELLANTS AND A STAY PENDING APPEAL**

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697
scott.keller@oag.texas.gov

SCOTT A. KELLER
Solicitor General

J. CAMPBELL BARKER
Deputy Solicitor General

ARI CUENIN
Assistant Solicitor General

# TABLE OF CONTENTS

Page

Table of authorities ........................................................................... ii

Interest of amici curiae ...................................................................... 1

Summary of the argument .................................................................. 2

Argument ........................................................................................... 5

I.   The Executive Order does not violate the INA because the Order implements power that Congress expressly delegated to the Executive. ..................................................................................... 5

    A.  The Order's country-specific suspension of entry does not violate the INA. ........................................................................ 5

    B.  The Order's directives on refugee admission do not violate the INA. ....................................................................................... 10

II.  Plaintiffs' arguments that the Executive Order violates the Constitution are meritless. ............................................................ 11

    A.  The Order receives the strongest presumption of validity because it falls within in an area of maximum executive authority: *Youngstown*'s first category of executive action pursuant to congressionally delegated power. ............................ 11

    B.  Plaintiffs' constitutional claims fail because the Constitution does not accord rights extraterritorially to nonresident aliens abroad seeking entry into the United States. ............................... 13

    C.  Even assuming arguendo that constitutional rights extend extraterritorially to nonresident aliens abroad, plaintiffs' claims are meritless. ............................................................... 14

        1.  The Executive Order is grounded in national-security concerns and classifies aliens by nationality, so the Order is not an unconstitutional pretext for religious discrimination. ........ 14

        2.  This Court should not rely on the Ninth Circuit's decision in *Washington v. Trump* because it was wrongly decided. ............ 20

Conclusion ........................................................................................ 25

Certificate of service ......................................................................... 27

Certificate of compliance .................................................................. 28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abourezk v. Reagan,*
785 F.2d 1043 (D.C. Cir. 1986) ............................................................. 9

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
526 U.S. 40 (1999) ............................................................................... 20

*Arizona v. United States,*
132 S. Ct. 2492 (2012) ..................................................................... 1, 11

*Azizi v. Thornburgh,*
908 F.2d 1130 (2d Cir. 1990) .............................................................. 21

*Bi-Metallic Inv. Co. v. State Bd. of Equalization,*
239 U.S. 441 (1915) ............................................................................. 21

*Boumediene v. Bush,*
553 U.S. 723 (2008) ..............................................................2, 14, 18, 19

*City of Columbia v. Omni Outdoor Advert., Inc.,*
499 U.S. 365 (1991) ............................................................................. 15

*Crosby v. Nat'l Foreign Trade Council,*
530 U.S. 363 (2000) ............................................................................. 11

*Dames & Moore v. Regan,*
453 U.S. 654 (1981) ............................................................................. 11

*De Avilia v. Civiletti,*
643 F.2d 471 (7th Cir. 1981) .............................................................. 21

*Demore v. Kim,*
538 U.S. 510 (2003) ............................................................................. 21

*Haitian Refugee Ctr. v. Gracey,*
809 F.2d 794 (D.C. Cir. 1987) .............................................................. 7

*Johnson v. Eisentrager,*
339 U.S. 763 (1950) ............................................................................. 13

*Kerry v. Din,*
135 S. Ct. 2128 (2015) ........................................................................ 24

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972) ............................................................... 12, 13, 20, 24

*Knauff v. Shaughnessy*,
    338 U.S. 537 (1950) ............................................................................. 12

*Landon v. Plasencia*,
    459 U.S. 21 (1982) ..............................................................13, 20, 21, 22, 23

*Louhghalam v. Trump*,
    No. 1:17-cv-10154, 2017 WL 479779 (D. Mass. Feb. 3, 2017) ........................... 21

*Mathews v. Diaz*,
    426 U.S. 67 (1976) ........................................................................ 12, 16

*McCleskey v. Kemp*,
    481 U.S. 279 (1987) .............................................................................15

*Nademi v. INS*,
    679 F.2d 811 (10th Cir. 1982) .................................................................16

*Narenji v. Civiletti*,
    617 F.2d 745 (D.C. Cir. 1979) .................................................................16

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979) ...................................................................... 15, 19

*Plyler v. Doe*,
    457 U.S. 202 (1982) .............................................................................19

*Posadas v. Nat'l City Bank of N.Y.*,
    296 U.S. 497 (1936) ..........................................................................7-8

*Republican Party of Minn. v. White*,
    536 U.S. 765 (2002) .............................................................................19

*Rodriguez-Silva v. INS*,
    242 F.3d 243 (5th Cir. 2001) ..................................................................13

*Sale v. Haitian Ctrs. Council, Inc.*,
    509 U.S. 155 (1993) ................................................................ 3, 6, 7, 13, 24

*Shaughnessy v. United States ex rel. Mezei*,
    345 U.S. 206 (1953) .............................................................................. 5

*Smith v. Doe*,
    538 U.S. 84 (2003) ..............................................................................15

*Soskin v. Reinertson*,
    353 F.3d 1242 (10th Cir. 2004) ................................................................16

iii

*Sunday Lake Iron Co. v. Wakefield Twp.*,
  247 U.S. 350 (1918) ................................................................................16

*Swarthout v. Cooke*,
  562 U.S. 216 (2011) ................................................................................ 20

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ............................................................11-12

*United States v. O'Brien*,
  391 U.S. 367 (1968) ................................................................................15

*United States v. Verdugo-Urquidez*,
  494 U.S. 259 (1990) ......................................................................... 13, 14

*U.S. Dep't of Labor v. Triplett*,
  494 U.S. 715 (1990) .................................................................................. 3

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ................................................................................15

*Washington v. Trump*,
  847 F.3d 1151 (9th Cir. 2017) .......................................4, 20, 22, 23, 24

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) ................................................................................13

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ....................................... 2, 11, 12, 16, 19-20

*Zadvydas v. Davis*,
  533 U.S. 678 (2001) .................................................................13, 14, 21, 22

## Constitutional Provisions, Statutes and Rules

U.S. Const. amend. I ................................................................................ 14

U.S. Const. amend. V ...........................................................................13, 20

Immigration and Nationality Act, 8 U.S.C. §§ 1101 *et seq.* ..............................*passim*

  § 1101(a)(4) .............................................................................................. 8

  § 1101(a)(13)(A) ...................................................................................... 8

  § 1101(a)(15)-(16) ................................................................................... 7

  § 1101(a)(42) .......................................................................................... 23

  § 1151(a)-(b) ............................................................................................ 7

  § 1152(a) .................................................................................................. 8

§ 1152(a)(1)(A)........................................................7, 9, 10

§ 1153(c)..................................................................16

§ 1157(a)..................................................................23

§ 1157(a)(2)...............................................................10

§ 1157(a)(3)...............................................................14

§ 1157 note................................................................14

§ 1158......................................................................23

§ 1158(a)..................................................................23

§ 1158(a)(1)...............................................................23

§ 1158(c)(1)...............................................................23

§ 1181......................................................................8

§ 1181(a)...................................................................7

§ 1181(c)..............................................................10, 23

§ 1182(a)................................................................8, 9

§ 1182(a)(9)(B)...........................................................22

§ 1182(f)...............................................................*passim*

§ 1184......................................................................8

§ 1185(a)(1)................................................................6

§ 1187(a)(12).............................................................17

§ 1187(a)(12)(A)(i)(III)..................................................17

§ 1201(h)...................................................................8

§ 1201(i)..........................................................6, 8, 21, 23

§ 1225(a)(1)................................................................8

§ 1225(b)(2)(A).............................................................8

§ 1254a(a)(1)..............................................................16

§ 1255 note................................................................16

10 U.S.C. § 801 note.......................................................19

50 U.S.C. § 1541 note......................................................18

Authorization for Use of Military Force,
   Pub. L. No. 107-40, 115 Stat. 224 (2001)...............................18

Haitian Refugee Immigration Fairness Act of 1998,
    Pub. L. No. 105-277, div. A, § 101(h), tit. IX, 112 Stat. 2681-538 ......................16

Immigration and Nationality Act of 1965,
    Pub. L. No. 89-236, 79 Stat. 911 ............................................................. 7

Intelligence Reform and Terrorism Prevention Act of 2004,
    Pub. L. No. 108-458, 118 Stat. 3638 ...................................... 23

National Defense Authorization Act for Fiscal Year 2016,
    Pub. L. No. 114-92, 129 Stat. 726 (2015) ................................18-19

Nicaraguan Adjustment and Central American Relief Act,
    Pub. L. No. 105-100, tit. II, 111 Stat. 2160 (1997) ...............................16

22 C.F.R. § 41.122 ............................................................................ 8

22 C.F.R. § 42.82 ............................................................................. 8

**Miscellaneous**

Executive Order 13,780,
    82 Fed. Reg. 13,209 (Mar. 9, 2017) ...........................................*passim*

H. Comm. on Homeland Sec., 114th Cong., *Syrian Refugee Flows:*
    *Security Risks and Counterterrorism Challenges* (Nov. 2015) ............................. 18

H. Comm. on Homeland Sec., 114th Cong., *Terror Threat Snapshot:*
    *The Islamist Terrorist Threat* (Nov. 2015) .......................................... 18

H. Comm. on Homeland Sec., 114th Cong., *Nation's Top Security*
    *Officials' Concerns on Refugee Vetting* (Nov. 19, 2015) ....................................... 18

Jack Moore & Conor Gaffey, *What's Behind Donald Trump's Decision*
    *to Include Some Muslim-Majority Countries in the Travel Ban—and*
    *Not Others?*, Newsweek, Jan. 31, 2017.............................................17

Letter of Bob Goodlatte, Chairman, H. Comm. on the Judiciary,
    to Barack Obama, President of the United States of America (Oct.
    27, 2015)........................................................................ 18

Pew Research Ctr., *World's Muslim Population More Widespread Than*
    *You Might Think* (Jan. 31, 2017) ...............................................17

Presidential Proclamation No. 5377,
    50 Fed. Reg. 41,329 (Oct. 10, 1985) ................................................... 9

Presidential Proclamation No. 5517,
    51 Fed. Reg. 30,470 (Aug. 26, 1986) ................................................... 9

The White House, *Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations* (Dec. 2016) .........................................................................19

## Interest of Amici Curiae

Amici curiae are the States of Texas, Alabama, Arizona, Arkansas, Florida, Kansas, Louisiana, Montana, Oklahoma, South Carolina, South Dakota, and West Virginia, and Governor Phil Bryant of the State of Mississippi.[1] Like every State, amici have a significant interest in protecting their residents' safety. But the States possess no authority to restrict or set the terms of aliens' entry into the United States for public-safety and national-security reasons. Instead, the States and their elected officials rely on the federal Executive Branch to carry out that function, pursuant to the laws of Congress. *See Arizona v. United States*, 132 S. Ct. 2492, 2507 (2012). Congress delegated to the Executive Branch significant authority to prohibit aliens' entry into the country, and the challenged Executive Order is a lawful exercise of that authority. Plaintiffs' lawsuit presents no basis to enjoin the Order.

---

[1] By separate motion, amici request leave to file this brief, to which the parties consent.

## Summary of the Argument

After multiple federal officials drew public attention to serious flaws in the preexisting vetting scheme for aliens residing abroad who wish to enter this country under visas or as refugees, the Executive Branch made a policy decision entrusted to it expressly by Congress: the Executive temporarily suspended the admission of specified classes of aliens pursuant to its broad authority under 8 U.S.C. § 1182(f). This Executive Order also expressly identified a heightened national-security risk attendant to six countries that Congress and the Obama Administration had previously identified under national-security-risk criteria.

The district court's injunction of the Executive's power to deny classes of aliens entry is remarkable. The Order falls within the Executive Branch's strongest area of authority—*Youngstown*'s first zone of executive action—because it draws support from not only the President's own foreign-affairs and national-security powers, but also from Congress's delegated authorization pursuant to its Article I powers over the admission of aliens into the country. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-36 (1952) (Jackson, J., concurring). The Executive Order, especially given its national-security context, thus enjoys "the strongest of presumptions and the widest latitude of judicial interpretation." *Id.* at 637. After all, "[u]nlike the President and some designated Members of Congress, neither the Members of [the Supreme] Court nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people." *Boumediene v. Bush*, 553 U.S. 723, 797 (2008). Furthermore, there is a "heavy presumption of constitutionality to which a carefully considered decision of a coequal

and representative branch of our Government is entitled." *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 721 (1990) (citation and quotation marks omitted).

Plaintiffs cannot satisfy the heavy burden necessary to overcome that strongest presumption of validity. Their theory calls for an extraordinary extension of constitutional rights to *nonresident aliens* who are *outside this country* and attempting to enter the country. Nonresident aliens who are in foreign territory clearly not under the sovereign control of the United States do not possess rights under the United States Constitution regarding entry into this country.

Yet even if plaintiffs were correct that the Constitution extended to nonresident aliens abroad, no constitutional violation exists here. Indeed, the Supreme Court has recognized that there is no "judicial remedy" to override the Executive's use of the delegated § 1182(f) power to deny classes of nonresident aliens entry into the country. *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 188 (1993).

The Executive Order is not a pretext for religious discrimination, as the Order is grounded in national-security concerns and classifies aliens according to nationality—not religion. The six countries covered by the Order were previously identified by Congress and the Obama Administration, under the visa-waiver program, as among national-security "countries of concern." In fact, before the current presidential Administration took office, multiple federal officials—including the FBI Director, the former Assistant Director of the FBI's Counterterrorism Division, and the former Director of National Intelligence—expressed concerns with deficiencies in the country's ability to vet the entry of aliens. *See infra* p. 18. And it is well-

known that terror attacks tied to radical Islam have recently occurred around the world and within the United States.

Nor should this Court rely on *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) (per curiam), which was wrongly decided. The Executive Order does not violate due process because nonresident aliens abroad have no liberty interest in seeking admission into the country; therefore, no constitutional claims accrue from a suspension of those aliens' ability to enter. Regardless, the text of the Order itself, which describes legitimate reasons for entry denial, provides whatever process could possibly be due.

The district court's ruling is thus an intrusion into the national-security, foreign-affairs, and immigration powers possessed by the Executive and delegated by Congress. The injunction is contrary to law, and it threatens amici's interests by denying the federal government—under a statutory regime crafted by the States' elected representatives in Congress—the latitude necessary to make policy judgments inherent in this country's nature as a sovereign. This Court should grant defendants' motion to stay and ultimately reverse.

# ARGUMENT

## I. The Executive Order Does Not Violate the INA Because the Order Implements Power that Congress Expressly Delegated to the Executive.

The President has temporarily suspended the entry into the United States of two classes of aliens:

- nationals of six listed countries, if they are not lawful permanent residents of the United States, were outside this country ten days after the executive order here issued, and do not qualify for other exceptions (such as holding a valid visa ten days after the executive order issued); and

- aliens seeking entry under the U.S. Refugee Admissions Program.

Executive Order 13,780 §§ 2, 3, 6, 82 Fed. Reg. 13,209, 13,212-16 (Mar. 9, 2017) ("EO"). This suspension of entry does not violate the INA. To the contrary, Congress delegated the President broad, discretionary authority under 8 U.S.C. § 1182(f) to suspend the entry of aliens. And the suspension of entry here is an exercise of that expressly delegated authority.

### A. The Order's country-specific suspension of entry does not violate the INA.

1. "Courts have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953). Congress has recognized this too, as it gave the President broad discretion to suspend the entry of any class of aliens:

*Whenever* the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, *he may by proclamation*, and *for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens* as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f) (emphases added). And it is unlawful for an alien to enter the country in violation of "such limitations and exceptions as the President may prescribe." *Id.* § 1185(a)(1).

In addition to the President's § 1182(f) power to suspend the entry of aliens, Congress also provided that the Executive Branch "may at any time, in [its] discretion," revoke a visa. *Id.* § 1201(i). Such a discretionary visa revocation is judicially unreviewable except in one narrow circumstance: in a removal proceeding, if the "revocation provides the sole ground for removal." *Id.*

2.    As an initial matter, any challenge to the President's § 1182(f) power fails under *Sale*, 509 U.S. at 187-88. At issue there was a challenge on behalf of Haitian refugees to an executive order requiring that certain aliens interdicted at sea be immediately returned to their home country without an opportunity to present asylum claims. *Id.* at 164-66. *Sale* held it "perfectly clear that 8 U.S.C. § 1182(f) . . . grants the President ample power to establish a naval blockade that would simply deny illegal Haitian migrants the ability to disembark on our shores." *Id.* at 187. The Court rejected the argument that a later-enacted statutory provision limits the President's power under § 1182(f) to suspend aliens' entry into the United States, reasoning that it "would have been extraordinary for Congress to make such an important change in the law without any mention of that possible effect." *Id.* at 176.

6

The Supreme Court in *Sale* ultimately found itself "in agreement with the conclusion expressed in Judge Edwards' concurring opinion in" *Haitian Refugee Center v. Gracey*, 809 F.2d 794 (D.C. Cir. 1987): "'*there is no solution to be found in a judicial remedy*'" that overrides the Executive's exercise of § 1182(f) authority.[2] *Sale*, 509 U.S. at 188 (quoting *Gracey*, 809 F.2d at 841 (Edwards, J., concurring)) (emphasis added).

3.    Plaintiffs cannot overcome the unmistakably sweeping delegation of authority in § 1182(f) by relying on 8 U.S.C. § 1152(a)(1)(A). Section 1152(a)(1)(A) does not address the *entry* of aliens into the country. Instead, it is part of a set of restrictions on the issuance of *immigrant visas*—visas for aliens to seek admission for permanent residence.[3] *See* 8 U.S.C. §§ 1101(a)(15)-(16), 1151(a)-(b), 1181(a). Section 1152(a)(1)(A), which was added in the Immigration and Nationality Act of 1965, states:

> Except as specifically provided [in a paragraph imposing country-specific caps on immigrant visas], no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence.

Section 1152(a)(1)(A) does not conflict with § 1182(f), let alone impliedly restrict it. *See, e.g.*, *Sale*, 509 U.S. at 176; *Posadas v. Nat'l City Bank of N.Y.*, 296 U.S.

---

[2] Like the claims in the instant case, Judge Edwards' persuasive conclusion in *Gracey* addressed both statutory and constitutional challenges. *See* 809 F.2d at 838.

[3] Section 1152(a)(1)(A), therefore, could not possibly support a *facial* injunction of § 2(c) of the Order, because it addresses only "immigrant visa" issuance. It does not apply to nonimmigrant visas and thus could not possibly show that the Order violates the INA as applied to aliens seeking entry as nonimmigrants.

497, 503 (1936) (describing conflict requirement for repeal by implication). An alien's entry into this country is a different and more consequential event than the preliminary step of receiving a visa, which only entitles the alien to apply for admission.[4] Visa possession does not control or guarantee entry into the country; the INA provides several ways in which visa-holding aliens can be denied entry. *See, e.g.*, 8 U.S.C. §§ 1101(a)(13)(A), 1182(a), (f), 1201(h), (i); 22 C.F.R. §§ 41.122, 42.82. One of them is the President's express authority under § 1182(f) to suspend the entry of classes of aliens.

To compare entry and visa-possession under the INA is to compare apples and oranges. A statutory provision about the preliminary step of receiving an immigrant visa, § 1152(a), does not somehow limit the President's § 1182(f) authority concerning the entry of aliens. Section 1152(a) is silent as to the President's separately delegated authority to suspend alien entry. And the Executive Branch has not his-

---

[4] Visa-possession and admission are distinct concepts. A visa is a determination that an alien is eligible to seek admission; it requires clearing specified bases for ineligibility. 8 U.S.C. §§ 1101(a)(4), 1181, 1182(a), 1184. But a visa does not entitle an alien to enter the country. Entry can be denied, for example, if the alien is found inadmissible upon arrival at a port of entry. *Id.* § 1201(h).

"Admission" of an alien means "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." *Id.* § 1101(a)(13)(A). Mere presence on U.S. soil is not enough: "an alien present in the United States who has not been admitted or who arrives in the United States" is only an "applicant for admission." *Id.* § 1225(a)(1). If an alien "is not clearly and beyond a doubt entitled to be admitted," he must generally be placed in removal proceedings. *Id.* § 1225(b)(2)(A).

torically treated § 1152(a)(1)(A) as prohibiting nationality-based suspensions of entry under § 1182(f). For example, President Reagan suspended the entry of Cuban nationals into the United States as immigrants, subject to certain exceptions. Presidential Proclamation No. 5517, 51 Fed. Reg. 30,470 (Aug. 26, 1986).

4.    Nor does 8 U.S.C. § 1182(a) somehow limit the President's § 1182(f) authority to deny aliens entry. In § 1182(a), Congress enumerated no fewer than seventy grounds that make an alien automatically inadmissible to the United States, unless an exception applies. But Congress did not provide that these are the only grounds on which the Executive can deny aliens entry. Instead, Congress in § 1182(f) separately enabled the President to impose additional entry restrictions, including the power to "suspend the entry" of "any class of aliens" for "such period as he shall deem necessary." As the D.C. Circuit correctly recognized in *Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986), § 1182(f) permits the Executive to deny aliens entry even if the aliens are not covered by one of the enumerated § 1182(a) categories that automatically render an alien inadmissible: "The President's sweeping proclamation power [in § 1182(f)] thus provides a safeguard against the danger posed by any particular case or class of cases that is not covered by one of the categories in section 1182(a)." *Id.* at 1049 n.2. The *Abourezk* court even noted an example of this understanding in a nationality-based § 1182(f) proclamation issued by President Reagan, which suspended entry for "officers or employees of the Cuban government or of the Cuban Communist Party." *Id.* (citing Presidential Proclamation No. 5377, 50 Fed. Reg. 41,329 (Oct. 10, 1985)).

9

## B. The Order's directives on refugee admission do not violate the INA.

The President's ability to direct the extent of refugee admission is also well-grounded in the INA. Not only does the President have authority under 8 U.S.C. § 1182(f) to temporarily restrict the entry of any class of aliens—including aliens claiming refugee status—but the INA also places the number of refugee admissions in the President's control. 8 U.S.C. § 1157(a)(2) (refugee admissions capped at "such number *as the President determines*," after certain congressional consultation, "is justified by humanitarian concerns *or is otherwise in the national interest*" (emphases added)). And, as explained above, the § 1152(a)(1)(A) restriction on issuance of immigrant visas is irrelevant to the President's authority to suspend alien entry. Section 1152(a)(1)(A) does not address the entry of refugees, or of aliens in general. Moreover, admission into the country as a refugee does not require an immigrant visa. *See* 8 U.S.C. § 1181(c). So refugee admission as a category is not even within § 1152(a)(1)(A)'s "immigrant visa" sweep.

10

## II. Plaintiffs' Arguments that the Executive Order Violates the Constitution Are Meritless.

### A. The Order receives the strongest presumption of validity because it falls within in an area of maximum executive authority: *Youngstown*'s first category of executive action pursuant to congressionally delegated power.

This lawsuit seeks a remarkable use of the judicial power to interfere with the President's national-security decisions in an area of strongest executive authority. Because the Executive Order implements power expressly delegated by Congress, *see supra* Part I, the President's authority is at its maximum and "includes all that he possesses in his own right plus all that Congress can delegate," *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring), *quoted in Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 375 (2000). Plaintiffs' constitutional claims thus implicitly argue that "the Federal Government as an undivided whole" lacks the authority to proceed as the Executive Order here directs. *Id.* at 636-37.

Executive action in this first *Youngstown* zone is "supported by the strongest of presumptions and the widest latitude of judicial interpretation." *Id.* at 637, *quoted in Dames & Moore v. Regan*, 453 U.S. 654, 674 (1981). That respect attaches here because of not only the explicit congressional grant of authority to deny entry, *see* 8 U.S.C. § 1182(f), but also the INA's complementary approach to allowing entry. Specifically, Congress enacted "extensive and complex" provisions detailing how over forty different classes of nonimmigrants, refugees, and other aliens can attain lawful presence in the country. *Arizona*, 132 S. Ct. at 2499; *see Texas v. United States*, 809 F.3d 134, 179 (5th Cir. 2015), *aff'd by an equally divided court*, 136

S. Ct. 2271 (2016) (per curiam). But while Congress provided these detailed criteria to significantly restrict the Executive's ability to unilaterally *allow* aliens to be lawfully present in the country, Congress simultaneously delegated the Executive broad discretionary authority to *exclude* aliens from the country, under § 1182(f). Congress knows how to limit executive power in this area, yet the broad delegation of executive power in § 1182(f) underscores the Executive's unique role in protecting the Nation.

The exclusion of aliens is also a core federal prerogative: a power "inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers—a power to be exercised exclusively by the political branches of government." *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972) (quotation marks omitted); *accord Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). The burden of persuasion should thus "rest heavily upon" any party who might attack the Executive's congressionally authorized action on such a fundamental aspect of sovereignty. *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

Extending constitutional rights as envisioned by plaintiffs would have grave implications, such as imposing delay, cost, and risk while courts scrutinize federal officials' concerns with existing procedures for vetting aliens seeking entry into the country. When it comes to deciding the best way to use a sovereign's power over its borders to manage risk, courts have long recognized that the political branches are uniquely well situated. *E.g.*, *Mathews v. Diaz*, 426 U.S. 67, 81 (1976).

### B. Plaintiffs' constitutional claims fail because the Constitution does not accord rights extraterritorially to nonresident aliens abroad seeking entry into the United States.

Plaintiffs' constitutional challenges rest on the flawed premise that the United States Constitution confers on nonresident foreign citizens, located abroad, rights regarding admission into this country. But it is "clear" that "an unadmitted and nonresident alien" "ha[s] no constitutional right of entry to this country as a nonimmigrant or otherwise." *Mandel*, 408 U.S. at 762. The "power to admit or exclude aliens is a sovereign prerogative," and aliens seeking admission to the United States request a "privilege." *Landon v. Plasencia*, 459 U.S. 21, 32 (1982).

The Fifth Amendment does not apply to nonresident aliens outside United States territory. The Supreme Court has "rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) (citing *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950)). This conforms to the Court's observation in *Sale* that no "judicial remedy" exists to challenge the Executive's exercise of § 1182(f) authority to deny nonresident aliens entry. 509 U.S. at 188. Likewise, the Court's precedents establish that the Fifth Amendment's Due Process Clause applies to "person[s]," U.S. Const. amend. V, only "within the territorial jurisdiction," *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886). The Court has thus recognized a key distinction between aliens inside versus outside the United States. *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *see also Rodriguez-Silva v. INS*, 242 F.3d 243, 248 (5th Cir. 2001) (determining that Congress was not required to establish a rational basis for nationality-based classifications because its power to reg-

ulate immigration is plenary). *Cf. Boumediene*, 553 U.S. at 754 (involving (1) lengthy detention, rather than entry denial, at (2) Guantanamo Bay, where the United States had "plenary control, or practical sovereignty").

Analogously, the Establishment Clause does not vest rights extraterritorially in nonresident aliens abroad—for essentially the same reasons that due-process and equal-protection rights do not apply to such aliens. *See, e.g.*, *Zadvydas*, 533 U.S. at 693; *Verdugo-Urquidez*, 494 U.S. at 269. Congress itself has long designated members of certain religious groups, such as Soviet Jews, Evangelical Christians, and Ukrainian Orthodox Church members, as presenting "special humanitarian concern to the United States" for immigration purposes. 8 U.S.C. § 1157(a)(3) & note.

**C. Even assuming arguendo that constitutional rights extend extraterritorially to nonresident aliens abroad, plaintiffs' claims are meritless.**

**1. The Executive Order is grounded in national-security concerns and classifies aliens by nationality, so the Order is not an unconstitutional pretext for religious discrimination.**

Even assuming for the sake of argument that some form of equal-protection or Establishment-Clause rights applied to the aliens covered by the Executive Order, the Order is a valid use of the Executive's foreign-affairs and national-security powers. The Court should reject any suggestion that the Order is motivated by a pretextual discriminatory purpose based on religion.

a.   The Supreme Court "has recognized, ever since *Fletcher v. Peck*, 6 Cranch 87, 130-31[] (1810), that judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of govern-

14

ment." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977). The Court has therefore permitted a discriminatory-purpose analysis "only in the 'very limited and well-defined class of cases where the very nature of the constitutional question requires [this] inquiry.'" *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 377 n.6 (1991) (quoting *United States v. O'Brien*, 391 U.S. 367, 383 n.30 (1968)). And amici are aware of no case in which a court has applied a religion-based discriminatory-purpose analysis in the foreign-affairs context—even though the federal government has been making immigration-based religious classifications for decades. *See supra* p. 14.

Regardless, in the "very limited and well-defined class of cases" where the Supreme Court has engaged in a discriminatory-purpose analysis of governmental actions, *City of Columbia*, 499 U.S. at 377 n.6, the Court has concomitantly stated that only obvious, clear proof of pretext can allow courts to override governmental actions, which are presumed valid:

- When there are "legitimate reasons" for governmental action, courts "will not infer a discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 298-99 (1987) (rejecting equal-protection claim).

- Governmental discriminatory purpose can be shown for a neutral classification only if it "is an obvious pretext for . . . discrimination"—that is, the law "can plausibly be explained only as a [suspect class]-based classification." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272, 275 (1979) (rejecting equal-protection claim).

- Governmental pretextual purpose can only be established where there is the "'clearest proof'" to override legitimate governmental objectives. *Smith v. Doe*, 538 U.S. 84, 92 (2003) (rejecting ex-post-facto claim).

15

All of this follows from the Court's admonition that government officials' actions have long been presumed valid. *E.g.*, *Sunday Lake Iron Co. v. Wakefield Twp.*, 247 U.S. 350, 353 (1918). And a claim of pretext is particularly unavailing in this context, as the Executive Order is in *Youngstown*'s first zone and thus "supported by the strongest of presumptions and the widest latitude of judicial interpretation." 343 U.S. at 637 (Jackson, J., concurring).

    b.   The Executive Order classifies aliens by nationality—not religion.[5] The Executive Order's temporary pause in entry by nationals from six countries and in the refugee program neither mentions any religion nor depends on whether affected aliens are Muslim. *See* EO §§ 2, 3, 6. These provisions distinguish among aliens only by nationality. *Id.* Thus, the Executive Order is emphatically not a "Muslim ban." Indeed, numerous Muslim-majority countries in the world were not covered

---

[5] Because the Executive Order classifies aliens by nationality, and not religion, any applicable equal-protection analysis subjects the Order to no more than rational-basis review. *See, e.g.*, *Mathews*, 426 U.S. at 83; *Nademi v. INS*, 679 F.2d 811, 814 (10th Cir. 1982). "Th[e] discrimination among subclassifications of aliens is not based on a suspect classification," *Soskin v. Reinertson*, 353 F.3d 1242, 1256 (10th Cir. 2004), and "may be drawn in the immigration field by the Congress or the Executive," *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979). In fact, decades-old nationality-based classifications are found throughout the INA. For example, Congress has authorized Temporary Protected Status for an "alien who is a national of a foreign state" specified by the Executive. 8 U.S.C. § 1254a(a)(1). Congress has also conferred certain benefits on aliens from particular countries who are applying for LPR status. *See, e.g.*, *id.* § 1255 note (listing immigration provisions under the Haitian Refugee Immigration Fairness Act of 1998 and the Nicaraguan Adjustment and Central American Relief Act, among others). And Congress created a "diversity immigrant" program to issue immigrant visas to aliens from countries with historically low rates of immigration to the United States. *See id.* § 1153(c).

by the seven-country list used in the prior Executive Order,[6] and the Pew Research Center estimates that this list from the prior Executive Order "would affect only about 12% of the world's Muslims."[7]

The Executive Order's nationality-based restrictions have a manifest legitimate basis: to "ensure the proper review and maximum utilization of available resources for the screening and vetting of foreign nationals, [and] to ensure that adequate standards are established to prevent infiltration by foreign terrorists." EO § 2(c). The Order then finds detriment to national interests from permitting "unrestricted entry into the United States of nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen," *id.*—similar to the prior Executive Order's restriction on entry of aliens from "countries referred to in, or designated under, section 217(a)(12) of the INA, 8 U.S.C. [§] 1187(a)(12)," EO § 1(b)(i), (f). Those six countries are among those previously identified by Congress and the Obama Administration, in administering the visa-waiver program, as a national-security "country or area of concern." 8 U.S.C. § 1187(a)(12)(A)(i)(III).

---

[6] Jack Moore & Conor Gaffey, *What's Behind Donald Trump's Decision to Include Some Muslim-Majority Countries in the Travel Ban—and Not Others?*, Newsweek, Jan. 31, 2017, http://www.newsweek.com/muslim-majority-countries-not-included-trump-travel-ban-550141 (listing Muslim-majority countries not covered by the prior Order's travel restrictions).

[7] Pew Research Ctr., *World's Muslim Population More Widespread Than You Might Think* (Jan. 31, 2017), http://www.pewresearch.org/fact-tank/2017/01/31/worlds-muslim-population-more-widespread-than-you-might-think/.

The Executive Order itself explains the President's rationale for the travel restrictions at length. *See* EO §§ 1-2. And before the current Administration took office, numerous federal government officials—including the FBI director,[8] the former Director of National Intelligence,[9] and the former Assistant Director of the FBI's Counterterrorism Division[10]—expressed concerns about the country's current capacity for vetting alien entry. According to the House Homeland Security Committee, ISIS and other terrorists "*are determined*" to abuse refugee programs,[11] and "groups like ISIS may seek to exploit the current refugee flows."[12] The national-security interests implicated by the ongoing War on Terror against radical Islamic terrorists were further recognized in the 2001 Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (codified at 50 U.S.C. § 1541 note). *See, e.g.*, *Boumediene*, 553 U.S. at 733; *see also, e.g.*, National Defense Authorization Act

---

[8] H. Comm. on Homeland Sec., 114th Cong., *Nation's Top Security Officials' Concerns on Refugee Vetting* (Nov. 19, 2015), https://homeland.house.gov/press/nations-top-security-officials-concerns-on-refugee-vetting/.

[9] *Id.*

[10] Letter of Bob Goodlatte, Chairman, H. Comm. on the Judiciary, to Barack Obama, President of the United States of America (Oct. 27, 2015), http://judiciary.house.gov/_cache/files/20315137-5e84-4948-9f90-344db69d318d/102715-letter-to-president-obama.pdf.

[11] H. Comm. on Homeland Sec., 114th Cong., *Syrian Refugee Flows: Security Risks and Counterterrorism Challenges* 2-3 (Nov. 2015), https://homeland.house.gov/wp-content/uploads/2015/11/HomelandSecurityCommittee_Syrian_Refugee_Report.pdf.

[12] H. Comm. on Homeland Sec., 114th Cong., *Terror Threat Snapshot: The Islamist Terrorist Threat* (Nov. 2015), https://homeland.house.gov/wp-content/uploads/2015/11/November-Terror-Threat-Snapshot.pdf.

for Fiscal Year 2016, Pub. L. No. 114-92, § 1035(a), 129 Stat. 726, 971 (2015) (codi-fied at 10 U.S.C. § 801 note); The White House, *Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Se-curity Operations* 4-7 (Dec. 2016), https://www.justsecurity.org/wp-content/uploads/2016/12/framework.Report_Final.pdf. In light of this reality, a challenge to the Executive Order as a pretext for religious discrimination must fail.

Ample reason thus exists for courts to leave undisturbed the "delicate policy judgments" inherent in the Executive Order about when a factor indicating a heightened national-security risk warrants a particular course of action regarding the Nation's borders. *Plyler v. Doe*, 457 U.S. 202, 225 (1982). Courts are not well situated to evaluate competing experts' views about particular national-security-risk-management measures. *See Boumediene*, 553 U.S. at 797. Comments the Presi-dent made during his campaign for office cannot overcome the Executive Order's detailed explanation of its national-security basis, the legitimate basis for that rea-soning in conclusions of numerous federal officials, *see supra* pp. 17-18, and the pre-sumption of validity of official government conduct. The Supreme Court has rec-ognized the limited significance of campaign statements before candidates assume the responsibilities of office. *See Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002). And comments made by nongovernmental officials are irrelevant for determining whether the Executive Branch decision-makers for the Order held a discriminatory, pretextual purpose. *See Feeney*, 442 U.S. at 279.

Any claim of religious pretext thus fails: the Executive Order is religion-neutral, and this exercise of *Youngstown* zone-one authority is "supported by the

19

strongest of presumptions and the widest latitude of judicial interpretation." 343 U.S. at 637 (Jackson, J., concurring); *see supra* Part II.A. Because the Executive Order states a "facially legitimate and bona fide reason" for exercising the Executive's national-security and foreign-affairs powers to restrict entry, courts must "neither look behind the exercise of that discretion, nor test it by balancing its justification against" plaintiffs' asserted constitutional rights. *Mandel*, 408 U.S. at 770.

### 2. This Court should not rely on the Ninth Circuit's decision in *Washington v. Trump* because it was wrongly decided.

In *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) (per curiam), a Ninth Circuit panel concluded that the Executive was unlikely to succeed in appealing a district court order enjoining the prior Executive Order on the basis that it violated the Due Process Clause. *Id.* at 1164-65. While a procedural due-process claim is not currently before this Court, the Court nevertheless should not rely on *Washington v. Trump* because it was wrongly decided.

a.    As the Supreme Court has recognized, no process is due if one is not deprived of a constitutionally protected interest in life, liberty, or property. *E.g.*, *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (per curiam); *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999). Nonresident aliens abroad[13] have no constitu-

---

[13] The analysis could be different for certain lawful permanent residents who are returning to the country from abroad, *see Landon*, 459 U.S. at 33-34, but the Executive Order's suspension of entry for certain foreign nationals does not apply to those who are lawful permanent residents of the United States. EO § 3(b)(i).

tionally protected interest in entering the United States.[14] Even apart from the is-sue of entry into the United States, "[t]here is no constitutionally protected inter-est in either obtaining or continuing to possess a visa." *Louhghalam v. Trump*, No. 1:17-cv-10154, 2017 WL 479779, at *5 (D. Mass. Feb. 3, 2017) (slip op. 13). Similar-ly, multiple courts of appeals have rejected due-process claims regarding visa issu-ance or processing. *See, e.g.*, *Azizi v. Thornburgh*, 908 F.2d 1130, 1134 (2d Cir. 1990); *De Avilia v. Civiletti*, 643 F.2d 471, 477 (7th Cir. 1981).

b.    Regardless, whatever process could possibly be due was satisfied here by the Executive Order's public proclamation prospectively announcing an exercise of the Executive's § 1182(f) authority. In fact, the Executive Order goes beyond the INA's requirements for process by giving ten days' advance notice to potentially affected aliens. And § 1182(f) cannot be subverted by arguing that a class-wide proclamation under that authority is constitutionally insufficient procedure. *See Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915).

---

[14] The analysis could be different where *removal proceedings*—which involve the distinct situation of potential detention and forcible removal—were instituted against an alien who is in this country and whose visa was revoked, as that alien would have certain due-process protections under the Fifth Amendment. *See Demore v. Kim*, 538 U.S. 510, 523 (2003) (noting that it is "well established" that aliens have due-process rights in deportation hearings (citation and quotation marks omitted)); *see also Zadvydas*, 533 U.S. at 693 (alien entitled to Fifth Amend-ment protections once alien is within the country). Hence, the INA provides for judicial review of visa revocations only in the limited context of deportation pro-ceedings. 8 U.S.C. § 1201(i). But the Order here concerns the denial of entry in the first place—not deportation—and the Supreme Court has not extended the Fifth Amendment to nonresident aliens abroad seeking to enter the country. *Cf. Landon*, 459 U.S. at 32.

c.   In *Washington v. Trump*, the Ninth Circuit panel incorrectly posited that four categories of aliens, other than LPRs, may have "potential" claims to due-process protections. 847 F.3d at 1166 (listing the following categories: (1) "persons who are in the United States, even if unlawfully"; (2) "non-immigrant visaholders who have been in the United States but temporarily departed or wish to temporarily depart"; (3) "refugees"; and (4) "applicants who have a relationship with a U.S. resident or an institution that might have rights of its own to assert"). That theory, however, leads to absurd consequences: it could effectively extend constitutional rights to every person on the planet.  Regardless, none of those potential claims has merit.

First, there are no viable claims as to aliens in the United States unlawfully. Even if unlawfully present aliens have due-process rights in *removal proceedings*, *see id.* (citing *Zadvydas*, 533 U.S. at 693), that does not mean that an unlawfully present alien who leaves the country somehow has a right to process for admission to the country upon return. To the contrary, such aliens would generally be inadmissible based on their prior unlawful presence. *See* 8 U.S.C. § 1182(a)(9)(B), (f).

The second category—nonimmigrant visaholders—is expressly exempted from the current Executive Order. EO § 3(a)(i)-(iii). In all events, *Landon* does not establish that nonimmigrant visa-holders have due-process rights when seeking to enter this country from abroad. *Cf. Washington*, 847 F.3d at 1166 (raising this suggestion). *Landon* involved a *resident* alien, and suggested that any process due must account for the circumstances of an alien's ties to this country. *See* 459 U.S. at 32-34 ("[O]nce an alien gains admission to our country and begins to develop the

22

ties that go with permanent residence his constitutional [due-process] status changes accordingly. . . . The constitutional sufficiency of procedures provided in any situation, of course, varies with the circumstances."). Those ties are significantly less in the case of a *nonresident* alien who was temporarily admitted on a nonimmigrant visa. In any event, *Landon* was decided before Congress changed the nature of an alien's interest in visa possession by amending the INA, in 2004, to provide that "[t]here shall be no means of judicial review . . . of a revocation" of a visa, "except in the context of a removal proceeding if such revocation provides the sole ground for removal under" the INA. Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, § 5304(a), 118 Stat. 3638, 3736 (codified at 8 U.S.C. § 1201(i)).

Third, any due-process argument based on the purported denial of refugees' rights to apply for relief also fails. *Cf. Washington*, 847 F.3d at 1166. Aliens seeking "refugee" status are nonresident aliens located abroad, so they have no constitutionally protected liberty interest in admission into the United States. *See supra* pp. 20-21. Any claim regarding the refugee program cannot rest on provisions regarding asylum. *See* 8 U.S.C. § 1158. Asylum and refugee admission are not the same thing. The INA's asylum protection can be sought by individuals who are already "physically present in the United States or who arrive[] in the United States." *Id.* § 1158(a)(1). Only an alien *outside* the United States may apply to be admitted as a refugee. *See id.* §§ 1101(a)(42), 1157(a), 1158(a), (c)(1), 1181(c). And, again, there is no baseline norm that constitutional rights—including the right to petition the

23

United States government—apply to citizens of other countries neither residing nor present in the United States. *See supra* Part II.B.

Fourth, there are no viable due-process arguments based on visa "applicants who have a relationship with a U.S. resident or an institution that might have rights of its own to assert." *Washington*, 847 F.3d at 1166 (citing *Kerry v. Din*, 135 S. Ct. 2128, 2139 (2015) (Kennedy, J., concurring in judgment); *id.* at 2142 (Breyer, J., dissenting); *Mandel*, 408 U.S. at 762-65)). As an initial matter, *Din* involved only a visa application, and it did not address the President's separate § 1182(f) power to deny classes of aliens entry. *Sale*, though, did just that and held there was no "judicial remedy" to challenge an exercise of § 1182(f) authority as applied to nonresident aliens. 509 U.S. at 188.

In any event, the narrowest opinion concurring in the judgment in *Din* expressly did not decide whether a U.S. citizen has a protected liberty interest in the visa application of her alien spouse, such that she was entitled to notice of the reason for the application's denial. *See* 135 S. Ct. at 2139-41 (Kennedy, J., concurring in the judgment). In fact, the concurrence reasoned that, even if due process applied in this context, the only process possibly required was that the Executive give a "facially legitimate and bona fide reason" for denying a visa to an alien abroad—a standard met here, as to the suspension of entry, by the explanation given in the Executive Order. *Id.* at 2141; *see also id.* at 2131 (plurality op.) ("[A]n unadmitted and nonresident alien . . . has no right of entry into the United States, and no cause of action to press in furtherance of his claim for admission."). Regardless, the existence of occasional scenarios like that in *Din* could not support a facial injunction.

24

## Conclusion

The Court should grant defendants' motion for a stay pending appeal and ul-timately reverse the district court's order enjoining the Executive Order.

Respectfully submitted.

Steven T. Marshall
Attorney General of Alabama

Mark Brnovich
Attorney General of Arizona

Leslie Rutledge
Attorney General of Arkansas

Pamela Jo Bondi
Attorney General of Florida

Derek Schmidt
Attorney General of Kansas

Jeff Landry
Attorney General of Louisiana

Tim Fox
Attorney General of Montana

Mike Hunter
Attorney General of Oklahoma

Alan Wilson
Attorney General of South Carolina

Marty J. Jackley
Attorney General of South Dakota

Ken Paxton
Attorney General of Texas

Jeffrey C. Mateer
First Assistant Attorney General

s/ Scott A. Keller
Scott A. Keller
Solicitor General

J. Campbell Barker
Deputy Solicitor General

Ari Cuenin
Assistant Solicitor General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697
scott.keller@oag.texas.gov

25

PATRICK MORRISEY
Attorney General of West Virginia

PHIL BRYANT
Governor of Mississippi

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2017, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

<u>s/ Scott A. Keller</u>
SCOTT A. KELLER

### Certificate of Compliance

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it is prepared in a proportionally spaced typeface in Microsoft Word using 14-point Equity typeface and with the type-volume limitation because it contains under 6,500 words.

s/ Scott A. Keller
Scott A. Keller