**RECORD NOS. 13-4835(L), 13-4836, 13-4837, 13-4839**

In The

# United States Court Of Appeals
## For The Fourth Circuit

### UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

### KEITH WILLIE REED;
### STANLEY RAY WINSTON, a/k/a Stanley Wilson,
### a/k/a Rashaad Winston; ANTHONY CANNON;
### TOBIAS RICHARD DYER,

*Defendants – Appellants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT ALEXANDRIA**

———————

**JOINT APPENDIX
Volume I of VII
(Pages 1 – 333)**

———————

Lawrence H. Woodward, Jr.
SHUTTLEWORTH, RULOFF,
 SWAIN, HADDAD
 & MORECOCK, PC
4525 South Boulevard
Suite 300
Virginia Beach, VA 23452
(757) 671-6000

*Counsel for Appellant
 Keith Willie Reed*

Abram J. Pafford
PAFFORD, LAWRENCE
 & CHILDRESS, PLLC
1100 Commerce Street
Lynchburg, VA 24504
(434) 528-6504

*Counsel for Appellant
 Tobias Richard Dyer*

Melinda L. VanLowe
LAW OFFICE OF
 MELINDA L. VANLOWE
10476 Armstrong Street
Fairfax, VA 22030
(703) 865-5555

*Counsel for Appellant
 Stanley Ray Winston*

Alfred L. Robertson, Jr.
ROBERTSON LAW OFFICE, PLLC
500 North Washington Street
Alexandria, VA 22314
(571) 482-5133

*Counsel for Appellant
 Anthony Cannon*

Rebecca H. Bellows
Office of the
 United States Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3748

*Counsel for Appellee*

## **<u>TABLE OF CONTENTS</u>**
### **Volume I of VII**

<div align="right">**Page:**</div>

**Docket Entries** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**Second Superseding Indictment**
      **filed April 23, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **35**

**Defendant's Motion for Severance of**
**Counts and Defendants (Reed)**
      **filed April 30, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **54**

**Government's Opposition to**
**Defendant's Motion for Severance of**
**Counts and Defendants (Reed)**
      **filed May 13, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **59**

**Transcript of Motions Hearing before**
**The Honorable Claude M. Hilton (Reed)**
      **on June 7, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **68**

**Order**
**Denying Defendant's Motion for Severance of**
**Counts and Defendants (Reed)**
      **filed June 7, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **76**

Transcript of Trial Preceding before
The Honorable Claude M. Hilton
    on June 17, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Testimony of <u>Dimanche Inn</u>:

Direct Examination by Ms. Giles . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99
Cross Examination by Mr. Wood . . . . . . . . . . . . . . . . . . . . . . . . . 107
Cross Examination by Ms. VanLowe  . . . . . . . . . . . . . . . . . . . . . . 108
Redirect Examination by Ms. Giles . . . . . . . . . . . . . . . . . . . . . . . . 121

Testimony of <u>Abigail Lopez</u>:

Direct Examination by Ms. Giles . . . . . . . . . . . . . . . . . . . . . . . . . . 122
Cross Examination by Mr. Wood . . . . . . . . . . . . . . . . . . . . . . . . . . 134
Cross Examination by Ms. VanLowe  . . . . . . . . . . . . . . . . . . . . . . 139
Cross Examination by Mr. Robertson . . . . . . . . . . . . . . . . . . . . . . 152
Cross Examination by Mr. Hunter . . . . . . . . . . . . . . . . . . . . . . . . 154
Redirect Examination by Ms. Giles . . . . . . . . . . . . . . . . . . . . . . . . 155

Testimony of <u>Erin Hablenko</u>:

Direct Examination by Ms. Bellows  . . . . . . . . . . . . . . . . . . . . . . . 156
Cross Examination by Mr. Wood . . . . . . . . . . . . . . . . . . . . . . . . . . 162
Cross Examination by Ms. VanLowe  . . . . . . . . . . . . . . . . . . . . . . 163
Cross Examination by Mr. Robertson . . . . . . . . . . . . . . . . . . . . . . 166
Cross Examination by Mr. Hunter . . . . . . . . . . . . . . . . . . . . . . . . 166

Testimony of <u>Carl Childress, Jr.</u>:

Direct Examination by Ms. Bellows  . . . . . . . . . . . . . . . . . . . . . . . 169
Cross Examination by Ms. VanLowe  . . . . . . . . . . . . . . . . . . . . . . 172

**Transcript of Trial Preceding before**
**The Honorable Claude M. Hilton**
          **on June 17, 2013, Continued:**

**Testimony of <u>Gregory Lynch</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . . **174**
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . . . . **180**

**Testimony of <u>Eldorado Mills</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . **181**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . . **192**
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . . . . **200**
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . . . **204**
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . . . . **207**

**Testimony of <u>Eric Johnson</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . . **210**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . . **218**
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . . . . **221**
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . . . **228**
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . . . . **228**
**Redirect Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . **231**
**Recross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . . **231**

**Testimony of <u>Harry Singleton</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . **233**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . . **236**

**Transcript of Trial Preceding before**
**The Honorable Claude M. Hilton**
      **on June 17, 2013, Continued:**

**Testimony of <u>Elmo English</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . . . **239**

**Testimony of <u>Shaquinta Gaines</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . . **242**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . . **247**

**Testimony of <u>Luis Dejesus</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . **248**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . . **260**
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . . . . . **263**
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . . . **265**

**Testimony of <u>Sandra Koch</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . **266**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . . **270**
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . . . . . **271**
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . . . **275**
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . . . . . **278**

**Transcript of Trial Preceding before**
**The Honorable Claude M. Hilton**
      **on June 17, 2013, Continued:**

**Testimony of <u>Constance Fischer</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **280**
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . . . . **288**
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . . . **291**

**Testimony of <u>Christopher Ormerod</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . . . **293**

## <u>TABLE OF CONTENTS</u>
### Volume II of VII

<div align="right"><b>Page:</b></div>

**Transcript of Trial Preceding before**
**The Honorable Claude M. Hilton**
 **on June 18, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **334**

**Testimony of <u>Christopher Ormerod</u>, continued:**

**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . **338**
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . **341**

**Testimony of <u>Donald Misele</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . **345**
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . . . **348**

**Testimony of <u>Joseph Sierra</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . **350**
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . . . **358**
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . . . **363**
**Redirect Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . **365**

**Testimony of <u>Joseph Trawicki</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . **366**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . **372**
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . **375**

**Transcript of Trial Preceding before**
**The Honorable Claude M. Hilton**
     **on June 18, 2013, Continued:**


**Testimony of <u>Robert Wenmoth</u>:**

Direct Examination by Ms. Giles . . . . . . . . . . . . . . . . . . . . . . . . . . . . 376
Cross Examination by Mr. Wood . . . . . . . . . . . . . . . . . . . . . . . . . . . 379
Cross Examination by Mr. Hunter . . . . . . . . . . . . . . . . . . . . . . . . . 380


**Testimony of <u>Christopher Derks</u>:**

Direct Examination by Ms. Bellows . . . . . . . . . . . . . . . . . . . . . . . . 381
Cross Examination by Mr. Wood . . . . . . . . . . . . . . . . . . . . . . . . . . . 392
Cross Examination by Mr. Robertson . . . . . . . . . . . . . . . . . . . . . . . 393
Cross Examination by Mr. Hunter . . . . . . . . . . . . . . . . . . . . . . . . . 394


**Testimony of <u>Amanda Romek</u>:**

Direct Examination by Ms. Giles . . . . . . . . . . . . . . . . . . . . . . . . . . . 395
Cross Examination by Mr. Wood . . . . . . . . . . . . . . . . . . . . . . . . . . . 399


**Testimony of <u>Felicia Williams</u>:**

Direct Examination by Ms. Bellows . . . . . . . . . . . . . . . . . . . . . . . . 401
Cross Examination by Ms. VanLowe . . . . . . . . . . . . . . . . . . . . . . . 404


**Testimony of <u>Michele Miller</u>:**

Direct Examination by Ms. Giles . . . . . . . . . . . . . . . . . . . . . . . . . . . 408

**Transcript of Trial Preceding before
The Honorable Claude M. Hilton
        on June 18, 2013, Continued:**

**Testimony of <u>Kirsten Montoya</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . 412

**Testimony of <u>Kirsten Henault</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . 413
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . 417
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . . 419
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . . . . 425

**Testimony of <u>Susannah Kehl</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . 426
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . 434
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . . 442
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . . . . 445
**Redirect Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . 451

**Testimony of <u>Yu Jin Kang</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . . 453
**Cross Examination by Mr. VanLowe** . . . . . . . . . . . . . . . . . . . . . . . 458
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . . . . 460

**Transcript of Trial Preceding before**
**The Honorable Claude M. Hilton**
      **on June 18, 2013, Continued:**

**Testimony of <u>Kira Glass</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 462
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 470
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . . . 471
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . . . . . 473

**Testimony of <u>Marc Hess</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . . . 475
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . . . . . 495
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . . . 501
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . . . . . 502
**Redirect Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . 506

**Testimony of <u>Rodney Jiggetts</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 507

**Testimony of <u>Thomas Reddick</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . . . 514
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . . . 519
**Redirect Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . 520

**Testimony of <u>Lynette Jones</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 525

**Transcript of Trial Preceding before
The Honorable Claude M. Hilton
        on June 18, 2013, Continued:**

**Testimony of <u>Latoya Freeman</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . . **532**
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . . . . **535**

**Testimony of <u>Gary Jameson</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . **537**

**Testimony of <u>Bobby Tabron</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . . **543**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . **545**

**Testimony of <u>Shawn Casey</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . . **546**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . **550**
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . . . . **550**
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . . **551**

**Testimony of <u>James Bright</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . . **552**
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . . **554**

**Transcript of Trial Preceding before**
**The Honorable Claude M. Hilton**
**       on June 18, 2013, Continued:**

**Testimony of <u>Romedan Hassen</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . . . **555**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . **564**

**Testimony of <u>Margarita Damian</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . **567**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . **572**

**Testimony of <u>Nana Donkoh</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . **573**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . **581**

**Testimony of <u>Yousuf Ashraf</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . . **583**

**Testimony of <u>Jorge Vergara</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . **588**

**Testimony of <u>Sherry O'Brien</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . **591**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . **593**

**Transcript of Trial Preceding before**
**The Honorable Claude M. Hilton**

on June 19, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 634

**Testimony of <u>Andrea Mattia</u>:**

Direct Examination by Ms. Bellows . . . . . . . . . . . . . . . . . . . . . . . . 637
Cross Examination by Mr. Wood . . . . . . . . . . . . . . . . . . . . . . . . . . 640
Cross Examination by Mr. Robertson . . . . . . . . . . . . . . . . . . . . . . 642

**Testimony of <u>Paul Lee</u>:**

Direct Examination by Ms. Bellows . . . . . . . . . . . . . . . . . . . . . . . . 645
Cross Examination by Mr. Wood . . . . . . . . . . . . . . . . . . . . . . . . . . 658
Cross Examination by Ms. VanLowe . . . . . . . . . . . . . . . . . . . . . . 660
Cross Examination by Mr. Robertson . . . . . . . . . . . . . . . . . . . . . . 661
Cross Examination by Mr. Hunter . . . . . . . . . . . . . . . . . . . . . . . . 662
Redirect Examination by Ms. Bellows . . . . . . . . . . . . . . . . . . . . . . 669

**Testimony of <u>Richard Fennern</u>:**

Direct Examination by Ms. Bellows . . . . . . . . . . . . . . . . . . . . . . . . 670
Cross Examination by Mr. Wood . . . . . . . . . . . . . . . . . . . . . . . . . . 683
Cross Examination by Ms. VanLowe . . . . . . . . . . . . . . . . . . . . . . 686
Cross Examination by Mr. Robertson . . . . . . . . . . . . . . . . . . . . . . 687
Redirect Examination by Ms. Bellows . . . . . . . . . . . . . . . . . . . . . . 688

**Testimony of <u>John Marsh</u>:**

Direct Examination by Ms. Bellows . . . . . . . . . . . . . . . . . . . . . . . . 689
Cross Examination by Mr. Wood . . . . . . . . . . . . . . . . . . . . . . . . . . 697
Cross Examination by Mr. Robertson . . . . . . . . . . . . . . . . . . . . . . 700

**Transcript of Trial Preceding before**
**The Honorable Claude M. Hilton**
    **on June 19, 2013, Continued:**


**Testimony of <u>Kevin Horan</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . . . 702
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . . 730
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . . . . 740
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . . . . 752
**Redirect Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . 760

# TABLE OF CONTENTS
## Volume III of VII

Page:

**Transcript of Trial Preceding before**
**The Honorable Claude M. Hilton**
on June 20, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 789

**Testimony of <u>Ramon Calderon</u>:**

Direct Examination by Ms. Bellows  . . . . . . . . . . . . . . . . . . . . . . . . . 795
Cross Examination by Ms. Giles  . . . . . . . . . . . . . . . . . . . . . . . . . . 801
Redirect Examination by Mr. Wood  . . . . . . . . . . . . . . . . . . . . . . . 803

**Testimony of <u>Richard Fennern</u>:**

Direct Examination by Mr. Robertson  . . . . . . . . . . . . . . . . . . . . . . . 805

**Transcript of Trial Preceding before**
**The Honorable Claude M. Hilton**
on June 21, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 922

**GOVERNMENT'S EXHIBITS:**

17.1   Photograph of Keith Willie Reed  . . . . . . . . . . . . . . . . . . . . . 927

17.2   Phone Examination Report . . . . . . . . . . . . . . . . . . . . . . . . . . 928

17.3   Text Messages #321 and #322  . . . . . . . . . . . . . . . . . . . . . . . 938

17.4   List of Incoming and Outgoing Phone Calls . . . . . . . . . . . . 940

**GOVERNMENT'S EXHIBITS, Continued:**

17.5   Alexandria Detention Center Call Records (Reed) . . . . . . . 945

18.10 )Photograph of Stanley Winston . . . . . . . . . . . . . . . . . . . . . . . . 952

18.11 Photograph of Stanley Winston . . . . . . . . . . . . . . . . . . . . . . . . 953

45     Diagrams Illustrating Cellular Analysis of
       (202) 510-4853, (202) 239-9022, (202) 594-4127,
       (240) 355-8256
              on December 7, December 9,
              and December 22, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . 954

Defendant's Motion for Judgment of Acquittal (Winston)
       filed July 5, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1019

Defendant's Memorandum in Support of
Motion for Judgment of Acquittal (Winston)
       filed July 5, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1023

Defendant's Motion for Judgment of Acquittal (Cannon)
       filed July 7, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1031

Defendant's Memorandum in Support of
Motion for Judgment of Acquittal (Cannon)
       filed July 7, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1034

Government's Memorandum of Law in Support of
Motion for Preliminary Order of Forfeiture (Dyer)
       filed October 11, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1042

**Defendant's Sentencing Memorandum (Winston)**
> **filed October 14, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1050**

**Government's Position with Respect to Sentencing (Dyer)**
> **filed October 17, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1055**

**Defendant's Position on Sentencing (Dyer)**
> **filed October 23, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1063**

**Transcript of Sentencing Hearing before
The Honorable Claude M. Hilton (Reed)**
> **on October 25, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1067**

**Transcript of Sentencing Hearing before
The Honorable Claude M. Hilton (Winston)**
> **on October 25, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1073**

**Transcript of Sentencing Hearing before
The Honorable Claude M. Hilton (Cannon)**
> **on October 25, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1081**

**Minute Entry Regarding Sentencing Proceedings (Dyer)**
> **filed October 25, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1088**

**Transcript of Sentencing Hearing before
The Honorable Claude M. Hilton (Dyer)**
> **on October 25, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1089**

**Notice of Appeal (Reed)**
> **filed October 30, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1095**

**Judgment (Reed)**
> **filed October 31, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1096**

**Judgment (Winston)**
         **filed October 31, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1102**

**Judgment (Cannon)**
         **filed October 31, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1108**

**Judgment (Dyer)**
         **filed October 31, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1114**

**Notice of Appeal (Cannon)**
         **filed October 31, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1120**

**Notice of Appeal (Winston)**
         **filed November 1, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1122**

**Notice of Appeal (Dyer)**
         **filed November 1, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1124**

# <u>TABLE OF CONTENTS</u>
## Volume IV of VII - UNDER SEAL

**Page:**

**Presentence Investigation Report (Dyer)**

**filed August 22, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1126**

## **<u>TABLE OF CONTENTS</u>**
### **Volume V of VII - UNDER SEAL**

**Page:**

**Presentence Investigation Report (Reed)**

    **filed September 16, 2013**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1159**

## **<u>TABLE OF CONTENTS</u>**
### **Volume VI of VII - UNDER SEAL**

**Page:**

**Presentence Investigation Report (Cannon)**

      **filed September 16, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1197**

# <u>TABLE OF CONTENTS</u>
## Volume VII of VII - UNDER SEAL

Page:

**Presentence Investigation Report (Winston)**

      **filed October 16, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1239**

APPEAL,CLOSED

# U.S. District Court
# Eastern District of Virginia - (Alexandria)
# CRIMINAL DOCKET FOR CASE #: 1:13-cr-00048-CMH All Defendants

Case title: USA v. Reed et al                          Date Filed: 01/24/2013
Magistrate judge case number: 1:12-mj-00823-IDD        Date Terminated: 10/31/2013

Assigned to: District Judge Claude M.
Hilton

Appeals court case number: 13-4835
4th Circuit

## Defendant (1)

**Keith Willie Reed**                    represented by **Terrell N Roberts , III**
*TERMINATED: 10/31/2013*                 Roberts, Wood, & Grimm
                                         6801 Kenilworth Ave
                                         Suite 202
                                         Riverdale, MD 20737
                                         (301) 699-0764
                                         Email: troberts@robertsandwood.com
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

                                         **Aamra S. Ahmad**
                                         Office of the Federal Public Defender
                                         (Alexandria)
                                         1650 King St
                                         Suite 500
                                         Alexandria, VA 22314
                                         703-600-0800
                                         Email: aamra_ahmad@fd.org
                                         *TERMINATED: 01/02/2013*
                                         *ATTORNEY TO BE NOTICED*

                                         **Douglas J. Wood**
                                         6801 Kenilworth Avenue
                                         Suite 202
                                         Riverdale, MD 20737
                                         N/A
                                         (301) 699-0764
                                         *ATTORNEY TO BE NOTICED*
                                         *Designation: Retained*

**Pending Counts**                                      **Disposition**

| | |
|---|---|
| 18:1951(a) Conspiracy (Ct 1: 12/22/2012) (1ss) | 720 months total - 60 months on each of Counts 1, 2, 3, 4, 5 and 9 to run concurrently w/each other and consecutive to all other counts; 60 months on Count 6 (consecutive); 300 months on Count 7 (consecutive); and 300 months on Count 8 (consecutive); 3 year SR term imposed on each of Counts 1, 2, 3, 4, 5, and 9 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other. |
| 18:2 and 1951 Interference with Commerce by Robbery (Ct 2: 12/07/2012)(CT 3: 12/09/2013)(Ct 4: 12/22/2012) FORFEITURE (2ss-4ss) | 720 months total - 60 months on each of Counts 1, 2, 3, 4, 5 and 9 to run concurrently w/each other and consecutive to all other counts; 60 months on Count 6 (consecutive); 300 months on Count 7 (consecutive); and 300 months on Count 8 (consecutive); 3 year SR term imposed on each of Counts 1, 2, 3, 4, 5, and 9 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other. |
| BA18:2 and 2113(a) and (d) Armed Robbery of a Credit Union (Ct 5: 12/22/2012) FORFEITURE (5ss) | 720 months total - 60 months on each of Counts 1, 2, 3, 4, 5 and 9 to run concurrently w/each other and consecutive to all other counts; 60 months on Count 6 (consecutive); 300 months on Count 7 (consecutive); and 300 months on Count 8 (consecutive); 3 year SR term imposed on each of Counts 1, 2, 3, 4, 5, and 9 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other. |
| 18:2 and 924(c)(1)(A) Using Firearm During a Crime of Violence (Ct 6: 12/07/2012)(Ct 7: 12/09/2012)(Ct 8: 12/22/2012) (6ss) | 720 months total - 60 months on each of Counts 1, 2, 3, 4, 5 and 9 to run concurrently w/each other and consecutive to all other counts; 60 months on Count 6 (consecutive); 300 months on Count 7 (consecutive); and 300 months on Count 8 (consecutive); 3 year SR term imposed on each of Counts 1, 2, 3, 4, 5, and 9 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other. |
| | 720 months total - 60 months on each of |

18:2 and 924(c)(1)(A) Using Firearm
During a Crime of Violence (Ct 6:
12/07/2012)(Ct 7: 12/09/2012)(Ct 8:
12/22/2012)
(7ss)

Counts 1, 2, 3, 4, 5 and 9 to run
concurrently w/each other and
consecutive to all other counts; 60
months on Count 6 (consecutive); 300
months on Count 7 (consecutive); and
300 months on Count 8 (consecutive); 3
year SR term imposed on each of
Counts 1, 2, 3, 4, 5, and 9 and a 5 year
term imposed on each of Counts 6, 7,
and 8 to run concurrently with each
other.

18:2 and 924(c)(1)(A) Using Firearm
During a Crime of Violence (Ct 6:
12/07/2012)(Ct 7: 12/09/2012)(Ct 8:
12/22/2012)
(8ss)

720 months total - 60 months on each of
Counts 1, 2, 3, 4, 5 and 9 to run
concurrently w/each other and
consecutive to all other counts; 60
months on Count 6 (consecutive); 300
months on Count 7 (consecutive); and
300 months on Count 8 (consecutive); 3
year SR term imposed on each of
Counts 1, 2, 3, 4, 5, and 9 and a 5 year
term imposed on each of Counts 6, 7,
and 8 to run concurrently with each
other.

18:922(g)(1) Possession of Firearm by
Prohibited Person (Ct 9: 12/22/2012)
(9ss)

720 months total - 60 months on each of
Counts 1, 2, 3, 4, 5 and 9 to run
concurrently w/each other and
consecutive to all other counts; 60
months on Count 6 (consecutive); 300
months on Count 7 (consecutive); and
300 months on Count 8 (consecutive); 3
year SR term imposed on each of
Counts 1, 2, 3, 4, 5, and 9 and a 5 year
term imposed on each of Counts 6, 7,
and 8 to run concurrently with each
other.

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**

18:371 Conspiracy (Ct 1: 12/22/2012
(1)

18:1951(a) Conspiracy (Ct 1:
12/22/2012)
(1s)

18:2 and 2113(a) and (d) Armed
Robbery of a Credit Union (Ct 2:

**Disposition**

Dismissed per filing of superseding
indictment

Dismissed per filing of second
superseding indictment

Dismissed per filing of superseding

| | |
|---|---|
| 12/22/2012) FORFEITURE (2) | indictment |
| 18:2 and 1951 Interference with Commerce by Robbery (Ct 2: 12/09/2012)(Ct 3: 12/22/2012) FORFEITURE (2s-3s) | Dismissed per filing of second superseding indictment |
| 18:2 and 942(c)(1)(A) Using Firearm During a Crime of Violence (Ct 3: 12/22/2012) (3) | Dismissed per filing of superseding indictment |
| 18:922(g)(1) Possession of Firearm by Prohibited Person (Ct 4: 12/22/2012) (4) | Dismissed per filing of superseding indictment |
| 18:2 and 2113(a) and (d) Armed Robbery of Federal Credit Union (Ct 4: 12/22/2012) FORFEITURE (4s) | Dismissed per filing of second superseding indictment |
| 18:2 and 924(c)(1)(A) Using Firearm During a Crime of Violence (Ct 5: 12/09/2012)(Ct 6: 12/22/2012) (5s-6s) | Dismissed per filing of second superseding indictment |
| 18:922(g)(1) Possession of Firearm by Prohibited Person (Ct 7: 12/22/2012) (7s) | Dismissed per filing of second superseding indictment |

**Highest Offense Level (Terminated)**

Felony

**Complaints**

18:2113(a) and (d) Armed Bank Robbery

**Disposition**

Assigned to: District Judge Claude M. Hilton

Appeals court case number: 13-4836 4th Circuit

**Defendant (2)**

**Stanley Ray Winston**
*TERMINATED: 10/31/2013*
*also known as*
Stanley Wilson
*TERMINATED: 10/31/2013*
*also known as*

represented by **Melinda L. VanLowe**
Law Office of Melinda L. Vanlowe
10476 Armstrong Street
Fairfax, VA 22030
703-865-5555
Fax: 703-763-2372

Rashaad Winston
*TERMINATED: 10/31/2013*

Email: melinda@vanlowelaw.com
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Pending Counts**

**Disposition**

720 months total - 60 months on each of
Counts 1, 2, 3, 4, 5 and 10 to run
concurrently w/each other and
consecutive to all other counts; 60
18:1951(a) Conspiracy (Ct 1:          months on Count 6 (consecutive); 300
12/22/2012)                           months on Count 7 (consecutive); and
(1ss)                                 300 months on Count 8 (consecutive); 3
                                      year SR term imposed on each of
                                      Counts 1, 2, 3, 4, 5, and 10 and a 5 year
                                      term imposed on each of Counts 6, 7,
                                      and 8 to run concurrently with each
                                      other.

                                      720 months total - 60 months on each of
                                      Counts 1, 2, 3, 4, 5 and 10 to run
                                      concurrently w/each other and
18:2 and 1951 Interference with       consecutive to all other counts; 60
Commerce by Robbery (Ct 2:            months on Count 6 (consecutive); 300
12/07/2012)(CT 3: 12/09/2013)(Ct 4:   months on Count 7 (consecutive); and
12/22/2012) FORFEITURE                300 months on Count 8 (consecutive); 3
(2ss-4ss)                             year SR term imposed on each of
                                      Counts 1, 2, 3, 4, 5, and 10 and a 5 year
                                      term imposed on each of Counts 6, 7,
                                      and 8 to run concurrently with each
                                      other.

                                      720 months total - 60 months on each of
                                      Counts 1, 2, 3, 4, 5 and 10 to run
                                      concurrently w/each other and
                                      consecutive to all other counts; 60
BA18:2 and 2113(a) and (d) Armed      months on Count 6 (consecutive); 300
Robbery of a Credit Union (Ct 5:      months on Count 7 (consecutive); and
12/22/2012) FORFEITURE                300 months on Count 8 (consecutive); 3
(5ss)                                 year SR term imposed on each of
                                      Counts 1, 2, 3, 4, 5, and 10 and a 5 year
                                      term imposed on each of Counts 6, 7,
                                      and 8 to run concurrently with each
                                      other.

                                      720 months total - 60 months on each of
                                      Counts 1, 2, 3, 4, 5 and 10 to run
                                      concurrently w/each other and
18:2 and 924(c)(1)(A) Using Firearm   consecutive to all other counts; 60
During a Crime of Violence (Ct 6:     months on Count 6 (consecutive); 300
12/07/2012)(Ct 7: 12/09/2012)(Ct 8:   months on Count 7 (consecutive); and
12/22/2012)                           300 months on Count 8 (consecutive); 3

CM/ECF - vaed

(6ss)

year SR term imposed on each of Counts 1, 2, 3, 4, 5, and 10 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other.

18:2 and 924(c)(1)(A) Using Firearm During a Crime of Violence (Ct 6: 12/07/2012)(Ct 7: 12/09/2012)(Ct 8: 12/22/2012)
(7ss)

720 months total - 60 months on each of Counts 1, 2, 3, 4, 5 and 10 to run concurrently w/each other and consecutive to all other counts; 60 months on Count 6 (consecutive); 300 months on Count 7 (consecutive); and 300 months on Count 8 (consecutive); 3 year SR term imposed on each of Counts 1, 2, 3, 4, 5, and 10 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other.

18:2 and 924(c)(1)(A) Using Firearm During a Crime of Violence (Ct 6: 12/07/2012)(Ct 7: 12/09/2012)(Ct 8: 12/22/2012)
(8ss)

720 months total - 60 months on each of Counts 1, 2, 3, 4, 5 and 10 to run concurrently w/each other and consecutive to all other counts; 60 months on Count 6 (consecutive); 300 months on Count 7 (consecutive); and 300 months on Count 8 (consecutive); 3 year SR term imposed on each of Counts 1, 2, 3, 4, 5, and 10 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other.

18:922(g)(1) Possession of Firearm by Prohibited Person (Ct 10: 12/22/2012)
(10ss)

720 months total - 60 months on each of Counts 1, 2, 3, 4, 5 and 10 to run concurrently w/each other and consecutive to all other counts; 60 months on Count 6 (consecutive); 300 months on Count 7 (consecutive); and 300 months on Count 8 (consecutive); 3 year SR term imposed on each of Counts 1, 2, 3, 4, 5, and 10 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other.

## Highest Offense Level (Opening)

Felony

## Terminated Counts

18:371 Conspiracy (Ct 1: 12/22/2012
(1)

## Disposition

Dismissed per filing of superseding indictment

| | |
|---|---|
| 18:1951(a) Conspiracy (Ct 1: 12/22/2012) (1s) | Dismissed per filing of second superseding indictment |
| 18:2 and 2113(a) and (d) Armed Robbery of a Credit Union (Ct 2: 12/22/2012) FORFEITURE (2) | Dismissed per filing of superseding indictment |
| 18:2 and 1951 Interference with Commerce by Robbery (Ct 2: 12/09/2012)(Ct 3: 12/22/2012) FORFEITURE (2s-3s) | Dismissed per filing of second superseding indictment |
| 18:2 and 942(c)(1)(A) Using Firearm During a Crime of Violence (Ct 3: 12/22/2012) (3) | Dismissed per filing of superseding indictment |
| 18:2 and 2113(a) and (d) Armed Robbery of Federal Credit Union (Ct 4: 12/22/2012) FORFEITURE (4s) | Dismissed per filing of second superseding indictment |
| 18:922(g)(1) Possession of Firearm by Prohibited Person (Ct 5: 12/22/2012) (5) | Dismissed per filing of superseding indictment |
| 18:2 and 924(c)(1)(A) Using Firearm During a Crime of Violence (Ct 5: 12/09/2012)(Ct 6: 12/22/2012) (5s-6s) | Dismissed per filing of second superseding indictment |
| 18:922(g)(1) Possession of Firearm by Prohibited Person (Ct 8: 12/22/2012) (8s) | Dismissed per filing of second superseding indictment |

**Highest Offense Level (Terminated)**

Felony

**Complaints**

18:2113(a) and (d) Armed Bank Robbery

**Disposition**

Assigned to: District Judge Claude M. Hilton

Appeals court case number: 13-4837 4th Circuit

**Defendant (3)**

CM/ECF - vaed                                                              Page 8 of 34

**Anthony Cannon**                    represented by **Alfred Lincoln Robertson , Jr.**
*TERMINATED: 10/31/2013*                              Robertson Law Office, PLLC
                                                      500 N. Washington St.
                                                      Alexandria, VA 22314
                                                      571-482-5133
                                                      Fax: 703-846-6196
                                                      Email: rob@robertsonlawoffice.com
                                                      *ATTORNEY TO BE NOTICED*
                                                      *Designation: CJA Appointment*

**Pending Counts**                                    **Disposition**

18:371 Conspiracy (Ct 1: 12/22/2012)                  Dismissed per filing of superseding
(1)                                                   indictment

18:1951(a) Conspiracy (Ct 1:                          Dismissed per filing of second
12/22/2012)                                           superseding indictment
(1s)

                                                      720 months total - 60 months on each of
                                                      Counts 1, 2, 3, 4, 5 and 11 to run
                                                      concurrently w/each other and
                                                      consecutive to all other counts; 60
                                                      months on Count 6 (consecutive); 300
18:1951(a) Conspiracy (Ct 1:                          months on Count 7 (consecutive); and
12/22/2012)                                           300 months on Count 8 (consecutive); 3
(1ss)                                                 year SR term imposed on each of
                                                      Counts 1, 2, 3, 4, 5, and 11 and a 5 year
                                                      term imposed on each of Counts 6, 7,
                                                      and 8 to run concurrently with each
                                                      other.

18:2 and 2113(a) and (d) Armed
Robbery of a Credit Union (Ct 2:                      Dismissed per filing of superseding
12/22/2012) FORFEITURE                                indictment
(2)

18:2 and 1951 Interference with
Commerce by Robbery (Ct 2:                            Dismissed per filing of second
12/09/2012)(Ct 3: 12/22/2012)                         superseding indictment
FORFEITURE
(2s-3s)

                                                      720 months total - 60 months on each of
                                                      Counts 1, 2, 3, 4, 5 and 11 to run
                                                      concurrently w/each other and
18:2 and 1951 Interference with                       consecutive to all other counts; 60
Commerce by Robbery (Ct 2:                            months on Count 6 (consecutive); 300
12/07/2012)(CT 3: 12/09/2013)(Ct 4:                   months on Count 7 (consecutive); and
12/22/2012) FORFEITURE                                300 months on Count 8 (consecutive); 3
(2ss-4ss)                                             year SR term imposed on each of
                                                      Counts 1, 2, 3, 4, 5, and 11 and a 5 year
                                                      term imposed on each of Counts 6, 7,
                                                      and 8 to run concurrently with each

-8-

other.

18:2 and 942(c)(1)(A) Using Firearm
During a Crime of Violence (Ct 3:
12/22/2012)
(3)

Dismissed per filing of superseding
indictment

18:2 and 2113(a) and (d) Armed
Robbery of Federal Credit Union (Ct 4:
12/22/2012) FORFEITURE
(4s)

Dismissed per filing of second
superseding indictment

18:2 and 924(c)(1)(A) Using Firearm
During a Crime of Violence (Ct 5:
12/09/2012)(Ct 6: 12/22/2012)
(5s-6s)

Dismissed per filing of second
superseding indictment

720 months total - 60 months on each of
Counts 1, 2, 3, 4, 5 and 11 to run
concurrently w/each other and
consecutive to all other counts; 60
months on Count 6 (consecutive); 300
months on Count 7 (consecutive); and
300 months on Count 8 (consecutive); 3
year SR term imposed on each of
Counts 1, 2, 3, 4, 5, and 11 and a 5 year
term imposed on each of Counts 6, 7,
and 8 to run concurrently with each
other.

BA18:2 and 2113(a) and (d) Armed
Robbery of a Credit Union (Ct 5:
12/22/2012) FORFEITURE
(5ss)

18:922(g)(1) Possession of Firearm by
Prohibited Person (Ct 6: 12/22/2012)
(6)

Dismissed per filing of superseding
indictment

720 months total - 60 months on each of
Counts 1, 2, 3, 4, 5 and 11 to run
concurrently w/each other and
consecutive to all other counts; 60
months on Count 6 (consecutive); 300
months on Count 7 (consecutive); and
300 months on Count 8 (consecutive); 3
year SR term imposed on each of
Counts 1, 2, 3, 4, 5, and 11 and a 5 year
term imposed on each of Counts 6, 7,
and 8 to run concurrently with each
other.

18:2 and 924(c)(1)(A) Using Firearm
During a Crime of Violence (Ct 6:
12/07/2012)(Ct 7: 12/09/2012)(Ct 8:
12/22/2012)
(6ss)

720 months total - 60 months on each of
Counts 1, 2, 3, 4, 5 and 11 to run
concurrently w/each other and
consecutive to all other counts; 60
months on Count 6 (consecutive); 300
months on Count 7 (consecutive); and
300 months on Count 8 (consecutive); 3
year SR term imposed on each of

18:2 and 924(c)(1)(A) Using Firearm
During a Crime of Violence (Ct 6:
12/07/2012)(Ct 7: 12/09/2012)(Ct 8:
12/22/2012)

(7ss)

Counts 1, 2, 3, 4, 5, and 11 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other.

720 months total - 60 months on each of Counts 1, 2, 3, 4, 5 and 11 to run concurrently w/each other and consecutive to all other counts; 60 months on Count 6 (consecutive); 300 months on Count 7 (consecutive); and 300 months on Count 8 (consecutive); 3 year SR term imposed on each of Counts 1, 2, 3, 4, 5, and 11 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other.

18:2 and 924(c)(1)(A) Using Firearm During a Crime of Violence (Ct 6: 12/07/2012)(Ct 7: 12/09/2012)(Ct 8: 12/22/2012)
(8ss)

18:922(g)(1) Possession of Firearm by Prohibited Person (Ct 9: 12/22/2012)
(9s)

Dismissed per filing of second superseding indictment

18:922(g)(1) Possession of Firearm by Prohibited Person (Ct 11: 12/22/2012)
(11ss)

720 months total - 60 months on each of Counts 1, 2, 3, 4, 5 and 11 to run concurrently w/each other and consecutive to all other counts; 60 months on Count 6 (consecutive); 300 months on Count 7 (consecutive); and 300 months on Count 8 (consecutive); 3 year SR term imposed on each of Counts 1, 2, 3, 4, 5, and 11 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other.

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**

None

**Disposition**

**Highest Offense Level (Terminated)**

None

**Complaints**

18:2113(a) and (d) Armed Bank Robbery

**Disposition**

Assigned to: District Judge Claude M. Hilton

Appeals court case number: 13-4839 4th Circuit

**Defendant (4)**

**Tobias Richard Dyer**
*TERMINATED: 10/31/2013*

represented by **Gregory Todd Hunter**
Law Office of Gregory Hunter
2055 North 15th Street
Suite 302
Arlington, VA 22201
(703) 966-7226
Fax: 703-527-0810
Email: greghunter@mail.com
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

| Pending Counts | Disposition |
|---|---|
| 18:1951(a) Conspiracy (Ct 1: 12/22/2012) (1ss) | 720 months total - 60 months on each of Counts 1, 2, 3, 4, 5 and 12 to run concurrently w/each other and consecutive to all other counts; 60 months on Count 6 (consecutive); 300 months on Count 7 (consecutive); and 300 months on Count 8 (consecutive); 3 year SR term imposed on each of Counts 1, 2, 3, 4, 5, and 12 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other. |
| 18:2 and 1951 Interference with Commerce by Robbery (Ct 2: 12/07/2012)(CT 3: 12/09/2013)(Ct 4: 12/22/2012) FORFEITURE (2ss-4ss) | 720 months total - 60 months on each of Counts 1, 2, 3, 4, 5 and 12 to run concurrently w/each other and consecutive to all other counts; 60 months on Count 6 (consecutive); 300 months on Count 7 (consecutive); and 300 months on Count 8 (consecutive); 3 year SR term imposed on each of Counts 1, 2, 3, 4, 5, and 12 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other. |
| BA18:2 and 2113(a) and (d) Armed Robbery of a Credit Union (Ct 5: | 720 months total - 60 months on each of Counts 1, 2, 3, 4, 5 and 12 to run concurrently w/each other and consecutive to all other counts; 60 months on Count 6 (consecutive); 300 months on Count 7 (consecutive); and |

12/22/2012) FORFEITURE
(5ss)

300 months on Count 8 (consecutive); 3 year SR term imposed on each of Counts 1, 2, 3, 4, 5, and 12 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other.

720 months total - 60 months on each of Counts 1, 2, 3, 4, 5 and 12 to run concurrently w/each other and consecutive to all other counts; 60 months on Count 6 (consecutive); 300 months on Count 7 (consecutive); and 300 months on Count 8 (consecutive); 3 year SR term imposed on each of Counts 1, 2, 3, 4, 5, and 12 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other.

18:2 and 924(c)(1)(A) Using Firearm During a Crime of Violence (Ct 6: 12/07/2012)(Ct 7: 12/09/2012)(Ct 8: 12/22/2012) (6ss)

720 months total - 60 months on each of Counts 1, 2, 3, 4, 5 and 12 to run concurrently w/each other and consecutive to all other counts; 60 months on Count 6 (consecutive); 300 months on Count 7 (consecutive); and 300 months on Count 8 (consecutive); 3 year SR term imposed on each of Counts 1, 2, 3, 4, 5, and 12 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other.

18:2 and 924(c)(1)(A) Using Firearm During a Crime of Violence (Ct 6: 12/07/2012)(Ct 7: 12/09/2012)(Ct 8: 12/22/2012) (7ss)

720 months total - 60 months on each of Counts 1, 2, 3, 4, 5 and 12 to run concurrently w/each other and consecutive to all other counts; 60 months on Count 6 (consecutive); 300 months on Count 7 (consecutive); and 300 months on Count 8 (consecutive); 3 year SR term imposed on each of Counts 1, 2, 3, 4, 5, and 12 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other.

18:2 and 924(c)(1)(A) Using Firearm During a Crime of Violence (Ct 6: 12/07/2012)(Ct 7: 12/09/2012)(Ct 8: 12/22/2012) (8ss)

720 months total - 60 months on each of Counts 1, 2, 3, 4, 5 and 12 to run concurrently w/each other and consecutive to all other counts; 60 months on Count 6 (consecutive); 300 months on Count 7 (consecutive); and 300 months on Count 8 (consecutive); 3

18:922(g)(1) Possession of Firearm by Prohibited Person (Ct 12: 12/22/2012)

(12ss)

year SR term imposed on each of Counts 1, 2, 3, 4, 5, and 12 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other.

## Highest Offense Level (Opening)

Felony

| Terminated Counts | Disposition |
|---|---|
| 18:371 Conspiracy (Ct 1: 12/22/2012 (1) | Dismissed per filing of superseding indictment |
| 18:1951(a) Conspiracy (Ct 1: 12/22/2012) (1s) | Dismissed per filing of second superseding indictment |
| 18:2 and 2113(a) and (d) Armed Robbery of a Credit Union (Ct 2: 12/22/2012) FORFEITURE (2) | Dismissed per filing of superseding indictment |
| 18:2 and 1951 Interference with Commerce by Robbery (Ct 2: 12/09/2012)(Ct 3: 12/22/2012) FORFEITURE (2s-3s) | Dismissed per filing of second superseding indictment |
| 18:2 and 942(c)(1)(A) Using Firearm During a Crime of Violence (Ct 3: 12/22/2012) (3) | Dismissed per filing of superseding indictment |
| 18:2 and 2113(a) and (d) Armed Robbery of Federal Credit Union (Ct 4: 12/22/2012) FORFEITURE (4s) | Dismissed per filing of second superseding indictment |
| 18:2 and 924(c)(1)(A) Using Firearm During a Crime of Violence (Ct 5: 12/09/2012)(Ct 6: 12/22/2012) (5s-6s) | Dismissed per filing of second superseding indictment |
| 18:922(g)(1) Possession of Firearm by Prohibited Person (Ct 7: 12/22/2012) (7) | Dismissed per filing of superseding indictment |
| 18:922(g)(1) Possession of Firearm by Prohibited Person (Ct 10: 12/22/2012) (10s) | Dismissed per filing of second superseding indictment |

## Highest Offense Level (Terminated)

Felony

-13-

## Complaints

## Disposition

18:2113(a) and (d) Armed Bank
Robbery

## Plaintiff

**USA**

represented by **Patricia T. Giles**
United States Attorney's Office
2100 Jamieson Ave
Alexandria, VA 22314
(703)299-3700
Email: Patricia.Giles@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rebeca H. Bellows**
United States Attorney's Office
2100 Jamieson Ave
Alexandria, VA 22314
(703)299-3700
Email: becky.bellows@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Karen Ledbetter Taylor**
United States Attorney's Office
2100 Jamieson Ave
Alexandria, VA 22314
NA
703 299-3700
Email: Karen.Taylor2@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/27/2012 | 1 | COMPLAINT as to Keith Willie Reed (1), Stanley Ray Winston (2), Anthony Cannon (3), Tobias Richard Dyer (4). (jcor) [1:12-mj-00823-IDD] (Entered: 12/28/2012) |
| 12/27/2012 | 2 | AFFIDAVIT by USA as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer 1 Complaint (jcor) [1:12-mj-00823-IDD] (Entered: 12/28/2012) |
| 12/27/2012 | 3 | Redacted Criminal Case Cover Sheet (jcor) [1:12-mj-00823-IDD] (Entered: 12/28/2012) |
| 12/27/2012 | 5 | Arrest Warrant Issued by Magistrate Judge John F. Anderson in case as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard |

|            |     |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                    |
|------------|-----|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|            |     | Dyer. (jcor) [1:12-mj-00823-IDD] (Entered: 12/28/2012)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                       |
| 12/28/2012 |     | Arrest of Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer (nbla, ) [1:12-mj-00823-IDD] (Entered: 12/28/2012)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                      |
| 12/28/2012 | 7   | ARREST Warrant Returned Executed on 12/28/2012 in case as to Stanley Ray Winston. (nbla, ) [1:12-mj-00823-IDD] (Entered: 12/28/2012)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                          |
| 12/28/2012 | 10  | Minute Entry for proceedings held before Magistrate Judge John F. Anderson:Initial Appearance as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer held on 12/28/2012. USA appeared through; s. rohrs. Defendants appeared; w/o counsel. each defendant informed of rights, charges and penalties. Court to appoint counsel as to each defendant. USA seeks detention as to each defendant-GRANTED. Each defendant is remanded to the custody of the USMS pending a PH/DH. Detention Hearing set for 1/2/2013 at 02:00 PM in Alexandria Courtroom 400 before Magistrate Judge Ivan D. Davis. Preliminary Hearing set for 1/2/2013 at 02:00 PM in Alexandria Courtroom 400 before Magistrate Judge Ivan D. Davis. (Tape #ftr.)(nbla, ) [1:12-mj-00823-IDD] (Entered: 12/28/2012) |
| 12/28/2012 | 12  | Temporary Detention Order as to Stanley Ray Winston. Signed by Magistrate Judge John F. Anderson on 12/28/2012. (nbla, ) [1:12-mj-00823-IDD] (Entered: 12/28/2012)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                             |
| 12/28/2012 | 15  | CJA 20 as to Stanley Ray Winston :Appointment of Attorney Melinda L. VanLowe for Stanley Ray Winston (jcor) [1:12-mj-00823-IDD] (Entered: 12/28/2012)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                         |
| 12/28/2012 | 9   | ARREST Warrant Returned Executed on 12/28/2012 in case as to Tobias Richard Dyer. (nbla, ) [1:12-mj-00823-IDD] (Entered: 12/28/2012)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                          |
| 12/28/2012 | 14  | Temporary Detention Order as to Tobias Richard Dyer. Signed by Magistrate Judge John F. Anderson on 12/28/2012. (nbla, ) [1:12-mj-00823-IDD] (Entered: 12/28/2012)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                             |
| 12/28/2012 | 17  | CJA 20 as to Tobias Richard Dyer :Appointment of Attorney Gregory Todd Hunter for Tobias Richard Dyer. (jcor) [1:12-mj-00823-IDD] (Entered: 12/28/2012)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                       |
| 12/28/2012 | 6   | ARREST Warrant Returned Executed on 12/28/2012 in case as to Keith Willie Reed. (nbla, ) [1:12-mj-00823-IDD] (Entered: 12/28/2012)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                            |
| 12/28/2012 | 11  | Temporary Detention Order as to Keith Willie Reed. Signed by Magistrate Judge John F. Anderson on 12/28/2012. (nbla, ) [1:12-mj-00823-IDD] (Entered: 12/28/2012)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                               |
| 12/28/2012 | 8   | ARREST Warrant Returned Executed on 12/28/2012 in case as to Anthony Cannon. (nbla, ) [1:12-mj-00823-IDD] (Entered: 12/28/2012)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                               |
| 12/28/2012 | 13  | Temporary Detention Order as to Anthony Cannon. Signed by Magistrate Judge John F. Anderson on 12/28/2012. (nbla, ) [1:12-mj-00823-IDD] (Entered: 12/28/2012)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                  |
| 12/28/2012 | 16  | CJA 20 as to Anthony Cannon :Appointment of Attorney Alfred Lincoln                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                           |

| | | |
|---|---|---|
| | | Robertson, Jr. for Anthony Cannon. (jcor) [1:12-mj-00823-IDD] (Entered: 12/28/2012) |
| 12/31/2012 | 18 | NOTICE OF ATTORNEY APPEARANCE Patricia T. Giles appearing for USA. (Giles, Patricia) [1:12-mj-00823-IDD] (Entered: 12/31/2012) |
| 01/02/2013 | 21 | Minute Entry for proceedings held before Magistrate Judge Ivan D. Davis:Preliminary and Detention Hearing as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer held on 1/2/2013. USA appeared through P. Giles. Keith Willie Reed appeared w/ counsel: D. Wood, Stanley Ray Winston appeared w/ counsel: M. VanLowe, Anthony Cannon appeared w/ counsel: A. Robertson, and Tobias Richard Dyer appeared w/ counsel: G. Hunter. FPD motions to be removed from the case as Mr. Reed has retained counsel - GRANTED. USA calls witness and adduces evidence. Agent identifies all defendants. Cross examination by all defense counsels. Redirect by USA. Closing argument made by USA and all defense counsels. Court finds probable cause and the matter has been continued for further proceedings before the Grand Jury. USA seeks detention as to all defendants. All defense counsels argue for release - DENIED. All defendants are REMANDED to the custody of the USMS. (Tape #ftr.)(ktot, ) [1:12-mj-00823-IDD] (Entered: 01/02/2013) |
| 01/02/2013 | 19 | NOTICE OF ATTORNEY APPEARANCE: Terrell N Roberts, III appearing for Keith Willie Reed (Roberts, Terrell) [1:12-mj-00823-IDD] (Entered: 01/02/2013) |
| 01/02/2013 | 20 | NOTICE OF ATTORNEY APPEARANCE: Douglas J. Wood appearing for Keith Willie Reed (ktot, ) [1:12-mj-00823-IDD] (Entered: 01/02/2013) |
| 01/03/2013 | 25 | ORDER OF DETENTION as to Stanley Ray Winston. Signed by Magistrate Judge Ivan D. Davis on 1/3/2013. (ktot, ) [1:12-mj-00823-IDD] (Entered: 01/04/2013) |
| 01/03/2013 | 23 | ORDER OF DETENTION as to Tobias Richard Dyer. Signed by Magistrate Judge Ivan D. Davis on 1/3/2013. (ktot, ) [1:12-mj-00823-IDD] (Entered: 01/04/2013) |
| 01/03/2013 | 22 | ORDER OF DETENTION as to Keith Willie Reed. Signed by Magistrate Judge Ivan D. Davis on 1/3/2013. (ktot, ) [1:12-mj-00823-IDD] (Entered: 01/04/2013) |
| 01/03/2013 | 24 | ORDER OF DETENTION as to Anthony Cannon. Signed by Magistrate Judge Ivan D. Davis on 1/3/2013. (ktot, ) [1:12-mj-00823-IDD] (Entered: 01/04/2013) |
| 01/24/2013 | 26 | INDICTMENT as to Keith Willie Reed (1) count(s) 1, 2, 3, 4, Stanley Ray Winston (2) count(s) 1, 2, 3, 5, Anthony Cannon (3) count(s) 1, 2, 3, 6, Tobias Richard Dyer (4) count(s) 1, 2, 3, 7. (jlan) (Entered: 01/24/2013) |
| 01/24/2013 | 28 | Redacted Criminal Case Cover Sheet (jlan) (Entered: 01/24/2013) |
| 01/24/2013 | | Set Hearing as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer: Arraignment set for 2/1/2013 at 09:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. (jlan) |

| | | (Entered: 01/24/2013) |
|---|---|---|
| 02/01/2013 | 29 | Minute Entry for proceedings held before District Judge Claude M. Hilton:Arraignment as to Keith Willie Reed (1) Count 1,2,3,4 and Stanley Ray Winston (2) Count 1,2,3,5 and Anthony Cannon (3) Count 1,2,3,6 and Tobias Richard Dyer (4) Count 1,2,3,7 held on 2/1/2013. Defts WFA, PNG, and demanded a jury trial, with 2 of the Defts unwilling to waive speedy trial. Jury Trial set for 3/25/2013 at 10:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. Motion Hearing set for 3/15/2013 at 09:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. Motions are due in 20 days. 4 discovery orders were passed up to the Court and will be entered later. Appearances: Patricia Giles / Rebeca Bellows for gov't; Deft Reed w/ counsel, Terrell Roberts, III; Deft Winston w/ counsel Melinda VanLowe; Deft Cannon w/ counsel Alfred Robertson, Jr; and Deft Dyer w/ counsel, Gregory Hunter. All Defts remanded. (Court Reporter T. Westfall.)(tbul, ) (Entered: 02/01/2013) |
| 02/01/2013 | 30 | Agreed Discovery Order as to Anthony Cannon. Signed by District Judge Claude M. Hilton on 02/01/2013. (jlan) (Entered: 02/04/2013) |
| 02/01/2013 | 31 | Agreed Discovery Order as to Stanley Ray Winston. Signed by District Judge Claude M. Hilton on 02/01/2013. (jlan) (Entered: 02/04/2013) |
| 02/01/2013 | 32 | Agreed Discovery Order as to Keith Willie Reed. Signed by District Judge Claude M. Hilton on 02/01/2013. (jlan) (Entered: 02/04/2013) |
| 02/01/2013 | 33 | Agreed Discovery Order as to Tobias Richard Dyer. Signed by District Judge Claude M. Hilton on 02/01/2013. (jlan) (Entered: 02/04/2013) |
| 02/22/2013 | 34 | Blank Subpoenas issued for hearing on 03/25/2013 (jlan) (Entered: 02/26/2013) |
| 03/12/2013 | | Motion hearing deadline for Keith Willie Reed set for 3/15/2013 has been terminated. No motions filed for 3/15/2013 motions hearing date. (stas) (Entered: 03/12/2013) |
| 03/12/2013 | | Motion hearing deadline for Stanley Ray Winston set for 3/15/2013 has been terminated. No motions filed for 3/15/2013 motions hearing date. (stas) (Entered: 03/12/2013) |
| 03/12/2013 | | Motion hearing deadlines for Anthony Cannon and Tobias Richard Dyer set for 3/15/2013 have been terminated. No motions filed for 3/15/2013 motions hearing date. (stas) (Entered: 03/12/2013) |
| 03/12/2013 | 35 | SUPERSEDING INDICTMENT as to Keith Willie Reed (1) count(s) 1s, 2s-3s, 4s, 5s-6s, 7s, Stanley Ray Winston (2) count(s) 1s, 2s-3s, 4s, 5s-6s, 8s, Anthony Cannon (3) count(s) 1s, 2s-3s, 4s, 5s-6s, 9s, Tobias Richard Dyer (4) count(s) 1s, 2s-3s, 4s, 5s-6s, 10s. (jlan) (Entered: 03/13/2013) |
| 03/12/2013 | | DISMISSAL OF COUNTS per filing of superseding indictment as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer. (jlan) (Entered: 03/13/2013) |
| 03/13/2013 | | Set Hearing as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, |

| | | |
|---|---|---|
| | | Tobias Richard Dyer: Arraignment set for 3/22/2013 at 09:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. (jlan) (Entered: 03/13/2013) |
| 03/13/2013 | 36 | Sealed Document. (rban, ) (Entered: 03/13/2013) |
| 03/14/2013 | | Reset Hearing as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer: Arraignment set for 3/15/2013 at 09:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. (jlan) (Entered: 03/14/2013) |
| 03/15/2013 | 37 | Minute Entry for proceedings held before District Judge Claude M. Hilton: Arraignment on Superseding Indictment as to Keith Willie Reed (1) on Counts 1s,2s-3s,4s,5s-6s,7s; Stanley Ray Winston (2) Counts 1s,2s-3s,4s,5s-6s,8s; Anthony Cannon (3) Counts 1s,2s-3s,4s,5s-6s,9s; and Tobias Richard Dyer (4) Counts 1s,2s-3s,4s,5s-6s,10s held on 3/15/2013. US appeard through: Rebeca Bellows and Patricia Giles. Dft Reed appeared w/counsel Douglas Wood; Dft Winston appeared w/counsel Van Lowe; Dft Cannon appeared w/counsel Robertson; Dft Dyer appeared w/counsel Hunter. Dfts WFA, PNG and demanded a jury trial. Dfts waive speedy trial. Motion Hearing reset for 5/3/2013 at 09:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. Jury Trial reset for 5/22/2013 at 10:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. Defendants remanded. (Court Reporter: Westfall)(tarm) (Entered: 03/15/2013) |
| 03/15/2013 | 38 | 80 Subpoenas (40 sets) issued for 5/22/2013 (jcor) (Entered: 03/18/2013) |
| 03/22/2013 | 39 | ORDERED that the trial in this matter is continued from March 25, 2013, to May 22, 2013. IT IS FURTHER ORDERED that, pursuant to 18 U.S.C. § 3161(h)(8)(A), any period of delay resulting from this continuance is excludable in computing the time within which the trial must commence as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer. Signed by District Judge Claude M. Hilton on 03/22/2013. (jlan) (Entered: 03/27/2013) |
| 03/26/2013 | 40 | Subpoenas issued for 5/22/13 Jury Trial. (tche) (Entered: 03/27/2013) |
| 03/26/2013 | 41 | 40 Subpoenas (20 sets) issued for 5/22/2013 (jcor) (Entered: 03/27/2013) |
| 04/15/2013 | 42 | Blank Subpoenas issued for hearing on 05/22/2013 (jlan) (Entered: 04/16/2013) |
| 04/23/2013 | 43 | SECOND SUPERSEDING INDICTMENT as to Keith Willie Reed (1) count (s) 1ss, 2ss-4ss, 5ss, 6ss-8ss, 9ss, Stanley Ray Winston (2) count(s) 1ss, 2ss-4ss, 5ss, 6ss-8ss, 10ss, Anthony Cannon (3) count(s) 1ss, 2ss-4ss, 5ss, 6ss-8ss, 11ss, Tobias Richard Dyer (4) count(s) 1ss, 2ss-4ss, 5ss, 6ss-8ss, 12ss. (jlan) (Entered: 04/24/2013) |
| 04/23/2013 | 45 | Redacted Criminal Case Cover Sheet (jlan) (Entered: 04/24/2013) |
| 04/23/2013 | | Set Hearing as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer: Arraignment set for 5/3/2013 at 09:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. (jlan) |

| | | (Entered: 04/24/2013) |
|---|---|---|
| 04/23/2013 | | DISMISSAL OF COUNTS per filing of second superseding indictment as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer. (jlan) (Entered: 04/29/2013) |
| 04/30/2013 | 46 | MOTION to Sever Defendant *and Counts* by Keith Willie Reed. (Roberts, Terrell) (Entered: 04/30/2013) |
| 05/03/2013 | 47 | Minute Entry for proceedings held before District Judge Claude M. Hilton: Arraignment on 2nd Superseding Indictment as to Keith Willie Reed (1) Counts 1ss,2ss-4ss,5ss,6ss-8ss,9ss and Stanley Ray Winston (2) Counts 1ss,2ss-4ss,5ss,6ss-8ss,10ss and Anthony Cannon (3) Counts 1ss,2ss-4ss,5ss,6ss-8ss,11ss and Tobias Richard Dyer (4) Counts 1ss,2ss-4ss,5ss,6ss-8ss,12ss held on 5/3/2013. US appeared through: Rebeca Bellows and Patricia Giles. Dft Reed appeared w/counsel Douglas Wood. Dft Winston appeared w/counsel Chrisy Leary (standing in for Melinda Van Lowe). Dft Cannon appeared w/counsel Alfred Robertson, Jr. Dft Dyer appeared w/counsel Gregory Hunter. Dfts WFA, PNG and demanded a jury trial. 20 days to file motions. Motion Hearing set for 6/7/2013 at 09:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. Jury Trial set for 6/17/2013 at 10:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. Order entered waiving speedy trial. Dfts remanded. (Court Reporter: Westfall)(tarm) (Entered: 05/03/2013) |
| 05/03/2013 | 48 | ORDER that the trial in this matter is continued from 5/22/13 to 6/17/13 and any period of delay resulting from this continuance is excludable in computing the time within which the trial must commence. Signed by District Judge Claude M. Hilton on 5/3/13. (tarm) (Entered: 05/03/2013) |
| 05/07/2013 | 49 | Blank Subpoenas issued for hearing on 06/17/2013 (jlan) (Entered: 05/07/2013) |
| 05/13/2013 | 50 | RESPONSE in Opposition by USA as to Keith Willie Reed re 46 MOTION to Sever Defendant *and Counts* (Bellows, Rebeca) (Entered: 05/13/2013) |
| 05/21/2013 | 51 | Blank Subpoenas issued for hearing on 06/17/2013 (jlan) (Entered: 05/24/2013) |
| 06/05/2013 | | No motions filed for 6/7/13 motions hearing for defendants Stanley Ray Winston; Anthony Cannon and Tobias Richard Dyer (clar, ) (Entered: 06/05/2013) |
| 06/05/2013 | | Deadlines terminated for motions hearing for defendants Stanley Ray Winston; Anthony Cannon and Tobias Richard Dyer (clar, ) (Entered: 06/05/2013) |
| 06/07/2013 | 52 | Minute Entry for proceedings held before District Judge Claude M. Hilton: Motion Hearing as to Keith Willie Reed held on 6/7/2013. US appeared through: Rebeca Bellows and Patricia Giles. Dft appeared w/counsel Douglas Wood. Dft's 46 MOTION to Sever Defendant *and Counts* filed by Keith Willie Reed - Argued and Denied. Govt's request to be permitted to play video excerpts at trial - Granted, subject to any objections dfts may have at |

|  |  | trial.Dft remanded.(Court Reporter: Westfall)(tarm) (Entered: 06/07/2013) |
|---|---|---|
| 06/07/2013 | 58 | ORDER For the reasons stated from the bench, Dft's 46 Motion to Sever as to Keith Willie Reed (1) is DENIED. Signed by District Judge Claude M. Hilton on 06/07/2013. (tarm) (Entered: 06/11/2013) |
| 06/10/2013 | 53 | EXHIBIT LIST by USA as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer (Bellows, Rebeca) (Entered: 06/10/2013) |
| 06/10/2013 | 54 | Proposed Jury Instructions by USA as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer (Giles, Patricia) (Entered: 06/10/2013) |
| 06/10/2013 | 55 | Proposed Voir Dire by Stanley Ray Winston (VanLowe, Melinda) (Entered: 06/10/2013) |
| 06/10/2013 | 56 | Proposed Jury Instructions by Stanley Ray Winston (VanLowe, Melinda) (Entered: 06/10/2013) |
| 06/10/2013 | 57 | TRIAL EXHIBIT CUSTODY FORM by USA as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer (jcor) (Entered: 06/11/2013) |
| 06/16/2013 | 59 | *Amended* EXHIBIT LIST by USA as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer (Bellows, Rebeca) (Entered: 06/16/2013) |
| 06/17/2013 | 60 | Minute Entry for proceedings held before District Judge Claude M. Hilton: Voir Dire Begun/Jury Trial Held on 6/17/2013 RE: Keith Willie Reed (1) on Counts 1ss,2ss-4ss,5ss,6ss-8ss,9ss and Stanley Ray Winston (2) on Counts 1ss,2ss-4ss,5ss,6ss-8ss,10ss and Anthony Cannon (3) on Counts 1ss,2ss-4ss,5ss, 6ss-8ss, 11ss and Tobias Richard Dyer (4) on Counts 1ss,2ss-4ss,5ss,6ss-8ss,12ss US appeared through: Patricia Giles and Rebeca Bellows. Dft Reed appeared w/counsel Douglas Wood; Dft Winston appeared w/counsel Melinda VanLowe; Dft Cannon appeared w/counsel Alfred Robertson, Jr.; Dft Dyer appeared w/counsel Greg Hunter. The jurors appeared as summoned and were examined on voir dire. 12 jurors and 2 alternates were selected and sworn to try the issues. Opening Statements made. US adduced evidence. Case cont'd to 6/18/13 @ 10:00; Jury Trial reset for 6/18/2013 at 10:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. Defendants remanded. (Court Reporter: Westfall) (tarm) (Entered: 06/17/2013) |
| 06/18/2013 | 61 | Minute Entry for proceedings held before District Judge Claude M. Hilton: Jury Trial as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer cont'd on 6/18/2013. US appeared through: Patricia Giles and Rebeca Bellows. Dft Reed appeared w/counsel Douglas Wood; Dft Winston appeared w/counsel Melinda VanLowe; Dft Cannon appeared w/counsel Alfred Robertson, Jr.; Dft Dyer appeared w/counsel Greg Hunter. US adduced evidence. Case cont'd to 6/19/13 @ 1:30; Jury Trial reset for 6/19/2013 at 01:30 PM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. Dfts remanded. (Court Reporter: Westfall)(tarm) (Entered: |

|            |    | 06/18/2013) |
|------------|----|-------------|
| 06/19/2013 | 62 | Minute Entry for proceedings held before District Judge Claude M. Hilton: Jury Trial as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer cont'd on 6/19/2013. US appeared through: Patricia Giles and Rebeca Bellows. Dft Reed appeared w/counsel Douglas Wood; Dft Winston appeared w/counsel Melinda VanLowe; Dft Cannon appeared w/counsel Alfred Robertson, Jr.; Dft Dyer appeared w/counsel Greg Hunter. US cont'd to adduce evidence and rests. Case cont'd to 6/20/13 @ 10:00 for further trial by jury; Jury Trial reset for 6/20/2013 at 10:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. Defendants remanded. (Court Reporter: Westfall)(tarm) (Entered: 06/19/2013) |
| 06/20/2013 | 63 | Minute Entry for proceedings held before District Judge Claude M. Hilton: Jury Trial as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer cont'd on 6/20/2013. US appeared through: Patricia Giles and Rebeca Bellows. Dft Reed appeared w/counsel Douglas Wood; Dft Winston appeared w/counsel Melinda VanLowe; Dft Cannon appeared w/counsel Alfred Robertson, Jr.; Dft Dyer appeared w/counsel Greg Hunter. Defendants' Rule 29 Motions for Judgment of Acquittal - Argued and Denied. Defendant Cannon's Motion to Strike paragraph 14 of the indictment - Unopposed and Granted. Defendant Reed adduced evidence and rests. Defendant Cannon adduced evidence and rests. Defendant Winston Rests. Defendant Dyer Rests. Jury instruction conference held with counsel. Closing arguments heard. The Court charged the jury and the jury retired to deliberate (@ 2:30). Question received from jury re: DNA evidence. Question reviewed w/counsel and response given. Case Continued To: 6/21/13 @ 9:00 for further deliberations; Jury Trial reset for 6/21/2013 at 09:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. Defendants remanded. (Court Reporter: Westfall)(tarm) (Entered: 06/20/2013) |
| 06/21/2013 | 64 | Minute Entry for proceedings held before District Judge Claude M. Hilton: Jury Trial cont'd as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer on 6/21/2013. US appeared through: Patricia Giles and Rebeca Bellows. Dft Reed appeared w/counsel Douglas Wood; Dft Winston appeared w/counsel Melinda VanLowe; Dft Cannon appeared w/counsel Alfred Robertson, Jr.; Dft Dyer appeared w/counsel Greg Hunter. Jury deliberations cont'd. The jury returned to the courtroom w/verdicts of Guilty on all counts for all defendants as follows: Keith Reed - Guilty on Counts 1-8 and 9; Stanley Ray Winston - Guilty on Counts 1-8 and 10; Anthony Cannon - Guilty on Counts 1-8 and 11;Tobias Richard Dyer - Guilty on Counts 1-8 and 12; The defendants were referred to the probation office for preparation of presentence reports and the case is continued to: 9/27/13 @ 9:00 for sentencing. Set/Reset Hearings as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer: Sentencing set for 9/27/2013 at 09:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. Order entered returning exhibits to counsel. Dfts remanded. (Court Reporter: Westfall)(tarm) (attachments: # 1 Govt Witness List, # 2 Govt Exhibit List, # 3 Dfts Witness List, # 4 Dfts Exhibit List, # 5 Indictment to Jury, # 6 Jury Question #1, # 7 Jury Question #2) (tarm, ). |

|            |    | (Entered: 06/25/2013) |
|------------|----|------------------------|
| 06/21/2013 | 65 | JURY VERDICT as to Keith Willie Reed (1) Guilty on Counts 1ss,2ss-4ss,5ss,6ss-8ss,9ss. (tarm, ) (Entered: 06/25/2013) |
| 06/21/2013 | 66 | JURY VERDICT as to Stanley Ray Winston (2) Guilty on Counts 1ss,2ss-4ss,5ss,6ss-8ss,10ss. (tarm) (Entered: 06/25/2013) |
| 06/21/2013 | 67 | JURY VERDICT as to Anthony Cannon (3) Guilty on Counts 1ss,2ss-4ss,5ss,6ss-8ss,11ss. (tarm) (Entered: 06/25/2013) |
| 06/21/2013 | 68 | JURY VERDICT as to Tobias Richard Dyer (4) Guilty on Counts 1ss,2ss-4ss,5ss,6ss-8ss,12ss. (tarm) (Entered: 06/25/2013) |
| 06/21/2013 | 69 | ORDERED that the Clerk is relieved of all responsibility of the exhibits in this case and upon request from the clerk, the custodian of the exhibits shall deliver said exhibits to the clerk forthwith. Signed by District Judge Claude M. Hilton on 6/21/13. (tarm) (Entered: 06/27/2013) |
| 07/05/2013 | 70 | MOTION for Judgment NOV by Stanley Ray Winston as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer. (VanLowe, Melinda) (Entered: 07/05/2013) |
| 07/05/2013 | 71 | Memorandum in Support by Stanley Ray Winston re 70 MOTION for Judgment NOV (VanLowe, Melinda) (Entered: 07/05/2013) |
| 07/07/2013 | 72 | MOTION for Judgment NOV by Anthony Cannon as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer. (Robertson, Alfred) (Entered: 07/07/2013) |
| 07/07/2013 | 73 | Memorandum in Support by Anthony Cannon as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer re 72 MOTION for Judgment NOV (Robertson, Alfred) (Entered: 07/07/2013) |
| 07/16/2013 | 74 | Opposition by USA as to Stanley Ray Winston re 70 MOTION for Judgment NOV (Bellows, Rebeca) (Entered: 07/16/2013) |
| 07/17/2013 | 75 | TRANSCRIPT of Proceedings held on June 18, 2013 (Excerpt, D. Miesle's testimony), before Judge Hilton. Court reporter/transcriber Tracy Westfall, Telephone number 703-549-2080. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov <br><br> Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 8/16/2013. Redacted Transcript Deadline set for 9/16/2013. Release of Transcript Restriction set for 10/15/2013.** (westfall, tracy) (Entered: 07/17/2013) |
| 07/17/2013 | 76 | Opposition by USA as to Anthony Cannon re 72 MOTION for Judgment NOV (Bellows, Rebeca) (Entered: 07/17/2013) |

| 08/22/2013 | 77 | PRESENTENCE INVESTIGATION REPORT (Disclosed Presentence Investigation Report) (SEALED - government and defense counsel) as to Tobias Richard Dyer. Objections to PSI due 9/9/13. (khalid, lawanna) (Entered: 08/22/2013) |
| 08/23/2013 | 78 | PRESENTENCE INVESTIGATION REPORT (Disclosed Presentence Investigation Report) (SEALED - government and defense counsel) as to Stanley Ray Winston. Objections to PSI due 09/09/2013. (koch, shanna) (Entered: 08/23/2013) |
| 08/23/2013 | 79 | PRESENTENCE INVESTIGATION REPORT (Disclosed Presentence Investigation Report) (SEALED - government and defense counsel) as to Anthony Cannon. Objections to PSI due 09/09/2013. (palya, mary) (Entered: 08/23/2013) |
| 08/23/2013 | 80 | PRESENTENCE INVESTIGATION REPORT (Disclosed Presentence Investigation Report) (SEALED - government and defense counsel) as to Keith Willie Reed. Objections to PSI due 09/09/2013. (palya, mary) (Entered: 08/23/2013) |
| 09/16/2013 | 82 | PRESENTENCE INVESTIGATION REPORT (Sentencing Presentence Investigation Report) (SEALED - government and defense counsel) as to Keith Willie Reed. (Attachments: # 1 Letter Attorney)(koch, shanna) (Entered: 09/16/2013) |
| 09/16/2013 | 84 | PRESENTENCE INVESTIGATION REPORT (Sentencing Presentence Investigation Report) (SEALED - government and defense counsel) as to Stanley Ray Winston. (Attachments: # 1 Letter Attorney)(koch, shanna) (Entered: 09/16/2013) |
| 09/16/2013 | 85 | PRESENTENCE INVESTIGATION REPORT (Sentencing Presentence Investigation Report) (SEALED - government and defense counsel) as to Anthony Cannon. (Attachments: # 1 Letter PSR Changes)(khalid, lawanna) (Entered: 09/16/2013) |
| 09/16/2013 | 87 | PRESENTENCE INVESTIGATION REPORT (Sentencing Presentence Investigation Report) (SEALED - government and defense counsel) as to Tobias Richard Dyer. (Attachments: # 1 Letter PSR Changes)(khalid, lawanna) (Entered: 09/16/2013) |
| 09/20/2013 | | Reset Deadlines/Hearings as to Tobias Richard Dyer: Sentencing set for 10/18/2013 at 09:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. (Per CMH chambers) (clar, ) (Entered: 09/20/2013) |
| 09/20/2013 | | Reset Deadlines/Hearings as to Anthony Cannon: Sentencing set for 10/25/2013 at 09:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. (Per CMH chambers) (clar, ) (Entered: 09/20/2013) |
| 09/20/2013 | | Reset Deadlines/Hearings as to Stanley Ray Winston: Sentencing set for 10/25/2013 at 09:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. (Per CMH chambers) (clar, ) (Entered: 09/20/2013) |
| 09/20/2013 | | Reset Deadlines/Hearings as to Keith Willie Reed: Sentencing set for 10/25/2013 at 09:00 AM in Alexandria Courtroom 800 before District Judge |

|            |     | Claude M. Hilton. (Per CMH chambers) (clar, ) (Entered: 09/20/2013) |
|------------|-----|---------------------------------------------------------------------|
| 10/03/2013 |     | Set/Reset Hearings as to Tobias Richard Dyer: Sentencing reset for 10/25/2013 at 09:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. (per CMH's Chambers) (tarm) (Entered: 10/03/2013) |
| 10/11/2013 | 89  | MOTION for Forfeiture of Property by USA as to Keith Willie Reed. (Attachments: # 1 Proposed Order)(Bellows, Rebeca) (Entered: 10/11/2013) |
| 10/11/2013 | 90  | Memorandum in Support by USA as to Keith Willie Reed re 89 MOTION for Forfeiture of Property (Bellows, Rebeca) (Entered: 10/11/2013) |
| 10/11/2013 | 91  | MOTION for Forfeiture of Property by USA as to Stanley Ray Winston. (Attachments: # 1 Proposed Order)(Bellows, Rebeca) (Entered: 10/11/2013) |
| 10/11/2013 | 92  | Memorandum in Support by USA as to Stanley Ray Winston re 91 MOTION for Forfeiture of Property (Bellows, Rebeca) (Entered: 10/11/2013) |
| 10/11/2013 | 93  | MOTION for Forfeiture of Property by USA as to Anthony Cannon. (Attachments: # 1 Proposed Order)(Bellows, Rebeca) (Entered: 10/11/2013) |
| 10/11/2013 | 94  | Memorandum in Support by USA as to Anthony Cannon re 93 MOTION for Forfeiture of Property (Bellows, Rebeca) (Entered: 10/11/2013) |
| 10/11/2013 | 95  | MOTION for Forfeiture of Property by USA as to Tobias Richard Dyer. (Attachments: # 1 Proposed Order)(Bellows, Rebeca) (Entered: 10/11/2013) |
| 10/11/2013 | 96  | Memorandum in Support by USA as to Tobias Richard Dyer re 95 MOTION for Forfeiture of Property (Bellows, Rebeca) (Entered: 10/11/2013) |
| 10/14/2013 | 97  | SENTENCING MEMORANDUM by Stanley Ray Winston (VanLowe, Melinda) (Entered: 10/14/2013) |
| 10/16/2013 | 98  | PRESENTENCE INVESTIGATION REPORT (Sentencing Presentence Investigation Report) (SEALED - government and defense counsel) *Revised* as to Stanley Ray Winston. (Attachments: # 1 Letter Attorney)(koch, shanna) (Entered: 10/16/2013) |
| 10/17/2013 | 99  | Position on Sentencing by USA as to Tobias Richard Dyer (Giles, Patricia) (Entered: 10/17/2013) |
| 10/17/2013 | 100 | Position on Sentencing by USA as to Anthony Cannon (Giles, Patricia) (Entered: 10/17/2013) |
| 10/17/2013 | 101 | Position on Sentencing by USA as to Keith Willie Reed (Giles, Patricia) (Entered: 10/17/2013) |
| 10/17/2013 | 102 | Position on Sentencing by USA as to Stanley Ray Winston (Giles, Patricia) (Entered: 10/17/2013) |
| 10/18/2013 | 103 | TRANSCRIPT of Proceedings held on June 17, 2013 (Excerpt, S. Koch and C. Fisher), before Judge Hilton. Court reporter/transcriber Tracy Westfall, Telephone number 703-549-2080. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no** |

| | | |
|---|---|---|
| | | such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov <br><br> Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 11/18/2013. Redacted Transcript Deadline set for 12/18/2013. Release of Transcript Restriction set for 1/16/2014.(westfall, tracy) (Entered: 10/18/2013) |
| 10/18/2013 | 104 | TRANSCRIPT of Proceedings held on June 18, 2013 (Excerpt, K. Glass and R. Jiggetts), before Judge Hilton. Court reporter/transcriber Tracy Westfall, Telephone number 703-549-2080. **NOTICE RE REDACTION OF TRANSCRIPTS:**The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov <br><br> Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 11/18/2013. Redacted Transcript Deadline set for 12/18/2013. Release of Transcript Restriction set for 1/16/2014.(westfall, tracy) (Entered: 10/18/2013) |
| 10/23/2013 | 105 | Position on Sentencing by Tobias Richard Dyer (Hunter, Gregory) (Entered: 10/23/2013) |
| 10/24/2013 | 106 | Position on Sentencing by Anthony Cannon (Robertson, Alfred) (Entered: 10/24/2013) |
| 10/25/2013 | 107 | Minute Entry for proceedings held before District Judge Claude M. Hilton: Sentencing held on 10/25/2013 for Keith Willie Reed (1), Counts 1ss,2ss-4ss,5ss, 6ss-8ss, 9ss. US appeared through: Patricia Giles. Dft appeared w/counsel Douglas Wood. The Court finds the guidelines to be properly assessed at a range of 922 to 987 months. Considering the factors under § 3553, and considering the defendant's age and the nature of the offense, the Court finds that the following sentence is appropriate. Dft committed to the custody of the US Atty General to serve a term of 60 months on each of Counts 1, 2, 3, 4, 5 and 9 to run concurrently w/each other and consecutive to all other counts; 60 months on Count 6 (consecutive); 300 months on Count 7 (consecutive); and 300 months on Count 8 (consecutive) - 720 months total; 3 year SR term imposed on each of Counts 1, 2, 3, 4, 5, and 9 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other. $100 assessment imposed on each of Counts 1-9 = $900. $76,915.15 Restitution Ordered pursuant to the Restitution Judgment entered and filed in open court. Preliminary Order of Forfeiture entered and filed in open court. Dft Remanded. (Court Reporter: Westfall)(tarm) (Entered: 10/30/2013) |
| 10/25/2013 | 110 | Restitution Judgment as to Keith Willie Reed. Signed by District Judge Claude M. Hilton on 10/25/2013. (tarm) (Entered: 10/31/2013) |
| | | |

| 10/25/2013 | 111 | PRELIMINARY ORDER OF FORFEITURE as to Keith Willie Reed. Signed by District Judge Claude M. Hilton on 10/25/13. (tarm) (Entered: 10/31/2013) |
|---|---|---|
| 10/25/2013 | 113 | Minute Entry for proceedings held before District Judge Claude M. Hilton: Sentencing held on 10/25/2013 for Stanley Ray Winston (2),Counts 1ss, 2ss-4ss, 5ss, 6ss-8ss, 10ss. US appeared through: Patricia Giles. Dft appeared w/counsel Melinda VanLowe. Dft's Rule 29 Motion for Judgment of Acquittal - Denied. The Court finds the guidelines to be properly assessed at a range of 78 to 97 months, plus the 55 year mandatory minimum. Considering the factors under § 3553, and considering the defendant's age and the nature of the offense, the Court finds that the following sentence is appropriate. Dft committed to the custody of the US Atty General to serve a term of 60 months on each of Counts 1, 2, 3, 4, 5 and 10 to run concurrently w/each other and consecutive to all other counts; 60 months on Count 6 (consecutive); 300 months on Count 7 (consecutive); and 300 months on Count 8 (consecutive) - 720 months total; 3 year SR term imposed on each of Counts 1, 2, 3, 4, 5, and 10 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other. $100 assessment imposed on each of Counts 1-8, and 10 = $900. $76,915.15 Restitution Ordered pursuant to the Restitution Judgment entered and filed in open court. Preliminary Order of Forfeiture entered and filed in open court. Dft Remanded. (Court Reporter: Westfall.)(tarm) (Entered: 10/31/2013) |
| 10/25/2013 | 114 | Restitution Judgment as to Stanley Ray Winston. Signed by District Judge Claude M. Hilton on 10/25/13. (tarm) (Entered: 10/31/2013) |
| 10/25/2013 | 115 | PRELIMINARY ORDER OF FORFEITURE as to Stanley Ray Winston. Signed by District Judge Claude M. Hilton on 10/25/13. (tarm) (Entered: 10/31/2013) |
| 10/25/2013 | 116 | Minute Entry for proceedings held before District Judge Claude M. Hilton: Sentencing held on 10/25/2013 for Anthony Cannon (3), Counts: 1ss, 2ss-4ss, 5ss, 6ss-8ss, 11ss. US appeared through: Patricia Giles. Dft appeared w/counsel Alfred Robertson, Jr. Dft's Rule 29 Motion for Judgment of Acquittal - Denied. The Court finds the guidelines to be properly assessed at a range of 100 to 125 months, plus the 660 months of mandatory minimum. Dft committed to the custody of the US Atty General to serve a term of 60 months on each of Counts 1, 2, 3, 4, 5 and 11 to run concurrently w/each other and consecutive to all other counts; 60 months on Count 6 (consecutive); 300 months on Count 7 (consecutive); and 300 months on Count 8 (consecutive) - 720 months total; 3 year SR term imposed on each of Counts 1, 2, 3, 4, 5, and 11 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other. $100 assessment imposed on each of Counts 1-8, and 11 = $900. $76,915.15 Restitution Ordered pursuant to the Restitution Judgment entered and filed in open court. Preliminary Order of Forfeiture entered and filed in open court. Dft Remanded. (Court Reporter: Westfall)(tarm) (Entered: 10/31/2013) |
| 10/25/2013 | 117 | Restitution Judgment as to Anthony Cannon. Signed by District Judge Claude M. Hilton on 10/25/13. (tarm) (Entered: 10/31/2013) |
| 10/25/2013 | 118 | PRELIMINARY ORDER OF FORFEITURE as to Anthony Cannon. Signed |

|  |  | by District Judge Claude M. Hilton on 10/25/13. (tarm) (Entered: 10/31/2013) |
|---|---|---|
| 10/25/2013 | 119 | Minute Entry for proceedings held before District Judge Claude M. Hilton:Sentencing held on 10/25/2013 for Tobias Richard Dyer (4) Counts: 1ss, 2ss-4ss, 5ss, 6ss-8ss, 12ss. US appeared through: Patricia Giles. Dft appeared w/counsel Greg Hunter. The Court finds the guidelines to be properly assessed at a range of 87 to 108 months, plus 660 months of mandatory time. Dft committed to the custody of the US Atty General to serve a term of 60 months on each of Counts 1, 2, 3, 4, 5 and 12 to run concurrently w/each other and consecutive to all other counts; 60 months on Count 6 (consecutive); 300 months on Count 7 (consecutive); and 300 months on Count 8 (consecutive) - 720 months total; 3 year SR term imposed on each of Counts 1, 2, 3, 4, 5, and 12 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other. $100 assessment imposed on each of Counts 1-8, and 12 = $900. $76,915.15 Restitution Ordered pursuant to the Restitution Judgment entered and filed in open court. Preliminary Order of Forfeiture entered and filed in open court. Dft Remanded. (Court Reporter: Westfall)(tarm) (Entered: 10/31/2013) |
| 10/25/2013 | 120 | Restitution Judgment as to Tobias Richard Dyer. Signed by District Judge Claude M. Hilton on 10/25/13. (tarm) (Entered: 10/31/2013) |
| 10/25/2013 | 121 | PRELIMINARY ORDER OF FORFEITURE as to Tobias Richard Dyer. Signed by District Judge Claude M. Hilton on 10/25/13. (tarm) (Entered: 10/31/2013) |
| 10/30/2013 | 108 | NOTICE OF APPEAL by Keith Willie Reed Filing fee $455, receipt number 0422-3727833. (Roberts, Terrell) (Entered: 10/30/2013) |
| 10/31/2013 | 109 | Transmission of Notice of Appeal to 4CCA as to Keith Willie Reed to US Court of Appeals re 108 Notice of Appeal - Final Judgment (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (jlan) (Entered: 10/31/2013) |
| 10/31/2013 | 112 | NOTICE OF APPEAL by Anthony Cannon (Robertson, Alfred) (Entered: 10/31/2013) |
| 10/31/2013 | 125 | JUDGMENT as to Keith Willie Reed (1), Counts 1ss, 2ss-4ss, 5ss, 6ss-8ss, 9ss; 720 months total - 60 months on each of Counts 1, 2, 3, 4, 5 and 9 to run concurrently w/each other and consecutive to all other counts; 60 months on Count 6 (consecutive); 300 months on Count 7 (consecutive); and 300 months on Count 8 (consecutive); 3 year SR term imposed on each of Counts 1, 2, 3, 4, 5, and 9 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other. Signed by District Judge Claude M. Hilton on 10/31/13. (tarm) (Entered: 11/04/2013) |
| 10/31/2013 | 126 | Sealed Statement of Reasons as to Keith Willie Reed. J&C Signed by District Judge Claude M. Hilton on 10/31/2013. (tarm) (Entered: 11/04/2013) |
| 10/31/2013 | 127 | JUDGMENT as to Stanley Ray Winston (2), Counts 1ss, 2ss-4ss, 5ss, 6ss-8ss, 10ss: 720 months total - 60 months on each of Counts 1, 2, 3, 4, 5 and 10 to run concurrently w/each other and consecutive to all other counts; 60 months on Count 6 (consecutive); 300 months on Count 7 (consecutive); and 300 |

-27-

| | | months on Count 8 (consecutive); 3 year SR term imposed on each of Counts 1, 2, 3, 4, 5, and 10 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other. Signed by District Judge Claude M. Hilton on 10/31/13. (tarm) (Entered: 11/04/2013) |
|---|---|---|
| 10/31/2013 | 128 | Sealed Statement of Reasons as to Stanley Ray Winston. J&C Signed by District Judge Claude M. Hilton on 10/31/13. (tarm) (Entered: 11/04/2013) |
| 10/31/2013 | 129 | JUDGMENT as to Anthony Cannon (3), Counts: 1ss, 2ss-4ss, 5ss, 6ss-8ss, 11ss. 720 months total - 60 months on each of Counts 1, 2, 3, 4, 5 and 11 to run concurrently w/each other and consecutive to all other counts; 60 months on Count 6 (consecutive); 300 months on Count 7 (consecutive); and 300 months on Count 8 (consecutive); 3 year SR term imposed on each of Counts 1, 2, 3, 4, 5, and 11 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other. Signed by District Judge Claude M. Hilton on 10/31/2013. (tarm) (Entered: 11/04/2013) |
| 10/31/2013 | 130 | Sealed Statement of Reasons as to Anthony Cannon. J&C Signed by District Judge Claude M. Hilton on 10/31/13. (tarm) (Entered: 11/04/2013) |
| 10/31/2013 | 131 | JUDGMENT as to Tobias Richard Dyer (4), Counts: 1ss, 2ss-4ss, 5ss, 6ss-8ss, 12ss; 720 months total - 60 months on each of Counts 1, 2, 3, 4, 5 and 12 to run concurrently w/each other and consecutive to all other counts; 60 months on Count 6 (consecutive); 300 months on Count 7 (consecutive); and 300 months on Count 8 (consecutive); 3 year SR term imposed on each of Counts 1, 2, 3, 4, 5, and 12 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other. Signed by District Judge Claude M. Hilton on 10/31/13. (tarm) (Entered: 11/04/2013) |
| 10/31/2013 | 132 | Sealed Statement of Reasons as to Tobias Richard Dyer. J&C Signed by District Judge Claude M. Hilton on 10/31/13. (tarm) (Entered: 11/04/2013) |
| 10/31/2013 | 135 | DUPLICATE NOTICE OF APPEAL by Tobias Richard Dyer re 131 Judgment. (Attachments: # 1 Envelope)(jlan) (Entered: 11/05/2013) |
| 11/01/2013 | 122 | Transmission of Notice of Appeal to 4CCA as to Anthony Cannon to US Court of Appeals re 112 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (gwalk, ) (Entered: 11/01/2013) |
| 11/01/2013 | 123 | NOTICE OF APPEAL as to 127 Judgment by Stanley Ray Winston (VanLowe, Melinda) Modified on 11/5/2013 (jlan). (Entered: 11/01/2013) |
| 11/01/2013 | 124 | NOTICE OF APPEAL as to 131 Judgment by Tobias Richard Dyer (Hunter, Gregory) Modified on 11/5/2013 (jlan) (Entered: 11/01/2013) |
| 11/05/2013 | 133 | Transmission of Notice of Appeal to 4CCA as to Stanley Ray Winston to US Court of Appeals re 123 Notice of Appeal - Final Judgment (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (jlan) (Entered: 11/05/2013) |
| 11/05/2013 | 134 | Transmission of Notice of Appeal to 4CCA as to Tobias Richard Dyer to US Court of Appeals re 124 Notice of Appeal - Final Judgment (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth |

| | | |
|---|---|---|
| | | Circuit's website at www.ca4.uscourts.gov) (jlan) (Entered: 11/05/2013) |
| 11/05/2013 | 136 | Transmission of Notice of Appeal to 4CCA as to Tobias Richard Dyer to US Court of Appeals re 135 Notice of Appeal - Final Judgment (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (jlan) (Entered: 11/05/2013) |
| 11/05/2013 | 137 | USCA Case Number 13-4835 4th Circuit, Case Manager J. Moore for 108 Notice of Appeal - Final Judgment filed by Keith Willie Reed. (rban, ) (Entered: 11/05/2013) |
| 11/05/2013 | 138 | USCA Case Number 13-4836 4th Circuit, Case Manager J. Moore for 123 Notice of Appeal - Final Judgment filed by Stanley Ray Winston. (rban, ) (Entered: 11/05/2013) |
| 11/05/2013 | 139 | USCA Case Number 13-4837 4th Circuit, Case Manager J. Moore for 112 Notice of Appeal filed by Anthony Cannon. (rban, ) (Entered: 11/05/2013) |
| 11/05/2013 | 140 | USCA Case Number 13-4839 4th Circuit, Case Manager J. Moore for 124 Notice of Appeal - Final Judgment filed by Tobias Richard Dyer, 135 Notice of Appeal - Final Judgment filed by Tobias Richard Dyer. (rban, ) (Entered: 11/05/2013) |
| 11/05/2013 | 141 | ORDER of USCA as to Stanley Ray Winston re 123 Notice of Appeal - Final Judgment. The court appoints Melinda VanLowe to represent Stanley Ray Winston. (rban, ) (Entered: 11/05/2013) |
| 11/05/2013 | 142 | ORDER of USCA as to Anthony Cannon re 112 Notice of Appeal. The court appoints Alfred Lincoln Robertson, Jr., to represent Anthony Cannon. (rban, ) (Entered: 11/05/2013) |
| 11/05/2013 | 143 | ORDER of USCA as to Tobias Richard Dyer re 124 Notice of Appeal - Final Judgment, 135 Notice of Appeal - Final Judgment. The court appoints Gregory Todd Hunter to represent Tobias Richard Dyer. (rban, ) (Entered: 11/05/2013) |
| 11/05/2013 | 144 | ORDER of USCA as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer re 108 Notice of Appeal - Final Judgment, 124 Notice of Appeal - Final Judgment, 123 Notice of Appeal - Final Judgment, 135 Notice of Appeal - Final Judgment, 112 Notice of Appeal. The court consolidates Case No. 13-4835, 13-4836, 13-4837, and Case No. 13-4839. Entry of appearance forms and disclosure statements filed by counsel and parties to the lead case are deemed filed in the secondary case. (rban, ) (Entered: 11/05/2013) |
| 11/05/2013 | 147 | DUPLICATE NOTICE OF APPEAL by Anthony Cannon re 129 Judgment (Attachments: # 1 Envelope)(jlan) (Entered: 11/07/2013) |
| 11/06/2013 | 145 | ORDER For the reasons stated from the bench, Dft Keith Reid's Motion for Judgment of Acquittal is DENIED. Signed by District Judge Claude M. Hilton on 11/6/13. (tarm) (Entered: 11/06/2013) |
| 11/06/2013 | 146 | ORDER For the reasons stated from the bench, Dft Stanley Winston's Motion for Judgment of Acquittal is DENIED. Signed by District Judge Claude M. |

|  |  | Hilton on 11/6/13. (tarm) (Entered: 11/06/2013) |
|---|---|---|
| 11/07/2013 | 148 | Transmission of Notice of Appeal to 4CCA as to Anthony Cannon to US Court of Appeals re 147 Notice of Appeal - Final Judgment (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (jlan) (Entered: 11/07/2013) |
| 11/20/2013 | 149 | ORDER of USCA as to Keith Willie Reed re 108 Notice of Appeal - Final Judgment. The court appoints Lawrence H. Woodward, Jr. to represent appellant on appeal. (rban, ) (Entered: 11/20/2013) |
| 12/17/2013 | 150 | Transcript Order Acknowledgment from USCA re 108 Notice of Appeal - Final Judgment, 124 Notice of Appeal - Final Judgment, 123 Notice of Appeal - Final Judgment, 135 Notice of Appeal - Final Judgment, 147 Notice of Appeal - Final Judgment, 112 Notice of Appeal : Court Reporter/Transcriber Tracy Westfall. (rban, ) (Entered: 12/17/2013) |
| 01/22/2014 | 151 | TRANSCRIPT of proceedings as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer for dates of June 17, 2013 before Judge Hilton, re 108 Notice of Appeal - Final Judgment, 124 Notice of Appeal - Final Judgment, 123 Notice of Appeal - Final Judgment, 135 Notice of Appeal - Final Judgment, 147 Notice of Appeal - Final Judgment, 112 Notice of Appeal Court Reporter/Transcriber Tracy Westfall, Telephone number 703-549-2080. NOTICE RE REDACTION OF TRANCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov *Does this satisfy all appellate orders for this reporter? n* Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/21/2014. Redacted Transcript Deadline set for 3/24/2014. Release of Transcript Restriction set for 4/22/2014.(westfall, tracy) (Entered: 01/22/2014) |
| 01/22/2014 | 152 | TRANSCRIPT of proceedings as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer for dates of June 18, 2013 before Judge Hilton, re 108 Notice of Appeal - Final Judgment, 124 Notice of Appeal - Final Judgment, 123 Notice of Appeal - Final Judgment, 135 Notice of Appeal - Final Judgment, 147 Notice of Appeal - Final Judgment, 112 Notice of Appeal Court Reporter/Transcriber Tracy Westfall, Telephone number 703-549-2080. NOTICE RE REDACTION OF TRANCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov *Does this satisfy all appellate orders for this reporter? n* Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript |

|            |     | Restriction. After that date it may be obtained through PACER Redaction Request due 2/21/2014. Redacted Transcript Deadline set for 3/24/2014. Release of Transcript Restriction set for 4/22/2014.(westfall, tracy) (Entered: 01/22/2014) |
|------------|-----|---|
| 01/22/2014 | 153 | TRANSCRIPT of proceedings as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer for dates of June 19, 2013 before Judge Hilton, re 108 Notice of Appeal - Final Judgment, 124 Notice of Appeal - Final Judgment, 123 Notice of Appeal - Final Judgment, 135 Notice of Appeal - Final Judgment, 147 Notice of Appeal - Final Judgment, 112 Notice of Appeal Court Reporter/Transcriber Tracy Westfall, Telephone number 703-549-2080. NOTICE RE REDACTION OF TRANCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov *Does this satisfy all appellate orders for this reporter? n* Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/21/2014. Redacted Transcript Deadline set for 3/24/2014. Release of Transcript Restriction set for 4/22/2014.(westfall, tracy) (Entered: 01/22/2014) |
| 01/22/2014 | 154 | TRANSCRIPT of proceedings as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer for dates of June 20, 2013 before Judge Hilton, re 108 Notice of Appeal - Final Judgment, 124 Notice of Appeal - Final Judgment, 123 Notice of Appeal - Final Judgment, 135 Notice of Appeal - Final Judgment, 147 Notice of Appeal - Final Judgment, 112 Notice of Appeal Court Reporter/Transcriber Tracy Westfall, Telephone number 703-549-2080. NOTICE RE REDACTION OF TRANCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov *Does this satisfy all appellate orders for this reporter? n* Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/21/2014. Redacted Transcript Deadline set for 3/24/2014. Release of Transcript Restriction set for 4/22/2014.(westfall, tracy) (Entered: 01/22/2014) |
| 01/22/2014 | 155 | TRANSCRIPT of proceedings as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer for dates of June 21, 2013 before Judge Hilton, re 108 Notice of Appeal - Final Judgment, 124 Notice of Appeal - Final Judgment, 123 Notice of Appeal - Final Judgment, 135 Notice of Appeal - Final Judgment, 147 Notice of Appeal - Final Judgment, 112 Notice of Appeal Court Reporter/Transcriber Tracy Westfall, Telephone |

| | | |
|---|---|---|
| | | number 703-549-2080. NOTICE RE REDACTION OF TRANCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov *Does this satisfy all appellate orders for this reporter? n* Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/21/2014. Redacted Transcript Deadline set for 3/24/2014. Release of Transcript Restriction set for 4/22/2014.(westfall, tracy) (Entered: 01/22/2014) |
| 01/23/2014 | 156 | TRANSCRIPT of proceedings as to Keith Willie Reed for dates of June 7, 2013 before Judge Hilton, re 108 Notice of Appeal - Final Judgment Court Reporter/Transcriber Tracy Westfall, Telephone number 703-549-2080. NOTICE RE REDACTION OF TRANCRIPTS:The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov *Does this satisfy all appellate orders for this reporter? n* Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/24/2014. Redacted Transcript Deadline set for 3/25/2014. Release of Transcript Restriction set for 4/23/2014.(westfall, tracy) (Entered: 01/23/2014) |
| 01/23/2014 | 157 | TRANSCRIPT of proceedings as to Keith Willie Reed for dates of October 25, 2013 before Judge Hilton, re 108 Notice of Appeal - Final Judgment Court Reporter/Transcriber Tracy Westfall, Telephone number 703-549-2080. NOTICE RE REDACTION OF TRANCRIPTS:The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov *Does this satisfy all appellate orders for this reporter? y* Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/24/2014. Redacted Transcript Deadline set for 3/25/2014. Release of Transcript Restriction set for 4/23/2014.(westfall, tracy) (Entered: 01/23/2014) |
| 01/23/2014 | 158 | TRANSCRIPT of proceedings as to Stanley Ray Winston for dates of October 25, 2013 before Judge Hilton, re 123 Notice of Appeal - Final Judgment Court Reporter/Transcriber Tracy Westfall, Telephone number 703-549-2080. NOTICE RE REDACTION OF TRANCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of |

|  |  | Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov *Does this satisfy all appellate orders for this reporter?* y Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/24/2014. Redacted Transcript Deadline set for 3/25/2014. Release of Transcript Restriction set for 4/23/2014.(westfall, tracy) (Entered: 01/23/2014) |
|---|---|---|
| 01/23/2014 | 159 | TRANSCRIPT of proceedings as to Anthony Cannon for dates of October 25, 2013 before Judge Hilton, re 147 Notice of Appeal - Final Judgment, 112 Notice of Appeal Court Reporter/Transcriber Tracy Westfall, Telephone number 703-549-2080. NOTICE RE REDACTION OF TRANCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov *Does this satisfy all appellate orders for this reporter?* y Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/24/2014. Redacted Transcript Deadline set for 3/25/2014. Release of Transcript Restriction set for 4/23/2014.(westfall, tracy) (Entered: 01/23/2014) |
| 01/23/2014 | 160 | TRANSCRIPT of proceedings as to Tobias Richard Dyer for dates of October 25, 2013 before Judge Hilton, re 124 Notice of Appeal - Final Judgment, 135 Notice of Appeal - Final Judgment Court Reporter/Transcriber Tracy Westfall, Telephone number 703-549-2080. NOTICE RE REDACTION OF TRANCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov *Does this satisfy all appellate orders for this reporter?* y Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/24/2014. Redacted Transcript Deadline set for 3/25/2014. Release of Transcript Restriction set for 4/23/2014.(westfall, tracy) (Entered: 01/23/2014) |
| 02/14/2014 | 161 | NOTICE OF ATTORNEY APPEARANCE Karen Ledbetter Taylor appearing for USA. (Taylor, Karen) (Entered: 02/14/2014) |
| 02/14/2014 | 162 | NOTICE *of Finality of Forfeiture* by USA as to Keith Willie Reed, Stanley Ray Winston, Anthony Cannon, Tobias Richard Dyer re 111 Consent Order for Forfeiture of Property, 121 Consent Order for Forfeiture of Property, 118 |

-33-

|  |  | Consent Order for Forfeiture of Property, 115 Consent Order for Forfeiture of Property (Attachments: # 1 Affidavit)(Taylor, Karen) (Entered: 02/14/2014) |
|---|---|---|
| 04/02/2014 | 163 | ORDER of USCA as to Tobias Richard Dyer re 124 Notice of Appeal - Final Judgment, 135 Notice of Appeal - Final Judgment. The court relieves appellant's court-appointed counsel, Gregory Todd Hunter, from the obligation of further legal representation of appellant on appeal. (rban, ) (Entered: 04/02/2014) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/16/2014 09:42:10 | | |
| PACER Login: sr3182 | Client Code: | K. Reed |
| Description: | Docket Report | Search Criteria: 1:13-cr-00048-CMH |
| Billable Pages: 30 | Cost: | 3.00 |

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

```
                                         ┌──────────────────────────┐
                                         │         FILED            │
                                         │     IN OPEN COURT        │
                                         │                          │
                                         │     APR 2 3 2013         │
                                         │                          │
                                         │ CLERK, U.S. DISTRICT COURT│
                                         │   ALEXANDRIA, VIRGINIA   │
                                         └──────────────────────────┘
```

| | |
|---|---|
| UNITED STATES OF AMERICA ) | CRIMINAL NO. 1:13cr48 |
| ) | |
| v. ) | Count 1 – 18 U.S.C. § 1951(a) |
| ) | Conspiracy |
| KEITH WILLIE REED, ) | |
| (Counts 1 - 9) ) | Counts 2 - 4 – 18 U.S.C. §§ 2 & 1951(a) |
| ) | Interference with Commerce by Robbery |
| STANLEY RAY WINSTON, ) | |
| aka "Stanley Wilson" and ) | Count 5 – 18 U.S.C. §§ 2 & 2113(a) & (d) |
| "Rashaad Winston" ) | Armed Robbery of Federal Credit Union |
| (Counts 1 - 8, 10) ) | |
| ) | Counts 6 - 8 – 18 U.S.C. §§ 2 & 924(c)(1)(A) |
| ANTHONY CANNON, ) | Using and Carrying a Firearm During |
| (Counts 1 - 8, 11) ) | and in Relation to a Crime of Violence |
| ) | |
| TOBIAS RICHARD DYER, ) | Counts 9 - 12 – 18 U.S.C. § 922(g)(1) |
| (Counts 1 - 8, 12) ) | Possession of Firearm by Prohibited Person |
| ) | |
| ) | Forfeiture – 18 U.S.C. § 981(a)(1)(c) & |
| Defendants. ) | 28 U.S.C. § 2461(c) |

## SECOND SUPERSEDING INDICTMENT

### April 2013 Term - at Alexandria

#### Count One

(Conspiracy)

THE GRAND JURY CHARGES THAT:

From on or about December 7, 2012, and continuing through on or about December 22,

2012, in the Eastern District of Virginia and elsewhere, the defendants, KEITH WILLIE REED,

STANLEY RAY WINSTON, also known as "Stanley Wilson" and "Rashaad Winston,"

ANTHONY CANNON, and TOBIAS RICHARD DYER, did knowingly combine, conspire,

confederate and agree together and with others known and unknown to the grand jury to commit

an offense against the United States of America: namely, to obstruct, delay and affect commerce

by robbery, in violation of Title 18, United States Code, Section 1951.

<div align="center">MANNER AND MEANS OF THE CONSPIRACY</div>

The purpose of the conspiracy was to obtain money from a business and a credit union in

the Eastern District of Virginia by way of armed robbery. The manner and means by which the

conspirators conducted the conspiracy included the following:

1.     It was part of the conspiracy that the defendants would travel in interstate

commerce to commit armed robberies of a store and a credit union.

2.     It was further part of the conspiracy that the defendants would enter these

establishments, armed with firearms, and wear masks to obscure part of their faces.

3.     It was further part of the conspiracy that the defendants would use a stolen vehicle

to flee after the armed robbery in efforts to avoid apprehension.

<div align="center">OVERT ACTS</div>

In furtherance of the conspiracy and to effect the object thereof, the defendants performed

the following overt acts in the Eastern District of Virginia and elsewhere:

1.     On or about December 7, 2012, defendants KEITH WILLIE REED, STANLEY

RAY WINSTON, ANTHONY CANNON, and TOBIAS RICHARD DYER obtained a silver

Grand Jeep Cherokee, which had been stolen from Alexandria, Virginia, for the purpose of using

it as their get-away vehicle.

2.     On or about December 7, 2012, defendants REED, WINSTON, CANNON, and

DYER parked the stolen silver Jeep Grand Cherokee in front of VVM, Inc. located at 4810

<div align="center">2</div>

<div align="center">-36-</div>

Beauregard Street, # 103, Fairfax County, Virginia, to facilitate a quick entry into the store and a quick get-away after the robbery.

3.    On or about December 7, 2012, while defendants WINSTON, CANNON, and DYER entered VVM, Inc., defendant REED remained in the stolen silver Jeep Grand Cherokee, which was parked out front, in order to facilitate a quick get-away after the robbery.

4.    On or about December 7, 2012, defendants WINSTON, CANNON, and DYER brandished firearms at employees and a store customer of VVM, Inc.

5.    On or about December 7, 2012, defendants WINSTON, CANNON, and DYER, took at least $700 in United States currency that belonged to VVM, Inc.

6.    On or about December 7, 2012, defendants REED, WINSTON, CANNON, and DYER fled VVM, Inc. in the stolen silver Jeep Grand Cherokee.

7.    On or about December 9, 2012, defendants KEITH WILLIE REED, STANLEY RAY WINSTON, ANTHONY CANNON, and TOBIAS RICHARD DYER obtained a blue Jeep Liberty, which had been stolen from southwest Washington, D.C., for the purpose of using it as their get-away vehicle.

8.    On or about December 9, 2012, defendants REED, WINSTON, CANNON, and DYER parked the stolen blue Jeep Liberty in front of the Shoppers Food Warehouse located at 3801 Jefferson Davis Highway, Alexandria, Virginia, to facilitate a quick entry into the store and a quick get-away after the robbery.

9.    On or about December 9, 2012, while defendants WINSTON, CANNON, and DYER entered the Shoppers Food Warehouse, defendant REED remained in the stolen blue Jeep

3

Liberty, which was parked in front of the Shoppers Food Warehouse, in order to facilitate a quick get-away after the robbery.

10.    On or about December 9, 2012, defendants WINSTON, CANNON, and DYER brandished firearms and ordered store employees to the floor.

11.    On or about December 9, 2012, defendants WINSTON, CANNON, and DYER, took $15,704 in United States currency that belonged to the Shoppers Food Warehouse.

12.    On or about December 9, 2012, defendants REED, WINSTON, CANNON, and DYER fled the Shoppers Food Warehouse in the stolen blue Jeep Liberty.

13.    On or about December 9, 2012, defendants REED, WINSTON, CANNON, and DYER abandoned the stolen blue Jeep Liberty in southwest Washington, D.C., for the purpose of avoiding apprehension.

14.    On or about December 18, 2012, at 3555 Georgia Avenue, N.W., Washington, D.C., defendant CANNON purchased four masks for the purpose of using them during an armed robbery.

15.    On or about December 22, 2012, defendants REED, WINSTON, CANNON, and DYER obtained a black Jeep Liberty, which had been stolen from District Heights, Maryland, for the purpose of using it as their get-away vehicle.

16.    On or about December 22, 2012, defendants REED, WINSTON, CANNON, and DYER parked the stolen black Jeep Liberty in front of the Navy Federal Credit Union, located at 875 North Randolph Street, Arlington, Virginia, to facilitate a quick entry into the credit union and a quick get-away after the robbery.

4

-38-

17.     On or about December 22, 2012, defendants WINSTON, CANNON, and DYER entered the Navy Federal Credit Union located at 875 North Randolph Street, Arlington, Virginia, for the purpose of committing an armed robbery.

18.     On or about December 22, 2012, while defendants WINSTON, CANNON, and DYER entered the Navy Federal Credit Union, defendant REED remained in the stolen black Jeep Liberty, which was parked in front of the Navy Federal Credit Union, in order to facilitate a quick get-away after the robbery.

19.     On or about December 22, 2012, defendants WINSTON, CANNON, and DYER brandished firearms and ordered credit union employees and customers to the floor.

20.     On or about December 22, 2012, defendants WINSTON, CANNON, and DYER, by force and violence, and by intimidation, took $60,411.15 in United States currency that belonged to the Navy Federal Credit Union.

21.     On or about December 22, 2012, defendants REED, WINSTON, CANNON, and DYER fled the Navy Federal Credit Union in the stolen black Jeep Liberty.

22.     On or about December 22, 2012, defendants REED, WINSTON, CANNON, and DYER abandoned the stolen black Jeep Liberty in Arlington, Virginia, for the purpose of avoiding apprehension.

23.     On or about December 22, 2012, defendants REED, WINSTON, CANNON, and DYER traveled from Arlington, Virginia, to Washington, D.C., with the money they had taken from the Navy Federal Credit Union during the armed robbery.

24.     On or about December 22, 2012, defendants REED, WINSTON, CANNON, and DYER went to 1501 38th Street, S.E., Washington, D.C., and stashed firearms used during the

5

robbery and approximately $18,237 in United States currency taken during the armed robbery of the Navy Federal Credit Union.

26.    On or about December 22, 2012, in the vicinity of 38th Street and Pope Street, S.E., Washington, D.C., defendants REED, WINSTON, CANNON, and DYER discarded masks, gloves, and clothing they had used to commit the armed robbery of the Navy Federal Credit Union.

26.    On or about December 22, 2012, in the vicinity of 38th Street and Pope Street, S.E., Washington, D.C., defendants REED, WINSTON, CANNON, and DYER fled from law enforcement officers and, during their flight, discarded gloves and ski masks used to commit the armed robbery of the Navy Federal Credit Union as well as approximately $19,631.00 in United States currency and two Global Positioning System (GPS) trackers taken during the armed robbery.

(All in violation of Title 18, United States Code, Section 1951(a).)

6

**-40-**

### Count Two

### (Interference with Commerce by Robbery)

THE GRAND JURY FURTHER CHARGES THAT:

On or about December 7, 2012, in Fairfax County, Virginia, within the Eastern District of Virginia, the defendants, KEITH WILLIE REED, STANLEY RAY WINSTON, also known as "Stanley Wilson" and "Rashaad Winston," ANTHONY CANNON, and TOBIAS RICHARD DYER, did unlawfully obstruct, delay and affect, and attempt to obstruct, delay and affect, commerce as that term is defined in Title 18, United States Code, Section 1951, and the movement of articles and commodities in such commerce, by robbery as that term is defined in Title 18, United States Code, Section 1951, in that the defendants did unlawfully take and obtain personal property consisting of at least $700 in United States currency belonging to VVM, Inc., located at 4810 Beauregard Street, #103, in Fairfax County, Virginia, in the presence of an employee against his will by means of actual and threatened force, violence, and fear of immediate and future injury to his person, while the employee engaged in commercial activities as an employee of VVM, Inc., a business that was engaged in and that affects interstate commerce.

(In violation of Title 18, United States Code, Sections 2 and 1951).

7

**-41-**

## Count Three

### (Interference with Commerce by Robbery)

THE GRAND JURY FURTHER CHARGES THAT:

On or about December 9, 2012, in Alexandria, Virginia, within the Eastern District of Virginia, the defendants, KEITH WILLIE REED, STANLEY RAY WINSTON, also known as "Stanley Wilson" and "Rashaad Winston," ANTHONY CANNON, and TOBIAS RICHARD DYER, did unlawfully obstruct, delay and affect, and attempt to obstruct, delay and affect, commerce as that term is defined in Title 18, United States Code, Section 1951, and the movement of articles and commodities in such commerce, by robbery as that term is defined in Title 18, United States Code, Section 1951, in that the defendants did unlawfully take and obtain personal property consisting of approximately $15,704 in United States currency belonging to Shoppers Food Warehouse, located at 3801 Jefferson Davis Highway, in Alexandria, Virginia, in the presence of employees against their will by means of actual and threatened force, violence, and fear of immediate and future injury to their persons, while the employees engaged in commercial activities as employees of Shoppers Food Warehouse, a business that was engaged in and that affects interstate commerce.

(In violation of Title 18, United States Code, Sections 2 and 1951).

8

**-42-**

#### Count Four

(Interference with Commerce By Robbery)

THE GRAND JURY FURTHER CHARGES THAT:

On or about December 22, 2012, in Arlington County, Virginia, in the Eastern District of

Virginia, the defendants, KEITH WILLIE REED, STANLEY RAY WINSTON, also known as

"Stanley Wilson" and "Rashaad Winston," ANTHONY CANNON, and TOBIAS RICHARD

DYER, did unlawfully obstruct, delay and affect, and attempt to obstruct, delay and affect,

commerce as that term is defined in Title 18, United States Code, Section 1951, and the

movement of articles and commodities in such commerce, by robbery as that term is defined in

Title 18, United States Code, Section 1951, in that the defendants did unlawfully take and obtain

personal property consisting of approximately $60,411.15 in United States currency in the

custody and control of the Navy Federal Credit Union located at 875 North Randolph Street,

Arlington, Virginia, in the presence of employees against their will by means of actual and

threatened force, violence, and fear of immediate and future injury to their persons, while the

employees engaged in commercial activities as employees of the Navy Federal Credit Union, a

business that was engaged in and that affects interstate commerce.


(In violation of Title 18, United States Code, Sections 2 and 1951).

9

-43-

<u>Count Five</u>

(Armed Robbery of a Credit Union)

THE GRAND JURY FURTHER CHARGES THAT:

On or about December 22, 2012, in Arlington County, Virginia, in the Eastern District of Virginia, the defendants, KEITH WILLIE REED, STANLEY RAY WINSTON, also known as "Stanley Wilson" and "Rashaad Winston," ANTHONY CANNON, and TOBIAS RICHARD DYER, by force and violence, and by intimidation, did take from the person and presence of another, namely employees of the Navy Federal Credit Union located at 875 North Randolph Street, Arlington, Virginia, approximately $60,411.15 in United States currency, money belonging to and in the care, custody, control, management, and possession of the Navy Federal Credit Union, a credit union whose deposits were then insured by the National Credit Union Administration, and did assault and put in jeopardy the life of another person, namely credit union employees and customers, by the use of dangerous weapons, namely firearms.

(In violation of Title 18, United States Code, Sections 2 and 2113(a) and (d).)

10

**-44-**

<u>Count Six</u>

(Using Firearm During a Crime of Violence)

THE GRAND JURY FURTHER CHARGES THAT:

On or about December 7, 2012, in Fairfax County, Virginia, in the Eastern District of Virginia, the defendants, KEITH WILLIE REED, STANLEY RAY WINSTON, also known as "Stanley Wilson" and "Rashaad Winston," ANTHONY CANNON, and TOBIAS RICHARD DYER, did knowingly and unlawfully use and carry firearms during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, that is, the December 7, 2012 interference with commerce by robbery of VVM, Inc., as set forth and charged in Count Two of this Second Superseding Indictment.

(In violation of Title 18, United States Code, Sections 2 and 924(c)(1)(A).)

11

**-45-**

## Count Seven

(Using Firearm During a Crime of Violence)

THE GRAND JURY FURTHER CHARGES THAT:

On or about December 9, 2012, in Alexandria, Virginia, in the Eastern District of Virginia, the defendants, KEITH WILLIE REED, STANLEY RAY WINSTON, also known as "Stanley Wilson" and "Rashaad Winston," ANTHONY CANNON, and TOBIAS RICHARD DYER, did knowingly and unlawfully use and carry firearms during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, that is, the December 9, 2012 interference with commerce by robbery of the Shoppers Food Warehouse, as set forth and charged in Count Three of this Second Superseding Indictment.

(In violation of Title 18, United States Code, Sections 2 and 924(c)(1)(A).)

12

**-46-**

<u>Count Eight</u>

(Using Firearm During a Crime of Violence)

THE GRAND JURY FURTHER CHARGES THAT:

On or about December 22, 2012, in Arlington County, Virginia, in the Eastern District of Virginia, the defendants, KEITH WILLIE REED, STANLEY RAY WINSTON, also known as "Stanley Wilson" and "Rashaad Winston," ANTHONY CANNON, and TOBIAS RICHARD DYER, did knowingly and unlawfully use and carry firearms during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, that is, the December 22, 2012, interference with commerce by robbery and armed robbery of the Navy Federal Credit Union, as set forth and charged in Counts Four and Five, respectively, of this Second Superseding Indictment.

(In violation of Title 18, United States Code, Sections 2 and 924(c)(1)(A).)

13

**-47-**

## Count Nine

(Possession of Firearm by Prohibited Person)

THE GRAND JURY FURTHER CHARGES THAT:

On or about December 22, 2012, in Fairfax County, Virginia, in the Eastern District of Virginia, defendant KEITH WILLIE REED, after having been convicted of a crime punishable by imprisonment for a term exceeding one year, namely, Attempted Robbery, in the Circuit Court for Prince George's County, Maryland, on or about October 15, 2008, and Robbery, in the Circuit Court for Montgomery County, Maryland, on or about August 26, 2008, did knowingly and unlawfully possess in and affecting interstate commerce firearms, specifically: one Luger Model AP9 9 mm firearm with serial number 021572 and one Federal Ordnance .45 caliber handgun with partial serial number F8801623.

(In violation of Title 18, United States Code, Section 922(g)(1).)

14

**-48-**

<u>Count Ten</u>

(Possession of Firearm by Prohibited Person)

THE GRAND JURY FURTHER CHARGES THAT:

On or about December 22, 2012, in Fairfax County, Virginia, in the Eastern District of

Virginia, defendant STANLEY RAY WINSTON, also known as "Stanley Wilson" and "Rashaad

Winston," after having been convicted of a crime punishable by imprisonment for a term

exceeding one year, namely, Transporting a Handgun on Roadway and Illegal Possession of a

Regulated Firearm, in the Circuit Court for Prince George's County, Maryland, on or about May

5, 2010, did knowingly and unlawfully possess in and affecting interstate commerce firearms,

specifically:  one Luger Model AP9 9 mm firearm with serial number 021572 and one Federal

Ordnance .45 caliber handgun with partial serial number F8801623.

(In violation of Title 18, United States Code, Section 922(g)(1).)

15

<u>Count Eleven</u>

(Possession of Firearm by Prohibited Person)

THE GRAND JURY FURTHER CHARGES THAT:

On or about December 22, 2012, in Fairfax County, Virginia, in the Eastern District of Virginia, defendant ANTHONY CANNON, after having been convicted of a crime punishable by imprisonment for a term exceeding one year, namely, Conspiracy to Commit Carjacking, in the Circuit Court for Prince George's County, Maryland, on or about December 11, 2006, and Unauthorized Use of a Motor Vehicle, in the Circuit Court for Prince George's County, Maryland, on or about April 13, 2010, did knowingly and unlawfully possess in and affecting interstate commerce firearms, specifically:  one Luger Model AP9 9 mm firearm with serial number 021572 and one Federal Ordnance .45 caliber handgun with partial serial number F8801623.

(In violation of Title 18, United States Code, Section 922(g)(1).)

16

**-50-**

<u>Count Twelve</u>

(Possession of Firearm by Prohibited Person)

THE GRAND JURY FURTHER CHARGES THAT:

On or about December 22, 2012, in Fairfax County, Virginia, in the Eastern District of

Virginia, defendant TOBIAS RICHARD DYER, after having been convicted of a crime

punishable by imprisonment for a term exceeding one year, namely, Robbery with a Dangerous

Weapon and Use of a Handgun in the Commission of a Crime, in the Circuit Court for

Montgomery County, Maryland, on or about December 29, 2009, did knowingly and unlawfully

possess in and affecting interstate commerce firearms, specifically:  one Luger Model AP9 9 mm

firearm with serial number 021572 and one Federal Ordnance .45 caliber handgun with partial

serial number F8801623.

(In violation of Title 18, United States Code, Section 922(g)(1).)

17

**-51-**

FORFEITURE NOTICE

The defendants, KEITH WILLIE REED, STANLEY RAY WINSTON, ANTHONY CANNON, and TOBIAS RICHARD DYER, if convicted of Counts Two through Five of this Second Superseding Indictment, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds of the offenses charged in those counts. This property includes, but is not limited to,

(a) approximately $700 in United States currency taken from VVM, Inc. on December 7, 2012;

(b) approximately $15,704 in United States currency taken from the Shoppers Food Warehouse on December 9, 2012; and

(c) approximately $60,411.15 in United States currency taken from the Navy Federal Credit Union on December 22, 2012.

Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendants shall forfeit substitute property, up to the value of the amount described above, if by any act or omission of the defendants, the property described above, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold, or substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

Furthermore, pursuant to Title 18, United States Code, Section 924(d)(1), the following firearms, which were used by the defendants, all previously convicted felons, during and in relation to the armed robbery charged in this Second Superseding Indictment, in violation of Title

18

-52-

18, United States Code, Sections 922(g)(1) and 924(c), shall be forfeited to the United States:

one Luger Model AP9 9 mm firearm with serial number 021572 and one Federal Ordnance .45

caliber handgun with partial serial number F8801623.

(Pursuant to Title 18, United States Code, Sections 924(d)(1) and 981(a)(1)(C); and Title 28,
United States Code, Section 2461(c); and Rule 32.2(a), Federal Rules of Criminal Procedure.)

A TRUE BILL

Pursuant to the E-Government Act,
the original of this page has been Filed
under seal in the Clerk's Office.

_____
Foreperson of the Grand Jury

Neil H. MacBride
United States Attorney

By: _____
Patricia T. Giles
Rebeca H. Bellows
Assistant United States Attorneys

19

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

UNITED STATES OF AMERICA

v.                                                    No. 1:13CR48

KEITH REED

### MOTION FOR SEVERANCE OF COUNTS AND DEFENDANTS

Comes now the Defendant herein, Keith Reed, through his counsel, Douglas J. Wood and

Terrell N. Roberts, III, and hereby moves this Court pursuant to Fed.R.Crim.P. 8 and 14 to

sever those Counts involving the Defendant from those of his Co-Defendants, and to grant him

a trial separate from those Co-Defendants, where such Co-Defendants are not properly joined in

this Indictment and/or whereby such joinder causes prejudice to this Defendant.

### Argument

Fed. R. Crim. P. 8(b) provides:

> Two or more defendants may be charged in the same indictment or information if
> they are alleged to have participated in the same act or transaction or in the same
> series of acts or transactions constituting an offense or offenses. Such defendants
> may be charged in one or more counts together or separately and all of the defendants
> need not be charged in each count.

Misjoinder is, of course, prejudicial per se. *McElroy v. United States*, 164 U.S. 76 (1896);

*Ingraham v. United States*, 272 F.2d 567 (4th Cir. 1959); *United States v. Kaplan*, 588 F.2d 71

(4th Cir. 1978).

Absent special circumstances, individuals indicted together should be tried together. *United*

1

**-54-**

*States v. Parodi*, 703 F.2d 768, 779 (4th Cir. 1983); *United States v. Seidel*, 620 F.2d 2006 (4th Cir. 1980); *United States v. Mandel*, 591 F.2d 1347 (4th Cir. 1976); *United States v. Mankins*, 497 F.2d 1265 (4th Cir. 1974); *United States v. Shuford*, 454 F.2d 772 (4th Cir. 1971). The test for joinder under Rule 8(b) is whether Defendants are alleged to have participated in the same act or transaction or in the same series of acts or transactions. The fact that each incident of participation may not have constituted a crime on the part of a defendant is of no consequence.

Participation in the same series of transactions as referred to in Rule 8(b) does not require participation in each transaction of the series. *See Haggard v. United States*, 369 F.2d 968 (8th Cir. 1966); *United States v. Bruginan*, 655 F.2d 540 (4th Cir. 1981).

Rule 8(b) does not define the phrase "same series of acts or transactions" but such phrase logically includes those transactions so interconnected in time, place and manner as to constitute a common scheme or plan. *United States v. Santoni*, 585 F.2d 667 (4th Cir. 1978). However, when the connection between different groups is limited to a few individuals to each but when those individuals commit separate acts which involve them in separate offenses with no common aim, then the requisite substantial identify of facts or participants is not present. *United States v. Nettles*, 570 F.2d 547 (5th Cir. 1978). Admittedly, if there was one large conspiracy with those persons common to each group forming a hub and the different operations as the spokes, then joinder would be proper if there was some interaction between the operations to provide the rim. For a so-called wheel conspiracy to exist, those people who formed the wheel spokes must have been aware and must do something in furtherance of some single illegal enterprise. *United States v. Levine*, 546 F.2d 658 (1975). That is not the situation in the case at hand, and for that reason, a severance should be granted for the reason of improper joinder. The government claims that Mr. Reed was a member of the conspiracy

as charged in the various iterations of the indictment, however, he only appears to be connected to a single robbery that occurred on December 22, 2012, near the very end of the investigation, and his appearance is tangential at best, with no ties demonstrable[1i] from the evidence. While this might be considered to be conspiracy conduct, in terms of what it alleges, the factual basis underlying such allegations of conspiratorial conduct simply does not exist.

Even the most cursory review of the discovery material provided thus far to the defense makes clear that while certain of the other Co-Defendants repeatedly are named as perpetrators of what is ostensibly conspiracy conduct related to the three robberies, the same cannot be said as to Mr. Reed.

In light of the substantially differing quanta of evidence to be arrayed against the Co-Defendants, the joinder clearly is prejudicial. Where evidence admitted at trial pertains solely to one co-defendant and such evidence is particularly prejudicial, it is an abuse of the trial court's discretion to refuse to sever the defendants before trial. *See, e.g., United States v. Engleman*, 648 F.2d 473, 480-81 (8th Cir. 1981) (where, notwithstanding precautionary instructions, the Eighth Circuit held that it was an abuse of discretion for the trial court to refuse to sever two (2) defendants in a prosecution for conspiracy and mail fraud where similar act evidence was admitted as to one (1) defendant pertaining his/her involvement in a similar scheme thirteen (13) years previously and the co-defendant was no involved in that prior scheme) *See also United States v. Truslow*, 530 F.2d 257, 261 (4th Cir. 1975) (where the Fourth Circuit found that severance was mandated by the combination of prejudicial evidentiary admissions).

Defendant's undersigned counsel is not presently aware of any other grounds for severance aside from those mentioned above. Nonetheless, defense counsel requests that if and when any further grounds for severance become known to him, that he be allowed to promptly

---

[1] Or, perhaps more correctly, no ties abstractable from the discovery provided.

file further papers setting out said grounds. Further grounds for severance of defendants would arise, for instance, if it becomes known to defense counsel that co-defendant would be willing to testify favorably on behalf of Defendant at a separate trial, but not at a joint trial, *United States v. Echeles*, 353 F.2d 892 (7th Cir. 1965), or if it becomes known that Defendant's expected defense will be mutually inconsistent with the defense decided on by co-defendant, *United States v. DeLuna*, 308 F.2d 140 (5th Cir. 1961).

Under the circumstances noted herein, Defendant will be unfairly prejudiced if required to proceed to a joint trial with the co-defendants. Rule 14 of the Federal Rules of Criminal Procedure provides that if a defendant is prejudiced by a joinder of other co-defendants, severance may be ordered. The defendant, Keith Reed also moves of a severance of counts as the evidence linking him to the robberies of December 7 and December 9, 2012, is nonexistent and introduction of evidence as to those robberies will adversely prejudice Mr. Reed in his defense to the robbery of December 22, 2012.

WHEREFORE, for the foregoing reasons, Defendant Mr. Reed respectfully requests this Honorable Court for a severance of both counts and defendants, and to grant him a separate trial from his Co-Defendants.

Respectfully submitted,

*Douglas Wood / this*

Douglas J. Wood
Roberts & Wood
6801 Kenilworth Avenue, Suite 202
Riverdale, Maryland 20737
(301) 699-0764
Counsel for Defendant Keith Reid

4

Terrell N. Roberts, III
Roberts & Wood
6801 Kenilworth Avenue, Suite 202
Riverdale, Maryland 20737
(301) 699-0764
Counsel for Defendant Keith Reid

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on or before this 30th day of April, 2013, a copy of the

foregoing

(1) Motion for Severance of Counts and Defendants

was e-filed to Patricia Giles, Esq., Office of the United States Attorney, 2100 Jamieson Avenue,

Alexandria, Virginia 22314.

Douglas J. Wood

Terrell N. Roberts, III

5

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:13CR48 |
| | ) | |
| KEITH WILLIE REED, | ) | |
| | ) | |
| Defendant. | ) | |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION FOR SEVERANCE OF COUNTS AND DEFENDANTS

Defendant KEITH WILLIE REED and three co-defendants have been charged with numerous federal offenses all stemming from three armed robberies that they committed in December 2012. REED has moved to sever his trial from that of his co-defendants, and to sever the counts against him. Thus, REED asks that this Court conduct at least four separate trials for crimes charged in one indictment. The defendant's motion should be denied as severance is unwarranted and would be a needless duplication of judicial proceedings.

Background

On January 24, 2013, a federal grand jury in Alexandria, Virginia, returned a seven-count indictment charging Defendant REED and three others with armed robbery of a Navy Federal Credit Union in Arlington, Virginia, on December 22,

-59-

2012.  Docket Entry ("DE") 26.  In addition to charging all four defendants with conspiracy to commit armed robbery, the Indictment charged each defendant with various substantive offenses, including use of a firearm during and in relation to a crime of violence and possession of a firearm by a prohibited person.  *Id*.  In setting forth overt acts taken in furtherance of the conspiracy, the Indictment charged that REED, as the get-away driver, remained in a stolen Jeep Liberty while the other three defendants brandished firearms and robbed the credit union by force and intimidation; that all four defendants fled the credit union in the stolen Jeep Liberty; and that, in attempts to avoid apprehension, the defendants abandoned the stolen Jeep Liberty a short distance from the credit union.  *Id*. at 3-4.

On March 12, 2013, the grand jury returned a Superseding Indictment against Defendant REED and his three co-defendants.  DE 35.  The Superseding Indictment added charges against all four defendants, namely, counts related to the armed robbery of a Shopper's Food Warehouse in Alexandria, Virginia, on December 9, 2012.  *Id*.  In addition to substantive offenses related to the December 9, 2012 and December 22, 2012 armed robberies, the Superseding Indictment charged all four defendants with conspiring to commit armed robberies.  *Id*.  The overt acts alleged in Count One of the Superseding Indictment included those previously alleged in the original indictment as well as acts taken in furtherance of the December 9, 2012

2

**-60-**

armed robbery of the Shoppers Food Warehouse. *Id*. 2-4. Those additional overt acts included, but were not limited to, the defendants using a stolen Jeep Liberty as the get-away vehicle, REED serving as the get-away driver after his co-defendants robbed the grocery store at gunpoint, and the defendants abandoning the stolen Jeep Liberty following the robbery. *Id*.

On April 23, 2013, the grand jury returned a Second Superseding Indictment that added counts related to yet another armed robbery committed by Defendant REED and his three co-defendants in December 2012. DE 43. In addition to the counts charged in the Superseding Indictment, the Second Superseding Indictment charged all four defendants with armed robbery and using a firearm during and in relation to a crime of violence in connection with the December 7, 2012 armed robbery of a business in Fairfax County, Virginia. *Id*. The Second Superseding Indictment also charged that the conspiracy to affect commerce by robbery began on or about December 7, 2012, and that the armed robberies of the Fairfax business, Shoppers Food Warehouse, and the Navy Federal Credit Union were in furtherance of that conspiracy. *Id*. at 1-3. The Second Superseding Indictment also alleged that the defendants performed overt acts on December 7, 2012 to further the objects of the conspiracy, including the defendants using a stolen Jeep Cherokee as a get-away vehicle, REED serving as the get-away driver after his co-defendants entered with

Appeal: 13-4835     Doc: 47-1         Filed: 05/07/2014     Pg: 84 of 355

firearms and robbed the business, and the defendants abandoning the Jeep Cherokee shortly after the robbery to evade capture.  *Id*. at 2-3.

Since the original indictment was returned, the government has produced voluminous discovery, including reports prepared by law enforcement officers, video and audio recordings, photographs, copies of physical evidence secured through search warrants, and phone records.  The materials and evidence provided to defense counsel implicate each defendant in all three armed robberies charged in the Second Superseding Indictment.

<u>Argument</u>

Severance Is Unwarranted Because the Counts and the Defendants Were Properly Joined in the Same Indictment and a Joint Trial Would Not <u>Result in a Miscarriage of Justice.</u>

Generally, defendants may, and indeed should, be indicted and charged together if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.  Fed. R. Crim. P. 8(b); *United States v. Min*, 704 F.3d 314, 319 (4th Cir. 2013).  Similarly, the test to determine whether joinder of offenses is permissible is whether the offenses "are similar in character, are based on the same act or transaction or series of transactions, or constitute parts of a 'common scheme.'"  *United States v. Larouche*, 896 F.2d 815, 830 (4th Cir. 1990).  The term "transaction" is defined "very flexibly"

4

and connotes a "logical relationship rather than immediateness." *Id*. at n. 5. Because of "the prospect of duplicating witness testimony, impaneling additional jurors, and wasting limited judicial resources," joinder is the rule rather than the exception. *United States v. Mir*, 525 F.3d 351, 357 (4th Cir. 2008).

In light of these principles, there can be no question that the defendants and the offenses charged in the Second Superseding Indictment were properly joined pursuant to Fed. R. Crim. P. 8(a) and (b). A federal grand jury found that all four defendants participated in three armed robberies in the Eastern District of Virginia within a fifteen-day period. The Second Superseding Indictment further alleges that REED and his co-defendants committed these three armed robberies in furtherance of a conspiracy whose purpose was to obtain money by way of armed robbery. DE 43 at 1-6. Contrary to REED's bald assertion that "he only appears to be connected to a single robbery that occurred on December 22, 2012," Def. Mot. at 3, the grand jury found probable cause to believe that REED participated in all three robberies. DE 43. Because the grand jury found that there was sufficient evidence supporting a probable cause finding that all four defendants participated in the three armed robberies together, the defendants have all been properly joined in one indictment pursuant to Fed. R. Crim. P. 8(b). And because the offenses charged in the Second Superseding

Indictment were similar in character and constituted part of a common scheme, they were properly joined under Fed. R. Crim. P. 8(a).

Having been properly charged in one indictment, REED and his co-defendants should be tried together. "There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). Joint trials of defendants are "highly favored" in conspiracy cases. *See*, *e.g.*, *United States v. Dinkins*, 691 F.3d 358, 368 (4th Cir. 2012); *United States v. Spitler*, 800 F.2d 1267, 1271 (4th Cir. 1986) ("Generally, where the indictment charges a conspiracy, or a crime having a principal and aider-abettors, the rule is that persons jointly indicted should be tried together."). Indeed, unless a "miscarriage of justice" will result, there is a presumptive expectation that co-defendants should and will be tried together. *Richardson v. Marsh*, 481 U.S. 200, 206-11 (1987). Where, as here, an indictment has properly joined two or more defendants pursuant to Fed. R. Crim. P. 8(b), severance under Fed. R. Crim. P. 14 should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.

In this case, Defendant REED does not claim that a joint trial will deprive him of a specific trial right. Rather, he contends that based on his "cursory review of the

discovery," the evidence implicating his co-defendants in the armed robberies is stronger than the evidence implicating him in the same robberies. Def. Mot. at 3. According to REED and without any further elaboration, this purportedly "differing quanta of evidence" makes joinder prejudicial to him.[1]

REED's conclusory assertions of prejudice are insufficient to warrant separate trials. A defendant making a motion for severance pursuant to Rule 14 has the burden of demonstrating that "actual prejudice would result from a joint trial." *United States v. Reavis*, 48 F.3d 763, 767 (4th Cir. 1995). "A defendant is not entitled to severance merely because separate trials would more likely result in acquittal, or because the evidence against one defendant is not as strong as that against the other." *United States v. Strickland*, 245 F.3d 368, 384 (4th Cir. 2001). Thus, REED's claims about his relative culpability and about the nature and quantity of evidence against his co-defendants are insufficient to establish prejudice. Because REED cannot demonstrate that a joint trial will deprive him of a fair trial and result in a miscarriage of justice, his motion to be severed from his co-defendants for trial must be denied.

————————————————

[1] The government disputes the claim made by REED that the evidence of his involvement in all three robberies is weaker than the evidence implicating his three co-defendants in the same robberies. But if REED's assessment of the evidence were assumed to be true, such discrepancy in the evidence would not prejudice REED. If anything, a substantially weaker case against REED in comparison to the case against his co-defendants would inure to REED's benefit at a joint trial.

7

Similarly, REED has failed to show clear prejudice that would result from one trial on all the offenses charged in the indictment.  Because the offenses charged in the Second Superseding Indictment relate to the participation of all four defendants in three armed robberies committed within a fifteen-day period with the same *modus operandi*, the offenses were properly joined under Fed. R. Crim. P. 8(a).  Because there is no "serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about guilt or innocence" on each count, severance should be denied.  *United States v. Hornsby*, 666 F.3d 296, 309 (4th Cir. 2012).

<u>Conclusion</u>

For the foregoing reasons, the Court should deny Defendant REED's motion for severance of counts and defendants.

Respectfully Submitted,

Neil H. MacBride
United States Attorney

By:    _____/s/_____

Patricia T. Giles
Rebeca H. Bellows
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone (703)299-3700
patricia.giles@usdoj.gov
becky.bellows@usdoj.gov

8

<u>Certificate of Service</u>

I certify that on this 13th day of May, 2013, I electronically filed the foregoing Government's Opposition to Defendant's Motion for Severance of Counts and Defendants using the CM/ECF system, and sent a copy *via* electronic mail to the following:

Douglas J. Wood, Esq.
Terrell Roberts, Esq.
6801 Kenilworth Avenue, Suite 202
Riverdale, Maryland 20737

Melinda VanLowe, Esq.
10476 Armstrong Street
Fairfax, Virginia 22030

Alfred "Rob" Robertson, Jr., Esq.
500 N. Washington St.
Alexandria, VA 22314

Gregory Todd Hunter, Esquire
2055 North 15th Street, Suite 302
Arlington, Virginia 22201

/s/

Rebeca H. Bellows
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone (703)299-3700
Facsimile (703)299-3982
Email: becky.bellows@usdoj.gov

9

```
1                   UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
2                        ALEXANDRIA DIVISION

3    _____

                                   )
4    UNITED STATES OF AMERICA       )
                                    )  Case No. 1:13-cr-48
5              v.                   )  Alexandria, Virginia
                                    )
6    KEITH WILLIE REED,             )  June 7, 2013
                                    )  9:00 a.m.
7              Defendant.           )
                                    )
8    _____

9

10                    TRANSCRIPT OF HEARING

11          BEFORE THE HONORABLE CLAUDE M. HILTON

12              UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20   APPEARANCES:

     For the United States:   Patricia T. Giles, Esq.
21                            Rebeca H. Bellows, Esq.

22   For the Defendants:      Douglas J. Wood, Esq.
                              Defendant Keith W. Reed, in person
23
      Court Reporter:        Tracy L. Westfall, RPR, CMRS, CCR
24
     Proceedings reported by machine shorthand, transcript produced
25   by computer-aided transcription.
```

```
1                    P R O C E E D I N G S
2          THE CLERK:  Criminal No. 2013-48, United States of
3   America v. Keith Willie Reed.
4          MS. BELLOWS:  Good morning, Your Honor.  Rebeca Bellows
5   and Patricia Giles on behalf of the United States.
6          THE COURT:  Good morning.
7          MR. WOOD:  Good morning, Your Honor.  Douglas Wood
8   representing Keith Reed, who is present.
9          THE COURT:  Good morning.  This comes on on your
10  motion?
11         MR. WOOD:  Yes, Your Honor.  This was our motion to
12  sever certain counts of the indictment.  Essentially, Mr. Reed's
13  charged with three armed robberies, and they've encapsulated
14  that into an overarching conspiracy.  The armed robberies occur
15  December 7th, December 9th, and December 22nd of 2012.
16         Essentially, Your Honor, the facts against Mr. Reed, in
17  terms of the first two robberies, are solely based on, my
18  understanding of the evidence is, cell phone records that place
19  him in or around the locations of the robbery.
20         The government's theory in each of the robberies is
21  that Mr. Reed is the getaway driver.  In the first robbery,
22  they're claiming that he drove a Jeep Cherokee away from the
23  scene, but, essentially, they tie him into that scene through
24  cell phone records, put him in the general vicinity.
25         Similarly, in the December 9th robbery of a Shoppers
```

1  Food Warehouse, they're claiming he was the getaway driver.  In

2  neither of those two instances does he enter the location.

3  They're claiming that is he, again, tied to that through cell

4  phone records.  No identification, there's no DNA, there's no

5  fingerprints tying him to those two robberies.

6           However, on the third robbery there's a significant

7  amount of evidence against him, which we submit, Your Honor,

8  would cause the jury to possibly just infer simply because of

9  his involvement in a December 22nd armed robbery that he must

10  have been the getaway driver in the December 7th and

11  December 9th armed robbery.

12           In the December 22nd armed robbery, they have some DNA.

13  They have him apprehended with three other codefendants at a

14  location in the District of Columbia.  And in that general scene

15  where he's apprehended, there are proceeds of the armed robbery.

16           So the evidence in the third armed robbery,

17  comparatively speaking, is overwhelming compared to the lack of

18  very de minimis evidence in the first two armed robberies.

19           Again, we're concerned with this that he would be very

20  prejudiced by having a joint trial on three armed robberies when

21  they'll just simply infer from his presence at the third armed

22  robbery that he must have been the getaway in the first two

23  robberies.

24           So it would be much fairer, Your Honor, for him to have

25  three separate robberies.  There would be a distinct witness in

4

1   each robbery.

2            I think in the government's motion they said there

3   would be repetitive witnesses.  I don't believe there would be

4   repetitive witnesses.  There might be one witness who will

5   testify about cell phone records in each of the instances, but

6   there's no duplication of evidence.  So it would be very simple

7   to have three separate trials against Mr. Reed for his alleged

8   involvement in the three robberies.

9            So we would ask for a severance, Your Honor, of the

10  robbery, basically, essentially, the armed robbery counts in the

11  indictment.

12           THE COURT:  All right.  Well, I understand your

13  position.  I don't believe there's any undue prejudice involved

14  here at all.  This is all part and parcel of the same offense of

15  conspiracy to commit bank robbery, and it should be tried

16  together -- or these charges should be tried along with the

17  other defendants here.  Motion to sever be denied.

18           MR. WOOD:  Thank you, Your Honor.

19           MS. BELLOWS:  Thank you, Your Honor.  I just have two

20  housekeeping matters that I've e-mailed -- with respect to the

21  first one, I've e-mailed the codefendants' counsel and they're

22  aware that I'm requesting this.

23           We have -- as you know, this trial begins on June 17th

24  and it's slated for three to four days.  We have numerous law

25  enforcement witnesses and also out-of-town witnesses, and we

1  would ask that the Court permit us to allow those witnesses to

2  appear on the day that we anticipate that they're going to be

3  called, understanding that we're not going to run out of

4  witnesses.

5          I know that the Court likes to recognize all of the

6  witnesses the first day of trial, but with respect to these

7  witnesses, we were wondering if the Court would permit them not

8  to appear the first day of trial and actually appear on the day

9  we intend to call them.

10         THE COURT:  I will, but I will not wait on witnesses

11  now.  And I don't think your case should last over -- it should

12  certainly be finished by the end of the second day.  There's not

13  that much evidence in this case.

14         MS. BELLOWS:  Your Honor, there is.  There is --

15         THE COURT:  There doesn't need to be.

16         MS. BELLOWS:  Our concern -- we will move -- we think

17  that just if we were calling our witnesses, we definitely would

18  be finished in two days.  However, there are four codefendants.

19  They may take a long time cross-examining our witnesses.  That's

20  hard to anticipate, Your Honor.

21         THE COURT:  They won't take too long.  You plan on

22  finishing -- what?  Do we start on Tuesday?

23         MS. BELLOWS:  We start on Monday.

24         THE COURT:  Well, you can plan on finishing Tuesday

25  afternoon.  We'll do our best to do that.

1          MS. BELLOWS:  We will do our best, but I can't

2    guarantee, Your Honor.  I can assure you that Ms. Giles and I

3    are working on streamlining the case.

4          I have another question, Your Honor.  Has the Court

5    changed its practice with respect to allowing sanctions?  Would

6    that be something that the Court would permit in this case for

7    us to use, you know, the videotape, not for every single

8    exhibit, just for a couple of exhibits, especially the actual --

9    just one clip of each armed robbery, which would last like one

10   minute, each clip, to allow the jury to see that as it's being

11   presented?

12         THE COURT:  No.  I'll admit it and you can let the jury

13   see it if they want to later on.  But I can't imagine that

14   there's anything crucial involved in seeing the particular scene

15   that's being described.

16         MS. BELLOWS:  Well, Your Honor, it shows how similar

17   they -- each of them are, and they only last one minute.  The

18   Court permitted us to do that in the *Cole* case.  All we ask is

19   just one video clip for each robbery.  They don't last more than

20   one minute.

21         THE COURT:  When you say they look similar, what do you

22   mean?

23         MS. BELLOWS:  The defendants that come in, they have

24   the same -- the way that they come in, their physical

25   appearance, is very similar.  The way they take down every one

7

1  in the business is very similar.  We think it's important for

2  them --

3         THE COURT:  That sounds appropriate to do that.  I'll

4  allow you to do that, subject to any objection they may have at

5  trial.

6         MS. BELLOWS:  Thank you, Your Honor.

7         THE COURT:  You can plan on doing that.

8         MS. BELLOWS:  Thank you.  We have nothing further.

9         THE COURT:  All right.  Thank you.

10        * * *

11    (Proceedings conclude at 9:11 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Tracy L. Westfall  OCR-USDC/EDVA

**-74-**

8

<u>CERTIFICATION</u>

1

2

3        I certify, this 23rd day of January 2014, that the

4   foregoing is a correct transcript from the record of proceedings

5   in the above-entitled matter to the best of my ability.

6

7                        /s/

8        _____

         Tracy Westfall, RPR, CMRS, CCR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| V. | ) |
| | ) |
| KEITH WILLIE REED, | ) |
| | ) |
| Defendant. | ) |

Civil Action No. 1:13CR48

## ORDER

This matter comes before the Court on the Defendant's Motion For Severance Of Counts And Defendants.  For the reasons stated from the bench, it is hereby

ORDERED that the Defendant's Motion is DENIED.

/s/
_____
Claude M. Hilton
United States District Judge

Alexandria, Virginia
June  7  , 2013

```
 1                  UNITED STATES DISTRICT COURT
 2                  EASTERN DISTRICT OF VIRGINIA
                         ALEXANDRIA DIVISION
 3    _____

 4                               )
      UNITED STATES OF AMERICA    )
 5                               )  Case No. 1:13-cr-48
                   v.            )  Alexandria, Virginia
 6                               )
      KEITH WILLIE REED, et al., )  June 17, 2013
 7                               )  10:00 a.m.
                 Defendants.     )
 8                               )
      _____

 9

10
                       TRANSCRIPT OF TRIAL
11                         (Volume I)

12        BEFORE THE HONORABLE CLAUDE M. HILTON

13            UNITED STATES DISTRICT JUDGE

14                     AND A JURY

15

16

17    APPEARANCES:

18    For the United States:   Patricia T. Giles, Esq.
                               Rebeca H. Bellows, Esq.
19
      For the Defendants:      Douglas J. Wood, Esq.
20                               Defendant Keith W. Reed
                               Melinda L. VanLowe, Esq.
21                               Defendant Stanley R. Winston
                               Alfred L. Robertson, Jr., Esq.
22                               Defendant Anthony Cannon
                               Gregory T. Hunter, Esq.
23                               Defendant Tobias R. Dyer

24     Court Reporter:      Tracy L. Westfall, RPR, CMRS, CCR

25    Proceedings reported by machine shorthand, transcript produced
      by computer-aided transcription.
```

```
1                        I N D E X
2                    Direct   Cross   Redirect   Recross
3    FOR THE GOVERNMENT:
4    D. Inn                23      31       45         --
5    A. Lopez              46      58       79         --
6    E. Hablenko           80      86       --         --
7    C. Childress          93      96       --         --
8    G. Lynch              98     104       --         --
9    E. Mills             105     116       --         --
10   E. Johnson           134     142      155        155
11   H. Singleton         157     160       --         --
12   E. English           163      --       --         --
13   S. Gaines            166     171       --         --
14   L. DeJesus           172     184       --         --
15   S. Koch              190     194       --         --
16   C. Fisher            204     212       --         --
17   C. Ormerod           217      --       --         --
18
19
20
21
22
23
24
25
```

1                   P R O C E E D I N G S

2          THE CLERK:  Criminal No. 2013-48, *United States of*

3  *America v. Keith Willie Reed, Stanley Ray Winston, Anthony*

4  *Cannon, and Tobias Dyer*.

5          This case comes on for trial by jury.  Counsel, please

6  state your appearances for the record.

7          MS. GILES:  Good morning, Your Honor.  Patricia Giles

8  and Rebeca Bellows for the United States.

9          MS. BELLOWS:  Good morning, Your Honor.

10         THE COURT:  Good morning.

11         MR. WOOD:  Good morning, Your Honor.  Douglas Wood

12  representing Keith Reed.

13         THE COURT:  Good morning.

14         MS. VANLOWE:  Good morning.  Melinda VanLowe

15  representing Stanley Winston.

16         THE COURT:  Good morning.

17         MR. ROBERTSON:  Good morning, Your Honor.  Alfred

18  Robertson for Anthony Cannon.

19         MR. HUNTER:  Greg Hunter on behalf of Tobias Dyer.

20         (Pause.)

21         * * *

22         (The jury venire enters at 10:11 a.m.  The jury for the

23  case is selected and sworn; whereupon, the proceedings commence

24  as follows.)

25         * * *

4

 1           THE COURT:  Members of the jury, now that you have been

 2   sworn, I'll give you a few preliminary instructions which I hope

 3   will guide you in your participation in this trial.  It's going

 4   to be your duty to find from the evidence what the facts are.

 5   You, and you alone, are the judges of the facts.  You'll then

 6   have to apply those facts to the law as the Court will give it

 7   to you.  You must follow that law whether you agree with it or

 8   not.

 9           Now, the evidence from which you will find the facts

10   will consist of the testimony of witnesses, documents received

11   into the record, those exhibits, any facts that the lawyers may

12   stipulate to or any facts that the Court may instruct you to

13   find.

14           Certain things are not evidence and must not be

15   considered by you.  Statements or arguments and questions by

16   lawyers are not evidence.  Objections to questions are not

17   evidence.

18           Now, the lawyers have an obligation to their clients to

19   object when they believe that the evidence being offered is

20   improper under the Rules of Evidence.  You should not be

21   influenced by the objection or by the Court's ruling on it.  If

22   the objection is sustained, ignore the question.  If the

23   objection is overruled, treat the answer like any other.

24           Now, if you're instructed that some item of evidence is

25   received for a limited purpose only, you must follow that

1  instruction.

2          The testimony that the Court has excluded and told you

3  to disregard is not evidence and should not be considered by

4  you.  Anything you have seen or heard outside of the courtroom

5  is not evidence in this case.  You must decide the case solely

6  on the evidence presented here in the courtroom.

7          Now, just a few words as to your conduct as jurors.  I

8  would instruct you that during the trial you should not discuss

9  this case with anyone or permit anyone to discuss it with you.

10  Until you retire to the jury room at the end of the case to

11  deliberate on your verdict, you simply should not talk about the

12  case.

13          Don't read or listen to anything touching the case in

14  any way.  If anyone should try to bring -- or try to talk to you

15  about it, bring it to the Court's attention promptly.

16          Don't try to do any research or make any investigation

17  on your own.  And finally, don't form any opinion until all the

18  evidence is in.  Keep an open mind until you begin your

19  deliberations at the end of the case.

20          Now, I would prefer that you-all not take notes but

21  simply listen to the testimony as it comes in and rely on your

22  collective recollection of the evidence when you begin your

23  deliberations.

24          Now, the trial is going to begin.  The lawyers will

25  make an opening statement.  Thereafter, the government will

1  present their witnesses who may be cross-examined by the

2  defendants.  After the government finishes, the defendants will

3  present what evidence they want to present, if they want to

4  present any.  And if they do call witnesses, the government may

5  cross-examine them.

6        After all the evidence is in, the lawyers will make

7  their closing arguments.  I will instruct you on the law, and

8  you'll begin your deliberations.

9        Now, we'll take a recess here in the middle of the

10 morning, about 11:30, and we'll try to recess for lunch about

11 1 o'clock, take a recess in the middle of the afternoon, and go

12 until 5:00 or 5:30 in the afternoon, depending on where we are

13 with the witnesses that are here.  All right.

14        Ms. Giles.

15        MS. GILES:  Thank you, Your Honor.

16        Good morning.  It was three days before Christmas and

17 the Navy Federal Credit Union opened for business as usual.

18 Employees and customers were busy inside when four men inside of

19 a black Jeep Liberty pulled up to the front of the building.

20 Three of those men rushed inside the bank, and they were wearing

21 black masks, those kinds of black masks that have one large

22 opening where you can see the skin around the eyes.

23        One of those men was armed with a big black

24 semiautomatic handgun that had an extended clip.  He took that

25 gun over to the front greeter area of the bank and he threatened

the employees there and he demanded money.  And meanwhile, the

two other robbers who entered jumped the teller counter.  One of

them was armed with another gun, another semiautomatic handgun.

This one had a drum-style clip, magazine clip.  It's big and

round and holds a lot of ammunition, and it was attached to that

gun.  He held that gun just feet away from that young teller's

face demanding money.

The other man who jumped the teller counter went back

to the vault area of the bank where he got the big money.  And

after they got all the bank's money, all the money that they

wanted, they fled out of that bank, out of the credit union,

back into that waiting black Jeep Liberty that was driven by the

fourth man.

The four men who robbed the Navy Federal Credit Union

are seated in this courtroom, and they are the defendants.

Now, the man who had the gun with the extended clip,

that was Defendant Stanley Winston who's seated at the edge.

The man who held the gun with the drum-style clip just

feet away from that employee's -- teller's face is seated at the

second table.  It's Defendant Tobias Dyer.  He's at the end.

The robber that went to that back vault area, that was

Defendant Anthony Cannon, and he's seated there at the second

table.

And the fourth man who was waiting inside of that black

Jeep Liberty, he's the fourth defendant, Keith Reed.

1          These four men committed what seemed like the perfect
2    robbery.  There were in and out of that credit union in less
3    than two minutes.  They had their masks on, their gloves on to
4    conceal their identity.  They arrived and left in that stolen
5    getaway car which they abandoned very close to the credit union.
6          It seemed perfect, but they forgot one thing -- three
7    things, actually, and those were the three GPS trackers that
8    were hidden inside of the bank's money.  Those trackers
9    activated as soon as they were taken outside of the bank.  The
10   FBI and the police officers tracked those trackers, and like
11   bread crumbs, they led right to these defendants.
12         And they led right back to Southeast, D.C., near an
13   address, 1501 38th Street.  And that was the residence of
14   Defendant Anthony Cannon seated in the back.
15         An observant MPD police officer who was responding and
16   patrolling, looking out for these suspects involved in the bank
17   robbery, spotted these four men walking down the street.  And as
18   soon as they saw this officer, one of them crossed the street
19   and dropped the blue bag that he was carrying.
20         When the officer tried to talk to them, they
21   immediately started running, and they ran to a wooded area.
22   Initially this officer went in after these four men alone, but
23   soon he was joined by other officers.  And they could hear them
24   hiding in the bushes, hiding in the woods, and one by one they
25   were apprehended.

1          But that's not all that the police and the FBI got out

2     of the woods that day, because they also got $19,000 of the

3     bank's money, two of those three GPS trackers, masks like the

4     ones that the robbers were wearing inside the bank, and three of

5     their cell phones.  They also recovered from Defendant Reed,

6     seated at the front, a screwdriver in his pocket, which proved

7     to be significant because, as I stated, they arrived in a stolen

8     getaway car, and when they later recovered that black Jeep

9     Liberty, it had marks and damage to the door locks and to the

10    ignition because it had been punched.

11          Within an hour of the robbery at the Navy Federal

12    Credit Union, these men were apprehended.  Within an hour.  And

13    the FBI also, in addition to the items they recovered in the

14    woods, they recovered that black bag -- or the blue bag where

15    they found yet another mask.  That same day they also searched

16    Anthony Cannon's home and they found more of the bank's money,

17    that last of the bank's trackers, those GPS trackers, and three

18    guns, one with a big drum-style clip and another one with an

19    extended clip, just like the guns that were used inside the

20    robbery at the Navy Federal Credit Union.

21          And in the trash can outside of his home, they found

22    three more masks.  So in all during that day, they recovered

23    eight black masks; eight masks, four men, and there are reasons

24    why there were more masks than men:  Because Navy Federal Credit

25    Union wasn't the only robbery these four individuals committed.

1    On December 7th, just 15 days before robbing the Navy
2 Federal Credit Union, they robbed the VVM, Incorporated, which
3 is located on Beauregard Street in Fairfax County, in the
4 Alexandria portion of Fairfax County.  VVM is a small store and
5 it sells items, but in addition to that, in the back of the
6 store there's also a Western Union counter and a check cashing
7 area where they keep big money.

8    On December 7th, just around closing at 8 o'clock,
9 three masked men rushed in, two tall, thin ones, Tobias Dyer and
10 Anthony Cannon, and one shorter, darker-complected robber.  Two
11 of them already had their guns drawn.  They put the employee and
12 a customer on the floor up front while the third man went to the
13 bank -- went to the back, just like at the credit union, went to
14 the back.  He went to that check cashing area where they kept
15 the big money, but that area was enclosed in glass and it had a
16 door that locked.  There was a little woman working back there
17 and she wouldn't open the door.  And when she wouldn't, he tried
18 to pry it open with a tool, but that didn't work either.  So on
19 that day, they only got the money that was in that cash
20 register.

21    But when they left, they fled in, again, a stolen Jeep.
22 And that date they only got $700.  So two days later,
23 December 7th, they robbed the Shoppers Food Warehouse located
24 right here on Jefferson Davis Highway.  That robbery occurred at
25 6:00 a.m. on a Sunday morning, 6:00 a.m. when the store was just

opening.

Again, three men rushed in, two taller, lighter-complected, one shorter, darker-complected. Again, it was Defendants Cannon, Dyer, and Winston who entered. And while Defendants Cannon and Dyer {sic} were controlling the employees in the front of the store, Defendant Cannon went for the big money.

And at Shoppers Food Warehouse, they kept the big money in the bookkeeper's office, and that office is behind two locked doors, but the ceilings don't go all the way to the top. And so he scaled the wall to get in to that money. Not only did he scale it once, he scaled it twice because after he had gotten some money and brought it out, he got locked out when that door closed so he climbed over again. You'll see the surveillance.

And meanwhile, while he was in the bookkeeper's office, again, Defendants Dyer and Winston were taking what they could up front. That day, they got about $15,000 of the bank's [sic] money, and they fled again in a stolen Jeep that was driven by Defendant Reed.

So there were three different robberies, but all of them involved stolen getaway cars, always the same type of car, a Jeep. And in each robbery, Defendant Reed served as the driver. In each robbery, Defendants Cannon, Dyer, and Winston were the individuals who entered. Always Defendants Dyer and Winston, the two on the end, went and controlled the employees

1  or the customers who were in the front, while Defendant Cannon,

2  seated in the back, would go and get the big money.

3         The evidence will prove that these four defendants

4  committed all three robberies together.  And the evidence --

5  this case is going to start with the Navy Federal Credit Union,

6  because although it happened last in time -- it happened on

7  December 22nd, I told you at the beginning that when the police

8  apprehended them in the woods, they recovered cell phones, and

9  they actually recovered three cell phones.  When he was

10 apprehended, Defendant Reed actually was holding his cell phone

11 in his hand.  The officers also seized Defendant Dyer and

12 Defendant Winston -- again, seated at the end -- seized their

13 cell phones as well.

14        Those cell phones were a gold mine of evidence.  They

15 uncovered evidence which linked them back to the other previous

16 robberies.

17        One, they supplied the defendants' phone numbers.  Two,

18 they held the substance of certain text messages between the

19 four.  They also -- Defendants Winston's and Dyer's phones also

20 contained photographs, lots of photographs with them with big

21 wads of stolen cash.

22        Four, law enforcement also were able to obtain their

23 phone records which showed the text messages and phone calls

24 between these four defendants around the time of the robberies.

25 And five, they were also able to obtain cell site information.

1          Now, you will hear that cell site information allows
2    you to determine the approximate location of a phone at the time
3    it's used.  If there's no activity on a phone, meaning if it's
4    off or it's not getting or receiving a call, there won't be cell
5    site information.  But if the phone is being used, you'll have
6    cell site information.  And in this case for the Navy Federal
7    Credit Union, Defendant Winston's phone was active, and right
8    before the robbery, his phone is pinging near the credit union.

9          And then at the time of the Shoppers Food Warehouse
10   robbery, Defendants Cannon's and Reed's cell phones are active.
11   And at 6:00 a.m. on a Sunday morning, those phone calls are
12   pinging near the Shoppers Food Warehouse.  Then on December 7th,
13   although none of these defendants live in Virginia, for the VVM
14   robbery, every single one of their cell phones were pinging near
15   that robbery on that date.

16         You will hear from several witnesses in this case.  You
17   will hear from the victim tellers and customers.  Pay close
18   attention to the details that they provide you about the robbers
19   who entered that day.

20         You will also see the surveillance footage.  In each of
21   these locations, they had multiple cameras so you'll be able to
22   see the robberies from multiple angles.

23         You'll hear from the MPD officers who apprehended these
24   defendants.  You will see the phone records and the text
25   messages and the calls between these defendants.

1          You will also hear from the FBI's special agent who is

2    the expert in this cell site analysis, and he's the one who

3    determined the location of these phones.  And you will also hear

4    from forensic examiners with the FBI laboratory who will testify

5    about linking these defendants to several of the items that were

6    recovered.

7          And finally, you will see the guns, the masks, and the

8    money.  You'll see the extended -- gun with the extended clip

9    and that one with that big drum-style magazine.

10         This is the evidence.  And ladies and gentlemen, these

11   men are charged with conspiracy, robbery affecting interstate

12   commerce, armed robbery of a credit union, use of a handgun in

13   crimes of violence, which would be each of these robberies, and

14   each is charged with being a felon in possession of a firearm.

15         The evidence in this case will prove beyond a

16   reasonable doubt that they committed these crimes, and at the

17   conclusion, we will ask that you find them guilty of each count

18   charged.  Thank you.

19         MR. WOOD:  Good morning, ladies and gentlemen.  My name

20   is Douglas Wood and I represent Keith Reed, and Keith Reed is

21   not guilty of each and every allegation made against him.

22         Now, the process we went through this morning is an

23   important one because we wanted to select a group of people who

24   didn't know any of the participants, who didn't know anything

25   about this case, and who bring to this court an open mind about

1   what you're about to hear.  So not to say that you have blank

2   minds, but you haven't formed any opinion about this case at

3   this time.

4         And as we go through the evidence in this case -- and

5   it's going to be a painstaking process -- I want you to remember

6   one thing.  I represent Keith Reed.  Each of the defendants has

7   an attorney representing them.  Each of the pieces of evidence,

8   when it comes in during the course of this case, has to be

9   evaluated as to how it relates to the individual defendant.

10        And I submit when you look at the evidence that they're

11  going to try to purport to bring in against Keith Reed, you'll

12  come to the conclusion that Keith Reed is not guilty.  And

13  that's very important because up until this time, ladies and

14  gentlemen, all that's occurred in this process is accusations

15  and allegations.

16        And now though, when we start this trial, in a sense,

17  it's the moment of truth.  And in the moment of truth, the

18  government has the burden to prove beyond a reasonable doubt

19  each and every accusation they have made up to this time that's

20  gotten my client to this position where he sits before you.

21        When you look at the evidence, ladies and gentlemen,

22  it's going to be a lot of evidence, but you're going to look at

23  the evidence and you're going to see that they're going to have

24  surveillance photographs from the three separate robberies.

25  You're not going to see Keith Reed in any of these surveillance

1    photographs.

2              You're going to hear evidence that Jeep Liberties were

3    recovered.  You're not going to find any fingerprints belonging

4    to Keith Reed in any Jeep Liberty.  You're going to find that

5    there -- certain items were tested for DNA-type evidence.

6    You're not going to find any DNA evidence that links Mr. Reed to

7    the December 7th or December 9th robbery, one of a check cashing

8    location, the other of a Shoppers Food Warehouse.

9              You're not going to hear any witness come to court and

10   say, oh, when looking at Keith Reed, that's the guy I saw at the

11   scene of those robberies.  Not one witness is going to come to

12   court and say, oh, that's the guy I saw inside a Jeep Liberty

13   waiting outside the respective establishments.

14             That's just a brief summary of some of the things

15   you're going to hear in this case.  And that's why it's

16   important, ladies and gentlemen, to listen to the evidence in

17   the context of Keith Reed and decide whether or not the

18   government has proven to you beyond a reasonable doubt that any

19   of that evidence relates to Keith Reed.

20             And particularly I ask you, ladies and gentlemen, don't

21   get overwhelmed by a lot of irrelevant evidence that relates to

22   other people that does not relate to Keith Reed and just simply

23   assume because he is sitting here with a bunch of other people

24   that he must be involved in this.  Because up until this time,

25   ladies and gentlemen, my client is presumed to be innocent.

1          And when the evidence is presented in this case in
2  however long it takes -- two, three, four days -- I'm going to
3  come back before you and tell you the same thing, because we're
4  going to go over the evidence bit by bit as it relates to Keith
5  Reed, and you will be convinced that Keith Reed is not guilty of
6  each and every one of these charges.
7          And I thank you, ladies and gentlemen, for having sat
8  through that voir dire process.  It took us a little while, but
9  it was so important to get a bunch of people who are unbiased,
10  have formed no opinions about this case, and are going to give
11  my client a fair trial.  Thank you very much.
12          MS. VANLOWE:  Good morning.  My name is Melinda
13  VanLowe, and I am here with Stanley Winston.  Both of us first
14  want to thank you very much for your time and attention today.
15  This is not an easy process.  You started out this morning
16  standing outside in a line to come and sit down here and be in
17  what is kind of a line, put your lives on hold and come here and
18  be able to serve as a juror.  We understand the difficulty that
19  is for you, and we thank you very much for your time and your
20  very close attention to this case.
21          This is a very important case for Mr. Winston.  It is a
22  very important -- it has very important consequences, and it is
23  something that he is passionate about because he is not guilty
24  of this offense -- or these offenses.
25          Now, Mr. Wood kind of touched on this, and I will

1   briefly overlap and say that this is a case of details.  You are

2   going to hear, as the government promised you, a lot of witness

3   testimony, a lot of exhibits that are going to be coming before

4   you, and you are going to have to consider them.  And after you

5   hear all the evidence, you're going to go back into the

6   deliberation room and you're going to have to look at all of

7   these pieces.  All of these exhibits, all of that testimony,

8   they're kind of like puzzle pieces, if you will.

9           And if you open up a puzzle, you get your puzzle, you

10  cut off the box, you open it up, you dump all of the stuff on

11  the table, and that's basically what you're going to have when

12  you go back and deliberate.

13          What you're going to have to do with each of those

14  puzzle pieces, each of those exhibits, each of that testimony,

15  is that you're going to try to have to see how all of them link

16  together.  And what the government has promised you -- Ms. Giles

17  stood before you today, and kind of like a bedtime story, she

18  told you about what she alleges and Rebeca Bellows alleges to

19  have happened in these three establishments.

20          They've made you a lot of promises.  They said there

21  were going to be cell phones with what they called a wealth of

22  information, a pot of gold.  And they talked about masks that

23  you're going to see, and she went even into detail about

24  describing the complexions of the people that are there with

25  masks on covering their faces.  She made you those promises,

1  each and every one of those pieces of evidence that she talked

2  about.

3          So when you go back into the deliberation room and you

4  have all of those puzzle pieces in front of you, you're going to

5  hold the government to each and every one of those promises that

6  they made today, and you're going to have to take all of those

7  pieces of evidence and put them together into a puzzle. And if

8  the puzzle at the end of the day doesn't match, if it doesn't

9  come together, if there are pieces that do not work, if there

10 are things that do not fit, then at the end of the day, you, as

11 jurors, have your duty and your opportunity and your requirement

12 to find these individuals, specifically Stanley Winston, not

13 guilty of these offenses.

14         They can't be partially together. There can't be some

15 pieces that are left open. There can't be, for instance, the

16 identity of these individuals left to your curiousness.

17         You have to go back and deliberate and determine beyond

18 a reasonable doubt that these incidents occurred at the Navy

19 Federal Credit Union, at the VVM, Inc., and at the Shoppers Food

20 Warehouse, and that you know definitively, just like the

21 government promised you, that it was these individuals, and

22 specifically Stanley Winston, and that it was specifically

23 Stanley Winston that did exactly what the government promised

24 you.

25         And if after you go back to deliberate -- and I'm sure

1    that you will -- and you are not able to put together those

2    pieces of the puzzle and you are not able to link all of these

3    pieces of evidence up in the way that the government claimed,

4    then it's your requirement and your responsibility to find

5    Stanley Winston not guilty.  Thank you very much.

6          MR. ROBERTSON:  Good morning, ladies and gentlemen.

7    I'm Alfred Robertson.  I am the one who is going to knock

8    everything over in the next couple of days.  I represent Anthony

9    Cannon.

10         The government has made you a big promise as to what

11   they're going to show you, and their evidence just isn't going

12   to make it.  You'll see, when we walk through it and we go

13   through everything, you'll see that what this is is a case of

14   wishful thinking, of them seeing different pieces of information

15   and taking that information and saying, oh, well, that must be

16   what it is.  That's not enough for a conviction beyond a

17   reasonable doubt, and you'll hear those instructions later at

18   the end of the case.

19         This is a case of wishful thinking that they have all

20   these unsolved cases and they have to plug somebody in for it,

21   and those must be the guys.  What we have is we have four guys

22   that ran from the police in Southeast, D.C.; they must have done

23   it.

24         We'll be asking you to find these people not guilty at

25   the end of this case.  You'll see the pieces of evidence.  As I

1  said, they don't show what Ms. Giles promised you that they

2  show.  Thank you.

3         MR. HUNTER:  Good morning, ladies and gentlemen.  My

4  name is Greg Hunter.  I'm a defense lawyer here in the Eastern

5  District of Virginia.  I have the great privilege of practicing

6  in this court almost every day.  Today and throughout most of

7  this week, I'm here to represent Mr. Tobias Dyer, sitting next

8  to me here at the table.

9         You're going to hear a lot of evidence this week about

10  these three robberies:  The Navy Federal Credit Union robbery,

11  the VVM robbery, and the Shoppers Food Warehouse robbery.  There

12  is absolutely no question that these robberies happened.  You're

13  going to hear in loving detail from two terrific trial attorneys

14  for the government that these robberies happened.

15         You're going to hear from the victims.  You're going to

16  hear from the police officers and FBI agents and other

17  professionals who have investigated this.  You're going to hear

18  lots and lots of facts about these robberies.  The question

19  though is whether it's the perfect robbery -- Ms. Giles told you

20  it was -- or whether it's the perfect case that she'd have you

21  believe.

22         This is not a perfect case against these defendants,

23  and certainly not against Mr. Dyer who I'm here to represent.

24  Saying it's Mr. Dyer doesn't make it Mr. Dyer.

25         What they have is three robberies committed by people

1    that the victims, the witnesses here, claim to be black men

2    wearing dark clothes, some taller, some shorter, some thinner.

3    Some have lighter complexions, darker complexions, but really,

4    you're going to see a lot of videotape and surveillance photos

5    with black guys, not a real uncommon thing to encounter here in

6    the D.C. area.  You are going to hear a lot of evidence about

7    cell phones and who was calling whom and -- and texts back and

8    forth, photographs on phones.  Whose phones are they?  Really?

9    I mean, that's the question that they've got to answer.

10          She's going to tell you later that you've got to use

11   your common sense.  And that's code for I don't have any

12   evidence to prove that; I have a hole in my case and I'm asking

13   you to fill it in.

14          Force the government to prove every single element of

15   every charge against Mr. Dyer beyond a reasonable doubt or find

16   him not guilty.  Thank you.

17          THE COURT:  All right.  We'll take a brief recess at

18   this time.

19       (Recess taken at 11:32 a.m.; the jury enters at 11:47 a.m.)

20          THE COURT:  Ms. Giles.

21          MS. GILES:  Thank you, Your Honor.  The government

22   calls Dimanche Inn.

23                        **DIMANCHE INN**,

24             after having been duly sworn or affirmed,

25             took the stand and testified as follows:

1                        **DIRECT EXAMINATION**

2     BY MS. GILES:

3     Q.  Good morning, sir.

4     A.  Good morning.

5     Q.  Could you please state your name.

6     A.  Dimanche Inn.

7     Q.  Would you spell that.

8     A.  D-I-M-A-N-C-H-E, I-N-N.

9     Q.  Where do you work?

10    A.  Navy Federal Credit Union.

11    Q.  What's the address there?

12    A.  875 North Randolph Street, Arlington, Virginia.

13    Q.  Is that within a particular area in Arlington?

14    A.  Yes.

15    Q.  What is that?

16    A.  Ballston.

17    Q.  What do you do there?

18    A.  I am a MSR.  It's a member service representative.

19    Q.  And how long have you been working there?

20    A.  For about eight months now.

21    Q.  Were you working there on December 22nd of 2012?

22    A.  Yes.

23    Q.  What day of the week was that?

24    A.  That was a Saturday.

25    Q.  And what time did the credit union open that morning?

1   A.  We open at 9:30.

2   Q.  What part of the credit union were you working in?

3   A.  I was right at the front desk.

4   Q.  And is -- where is the front desk located?

5   A.  It's right by the entrance.

6   Q.  How many people were in the credit union?

7   A.  There were seven other workers and one member in the branch.

8   Q.  And did anything unusual happen that morning?

9   A.  Yes.

10  Q.  And what was that?

11  A.  We got robbed that day.

12  Q.  And what time did the robbery occur?

13  A.  Approximately 20 minutes after we opened.

14  Q.  Okay.  And you say you opened at 9:30?

15  A.  Correct.

16  Q.  How did you first realize that the credit union was being

17  robbed?

18  A.  When I first realized is when I had a gun pointed at my

19  face.

20  Q.  Okay.  And who was pointing that gun at your face?

21  A.  One of the robbers were.

22  Q.  How far away from you was he?

23  A.  It was right in my face.

24  Q.  And was anyone else near you?

25  A.  Yes.

1    Q.   Who?

2    A.   Rosa was.

3    Q.   And who is Rosa?

4    A.   She is another worker.

5    Q.   And at that time when he put the gun in your face, did he

6    say anything to you?

7    A.   He told us to get to the ground.

8    Q.   And did he touch you at all?

9    A.   Yes, he did.

10   Q.   How so?

11   A.   He grabbed me by the right -- left arm.

12   Q.   And what did he do?

13   A.   And he just pushed us to the ground.

14   Q.   Did he grab Rosa as well?

15   A.   Yes.

16   Q.   And what happened next?

17   A.   After that, he would hover around us and go around the front

18   desk and see if we had money back there, which we don't keep

19   money up there.

20   Q.   Did he say anything?

21   A.   He asked us where the money was.

22   Q.   And what did you say?

23   A.   Basically, there was no money up here.

24   Q.   And what did he then say?

25   A.   He then threatened to shoot me.

1   Q.  What did he say exactly?

2   A.  Basically, I'm going to kill you.

3   Q.  And you said he was hovering around you looking for money.

4   A.  Yes.

5   Q.  Did he do anything else during this time?

6   A.  No, he just stood around us.

7   Q.  And had this robber entered the credit union alone?

8   A.  No.

9   Q.  And how did you know that there were other robbers?

10  A.  I heard commotion from the teller window.

11  Q.  Did you see those other individuals?

12  A.  No.

13  Q.  You just heard them?

14  A.  Yes.

15  Q.  And you said that this robber who was hovering near you at

16  the greeter station, that he had a gun.

17  A.  Yes.

18  Q.  Can you describe that gun?

19  A.  I'd say it was about a foot in length.  It looked like it

20  had an extended barrel and an extended magazine as well.

21  Q.  And based on your understanding, what is the barrel?

22  A.  Basically where -- it's towards the front of the gun.

23          MS. GILES:  Okay.  May the record reflect he's pointing

24  -- making his hand like a gun and he pointed to his index

25  finger.

1  BY MS. GILES:

2  Q.  And where is the -- you said there was also an extended

3  magazine clip.

4  A.  Yes.

5  Q.  And where was that extended magazine clip?

6  A.  Right towards the barrel, right underneath it.

7  Q.  Right underneath the barrel?  And could you describe this

8  individual who had the gun?

9  A.  He was about 5'5" in height, medium to skinny built.

10  Q.  And do you recall anything else about him?

11  A.  When he was hovering over us, it looked like he had

12  dreadlocks or dreads.

13  Q.  Okay.  You say that he was hovering.  Would you -- how could

14  you tell that he had dreads?

15  A.  Because most of the time he was in my face just watching us.

16  Q.  Okay.  Did he have any covering on him?

17  A.  Yes.

18  Q.  And what kind of covering?

19  A.  He had a mask and a hood on.

20  Q.  And so if he had on a mask, how could you tell that he had

21  dreads?

22  A.  Because he would lean over us, and every time he would lean,

23  it looked like a strand of hair would come out.

24  Q.  I'm going to show you what's been marked as Government's

25  Exhibit 1-1A to 1-1D.

D. Inn - Direct                                                    28

1        And do you recognize those?

2   A.  Yes.

3   Q.  And what are they?

4   A.  It's the Navy Federal Credit Union.

5   Q.  And that is where you work?

6   A.  Correct.

7   Q.  And are those pictures of the front and interior of the

8   bank?

9   A.  Yes.

10          MS. GILES:  Your Honor, at this time we would move in

11  Exhibits 1-1A to 1-1D.

12          THE COURT:  Any objection?

13          MR. WOOD:  No, Your Honor.

14          MS. VANLOWE:  No, Your Honor.

15          THE COURT:  They're admitted.

16          MR. ROBERTSON:  No, Your Honor.

17          MR. HUNTER:  No, Your Honor.

18  BY MS. GILES:

19  Q.  If you could also take a look at what's been marked as 1-1C.

20  A.  1-1C.  Okay.

21  Q.  I'm sorry.  1-7.

22  A.  1-7.

23  Q.  Do you see that?

24  A.  Yes.

25  Q.  And do you recognize it?

1   A.  Yes.

2   Q.  How do you recognize it?

3   A.  That is me in the corner.

4   Q.  What do you have open there?  1-1?

5   A.  Excuse me?

6   Q.  You have 1-17D?

7   A.  1-17D.

8   Q.  Okay.  And if you could look at that whole series, 1 --

9   actually, if you could start with 1-17.  I believe it's a DVD.

10  A.  Okay.

11  Q.  Do you have that?

12  A.  Yep.

13  Q.  And do you recognize that?

14  A.  Yes.

15  Q.  How do you recognize it?

16  A.  Those are my initials on the DVD.

17  Q.  And did you watch that DVD?

18  A.  Yes.

19  Q.  And does that DVD reflect what happened in the credit union

20  on December 22nd during the robbery?

21  A.  Yes.

22  Q.  Now, if you would take a look at what's been marked as 1-17A

23  to 1-17G, that whole series.

24  A.  All right.

25  Q.  Do you recognize those?

1   A.  Yes.

2   Q.  And are those photographs?

3   A.  Yes.

4   Q.  And do they accurately -- also accurately reflect what

5   happened in the bank that day -- in the credit union that day?

6   A.  Yes, they do.

7   Q.  In fact, are those the photographs that were made or taken

8   from the surveillance footage?

9   A.  Yes, they were.

10  Q.  And now, finally, if you would look at what's been marked as

11  Government's 1-8.

12  A.  Okay.

13  Q.  And do you recognize that?

14  A.  Yes.

15  Q.  And what is -- how do you recognize it?

16  A.  My initials are on it as well.

17  Q.  And that's another DVD that you've watched?

18  A.  Yes.

19  Q.  And does that also accurately reflect what happened in the

20  credit union on December 22nd?

21  A.  Yes, it does.

22          MS. GILES:  Your Honor, at this time the government

23  moves in 1-7, 1-7A to 1-7G, and 1-8.

24          THE COURT:  Any objection?

25          MR. WOOD:  No objection, Your Honor.

D. Inn - Cross                                                    31

1            MS. VANLOWE:  No objection, Your Honor.

2            MR. ROBERTSON:  No objection, Your Honor.

3            MR. HUNTER:  Without objection.

4            THE COURT:  Admitted.

5            MS. GILES:  Thank you, Your Honor.  Those are all the

6    questions we have.

7            THE COURT:  All right.  Cross-examine?

8            MS. GILES:  I'm sorry.  I did have one final question.

9    BY MS. GILES:

10   Q.  What did the barrel of the gun look like?

11   A.  It looked like it had holes on it.

12           MS. GILES:  That's all.

13   BY MS. GILES:

14   Q.  Just holes right through it?

15   A.  Yes.

16           MS. GILES:  Those are all the questions we have, Your

17   Honor.

18                      **CROSS-EXAMINATION**

19   BY MR. WOOD:

20   Q.  Sir, you indicated you were inside the bank, obviously, when

21   this robbery occurred, correct?

22   A.  Correct.

23   Q.  And from looking at the surveillance photographs, you see

24   more than one individual actually in the bank committing the

25   robbery, right?

1  A.  Right.

2  Q.  But when you were actually robbed, you only saw one

3  individual?

4  A.  Correct.

5  Q.  So you didn't see the others.  You only know that others

6  were there from looking at the surveillance photographs, right?

7  A.  But I heard the commotion from it as well.

8  Q.  You heard commotion indicating there might be other people

9  there, right?

10  A.  Yes.

11  Q.  But you couldn't tell at that time from the commotion how

12  many people were there, right?

13  A.  Correct.

14  Q.  And the person you dealt with was 5-foot-5, correct?

15  A.  Correct.

16          MR. WOOD:  I have no further questions, Your Honor.

17                      **CROSS-EXAMINATION**

18  BY MS. VANLOWE:

19  Q.  Good morning, Mr. Inn.  How are you today?

20  A.  Doing well.

21  Q.  I just have to ask you a couple of questions about what your

22  testimony has been.  First of all, you said that you --

23  Ms. Giles pointed you in the direction of a DVD, and you said

24  that you had put your initials on it; is that correct?

25  A.  Correct.

1  Q.  And when did you look at that DVD?

2  A.  About a week ago.

3  Q.  And how many times have you seen the video?

4  A.  I've seen them about once.

5  Q.  And that was the -- once a week ago?

6  A.  Correct.

7  Q.  Okay.  And where did you go to watch the video?

8  A.  I came to the attorney's office.

9  Q.  Okay.  And who was with you when you were watching the

10 video?

11 A.  Ms. Giles was.

12 Q.  Okay.  And at that particular time, did you have an

13 opportunity to talk about what was on the video?

14 A.  Yes.

15 Q.  Okay.  And did you give a statement to law enforcement

16 before you came and watched the video a week ago?

17 A.  Yes, I did.

18 Q.  And when did you give that statement?

19 A.  The day of the robbery.

20 Q.  And how long after -- on that day -- how long after when

21 this incident happened and your statement, what was the time

22 that elapsed during that time?

23 A.  About a couple of months.

24 Q.  A couple of months?

25 A.  Or -- can you rephrase the question?

1    Q.  Sure.  You said that you gave a statement to law enforcement

2    and you said that it was the day of the robbery.  What I'm --

3    what I was asking you is what was the time that elapsed between

4    when you -- when this incident happened and when you gave that

5    statement?

6    A.  It happened -- I gave it to them right after it happened.

7    Q.  Okay.  And in that statement did you describe the gun to

8    the -- what the gun looked like to the law enforcement officer?

9    A.  Yes, I did.

10   Q.  Okay.  Now, how did you describe it?

11   A.  I described it about a foot in length, extended barrel and a

12   magazine, and it had holes in it.

13   Q.  Now, do you have knowledge of guns?

14   A.  No, I don't.

15   Q.  Before you got to the Navy Federal Credit Union and had that

16   incident that day, had you ever actually seen a gun in person

17   before, a real one?

18   A.  No.

19   Q.  Had you ever -- did you -- had you studied guns?  Did you

20   really know anything about guns before?

21   A.  No, I didn't.

22   Q.  Okay.  So when you're talking about a magazine, did you know

23   anything about a magazine before you had that -- before the

24   bank -- the incident at the bank?

25   A.  A little, yes.

1   Q.  And where did you get your reference from?

2   A.  Just from reading stuff.

3   Q.  Okay.  Did you read anything about guns?

4   A.  Not extensively.

5   Q.  Okay.  And you referred to a long barrel.  Isn't that what

6   you said?

7   A.  Yes.

8   Q.  And you're saying that before you went into the Navy Federal

9   Credit Union that morning, you knew about that type of barrel

10  and you used that language?

11  A.  Correct.

12  Q.  In what context did you talk about gun magazines and

13  barrels?

14  A.  I just -- it's from what I've read.

15  Q.  Okay.  And when you say what you've read, what type of

16  things are you reading about gun magazines and barrels?

17  A.  Just video game magazines and then there's paint ball

18  magazines I would read.  So same terms.

19  Q.  Same terms.  Okay.  And you're saying that the barrel and

20  the magazine is the same thing as paint ball -- same terms as

21  paint ball?

22  A.  Correct.

23  Q.  Okay.  And so when the officer -- you're saying that when

24  the officer asked you about this gun, you would go -- you went

25  into detail about that?

1   A.  Correct.

2   Q.  Did you ever have an opportunity to look up this gun and

3   what it looked like on the Internet?

4   A.  No, I haven't.

5   Q.  You didn't.  Did anybody else in the bank with you?

6   A.  I don't believe so.

7   Q.  Okay.  And did you talk with anybody else in the bank before

8   you gave your statement?

9   A.  No.

10  Q.  Okay.  All of you just had this experience and then you

11  didn't say anything to anybody else?

12  A.  Correct.

13  Q.  You just stood behind the information desk and said nothing?

14  A.  Well, we had to secure the bank to make sure that was it.

15  And then once the officers came, we made -- they took their

16  statements.

17  Q.  Okay.  And were -- where were the officers taking your

18  statements?

19  A.  Right in the bank itself.

20  Q.  Okay.  And were you alone?

21  A.  No.

22  Q.  There were other employees at the bank there with you?

23  A.  Correct.

24  Q.  Okay.  And the officers just kind of took the statements

25  with all of you standing there, right?

1    A.  Correct.

2    Q.  And you also actually wrote out a statement; is that

3    correct?

4    A.  Yes.

5    Q.  And when did you write your statement?

6    A.  Right after it happened.

7    Q.  Okay.  So you gave your oral statement.  Then you wrote it

8    down; is that right?

9    A.  Correct.

10   Q.  And how many of the other witnesses did that?

11   A.  I believe everyone that was in the bank took statements

12   down.

13   Q.  Okay.  And where were you in the sequence of those?

14   A.  In the sequence -- I was right up front, just sitting.

15   Q.  So you were the first one to give a statement?

16   A.  Correct.

17   Q.  Okay.

18          THE COURT:  What's the relevancy of this questioning

19   about statements?

20          MS. VANLOWE:  I'll move forward, Your Honor.  That was

21   my last question.

22   BY MS. VANLOWE:

23   Q.  In terms of your positioning in the bank, you said that you

24   were right up front there at the information desk, right?

25   A.  Correct.

1  Q.  Okay.  And were you standing or were you hunched on the
2  ground?
3  A.  I was standing at the time.
4  Q.  Okay.  And when the person that you're referring to or that
5  you described came in, where were you at that point?
6  A.  At that point I was still at the front desk.
7  Q.  Okay.  And where was that person?
8  A.  He was on the other end of the front desk.
9  Q.  Okay.  So you're -- he was -- was there a person in between
10 you?
11 A.  No, there wasn't.
12 Q.  Okay.  So you were saying that you were standing next to
13 this individual that had the gun?
14 A.  Uh-huh.
15 Q.  I'm sorry?
16 A.  Yes.
17 Q.  Okay.  And was there somebody else up there with you?
18 A.  Yes, there was.
19 Q.  And where was that person?
20 A.  She was on my right -- left side.
21 Q.  Okay.  So it was the person that you said was there with the
22 gun, you, and this other person?
23 A.  Correct.
24 Q.  Okay.  And you -- did you stand the whole time or where --
25 how were you situated?

1   A.  He situated us onto the floor at the time.

2   Q.  Okay.  So were you lying down on your stomach?  Were you on

3   your knee?  How were you?

4   A.  I was sitting.

5   Q.  You were sitting?

6   A.  Yes.

7   Q.  So you're sitting just on the floor?

8   A.  Yes.

9   Q.  Okay.  And then you said that you were doing what at that

10  point?  What you were looking at while this is going on?

11  A.  I was just trying to take information in, see how much I can

12  get.

13  Q.  Okay.  And you said though that there was this gun that was

14  pointed in your face, right?

15  A.  Yes.

16  Q.  Okay.  And you took in the information about the gun, right,

17  what it looked like?

18  A.  Yes.

19  Q.  Okay.  And in terms of the individual, you said that he had

20  a mask on; is that correct?

21  A.  Correct.

22  Q.  Okay.  What did the mask look like?

23  A.  It was just a regular black mask.

24  Q.  Okay.  When you say a regular black mask, could you describe

25  to the jury what you saw?

1    A.  It looked like just a ski mask on.

2    Q.  Okay.  And were there room for the eye holes or how much of

3    the face was covered?

4    A.  Just -- there was room for the eye holes and the mouth.

5    Q.  Okay.  So there were -- how many holes were in the mask?

6    A.  Three.

7    Q.  Three.  And that's two for the eyes and one for the mouth --

8    A.  Correct.

9    Q.  -- is that right?  Okay.  And so what part of the face could

10   you actually see the skin part?

11   A.  Just the mouth and the eyes.  That was it.

12   Q.  Okay.  Now, you said that that person -- were you able to

13   see any of the neck area or was it pulled down?

14   A.  No, I wasn't able to see that.

15   Q.  Okay.  So did you see what kind of shirt the person was

16   wearing?

17   A.  No.

18   Q.  Didn't see that?

19   A.  No.

20   Q.  Did you notice what kind of jacket they were wearing?

21   A.  No.

22   Q.  Okay.  You said it had a hood?

23   A.  Yes.

24   Q.  Was the hood down or was it up?

25   A.  It was up.

1  Q.  Okay.  The hood was up.  And so you said that you then saw a

2  strand of hair.

3  A.  Correct.

4  Q.  And what did the strand of hair look like?

5  A.  It just looked like dreads.

6  Q.  Okay.  Were you familiar with dreads before -- dreadlocks

7  before you -- in the context of your life?

8  A.  Yes.

9  Q.  How so?

10  A.  My friend has them.

11  Q.  Okay.  And how long are his or hers?

12  A.  His.  They come about to his eyes so they're decently short.

13  Q.  They come to his eyes?

14  A.  Yeah.

15  Q.  Hanging down?

16  A.  Hanging down, yes.

17  Q.  Okay.  And so when you say that you saw a strand and you

18  said that it looked like a dreadlock, where was that strand

19  coming from?

20  A.  It was coming from the side of his face.

21  Q.  Which side of his face?

22  A.  From his right.

23  Q.  Okay.  And where exactly was it?  Was it peeking out of one

24  of the holes?

25  A.  No.  It looked like it was coming -- like he didn't tuck it

1   back far enough or something.

2   Q.  Okay.  Well, I'm just trying to figure out.  Was it peeking

3   out of one of the eye holes?

4   A.  No, it wasn't.

5   Q.  Was it peeking out the mouth hole?

6   A.  No.

7   Q.  Okay.  So it was underneath --

8   A.  The hood.

9   Q.  -- the mask?

10  A.  Yes.

11  Q.  And underneath the hood?

12  A.  Yes.

13  Q.  So you are saying that you didn't actually then see the

14  dread.  You saw what looked to be an outline?

15  A.  Correct.

16  Q.  Okay.  And you saw that and you thought that it was a dread

17  because of what?

18  A.  I just assumed it was.

19  Q.  You just assumed.  And you didn't actually see it though?

20  A.  Correct.

21  Q.  Okay.  Now, you also gave a description that you said the

22  person was 5-foot-5, right?

23  A.  Correct.

24  Q.  And that was -- when did you assess how tall that person

25  was?

1   A.  Usually what they teach us is --

2   Q.  Well, not what they teach you, just when did you assess what

3   height this person was?  When did you first look at them?

4   A.  When he first walked into the bank.

5   Q.  Okay.  And at that time he was standing?

6   A.  Correct.

7   Q.  Okay.  And then what happened at that point?

8   A.  At that point he would -- I had just measured his height and

9   assumed closest to it.

10  Q.  Okay.  And then you said that you got on the ground?

11  A.  Correct.

12  Q.  Okay.  And you said that he was -- he at that point in time

13  was standing up --

14  A.  Correct.

15  Q.  -- is that correct?  Okay.

16      And when you said that you were making this height

17  determination, you said you were comparing it to something else

18  in the bank?

19  A.  Yes.

20  Q.  What did you compare it to?

21  A.  I compared it to about the teller window.

22  Q.  Okay.  And you said that -- and you know how high those are?

23  A.  Correct.

24  Q.  You had training in that?

25  A.  Correct.

1   Q.  Okay.  And so when you looked at the teller window, you're

2   saying that you figured that that was a certain height, and so

3   then you looked over and you saw him and so you kind of

4   guesstimated about how tall he was?

5   A.  Correct.

6   Q.  Okay.  And you never received any measurements or anything

7   like that to be clear about what that height was, right?

8   A.  Correct.

9   Q.  That, like the statement about the dreadlock, that's just

10  kind of what you're assuming, correct?

11  A.  Yes.

12          MS. VANLOWE:  Okay.  I don't have any further

13  questions.

14          MR. ROBERTSON:  Your Honor, Ms. VanLowe asked all the

15  questions I would have asked.  I'm not going to repeat them.

16          THE COURT:  Do you have anything further?

17          MR. HUNTER:  No, Judge.

18          THE COURT:  Thank you.  You may step down and may be

19  excused.

20          MS. GILES:  Your Honor, do I get to redirect on a

21  couple?

22          THE COURT:  What?

23          MS. GILES:  Do I get any redirect, Your Honor?

24          THE COURT:  All right.

25          MS. GILES:  I'll be very brief.

1                        **REDIRECT EXAMINATION**

2    BY MS. GILES:

3    Q.  Mr. Inn, how tall are you?

4    A.  About 5'9".

5    Q.  And how did the person compare in height to you?

6    A.  It looked like he came about shy of my shoulders.

7    Q.  Okay.  And you testified that -- on direct -- that you saw a

8    dread.  And have you been previously interviewed at the time --

9    prior to your testimony today?

10   A.  No.

11   Q.  You've not been interviewed by the police?

12   A.  No, I haven't -- I have been interviewed by the police, yes.

13   Q.  And at that time did you indicate that you saw a dread or an

14   outline?

15   A.  Dreads.

16   Q.  Okay.  And at the time that you wrote your statement, did

17   you say you saw an outline or did you say that the person had

18   dreads?

19   A.  The person had dreads.

20   Q.  And at that time that you made those statements --

21           MS. VANLOWE:  Your Honor, objection.  The testimony

22   stands as the testimony stands.  I stopped asking about the

23   witness statement, but this gentleman testified to what he saw,

24   and that testimony is what is the evidence in this case.

25           THE COURT:  Well, you can argue later.  Objection

1    overruled.

2            MS. GILES:  Thank you, Your Honor.

3    BY MS. GILES:

4    Q.  And so -- and when you gave that statement at the bank, that

5    was immediately after the robbery?

6    A.  Correct.

7    Q.  And you weren't under a cross-examination at that time, were

8    you?

9    A.  Correct.

10           THE COURT:  Thank you.  You may step down and may be

11   excused.

12           (Witness stands down.)

13           THE COURT:  Who's next?

14           MS. GILES:  Ms. Abigail Lopez, sir.

15                         **ABIGAIL LOPEZ,**

16          after having been duly sworn or affirmed,

17          took the stand and testified as follows:

18                      **DIRECT EXAMINATION**

19   BY MS. GILES:

20   Q.  Good morning.

21   A.  Hi.

22   Q.  Please state your name.

23   A.  Abigail Lopez.

24   Q.  Where do you work?

25   A.  Navy Federal Credit Union.

Appeal: 13-4835    Doc: 47-1    Filed: 05/07/2014    Pg: 145 of 355


A. Lopez - Direct                                              47

1   Q.  At which branch?

2   A.  Ballston branch.

3   Q.  What do you do there?

4   A.  I'm the assistant manager.

5   Q.  Were you working there on December 22nd?

6   A.  Yes.

7   Q.  And where in the bank were you that morning?  In the credit

8   union.  I'm sorry.

9   A.  I was inside the vault.

10  Q.  Where is the vault area?

11  A.  All the way at the back of the office.

12  Q.  Did anything unusual happen that morning?

13  A.  We got robbed.

14  Q.  How did you first realize that the credit union was being

15  robbed?

16  A.  I heard somebody scream in the lobby.

17  Q.  And then what happened?

18  A.  I opened the vault room door towards where the tellers were

19  at and I saw two men, and one man walked in the vault.

20  Q.  You say you saw two men.  And what were they doing, those

21  two men?

22  A.  They were robbing the bank.

23  Q.  What were they -- where were they positioned when you first

24  opened the door?

25  A.  One was directly right by the door when I opened it, and

Tracy L. Westfall  OCR-USDC/EDVA

-123-

A. Lopez - Direct                                          48

1   then the other one was towards the end of the teller line.

2   Q.  Did you see what they were doing?

3   A.  Yes.  They were robbing the bank.

4   Q.  Okay.  And what makes you say they were robbing the bank?

5   A.  Because they don't work there.

6   Q.  Were they wearing anything?

7   A.  Yes.  They were wearing masks, and the other one was wearing

8   a black jacket.

9   Q.  And after you opened the door, what happened next?

10  A.  The man closest to the door asked me where the money is and

11  he walked in the vault.

12  Q.  And what was he wearing?

13  A.  He was wearing a yellow jacket and a mask.

14  Q.  Okay.  And did he come into the vault area?

15  A.  Yes.

16  Q.  And what happened once he got in that area?

17  A.  He kept asking me where the money is.  So I gave him the

18  money.  And then when he saw that there were bags inside the

19  vault, they asked me what they were -- or they asked me what's

20  inside.  So I said they were cash bags.

21      And they -- so he asked me if I could give it to him, but he

22  wants me to open them one by one.

23  Q.  What is -- these are cash bags.  Where does the -- what are

24  these cash bags?

25  A.  I give them to the tellers and there's money inside.  It's

1    their cash.

2    Q.  For their particular drawer?

3    A.  Yep.

4    Q.  And these bags are kept in the vault area?

5    A.  Correct.

6    Q.  Okay.  Are they locked, each individual bag?

7    A.  Yes.

8    Q.  And so he -- you testified that he asked you to open the

9    bags.

10   A.  Yes.  And I told him I have to look for the keys so it's

11   going to take a while.  So then he just grabbed the bags and put

12   it in his shopping bag.

13   Q.  In his shopping bag.  Was that something he had brought in

14   with him?

15   A.  Yes.

16   Q.  And then what happened after you gave him the cash bags?

17   A.  So then he proceeded to leave the vault room.  So when I

18   left the vault room, that's when I saw that the other MSRs, or

19   the other member service representatives, and some of the

20   members were on the floor.

21   Q.  And when you first came out, could you see if there were

22   other robbers in the bank at that time?

23   A.  Yes.  I saw that there was another one by the greeter

24   station which was by the door of the branch.

25   Q.  And did you see any of these robbers holding any weapons?

A. Lopez - Direct                                             50

1   A.  Yes.

2   Q.  Okay.  And what did you see?

3   A.  I saw the one by the door was holding a weapon, and the one

4   by the teller line was also holding a weapon.

5   Q.  So after you exited the vault area, what happened?

6   A.  The one behind the teller line was yelling to take the trash

7   bag -- or trash can.  At that time I didn't know what was

8   inside.  But he kept yelling, take this, take this.

9   Q.  Who was he talking to?

10  A.  To the one that was inside the vault room with me.

11  Q.  Okay.  And this trash can, did you know where that came

12  from?

13  A.  Yes.  That's our trash can.

14  Q.  Okay.  And he was yelling at the other robber to take the

15  trash can?

16  A.  Yes.

17  Q.  Okay.  And then what happened?

18  A.  And then the one behind the teller line jumped the teller

19  line, and then they proceeded to leave the branch.

20  Q.  And did you see them leave?

21  A.  Yes.

22  Q.  And describe what happened or what you saw.

23  A.  I saw that there was a black Jeep waiting outside.

24  Q.  And did you see anything else?

25  A.  No.  That's it.

A. Lopez - Direct                                              51

1   Q.  And was there a customer with you outside?

2   A.  I saw -- well, I saw that there were people already calling

3   outside, people were already on their cell phones.

4   Q.  And did anyone get a partial tag?

5   A.  Yes.  It was a member that said that he had the tag.

6           MS. VANLOWE:  Objection.  Hearsay.

7           MS. GILES:  The only question I asked is did someone

8   get a partial tag.  I didn't ask what the partial tag was.

9           THE COURT:  She was going to say it though.  Objection

10  sustained.

11  BY MS. GILES:

12  Q.  And do you know whether or not -- do you know whether or not

13  a partial tag was provided to the police?

14  A.  Yes.

15  Q.  And how do you know that?

16  A.  Because the member told me.  He stayed -- he wanted to stay

17  inside the branch.

18  Q.  Was --

19          MS. VANLOWE:  Objection.  Hearsay.

20  BY MS. GILES:

21  Q.  Was a phone call made to the police department?

22  A.  Yes.

23          THE COURT:  Objection overruled.

24          MS. VANLOWE:  Objection to that question as well with

25  respect to whether -- without foundation with respect to whether

A. Lopez - Direct                                                52

1   a phone call was made.

2   BY MS. GILES:

3   Q.  Ms. Lopez, did you call the police station?

4   A.  Yes.

5   Q.  Did you call the police station about the robbery after it

6   happened?

7   A.  Yes.

8   Q.  Now, you testified that the robber took money from the vault

9   area.  Was there anything significant about the money that the

10  robber took?

11  A.  There was a GPS in our money.

12  Q.  And how did he get that GPS?

13  A.  I dropped it in the bag.

14  Q.  You dropped it in the bag?  What was the purpose of dropping

15  it in the bag?

16  A.  So that they could get caught.

17  Q.  Was there an audit done to determine the amount of loss to

18  the bank after the robbery -- or to the credit union after the

19  robbery?

20  A.  Yes.

21  Q.  And is it normal to prepare audits at the end of each day?

22  A.  We balance every day, yes.

23  Q.  I'd like to show you what's been marked as Government's

24  Exhibit 1-11.

25  A.  Do I have to look for it?  1-11?

A. Lopez - Direct                                                        53

1    Q.  Yes, 1-11, please, ma'am.

2    A.  Okay.

3    Q.  Do you recognize that?

4    A.  Yes.  This is our balancing sheet.

5    Q.  Okay.  And what is that -- what is a balancing sheet?

6    A.  At the end of the day, these are the figures that we are

7    supposed to have.

8    Q.  Okay.  And is this balancing sheet record prepared during

9    the course of someone doing an audit at Navy Federal Credit

10   Union?

11   A.  Yes.

12   Q.  Okay.  And is it prepared by someone who would have

13   knowledge of the audit?

14   A.  Yes.

15   Q.  And is it prepared in the normal course of business?

16   A.  Yes.

17   Q.  And is it also kept in the normal course of business?

18   A.  Yes.

19          MS. GILES:  At this time, Your Honor, we move in --

20   BY MS. GILES:

21   Q.  And is this particular audit, was it from the day of the

22   robbery?

23   A.  Yes.

24          MS. GILES:  At this time, Your Honor, we'd move in

25   Government's Exhibit 1-11.

A. Lopez - Direct                                                54

```
 1              MR. WOOD:  No objection.

 2              MS. VANLOWE:  No objection.

 3              THE COURT:  It's admitted.

 4    BY MS. GILES:

 5    Q.  How much money was stolen from the bank that day?

 6    A.  $60,411.15.

 7    Q.  Is the credit union -- Navy Federal Credit Union insured by

 8    the National Credit Union Administration?

 9    A.  Yes.

10              MS. GILES:  Okay.  At this time, Your Honor, we'd also

11    move in Government's 1-12.  It is the certificate of insurance,

12    and we move it in pursuant to 902(1).  It's a public record

13    under seal.

14              MS. VANLOWE:  No objection.

15              THE COURT:  It's admitted.

16    BY MS. GILES:

17    Q.  Does Navy Federal Credit Union conduct any interstate

18    business?

19    A.  Yes.

20    Q.  Do you cash out-of-state checks?

21    A.  Yes.

22    Q.  And do you do any bank wires?

23    A.  Yes.

24    Q.  And where do you bank wire?

25    A.  All over the place.  All over the world, other countries,
```

A. Lopez - Direct                                              55

1   yeah.

2   Q.  What about -- do you-all do any Western Union services?

3   A.  Correct, yes.

4   Q.  And where would those money services or transfers be?

5   A.  That's outside of Virginia.  All over the world.

6   Q.  And after the robbery, did the credit union close that day?

7   A.  Yes.

8   Q.  At this time I would like for you to take a look at what's

9   been marked as 1-5 as well as, after you look at 1-5...

10  A.  Okay.

11  Q.  Do you recognize that?

12  A.  Yes.

13  Q.  And how do you recognize it?

14  A.  This is a copy of the video.

15  Q.  Video from what, ma'am?

16  A.  From the robbery.

17  Q.  And does it capture what happened in the vault room during

18  the robbery?

19  A.  Yes.

20  Q.  And are those your initials on that?

21  A.  Correct.

22  Q.  And then -- now, if you could look at 1-5A and 1-5B.  Do you

23  recognize those, ma'am?

24  A.  Yes.  That's me and the robber.

25  Q.  That's you and the robber?

1    A.  Yes.

2    Q.  Okay.  And are those photographs of what happened in the

3    vault room?

4    A.  Yes.

5    Q.  And they accurately reflect what happened?

6    A.  Yes.

7           MS. GILES:  Your Honor, at this time we move in 1-5 and

8    1-5A and 1-5B.

9           MR. WOOD:  No objection, Your Honor.

10          THE COURT:  They're admitted.

11   BY MS. GILES:

12   Q.  And now, ma'am, if you would look at what's been marked as

13   1-9A to 1-19C [sic].

14       Do you recognize the objects that are in those photographs?

15   A.  Yes.  These are cash bags.

16   Q.  They're cash bags from where?

17   A.  From our bank, Navy Federal.

18   Q.  And do you normally keep those cash bags in the locations

19   where they are in those photographs?

20   A.  No.

21   Q.  How can you tell that those are your cash bags from Navy

22   Federal Credit Union?

23   A.  Because these are the bags that I give the tellers.  They're

24   from my vault.

25   Q.  Okay.  Then if you could look at what's been marked as 5-1J

A. Lopez - Direct                                          57

1   and 5-1P.

2   A.  I can't find it.

3   Q.  It should be under -- there's a tab for 5.  Do you see

4   tab 5?

5   A.  It ends at 3.

6   Q.  Sorry.  It's 5-1J and 5-1P.  Just -- only 5-1J and only

7   5-1P.

8   A.  Okay.

9   Q.  Have you looked at those two photos?

10  A.  Those are bills from the bags.  It has straps.  And those

11  are our straps.

12  Q.  And what do you mean by straps?

13  A.  The monies are strapped depending on the denomination.

14  Q.  By straps, are you -- is another word for straps money

15  bands?

16  A.  Yes.

17  Q.  And do you recognize the money bands that are reflected in

18  those --

19  A.  Yes.

20  Q.  -- exhibits?

21  A.  Yes.

22  Q.  And where are those from?

23  A.  Those are from Navy Federal.

24  Q.  Okay.  Do you normally keep your money bands in the

25  locations that are reflected in those photographs?

A. Lopez - Cross                                                    58

1   A.  No.

2          MS. GILES:  Those are all the questions we have for

3   this witness.

4          THE COURT:  All right.  Cross-examine.

5                      **CROSS-EXAMINATION**

6   BY MR. WOOD:

7   Q.  Ms. Lopez, you indicated that when this robbery started, you

8   were in the back vault, right?

9   A.  Correct.

10  Q.  And you were by yourself?

11  A.  No.  I was with one of the MSRs.

12  Q.  Pardon me?

13  A.  I was with another MSR, member service rep.

14  Q.  Okay.  So there were two of you back there.  And that --

15  where that vault is situated inside the bank, that is away from

16  the front tellers, right?

17  A.  Yes.

18  Q.  And that's also away from where the tellers -- there is a

19  distance between where the tellers are and the front door,

20  correct?

21  A.  Yes.

22  Q.  Okay.  So when you were in the back vault, you did not see

23  any potential robbers enter that bank, correct?

24  A.  No.

25  Q.  The first time you became aware of a robber was when someone

A. Lopez - Cross                                                59

1  came to that back vault area, right?

2  A.  No.  I heard a scream.

3  Q.  You heard a scream, but you didn't see anyone until someone

4  came to the back vault area?

5  A.  Until I opened the door.

6  Q.  So is that a secure door?

7  A.  No.

8  Q.  The door where you were that you opened, does that allow you

9  then to look outside into the foyer of the bank?

10  A.  No.

11  Q.  So you couldn't see from where that door was to the front

12  part of the bank, right?

13  A.  Yes.

14  Q.  But why did you open that door?

15  A.  Because I heard somebody scream in the lobby.

16  Q.  Okay.  So you heard the scream in the lobby.  But even after

17  you opened the door, you couldn't see what was causing the

18  commotion?

19  A.  When I opened the door, I already saw the robbers.

20  Q.  Oh, you -- so you could see the robbers after you opened the

21  door?

22  A.  Yes.

23  Q.  And then after you opened the door, one of the robbers came

24  to the back area where the vault was, right?

25  A.  Yes.

A. Lopez - Cross                                                    60

1    Q.  Okay.  And that robber stayed inside there with you and you

2    provided them with some money, correct?

3    A.  Yes.

4    Q.  And then how long was that robber in that back vault area

5    with you?

6    A.  Less than a minute.  I don't know.

7    Q.  Okay.

8    A.  It was fast.

9    Q.  Fast.  Okay.  Then after the robber left the back vault

10   area, you remained in the back vault area?

11   A.  No.

12   Q.  Where did you go?

13   A.  I followed him.

14   Q.  This fellow had a gun, right?

15   A.  I'm sorry?

16   Q.  Did this fellow have a gun?

17   A.  No.

18   Q.  He did not have a gun?

19   A.  No.

20   Q.  You did not see him with any gun while he was in the back

21   vault area?

22   A.  No.

23   Q.  Just he was making demands of you?

24   A.  Yes.

25   Q.  So then you follow him through the door.  And did you follow

A. Lopez - Cross                                              61

1   him to the teller area?

2   A.  No.  I followed him to the lobby.

3   Q.  To the lobby area.  And did you remain inside the lobby?

4   A.  Yes.

5   Q.  Okay.  You said you called -- you called the police, right?

6   A.  Yes.

7   Q.  The call you made to the police, was that made from the

8   lobby area?

9   A.  Yes.

10  Q.  Okay.  So you remained in the lobby area and the robber went

11  outside, correct?

12  A.  Yes.

13  Q.  You did not follow that robber outside?

14  A.  No.

15  Q.  Did you see any of the other robbers go outside or just the

16  fellow who had been in the vault area?

17  A.  All of them left.  All of them went outside.

18  Q.  All of them went outside.  But, again, you remained in

19  the -- inside the bank, correct?

20  A.  Yes.

21  Q.  Would that be called the foyer of the bank?

22  A.  Front door, if you will.

23  Q.  Front door.  You never went outside, correct?

24  A.  Yeah.

25  Q.  Okay.  And you indicated there was a Jeep outside?

1    A.  Black Jeep.

2    Q.  A black Jeep.  Other than calling it a black Jeep, that's

3    all you could identify it as, correct?

4    A.  Yes.

5    Q.  You could not tell the tag number?

6    A.  No.

7    Q.  Naturally, because you're inside the bank, you don't have a

8    view of the front or back tag of that vehicle, correct?

9    A.  Yes.

10   Q.  And did that black Jeep have tinted windows?

11   A.  I believe so, yes.

12   Q.  Or are you not sure?  I mean, I'm not trying to tell you it

13   had tinted windows.

14   A.  It was all dark.  So I -- it is tinted.

15   Q.  Okay.  It was all dark.  So you could not see inside that --

16   A.  No.

17   Q.  Okay.  And the robber who you dealt with, where did he go?

18   A.  In the Jeep.

19   Q.  What part of the Jeep?

20   A.  I can't remember.

21   Q.  Okay.  And you can't remember where any of the other two

22   robbers went inside that Jeep as well, correct?

23   A.  No.

24   Q.  Somehow all three robbers got in that Jeep, correct?

25   A.  Yes.

A. Lopez - Cross                                                    63

1   Q.  They got in the driver's side, passenger's side, front and

2   back?

3   A.  Yes.

4   Q.  But you couldn't tell where in the Jeep they got?

5   A.  No.

6   Q.  Okay.  So you couldn't tell which one went to the driver's

7   side front, correct?

8   A.  Yes.

9   Q.  Okay.  And so when those robbers got in the Jeep, it was

10  only after they got in the Jeep that the Jeep drove away,

11  correct?

12  A.  Yes.

13  Q.  You could not see anyone else inside that Jeep; isn't that

14  right?

15  A.  Yes.

16  Q.  So all you know is that there were three people inside that

17  Jeep; isn't that correct?

18  A.  Yes.

19          MR. WOOD:  I have no further questions.

20                      **CROSS-EXAMINATION**

21  BY MS. VANLOWE:

22  Q.  Good morning.

23  A.  Hi.

24  Q.  Or good afternoon at this point.  I kind of want to take you

25  through the situation and kind of start from the beginning.  So

1    the bank opened at about what time?

2    A.  9:30.

3    Q.  9:30.  And where were you?

4    A.  When the bank opened?

5    Q.  Yes.

6    A.  I would probably be in the lobby.

7    Q.  Okay.  But you're not sure of that?

8    A.  No.  I don't know.

9    Q.  Okay.  When did you go inside of the vault?

10   A.  I would say ten minutes after we opened.

11   Q.  And what were you doing in the vault?

12   A.  I was counting my money from my ATM, and I was also in the

13   process of giving one of the MSRs his cash bag.

14   Q.  Okay.  So there was somebody else in there with you?

15   A.  Yes.

16   Q.  And about how much time had passed since you were counting

17   that money and doing those -- is it fair to say that they were

18   like basically chores that you do in your routine at being in

19   the bank?  Is that correct?

20   A.  Yes.

21   Q.  And about how long were you at that process?  Do you know?

22   A.  Five minutes into it.

23   Q.  Did you get through a lot of the stuff or -- a lot of your

24   duties or --

25   A.  No.  I was in the middle of everything.

A. Lopez - Cross                                                        65

1   Q.   In the middle.  Okay.  And at that point in time, you said

2   that there was something that drew your attention to the front.

3   A.   Yes.  I heard somebody scream in the lobby.

4   Q.   Okay.  Now, at that point in time -- Mr. Wood asked you

5   about a door.  Okay.  Does the vault have any windows or

6   anything that looks outside?

7   A.   No.

8   Q.   Okay.  And so the door, is it -- what kind of door is it?

9   A.   A wood door.

10  Q.   Okay.  Does it have any windows?

11  A.   No.

12  Q.   Okay.  And so you hear this scream through the door.  Okay.

13  And what do you do at that time?

14  A.   I opened the door.

15  Q.   Okay.  And when you open the door, what do you see when you

16  open the door?

17  A.   There was a man by the door.

18  Q.   Well, before we get to that, what is right outside of the

19  door?  Does it -- do you immediately open the door and there you

20  are in the lobby or do you have to walk some ways?

21  A.   It's the door behind the teller line.

22  Q.   Okay.  So the teller line -- when you open the door, what

23  you see is basically the tellers' view to the front?

24  A.   I see the back of the tellers.

25  Q.   The back of the tellers.  Okay.  And so does that door allow

1   you to see all of the teller window or just part of it?

2   A.  I just see the behind -- the back part of it.  I don't see

3   what's in the lobby.

4   Q.  Okay.  And so when you opened that door, there was somebody

5   where?  How far -- what distance between you and the other

6   person?

7   A.  Right outside that door.

8   Q.  Okay.  So you open the door and there's somebody standing

9   there?

10  A.  Yes.

11  Q.  Okay.  And so then -- and you said at this time this person

12  that's standing right there does not have a gun in their hand?

13  A.  No.

14  Q.  Okay.  And so then what happens?

15  A.  So he walks in the door and he asks me where's the money.

16  Q.  Okay.  And at that point in time you proceeded to do what?

17  A.  I proceeded to go towards the vault and hand him the cash

18  that's in the vault.

19  Q.  Okay.  And was the vault closed or was it open?

20  A.  It was already open.

21  Q.  Okay.  And then you -- he was taking the money or she was

22  taking the money or what were you doing?

23  A.  I was handing him the money.

24  Q.  Okay.  And when you're saying him, you know that because of

25  how?

1   A.  His voice.

2   Q.  Okay.  But you didn't actually see what this person looked

3   like, correct?

4   A.  No.

5   Q.  Okay.  And so you hand the money.  And then what happens?

6   A.  So I hand him the money, and then he asks me for the bags,

7   the cash bags.  I hand him the cash bags, and then he proceeded

8   to go outside to the lobby.

9   Q.  Okay.  And by the time he goes out into the lobby -- did you

10  follow right after him?

11  A.  I followed behind him --

12  Q.  So you were --

13  A.  -- towards the door.

14  Q.  Was he walking or running or how fast --

15  A.  He was in a hurry.

16  Q.  He was in a hurry.  Okay.  And so what distance -- how far

17  was he in front of you when you were walking after him?

18  A.  Just a couple of steps.

19  Q.  Okay.  The distance between here and here?

20  A.  That's too far.  No.

21  Q.  Okay.  So give me -- what --

22  A.  By the -- by that tea, whatever.

23  Q.  The coffee?

24  A.  Yeah.

25  Q.  Okay.  And so were you running or were you walking?

A. Lopez - Cross                                                    68

1    A.  I was walking behind him.

2    Q.  Okay.  And so then at that point in time, what were you able

3    to see?

4    A.  I saw the other robber on the teller line, and he was

5    yelling for the one that was with me in the vault to grab the

6    trash bag or trash can that we have.

7         Then the other -- and then he jumps off from the teller

8    line.  And then the one by the greeter station closest to the

9    door, they all left.

10   Q.  Okay.  And so at that point in time, that was the first time

11   that you had been out in the lobby and actually saw the entirety

12   of what was going on?

13   A.  Yes.

14   Q.  So it's fair to say that you have no idea who was in the

15   bank at what time before you followed this one gentleman out.

16   A.  Well, I already saw the other one on the teller line.  So I

17   knew that there's another one.

18   Q.  Okay.  So you know that there's one other one besides the

19   one that's there?

20   A.  Yes.

21   Q.  Okay.  The time that you were in the vault -- is it fair to

22   say you were in the vault the entire time that all of this was

23   going on?  You really don't know what was going on while you

24   were in the vault because you didn't see what was going on,

25   right?

A. Lopez - Cross                                              69

1   A.  Well, I didn't know what was going on in the lobby, but I

2   knew that --

3   Q.  You knew what was --

4   A.  -- what was going on behind the teller line.

5   Q.  Exactly.  But you didn't know what was going on in the lobby

6   and you didn't know who was in the lobby or who wasn't in the

7   lobby, right?

8   A.  Yes.

9   Q.  Okay.  Now, you said -- and you were looking at the -- you

10  were looking at the pictures that Ms. Giles showed you.  And if

11  we could look at 5-1J.  Do you have that in front of you?

12      Now, you said you looked at that, and what did -- and you

13  said that there is -- what does the picture have in it?

14  A.  It's dollar bills with a hundred-dollar strap.

15  Q.  Okay.  And what is -- what else is in the picture?

16  A.  Leaves, branches.

17  Q.  Okay.  So basically woods, is that accurate, what you would

18  say is around the money is a wooded area?

19  A.  Yes.

20  Q.  Okay.  Now, from the picture are you able to determine

21  whether this is indeed a hundred dollars?

22  A.  Well, I'm able to determine it's $1 bills.

23  Q.  You see $1 bills.  Are you able to determine how many $1

24  bills are sitting right there?

25  A.  No.

A. Lopez - Cross                                                    70

1   Q.  Okay.  And you said that this little band that's there, can

2   you see the entire band or can you only see a portion of it?

3   A.  I can see the band.

4   Q.  Okay.  Can you -- is it sitting up flat?

5   A.  No.

6   Q.  Okay.  There's a portion of it that's kind of hidden from --

7   that you can see half of it that's sticking up, right?

8   A.  Yes.

9   Q.  And the other half you can't see?

10  A.  Yes.

11  Q.  Okay.  Now, is this job with the Navy Federal Credit Union,

12  is this the only banking job that you have had?

13  A.  Yes.

14  Q.  Okay.  And how long have you worked at Navy Federal?

15  A.  Ten years.

16  Q.  Okay.  And in that time did those bands have any type of

17  marking to indicate that it's Navy Federal Credit Union?

18  A.  No, but that's the bands that we use.

19  Q.  Those appear to be the same bands that you use in that bank;

20  is that right?  They look like the bands you use, right?

21  A.  Yes.

22  Q.  Okay.  But my question was does it have anything on the

23  bands that say Navy Federal Credit Union?

24  A.  No.

25  Q.  And do you happen to know what money bands in other banks

A. Lopez - Cross                                                          71

1   look like?

2   A.  No.

3   Q.  Okay.  When you were talking about -- I think it was the

4   5 -- Exhibit 5-1A, the bank bags.

5        MS. VANLOWE:  Is that the exhibit?  What was the

6   number?

7   BY MS. VANLOWE:

8   Q.  1-9.  Could you look at 1-9A and 1-9C, please?

9        Now, you said that that is -- that looks like the bags that

10  you provided, right?

11  A.  Yes.

12  Q.  Do you know where these bags were found?  Do you happen to

13  know?

14  A.  No.

15  Q.  Okay.  Does -- what does the outside of -- well, I'll move

16  on to the next question.

17       These particular bags here, is it -- does the bag look like

18  it did when -- does this look like the bags that you have in

19  your bank?

20  A.  Yes.

21  Q.  Okay.  And is it intact?

22  A.  When I gave it to him, yes.

23  Q.  Okay.  But is this one in this picture intact?

24  A.  No.

25  Q.  Okay.  What's different about it?

A. Lopez - Cross                                                72

1    A.   It looks like they were slashed open.

2    Q.   Okay.  There's the top of it that's ripped off, right?

3    A.   Yes.

4    Q.   Okay.  Now, can you see the entire bag in that picture?

5    A.   Yeah.

6    Q.   Can you see the bottom of the bag?

7    A.   No.

8    Q.   Okay.  Can you see the sides of the bag entirely?

9    A.   Some of it.

10   Q.   Not the entire thing, right?

11   A.   No.

12   Q.   You can basically see the top of it, right?

13   A.   Yes.

14   Q.   And it has a 3 on it?

15   A.   Yes.

16   Q.   And that 3 is written in blue marker?

17   A.   No.  That's in black marker.

18   Q.   It's black.  Okay.  Is there anything on that bag that

19   identifies it as Navy Federal Credit Union?

20   A.   It doesn't say Navy Federal.

21   Q.   Okay.  And it doesn't -- this is a blue money bag, right?

22   A.   Yes.

23   Q.   Okay.  And so aside from the fact that you were told that

24   this is a Navy Federal Credit Union bag, you have no idea to

25   know whether that's the bag that you gave him or not, right?

A. Lopez - Cross                                                          73

1   A.  No, because I know that number 3, it's handwritten.

2   Q.  Right.  You know it's the number 3, correct?

3   A.  Well, I know who wrote that number 3 so I know that that's

4   our bag.

5   Q.  Okay.  Did you actually go to the place where this was

6   found?

7   A.  No.

8   Q.  And so when you -- when the bag left the bank, you saw the

9   condition that it was then, right?

10  A.  Yes.

11  Q.  Okay.  You have no idea what the bag looked like, except for

12  this picture that you saw, when it was -- where it was found or

13  what it looked like when it was found, right?

14  A.  After.

15  Q.  This is basically a picture that the government showed you

16  and told you that this is the bag?

17          MS. GILES:  Objection, Your Honor, to what the

18  government told Ms. Lopez.  I don't think there's been any

19  testimony at all about this, and I object to that

20  characterization.

21          THE COURT:  It's cross-examination.  Objection

22  overruled.

23  BY MS. VANLOWE:

24  Q.  So this is what the government -- this is a picture that the

25  government gave you and they told you this is a picture of the

1  bag, right, and you looked at it and you said that looks like my

2  bag?

3  A.  That is our bag.

4  Q.  Okay.  Again, you didn't see the bag that was picked up

5  here, right?

6  A.  Uh-uh.

7  Q.  This was a picture that was given to you by the government,

8  right?

9  A.  Shown, yes.

10  Q.  Okay.  Now, getting to that, you had a meeting with the

11  government -- attorneys for the government, right?

12  A.  Yes.

13  Q.  Okay.  When did that meeting take place?

14  A.  God, I don't know.  Two weeks ago, a week ago.

15  Q.  Okay.  And you identified in this list of exhibits a video.

16  When did you first see that video?

17  A.  After the robbery.

18  Q.  Okay.  How long after?

19  A.  Right after.

20  Q.  You watched the -- you watched the surveillance video right

21  after?

22  A.  I have -- I had to show it to the cops, yes.

23  Q.  Okay.  And so when did you -- did you give a statement to

24  the police?

25  A.  Yes.

1    Q.  And when did you give that statement to the police in

2    relation to when you watched the video?

3    A.  I gave the statement first and then I saw the video.

4    Q.  Okay.  And then did you come back after a period of time and

5    watch the video again?

6    A.  No.  That was the last time I saw it.  Well, when the cops

7    were there that day and then when I met up with the attorneys.

8    Q.  Okay.  And when you say that this incident in the bank

9    happened, you said that it was fast, right?

10   A.  Yes.

11   Q.  Okay.  About how long do you think that this person was in

12   the vault with you?

13   A.  Less than a minute.

14   Q.  Less than a minute.  Okay.  And in that less than a minute

15   time, you gave a statement, you're saying, that detailed

16   everything that you saw.  Is that what you're telling the Court?

17   A.  Yes.

18   Q.  Okay.  And then you're also telling the Court that then you

19   immediately watched a video, and you're saying that everything

20   was the same on that video as to what you experienced.  Is that

21   what your testimony is today?

22   A.  Yes.

23   Q.  So you were not surprised at anything that was going on that

24   showed in the vault.  There was no difference between what was

25   in that video and what your memory was?

1   A.   There was little discrepancies, yes, because I was under

2   pressure.

3   Q.   Right.   And you had also only been there for a minute,

4   right?

5   A.   Yes.

6   Q.   Okay.   And so the video helped kind of remind you of what

7   happened, right?

8   A.   Refreshed my memory, yeah.

9   Q.   Okay.   And except for the parts that you didn't remember.

10  It informed you about the parts that you didn't know, right?

11  A.   Yes.

12  Q.   Okay.   And then when -- you also got to watch the video two

13  weeks from today, from your coming in to testify, you got to

14  watch that video again, right?

15  A.   Yes.

16  Q.   And your memory got reminded yet again of what you

17  supposedly saw, right?

18  A.   Yes.

19        MS. VANLOWE:   Okay.   I don't have any further

20  questions.

21                    **CROSS-EXAMINATION**

22  BY MR. ROBERTSON:

23  Q.   Ms. Lopez, when you opened the door to the teller line, what

24  did the mask that the man was wearing -- what did the mask look

25  like?

A. Lopez - Cross                                                    77

1   A.  Black ski mask, looks like.

2   Q.  Did it have one hole?  Two holes?

3   A.  There was a hole for the eyes and a hole -- I believe it's

4   just the eyes.

5   Q.  Just two holes for the eyes?

6   A.  There was one hole.

7   Q.  One hole for the eyes?

8   A.  Yeah.

9   Q.  I'd like to refer you to Exhibit 19-C.  How do you know

10  that's your bag?

11  A.  It looks like the bag that we have at the bank.

12  Q.  How do you know it's your bag?

13  A.  Well, this is the bag that I gave them.

14  Q.  There's no number on it, is there?

15  A.  No, there's no number.

16  Q.  There's no markings on it that you can see from this

17  picture, right?

18  A.  Yeah.

19  Q.  So how do you know it's your bag?

20  A.  I know it from memory.  I see it all the time.

21  Q.  Bank bags like these are common in the industry, correct?

22  You've seen them before.

23  A.  I only work for Navy Federal.

24  Q.  You've never worked for any other -- you've never done any

25  other cash operations anywhere else?

A. Lopez - Cross                                                    78

```
 1   A.  No.
 2           MR. ROBERTSON:  No other questions, Your Honor.
 3                    CROSS-EXAMINATION
 4   BY MR. HUNTER:
 5   Q.  Very briefly.  I understand you've been here a long time.
 6       I'm going to call your attention to Exhibit 1-5 -- there's
 7   1-5A and 5B.  They're photographs.  And it's your testimony that
 8   you were in the vault room at the same time that that photograph
 9   was taken?
10   A.  Yes.
11   Q.  And can you describe the person that's in that photograph?
12   A.  Aside from myself or the robber?
13   Q.  Is that the robber that you saw?
14   A.  Yes.
15   Q.  What's he wearing?
16   A.  Yellow ski -- yellow jacket.
17   Q.  Anything else that you remember about what he was wearing?
18   A.  Pants, wearing a glove.  He was wearing a mask.
19   Q.  A mask and a yellow jacket?
20   A.  Yeah.
21   Q.  Did you ever identify -- were you ever shown any photographs
22   of individuals that might be suspects in this crime?
23   A.  No.
24   Q.  Ever see a lineup of individuals?
25   A.  No.
```

A. Lopez - Redirect                                          79

1   Q.  Never?

2   A.  No.

3   Q.  So the best description -- what's the best description you

4   could give of the people that you saw at the bank that day?

5   A.  Of the robber?

6   Q.  Yeah.

7   A.  Wearing -- tall guy wearing a yellow jacket and a mask.

8           MR. HUNTER:  Perfect.  Thank you, ma'am.

9           THE COURT:  Do you have anything else?

10          MS. GILES:  Briefly.

11                      **REDIRECT EXAMINATION**

12  BY MS. GILES:

13  Q.  How often do you work with those bank bags, Ms. Lopez?

14  A.  Every day.  Every time I work.

15  Q.  And were you told anything about the photographs that you

16  were shown?

17  A.  No.

18          MS. GILES:  Thank you.

19          THE COURT:  Thank you.  You may step down and may be

20  excused.

21          (Witness stands down.)

22          MS. BELLOWS:  The next witness is Erin Hablenko,

23  H-A-B-L-E-N-K-O.

24          THE COURT:  She's going to tell us something different

25  than these two?

E. Hablenko - Direct                                      80

1          MS. BELLOWS:  Yes, Your Honor, from a different vantage

2    point, and she's the person who authenticates the video.  That

3    will be --

4          THE COURT:  All right.  Well, just go to that.  The

5    video is in.  We can't have everybody testify about the --

6          MS. BELLOWS:  Well, Your Honor, she did -- she has a

7    different vantage, but I'll be very quick.

8          THE COURT:  That's why I've got the different videos.

9    It's a different vantage.

10                        **ERIN HABLENKO,**

11           after having been duly sworn or affirmed,

12           took the stand and testified as follows:

13                      **DIRECT EXAMINATION**

14   BY MS. BELLOWS:

15   Q.  Will you please state your name.

16   A.  Erin Hablenko.

17   Q.  What do you do for a living?

18   A.  I'm a supervisor at the Ballston branch of Navy Federal

19   Credit Union.

20   Q.  Were you present during the robbery that occurred on

21   December 22nd of 2012?

22   A.  I was.

23   Q.  And where were you immediately before the robbery?

24   A.  I was at a teller window.

25   Q.  Was anyone else at a teller window?

1  A.  Yes, there was one other gentleman at a window.

2  Q.  Will you tell the members of the jury what you saw and heard

3  during the robbery?

4  A.  I heard someone screaming first.  And when I looked up, I

5  saw two gentlemen coming in the door.  One of them ran over to

6  the window where I was and pointed a gun at me and then walked

7  to the window next to me.  After I saw the gun in my face, I

8  scooted back and put my hands in the air and didn't really look

9  at much else.

10      I know after that one of the men jumped over the counter.

11  And at that time I guess my assistant manager, who was in the

12  vault room immediately to my right, had heard some of the

13  yelling and she opened the door enough to poke her face out.  At

14  that point one of the gentlemen saw the door open and rushed

15  past me as the other one told me and the other teller to get

16  down on the floor facedown.

17      All I remember them saying other than that was not to touch

18  anything, and they asked where the money was.  I told them it

19  was in the top drawer, and I heard them open it.

20      That was really all I saw until I heard that they were gone,

21  at which point I did get up.

22  Q.  You said that a gun was pointed at you.  Do you remember

23  what it looked like?

24  A.  It looked like a Tommy gun, a smaller version of a Tommy gun

25  with a round clip underneath the barrel.

1  Q.  Could you tell the robbers' race?

2  A.  They appeared to be African-American.  They all had masks

3  and long sleeves on so all I could really see was the area just

4  right around their eyes.

5  Q.  With the assistance of the court security officer, I'd like

6  you to look at what's been marked as Government Exhibit 1-2.

7      Do you recognize that exhibit?

8  A.  Yes.  That is a video feed of what happened the day of the

9  robbery.

10 Q.  And have you viewed that video?

11 A.  I have, yes.

12 Q.  And how do you know that's the same video that you viewed?

13 A.  I initialed it after we watched the video.

14 Q.  Look at what's been marked as Government Exhibit 1-3.  Do

15 you recognize that video -- I mean, that exhibit?

16 A.  Yes.  That's another recording from a different vantage

17 point of what happened that day.

18 Q.  And did you initial it?

19 A.  I did.

20 Q.  Look at what's been marked as Government Exhibit 1-4.  What

21 is that?

22 A.  It's another video recording from a different vantage point.

23 Q.  Did you review that video?

24 A.  I did, yes.

25 Q.  And did you initial it after you reviewed it?

1    A.  Yes.

2    Q.  Please look at what's been marked as Government Exhibit 1-6.

3    Do you recognize that exhibit?

4    A.  Yes.  It is another video recording, and I did initial this

5    disk as well.

6    Q.  Did you view all these recordings before today?

7    A.  Yes.

8    Q.  And do they contain -- do each of those disks contain an

9    accurate recording of what transpired during the bank robbery?

10   A.  Yes.

11         MS. BELLOWS:  Your Honor, at this time I would move for

12   the admission of Government Exhibit 1-2, 1-3, 1-4, and 1-6.

13         MR. WOOD:  No objection, Your Honor.

14         THE COURT:  They're admitted.

15         MS. BELLOWS:  Your Honor, at this time I would request

16   permission to publish Government Exhibit 1-3 to the jury.

17         THE COURT:  Well, why do we want to do that?  They can

18   see them all at one -- when they want to see them.

19         MS. BELLOWS:  Excuse me, Your Honor?

20         THE COURT:  I said the jury can see them when they

21   retire to deliberate.  They can see these things, can't they?

22         MS. BELLOWS:  Yes, Your Honor, but I had requested last

23   week, and the Court had indicated that I would be permitted, to

24   just show one video for each robbery.

25         THE COURT:  I didn't know then we were going to have

1    five different -- four different witnesses for four different

2    videos and -- this is taking forever.

3            All right.  Go ahead and show it.  But somehow you've

4    got to figure out how to move this case along now.

5            MS. BELLOWS:  We can show it, Your Honor?

6            THE COURT:  Yes.

7            MS. BELLOWS:  Please play 1-3.

8        (Video played in open court.)

9            MS. BELLOWS:  Thank you.

10   BY MS. BELLOWS:

11   Q.  Ms. Hablenko, will you tell the members of the jury where

12   you were in relation -- on that video what part of the screen

13   you were on?

14   A.  The video feed was of the middle window.  I was at the

15   window directly to the right.  So when he comes up and you see

16   him go to the side and then come back to the window, I was over

17   on the side that he had gone to.

18   Q.  Please look at the binder in front of you and look at the

19   four exhibits marked 1-2A, 1-2B, 1-2C, and 1-2D.

20       Are those stills from the surveillance video --

21   A.  Yes.

22   Q.  -- you've reviewed?

23       And are they accurate depictions of the robbery?

24   A.  Yes.

25           MS. BELLOWS:  Your Honor, I'd move for the admission of

1    Government Exhibit 1-2A through 1-2D.

2             THE COURT:  They're admitted.

3             MR. WOOD:  No objection.

4             MR. ROBERTSON:  No objection.

5    BY MS. BELLOWS:

6    Q.  Who is the woman in the photograph marked as Government

7    Exhibit 1-2A?

8    A.  That is me.

9    Q.  Please look at what's been marked as Government Exhibit 1-3A

10   through 1-3D.  Do you recognize those exhibits?

11   A.  Yes.

12   Q.  What are they?

13   A.  They're stills from the video feed, I believe, that we just

14   watched.

15   Q.  And are they accurate depictions of what happened during the

16   robbery?

17   A.  Yes, ma'am.

18            MS. BELLOWS:  Your Honor, I'd move for the admission of

19   Government Exhibit 1-3A through 1D through -- through 1-3D, I

20   mean.

21            MR. WOOD:  No objection.

22            THE COURT:  They're admitted.

23            MS. BELLOWS:  And please look at what's been marked as

24   Government Exhibit 1-4A through 1-4E.

25            THE COURT:  Are they more pictures of this video we

A. Lopez - Cross                                          86

1   just saw?

2        MS. BELLOWS:  No, not this video, Your Honor.

3        THE COURT:  But another?

4        MS. BELLOWS:  Yes.

5        THE COURT:  Any objection to these pictures?

6        MR. WOOD:  No, Your Honor.

7        THE COURT:  All right.  They're admitted.

8        MS. BELLOWS:  And, Your Honor -- all right.  1-4A.

9        And then I'd also move for the admission of 1-6A

10  through 1-6C, which are stills from the video that's been

11  entered in evidence as Government Exhibit 1-6.

12       THE COURT:  Any objection?

13       MR. WOOD:  No.

14       THE COURT:  All right.  They're admitted.

15       MS. BELLOWS:  I have nothing further.

16       THE COURT:  Any questions of this witness?

17                    **CROSS-EXAMINATION**

18  BY MR. WOOD:

19  Q.  Ma'am, from your vantage point, you dealt with potentially

20  one robber, correct?

21  A.  Yes.

22  Q.  And then from your vantage point you stay behind that teller

23  window throughout the entire event, correct?

24  A.  Yes, sir.

25  Q.  And the last thing you saw was three people leave the bank,

A. Lopez - Cross                                                    87

1   right?

2   A.  Yes.

3         MR. WOOD:  I have no further questions.

4                         **CROSS-EXAMINATION**

5   BY MS. VANLOWE:

6   Q.  You were also not standing, correct?

7   A.  Correct.  When they came in at first I was seated, and then

8   at their instructions, I got down on the floor.

9   Q.  And that was then -- what you're looking at is basically the

10  teller window, the bottom of the teller --

11  A.  Yes.

12  Q.  -- is that right?

13  A.  Yes.

14  Q.  And so, as you said, you couldn't really see -- didn't see

15  much else except for this person standing there with the gun in

16  front of you, right?

17  A.  Correct.

18  Q.  So when you have testified here that this is -- these videos

19  are accurate depictions of what happened in the bank, you didn't

20  actually see what happened in the bank, right?  You saw what

21  happened in front of you?

22  A.  Correct.

23  Q.  Okay.  So you don't know whether -- you have no idea -- all

24  that stuff that you just saw in the video about where -- where

25  people were in front and they were over here and over there, you

A. Lopez - Cross                                                        88

1   have no idea what was going on to be able to say that other than

2   what you saw in the video, right?

3   A.  Once they had me get down on the ground, that is correct.

4   Q.  Okay.  And when you come in and look at the video to the --

5   did you come into the government's office?

6   A.  It was last week.

7   Q.  It was last week.  Okay.  And had you seen the video before

8   then?

9   A.  Immediately after the robbery there were police officers who

10  came in, and they needed me to show them how to pull the image

11  up on the screen.  And then after that, I was back and forth

12  from the vault room to other areas of the branch so I had seen

13  parts of it.

14  Q.  You had seen bits and pieces, but not the entire video?

15  A.  Yes, ma'am.

16  Q.  But you did see the video one week ago in preparation for

17  your testimony here?

18  A.  Yes, ma'am.

19  Q.  Now, the stills of these -- the still pictures, those were

20  also pictures that the government gave you, right?

21  A.  Yes.  They're still form -- or still films from our video

22  recorders.

23  Q.  And so you can basically say that you can look at those

24  pictures and you can look at the video and they match up, right?

25  A.  Yes, ma'am.

1    Q.   And you couldn't, however, from your own memory say, yes,

2    that picture is exactly what happened, right?

3    A.   Correct.

4    Q.   Because you didn't really see much, right?

5    A.   Correct.

6    Q.   Okay.  Did you see the person in front of you wearing a

7    mask?

8    A.   Yes.

9    Q.   Now, you said that they appeared to be African-American?

10   A.   Yes.

11   Q.   How do you know that from what you saw?

12   A.   From what I saw basically around their eyes, it was dark

13   skin, dark eyes.

14   Q.   Okay.  And how long have you lived in this area?

15   A.   About 21 years.

16   Q.   Would you say that this is an ethnically diverse area?

17   A.   Yes, ma'am.

18   Q.   Would you say that there are multiple people with that same

19   color brown shade that you know of that are not African-American

20   or black?

21   A.   Yes, ma'am.

22   Q.   Okay.  And so basically what you saw is somebody's

23   complexion, right?

24   A.   Correct.

25   Q.   But the complexion that you saw wasn't -- did not enable you

1  to be able to tell their race, right?

2  A.  Correct.

3  Q.  You saw a complexion?

4  A.  Correct.

5  Q.  You saw brown?

6  A.  Yes, ma'am.

7          MS. VANLOWE:  Okay.  I don't have any other questions.

8                      **CROSS-EXAMINATION**

9  BY MR. ROBERTSON:

10  Q.  I have a question about the hierarchy here.  Are you

11  Ms. Lopez' supervisor?

12  A.  No.  She is my supervisor.

13  Q.  She's your supervisor.  Okay.

14  A.  Yes.

15  Q.  And was Ms. Lopez' supervisor at the bank that day?

16  A.  He was not, no.

17  Q.  Okay.  Ms. Lopez was the supervisor for the bank that day?

18  A.  Correct.

19          MR. ROBERTSON:  All right.  That's all I have, Your

20  Honor.

21                      **CROSS-EXAMINATION**

22  BY MR. HUNTER:

23  Q.  Briefly, you testified that you saw how many robbers in the

24  bank?

25  A.  I only remember seeing two.

1    Q.   You only saw the two.  And could you describe the two that

2    you saw?

3    A.   I don't remember much detail other than, as I said, their

4    faces being covered.  I did remember seeing yellow.  I believe I

5    put that in my statement.  I couldn't identify whether it was a

6    top or a bottom, but I remembered seeing the color yellow.

7         And other than that, I really did not observe much detail.

8    Q.   You wouldn't be able to identify them further?

9    A.   No.

10   Q.   Okay.  The video that you authenticated, and the photos as

11   well, show these guys walking on top of the counter.  Is that

12   unusual?

13   A.   Yes.  Most of our members do not tend to do that on an

14   average day.

15   Q.   Have you ever seen that before?

16   A.   No.

17   Q.   Thank you.

18   A.   You're welcome.

19   Q.   Just briefly, do you remember speaking with the police right

20   after the robbery occurred?

21   A.   I remember that they came very shortly after.  I don't

22   recall exactly what I may have said.

23   Q.   You don't remember what you said.  Did you write a

24   statement?

25   A.   I did, yes.

A. Lopez - Cross                                                          92

1    Q.  Okay.  Do you recall telling the police, either speaking to

2    them or writing a statement, that you saw a yellow scarf?

3    A.  As I said, I remembered seeing something yellow.  I couldn't

4    recall the detail of what it was, but I remembered seeing

5    something that was yellow.

6    Q.  Okay.  So do you know if it was a scarf or a jacket?

7    A.  From having seen the video feed since, yes, it was -- it

8    turned out to be a yellow jacket.

9    Q.  But you know that from the video?

10   A.  Yes.

11            MR. HUNTER:  Thank you, ma'am.

12            THE WITNESS:  You're welcome.

13            MS. BELLOWS:  I have no redirect, Your Honor.

14            THE COURT:  All right.  Thank you.  You may step down

15   and may be excused.

16            (Witness stands down.)

17            THE COURT:  And we'll recess now for lunch until 2:15.

18       (Lunch recess taken at 1:01 p.m.; the jury enters at 2:19

19   p.m.)

20            MS. BELLOWS:  May I proceed, Your Honor?

21            THE COURT:  Yes.

22                         **CARL CHILDRESS, JR.,**

23             after having been duly sworn or affirmed,

24              took the stand and testified as follows:

25

1                        **DIRECT EXAMINATION**

2   BY MS. BELLOWS:

3   Q.  Good afternoon.

4   A.  Hi.

5   Q.  Would you please state your full name for the record.

6   A.  Carl Childress, Jr.

7   Q.  What was the last name?

8   A.  Jr. -- Childress.

9   Q.  How do you spell that?

10  A.  C-H-I-L-D-R-E-S-S.

11  Q.  How are you employed?

12  A.  I'm a police officer with the Arlington County, Virginia,

13  Police Department.

14  Q.  Are you a patrol officer?

15  A.  Yes.

16  Q.  Now, I'd like to direct your attention to December 22nd of

17  2012.  On that day did you recover any evidence in connection

18  with a robbery investigation?

19  A.  I did.

20  Q.  And where did you recover that evidence?

21  A.  It was on the eastbound lanes of Interstate 66 in Arlington

22  County.

23  Q.  And how did you come to know that there might be evidence on

24  I-66?

25  A.  There were citizens who had called alerting us that they had

1   seen --

2           MR. WOOD:  Objection, Your Honor.  Hearsay.

3           MS. BELLOWS:  Your Honor, it's not submitted for the

4   truth of the matter asserted, but why he took the action that he

5   did.

6           THE COURT:  Well, he took it based on what somebody --

7   some phone calls.  You go ahead.

8   BY MS. BELLOWS:

9   Q.   There were phone calls, and you reported -- or you responded

10  to that area?

11  A.   Correct.  I was dispatched to respond to that location.

12  Q.   Okay.  And what did you find at that location?

13  A.   In the left lane of eastbound 66 and also on the left

14  shoulder, there were, probably extending for 3- to 400 yards

15  eastbound towards D.C., there were several bags.  There was a

16  lot of loose change, quarters, half dollars, dimes, nickels.

17  There were plastic coin holders that would have -- that were

18  holding the coins.  I guess it extended about 4- to 500 yards

19  eastbound towards D.C.

20  Q.   And why did you believe that had any relation to the bank

21  robbery that had occurred that morning?

22  A.   Just because the bags that were on the scene contained --

23  well, they -- they were locked, and they appeared to be

24  bank-type bags that you would get at a bank.

25  Q.   And did you take any photographs at the scene of those bags?

1   A.  I did.

2   Q.  And what condition were those bags in?

3   A.  They had been -- they had been cut.  It appeared either a

4   knife or a pair of scissors -- something had cut open the bottom

5   or sides of each bag because they were all still in a locked

6   position.

7   Q.  How many bank bags did you recover?

8   A.  I recovered five.

9   Q.  I'd like to show you what's been marked as Government

10  Exhibit -- and I think it's in the binder there, with the

11  assistance of the court security officer -- Government

12  Exhibit 1-9A, 1-9B, and 1-9C.

13  A.  Okay.

14  Q.  Have you had a chance to look at all three pictures?

15  A.  Yes.

16  Q.  And what are those exhibits?

17  A.  These would be the bags that I observed and photographed on

18  Interstate 66.

19  Q.  And is that all the bags or just three of them?

20  A.  That would be just three of the bags.

21          MS. BELLOWS:  Your Honor, I'd move for the admission of

22  Government Exhibit 1-9A through 1-9C.

23          THE COURT:  Any objection?

24          MR. WOOD:  No objection, Your Honor.

25          THE COURT:  They're admitted.

1  BY MS. BELLOWS:

2  Q.  Are you familiar with the location of the Navy Federal

3  Credit Union that's on Randolph in Arlington, Virginia?

4  A.  Yes.

5  Q.  How far is the Navy Federal Credit Union at that location

6  from I-66?

7  A.  It's a -- limited access onto 66.  The nearest ramp would

8  have been Glebe Road.  That's approximately a mile from the

9  bank.

10 Q.  Is Arlington, Virginia, in the Eastern District of Virginia?

11 A.  Yes, it is.

12         MS. BELLOWS:  Nothing further, Your Honor.

13         MR. WOOD:  I have no questions, Your Honor.

14         MS. VANLOWE:  Just one or two questions, Your Honor.

15                     **CROSS-EXAMINATION**

16 BY MS. VANLOWE:

17 Q.  Good afternoon, Officer.  Have you ever worked a bank

18 robbery case before?

19 A.  Yes, ma'am.

20 Q.  Okay.  And the bags that -- you said that they looked like

21 bank-type bags; is that correct?

22 A.  Yes, ma'am.

23 Q.  And so you have seen bags that look like that in other

24 robberies that you've worked in other banks; is that right?

25 A.  Yes.

1   Q.  And this particular bag that you saw did not have any type

2   of marking on it for Navy Federal Credit Union, correct?

3   A.  Nothing for that particular bank, no, ma'am.

4   Q.  And the change that you saw, was it loose change or was it

5   wrapped?

6   A.  It was all loose change.

7   Q.  Okay.  Just loose change on the side of the road?

8   A.  Yes.

9   Q.  Was any of it wrapped?

10  A.  No, ma'am.  There was some still in the plastic containers,

11  but none of it was actually wrapped like in paper or plastic or

12  anything like that.

13  Q.  And the plastic trays that you described, did they have any

14  sort of markings that indicated they came from Navy Federal

15  Credit Union?

16  A.  Not that I recall, ma'am.

17          MS. VANLOWE:  Okay.  Thank you.

18          MR. ROBERTSON:  No questions, Your Honor.

19          MR. HUNTER:  I have no questions for this witness.

20          THE COURT:  Thank you.  You may step down and may be

21  excused.

22          (Witness stands down.)

23          MS. BELLOWS:  The government would call Mr. Greg Lynch,

24  Your Honor.

25

1                        **GREGORY LYNCH,**

2              after having been duly sworn or affirmed,

3              took the stand and testified as follows:

4                      **DIRECT EXAMINATION**

5    BY MS. BELLOWS:

6    Q.  Good afternoon.

7    A.  Good afternoon.

8    Q.  Would you please state your full name for the record.

9    A.  Gregory Harold Lynch.

10   Q.  And how are you employed?

11   A.  I work for 3SI in the position of account executive.

12   Q.  And what does 3SI Systems do?

13   A.  3SI Systems manufactures a GPS tracking device that is used

14   in financial institutions, put with bank robbery money for the

15   apprehension of bank robbers.

16   Q.  How long have you been with 3SI?

17   A.  Three years and seven months.

18   Q.  What do you do as an account executive?

19   A.  My responsibility is the sales capacity in four states, the

20   Virginias and the Carolinas.

21   Q.  Is the Navy Federal Credit Union one of your clients?

22   A.  Yes.  It is one of our large customers.

23   Q.  In your capacity as an account executive, do you have

24   firsthand knowledge and experience with the ESP tracking devices

25   and systems that are sold and supported specifically to the Navy

1  Federal Credit Union?

2  A.  Yes, it is.  It is to my advantage to be an expert on this

3  product as I sell it to customers.

4  Q.  Can you please describe to the members of the jury generally

5  what -- how the ESP system works?

6  A.  Sure.  The EPS [sic], electronic satellite protection

7  system, is a GPS cell product that is used to -- it's to -- used

8  to secure assets.  And in this case a bank or credit union will

9  put it with their money, and whenever there is a bank robbery,

10  they hand that out with the bank robbery money.  The device

11  comes on when it is handed out, and it will start to send a

12  signal back to our secure software server and tracks the

13  movement of that device.

14  Q.  And then what services does 3SI Systems provide either to

15  the customer or to law enforcement to assist in tracking the

16  device?

17  A.  The -- we provide the device, the product, to the banks and

18  the credit unions, the financial services industry.  The police

19  dispatch as well as our organization monitors the activity of

20  that device when it leaves in that type of robbery situation.

21       The police dispatch is able to see on their view, on a PC, a

22  map of exactly where the device is tracking.  And the police

23  dispatch will dispatch their law enforcement in a counteractive

24  measure based on what they're seeing with this tracking device.

25  Q.  Let me direct your attention to December 22nd of last year.

1    On that date did you learn of a robbery at the Navy Federal

2    Credit Union in Arlington, Virginia?

3    A.  Yes, I did.  I have set up for all of my customers in all

4    four states the ability to see -- anytime a device is activated,

5    I see that on my iPhone.  And I saw a notification on that date

6    that belonged to Navy Federal of a robbery in their location.

7    Q.  And in that notification, how many devices were activated?

8    A.  I saw that there were three devices.  They were each

9    numbered according to the teller stations that they were

10   assigned to.

11   Q.  With the assistance of the court security officer, I'd ask

12   that you look at what's been marked as Government Exhibit 8-2.

13   Please take it out of that bag.  Do you recognize that exhibit?

14   A.  I do.

15   Q.  What is it?

16   A.  That is the GPS tracking device that was sold and installed

17   at Navy Federal.

18         MS. BELLOWS:  Your Honor, I would move for the

19   admission of Government Exhibit 8-2.

20         MR. WOOD:  No objection.

21         THE COURT:  It's admitted.

22   BY MS. BELLOWS:

23   Q.  And how is it that you know that that device is the one that

24   Navy Federal Credit Union -- that belonged to Navy Federal

25   Credit Union?

1    A.  For purposes -- for this reason.  We assign -- every device

2    which has an individual serial number, we assign that to the

3    specific location that it was installed, and we keep up with

4    that in our system.

5    Q.  And you've compared the serial number of what you received

6    an activation on with the serial numbers that are on these --

7    A.  That's correct.

8    Q.  -- exhibits?

9    A.  They are the same ones that were installed at Navy Federal

10   Credit Union.

11           MS. BELLOWS:  Your Honor, with the assistance of the

12   court security officer, I'd ask that the witness look at what's

13   been marked as Government Exhibit 8-3 and 9-10A.

14   BY MS. BELLOWS:

15   Q.  What are Government Exhibit 8-3 and 9-10A?

16   A.  These are the devices that we sold to Navy Federal that were

17   installed in their branches for the purpose -- to use for

18   robbery situations.

19   Q.  Are the devices alone in those -- can you just pull one out

20   and quickly show the jury?

21   A.  Sure.  (Witness complies.)

22   Q.  Are the devices alone?  Are they just one device or is there

23   anything attached to the device?

24   A.  I'm not sure I'm understanding your question.

25   Q.  Is it just the ESP device that you have in your hand or is

1    there anything else attached to --

2    A.  Well, the device is also put inside real money.  The serial

3    numbers are taken out and the device is placed inside this pack.

4    So this is -- would appear to be real money.

5            MS. BELLOWS:  Your Honor, I'd move for the admission

6    of, if I didn't already, Government Exhibit 8-3 and 9-10A.

7            THE COURT:  All right.  They're admitted.

8    BY MS. BELLOWS:

9    Q.  Please take a look at a binder in front of you for an

10   exhibit -- or three exhibits marked 3-1B, 3-2B, and 3-3B.

11   A.  You may have to show me where you're --

12   Q.  It will be behind the tab that says 3 -- oh, you have the

13   wrong book.  So it's 3-1B, 3-2B, and 3-3B.

14   A.  Okay.

15   Q.  Do you recognize those exhibits?

16   A.  I do.

17   Q.  What are they?

18   A.  These are the reports that are generated by the tracking

19   activity of this device in action, and also the map that is

20   generated showing the trail and the activity of the device as

21   it's been moved.

22   Q.  And do you have maps there for all three devices?

23   A.  I do.

24   Q.  Do they illustrate the path that the device took on

25   December 22nd?

G. Lynch - Direct                                                  103

1    A.  Yes, they do.

2    Q.  Please turn to what's been marked as Government Exhibit 3-4.

3    A.  Okay.

4    Q.  Do you recognize that exhibit?

5    A.  Yes, I do.

6    Q.  What is that?

7    A.  This is track evidence of the devices that were taken from

8    Navy Federal as they moved through the various positions that

9    they were carried.

10   Q.  Is that at the very -- like during the last ten minutes of

11   the possession of the devices?

12   A.  This is the end of the track.  This is where the track would

13   have stopped and where apprehension most likely would have been

14   made.

15        MS. BELLOWS:  Your Honor, at this time I'd move for the

16   admission of Government Exhibit 1 -- 3-1B, 3-2B, 3-3B, and 3-4.

17        THE COURT:  They're admitted.

18        MR. ROBERTSON:  Without objection.

19        MS. BELLOWS:  I have nothing further.

20        THE COURT:  Cross-examine.

21        MR. WOOD:  I have no questions, Your Honor.

22        THE COURT:  Does anybody else have any questions?

23        MS. VANLOWE:  I just have one question.

24

25

1                          **CROSS-EXAMINATION**

2  BY MS. VANLOWE:

3  Q.  I just have one short question.  If you could please

4  clarify, you said that the serial numbers are taken out.  When

5  you were looking at the money and there was the device in there,

6  that you said that the serial numbers are taken out.  I wasn't

7  quite sure what you meant by that.

8  A.  No.  The serial numbers are the same numbers that we have

9  recorded in our system as the serial numbers that were installed

10 at that location.

11 Q.  And then they are then written on the -- they are written on

12 the device itself that's inside of the money.  Is that what

13 you're saying?

14 A.  That is correct.  The serial numbers are posted on that

15 device.

16         MS. VANLOWE:  I don't have any further questions.

17         MR. ROBERTSON:  No questions, Your Honor.

18         MR. HUNTER:  I have no questions for this witness.

19         THE COURT:  Thank you.  You may step down and may be

20 excused.

21         (Witness stands down.)

22         MS. GILES:  The government calls Eldorado Mills, Your

23 Honor.

24

25

1                          **ELDORADO MILLS,**

2              after having been duly sworn or affirmed,

3              took the stand and testified as follows:

4                     **DIRECT EXAMINATION**

5   BY MS. GILES:

6   Q.   Good afternoon, sir.

7   A.   Good afternoon.

8   Q.   Would you please state your name.

9   A.   Eldorado Mills.

10  Q.   What do you do for a living?

11  A.   I'm a police officer with the Metropolitan Police

12  Department.

13  Q.   Are you a patrol officer?

14  A.   Yes, ma'am.

15  Q.   And where are you assigned?

16  A.   To the sixth district.

17  Q.   What area does the sixth district cover?

18  A.   That covers the southeast part of Pennsylvania Avenue going

19  out towards Maryland, Alabama Avenue as well.

20  Q.   And were you patrolling on the morning of December 22nd of

21  2012?

22  A.   Yes, ma'am.

23  Q.   Were you in a cruiser?

24  A.   Yes, ma'am.

25  Q.   And while you were patrolling, did you receive any

1   information involving a robbery that occurred in Virginia?

2   A.  Yes, I did.

3   Q.  And how did you receive that information?

4   A.  Over the air somebody came across our radio and gave a

5   lookout for a robbery that happened at a bank in Virginia.

6   Q.  And the lookout was for what?

7   A.  The lookout for a small black SUV.

8   Q.  After hearing the lookout, what did you do?

9   A.  I canvassed the area for that vehicle and suspects.

10  Q.  Okay.  And you said you canvassed the area.  What area were

11  you focusing on?

12  A.  I was focusing on 38th Street, Pope Street, Nash, and

13  Carpenter.

14  Q.  And all those areas are located in Southeast, D.C.?

15  A.  Yes, ma'am.

16  Q.  And why were you focused on those particular areas, 38th

17  Street, Pope, Nash, Carpenter?

18  A.  We kept getting alarms from the -- we kept getting alarms,

19  kept telling us where bags of money may be at all over that

20  particular area.  Kept -- we kept getting alarms back to back.

21  Q.  Okay.  And explain what you mean by you kept getting alarms.

22  A.  Alarms is a sensor -- it's an alarm device that's connected

23  to the money.  Wherever the money is, the alarm will -- it will

24  give out an alarm.

25  Q.  And you said that you were focusing on Carpenter, 38th

1  Street, Nash, Pope.  What kind of area is that?

2  A.  It's a residential area.

3  Q.  And while you were patrolling, what, if anything, did you

4  see?

5  A.  Okay.  I observed four black males.

6  Q.  And can you describe the four black males that you saw?

7  A.  Yes.  One was dark-skinned, kind of husky, wearing a black

8  jacket.  The other two was light-skinned.  And there was another

9  dark-skinned black male with braids or plats in his hair.

10  Q.  And when you first saw these four males, what were they

11  doing?

12  A.  They were walking towards me.

13  Q.  Are where were they coming from?

14  A.  They was coming from the side of a house on Pope, the corner

15  of Pope Street and 38th.

16  Q.  And when you saw them, what were they doing?

17  A.  They was -- all four of them was walking directly towards

18  me.

19  Q.  And then did they do anything after they saw you?

20  A.  Yes, ma'am.

21  Q.  And what was that?

22  A.  One of them was carrying a blue bag.  He parted from the

23  other three, went across the street, and dropped the blue bag in

24  front of the house on the corner.  And then he joined the other

25  three males walking down Pope Street.

1    Q.   And do you recall which one of these males did that?

2    A.   Yes.  The one right here with the -- next to the gentleman

3    with the beard and the gentleman in the yellow shirt with the

4    tie.

5    Q.   Okay.  Do you see the four men that you saw walking on --

6    coming from the direction of 38th Street and Pope Street in the

7    courtroom today?

8    A.   Yes, I do, ma'am.

9    Q.   Can you please identify them?

10   A.   Okay.  The gentleman here with the tattoo under his left eye

11   with the braids, white shirt.  The gentleman here with the tie,

12   don't know -- like a fuchsia-colored shirt.  The gentleman here

13   with the white shirt with the tattoo on his left wrist.  And the

14   gentleman right here sitting between the gentlemen with the

15   beard and the yellow shirt.

16          MS. GILES:  May the record reflect, Your Honor, that

17   he's identified the defendants?

18          THE COURT:  He's identified them.

19   BY MS. GILES:

20   Q.   And at this point were you alone?

21   A.   Yes.  I was patrolling by myself at that point, but I did

22   meet up with another officer.

23   Q.   And which officer was that?

24   A.   Officer Johnson.

25   Q.   So what happened next?

1   A.   Okay.  I asked Officer -- me and Officer Johnson met, and

2   just as they passed Officer Johnson's car, I asked Officer

3   Johnson, do you recall the lookout for the suspects from the

4   bank robbery.

5      At that point Officer Johnson -- I can't recall what he said

6   at that time, but I checked -- I came over my radio and asked

7   the dispatcher what was the lookout for the suspects in the

8   robbery.

9   Q.   Then what happened?

10  A.   Okay.  Shortly after that, she took -- they're coming back

11  to me so I said, if I don't stop these guys, they're probably

12  going to try to get away from me.  So I finally ended up

13  stopping them on Nash Street, on the corner.

14  Q.   What happened then?  And were you alone?  What happened with

15  Officer Johnson?

16  A.   I told Officer Johnson to keep his eyes on the blue bag that

17  was dropped at the corner house.

18  Q.   And so you said you proceeded to stop these young men?

19  A.   Yes, ma'am, I did.

20  Q.   Okay.  And where did that occur?

21  A.   That happened on Nash Street.

22  Q.   And how far from where you first saw them?

23  A.   It's about maybe 2,000 feet, maybe, from where I first saw

24  them.

25  Q.   And so what happened then?

1    A.  Okay.  I asked -- I was still patrolling in my car.  I got

2    out of my vehicle.  I asked the four guys, I said, do you guys

3    live around here?  They said no.

4    Q.  Okay.  And then what happened?

5    A.  Then I asked them if had they ID, and everybody just stood

6    and looked at me, just stared.

7    Q.  Then what happened?

8    A.  Okay.  The dark-skinned one with the black jacket motioned,

9    he put his right hand up, and he gave me a smirk and he took off

10   running.

11   Q.  What do you mean he put his hand up?  How so?

12   A.  He -- he put it up like this towards me and gave me a smirk

13   on his face and did a motion like that towards me, like forget

14   me, forget the police, or something.

15   Q.  Okay.  And you said the person who did that was wearing

16   the --

17   A.  The black jacket.

18   Q.  And do you see that person in the courtroom?

19   A.  Yes, ma'am.

20   Q.  Okay.  And which one did that?

21   A.  That's the gentleman here with the tie, the fuchsia-colored

22   shirt, I believe, sitting between the gentleman with the red tie

23   and the lady over here with the black outfit on.

24        MS. GILES:  May the record reflect that he's identified

25   Defendant Reed.

1        THE COURT:  He's identified him.

2   BY MS. GILES:

3   Q.  And then what happened after you said -- after you got this

4   "forget you" motion?

5   A.  They immediately took off running.  I told them to stop.

6   They wouldn't stop.  I -- at the same time, I had my radio in my

7   hand and I requested backup.

8   Q.  Okay.  And you said they started running.  Where did they

9   run toward?

10  A.  They ran towards Fort Davis Drive.  They crossed Fort Davis

11  Drive into the wooded area.

12  Q.  Okay.  And it's a wooded -- describe this wooded area.

13  A.  It's a lot of trees, grass, and sharp vines.

14  Q.  How big is it?

15  A.  It's very big.  It's a very big park area.

16  Q.  And is it flat or a hill?

17  A.  It's a hill.

18  Q.  And what's at the bottom of the hill?

19  A.  The bottom of the hill is grass and vines.

20  Q.  Is it bordered by anything?

21  A.  Yes.  It's bordered by the streets Fort Davis Drive and

22  Massachusetts Avenue.

23  Q.  Okay.  And what is at the top of the wooded area?

24  A.  It's a church.

25  Q.  Okay.  And you said they ran towards that wooded area.

1   Could you see them?

2   A.  Yes.

3   Q.  What about once they entered the wooded area, could you

4   still see them?

5   A.  Once they entered the wooded area, I lost sight of them

6   momentarily.

7   Q.  Did you pursue them into that wooded area?

8   A.  Yes, ma'am, I did.

9   Q.  And could you hear anything?

10  A.  Yes.  I heard a lot of movement, a lot of movement in the

11  bushes and trees.

12  Q.  And were you still alone?

13  A.  Yes.

14  Q.  And what were you doing?

15  A.  I was coordinating the other units to come help secure the

16  area.

17  Q.  Now, while you were in this wooded area and you could hear

18  them in the bushes, were you saying anything?

19  A.  Yes.  I told them to stop, come out with your hands -- put

20  your hands up.

21  Q.  Did anyone come out?

22  A.  No, ma'am.

23  Q.  And then what happened?

24  A.  Okay.  Shortly after that, other officers came to back me

25  up.  They cordoned off the area.  There was money laying on the

E. Mills - Direct                                                  113

1  trail of where they was running.  Other officers came.  I told

2  officers to go around to my right so you can stop them in case

3  they come back onto Fort Davis Drive, and the other officer

4  stopped at Massachusetts Avenue and the church on top of the

5  hill to block them off.

6  Q.  And how many officers are out there involved in this?

7  A.  There were several officers out.

8  Q.  Over ten?

9  A.  I'm not sure of the exact number, but it was enough.

10 Q.  And so what happened?

11 A.  Okay.  Shortly after that, to the right of me my colleagues

12 was capturing -- they captured one.  About a minute later they

13 captured another one, and about another minute later or two

14 minutes later they caught the second one.

15     And I did get stuck in the vines for a brief amount of time.

16 When I was able to get on top of the hill, that's when the last

17 suspect was caught.

18 Q.  A few minutes -- a few seconds ago you said they caught the

19 second one.  What do you mean by that?

20 A.  They came over the radio and said we got him in custody.

21 Q.  Okay.  Because you were counting?

22 A.  Yeah, because it was four of them.

23 Q.  And when you -- eventually, did you move up further into the

24 woods?

25 A.  Yes, ma'am.

1  Q.  And when you did, did you see anything?

2  A.  Yes.

3  Q.  What?

4  A.  I saw this gentleman right here with the black jacket, and

5  he put his hands up.

6  Q.  Okay.  And what about -- was there anything on the ground?

7  A.  There was money on the ground.

8  Q.  And how much money?

9  A.  I don't know exactly.  I saw a lot of 1s out there.

10  Q.  Was it in piles or scattered?

11  A.  Scattered.

12  Q.  I'd like you to take a look at what's marked as 4-1.  Do you

13  have that, sir?

14  A.  Yes, ma'am.

15  Q.  Do you recognize it?

16  A.  Yes, ma'am.

17  Q.  What is it?

18  A.  This is an aerial -- aerial view of the area where I gave

19  chase and the suspects was first spotted to where they ended in

20  the park area.

21  Q.  And is the park area that area that is at that far corner to

22  the right?

23  A.  Yes.  Yes, ma'am.

24          MS. GILES:  Your Honor, at this time we'd move in

25  Government Exhibit 4-1.

1            MR. WOOD:  No objection.

2            THE COURT:  Admitted.

3    BY MS. GILES:

4    Q.  If you'd take a look at what's marked in the book as

5    Government's 1-10.

6        1-10.  It's not a photograph.

7    A.  Okay.  Got 1 -- okay.  Uh-huh.

8    Q.  Do you recognize that?

9    A.  Yes, ma'am.

10   Q.  And how do you recognize it?

11   A.  This is the audio recording that was recorded on the day of

12   the event through my dispatchers, through the police department.

13   Q.  And did you make this transmission to dispatch?

14   A.  Yes, ma'am.

15   Q.  And so the voice on there is yours?

16   A.  Yes, ma'am.

17   Q.  And does it describe the events as they happened when they

18   happened?

19   A.  Yes, it does.

20           MS. GILES:  Your Honor, at this time we'd move in

21   Government Exhibit 1-10.

22           MR. WOOD:  No objection.

23           THE COURT:  It's admitted.

24   BY MS. GILES:

25   Q.  Does that radio transmission capture everything that

1   happened when you were out there in the woods with these four

2   defendants?

3   A.  No, ma'am.

4   Q.  And what is not on the transmission?

5   A.  The part when I was outside of my vehicle and I asked them

6   face to face if they had ID and if they lived in the area.

7   Q.  And why isn't that on the transmission?

8   A.  Because I wasn't transmitting it over the radio.  It was a

9   person-to-person communication.

10  Q.  And do the transmissions only capture your communications to

11  dispatch?

12  A.  Yes, ma'am.

13          MS. GILES:  Your Honor, those are all the questions we

14  have for this witness.

15          THE COURT:  Cross-examine.

16                     **CROSS-EXAMINATION**

17  BY MR. WOOD:

18  Q.  Officer, you indicated you had a lookout for some sort of

19  robbery?

20  A.  Yes, sir.

21  Q.  Okay.  And the lookout was for a black-colored vehicle?

22  A.  Yes, sir.

23  Q.  Okay.  And the lookout did not include a number of people,

24  correct?

25  A.  I don't recall.

1   Q.  Well, you do recall the lookout was for a black vehicle, but

2   you don't recall how many -- if the lookout mentioned the number

3   of people you should be looking out for, correct?

4   A.  There were several lookouts being given out.  One may have

5   been four males in a vehicle.

6   Q.  Well, I thought you said -- I thought you said you couldn't

7   remember.

8   A.  I'm sorry?

9   Q.  I just asked you about a lookout and you said you got a

10  lookout for a black-colored car, correct?

11  A.  Yes, sir.

12  Q.  And then I just asked you if there was a lookout regarding

13  the number of people and you said you couldn't recall; isn't

14  that right?

15  A.  There was -- there was several lookouts being given.  We was

16  all over the place in the general area.

17  Q.  Okay.  So you're not sure if the lookout included a number

18  of people; isn't that correct?

19  A.  I -- I recall at this point that it was four to six males in

20  a vehicle.

21  Q.  Okay.  So the lookout was for four to six people inside of a

22  vehicle, correct?

23  A.  That was one of the lookouts, yes.

24  Q.  One of the lookouts was four to six people, right?

25  A.  Yes.

E. Mills - Cross                                                    118

1    Q.   Okay.  So you see four individuals walking in the area and

2    you figured you would ask them some questions, correct?

3    A.   Well, there was -- that was the lookout for where the alarms

4    was alarming where the -- for the money locations at the time.

5    Q.   Okay.  But the lookout for the four to six people did not

6    include any type of clothing description; isn't that correct?

7    A.   That part I do not recall.

8    Q.   Okay.  So the four people you saw, you can't say they

9    matched any type of physical description that you may or may not

10   have received on a radio dispatch; isn't that right?

11   A.   To the best of my recollection, no.

12   Q.   Okay.  You just saw four guys walking down and you figured

13   you might just, you know, do a little investigation?

14   A.   They looked pretty suspicious, yes.

15   Q.   They looked suspicious because they were four guys?

16   A.   No, sir.

17   Q.   Well, you identified Mr. Reed here, the guy in the

18   fuchsia-colored jacket or shirt?

19   A.   Yes.

20   Q.   Okay.  What was he doing when you first saw him that was

21   suspicious?

22   A.   It was all four of them.  Their whole movements was --

23   Q.   I'm just asking about the person you've identified as

24   Mr. Reed.  What was he doing that was suspicious?

25   A.   He was just walking normal.

1    Q.  So that wasn't suspicious?

2    A.  No, sir.

3    Q.  Okay.  Then you saw him walk towards you, correct?

4    A.  Yes.

5    Q.  That wasn't suspicious, right?

6    A.  No.

7    Q.  Okay.  And then were you walking towards these four

8    individuals as well, kind of walking towards each other?

9    A.  I was driving towards them.  Then when -- he looked

10   suspicious when they all turned, and one of them detoured from

11   the group to drop a blue bag off.

12   Q.  Okay.  Someone in the group took a detour, but not Mr. Reed,

13   right?

14   A.  Which one is Mr. Reed?

15   Q.  Well, the one you identified, the fellow right here.  The

16   one in the tie and the fuchsia-colored shirt.  The one you

17   identified.

18   A.  Right.  He didn't look suspicious.

19   Q.  Okay.  He didn't look suspicious.

20   A.  But his -- the guy that was with them made them all look

21   suspicious at that point.

22   Q.  So the actions of one person made the other three look

23   suspicious?

24   A.  Yes.

25   Q.  Or is it just that the action of the one person was

1   suspicious and that made that guy look suspicious?

2   A.  It made everybody suspicious at that point.

3   Q.  Okay.  And in response to this one guy walking off, Mr. Reed

4   stood there, right?

5   A.  Repeat that, please.

6   Q.  Sure.  One guy walks off.  Mr. Reed, the person you've

7   identified in court, he stood there, right?

8   A.  He kept walking.

9   Q.  Oh, kept walking.  And that wasn't suspicious, right?

10  A.  No.

11  Q.  And he kept walking towards you, right?

12  A.  When they was walking towards me, that was all normal.

13  Q.  That was all normal?

14  A.  Normal, yes.

15  Q.  Okay.  And as he got closer to you, they all stopped, right?

16  A.  No.

17  Q.  Did there come a period of time when you said -- you asked

18  for their identifications?

19  A.  They made a left turn before -- before they made it to the

20  corner, they all made -- three of them made a left turn.  The

21  one that walked away went back to join with them and they

22  continued down -- walking down Pope Street.

23  Q.  Okay.  So when they're walking on -- Polk Street, P-O-L-K?

24  A.  Pope, P-O-P-E.

25  Q.  P-O-P-E.  And when they made that left turn on Pope Street,

1  they did not run; isn't that correct?

2  A.  No, sir.

3  Q.  Okay.

4  A.  At that point.

5  Q.  Okay.  And you followed them onto Pope Street, right?

6  A.  Yes.

7  Q.  And then you pulled your police cruiser up to the four

8  individuals, right?

9  A.  Yes.

10  Q.  Okay.  And did you tell Mr. Reed why you wanted to look at

11  his ID?

12  A.  I asked them all if they all had ID.

13  Q.  No.  Did you ask Mr. Reed, the person you've identified in

14  court -- you see Mr. -- directing your attention to him, did you

15  say, I'd like to see your ID because...?

16  A.  I asked them all for ID because --

17  Q.  No, but you --

18  A.  -- they didn't live in the area.

19  Q.  I take it you did not explain why you wanted to look at IDs.

20  A.  No.

21  Q.  Okay.  And you said that Mr. Reed put up his hand?

22  A.  Yes.

23  Q.  Okay.  That doesn't appear in any police reports; isn't that

24  right?

25  A.  Any police reports?

E. Mills - Cross                                        122

1    Q.  That you filled out.

2    A.  I don't recall filling out -- I didn't fill out any police

3    reports.

4    Q.  Okay.  So you never memorialized the fact that the person

5    you've identified as Mr. Reed put up his hand when you asked him

6    a question; isn't that right?

7    A.  Repeat the question, sir.

8    Q.  Sure.  You never filled out a police report which explains

9    that at the time, back on December 22nd, that the fellow you've

10   identified as Mr. Reed put up his hand and made some motion

11   towards you as you were talking to him; isn't that right?

12   A.  At the time I could not fill out any police report, sir.

13   Q.  How about the next day?

14   A.  I could not fill out any police reports.

15   Q.  You could not fill out a police report?

16   A.  No, sir.

17   Q.  Why can't you fill out a police report?

18   A.  Right after the last person, Mr. Reed, was caught in the

19   woods, while responding back to my cruiser, I had a heart

20   attack.

21   Q.  Okay.  So did you ever return to work?

22   A.  I went back to limited duty maybe in February.

23   Q.  So when you went back to limited duty, did you ever record

24   or memorialize what had occurred on that particular day?

25   A.  Yes.

1    Q.  But that report that did you fill out did not include anyone

2    saying -- that one of the persons lifted up their hand; isn't

3    that correct?

4    A.  I wrote a 119 statement.  My sergeant helped me with the

5    statement, and I wrote out notes.

6    Q.  Okay.  Now, did you follow any individuals -- when you saw

7    Mr. Reed, the person you've identified as Mr. Reed, you didn't

8    see anything in his hands; isn't that correct?

9    A.  I never said that.  He did have a cell phone in his hands.

10   Q.  Oh, you saw something in his hands?

11   A.  When he was caught in the woods?

12   Q.  No, no, no.  When you first saw him, when you first saw him

13   and you stopped him on Pope Street, you didn't see anything in

14   his hands; isn't that right?

15   A.  I didn't see anything in his hands, no.

16   Q.  So you were not the person who actually stopped Mr. Reed in

17   the woods?

18   A.  He was stopped in the woods.

19   Q.  No, no.  But not by you.

20   A.  He was stopped by my colleagues.

21   Q.  Right.

22   A.  And right after he was -- he put his hands up, I was right

23   there.

24   Q.  Okay.  And all you saw in his hands was a cell phone,

25   correct?

1    A.   Yeah.

2    Q.   Okay.  You didn't see anything else in his hands, correct?

3    A.   I didn't see anything else in his hands.

4    Q.   You didn't see any money, correct?

5    A.   I didn't see any money in his hands.

6    Q.   You didn't see any type of weapons on him; isn't that right?

7    A.   No.

8    Q.   Okay.  What you saw him was -- he was surrendering to your

9    colleague; isn't that right?

10    A.   Yes.

11           MR. WOOD:  Thank you.  I have no further questions.

12                         **CROSS-EXAMINATION**

13   BY MS. VANLOWE:

14    Q.   Good afternoon.

15    A.   Good afternoon.

16    Q.   You said that there were several lookouts.  In fact, the

17   number of people in the lookouts changed over the course of your

18   reviewing the audio coming in from your radio; isn't that right?

19    A.   As information was being dispersed to the police department,

20   the lookouts just kept coming in.

21    Q.   And the lookouts that described the number of people that

22   you were to be looking out for, that number changed periodically

23   during the -- as the day progressed, that number changed.

24    A.   Four to six people.  That's what I recall.

25    Q.   Okay.  And so you're saying that they consistently talked

1   about four to six people?

2   A.  I recall one lookout, and that was for four to six people.

3   Q.  Now, you said that you were sitting in your police cruiser

4   and four -- you saw these four gentlemen walking down the

5   street.  That's correct?

6   A.  I was driving my police vehicle and I saw the four, yes.

7   Q.  And they were on the sidewalk?  They were in the street?

8   Where exactly were they?

9   A.  They were walking from the side of a house on the corner on

10  the grass tree lawn towards Pope Street.

11  Q.  Okay.  And then they were walking towards Pope Street?

12  A.  Yes.

13  Q.  Okay.  And then when they got to Pope Street, they turned

14  onto Pope Street; isn't that right?

15  A.  Yes.

16  Q.  Okay.  And you -- and so three of them turned onto Pope

17  Street and the other one put something in the trash?

18  A.  Yes.

19  Q.  And then he joined the rest of the three guys that were

20  walking down Pope Street, right?

21  A.  Yes.

22  Q.  And when you saw them walking, you said that the one guy saw

23  you.  Is there some reason that you think that he saw you?

24  A.  Can you rephrase that question, please?

25  Q.  Sure.  You were in your police cruiser, correct?

1    A.  Yes.

2    Q.  And you said that one of the individuals saw you and turned,

3    right?  That was your testimony.

4    A.  I believe my testimony was one of them with the blue bag

5    split up from the other three, dropped the blue bag down in

6    front of the house across the street away from the house that

7    they came away from.

8    Q.  Do you remember on direct examination when you said when one

9    of the guys saw me, they turned, and you thought that that was

10   suspicious?  No?

11   A.  No, ma'am.

12   Q.  Okay.  So you then pull up on side -- alongside them as

13   they're walking down Pope Street, right?  You pull your cruiser

14   up next to them?

15   A.  Yes.  I was behind them.  And then when they first stopped

16   on Nash Street, that's when I got out of my cruiser.

17   Q.  How far were you behind them?

18   A.  I was like 20 feet away from them when they stopped.

19   Q.  Okay.  And in the time that you're driving behind them and

20   that they're walking, did their pace increase or did they start

21   running at that point?

22   A.  No, ma'am.

23   Q.  Okay.  And you eventually said that you stopped, you got out

24   of your cruiser, and you asked them for identification, right?

25   A.  Yes.

E. Mills - Cross                                        127

1  Q.  And one of them actually gave you identification, correct?

2  A.  No, ma'am.  I didn't see that.

3  Q.  So you're saying that none of them gave you identification

4  at that time?

5  A.  Nobody gave me any type of identification, no.

6  Q.  You're saying that the minute that you got them, you talked

7  to them.  You were asking what -- for identification.  One of

8  them raised his hand and said, as you were saying, let's go, and

9  at that point they started running.  Is that right?

10  A.  That's correct.

11  Q.  And all of them started running at the same time or one of

12  them started and then the others came after at different times?

13  A.  The gentleman here, Mr. Reed, ran first.  All -- the other

14  three followed.

15  Q.  Okay.  And you said that you lost track of them when you got

16  into the woods, correct?

17  A.  I could hear them in the woods.  I was caught in the vines

18  at the bottom of the wooded area.

19  Q.  Could you physically -- could you see anyone at that point?

20  A.  No.

21  Q.  When you said that you heard them in the woods, were they

22  talking?

23  A.  They was moving around.

24  Q.  So you heard movement in the woods?

25  A.  A lot of movement, ma'am.

E. Mills - Cross                                          128

1    Q.  A lot of movement?

2    A.  Yes.

3    Q.  But you didn't hear any voices; is that right?

4    A.  No, ma'am.

5    Q.  And you also didn't actually see them at that point?

6    A.  No, ma'am.

7    Q.  Now, to your knowledge had any police officers come and

8    entered those woods before you arrived there?

9    A.  No, ma'am.

10   Q.  Okay.  And had anybody looked at that ground before --

11   before anybody entered the woods?  Did anybody get there before

12   you on the other side of the woods and physically come into the

13   woods to inspect the area?

14   A.  No, ma'am.

15             MS. VANLOWE:  I don't have any further questions.

16                       **CROSS-EXAMINATION**

17   BY MR. ROBERTSON:

18   Q.  Officer, are you regularly assigned to this area?

19   A.  Yes.

20   Q.  This is your regular patrol area?

21   A.  Yes.

22   Q.  Do you work only day shifts or do you work night shifts and

23   evening shifts?

24   A.  All days.

25   Q.  All days?  Only days?

1   A.  Yes.

2   Q.  You've only worked that area during the day shift.  You've

3   never worked that area during a night shift?

4   A.  That particular area, I have not worked that area in the

5   evening or nights.

6   Q.  Is the area of the park known for harboring criminals, for

7   lack of a better term?

8   A.  We've chased quite a bit of criminal suspects to that same

9   wooded area.

10  Q.  Chased them through that area before?

11  A.  Yes.

12  Q.  Both on the day shifts and on other shifts?

13  A.  All -- 24/7.  That's -- in the sixth district we get a lot

14  of chases through there sometimes.

15  Q.  Do you know if there were any other chases in the prior

16  shift, before your shift, any other chases that went through

17  that area?

18  A.  To the -- no.  Nope.

19  Q.  Would you know if there were any other prior chases in that

20  area?

21  A.  Yes.

22  Q.  When you first saw the -- when you first saw these four men,

23  you said they were walking along Nash Street or was it Pope

24  Street?

25  A.  They were coming out -- was 38th Street I was coming down.

E. Mills - Cross                                                    130

1   They was walking towards Pope.

2   Q.  On 38th Street?

3   A.  Yeah.  They came out the side of a house -- they came from

4   the side when I first laid eyes on them.

5   Q.  They were coming from a house and walking down the sidewalk?

6   A.  They were coming from a grassy area beside the house towards

7   Pope Street.

8   Q.  All right.  And the fellow -- the first fellow didn't cross

9   the street until he was on Pope Street, right?

10  A.  Once he got to the sidewalk, he crossed the street to the

11  corner house with the blue bag.

12  Q.  So he went from where he was coming from and just kept on

13  walking across and put the bag down and then joined his friends

14  while you were watching them.  You hadn't approached them at

15  that point, had you?

16  A.  No, I had not approached them.

17  Q.  And your testimony was is that they saw you before he walked

18  across the street?

19  A.  It's possible they could have saw me.

20  Q.  But you're not certain if they saw you before that one

21  individual walked across the street?

22  A.  I can't say for a fact they did see me, but you cannot miss

23  a police car with lights on going in the same direction as you.

24  Q.  Your overhead lights were there?

25  A.  My overhead lights stay on.  That's one of our guidelines on

1   the police department.  Our blue lights stay on as we patrol.

2   Q.  So police cars are always running around there with lights

3   on, right?

4   A.  That's correct.

5   Q.  24/7 they're running around with lights on?

6   A.  Yeah.  We are supposed to have our cars in the first

7   position, with lights on.

8   Q.  Now, that's just the blue lights just kind of flashing,

9   right?

10  A.  Not flashing.  Just -- some vehicles, they flash.  Some

11  vehicles, they don't flash.

12  Q.  And that is so people notice the police car.

13  A.  Of course, yes.

14  Q.  But how long has that been the policy?  Since you've been on

15  the force, if you know, how long has that been the policy to

16  keep these lights on?

17  A.  I'm not sure.  It's been there for quite a few years.

18           MR. ROBERTSON:  Thank you.  I have no other questions,

19  Your Honor.  Thank you.

20                    **CROSS-EXAMINATION**

21  BY MR. HUNTER:

22  Q.  Good afternoon, Officer.

23  A.  Hello.

24  Q.  Briefly, you were patrolling the neighborhood that day.  Did

25  you see other people or was it just these four people?

1   A.  Just these four.

2   Q.  There weren't any other people in the neighborhood?

3   A.  I didn't see nobody else out.

4   Q.  Okay.  Is it possible -- do other people live in this

5   neighborhood?

6   A.  Yes.

7   Q.  You just didn't see anybody else?

8   A.  I looked very well.  I did not see nobody else.

9   Q.  Can you describe the clothing that these four gentlemen were

10  wearing when you saw them?

11  A.  I can describe the clothing that Mr. Reed had on.  He had on

12  a black jacket.

13  Q.  Did anyone have on a yellow jacket?

14  A.  I can't answer that.  I don't know.

15  Q.  You don't know?  You don't remember?

16  A.  I don't recall the clothing for all the...

17  Q.  Okay.  You were -- you've testified that you were the only

18  officer chasing these four individuals into the park at first,

19  correct?

20  A.  At first it was my chase, it was my foot chase.  I initiated

21  it.

22  Q.  And then other officers joined in at some point later?

23  A.  Yes.

24  Q.  Okay.  And that you got trapped in the vines; is that

25  correct?

E. Mills - Cross                                                      133

1    A.  Yes.  It was sharp sticker vines.

2    Q.  So at some point you had to stop and you could only hear

3    what was going on?

4    A.  Yes.

5    Q.  Did you -- so you didn't see anybody throw any money?

6    A.  No, sir.

7    Q.  Did you see anybody throw away any GPS trackers?

8    A.  No, sir.

9    Q.  Did you see anybody throw away any masks?

10   A.  No, sir.

11   Q.  Did you see anything else?

12   A.  Just my colleagues surrounding the area.

13   Q.  Okay.  Thank you, Officer.

14       Oh, briefly, one other question.  You've identified all four

15   of these defendants as having been present.  Can you tell me

16   their names?

17   A.  Their names?

18   Q.  Yeah.

19   A.  I don't know all their names.

20   Q.  Okay.  Thank you, Officer.

21   A.  Okay.

22           THE COURT:  All right.  Thank you.  You may step down

23   and may be excused.

24           (Witness stands down.)

25           MS. BELLOWS:  Your Honor, our next witness is Eric

1   Johnson.

2                           **ERIC JOHNSON,**

3              after having been duly sworn or affirmed,

4              took the stand and testified as follows:

5                      **DIRECT EXAMINATION**

6   BY MS. BELLOWS:

7   Q.  Good afternoon.  Will you please state your full name for

8   the record.

9   A.  Yes.  Officer Eric Johnson.

10  Q.  And how long -- you're an officer with which department?

11  A.  Metropolitan Police Department, assigned to the sixth

12  district.

13  Q.  How long have you been in that district as a police officer?

14  A.  Approximately nine-and-a-half years.

15  Q.  And were you on duty on the morning of December 22, 2012?

16  A.  Yes, ma'am.

17  Q.  And on that morning did you learn of a robbery that had

18  taken place at the Navy Federal Credit Union in Arlington?

19  A.  Yes.

20  Q.  And how did you learn of the robbery?

21  A.  Our dispatcher advised units that there was a robbery that

22  took place in Virginia at the Navy Federal Credit Union.

23  Q.  And do you know why your dispatcher was giving information

24  to the Metropolitan Police Department?

25  A.  Yes, ma'am.

1   Q.  And why is that?

2   A.  She gave the information based upon GPS transmitters that

3   were pinging in the sixth district, setting off signals in our

4   district.

5   Q.  And what action, if any, did you take as a result of

6   receiving that information from the dispatcher?

7   A.  We were given various locations and we were canvassing the

8   close -- the local vicinity in which we were given the various

9   locations that the GPS devices were pinging.

10  Q.  And what areas or specific area were you canvassing?

11  A.  I was canvassing the Fort Davis area, the Hillcrest/Fort

12  Davis area of the sixth district.

13  Q.  Is Pope Street and Nash Street part of that area?

14  A.  Yes, ma'am.

15  Q.  And around what time was this?

16  A.  It was around 10:30, 11 o'clock in the morning.  It was

17  during the morning hours.

18  Q.  Did you see anything while you were canvassing that area?

19  A.  Yes.

20  Q.  What did you see?

21  A.  While driving in the 3800 block of Nash Street, S.E., I was

22  canvassing and I observed four black males walking in the 3800

23  block of Pope Street, S.E.  I turned my vehicle around and

24  turned into the 3800 block of Pope Street.

25      I observed four black males walking -- walking towards my

1    vehicle down the center of the street in the 3800 block of Pope

2    Street, S.E.

3    Q.   Is this the same location where you had received information

4    that GPS sites were pinging --

5    A.   Yes, ma'am.

6    Q.   -- GPS devices were pinging?

7         Okay.  And did you see anyone other than four -- these four

8    black men?

9    A.   Yes, ma'am.  As I was proceeding in the 3800 block of Pope

10   Street, S.E., towards the individuals, I observed another sixth

11   district officer, Officer Mills, proceeding in my direction.

12   Q.   And then what did you do?

13   A.   We -- I drove past the individuals.  I made eye contact with

14   the individuals.  They made eye contact with me.  And Officer

15   Mills, our cars passed each other simultaneously, and he

16   motioned to me that the -- and also stated that the individuals

17   dropped a bag at a house within the block -- dropped a bag in a

18   trash can within that block.

19   Q.   And did he provide this information while you were both in

20   your vehicles?

21   A.   Yes.

22   Q.   Okay.  And you have your windows down and are communicating?

23   A.   Yes, ma'am.  Both of our drivers' windows were down, and he

24   communicated while he was still in his vehicle and I was in my

25   vehicle.

E. Johnson - Direct                                      137

1   Q.   Then what did you do?

2   A.   At that time he -- I started proceeding past his vehicle and

3   he was proceeding behind the individuals, and he called out the

4   priority -- within, I guess, 30 seconds, he called out the

5   priority as far as individuals running.

6   Q.   Okay.  And so what did you -- what did you do when you heard

7   Officer Mills over the radio say that the individuals were

8   running?

9   A.   I turned my vehicle around.  I was still in the 3800 block

10  of Pope Street.  When he called out the priority, he was then in

11  the 3800 block of Nash Street.  I turned my vehicle around to go

12  and offer assistance and parked my vehicle in the 3800 block of

13  Nash Street and proceeded behind Officer Mills.  He had went

14  into the woods adjacent to Fort Davis Drive.

15  Q.   Now, when you're -- when he's communicating over the radio,

16  who is all listening to these communications?

17  A.   All of the officers as well as specialized units that were

18  working that tour of duty, that they worked tour of duty that

19  day.

20  Q.   And did he provide over the radio dispatch the location

21  where these individuals were -- these four men were running?

22  A.   Yes.  He stated that I have -- I have individuals running

23  and they're running in the woods.  He stated they were running

24  in the -- I don't recall the exact location, but he stated that

25  the individuals were running in the woods.  I knew the exact

E. Johnson - Direct                                                138

1    woods he was referring to because I was right behind his vehicle

2    after I had turned around.

3    Q.  And did you go into these woods?

4    A.  Yes, ma'am.

5    Q.  What did you find while you were there?

6    A.  I proceeded into the woods after Officer Mills.  I crossed

7    Fort Davis Drive.  I found Officer Mills.  He was standing in

8    the woods near a log that had money near the log, and he stated

9    that they ran up the hill.  So I proceeded further up the hill

10   where I came in contact with other officers that were in the

11   woods.  I observed two individuals laying down in the woods

12   where the officer had them -- had them temporarily detained.

13   Q.  So were there officers at the top of the hill by the time

14   you -- when you were walking up the hill?

15   A.  Yes.

16   Q.  They already had responded to the calls over the radio?

17   A.  Yes, ma'am.  I -- once I found Officer Mills and proceeded

18   through the woods, units were gathering in the area.

19   Simultaneously, units were gathering in the area so that units

20   were at the top of the hill as well as the side perimeters of

21   the woods as well.

22   Q.  Did you see anything on the flight path that these men took

23   that you considered to be evidence of any kind?

24   A.  Yes.  Yes.  Upon arriving in the woods, there was various

25   amounts of money scattered throughout the woods.

1   Q.  Was anyone else around this -- their flight path?

2   A.  No.  There was Officer Mills as well as Officer Lay in the

3   woods as well.  I directed Officer Lay to go into the woods as I

4   was running into the woods simultaneously.

5   Q.  Now, other than officers, were there anyone else other than

6   the four suspects in the woods?

7   A.  No, ma'am.  No, not at all.

8   Q.  Did you say that you assisted in the apprehension of two of

9   the subjects?

10  A.  Yes.  I assisted with the apprehension of two of the

11  subjects, yes.

12  Q.  Will you please describe what these two men looked like.

13  A.  Yes.  They both were black males, medium complexion,

14  approximately 5'10" to 6 feet in height, and they -- about

15  180 pounds, give or take.  Each were of average to slender

16  build.

17  Q.  Did anyone have any scar -- did either one of them or both

18  of them have any scars or tattoos that you could readily see?

19  A.  Yes.  One of the individuals was -- I recall he was

20  heavily -- he was heavily tattooed with tattoos that proceeded

21  out of his collar area around his neck area.

22  Q.  And did you see officers apprehend the other men?

23  A.  I saw the officers bring the other men out of the woods.  I

24  didn't see the apprehension in the woods.

25  Q.  When they were brought out of the woods, which men did you

1    see?

2    A.   The other -- the other two individuals that I observed that

3    was with the initial group that I observed in the 3800 block of

4    Pope, all four individuals were brought out of the woods.

5    Q.   Okay.  And can you describe -- you said there were two men

6    that you assisted in apprehending.  What did the other two men

7    look like?

8    A.   The other two men, one was a black male, approximately

9    6 feet to 6'2" in height, around 230 pounds.  He was of dark

10   complexion, kind of a heavy build.

11       And the other individual was a black male, dark complexion,

12   approximately 5'7" and slender build.  He had dreads and he was

13   about maybe 150 to 160 pounds.

14   Q.   Now, you testified earlier that Officer Mills had told you

15   that one of the four men had dropped a blue bag -- or a bag?

16   A.   Yes.

17   Q.   Okay.

18   A.   Officer Mills stated to me, as our cars were passing each

19   other, he stated I saw them drop a bag in the trash can back

20   behind, and he was motioning back over toward the right side,

21   the passenger side of his vehicle, to three particular houses.

22   Q.   And after the four men were apprehended, did you do anything

23   with respect to that bag?

24   A.   Yes, ma'am.  I backtracked through the woods, and I walked

25   their flight path that they had taken back to that location, and

1    at 3815 -- I believe that 3815 was the address -- Pope Street, a

2    bag was observed inside one of the recycle bins.

3    Q.   And did you do anything with respect to that bag?

4    A.   No.   I saw the bag, and I informed FBI agents that had

5    arrived at that time that there is a bag that Officer Mills

6    observed the individuals drop in this can.   I informed them that

7    the bag is inside the can and saw them take the bag out of the

8    can at that time.

9    Q.   With the assistance of the court security officer, I'd like

10   you to look at what's been marked as Government Exhibit 7-1A and

11   7-1B.

12        Do you recognize those exhibits?

13   A.   Yes, ma'am.

14   Q.   What are they?

15   A.   It's the house in which Officer Mills motioned to me that

16   the bag was dropped in the trash can, the trash bin outside of

17   the location.

18        It's the house in which the bag that Officer Mills described

19   was dropped inside the can.   It's the exact location.

20   Q.   And in that photograph is the bag outside the trash can?

21   A.   Yes, ma'am.   It's sitting -- blue bag is sitting outside of

22   the recycle bin.

23   Q.   Did you indicate that FBI agents had removed it from the

24   trash can?

25   A.   Yes, ma'am.

1   Q.  Okay.  And is that the location where you last saw that blue

2   bag?

3   A.  Yes, ma'am.

4        MS. BELLOWS:  Your Honor, I would move for the

5   admission of Government Exhibits 7-1A and 7-1B.

6        MR. ROBERTSON:  Without objection.

7        THE COURT:  It's admitted.

8        MS. BELLOWS:  Nothing further, Your Honor.

9        THE COURT:  Do you have any questions?

10                      **CROSS-EXAMINATION**

11  BY MR. WOOD:

12  Q.  Officer Johnson, you got to the scene when individuals were

13  already in the woods; is that correct?

14  A.  No, sir.

15  Q.  You --

16  A.  I observed the individuals -- when I was in the 3800 block

17  of Nash Street, I observed the individuals walking in the 3800

18  block of Pope Street.

19  Q.  Right.  But then you were going in an opposite direction of

20  where these four individuals were, correct?

21  A.  No.  I was turning my car around within the block that I had

22  observed them when they took flight in the adjacent street.

23  Q.  Okay.  So you actually saw them take flight?

24  A.  No, I didn't see them take flight.  I was --

25  Q.  Okay.  So in the process of turning around, you missed

E. Johnson - Cross                                         143

1  anyone beginning to run and go towards the woods; is that

2  correct?

3  A.   Correct.  I missed -- I had missed the initial run.

4  Q.   Because the last you saw them, they were all simply walking

5  along in front of Officer Mills?

6  A.   No.  They were actually in the woods the next time I saw

7  them.

8  Q.   No, no, no.  You -- you pass Officer Mills, you begin to

9  turn around.  Okay?

10 A.   Yes.

11 Q.   At the time you pass Officer Mills, the four individuals

12 were still walking, correct?

13 A.   Yes, at the time I pass him.  Yes.

14 Q.   Okay.  By the time you made your turn-around, your U-turn,

15 they were no longer there; isn't that correct?

16 A.   Right.  They had began their flight.

17 Q.   You did not -- they were gone, right?

18 A.   They had began their flight.

19 Q.   But you didn't see them actually run, did you?

20 A.   The initial -- no, I didn't.

21 Q.   And then you follow some people in the woods, and when you

22 get into the woods, you see two individuals lying on the ground,

23 right?

24 A.   Yes, sir.

25 Q.   Okay.  And one of those individuals turned out to be

1   6-foot-2, around 230 pounds, correct?

2   A.  No, sir.  No.

3   Q.  I thought you said you saw two people lying on the

4   ground who --

5   A.  Two black males, approximately 5'10" to 6 feet,

6   approximately 180 pounds, medium complexion.

7   Q.  Those are the two lying on the ground?

8   A.  Yes.

9   Q.  Okay.  Did you later see a larger African-American male in

10  the woods?

11  A.  Yes.

12  Q.  You didn't actually apprehend that individual, did you?

13  A.  No, I didn't.

14  Q.  Okay.  When you saw that individual, was he on the ground or

15  was he standing up or what?

16  A.  He was being led out of the woods.

17  Q.  Okay.  So you didn't actually see that person being

18  apprehended, right?

19  A.  No, sir.

20  Q.  Okay.  So that was -- but you saw him when he was being led

21  out of the woods, and that person was around 6-foot-2,

22  230 pounds, right?

23  A.  Yes, sir.

24  Q.  Okay.  Now, as to that individual, you never saw that

25  individual throw anything to the ground, right?

1  A.  No, I didn't observe that.

2  Q.  Okay.  And you didn't see any weapons in that person's

3  hands?

4  A.  No, sir.

5  Q.  Okay.  The only time you saw him in the woods was actually

6  after he had been arrested or detained or held by the police,

7  being taken out of the woods, correct?

8  A.  Are you asking is that the only time I saw him?

9  Q.  No, no.  Okay.  When you saw that person in the woods --

10  A.  Yes.

11  Q.  -- the larger individual, when you saw him in the woods, he

12  was actually already apprehended, correct?

13  A.  Yes.

14  Q.  Okay.  You didn't -- you didn't chase that individual

15  during -- in the wooded area, correct?

16  A.  No, sir.

17  Q.  Okay.  He had already been apprehended -- by the time you

18  saw him in the wooded -- in the wooded area, he's being led out

19  by the other officers, right?

20  A.  Yes, sir.

21      MR. WOOD:  Okay.  I have no further questions.

22                      **CROSS-EXAMINATION**

23  BY MS. VANLOWE:

24  Q.  Good afternoon.

25  A.  Good afternoon.

1   Q.  First, to clarify.  In the woods, the two individuals that

2   were on the ground, had they already been -- were there other

3   officers there that had taken them into custody?

4   A.  No.  No.

5   Q.  They were just lying on the ground?

6   A.  They were following instructions given by Officer Lay, and I

7   made it up into the woods to assist Officer Lay.

8   Q.  Okay.  So essentially all of the individuals -- you saw

9   three individuals in the woods that day, right?

10  A.  There were four total in the woods.

11  Q.  Okay.  The people that you actually saw, you saw three of

12  them.  It sounds as though you saw three.  You saw one being led

13  out of the woods and two on the ground?

14  A.  They were -- when they were all led out of the woods, I saw

15  them all coming out together.  There were two that I assisted

16  with apprehending together.  There was another individual -- two

17  other individuals that were at different locations within the

18  woods, but close proximity.

19  Q.  You did not chase any of the individuals that were led out

20  of the woods in custody of officers, right?  You didn't chase

21  any of them?

22  A.  Yes.  I went in the woods following Officer Mills after the

23  individuals that ran into the woods.

24  Q.  But by the time you got there and the time you actually saw

25  the individuals, the police were already there.

1  A.  No, ma'am.  I actually put my handcuffs on one of the

2  individuals that we led out of the woods.

3  Q.  Okay.  Did you come upon any of the individuals in the

4  woods?  You said you saw one -- Mr. Wood already established

5  that you saw one that was being led out of the woods in

6  handcuffs, right?

7  A.  No, ma'am.  I stated that they all were led out of the woods

8  around the same amount of time.  There were two individuals that

9  were laying down that I assisted Officer Lay with, but the

10 individuals had -- the other two individuals had spread out.

11      But by the time we had put them in handcuffs, they were all

12 led out of the woods around about the same time.

13 Q.  Let me ask this way.  You say that you turned around.

14 You've already told Mr. Wood that.

15 A.  Yes.

16 Q.  Then you went into the woods.

17 A.  Yes.

18 Q.  Okay.  What was the first -- what was the first person that

19 you had contact with when you got in the woods?

20 A.  I saw Officer Lay and directed him to start running up the

21 hill as I was running across the -- Fort Davis Drive.

22 Q.  Who was the next person that you saw?

23 A.  I saw Officer Mills that was -- that was in the woods, and

24 he was standing -- kind of standing/kneeling near various

25 amounts of money and a log.

1   Q.   And who was the next person that you saw?

2   A.   Officer Lay again.   I caught up with Officer Lay that was up

3   in -- had went up the hill a little ways.

4   Q.   And after you saw Officer Lay, who was the next -- what was

5   the next person that you saw?

6   A.   We had the -- Officer Lay and I then detained two

7   individuals that Officer Lay instructed for them to lay down in

8   the woods.

9   Q.   Okay.   So when you got up with Officer Lay, you and Officer

10  Lay were then together, moving together?

11  A.   Yes, moving two individuals out of the woods.

12  Q.   And Officer Mills was still back here with this money next

13  to the log?

14  A.   I believe so.   He was in the lower part of the woods, yes.

15  Q.   Okay.   And so you and Officer Lay took off together, and

16  then you -- what was the next thing that you -- next people that

17  you and -- or person that you and Officer Lay then saw?

18  A.   We had the two individuals that I informed you that had laid

19  down in the woods.   We put them in handcuffs.

20  Q.   When you first caught sight of those two individuals, what

21  were they doing?

22  A.   They were following Officer Lay's instructions up in the

23  woods.

24       Are you referring to when I first saw them walking down the

25  street or in the woods?

1   Q.  No.  I'm taking you specifically through.  Okay?

2   A.  Okay.

3   Q.  So you come across Officer Mills.  You leave him.  You catch

4   up with Officer Lay.

5   A.  Yes.

6   Q.  At that point in time you and Officer Lay are together?

7   A.  Yes.

8   Q.  Okay.  And so you and Officer Lay are together.  What is the

9   next -- what -- who are the next people that you see?

10  A.  We -- the individuals that we placed in handcuffs.  I'm

11  not --

12  Q.  Okay.  And what were they doing?

13  A.  -- fully understanding.

14  Q.  What were they doing when you --

15  A.  They was following Officer Lay's instructions.  He was

16  giving instructions to them.

17  Q.  And what instructions did he give?

18  A.  He told them to lay down, you know, show your hands.  And,

19  you know, the individuals complied.

20  Q.  And so when you came up upon these two individuals, you told

21  them to lay -- Officer Lay gave them commands and they followed

22  those commands?

23  A.  Yes.

24  Q.  Okay.  Now, did you have any visual -- did you see the two

25  of them visually at any time before you came upon them?  How

E. Johnson - Cross                                        150

1   long did you have them in your sights?

2   A.  I saw them initially in the 3800 block of Pope.  Those

3   were --

4   Q.  Once you entered the woods, how long did you have them in

5   your sights?

6   A.  I don't recall the exact amount of time.  I don't recall.

7   Q.  Did you have to run, physically chase them?

8   A.  Yes, I had to run in the woods to catch up with --

9   Q.  Okay.

10  A.  -- the location where they were.

11  Q.  After you ran with Mr. --

12  A.  I caught up with --

13  Q.  When you first saw them, did you have to run after them?

14  A.  When I first saw them?

15  Q.  Yes.

16  A.  On Pope Street or in the woods?

17  Q.  I'm sorry.  We are talking -- now I'm only exclusively

18  talking about the woods.

19  A.  Okay.

20  Q.  So when I say when you first --

21  A.  No, I didn't.

22  Q.  -- saw them, I mean -- I'm past that.

23  A.  Okay.

24  Q.  I'm in the woods.

25  A.  Okay.

1  Q.  So when you first saw them in the woods -- when you first

2  saw them in the woods --

3  A.  Right.

4  Q.  -- okay, did you have to chase them at all?

5  A.  No, not in the woods.  No.

6  Q.  Okay.  And so at that point in time -- and I just want to

7  make sure -- you did not see either of the individuals that you

8  told to follow commands throwing anything out or having anything

9  in their person?

10 A.  Officer Lay gave them the commands.

11 Q.  Okay.  When both of you saw them, regardless of who was

12 giving commands, did you personally see them throwing anything

13 out of their -- from their person?

14 A.  No.

15 Q.  Okay.  And they were cooperative with you once you gave them

16 the commands and led them out?

17 A.  Yes.

18 Q.  Once Officer Lay gave them --

19 A.  Yes, they were cooperative.  Yes.

20 Q.  Okay.  Now, were there any -- do you know if there were any

21 other officers, besides Officer Lay, besides you, and besides

22 Officer Mills, do you know if there had been any other officers

23 that came through the woods before all of you were there?

24 A.  Before we were there, no, I don't know of any officers --

25 Q.  You don't know whether they were -- you don't know or the

1  answer is no, there were none?

2  A.  No, I don't know if any officers were in the woods before

3  Officer Mills, me, and Lay were in the woods.

4           MS. VANLOWE:  Okay.  Thank you very much.

5           THE WITNESS:  No problem.  Thank you.

6                      **CROSS-EXAMINATION**

7  BY MR. ROBERTSON:

8  Q.  Officer, I just want to be clear on something.  At any point

9  did you see these four subjects running?

10  A.  No.  No, sir.

11          MR. ROBERTSON:  Thank you.  No other questions.

12                     **CROSS-EXAMINATION**

13  BY MR. HUNTER:

14  Q.  Good afternoon.

15  A.  Good afternoon.

16  Q.  Your testimony is that when this morning began -- well,

17  strike that.

18     When this search for people that you've been given a lookout

19  about began --

20  A.  Yes.

21  Q.  -- you're patrolling in your car in this neighborhood?

22  A.  Yes, sir.

23  Q.  Did you go into the park before engaging the foot chase?

24  Did you enter the park before engaging in this foot chase?

25  A.  Yeah, as far as canvassing.  Are you referring to when the

1  lookout was given and we were canvassing?

2  Q.  Yeah.  Had you --

3  A.  Yeah, we were canvassing through the park area.

4  Q.  So you had been in the park earlier that morning?

5  A.  Driving in my vehicle, yes.

6  Q.  Okay.  But you hadn't walked through the --

7  A.  No, I hadn't walked, no.  No, not at all.

8           MR. HUNTER:  Court's indulgence.

9  BY MR. HUNTER:

10 Q.  And you testified earlier on cross-examination that there --

11 you never saw these four individuals running.

12 A.  No.  I heard the transmission, radio transmission.

13 Q.  What knowledge do you have of the path of their flight?

14 A.  The area where I initially saw Officer Mills and I turned my

15 vehicle around is a very short distance to where I reached his

16 vehicle and exited my vehicle.  And I could kind of see him in

17 the distance in the woods.  It's a very short distance where I

18 can see him in eyesight.

19 Q.  Could you give me an estimate of that distance?

20 A.  I couldn't give you an estimation.

21 Q.  100 feet?  500 feet?  2,000 feet?

22 A.  Less than 1,000 feet.  Between 100 to 300 feet, I guess.

23 Q.  And you testified that Officer Mills had asked you to keep

24 an eye on the blue plastic bag?

25 A.  Yeah.  When our vehicles crossed, he said, EJ, or Johnson,

1  he stated a -- he said they dropped a bag in the trash can back

2  there.

3  Q.  Okay.  Did you keep watching that bag while engaging in this

4  chase?

5  A.  No, I didn't get a chance to keep watching on the bag,

6  because simultaneously as I was turning my vehicle around,

7  Officer Mills called out that the individuals were running.  So

8  I proceeded to assist Officer Mills.

9  Q.  And you know this park pretty well?

10 A.  Yes.

11 Q.  You've been patrolling there for years?

12 A.  Familiar with the park.

13 Q.  Walked through it a bunch of times?

14 A.  I've patrolled it.

15 Q.  Okay.  Is this park sealed by walls or fences?

16 A.  No, sir.  No.

17 Q.  So it's possible that someone could start running on one end

18 and run through to the other?

19 A.  If they want to run uphill in the fall in a heavily wooded

20 area, yeah.

21 Q.  So it is possible to get out the other end?

22 A.  It's possible.

23        MR. HUNTER:  Okay.  Those are all the questions I have.

24 Thank you, Officer.

25        THE WITNESS:  All right.

1          MS. BELLOWS:  Short questions, Your Honor.

2                    **REDIRECT EXAMINATION**

3  BY MS. BELLOWS:

4  Q.  Officer Johnson, were the four men you saw apprehended in

5  the woods the same four men who you saw walking on Pope Street

6  just minutes earlier?

7  A.  Yes, ma'am.

8  Q.  And how soon after you saw these four men walking on Pope

9  Street did you hear Officer Mills say that they were running?

10 A.  Less than one minute.  Approximately 30 seconds.

11         MS. BELLOWS:  Nothing further.

12         THE COURT:  All right.  Thank you.  You may --

13         MR. HUNTER:  Briefly, Judge.

14         THE COURT:  Pardon me?

15         MR. HUNTER:  Recross in response to her question.

16         THE COURT:  What is there to recross?

17         MR. HUNTER:  One question, Judge.

18         THE COURT:  All right.

19                    **RECROSS EXAMINATION**

20 BY MR. HUNTER:

21 Q.  Officer --

22 A.  Yes, sir.

23 Q.  -- is it possible that other people were in the park that

24 day?

25         THE COURT:  Anything is possible.

1          MR. HUNTER:  I think you've answered my question,

2    Judge.

3          THE COURT:  Anything is possible.  Thank you.  You may

4    step down and may be excused.

5          (Witness stands down.)

6          THE COURT:  Who's next?

7          MS. GILES:  Harry Singleton.

8          THE COURT:  He's not going to talk about the park.

9          MS. GILES:  Something that he saw specifically that no

10   one else saw.

11         THE COURT:  What makes a difference?  We've seen

12   everything that can possibly be relevant in that park.

13         MS. GILES:  It's something -- it's along the lines of a

14   lot of the questions that have been asked on cross about what

15   was seen and what wasn't.

16         THE COURT:  You ask one question, and I'll decide if

17   it's relevant or not.  Okay?

18         MS. GILES:  Yes, sir.  Harry Singleton.

19         THE COURT:  Get right to the heart of it now.  You've

20   just got one.

21                        **HARRY SINGLETON**,

22              after having been duly sworn or affirmed,

23               took the stand and testified as follows:

24

25

1                          **DIRECT EXAMINATION**

2      BY MS. GILES:

3      Q.  Good afternoon, sir.

4      A.  Good afternoon.

5      Q.  Please state your name.

6      A.  Officer Harry Singleton.

7      Q.  You work for the Metropolitan Police Department?

8      A.  I do.

9      Q.  Are you assigned to the sixth district?

10     A.  I am.

11     Q.  Were you working on December 22, 2012?

12     A.  Yes.

13     Q.  And did you respond to the wooded area at Fort Davis and

14     Massachusetts in order to assist in the apprehension of

15     suspects?

16     A.  Yes, I did.

17     Q.  And did you personally apprehend anyone that day?

18     A.  I did.

19     Q.  And who did you apprehend?

20     A.  The individual seated to the left of the defense counsel

21     with the purple shirt, gray tie, short hair.

22          MS. GILES:  May the reflect that he's identified Keith

23     Reed.

24     BY MS. GILES:

25     Q.  Officer --

```
 1              THE COURT:  He's identified him.

 2              MS. GILES:  Thank you, Your Honor.

 3    BY MS. GILES:

 4    Q.  When you -- when did you -- describe what happened.

 5              THE COURT:  He arrested him there.

 6              MS. GILES:  Your Honor, it's what he was doing at the

 7    time that's going to be relevant.

 8              THE COURT:  Ask him that.

 9    BY MS. GILES:

10    Q.  What was the defendant doing when you saw him?

11    A.  When I first spotted the defendant, he picked up a

12    cell phone and put it to his ear as if he was talking.

13    Q.  Did you see him do anything else?

14    A.  He dropped his hands several times out of my sight behind a

15    log.

16    Q.  And where were his hands when he dropped them?

17    A.  There was a log about mid body, and he would drop his hand

18    down out of my sight behind the log, the fallen log.

19    Q.  And did you tell him anything when he was doing this?

20    A.  I ordered him the entire time to keep his hands in the air

21    where I could see them and not to move.

22    Q.  And when you -- at that time were you far away from him?  Or

23    how far away from him were you?

24    A.  From here to the exit door behind you.

25    Q.  At one point did you get closer to him?
```

1   A.  The entire time.  I steadily walked closer to him.

2   Q.  When you arrived where he was, what was around him?

3   A.  There was a blue cell phone on the ground and there was a

4   few dollars scattered here and there in the leaves.  It was a

5   very leafy forest floor.

6   Q.  And besides the money and the cell phone, did you see

7   anything else?

8   A.  I did not, not in his immediate area.

9   Q.  And what else -- but did you see anything else?

10  A.  I did.

11  Q.  What?

12  A.  In the woods as I was walking to his location, there was

13  money and a black item of clothing, a ski mask or a hat.

14  Q.  And were you giving him commands as you were getting closer

15  to him?

16  A.  Yes.

17  Q.  And what commands were you giving him?

18  A.  The commands were put your hands in the air where I can see

19  them, don't move, over and over again.

20  Q.  Did he comply at any point?

21  A.  He did not go anywhere, but he did not keep his hands in the

22  air.  He kept dropping them where I could not see them.

23  Q.  And it's once you got on him that you saw the money on the

24  ground?

25  A.  Yes.

1                          **CROSS-EXAMINATION**

2   BY MR. WOOD:

3   Q.  Officer, you said that as you were approaching Mr. Reed, you

4   saw some money on the ground?

5   A.  I did.

6   Q.  You didn't see him drop that money, did you?

7   A.  I did not.

8   Q.  And you said as you approached Mr. Reed, you saw a black ski

9   mask on the ground?

10  A.  Yes, I did.

11  Q.  Did you ever see him wear that ski mask?

12  A.  I did not.

13  Q.  Okay.  And for how long did you have Mr. Reed in your sight

14  as you approached him?

15  A.  Several minutes.

16  Q.  So for several minutes as you approached him, he was right

17  in front of you, correct?

18  A.  Dropping his hands.

19  Q.  Okay.  Now, you said there was a log on the ground, right?

20  A.  It was a fallen tree.  It was not necessarily on the ground.

21  It laid about 4 feet in the air.

22  Q.  Okay.  Did you see anything leave Mr. Reed's hands?

23  A.  I did not.

24  Q.  Did you hear anything hit the ground?

25  A.  Not at the distance I was.

1  Q.  Okay.  Well, as you approached him, did you hear anything

2  hit the ground?

3  A.  I did not.

4  Q.  Because you got this -- within a foot of him when you put

5  your handcuffs on him, right?

6  A.  Correct.

7  Q.  Okay.  So as you are walking -- say you're 3, 4, 5, 10 feet

8  away from him -- you didn't hear anything hit the ground,

9  correct?

10  A.  I did not.

11  Q.  Okay.  And when you said you saw him, he had a blue

12  cell phone in his hand?

13  A.  Yes.

14  Q.  Okay.  Was it in his right hand or left hand?

15  A.  It was in his right hand.

16  Q.  Okay.  And did he have it up at his ear?

17  A.  Yes.

18  Q.  And what was he saying?

19  A.  I could not hear what he was saying.

20  Q.  And from what distance did you see him with the blue

21  cell phone up against his ear?

22  A.  Beginning at the distance from me to the exit door there.

23  As I closed the distance, he eventually dropped the phone.

24  Q.  Dropped it to the ground?

25  A.  Yes.

1  Q.  In a different area where you saw this money behind the log,

2  right?

3  A.  I saw money in two different places.  One was in his

4  immediate area, which is where he dropped the cell phone, and I

5  saw money leading up to the area.

6  Q.  But the cell phone was not found among the money that's near

7  the log; isn't that correct, Officer?

8  A.  No.  The money that was by the log was where the cell phone

9  also was.  There was a different area where there was money

10  also.

11  Q.  Was the cell phone right in the middle of that?

12  A.  Yes.

13  Q.  Okay.  And these were a few dollars?

14  A.  Dollar bills, U.S. currency.  Not dollar bills.  I stand

15  corrected.  U.S. currency in paper form, several items of it.  I

16  don't know what the denomination was.

17  Q.  So you don't know the denominations --

18  A.  Correct.

19  Q.  -- correct?

20  A.  Correct.

21          MR. WOOD:  Thank you.

22          MS. VANLOWE:  No questions, Your Honor.

23          MR. ROBERTSON:  No questions, Your Honor.

24          THE COURT:  All right.  Thank you.  You may step

25  down --

1           THE WITNESS:  Yes, Your Honor.

2           THE COURT:  -- and be excused.

3           (Witness stands down.)

4           MS. BELLOWS:  Next witness is Elmo English.

5           THE COURT:  Is this another woods witness?

6           MS. BELLOWS:  Last woods witness.  Very short, Your

7   Honor, I promise.  Last one.

8           THE COURT:  We went through two witnesses that gave us

9   complete details of the woods.  I don't want to hear another

10  detail in the woods unless it's something we haven't heard.

11                          **ELMO ENGLISH,**

12           after having been duly sworn or affirmed,

13           took the stand and testified as follows:

14                        **DIRECT EXAMINATION**

15  BY MS. BELLOWS:

16  Q.  Good afternoon.  Please state your name for the record.

17  A.  My name is Elmo English.

18  Q.  How are you employed?

19  A.  I'm a police officer with the Metropolitan Police

20  Department.

21  Q.  On December 22, 2012, did you report to Fort Dupont Park at

22  the intersection of Fort Davis and Mass Ave to assist in the

23  apprehension of subjects?

24  A.  Yes, I did.

25  Q.  And did you apprehend any of the subjects there?

1  A.  Yes, I -- I was transporting one of the apprehended

2  subjects.

3  Q.  Okay.  So you transported one of them?

4  A.  Yes, ma'am.

5  Q.  Let me show you what's been marked as Government

6  Exhibit 4-4.  Actually, with the help of the court security

7  officer, please look at Government Exhibit 4-4.

8  A.  Yes, ma'am.

9  Q.  Okay.  Do you recognize that exhibit?

10 A.  Yes, ma'am.  That is the gentleman I transported.

11 Q.  That's a photograph of the man you transported?

12 A.  Yes, ma'am.

13 Q.  Do you see him in the courtroom today?

14 A.  Yes, I do.

15 Q.  Will you please identify him?

16 A.  He is sitting in the purple shirt with a purple tie.

17         MS. BELLOWS:  Your Honor, may the record reflect that

18 he's identified Defendant Reed.

19 BY MS. BELLOWS:

20 Q.  Did you collect any of Mr. Reed's personal effects before

21 transporting him to -- transporting him out of that area?

22 A.  Yes, ma'am.  Before we transported him, we walked him to the

23 back of the car, searched the individual for his property, and

24 he had money in his pockets and a screwdriver.

25 Q.  And what did the screwdriver look like?

1   A.  I don't recall exactly.  I know it was a flathead

2   screwdriver, but I don't recall the color.

3   Q.  And what about the money?  Was there anything unusual about

4   the money?

5   A.  There was a lot of $2 bills.

6   Q.  Now, when a suspect is arrested, what is done with his

7   personal effects or any items that are found on his person?

8   A.  They're placed in a prisoner's property bag.

9   Q.  And how will someone know who that -- who those personal

10  effects belong to?

11  A.  It has the name on the -- placed on the bag.

12  Q.  That's what officers do after they collect personal effects?

13  A.  Yes, ma'am.

14          MS. BELLOWS:  Nothing further, Your Honor.

15          MR. WOOD:  No questions, Your Honor.

16          MS. VANLOWE:  No questions, Your Honor.

17          MR. ROBERTSON:  No questions, Your Honor.

18          MR. HUNTER:  Nothing, Judge.

19          THE COURT:  Thank you.  You may step down and you may

20  be excused.

21          (Witness stands down.)

22          THE COURT:  Why don't we take a brief recess.

23      (Recess taken at 3:45 p.m.; the jury enters at 4:04 p.m.)

24

25

S. Gaines - Direct                                            166

1                          **SHAQUINTA GAINES,**

2                  after having been duly sworn or affirmed,

3                  took the stand and testified as follows:

4                        **DIRECT EXAMINATION**

5    BY MS. BELLOWS:

6    Q.  Good afternoon.  Would you please state your name for the

7    record.

8    A.  Shaquinta Gaines.

9    Q.  How do you spell your last name?

10   A.  G-A-I-N-E-S.

11   Q.  How are you employed?

12   A.  With the Metropolitan Police Department.

13   Q.  On December 22nd of 2012, did you report to the outside of

14   1501 38th Street, S.E., in Washington, D.C.?

15   A.  Yes.

16   Q.  And why did you report there?

17   A.  There was a call for -- that was the location where they

18   needed officers to respond to secure a house to -- so they can

19   get a warrant.

20   Q.  Okay.  And do you know why that particular house was going

21   to be searched?

22   A.  It was believed to be some type of a signal that was coming

23   from that location where they needed to secure the premises.

24   Q.  And what did you do at that location?

25   A.  I was in the -- on the outside perimeter inside of my

1   vehicle making sure no one went to that particular house.

2   Q.  And when you did that, did you see anybody around there?

3   A.  Yes, I did.

4   Q.  Who did you see?

5   A.  It was a black female walking around.

6   Q.  Tell the members of the jury specifically what you saw that

7   day.

8   A.  I saw a black female.  She was walking back and forth as if

9   she wanted to go towards the house that we were securing.  The

10  detective on the scene asked me to ask her where she wanted to

11  go, which I did.  And when I asked her where she wanted to go,

12  she pointed to the house that we were securing.

13  Q.  Did you identify that woman?

14  A.  Yes, I did.

15          MR. WOOD:  Objection, Your Honor.

16          THE COURT:  Objection overruled.

17  BY MS. BELLOWS:

18  Q.  Who was that woman?

19  A.  Her name was Jade Taylor.

20  Q.  And do you know -- did she tell you why she was there?

21  A.  Yes.  She said she was --

22          MR. WOOD:  Objection.  Hearsay.

23          MS. BELLOWS:  Your Honor, it's in furtherance of a

24  conspiracy.  That is the purpose of why we're eliciting this.

25          MR. WOOD:  Objection.

S. Gaines - Direct                                                168

1            THE COURT:  Have you made her a part of the conspiracy?

2            MS. BELLOWS:  She's an unindicted coconspirator, Your

3    Honor.

4            MR. WOOD:  We haven't been on notice of that, Your

5    Honor.  They never mentioned that before.

6            THE COURT:  There's no evidence of that in the case as

7    yet.

8            MS. BELLOWS:  This is it, Your Honor.

9            THE COURT:  Well, put her in the conspiracy before you

10   start giving statements about her.

11   BY MS. BELLOWS:

12   Q.  Okay.  Did she ask you any questions?

13   A.  Yes.

14   Q.  What did she ask you?

15           MR. WOOD:  Objection, Your Honor.

16           MS. BELLOWS:  May we have a sidebar, Your Honor?

17       (Conference at the bench, as follows:)

18           MS. BELLOWS:  Your Honor, if I may explain.  Jade

19   Taylor is the wife of Keith Reed.  The testimony that the Court

20   has received so far is that he was on the phone.  Ms. Taylor

21   shows up at the house just minutes after these individuals are

22   apprehended and says she needs to get in the house.

23           She also asks -- she also says that she is married to

24   Keith Reed.  Phone records will show that Keith Reed was calling

25   Jade Taylor.  She is trying to get in the house because evidence

1    is in there, the money and the GPS trackers.  That is why we

2    believe she is a coconspirator.

3          MR. WOOD:  Your Honor, that last part is a stretch as

4    to why she wants to get in the house.  They're making a

5    speculation that she wants to get in the house to get evidence

6    and the trackers.  There's no evidence of --

7          MS. BELLOWS:  Well, Your Honor, the evidence is -- it

8    can be an inference.  She said that she needed to get a wallet,

9    but given the timing, that is right after her husband is

10   apprehended.  He's seen with a telephone, and she's trying to

11   get into the very house where all this evidence is.  We believe

12   that shows that she's a coconspirator or at least there's

13   sufficient evidence of that.

14         MR. WOOD:  Your Honor, if someone --

15         THE COURT:  I don't know.  I don't have any problem

16   with you putting the evidence on that she was -- she's there

17   trying to get into one of these people's houses and the evidence

18   of what she did.

19         But in order to get the hearsay in or statements of a

20   coconspirator, I don't believe she's been shown to be a

21   coconspirator.

22         MS. BELLOWS:  Well, the problem we have, Your Honor, is

23   that the only way we show that she's part of the co-conspiracy

24   is from these actions.  So we don't -- you know, these

25   individuals had just been arrested that day.

S. Gaines - Direct                                              170

1              THE COURT:  Well, I think you're going to have to make

2    your argument just based on the evidence that's here instead of

3    putting in the hearsay from her.  I don't think there's enough

4    evidence in the record here to make her a coconspirator.

5              MS. BELLOWS:  All right.  Thank you, Your Honor.

6         (Thereupon, the following proceedings continued in open

7    court:)

8    BY MS. BELLOWS:

9    Q.  Ms. Gaines, was Ms. Taylor permitted to enter the home?

10   A.  No.

11   Q.  And why not?

12   A.  Because no one was permitted to go into the home.

13   Q.  Did she at any time identify herself as being related to any

14   of the defendants?

15   A.  She said she --

16             MR. WOOD:  Objection.  Hearsay.

17             THE COURT:  No.  Objection overruled as to how she

18   identified herself.

19             THE WITNESS:  She said she was married -- she wanted to

20   know if her husband had been arrested.

21   BY MS. BELLOWS:

22   Q.  And who did she say her husband was?

23   A.  Keith Reed.

24             MS. BELLOWS:  Thank you.  Oh, wait.  One more question.

25

1    BY MS. BELLOWS:

2    Q.  Approximately how soon after the four men were apprehended

3    did you see Ms. Taylor outside of 1501 38th Street?

4    A.  About 20 minutes later.

5           MS. BELLOWS:  Nothing further.

6                        **CROSS-EXAMINATION**

7    BY MR. WOOD:

8    Q.  Officer Gaines, were you there when people were apprehended

9    or did you come later?

10   A.  I was there.

11   Q.  You were there.  And what time was that?

12   A.  I can't remember what time it was.

13   Q.  You don't recall the time you got there?

14   A.  No, I don't.

15   Q.  Okay.  And your assignment was simply to watch over a

16   particular house, correct?

17   A.  No.  I responded to the initial location where they said the

18   suspects had ran.

19   Q.  Okay.  But you didn't get involved in chasing anyone,

20   correct?

21   A.  No.  Myself and other officers went into the woods and

22   apprehended one suspect.

23   Q.  And which suspect was that?

24   A.  I didn't know -- I don't know his name.

25   Q.  You don't know who you apprehended?

1  A.  No, I don't.

2  Q.  Then after you left the woods, you stood in front of -- or

3  parked in front of a house, correct?

4  A.  Once they took the suspect and put him in a transport

5  vehicle, they needed officers to respond to that house to secure

6  the premises while they got a warrant.

7  Q.  And so sometime later an individual by the name of Jade

8  Taylor showed up, correct?

9  A.  That is correct.

10         MR. WOOD:  I have no further questions, Your Honor.

11         THE COURT:  All right.  Thank you.  You may step down

12  and may be excused.

13         (Witness stands down.)

14         MS. GILES:  Special Agent Luis DeJesus, Your Honor.

15                        **LUIS DeJESUS,**

16         after having been duly sworn or affirmed,

17         took the stand and testified as follows:

18                     **DIRECT EXAMINATION**

19  BY MS. GILES:

20  Q.  Good afternoon, sir.

21  A.  Good afternoon.

22  Q.  Would you please state your name.

23  A.  Luis DeJesus.

24  Q.  What do you do?

25  A.  I'm a special agent for the FBI.

1  Q.  And how long have you done that?

2  A.  I've been doing that for about seven years.

3  Q.  Are you assigned to a particular squad?

4  A.  I'm assigned to the Violent Crimes Task Force which covers

5  the Northern Virginia area for all violent crimes.

6  Q.  And to your knowledge is -- Alexandria and Fairfax County,

7  are they within the Eastern District of Virginia?

8  A.  Yes.

9  Q.  As part of your duties, did you become involved in the

10  investigation of the robbery of the Navy Federal Credit Union?

11  A.  Yes.

12  Q.  And what was your involvement?

13  A.  That morning at about 10:00, I received a series of

14  notifications on my BlackBerry that a bank robbery had occurred

15  and that a GPS tracker was taken from the bank and was active.

16  Q.  And what did you do after that?

17  A.  I logged onto the computer for the GPS devices to get a

18  sense of where they were.  And on the computer was a map with

19  some points that were highlighted, and it gave a location of

20  that GPS device as well as the speed that those devices were

21  going.

22  Q.  And were you able to monitor the movement?

23  A.  Yes.  I monitored their movements and sent locations out to

24  our responding officers as well as MPD officers via telephone.

25  Q.  And once you logged on, what general area were the trackers

1   in?

2   A.   They were in Southeast, D.C.  Washington, D.C.  Sorry.

3   Q.   And where did they ultimately end up?

4   A.   One tracker ultimately ended up at 1501 38th Street in

5   Southeast, D.C., and another one was in a nearby vicinity.  I

6   believe it was Carpenter Street, but I don't recall the exact

7   address.

8   Q.   Okay.  And what did you do at that point?

9   A.   At that point I started responding to the bank, at which

10  time in the car I was notified to respond to Massachusetts

11  Avenue and Fort Davis, S.E. -- in Southeast, D.C.

12  Q.   And did you respond to that area?

13  A.   Yes.

14  Q.   And what was the scene when you arrived?

15  A.   When I arrived, a fellow agent on my squad, Chris Ormerod,

16  arrived at the same time.  There was a corner lot, a wooded area

17  that was marked off by crime scene tape.  MPD officers were all

18  over the scene.  There was patrol cars everywhere.

19       In the wooded lot, there were MPD officers inside -- or in

20  the wooded lot standing at various locations, and we met with

21  the MPD officer who was in charge of that scene to coordinate

22  what was going on.

23  Q.   And what happened from that point?

24  A.   At that point we decided the FBI was going to take custody

25  of the evidence that was throughout the wooded area.  The MPD

1   officers notified us that there was money throughout the whole

2   wooded area.

3        The wooded area is on an incline, and it was very windy that

4   day.  So some of the money was dropped in some piles, but then

5   it was also being blown around by the wind.  So we decided to

6   act fast and just take pictures and collect the money before

7   they were blown throughout the wooded area.

8   Q.  In addition to this money, did you see anything else?

9   A.  There was also clothing items, masks -- ski masks and

10  gloves, and a cell phone.

11  Q.  Okay.  And masks, how many masks were in the wooded area?

12  A.  There was four total masks in the wooded area.

13  Q.  And you said that there was a phone found?

14  A.  Yes.

15  Q.  Where was the phone found?

16  A.  The phone was found by a pile of money that was located in

17  the ground in the wooded area, and it was partially covered by

18  leaves.

19            MS. GILES:  Your Honor, at this time, with the help of

20  the court security officer, I'd like to pass up 5-2, 5-3A, 5-3B,

21  and 5-4, and 5-5, 5-6, and 5-7.  We'll do it as a group.

22  BY MS. GILES:

23  Q.  Do you have those items, sir?

24  A.  5-2, 5-3, 5-4, 5-6, 5-7, and 5-5.

25  Q.  Okay.  And right now I'd like to direct you to what has been

1  marked as 5-2.  Do you recognize that?

2  A.  Yes.

3  Q.  And what is that?

4  A.  This is one of the masks that was recovered from the wooded

5  area.

6  Q.  And 5-3A?

7  A.  Yes.

8  Q.  And then if you would look at 5-3B.

9       First, I just want you to look in the bag.  I don't want you

10 to pull anything out until we get the Court's permission.

11 A.  Yes.

12 Q.  And then 5-4.

13 A.  Yes.

14 Q.  Do you recognize those items?

15 A.  Yes.

16 Q.  And what are they?

17 A.  They're the items that were collected from the wooded area,

18 the masks.

19          MS. GILES:  Your Honor, at this time we move in 5-2,

20 5-3A, 5-3B, and 5-4.

21          THE COURT:  They're admitted.

22          MS. GILES:  Are we going to get permission to show any

23 of these or no?

24          THE COURT:  Why would you want to show them?

25          MS. GILES:  Very well, Your Honor.

1    BY MS. GILES:

2    Q.  If you'd take a look at what's marked as 5-5, 5-6, and 5-7.

3    Do you recognize those items?

4    A.  Yes.

5    Q.  What are they?

6    A.  They are other items that were collected from the wooded

7    area.  One was a money band that was collected in close vicinity

8    to one of the masks, one was a cell phone, and another one was

9    gloves.

10          MS. GILES:  Your Honor, at this time we move in 5-5,

11   5-6, and 5-7.

12          THE COURT:  They'll be admitted.

13   BY MS. GILES:

14   Q.  And now, sir, if you would look at what's in one of the

15   binders, and it's marked as 5-1A to 5-1Q.

16          Do you recognize those?

17   A.  Yes.

18   Q.  And what are they?

19   A.  Those are the photographs that I took at the scene of the

20   wooded area.

21          MS. GILES:  Your Honor, at this time we'd move in 5-1A

22   to 5-1Q.

23          THE COURT:  Any objection?

24          MR. WOOD:  No.

25          THE COURT:  They're admitted.

1           MS. GILES:  Thank you.

2    BY MS. GILES:

3    Q.  Agent DeJesus, if you would look at 5-1K.  Do you have that?

4        Is that -- does that photograph picture the phone that you

5    just identified as Government Exhibit 5-6?

6    A.  Yes.

7    Q.  And is that where it was located in the woods and what was

8    near it?

9    A.  Yes.

10   Q.  Now, after you collected these items from the woods, what

11   did you do next?

12   A.  After we collected these items, we were notified that there

13   was further items of additional evidence located near the wooded

14   area in a trash can and also by the street curb.  So Chris

15   Ormerod and I went to my vehicle and we secured these items in a

16   trunk that I have -- in a safe that's located in my trunk, and

17   then we went to the next scene where MPD was securing a trash

18   can.

19   Q.  And where was the next scene in relation to the woods

20   distance-wise?

21   A.  Walking distance, it was approximately a three-minute --

22   three- to five-minute walk, not far.

23   Q.  All right.  And so did you -- and where exactly was that

24   next location?

25   A.  1501 38th Street.

L. DeJesus - Direct                                      179

1  Q.  And what were you focused on at that location?

2  A.  We were told that there were items of evidence, gloves and

3  masks, inside a trash can that was out by the curb of that

4  residence.

5  Q.  So did you look in that trash can?

6  A.  Yes.

7  Q.  And can you describe what you saw?

8  A.  We opened the trash can.  There was some trash on the

9  bottom, but on top of the trash were several pairs of gloves

10 and -- I believe it was three pairs -- ski masks that was on top

11 of all the trash.

12 Q.  Okay.  And now if you would look at what's been marked as

13 Government's 6-2A through 6-2G.  Do you recognize those?

14 A.  Yes.

15 Q.  And what are they?

16 A.  They are the items taken from the trash can.

17         MS. GILES:  Your Honor, at this time we'd move in 6-2A,

18 6-2B -- well, actually, 6-2A through 6-2G, the entire series.

19         THE COURT:  They're admitted.

20 BY MS. GILES:

21 Q.  And the first three items, 6-2A, 6-2B, and 6-2C, are they

22 masks?

23 A.  There are three masks in here.  I'd have to take them out to

24 look at the actual -- yes.

25 Q.  And now if you'd look at what's in the binder marked as 6-1A

1   to 6-1D.  Do you recognize those, sir?

2   A.  Yes.

3   Q.  And what are they?

4   A.  They are the photographs that I took at the residence and of

5   the trash can.

6           MS. GILES:  Your Honor, at this time we'd move in 6-1A

7   to 6-1D.

8           THE COURT:  All right.  They're admitted.

9   BY MS. GILES:

10  Q.  After you collected these items outside of the trash can,

11  what did you do next?

12  A.  We were told that there was another location where there was

13  evidence related to -- possibly related to the scene, which was

14  at Pope Street which stemmed right off of the street that we

15  were just on, which was a very short walking distance.  So we

16  went there to collect those items.

17  Q.  And can you describe what you saw when you arrived at that

18  location?

19  A.  When we arrived there, there was a patrol officer standing

20  by pulling security on this -- a bag that was located on the

21  side of the curb next to another trash can.  It was marked with

22  crime scene tape.  It was a blue bag, and there was items inside

23  the blue bag.

24  Q.  What type of items were in the blue bag?

25  A.  I believe there were more masks.

1   Q.  If you would take a look at what's been marked as 7-1A to

2   7-1D.  Do you recognize those?

3   A.  Yes.

4   Q.  How do you -- how so?

5   A.  From the photographs that I took once we arrived on that

6   scene.

7   Q.  And do they reflect the blue bag that you recovered?

8   A.  Yes.

9           MS. GILES:  Your Honor, at this time we'd move in 7-1A

10  to 7-1D.

11          THE COURT:  They'll be admitted.

12          MS. GILES:  Thank you.

13  BY MS. GILES:

14  Q.  And what happened next?

15  A.  From there we coordinated with Chris Ormerod, and another

16  local task force officer on our squad had showed up with the GPS

17  tracking devices so that we can get a better location of the --

18  we were -- there's two GPS trackers that were still missing.  I

19  logged on my computer, and from my computer, you can see that

20  there were two devices still in the wooded area.

21      So we went back to the wooded area.  MPD still had it

22  secured with the crime scene, and they had officers there

23  pulling security.  We went to that area with the GPS tracker and

24  my laptop, and we did a more thorough search looking for the GPS

25  trackers.

1  Q.  And what do you mean by a more thorough search?

2  A.  In the initial time we went, we didn't conduct a complete

3  search.  We just went to grab what was basically in sight, in

4  plain sight, because of the wind that was blowing and the items

5  that were -- the money basically that was getting blown into

6  bushes and whatnot.  We wanted to collect as much as we could

7  without losing any of the evidence.

8      And it was a fast-moving process because then they were

9  saying, hey, there was -- we were being notified that there was

10 evidence at different locations.  So we were trying to collect

11 as much as we could before we lost any evidence.

12 Q.  And so when you began walking through with your computer,

13 what happened?

14 A.  When we walked through the second time with the computer and

15 the handheld devices, we were able to locate two GPS trackers

16 that were hidden underneath a downed tree with leaves that

17 covered most of the money.

18 Q.  And what do you mean they were hidden underneath?

19 A.  They were not in plain view.  They were underneath a tree

20 that was down, and you could barely see them unless you actually

21 walked up and you heard the device make a loud audible tone.

22      So we started looking very low, and we knew that the

23 cell phone had been underneath some leaves so we started moving

24 leaves around.  You could see that underneath one of the trees

25 there was U.S. currency.  Once we moved that and we moved the

1  leaves, there was a pile of U.S. currency basically tucked

2  further underneath the tree.

3  Q.  And is that where the GPS tracker -- one of them was?

4  A.  Yes.

5  Q.  And did you describe -- did you find the second one?

6  A.  Yes.

7  Q.  And where was it?

8  A.  It was located nearby the second one, basically in the same

9  manner.

10  Q.  And so what happened after you recovered the trackers?

11  A.  After we recovered the trackers, we secured those items and

12  then we went back to the 1501 38th Street residence.

13  Q.  And before we move on, I'd like for you to take a look at

14  8-2 and 8-3, which have already been admitted into evidence.

15  They're brown.

16      And, sir, in the book, you can look at 8-1A to 8-1G.  That

17  top bag, the little one.

18  A.  You said 8 --

19  Q.  8-2 and 8-3.  Do you see them both, 8-2 and 8-3?

20  A.  Yes.

21  Q.  Do you recognize those?

22  A.  Yes.

23  Q.  What are they?

24  A.  They resemble the GPS trackers that were located within the

25  money.

1  Q.  That you found in the woods?

2  A.  Yes.

3  Q.  And then if you look in the book at 8-1A to 8-1G.  Do you

4  recognize those?

5  A.  Yes.

6  Q.  And what are they?

7  A.  They're photos taken, once again, once we located the GPS

8  trackers and the other money in the wooded area.

9         MS. GILES:  Your Honor, at this time we'd move in 8-1A

10 to 8-1G.

11         THE COURT:  They're admitted.

12         MS. GILES:  That's all the questions we have for this

13 witness, Your Honor.

14         THE COURT:  Do you have any questions?

15                       **CROSS-EXAMINATION**

16 BY MR. WOOD:

17 Q.  Agent, you were actually -- seem to be the person

18 responsible for collecting evidence that day, correct?

19 A.  At the wooded area.

20 Q.  The wooded area.

21 A.  Correct.

22 Q.  So when you were collecting evidence in the wooded area,

23 would it have been your responsibility to secure those items and

24 then turn them over to whoever had to test those items?

25 A.  Secure those items, as far as just for that night or --

1  Q.  Well, no.  I mean, you recovered some money in the wooded

2  area, for instance, right?

3  A.  Correct.

4  Q.  Okay.  So did you submit that money that you recovered for,

5  say, fingerprint analysis?

6  A.  I did not.

7  Q.  Okay.  Would that be someone else's responsibility?

8  A.  That would be someone else's responsibility.

9  Q.  But did you actually pick up the money and put it in an

10 evidence bag?  I'm talking about the money in the woods.

11 A.  The money in the woods, yes.

12 Q.  So you took the money in the woods, put it in an evidence

13 bag, and then if someone else was responsible for getting

14 fingerprints off that money, that would not be you.  It would be

15 some other FBI agent or someone else?

16 A.  It depends on the case, but for that -- at that case, no, it

17 was not me.

18 Q.  Okay.  What about the cell phone?  Did you actually secure

19 the cell phone and put it in an evidence bag?

20 A.  Yes.

21 Q.  Okay.  Again, was there any procedures followed in order to

22 see if there were anyone's fingerprints on that cell phone?

23 A.  You would have to talk to the case agent.

24 Q.  Who would that be?

25 A.  Rachel Wolford.

1   Q.  Rachel Wolford.

2   A.  Special Agent Rachel Wolford.

3   Q.  Okay.  That would be her responsibility?

4   A.  She would know what was sent for processing in the case.

5   Q.  Okay.  So she would be the one who could tell us, yes, I

6   sent on a cell phone to see whose fingerprints were on it?

7   A.  Yes.

8   Q.  Same with the money?

9   A.  Yes.

10  Q.  And same with -- I think there was a piece of paper among

11  the money.  It looked like some wrapping paper used by banks.

12  A.  Yes.

13  Q.  So that would also be her responsibility to send that in for

14  fingerprints?

15  A.  Yes.

16  Q.  Okay.  And how about the tracking devices?  You found two

17  tracking devices in the woods?

18  A.  Yes.

19  Q.  Okay.  Again, it would be her responsibility to send those

20  tracking devices to see if there were fingerprints on it --

21  fingerprints on them to see who, if anyone, touched those items,

22  right?

23  A.  Yes.  If she decided to, yes.

24  Q.  Okay.  But you didn't do that?

25  A.  No.

1           MR. WOOD:   Okay.   I have no further questions.

2                      **CROSS-EXAMINATION**

3    BY MS. VANLOWE:

4    Q.   Good afternoon.

5    A.   Good afternoon.

6    Q.   You testified that you were monitoring the GPS tracking

7    devices as they were moving through -- as they were traveling?

8    A.   Yes.

9    Q.   You were observing them by the tracking path through the

10   computer?

11   A.   Yes.

12   Q.   Okay.   And when did you stop monitoring?

13   A.   It was approximately 10:30.

14   Q.   And what -- did you stop and somebody else come in or did

15   you stop when they stopped or what?

16   A.   I stopped.   I notified another agent and a task force

17   officer, at which time they said that they were sending units to

18   the scene, and then I stopped.   I don't know if the GPS trackers

19   just stopped at that point.

20   Q.   Okay.   So when you got -- when you left the screen

21   monitoring, at that point in time you don't whether they were

22   still moving or whether they're not, but you needed to get to

23   the scene?

24   A.   Correct.   One was -- had not moved for a while.   The other

25   two were still moving every so often, the other two trackers.

1   Q.  Okay.  And are you able to determine whether the trackers

2   that you saw -- that you were watching on the monitors were the

3   ones that were in the woods?

4   A.  Yes.

5   Q.  How?

6   A.  With serial numbers.

7   Q.  Okay.  And did you in fact inspect those trackers to see if

8   the serial numbers were the same as what you saw?

9   A.  We sent that to another agent and we e-mailed -- or I think

10  it was a call.  We got that information to another agent, at

11  which time he confirmed that those were the trackers taken from

12  the bank.

13  Q.  Okay.  And so the trackers had attached to it basically some

14  kind of time as to when they got there.  Is that fair to say?

15  Well, let me rephrase the question.

16      The trackers were basically being monitored -- you were

17  monitoring them as they were moving, right?

18  A.  Correct.

19  Q.  And so you had some idea, there was some indication of when

20  the trackers arrived in their location where you ultimately

21  found them, right?

22  A.  Correct.

23  Q.  Okay.  You talked about getting money and masks and gloves

24  that you found in the woods too.  Didn't you specifically

25  testify that you picked up masks and --

1    A.  Yes.

2    Q.  -- that you also found gloves in the woods?

3    A.  Yes.

4    Q.  Okay.  And you have no idea when those items came to be in

5    the woods, right?

6    A.  No.

7              MS. VANLOWE:  I don't have any further questions.

8                         **CROSS-EXAMINATION**

9    BY MR. ROBERTSON:

10   Q.  Agent DeJesus, when you got to Pope Street where the blue

11   bag was, was the blue bag in the can or was it out of the can?

12   A.  It was outside of the can.

13   Q.  Was the -- do you know if the blue bag was ever in the can?

14   Was it reported to you that it was in the can?

15   A.  It was reported to me that it was dropped outside of the

16   can.

17   Q.  The masks that you found in the woods -- I guess it would be

18   5-2, 5-3A, 5-3B, and 5-4 -- did they have one hole in them or

19   two holes in them?

20   A.  The masks had -- it was different masks.  I would have to

21   look at the actual masks to tell you whether they had one or

22   two.

23   Q.  Okay.  So of the masks that you found, did all of them --

24   not all of them were one hole, but some were different?

25   A.  Correct.

1  Q.  Were they all pullover style?

2  A.  Yes.

3          MR. ROBERTSON:  No other questions, Your Honor.

4          THE COURT:  Thank you.  You may step down and may be

5  excused.

6          THE WITNESS:  Thank you, Your Honor.

7          (Witness stands down.)

8          MS. GILES:  The government calls Sandra Koch.

9          Your Honor, a housekeeping matter.  We are having to

10 take these next two witnesses out of order.  I've already

11 alerted the defense to that, but I wanted to let the Court know

12 as well.

13         Koch, K-O-C-H.

14                         **SANDRA KOCH,**

15         after having been duly sworn or affirmed,

16         took the stand and testified as follows:

17                      **DIRECT EXAMINATION**

18 BY MS. GILES:

19 Q.  Good afternoon, ma'am.

20 A.  Good afternoon.

21 Q.  Could you please state your name.

22 A.  My name is Sandra Koch, and the last name is spelled

23 K-O-C-H.

24 Q.  What do you do?

25 A.  I am a forensic scientist, physical -- sorry.  Physical

1   scientist/forensic examiner in the trace evidence unit of the

2   FBI laboratory.

3   Q.  And how long have you worked there?

4   A.  About 16-and-a-half years.

5   Q.  What is your educational background?

6   A.  I have a bachelor --

7         THE COURT:  Is there any question about her

8   qualifications?

9         MS. VANLOWE:  No, Your Honor.

10        THE COURT:  Go ahead and just ask the question you want

11  to.

12        MS. GILES:  Thank you.

13  BY MS. GILES:

14  Q.  Ma'am, are you -- conduct microscopic hair examinations?

15  A.  I do.

16  Q.  And why are microscopic hair examinations conducted?

17  A.  It's based on Locard's exchange principle, that anytime two

18  people or a person and an object come into contact, trace

19  evidence may be exchanged.

20      A good example of that would be when your pets brush up

21  against your clothing and their fur gets onto your clothing.  I

22  examine items of evidence and look to see if there's evidence of

23  transfer, because we also will shed our own hairs onto our

24  clothing and onto our environment.

25  Q.  And how are these microscopic hair examinations conducted?

S. Koch - Direct                                          192

1   A.  They are conducted through analyzing the evidence that has

2   been collected from items that are submitted to our laboratory.

3   When the items come up to the trace evidence unit in the FBI

4   laboratory, they are processed in one of five different

5   processing rooms that we have.  They are processed in a

6   different room based on if they come from -- are identified as

7   having been collected from a different individual or a different

8   location.

9       The debris is collected and then mounted onto glass

10  microscope slides, and then I use a comparison microscope to

11  look at the hairs and fibers on the slides and do a direct

12  side-by-side examination with known samples.

13  Q.  And did you do any -- examine any hairs on a mask which was

14  identified as a Q26?  For our purposes, it's identified as

15  Government Exhibit 7-2.

16  A.  Yes, I did.

17  Q.  And what did you do with relation to that hair?

18  A.  I did find a hair on that mask that was -- exhibited

19  characteristics of negroid origin or of somebody who is of

20  African ancestry.  I compared that hair to the four known head

21  hair samples that I received.  They were from -- identified to

22  me as having come from Stanley Winston, Anthony Cannon, Keith

23  Reed, and Tobias Dyer.

24  Q.  And what did you -- what were the results of your

25  examination?

S. Koch - Direct                                            193

1    A.   The head hair that I found on the Q26 mask exhibited the

2    same microscopic characteristics as the known hair sample

3    identified to me as having come from Stanley Winston.

4         Accordingly, this hair could have come from Stanley Winston.

5    It should be noted that microscopic analysis of hairs is not a

6    means of positive identification.  I cannot say it came from

7    this person to the exclusion of all others.  However, there

8    are -- I was able to differentiate the known samples from each

9    other.

10   Q.   And after you came to your conclusion, what did you do?

11   A.   I then removed that hair from the glass microscope slide and

12   I sent it down to our evidence control unit to be further

13   analyzed in the mitochondrial DNA analysis unit.

14        MS. GILES:  Your Honor, at this time I would like to

15   move in Government Exhibit 32.

16   BY MS. GILES:

17   Q.   If you would actually take a look at Government Exhibit 32.

18   A.   I'm not sure I understand the ordering of the tabs.

19   Q.   Do you see a tab in there numbered?

20   A.   No, I do not.

21        MS. GILES:  She has the wrong book.

22        THE WITNESS:  I have 1 through 3, tab series 4 through

23   11.

24        MS. GILES:  It's Exhibit 32.  I think it's over here

25   with the law clerks.

S. Koch - Cross                                                194

1  BY MS. GILES:

2  Q.  Do you recognize that, ma'am?

3  A.  Exhibit 32 is my curriculum vitae.

4          MS. GILES:  Your Honor, may we move that in since we

5  did not cover her qualifications?

6          THE COURT:  It's admitted.

7          MS. GILES:  Thank you, Your Honor.

8          MR. ROBERTSON:  Your Honor, I was planning on

9  objecting.  I just think --

10          THE COURT:  What's your objection?

11          MR. ROBERTSON:  I just think it's cumulative.

12          THE COURT:  That's sort of standard procedure around

13  here.  May be a little cumulative, but it saves time just to put

14  that in.

15          Do you-all have any questions of this witness?

16                    **CROSS-EXAMINATION**

17  BY MR. WOOD:

18  Q.  Ma'am, let me see this.  You examined Q26, which was a mask,

19  and found a head hair on that, correct?

20  A.  That is correct.

21  Q.  Did you compare that head hair with head hair known sample

22  of a Keith Reed?

23  A.  Yes, I did.

24  Q.  Okay.  And you're able to determine that the hair sample on

25  Q26 was not -- did not come from Keith Reed; isn't that correct?

1  A.  That particular hair, no, it did not.  It was not consistent

2  microscopically with so I could not include.

3  Q.  So you could not include and say that's Keith Reed's hair on

4  Q26, which was a mask, correct?

5  A.  That is correct.

6        MR. WOOD:  Thank you.

7                        **CROSS-EXAMINATION**

8  BY MS. VANLOWE:

9  Q.  Good afternoon.  I just kind of want to go over your process

10  just slightly.

11       From what I'm hearing, it sounds as though you take the hair

12  sample, you put it on a slide and put that into a microscope; is

13  that right?

14  A.  Yes.  I use a comparison microscope, which is two

15  microscopes joined side by side by an optical bridge, and the

16  hairs are mounted on the glass microscope slide with a

17  semipermanent mounting medium so that I can better observe the

18  hairs.

19  Q.  And does it -- are the hairs overlapping when you're looking

20  at them?

21  A.  They can be, but they -- they also can be spread out.

22  Q.  Okay.  So I guess when you're looking at them, you know how

23  you can kind of have tracing paper, basically, and you can draw

24  an image and then you can take a somewhat sheer piece of paper

25  and put it over the other and kind of trace over what's on the

1  bottom?  Do you understand my analogy there?

2  A.  I understand your analogy.

3  Q.  Okay.  And so in that particular situation you're not, to

4  bring it to this, you're not taking the hair -- one hair and

5  then putting it on top of the other and kind of seeing if all

6  the grooves and everything match up, right?

7  A.  When I'm doing a comparison, I am following the questioned

8  hair from root to tip, however it lies along the slide, and also

9  looking at the known sample hairs and following it and

10  determining whether or not it exhibits the same microscopic

11  characteristics.

12  Q.  So when you're saying -- when you're talking about whether

13  they have the same microscopic characteristics, to kind of bring

14  that down to my level of expertise, you're basically looking at

15  one hair against the other to see if they look the same; isn't

16  that right?

17  A.  Essentially, yes.

18  Q.  Yeah.  And that analysis of whether they look the same is

19  based upon your eye view of what you see, right?

20  A.  It is my observation of the microscopic characteristics and

21  looking at the three layers of the hair and determining if all

22  the characteristics are present and consistent between the two

23  samples.

24  Q.  And have you ever had a situation where you've looked at --

25  where another forensic scientist has looked at the same?  Do you

1    ever ask different forensic scientists to kind of look at the

2    same sample as you might be?

3    A.   Our policy is that anytime I make a determination about a

4    hair where I would include some -- an individual's known sample,

5    that I then bring that hair to another examiner in my unit and

6    get that confirmed to ensure repeatability, that it is -- that

7    another individual can look at that and say that they see the

8    same characteristics.

9    Q.   And have you had instances in which you have looked at a

10   sample and another person has looked at a sample and there have

11   been differences of opinion as to whether they are the same?

12   A.   Yes, I've had some differences of opinion.  However, it's

13   mostly similarities versus similarities and differences.  It's

14   not really the inclusion versus I cannot include.

15   Q.   Okay.  And then getting kind of to the next part of what you

16   testified to, which was kind of a caveat I guess you would call

17   it, you indicated that this side-by-side visual analysis or

18   visual comparison is not a means of making a positive

19   identification.

20   A.   Correct.

21   Q.   And what do you mean by that?

22   A.   It means that while I can differentiate hair samples from

23   different individuals, I cannot say that it came from one

24   individual to the exclusion of all others because there is a

25   range of characteristics within our hairs, and that range of

1   characteristics can overlap another individual's.

2        So I don't have -- I'm limited by the known samples that I

3   am provided and I can include potential sources, but I also have

4   to leave open the option that there are others out there who I

5   have not seen their known samples and their hairs that could

6   also be potentially included by their microscopic

7   characteristics.

8   Q.  And when you're talking about characteristics of a hair,

9   what type of characteristics are you talking about?  The

10  visual -- basically looking at the hair that looks like it's the

11  outside visual characteristics of the hair?

12  A.  It's going to be the internal characteristics.  Hairs have

13  three layers: the cuticle, the cortex, and medulla.  So if you

14  think of a pencil, how it has the paint, then the wood, then the

15  lead, hair is similarly arranged.

16       Within the cortex there's all these pigment granules that

17  give hair its color.  And so the pigment granules, the size of

18  them, the shape of them, how they're distributed, if they're

19  clumpy, if they're patchy.  A lot other -- all that.

20  Q.  That can be -- those characteristics can be identical in

21  different people.

22  A.  The range of characteristics may overlap.  So there may be

23  somebody else who has a similar color and pigmentation pattern

24  so I would have to say -- leave open the option that another

25  individual could be also included.

S. Koch - Cross                                                    199

1   Q.  And when you're talking about another individual having that

2   population -- having those characteristics, you said that you

3   could determine that this hair was a person with African

4   descent?

5   A.  I can determine some racial characteristics based on the

6   microscopic characteristics and the morphological or shape of

7   the hairs.  So it is consistent with an individual of African

8   ancestry, yes.

9   Q.  Okay.  And so it's possible that this hair and the

10  characteristics of this hair could overlap with any person that

11  has an African descent; is that right?

12  A.  I can't say that it would be anyone.  I would have to see

13  their known sample, the actual hairs, before I could include

14  them or not.  But I'd have to leave open the possibility that

15  there is another individual out there.

16  Q.  Another person of African descent that could have the same

17  characteristics?  And certainly when we're dealing with people

18  of African descent, that population is how large?

19  A.  It's a large population.  Again, there is --

20  Q.  It would include me, right?

21  A.  Yes.

22          MS. VANLOWE:  Okay.  Thank you.

23                      **CROSS-EXAMINATION**

24  BY MR. ROBERTSON:

25  Q.  Ms. Koch, how many hairs did you examine for this case?

1  A.  I did not actually count the number of hairs.

2  Q.  Was it more than 50?

3  A.  I'm sure it was, yes.

4  Q.  More than 100?

5  A.  I don't know.

6  Q.  We can't pin you down anywhere on the number?

7  A.  I had the known samples and I had numerous hairs throughout

8  the case.  I did not count the number of hairs.

9  Q.  Out of all of those, only one cannot be excluded as coming

10  from one of the defendants?

11  A.  No.  There were additional hairs.

12  Q.  Okay.  But there were additional hairs that could -- that

13  came from some of the other people in this case?  Is that what

14  you're saying?

15  A.  There were additional hairs that I was able to conclude that

16  exhibited the same microscopic characteristics as some of the

17  known samples.

18  Q.  Okay.  So you can't say that they match?

19  A.  That term is not a word that we tend to use.

20  Q.  Okay.  Could you tell us how many, as a percentage of the

21  African-American population, that hair would be consistent with?

22  A.  I wouldn't feel comfortable saying a percentage of the

23  population that could.  I'm basing my conclusions on the known

24  samples I was provided and the characteristics that I was able

25  to look at.

1      It is consistent with an individual who's of African

2   ancestry.  I can differentiate known samples from different

3   individuals.  So I don't want to give a percentage because it's

4   not something that I actually can determine.

5   Q.  Do you spend a lot of time doing hair -- specifically human

6   hair examination in your work?

7   A.  Yes, I do.

8   Q.  How much of your time is spent on human hair examination?

9   A.  My work is -- the majority of my work is hair and fiber

10  analysis.

11  Q.  I understand that.  How much of that -- what kind of

12  percentage is it of human hair?

13      Your curriculum vitae that came in -- you know, I objected,

14  cumulative -- it talks about feathers.  It talks about the fact

15  that you went through training on feathers for two years at the

16  Smithsonian Institution, training on feathers.  That you do --

17  that you're part of the Indian Country Evidence Task Force; am I

18  correct?

19  A.  Yes.

20  Q.  So I assume that you're -- and probably your most recent

21  training was at a ropes college -- a ropes course in Maine where

22  you learned about different rope fiber, I would assume.

23  A.  Yes.

24  Q.  How much of your time is spent with human hair?

25  A.  Honestly, most of my cases are with hair analysis.  As part

1    of the Indian Country --

2    Q.  I'm asking human hair, not animal hair, because animal hair

3    is also on your vitae.

4    A.  Human hair would be the primary emphasis of my case work,

5    but most cases have both hair and fiber so I can't differentiate

6    how much is just hair or just fibers.

7        I've had more recent training in other aspects of my job,

8    but most of my cases have both hair -- human hair and fiber

9    analysis in them.

10   Q.  Can you match a known specimen of rope to a sample of rope

11   that has been sent to you if it's included?

12   A.  Again, I wouldn't use the term match for --

13   Q.  Okay.  Consistent with.

14   A.  If I have a known sample and a questioned sample, I can do

15   an analysis and determine if they are consistent.

16   Q.  Would you testify the same way, that it was consistent with?

17   A.  Yes.

18        MR. ROBERTSON:  Okay.  I have no other questions, Your

19   Honor.

20                          **CROSS-EXAMINATION**

21   BY MR. HUNTER:

22   Q.  Good afternoon.  Briefly, in your training, could you

23   explain to the jury how easily hairs are transferred from the

24   human head to other items?

25   A.  Certainly.  Humans, we lose about a hundred hairs a day and

S. Koch - Cross                                                    203

1   so our hairs are found throughout -- they are transferred to our

2   clothing as well as to our environment.

3       So me sitting here, I may be losing some hairs through

4   gravity, falling onto my clothing and potentially onto this

5   chair.  Eventually, that will -- may be picked up either by

6   somebody vacuuming or the next person coming into contact with

7   this chair.

8       I can also transfer hairs through direct contact with

9   another individual either coming into contact with my head or

10  with the hairs that may have gotten onto my clothing.

11  Q.  Could a hair be transported from a human head to, say, a

12  hat?

13  A.  Yes, it could easily.

14  Q.  Easily?

15  A.  When you put a hat onto your head, the hairs that may be

16  close -- they're at their terminal growth stage, they're ready

17  to be shed.  And if it's a tight-fitting hat, when you pull the

18  hat off, if may -- the hairs may go with the hat.

19            MR. HUNTER:  Thank you.

20            THE COURT:  Thank you.  You may step down and be

21  excused.

22            (Witness stands down.)

23            MS. GILES:  We call Dr. Constance Fisher.

24

25

C. Fisher - Direct                                                    204

1                         **CONSTANCE FISHER**,

2              after having been duly sworn or affirmed,

3              took the stand and testified as follows:

4                      **DIRECT EXAMINATION**

5    BY MS. GILES:

6    Q.  Good afternoon, ma'am.

7    A.  Good afternoon.

8    Q.  Could you please state your name.

9    A.  My name is Constance L. Fisher.  It's spelled

10   C-O-N-S-T-A-N-C-E, L, F-I-S-H-E-R.

11   Q.  Dr. Fisher, what do you do?

12   A.  I'm a biologist/forensic examiner in the mitochondrial DNA

13   unit of the FBI laboratory -- laboratory division of the FBI,

14   Federal Bureau of Investigation.

15   Q.  And what is the --

16             THE COURT:  Any question about her qualifications?

17             MS. VANLOWE:  No, Your Honor.

18             MR. WOOD:  No, Your Honor.

19             THE COURT:  All right.  She's qualified.

20             MS. GILES:  Thank you, Your Honor.  And we'd move in

21   Government Exhibit 28, which is her CV.

22             THE COURT:  It's admitted.

23             MS. GILES:  Thank you, Your Honor.

24   BY MS. GILES:

25   Q.  Dr. Fisher, can you please tell the jury what mitochondrial

1    DNA is?

2    A.  Mitochondrial DNA is one of the two kinds of DNA found in

3    the cells of our bodies, with nuclear DNA being the other kind

4    of DNA.

5        Now, DNA is the genetic material in our cells that can be

6    sort of an instruction manual for how to build you, what you

7    look like, and how your body works.

8        Now, the bulk of this information is stored in the nuclear

9    DNA.  It's the kind you have probably heard of before, but --

10   and if you think of yourself as an egg, nuclear DNA is found in

11   the egg yolk.  Now, out on the egg -- excuse me.  Out in the egg

12   white portion of the cell, there are structures called

13   mitochondria which are responsible for producing energy for your

14   body and your cells in your body to work.  And it's a little bit

15   of DNA in these mitochondria, and that DNA stores information

16   for how to build some of the energy-producing equipment.

17   Q.  And so how does -- exactly does mitochondrial DNA differ

18   from the nuclear DNA?

19   A.  There -- for forensics, there are two very important

20   differences.  And I've prepared a slide.

21   Q.  No, we don't.

22   A.  No?  Okay.  There are two major important -- two important

23   differences are the difference in a copy number and the

24   difference in mode of inheritance.  So nuclear DNA, in that

25   nucleus, that egg yolk, you have one copy you inherit from your

1    mother and one copy you inherit from your father.  And that

2    combination for nuclear DNA is unique to an individual with the

3    exception of identical twins.

4         The mitochondria -- again, they're out in the egg white

5    portion of the cell, and there are many mitochondria per cell

6    and it's many copies of mitochondrial DNA within each

7    mitochondria.

8         So on average, you're going to have hundreds to thousands of

9    copies of mitochondrial DNA per cell whereas you only have two

10   copies of the nuclear DNA.  And it's this difference in copy

11   number that explains why we are able to get a mitochondrial DNA

12   type out of types of evidence -- say it's just a hair shaft --

13   where you would not be able to get a nuclear DNA type.

14        Now, the other big difference in between the two types of

15   DNA is the mode of inheritance.  Remember we said with nuclear

16   DNA you get a copy from your mother and one copy from your

17   father?  Well, with mitochondrial DNA, it only comes through the

18   maternal line.  You only get the mitochondrial DNA from your

19   mother.

20        So if you take my family for an example, the mitochondrial

21   DNA that I have is the same as my mother has and the same as my

22   mother's mother has.  It's also the same as my sister and my

23   brother and my children and my sister's children, but my

24   brother's children will have the same mitochondrial DNA of their

25   mother.

1    So everyone that can be traced through a maternal relative

2  would be expected to have the same type of mitochondrial DNA.

3  Q.  So to clarify, nuclear DNA is unique and there are fewer

4  copies of nuclear DNA within the cell?

5  A.  That's correct.

6  Q.  And with mitochondrial DNA, there are multiple copies and it

7  is only inherited through the mother?

8  A.  That's correct.

9  Q.  And so when is a mitochondrial analysis used instead of

10 nuclear DNA analysis?

11 A.  There's two reasons why mitochondrial DNA is used.

12 Typically, it's used, like in this case, where there isn't

13 enough material to be able to get a nuclear DNA type from

14 evidence, such as a hair shaft.  There just isn't enough nuclear

15 DNA in that with our current technologies to be able to get a

16 type out of it, but you're able to get a mitochondrial DNA type

17 out of that kind of evidence.

18 Q.  And did you examine any evidence in this case?

19 A.  Yes, I did.

20 Q.  Particularly, did you examine a specimen of hair identified

21 as Q26.1 which was identified as coming from a mask, Q26?

22 A.  Yes, I did.

23 Q.  And what did you do with respect to that item?

24 A.  That item went through the steps -- the laboratory steps we

25 do to produce a mitochondrial DNA type.  The hair is ground up,

1    the DNA is extracted away, and it's purified away from all of

2    the portions of the hair.

3        We then copy specific regions of the mitochondrial DNA which

4    are known to differ between different maternal lineages, and

5    then we determine the order of the building blocks of that DNA

6    and that represents the mitochondrial DNA type.

7    Q.  And you did that in this case?

8    A.  Yes, we did.

9    Q.  And what was the result of your examination?

10   A.  When I -- with Q26.1, I was able to get a mitochondrial DNA

11   type.

12   Q.  Did you compare it to any known samples after that?

13   A.  Yes.  I received a number of known samples which also went

14   through the same steps in the laboratory.  I received -- if I

15   may refer to my report?

16           THE COURT:  Yes.

17           THE WITNESS:  I received known samples, a K6 from

18   Stanley Winston, a K10 from Anthony Cannon, a K14 from Tobias

19   Dyer, and a K18 from Keith Reed.

20   BY MS. GILES:

21   Q.  Did you develop the mitochondrial DNA sequence for those

22   known samples?

23   A.  Yes, I did.

24   Q.  And after you developed those sequences, what did you do

25   next?

1  A.  Then I did a comparison, and I was able to determine from

2  that that I was able to exclude Anthony Cannon, Tobias Dyer, and

3  Keith Reed as the source of the Q26.1 hair.

4  Q.  You were able to exclude those individuals?

5  A.  Those individuals were excluded, but Stanley Winston was not

6  excluded.  I could not exclude him as the source of the hair

7  because the sequences I got from the Q26.1 hair and the known

8  sample I had from Stanley Winston were the same.

9  Q.  Okay.  And so once you got the result of these sequences

10 matching between the known of Stanley Winston and the Q26 hair

11 from the mask, Q26, how did you give meaning to your results?

12 A.  Well, since -- we know mitochondrial DNA is not unique to an

13 individual because at least all maternal relatives are going to

14 have the same mitochondrial DNA type.  Also, there are people

15 out in the general population that can share mitochondrial DNA

16 types.  They may be distantly maternally related and not know it

17 or they could just happen to have the same sequence of the

18 building blocks that -- just by chance.

19     So when we have two sequences in a case that have the

20 sequence -- two samples that have the same sequence, we then

21 query a database of sequences to get an estimate of how common

22 or rare that particular sequence is in the general population.

23 Q.  And you did that in this case?

24 A.  Yes, we did.

25 Q.  And what were your results?

1    A.  For -- well, the database that I use has 11 different

2    population groups.  Are you interested in the results from all

3    of those?

4    Q.  Mainly the African-American, Caucasian, southeastern

5    Hispanic, and I believe southwestern Hispanic, or the most

6    popular of sequences in your book --

7    A.  Okay.  The three --

8    Q.  -- in your database.

9    A.  A database is composed of four -- overall database is

10   composed of 4,000 individuals.  The most populous of those are

11   the African-American, the Caucasian, and Hispanic.

12       And the -- I probed the database.  I didn't see -- that

13   particular sequence that was found in the Q26.1 and the K6

14   sample from Mr. Winston was not seen in that -- in our database

15   in any of the section.

16   Q.  So what did that mean?

17   A.  That means -- well, it means it's a rare sequence, but to

18   give an actual -- a number to it, we apply some standard

19   statistical calculations to it similar to when they do a

20   presidential poll.  They call individuals -- a number of

21   individuals across the country and ask if you think the

22   President is doing a good job or not.  Then they'll say the

23   presidential approval rating is 50 percent plus or minus 5

24   percent, and they give that plus or minus 5 percent because they

25   haven't called everybody in the country.  So the actual

C. Fisher - Direct                                      211

1   percentage could be anywhere between 45 percent or 55 percent.

2      When we do our calculations with the database, we also have

3   that plus or minus, but we're actually using the plus 5 percent.

4   So the results that I'm about to give you would be the higher --

5   the more frequent estimate of the frequency.

6   Q.  And why do you use the higher frequency?

7   A.  That makes it more common, and that would be beneficial to

8   the defendant.

9   Q.  Okay.  And so -- and what did you find were the frequencies

10  that you -- for those populations that I listed?

11  A.  Okay.  For African-Americans, the upper-bound frequency

12  estimate is .46 percent.  If you round up to .5 percent, that

13  means I would expect to see this particular sequence in no more

14  than five out of every 1,000 African-Americans.

15     For Caucasians, it's .17 percent.  Again, if you round that

16  .2 percent, that's -- I would expect to see this particular

17  sequence in no more than two out of every 1,000 Caucasians.  And

18  for Hispanics, it's .48 percent.  So doing a similar

19  calculation, that is also around five out of every 1,000

20  Hispanics.

21          MS. GILES:  Your Honor, those are all the questions we

22  have for this witness.

23          THE COURT:  All right.

24          MR. WOOD:  I have no questions.

25

1                          **CROSS-EXAMINATION**

2    BY MS. VANLOWE:

3    Q.  Good afternoon.

4    A.  Good afternoon.

5    Q.  I again want to try to bring this down to my intelligence

6    level so it needs to be very basic.  And so what I'm trying to

7    determine from what you said is that essentially the sequence

8    that you found in the DNA sample that you pulled from this mask

9    has the same sequence -- that same sequence can be found in a

10   Caucasian person, an Hispanic person, and an African-American

11   person; is that correct?

12   A.  What I'm saying is that if you -- when we probed the

13   database --

14   Q.  Well, not necessarily just probing the database.  What I'm

15   trying to do is bring this to a very simplistic level.  So you

16   gave us the statistics and the high frequency, and I

17   respectfully appreciate your analysis, but, again, I have to

18   understand it.  So just to bring it down to its most basic

19   level, what you're saying is that there is a basic sequence in

20   the mitochondrial DNA; is that right?

21   A.  That's correct.

22   Q.  And more than one person can have that sequence, right?

23   A.  Yes.

24   Q.  And so that particular sequence, if you find that sequence

25   in the hair the way that you said that you did with respect to

1  the Winston sample and this sample that you found on the mask,

2  that doesn't identify that particular hair that you found on the

3  mask as Mr. Winston's hair, right?

4  A.  That's correct.  Mitochondrial DNA cannot do that.

5  Q.  As a matter of fact, there could be, you're saying, at least

6  12 other people that could have that same sequence?

7  A.  No.  What I'm saying is that if -- it depends on which

8  portion of the database you're looking at.

9  Q.  Okay.  Approximately how many other people, based upon what

10  you analyzed, could have this particular sequence?

11  A.  That's very difficult to say.  Again, it depends on which

12  section of the database you're looking at.

13  Q.  Let's look at every section of the database.  Approximately

14  how many other people could have that same sequence?

15  A.  There could be -- again, we can go through the -- each

16  section of the database at a time.

17  Q.  Let me ask you this.  Based upon your -- based upon your

18  analysis, could it be more than ten people?

19  A.  Yes, it could be more than ten people.

20  Q.  Could it be more than 20 people?

21  A.  It depends on how -- again, if you have those -- a room full

22  of 1,000 individuals and you had every section of the

23  database -- the problem with this type of -- the question you're

24  asking is that to add up all these different groups, you would

25  have more than -- you would have to be dealing with more than

C. Fisher - Cross                                          214

1    the 1,000 individuals in the room.

2    Q.   Exactly.  And so when we're talking about the number of

3    individuals that have this sequence, this same sequence, at the

4    very least there are at least ten other people that could have

5    the same sequence as what you found with respect to the hair

6    that you saw in the mask with respect to Mr. Winston?

7    A.   If you would combine -- in your analogy, if you would

8    combine the African-American section of the database, which

9    would have five out of 1,000; if you have Caucasian, you would

10   have two out of 1,000 so that's seven out of 2,000; and Hispanic

11   would be another five out of 1,000 so that's 12 out of 3,000.

12        If those were your three rooms, you could have 12 -- no more

13   than 12 people with that particular sequence.

14   Q.   And if I'm understanding you correctly, there could be

15   individuals -- I hope I'm getting this right -- but there could

16   be individuals that are not even of African descent that have

17   the same sequence?

18   A.   That is possible.

19   Q.   So there could be a Caucasian woman -- a Caucasian person

20   that has the same sequence as what you found in the

21   mitochondrial DNA in the hair that you pulled off of that mask

22   or the hair that was found on the mask?

23   A.   It is possible.

24   Q.   And it's also possible that a Hispanic person could have the

25   same sequence as what -- as the sample that was pulled out of

1   the mask that you analyzed.  Is that possible as well?

2   A.  That is also possible.

3   Q.  And so in addition to that, within those -- the Caucasian,

4   the Hispanic and the person of African descent, you're saying

5   that approximately no more than 12 other people could

6   potentially have the same sequence?

7   A.  If we're dealing with those particular population groups,

8   yes.

9           MS. VANLOWE:  Great.  Thank you very much.  I have no

10  other questions.

11                          **CROSS-EXAMINATION**

12  BY MR. ROBERTSON:

13  Q.  Out of the samples you analyzed, were any of them traced to

14  Mr. Cannon?

15  A.  No.  I was able to exclude Anthony Cannon as a source of the

16  hairs.

17  Q.  Okay.  Now, the mitochondrial DNA is, I guess, for lack of a

18  better term -- I'm not very scientific -- passed down through

19  your mother's line?

20  A.  That's correct.

21  Q.  So while I have it from my mother, my children would not?

22  A.  That's correct.

23  Q.  Okay.  So brothers and sisters would have the same line?

24  A.  Provided they have the same mother, yes.

25  Q.  Cousins would have the same line from their grandmother?

1    A.  Yes.

2    Q.  And you could keep on going back, I guess -- how many

3    grandmothers do you have to go back to have the same sequence?

4    A.  The fastest calculated mutation rate, which is how fast it

5    which change, is 19 generations.  So there are a number of

6    individuals out there that would share the same sequence who are

7    maternally related but don't know they're maternally related.

8    Q.  So we could say, just for an example, Dolley Madison is

9    Mr. Winston's 18th great-grandmother, right, and he's getting

10   his -- this mitochondrial DNA from Dolley Madison.  I'm only

11   picking that because she's a famous figure who we know who lived

12   in the past.

13        Everybody else who lives in the D.C. area who might have

14   been descended from Dolley Madison would have the same

15   mitochondrial DNA sequence?

16   A.  I would expect that, yes.

17        MR. ROBERTSON:  Thank you.  I don't have any other

18   questions, Your Honor.

19        THE COURT:  Thank you.  You may step down and may be

20   excused.

21        (Witness stands down.)

22        THE COURT:  Do you have another short witness?

23        MS. BELLOWS:  I'm not sure.  Well, yeah, I think he can

24   be short, Your Honor.

25        THE COURT:  Or do you happen to have one that you can

1   make short?

2           MS. BELLOWS:  Yes.  It is Christopher Ormerod.

3                    **CHRISTOPHER ORMEROD,**

4            after having been duly sworn or affirmed,

5            took the stand and testified as follows:

6                    **DIRECT EXAMINATION**

7   BY MS. BELLOWS:

8   Q.  Good afternoon.  Will you please state your name for the

9   record.

10  A.  Christopher Ormerod.

11  Q.  How do you spell Ormerod?

12  A.  O-R-M-E-R-O-D.

13  Q.  How are you employed?

14  A.  I'm a special agent with the Federal Bureau of

15  Investigation.

16  Q.  On December 22nd of 2012, were you involved in an

17  investigation of -- robbery investigation that led you to

18  Washington, D.C.?

19  A.  Yes, I was.

20  Q.  And did you conduct searches of a wooded area and of a trash

21  can -- or obtain evidence from a trash can with Agent DeJesus?

22  A.  Yes, I did.

23  Q.  Okay.  And did you locate two GPS trackers in the woods with

24  Agent DeJesus?

25  A.  Yes, I did.

1   Q.  Okay.  And after that, what did you do?

2   A.  We were notified that there was still an outstanding GPS

3   unit going off so I started tracking to that location.

4   Q.  How did you start tracking it?

5   A.  With a handheld GPS tracker.

6   Q.  And where did it take you?

7   A.  Took me to 15 -- the rear of 1501 38th Street.

8   Q.  Is that a home?

9   A.  Yes.

10  Q.  And when you say it took you to the rear, can you explain

11  what you mean?

12  A.  There was a -- in the back of the residence there's a door,

13  and the GPS tracker was tracking right to the door.

14  Q.  When you say that it's tracking right to the door, can you

15  explain what you mean by that?

16  A.  Yes.  As you get closer to where the actual GPS is, the

17  handheld device gets louder.  And you can see on it, it starts

18  going from like a 1 to, let's say, a 1 to 10, and it gets closer

19  to the 10.  So if you're further away, it's closer to the 1 and

20  the sound that it puts out is a lot less.

21  Q.  And was the loudest sound right there by the door in the

22  back of 1501 38th Street?

23  A.  Yes.

24  Q.  And did the FBI obtain a warrant to search that residence?

25  A.  Yes, they did.

1  Q.  Did you participate in that search?

2  A.  Yes, I did.

3  Q.  What was your role in that search?

4  A.  I was the seizing agent.

5  Q.  What does that mean?

6  A.  It means once all the evidence is collected and packaged, I

7  seize it from the house.

8  Q.  And did you actually search for things too in the house?

9  A.  Yes, I participated.

10  Q.  Now, you testified earlier that the handheld device alerted

11  you to the back of the door.  Did you participate in the search

12  of the room that was on the other side of that door?

13  A.  Yes, I did.

14  Q.  And what kind of room was that?

15  A.  It was a bedroom.

16  Q.  Were there other agents with you during the search of that

17  room?

18  A.  Yes, there was.

19  Q.  Please describe for the members of the jury the search of

20  that room and what you located therein.

21  A.  As you go into the bedroom from the basement of the

22  residence, immediately to your right there was a utility closet.

23  It had like a furnace or -- and stuff in it.  And then there was

24  another door to the right, which was a bathroom.  Directly in

25  front of me was a closet.  A little bit to the left was a bed,

1    and along the same wall where you walk into the bedroom is

2    another door leading to the outside.

3    Q.  Was that the same door that the tracker had indicated that

4    the device might be near that door?

5    A.  Yes, it was.

6    Q.  And did you locate anything near that door?

7    A.  Yes.  As we began to search, we started searching in the

8    vicinity of that door, and we located some U.S. currency with --

9    inside of a bag.

10   Q.  Let me ask you to look at what's been marked as Government

11   Exhibit 9-10.  I believe it's up there in a bag.

12        No.  Sorry, sir.  It's 9-10, and it should be in one of the

13   bags.  It's a large bag.

14        Will you take a look inside the bag?

15        With the assistance of the court security officer, I'll give

16   you some gloves.  You have some.

17        Before you take it out, do you recognize what that is?

18   A.  Yes.

19   Q.  What is it?

20   A.  This right here?

21   Q.  Yes.  What is that?

22   A.  This is a GPS tracking device.

23   Q.  Did you locate that during the search of the house?

24   A.  This is the GPS, yes.

25   Q.  Where did you find it?

1  A.  This was in between the bundle of money that was located in

2  the bag.

3  Q.  Is the bag also contained in what's marked as Government

4  Exhibit 9-10?

5  A.  Yes.

6  Q.  Now, in addition to the GPS tracker and the bag that's --

7  that have been marked as Government Exhibit 9-10 and 9-10A, was

8  there anything else in that bag?

9  A.  There was additional money.

10  Q.  Additional money?  How much?  Do you know?

11  A.  If I can recall correctly, it was about $10,320.

12  Q.  Did you also search the closet of that room?

13  A.  Yes, I did.

14  Q.  And what was located in that closet?

15  A.  Located in that closet were three weapons and additional

16  money.

17  Q.  Okay.  What kind of weapons?

18  A.  One was two pistols, and I think the third was a pistol that

19  kind of resembled a -- like a MAC-10 type of a pistol.

20  Q.  Okay.  And you say more money was also located?

21  A.  Yes.

22  Q.  Do you know how much?

23  A.  About $7,837.

24  Q.  Was any additional money found anywhere else in the room?

25  A.  Yes.

1   Q.  How much?

2   A.  There was two packs of 1s that were $100 each underneath the

3   pillow on the bed.

4   Q.  For a total of how much?

5   A.  $200.

6   Q.  With the assistance of the court security officer, I'd like

7   you to identify, if you can, what's been marked as 9-6.  Do you

8   recognize that exhibit?

9   A.  It appears to be the same weapon that was found in the

10  closet.

11  Q.  Okay.  Is it the same weapon or does it just appear to be?

12  A.  To my recollection, it looks -- yeah.

13  Q.  Did you package it?

14  A.  I did not package it there.  This was -- I was the seizing

15  agent of it so --

16  Q.  Did you take photographs of the weapon when you recovered it

17  at the home?

18  A.  Yes.

19  Q.  And then also, please, look at what's been marked as

20  Government Exhibit 9-6A and 9-6B.

21      Before you look at that, when you -- when the FBI recovered

22  the first gun -- well, explain to the jury how you found the

23  guns -- or how the FBI agents found the guns.

24  A.  The weapon that you just showed me, along with another

25  handgun that had a drum magazine, they were located first in

Appeal: 13-4835    Doc: 47-1    Filed: 05/07/2014    Pg: 321 of 355

1   like a basket covered by some -- partially covered, because as

2   soon as you opened the closet and we looked down, we could see

3   the front portion of that weapon and we asked for the

4   photographer to come by.

5   Q.  And that weapon that you just saw -- or that you just looked

6   at that's been marked as Government Exhibit 9-6, was it loaded?

7   A.  Yes, it was.

8   Q.  And how was it loaded?

9   A.  It had a clip in it, a magazine, right here, and then there

10  was also a round in the chamber.

11  Q.  Now, if you may, look at what's been marked as Government

12  Exhibit 9-6A and 9-6B.  Can you identify that?

13  A.  It's a nine-millimeter bullet.

14  Q.  Do you know where that bullet came from?

15  A.  This was taken from the inside of the gun, the chamber of

16  the gun.

17  Q.  What you just looked at, that's 9-6?

18  A.  Yes.

19  Q.  Now, look at what's been marked as 9-6B.  Do you recognize

20  that exhibit?

21  A.  Yes.  This is the magazine that was inside the weapon.

22  Q.  Do you know if the weapon has any particular brand name?  Is

23  it called anything in particular?

24  A.  I believe it was manufactured by Luger.

25  Q.  Did you say Luger?

1   A.  Luger.

2   Q.  Do you know if it's an automatic or a semiautomatic weapon?

3   A.  I don't.

4   Q.  Please look at what's been marked as Government Exhibit 9-7,

5   which I'll provide you with the assistance of the court security

6   officer.  Do you recognize that exhibit?

7   A.  Yes, I do.

8   Q.  What is it?

9   A.  It's a pistol.

10  Q.  And did you recover that during the search?

11  A.  Yes.

12  Q.  And was it one of the two that you described to the jury

13  earlier that was inside a basket?

14  A.  Yes, it is.  This is the one that had a drum magazine at the

15  bottom of it.

16  Q.  So when you found it, it was loaded with the drum magazine?

17  A.  Yes, it was.

18  Q.  Did it have any bullets in the chamber?

19  A.  Yes, it did.

20  Q.  With the assistance of the court security officer, I'd like

21  you to look at what's been marked as Government Exhibit 9-7A.

22      Do you recognize that exhibit?

23  A.  Yes.

24  Q.  What is it?

25  A.  It's a bullet.

1  Q.  Where did that bullet come from?

2  A.  It came from the weapon that I just saw.

3  Q.  The one that was marked Government Exhibit 9-7?

4  A.  Yes.

5  Q.  Okay.  And what kind of gun, if you know, was the one you

6  just identified as 9-7?

7  A.  I'm not sure of the manufacturer.

8  Q.  Do you know the caliber?

9  A.  .45.

10  Q.  With the assistance of the court security officer, I'd like

11  you to look at 9-7B.  What is that?

12  A.  It's a drum magazine.

13  Q.  Where was that located?

14  A.  It was loaded in the handgun that I just saw.  I don't know

15  the exhibit number.

16  Q.  The one you just were shown?

17  A.  Yes.

18  Q.  The one that was a .45 caliber?

19  A.  Yes, ma'am.

20        MS. BELLOWS:  Your Honor, I'd move for the admission of

21  Government Exhibit 9-6, 9-6A, 9-6B, 9-7, 9-7A, and 9-7B.

22        THE COURT:  They're admitted.

23  BY MS. BELLOWS:

24  Q.  Were any other weapons -- well, you indicated that three

25  weapons were recovered?

1   A.   Yes.

2   Q.   Where was the other one recovered?

3   A.   In the closet, but it was further back in -- further back to

4   the right and it was like under a bunch of other items that were

5   in the closet.

6   Q.   I'd ask you to look at what's been marked as Government

7   Exhibit 9-8.  Do you recognize that exhibit?

8   A.   Yes.

9   Q.   What is it?

10  A.   It's another handgun, pistol.

11  Q.   Is that the one that was located at the bottom of the

12  closet?

13  A.   Yes.

14  Q.   Was anything found underneath the bed in that bedroom during

15  the search?

16  A.   Yes.

17  Q.   What?

18  A.   There were two magazines in a plastic bag.

19  Q.   Is that the same bedroom where these guns were found?

20  A.   Yes.

21  Q.   Please take a look at what's been marked as Government

22  Exhibit 9-9.  Do you recognize that exhibit?

23  A.   Yes.

24  Q.   What is it?

25  A.   Two magazines and a plastic bag.

```
1   Q.  Were those the ones that were recovered under the bed in

2   that same bedroom?

3   A.  Yes.

4           MS. BELLOWS:  Your Honor, I'd move for the admission of

5   Government Exhibit 9-9.

6           THE COURT:  It's admitted.

7   BY MS. BELLOWS:

8   Q.  Please look at what's been marked as Government

9   Exhibit 9-11.  Do you recognize that exhibit?

10  A.  Yes.

11  Q.  What is it?

12  A.  It's mail with the name Anthony Cannon.

13  Q.  And what's the address on that mail?

14  A.  1501 38th Street, S.E., Washington, D.C. 20020.

15  Q.  And where was that piece of mail found?

16  A.  Right inside the door of the bedroom to the left on a --

17  like a little table.

18  Q.  Same bedroom where the guns and the magazines were found?

19  A.  Yes.

20          MS. BELLOWS:  Your Honor, I would move for the

21  admission of 9-11.

22          THE COURT:  It's admitted.

23  BY MS. BELLOWS:

24  Q.  Were photographs taken during the search?

25  A.  Yes.  Prior to the search, our Evidence Response Team was
```

1   conducting the search, and they photographed the entire house

2   prior to the search.

3   Q.  And were photographs also taken while items were being

4   located?

5   A.  Yes.

6   Q.  Please look in the binder with the 9 series.  Okay.  There's

7   no book up there with a 9 series?  In between?

8       Do you have any books in front of you?

9           MS. BELLOWS:  Your Honor --

10          THE COURT:  Are they photographs?

11          MS. BELLOWS:  Yes, Your Honor.

12          THE COURT:  91-A and?

13          MS. BELLOWS:  9-1A to 9-1 --

14          THE COURT:  Do you-all have any objection to those?

15          MR. WOOD:  No, Your Honor.

16          THE COURT:  All right.  They're admitted.

17          MS. BELLOWS:  Okay.  Your Honor, then I would ask to

18  admit 9-1A and B.

19          THE COURT:  I've already admitted those.

20          MS. BELLOWS:  Okay.  9-2A to 9-2E, 9-3A to 9-3I, 9-4A

21  to 9-4E, 9-5A to 9-5O.  And those are photographs, Your Honor.

22          THE COURT:  Any objection?

23          MR. WOOD:  No, Your Honor.

24          THE COURT:  They're admitted.

25          MS. BELLOWS:  And 9-10A?  Is that a photograph too?

1   BY MS. BELLOWS:

2   Q.  Now, did you -- was the cash that was found inside the

3   closet, was that counted?

4   A.  Yes.

5   Q.  And how much money was in the closet?

6   A.  If I can recall correctly, it was $7,837.

7   Q.  And the money that was recovered in the woods, was that also

8   counted?

9   A.  Yes.

10  Q.  And how much money was found in the woods?

11  A.  I want to say somewhere around 19,000.  I don't know

12  specifics exactly.

13  Q.  And did you -- you said you were the seizing agent and so

14  you took custody of everything that was seized from the house.

15      Did you also take custody of any other evidence that was

16  recovered that day?

17  A.  I took custody of all the evidence from Pope Street that was

18  collected from the trash can in front of 1501 38th Street, and I

19  took custody of the items that were seized within that address.

20  And I also took custody of the items that were located and

21  seized from the wooded area.

22  Q.  If you can look at what's been marked as Government

23  Exhibit 7-2A to 7-2G.  Do you recognize that exhibit?

24  A.  Yeah.  It appears to be the bag taken off Pope Street.

25  Q.  And also the items that were found in the bag?

1    A.  Yes.

2            MS. BELLOWS:  Your Honor, I would move in the admission

3    of 7-2A to 7-2G.

4            THE COURT:  All right.  They're admitted.

5            How much more do you have?

6            MS. BELLOWS:  I believe he testified also to this

7    exhibit.  I'd also move 9-10, and then I have nothing further.

8            THE COURT:  That's admitted.

9            Do you-all have any questions of this witness?

10           MR. ROBERTSON:  I do, Your Honor.

11           THE COURT:  All right.  Why don't we do that tomorrow.

12           We'll adjourn now until 10 o'clock tomorrow morning.

13   * * *

14   (Proceedings concluded at 5:34 p.m.)

15

16   _____

17                          CERTIFICATION

18

19       I certify, this 22nd day of January 2014, that the

20   foregoing is a correct transcript from the record of proceedings

21   in the above-entitled matter to the best of my ability.

22

23                        /s/

24              _____
                  Tracy Westfall, RPR, CMRS, CCR

25

## $

**$10,320** [1] - 221:11
**$100** [1] - 222:2
**$15,000** [1] - 11:17
**$19,000** [1] - 9:2
**$200** [1] - 222:5
**$60,411.15** [1] - 54:6
**$7,837** [2] - 221:23, 229:6
**$700** [1] - 10:22

## /

**/s** [1] - 230:23

## 1

**1** [11] - 6:11, 29:8, 69:22, 69:23, 103:16, 115:7, 193:22, 218:18, 218:19
**1,000** [9] - 153:22, 211:14, 211:17, 211:19, 213:22, 214:1, 214:9, 214:10, 214:11
**1-1** [1] - 29:4
**1-10** [3] - 115:5, 115:6, 115:21
**1-11** [4] - 52:24, 52:25, 53:1, 53:25
**1-12** [1] - 54:11
**1-17** [1] - 29:9
**1-17A** [1] - 29:22
**1-17D** [2] - 29:6, 29:7
**1-17G** [1] - 29:23
**1-19C** [1] - 56:13
**1-1A** [2] - 27:25, 28:11
**1-1C** [2] - 28:19, 28:20
**1-1D** [2] - 27:25, 28:11
**1-2** [2] - 82:6, 83:12
**1-2A** [3] - 84:19, 85:1, 85:7
**1-2B** [1] - 84:19
**1-2C** [1] - 84:19
**1-2D** [2] - 84:19, 85:1
**1-3** [4] - 82:14, 83:12, 83:16, 84:7
**1-3A** [2] - 85:9, 85:19
**1-3D** [2] - 85:10, 85:19
**1-4** [2] - 82:20, 83:12
**1-4A** [2] - 85:24, 86:8
**1-4E** [1] - 85:24
**1-5** [3] - 55:9, 56:7, 78:6
**1-5..** [1] - 55:9
**1-5A** [3] - 55:22, 56:8, 78:7
**1-5B** [2] - 55:22, 56:8
**1-6** [3] - 83:2, 83:12, 86:11
**1-6A** [1] - 86:9
**1-6C** [1] - 86:10
**1-7** [3] - 28:21, 28:22, 30:23
**1-7A** [1] - 30:23
**1-7G** [1] - 30:23

## 1

**1-8** [2] - 30:11, 30:23
**1-9** [1] - 71:8
**1-9A** [4] - 56:13, 71:8, 95:12, 95:22
**1-9B** [1] - 95:12
**1-9C** [3] - 71:8, 95:12, 95:22
**10** [4] - 161:7, 218:18, 218:19, 230:12
**100** [3] - 153:21, 153:22, 200:4
**104** [1] - 2:8
**105** [1] - 2:9
**10:00** [2] - 1:7, 173:13
**10:11** [1] - 3:22
**10:30** [2] - 135:16, 187:13
**11** [3] - 135:16, 193:23, 210:1
**116** [1] - 2:9
**119** [1] - 123:4
**11:30** [1] - 6:10
**11:32** [1] - 22:19
**11:47** [1] - 22:19
**12** [5] - 213:6, 214:11, 214:12, 214:13, 215:5
**134** [1] - 2:10
**142** [1] - 2:10
**15** [2] - 10:1, 218:7
**150** [1] - 140:13
**1501** [10] - 8:13, 166:14, 171:3, 174:4, 178:25, 183:12, 218:7, 218:22, 227:14, 229:18
**155** [2] - 2:10
**157** [1] - 2:11
**16-and-a-half** [1] - 191:4
**160** [2] - 2:11, 140:13
**163** [1] - 2:12
**166** [1] - 2:13
**17** [2] - 1:6, 211:15
**171** [1] - 2:13
**172** [1] - 2:14
**180** [2] - 19:15, 144:6
**184** [1] - 2:14
**18th** [1] - 216:9
**19** [1] - 216:5
**19,000** [1] - 229:11
**19-C** [1] - 77:9
**190** [1] - 2:15
**194** [1] - 2:15
**1:01** [1] - 92:18
**1:13-cr-48** [1] - 1:5
**1D** [1] - 85:19
**1s** [2] - 114:9, 222:2

## 2

**2** [2] - 165:5, 211:16
**2,000** [3] - 109:23, 153:21, 214:10
**20** [4] - 24:13, 126:18, 171:4, 213:20

## 2

**20020** [1] - 227:14
**2012** [9] - 23:21, 80:21, 93:17, 105:21, 134:15, 157:11, 163:21, 166:13, 217:16
**2013** [2] - 1:6, 230:19
**2013-48** [1] - 3:2
**204** [1] - 2:16
**21** [1] - 89:15
**212** [1] - 2:16
**217** [1] - 2:17
**22** [3] - 134:15, 157:11, 163:21
**22nd** [14] - 12:7, 23:21, 29:20, 30:20, 47:5, 80:21, 93:16, 99:25, 102:25, 105:20, 122:9, 166:13, 217:16, 230:19
**23** [1] - 2:4
**230** [3] - 140:9, 144:1, 144:22
**24/7** [2] - 129:13, 131:5
**28** [1] - 204:21
**2:15** [1] - 92:17
**2:19** [1] - 92:18

## 3

**3** [10] - 57:5, 72:14, 72:16, 73:1, 73:2, 73:3, 94:14, 102:12, 161:7, 193:22
**3,000** [1] - 214:11
**3-1B** [3] - 102:10, 102:13, 103:16
**3-2B** [3] - 102:10, 102:13, 103:16
**3-3B** [3] - 102:10, 102:13, 103:16
**3-4** [2] - 103:2, 103:16
**30** [2] - 137:4, 155:10
**300** [1] - 153:22
**31** [1] - 2:4
**32** [4] - 193:15, 193:17, 193:24, 194:3
**3800** [12] - 135:21, 135:22, 135:24, 136:1, 136:9, 137:9, 137:11, 137:12, 140:3, 142:16, 142:17, 150:2
**3815** [2] - 141:1
**38th** [17] - 8:13, 106:12, 106:16, 106:25, 107:15, 108:6, 129:25, 130:2, 166:14, 171:3, 174:4, 178:25, 183:12, 218:7, 218:22, 227:14, 229:18
**3:45** [1] - 165:23
**3SI** [5] - 98:11, 98:12, 98:13, 98:16, 99:14

## 4

**4** [4] - 94:18, 160:21, 161:7, 193:22
**4,000** [1] - 210:10
**4-1** [2] - 114:12, 114:25
**4-4** [2] - 164:6, 164:7
**400** [1] - 94:14
**45** [4] - 2:4, 211:1, 225:9, 225:18
**46** [2] - 2:5, 211:12
**48** [1] - 211:18
**4:04** [1] - 165:23

## 5

**5** [8] - 57:3, 57:4, 71:4, 161:7, 210:23, 210:24, 211:3, 211:12
**5'10** [2] - 139:14, 144:5
**5'5** [1] - 27:9
**5'7** [1] - 140:12
**5'9"** [1] - 45:4
**5-1A** [3] - 71:4, 177:15, 177:21
**5-1J** [2] - 56:25, 57:6, 69:11
**5-1K** [1] - 178:3
**5-1P** [3] - 57:1, 57:6, 57:7
**5-1Q** [2] - 177:15, 177:22
**5-2** [5] - 175:20, 175:24, 176:1, 176:19, 189:18
**5-3** [1] - 175:24
**5-3A** [4] - 175:20, 176:6, 176:20, 189:18
**5-3B** [4] - 175:20, 176:8, 176:20, 189:18
**5-4** [5] - 175:21, 175:24, 176:12, 176:20, 189:18
**5-5** [4] - 175:21, 175:24, 177:2, 177:10
**5-6** [5] - 175:21, 175:24, 177:2, 177:11, 178:5
**5-7** [4] - 175:21, 175:24, 177:2, 177:11
**5-foot-5** [2] - 32:14, 42:22
**50** [2] - 200:2, 210:23
**500** [2] - 94:18, 153:21
**55** [1] - 211:1
**58** [1] - 2:5
**5:00** [1] - 6:12
**5:30** [1] - 6:12
**5:34** [1] - 230:14
**5B** [1] - 78:7

## 6

**6** [3] - 139:14, 140:9, 144:5
**6'2** [1] - 140:9
**6-1A** [2] - 179:25, 180:6
**6-1D** [2] - 180:1, 180:7

**6-2A** [4] - 179:13, 179:17, 179:18, 179:21
**6-2B** [2] - 179:18, 179:21
**6-2C** [1] - 179:21
**6-2G** [2] - 179:13, 179:18
**6-foot-2** [2] - 144:1, 144:21
**66** [4] - 93:21, 94:13, 95:18, 96:7
**6:00** [3] - 10:25, 13:11

## 7

**7-1A** [4] - 141:10, 142:5, 181:1, 181:9
**7-1B** [2] - 141:11, 142:5
**7-1D** [2] - 181:2, 181:10
**7-2** [1] - 192:15
**7-2A** [2] - 229:23, 230:3
**7-2G** [2] - 229:23, 230:3
**79** [1] - 2:5
**7th** [5] - 10:1, 10:8, 10:23, 13:12, 16:7

## 8

**8** [2] - 10:8, 183:18
**8-1A** [3] - 183:16, 184:3, 184:9
**8-1G** [3] - 183:16, 184:3, 184:10
**8-2** [5] - 100:12, 100:19, 183:14, 183:19
**8-3** [6] - 101:13, 101:15, 102:6, 183:14, 183:19
**80** [1] - 2:6
**86** [1] - 2:6
**875** [1] - 23:12

## 9

**9** [2] - 228:6, 228:7
**9-1** [1] - 228:13
**9-10** [5] - 220:11, 220:12, 221:4, 221:7, 230:7
**9-10A** [5] - 101:13, 101:15, 102:6, 221:7, 228:25
**9-11** [2] - 227:9, 227:21
**9-1A** [2] - 228:13, 228:18
**9-2A** [1] - 228:20
**9-2E** [1] - 228:20
**9-3A** [1] - 228:20
**9-3I** [1] - 228:20
**9-4A** [1] - 228:20
**9-4E** [1] - 228:21
**9-5A** [1] - 228:21
**9-5O** [1] - 228:21
**9-6** [4] - 222:7, 223:6, 223:17, 225:21
**9-6A** [3] - 222:20, 223:12, 225:21

**9-6B** [4] - 222:20, 223:12, 223:19, 225:21
**9-7** [4] - 224:4, 225:3, 225:6, 225:21
**9-7A** [2] - 224:21, 225:21
**9-7B** [2] - 225:11, 225:21
**9-8** [1] - 226:7
**9-9** [2] - 226:22, 227:5
**902(1)** [1] - 54:12
**91-A** [1] - 228:12
**93** [1] - 2:7
**96** [1] - 2:7
**98** [1] - 2:8
**9:30** [4] - 24:1, 24:14, 64:2, 64:3
**9th** [1] - 16:7

## A

**a.m** [7] - 1:7, 3:22, 10:25, 13:11, 22:19
**abandoned** [1] - 8:5
**Abigail** [2] - 46:14, 46:23
**ABIGAIL** [1] - 46:15
**ability** [2] - 100:4, 230:21
**able** [34] - 12:22, 12:25, 13:21, 17:18, 20:1, 20:2, 40:12, 40:14, 68:2, 69:20, 69:22, 69:23, 88:1, 90:1, 91:8, 99:21, 113:16, 173:22, 182:15, 188:1, 193:8, 194:24, 200:15, 200:24, 206:11, 206:13, 207:13, 207:15, 207:16, 208:10, 209:1, 209:2, 209:4, 215:15
**above-entitled** [1] - 230:21
**absolutely** [1] - 21:12
**access** [1] - 96:7
**according** [1] - 100:9
**accordingly** [1] - 193:4
**account** [3] - 98:11, 98:18, 98:23
**accurate** [5] - 69:17, 83:9, 84:23, 85:15, 87:19
**accurately** [4] - 30:4, 30:19, 56:5
**accusation** [1] - 15:19
**accusations** [1] - 15:14
**act** [1] - 175:6
**action** [4] - 94:4, 102:19, 119:25, 135:5
**actions** [2] - 119:22, 169:24
**activated** [3] - 8:9, 100:4, 100:7
**activation** [1] - 101:6
**active** [3] - 13:7, 13:10, 173:15
**activity** [4] - 13:3, 99:19, 102:19, 102:20

**actual** [6] - 179:24, 189:21, 199:13, 210:18, 210:25, 218:16
**add** [1] - 213:24
**addition** [5] - 9:13, 10:5, 175:8, 215:3, 221:19
**additional** [8] - 178:13, 200:11, 200:12, 200:15, 221:9, 221:10, 221:15, 221:24
**address** [6] - 8:13, 23:11, 141:1, 174:7, 227:13, 229:19
**adjacent** [2] - 137:14, 142:22
**adjourn** [1] - 230:12
**Administration** [1] - 54:8
**admission** [13] - 83:12, 84:25, 85:18, 86:9, 95:21, 100:19, 102:5, 103:16, 142:5, 225:20, 227:4, 227:21, 230:2
**admit** [1] - 228:18
**admitted** [35] - 28:15, 31:4, 54:3, 54:15, 56:10, 83:14, 85:2, 85:22, 86:7, 86:14, 95:25, 100:21, 102:7, 103:17, 115:2, 115:23, 142:7, 176:21, 177:12, 177:25, 179:19, 180:8, 181:11, 183:14, 184:11, 194:6, 204:22, 225:22, 227:6, 227:22, 228:16, 228:19, 228:24, 230:4, 230:8
**advantage** [1] - 99:2
**advised** [1] - 134:21
**aerial** [2] - 114:18
**affecting** [1] - 14:11
**affirmed** [14] - 22:24, 46:16, 80:11, 92:23, 98:2, 105:2, 134:3, 156:22, 163:12, 166:2, 172:16, 190:15, 204:2, 217:4
**African** [20] - 82:2, 89:9, 89:19, 144:9, 192:20, 199:3, 199:7, 199:11, 199:16, 199:18, 200:21, 201:1, 210:4, 210:11, 211:11, 211:14, 212:10, 214:8, 214:16, 215:4
**African-American** [9] - 82:2, 89:9, 89:19, 144:9, 200:21, 210:4, 210:11, 212:10, 214:8
**African-Americans** [2] - 211:11, 211:14
**afternoon** [34] - 6:11, 6:12, 63:24, 93:3, 96:17, 98:6, 98:7, 105:6, 105:7, 124:14, 124:15, 131:22, 134:7,

145:24, 145:25, 152:14, 152:15, 157:3, 157:4, 163:16, 166:6, 172:20, 172:21, 187:4, 187:5, 190:19, 190:20, 195:9, 202:22, 204:6, 204:7, 212:3, 212:4, 217:8
**Agent** [4] - 172:14, 186:2, 217:21, 217:24
**agent** [15] - 14:1, 172:25, 174:15, 178:3, 184:17, 185:15, 185:23, 187:16, 188:9, 188:10, 189:10, 217:14, 219:4, 222:15, 229:13
**agents** [5] - 21:16, 141:4, 141:23, 219:16, 222:23
**ago** [7] - 33:2, 33:5, 33:16, 74:14, 88:16, 113:18
**agree** [1] - 4:7
**ahead** [3] - 84:3, 94:7, 191:10
**aided** [1] - 1:25
**air** [6] - 81:8, 106:4, 158:20, 159:18, 159:22, 160:21
**al** [1] - 1:6
**Alabama** [1] - 105:19
**alarm** [3] - 106:22, 106:23, 106:24
**alarming** [1] - 118:4
**alarms** [6] - 106:18, 106:20, 106:21, 106:22, 118:3
**alerted** [2] - 190:11, 219:10
**alerting** [1] - 93:25
**ALEXANDRIA** [1] - 1:2
**Alexandria** [3] - 1:5, 10:4, 173:6
**alfred** [1] - 3:17
**Alfred** [2] - 1:21, 20:7
**allegation** [1] - 14:21
**allegations** [1] - 15:15
**alleges** [2] - 18:18
**allow** [2] - 59:8, 65:25
**allows** [1] - 13:1
**almost** [1] - 21:6
**alone** [9] - 4:5, 8:22, 26:7, 36:20, 101:19, 101:22, 108:20, 109:14, 112:12
**alongside** [1] - 126:12
**AMERICA** [1] - 1:4
**America** [1] - 3:3
**American** [9] - 82:2, 89:9, 89:19, 144:9, 200:21, 210:4, 210:11, 212:10, 214:8
**Americans** [2] - 211:11, 211:14
**ammunition** [1] - 7:5
**amount** [4] - 52:17, 113:15, 147:8, 150:6

3

**amounts** [2] - 138:25, 147:25
**analogy** [3] - 196:1, 196:2, 214:7
**analysis** [14] - 14:2, 185:5, 193:5, 193:13, 196:18, 197:17, 201:10, 201:25, 202:9, 202:15, 207:9, 207:10, 212:17, 213:18
**analyzed** [4] - 193:13, 213:10, 215:1, 215:13
**analyzing** [1] - 192:1
**ancestry** [3] - 192:20, 199:8, 201:2
**AND** [1] - 1:14
**angles** [1] - 13:22
**animal** [2] - 202:2
**answer** [4] - 4:23, 22:9, 132:14, 152:1
**answered** [1] - 156:1
**Anthony** [13] - 1:22, 3:3, 3:18, 7:22, 8:14, 9:16, 10:10, 20:8, 192:22, 208:18, 209:2, 215:15, 227:12
**anytime** [3] - 100:4, 191:17, 197:3
**appear** [4] - 70:19, 102:4, 121:23, 222:11
**appearances** [1] - 3:6
**APPEARANCES** [1] - 1:17
**appeared** [4] - 82:2, 89:9, 94:23, 95:3
**apply** [2] - 4:6, 210:18
**appreciate** [1] - 212:17
**apprehend** [5] - 139:22, 144:12, 157:17, 157:19, 163:25
**apprehended** [17] - 8:25, 9:12, 12:8, 12:10, 13:23, 140:22, 144:18, 145:12, 145:17, 155:4, 164:1, 168:22, 169:10, 171:2, 171:8, 171:22, 171:25
**apprehending** [2] - 140:6, 146:16
**apprehension** [7] - 98:15, 103:13, 139:8, 139:10, 139:24, 157:14, 163:23
**approached** [6] - 130:14, 130:16, 160:8, 160:14, 160:16, 161:1
**approaching** [1] - 160:3
**approval** [1] - 210:23
**approximate** [1] - 13:2
**area** [122] - 6:25, 7:9, 7:21, 8:21, 10:7, 10:14, 10:15, 22:6, 23:13, 40:13, 47:10, 48:14, 48:16, 49:4, 50:5, 52:9, 59:1, 59:4, 59:24, 60:4, 60:10, 60:21, 61:1,

61:3, 61:8, 61:10, 61:16, 69:18, 82:3, 89:14, 89:16, 94:10, 105:17, 106:9, 106:10, 106:20, 107:1, 107:2, 111:11, 111:12, 111:15, 111:23, 111:25, 112:3, 112:5, 112:7, 112:16, 112:17, 112:25, 114:18, 114:20, 114:21, 116:6, 117:16, 118:1, 121:18, 127:18, 128:13, 128:18, 128:20, 129:2, 129:3, 129:4, 129:6, 129:9, 129:10, 129:17, 129:20, 130:6, 133:12, 135:10, 135:11, 135:12, 135:13, 135:18, 138:18, 138:19, 139:21, 145:15, 145:18, 153:3, 153:14, 154:20, 157:13, 159:8, 162:1, 162:4, 162:5, 162:9, 164:21, 173:5, 173:25, 174:12, 174:16, 174:25, 175:2, 175:3, 175:7, 175:11, 175:12, 175:17, 176:5, 176:17, 177:7, 177:20, 178:14, 181:20, 181:21, 181:23, 184:8, 184:19, 184:20, 184:22, 185:2, 216:13, 217:20, 229:21
**areas** [4] - 88:12, 106:14, 106:16, 135:10
**argue** [1] - 45:25
**argument** [1] - 170:2
**arguments** [2] - 4:15, 6:7
**Arlington** [8] - 23:12, 23:13, 93:12, 93:21, 96:3, 96:10, 100:2, 134:18
**arm** [1] - 25:11
**armed** [3] - 6:23, 7:3, 14:12
**arranged** [1] - 198:15
**arrested** [5] - 145:6, 158:5, 165:6, 169:25, 170:20
**arrived** [12] - 8:4, 9:7, 128:8, 141:5, 159:2, 174:14, 174:15, 174:16, 180:17, 180:19, 181:5, 188:20
**arriving** [1] - 138:24
**aside** [2] - 72:23, 78:12
**aspects** [1] - 202:7
**asserted** [1] - 94:4
**assess** [2] - 42:24, 43:2
**assets** [1] - 99:8
**assign** [2] - 101:1, 101:2
**assigned** [7] - 100:10, 105:15, 128:18, 134:11, 157:9, 173:3, 173:4
**assignment** [1] - 171:15
**assist** [5] - 99:15, 146:7,

154:8, 157:14, 163:22
**assistance** [11] - 82:5, 95:11, 100:11, 101:11, 137:12, 141:9, 220:15, 222:6, 224:5, 224:20, 225:10
**assistant** [2] - 47:4, 81:11
**assisted** [5] - 139:8, 139:10, 140:6, 146:15, 147:9
**assume** [3] - 16:23, 201:20, 201:22
**assumed** [3] - 42:18, 42:19, 43:9
**assuming** [1] - 44:10
**ATM** [1] - 64:12
**attached** [4] - 7:5, 101:23, 102:1, 188:13
**attack** [1] - 122:20
**attention** [9] - 5:15, 13:18, 17:14, 17:20, 65:2, 78:6, 93:16, 99:25, 121:14
**attorney** [1] - 15:7
**attorney's** [1] - 33:8
**attorneys** [3] - 21:13, 74:11, 75:7
**audible** [1] - 182:21
**audio** [2] - 115:11, 124:18
**audit** [4] - 52:17, 53:9, 53:13, 53:21
**audits** [1] - 52:21
**authenticated** [1] - 91:10
**authenticates** [1] - 80:2
**automatic** [1] - 224:2
**Ave** [1] - 163:22
**Avenue** [5] - 105:18, 105:19, 111:22, 113:4, 174:11
**average** [3] - 91:14, 139:15, 206:8
**aware** [1] - 58:25

## B

**bachelor** [1] - 191:6
**background** [1] - 191:5
**backtracked** [1] - 140:24
**backup** [1] - 111:7
**bag** [92] - 8:19, 9:14, 49:6, 49:12, 49:13, 50:7, 52:13, 52:14, 52:15, 64:13, 68:6, 71:17, 72:4, 72:6, 72:8, 72:18, 72:21, 72:24, 72:25, 73:4, 73:8, 73:11, 73:16, 74:1, 74:2, 74:3, 74:4, 77:10, 77:11, 77:12, 77:13, 77:19, 95:5, 97:1, 100:13, 107:22, 107:23, 109:16, 119:11, 126:4, 126:5, 130:11, 130:13, 136:17, 140:15, 140:19, 140:23, 141:2, 141:3, 141:4, 141:5, 141:7, 141:16, 141:18,

141:20, 141:21, 142:2, 153:24, 154:1, 154:3, 154:5, 165:8, 165:11, 176:9, 180:20, 180:22, 180:23, 180:24, 181:7, 183:17, 185:10, 185:13, 185:19, 189:11, 189:13, 220:9, 220:11, 220:13, 220:14, 221:2, 221:3, 221:6, 221:8, 226:18, 226:25, 229:24, 229:25
**bags** [38] - 48:18, 48:20, 48:23, 48:24, 49:4, 49:9, 49:11, 49:16, 56:15, 56:16, 56:18, 56:21, 56:23, 57:10, 67:6, 67:7, 71:4, 71:9, 71:12, 71:17, 71:18, 77:21, 79:13, 94:15, 94:22, 94:24, 94:25, 95:2, 95:7, 95:17, 95:19, 95:20, 96:20, 96:21, 96:23, 106:19, 220:13
**balance** [1] - 52:22
**balancing** [3] - 53:4, 53:5, 53:8
**ball** [3] - 35:17, 35:20, 35:21
**Ballston** [3] - 23:16, 47:2, 80:18
**band** [4] - 70:1, 70:2, 70:3, 177:7
**bands** [9] - 57:15, 57:17, 57:24, 70:16, 70:18, 70:19, 70:20, 70:23, 70:25
**bank** [80] - 6:20, 6:25, 7:9, 7:11, 8:9, 8:16, 9:4, 10:13, 28:8, 30:5, 31:20, 31:24, 34:24, 36:5, 36:7, 36:14, 36:19, 36:22, 37:11, 37:23, 43:4, 43:18, 46:4, 47:7, 47:22, 48:3, 48:4, 49:22, 52:18, 54:5, 54:22, 54:24, 56:17, 58:15, 58:23, 59:9, 59:12, 61:19, 61:21, 62:7, 64:1, 64:4, 64:19, 68:15, 70:19, 71:4, 71:19, 73:8, 75:8, 77:11, 77:21, 79:4, 79:13, 83:9, 86:25, 87:19, 87:20, 90:15, 90:17, 90:24, 94:20, 94:24, 95:7, 96:9, 96:17, 96:21, 97:3, 98:14, 98:15, 99:8, 99:9, 99:10, 106:5, 109:4, 173:14, 173:15, 174:9, 188:12
**bank's** [6] - 7:10, 8:8, 9:3, 9:16, 9:17, 11:17
**bank-type** [2] - 94:24, 96:21
**banking** [1] - 70:12
**banks** [4] - 70:25, 96:24, 99:17, 186:11
**barely** [1] - 182:20
**barrel** [10] - 26:20, 26:21,

4

27:6, 27:7, 31:10, 34:11, 35:5, 35:9, 35:19, 81:25
**barrels** [2] - 35:13, 35:16
**based** [12] - 26:21, 94:6, 99:24, 135:2, 170:2, 191:17, 192:6, 196:19, 199:5, 213:9, 213:17
**basement** [1] - 219:21
**basic** [3] - 212:6, 212:18, 212:19
**basing** [1] - 200:23
**basket** [2] - 223:1, 224:13
**bathroom** [1] - 219:24
**beard** [2] - 108:3, 108:15
**Beauregard** [1] - 10:3
**became** [1] - 58:25
**because..** [1] - 121:15
**become** [1] - 173:9
**bed** [4] - 219:25, 222:3, 226:14, 227:1
**bedroom** [8] - 219:15, 219:21, 220:1, 226:14, 226:19, 227:2, 227:16, 227:18
**bedtime** [1] - 18:17
**began** [2] - 143:16, 143:18, 152:16, 152:19, 182:12, 220:7
**begin** [5] - 5:18, 5:22, 5:24, 6:8, 143:8
**beginning** [4] - 12:7, 63:25, 143:1, 161:22
**behalf** [1] - 3:19
**behind** [22] - 11:9, 36:13, 50:6, 50:18, 65:21, 66:2, 67:11, 68:1, 69:4, 86:22, 102:12, 126:15, 126:17, 126:19, 137:3, 137:13, 138:1, 140:20, 158:14, 158:18, 158:24, 162:1
**Bellows** [3] - 1:18, 3:8, 18:18
**BELLOWS** [86] - 3:9, 79:22, 80:1, 80:6, 80:14, 83:11, 83:15, 83:19, 83:22, 84:5, 84:7, 84:9, 84:10, 84:25, 85:5, 85:18, 85:23, 86:2, 86:4, 86:8, 86:15, 92:13, 92:20, 93:2, 94:3, 94:8, 95:21, 96:1, 96:12, 97:23, 98:5, 100:18, 100:22, 101:11, 101:14, 102:5, 102:8, 103:15, 103:19, 133:25, 134:6, 142:4, 142:8, 155:1, 155:3, 155:11, 163:4, 163:6, 163:15, 164:17, 164:19, 165:14, 166:5, 167:17, 167:23, 168:2, 168:8, 168:11, 168:16, 168:18, 169:7, 169:22, 170:5,

170:8, 170:21, 170:24, 171:1, 171:5, 216:23, 217:2, 217:7, 225:20, 225:23, 227:4, 227:7, 227:20, 227:23, 228:9, 228:11, 228:13, 228:17, 228:20, 228:25, 229:1, 230:2, 230:6
**belong** [1] - 165:10
**belonged** [2] - 100:6, 100:24
**belonging** [1] - 16:3
**bench** [1] - 168:17
**beneficial** [1] - 211:7
**beside** [1] - 130:6
**best** [4] - 79:3, 118:11, 230:21
**better** [4] - 129:7, 181:17, 195:17, 215:18
**between** [19] - 12:18, 12:24, 13:25, 34:3, 38:9, 58:19, 66:5, 67:19, 75:24, 108:14, 110:22, 153:22, 196:22, 206:14, 208:4, 209:10, 211:1, 221:1, 228:7
**beyond** [6] - 14:15, 15:18, 16:18, 19:17, 20:16, 22:15
**big** [16] - 6:23, 7:4, 7:9, 9:18, 10:7, 10:15, 11:6, 11:8, 12:2, 12:20, 14:9, 20:10, 111:14, 111:15, 206:14
**bills** [8] - 57:10, 69:14, 69:22, 69:23, 69:24, 162:14, 165:5
**bin** [2] - 141:16, 141:22
**binder** [5] - 84:18, 95:10, 102:9, 179:25, 228:6
**binders** [1] - 177:15
**bins** [1] - 141:2
**biologist/forensic** [1] - 204:12
**bit** [5] - 17:4, 129:8, 205:14, 219:25
**bits** [1] - 88:14
**black** [47] - 6:19, 6:21, 6:23, 7:12, 7:24, 9:8, 9:14, 9:23, 22:1, 22:5, 39:23, 39:24, 48:8, 50:23, 62:1, 62:2, 62:10, 72:17, 72:18, 77:1, 89:20, 106:7, 107:5, 107:6, 107:7, 107:9, 110:8, 110:17, 110:23, 114:4, 116:21, 117:1, 117:10, 132:12, 135:22, 135:25, 136:8, 139:13, 140:8, 140:11, 144:5, 159:13, 160:8, 167:5, 167:8
**black-colored** [2] - 116:21, 117:10
**BlackBerry** [1] - 173:14
**blank** [1] - 15:1

**block** [16] - 113:5, 135:21, 135:23, 135:24, 136:1, 136:9, 136:17, 136:18, 137:9, 137:11, 137:12, 140:3, 142:16, 142:18, 142:21, 150:2
**blocks** [2] - 208:5, 209:18
**blowing** [1] - 182:4
**blown** [3] - 175:5, 175:7, 182:5
**blue** [27] - 8:19, 9:14, 72:16, 72:21, 107:22, 107:23, 109:16, 119:11, 126:4, 126:5, 130:11, 131:1, 131:8, 140:15, 141:21, 142:1, 153:24, 159:3, 161:11, 161:20, 180:22, 180:23, 180:24, 181:7, 189:10, 189:11, 189:13
**bodies** [1] - 205:3
**body** [4] - 158:17, 205:7, 205:14
**book** [7] - 102:13, 115:4, 183:16, 184:3, 193:21, 210:6, 228:7
**bookkeeper's** [2] - 11:9, 11:15
**books** [1] - 228:8
**bordered** [2] - 111:20, 111:21
**bottom** [11] - 72:6, 87:10, 91:6, 95:4, 111:18, 111:19, 127:18, 179:9, 196:1, 224:15, 226:11
**bound** [1] - 211:11
**box** [1] - 18:10
**braids** [2] - 107:9, 108:11
**branch** [8] - 24:7, 47:1, 47:2, 49:24, 50:19, 51:17, 80:18, 88:12
**branches** [2] - 69:16, 101:17
**brand** [1] - 223:22
**bread** [1] - 8:11
**bridge** [1] - 195:15
**brief** [5] - 16:14, 22:17, 44:25, 113:15, 165:22
**briefly** [9] - 18:1, 78:5, 79:10, 90:23, 91:19, 131:24, 133:14, 155:13, 202:22
**bring** [11] - 5:14, 5:15, 14:25, 15:11, 139:23, 196:4, 196:13, 197:5, 212:5, 212:15, 212:18
**brother** [1] - 206:23
**brother's** [1] - 206:24
**brothers** [1] - 215:23
**brought** [4] - 11:13, 49:13, 139:25, 140:4
**brown** [3] - 89:19, 90:5, 183:15

**brush** [1] - 191:20
**build** [5] - 139:16, 140:10, 140:12, 205:6, 205:16
**building** [3] - 6:19, 208:5, 209:18
**built** [1] - 27:9
**bulk** [1] - 205:8
**bullet** [4] - 223:13, 223:14, 224:25, 225:1
**bullets** [1] - 224:18
**bunch** [4] - 16:23, 17:9, 154:13, 226:4
**bundle** [1] - 221:1
**burden** [1] - 15:18
**Bureau** [2] - 204:14, 217:14
**bushes** [4] - 8:24, 112:11, 112:18, 182:6
**business** [3] - 6:17, 53:15, 53:17, 54:18
**busy** [1] - 6:18
**BY** [101] - 23:2, 27:1, 28:18, 31:9, 31:13, 31:19, 32:18, 37:22, 45:2, 46:3, 46:19, 51:11, 51:20, 52:2, 53:20, 54:4, 54:16, 56:11, 58:6, 63:21, 71:7, 73:23, 76:22, 78:4, 79:12, 80:14, 84:10, 85:5, 86:18, 87:5, 90:9, 90:22, 93:2, 94:8, 96:1, 96:16, 98:5, 100:22, 101:14, 102:8, 104:2, 105:5, 108:19, 111:2, 115:3, 115:24, 116:17, 124:13, 128:17, 131:21, 134:6, 142:11, 145:23, 152:7, 152:13, 153:9, 155:3, 155:20, 157:2, 157:24, 158:3, 159:8, 160:2, 163:15, 164:19, 166:5, 167:17, 168:11, 170:8, 170:21, 171:1, 171:7, 172:19, 175:22, 177:1, 177:13, 178:2, 179:20, 180:9, 181:13, 184:16, 187:3, 189:9, 190:18, 191:13, 193:16, 194:1, 194:17, 195:8, 199:24, 202:21, 204:5, 204:24, 208:20, 212:2, 215:12, 217:7, 225:23, 227:7, 227:23, 229:1

**C**

**C-H-I-L-D-R-E-S-S** [1] - 93:10
**calculated** [1] - 216:4
**calculation** [1] - 211:19
**calculations** [2] - 210:19, 211:2

**caliber** [2] - 225:8, 225:18
**cameras** [1] - 13:21
**Cannon** [18] - 1:22, 3:4, 3:18, 7:22, 8:14, 10:10, 11:4, 11:5, 11:6, 11:23, 12:1, 20:9, 192:22, 208:18, 209:2, 215:14, 215:15, 227:12
**Cannon's** [2] - 9:16, 13:10
**cannot** [6] - 130:22, 193:6, 197:14, 197:23, 200:9, 213:4
**canvassed** [2] - 106:9, 106:10
**canvassing** [8] - 135:7, 135:10, 135:11, 135:18, 135:22, 152:25, 153:1, 153:3
**capacity** [2] - 98:19, 98:23
**capture** [3] - 55:17, 115:25, 116:10
**captured** [2] - 113:12, 113:13
**capturing** [1] - 113:12
**car** [12] - 8:5, 9:8, 11:21, 109:2, 110:1, 117:10, 130:23, 131:12, 142:21, 152:21, 164:23, 174:10
**CARL** [1] - 92:22
**carl** [1] - 93:6
**Carolinas** [1] - 98:20
**Carpenter** [4] - 106:13, 106:17, 106:25, 174:6
**carried** [1] - 103:9
**carrying** [2] - 8:19, 107:22
**cars** [6] - 11:21, 131:2, 131:6, 136:15, 140:18, 174:18
**Case** [1] - 1:5
**case** [49] - 3:5, 3:23, 5:5, 5:9, 5:10, 5:12, 5:13, 5:19, 12:5, 13:6, 13:16, 14:15, 14:25, 15:2, 15:4, 15:8, 16:15, 17:1, 17:10, 17:20, 17:21, 18:1, 20:13, 20:18, 20:19, 20:25, 21:20, 21:22, 22:12, 45:24, 84:4, 96:18, 99:8, 113:2, 168:6, 185:16, 185:23, 186:4, 199:25, 200:8, 200:13, 202:4, 207:12, 207:18, 208:7, 209:19, 209:23
**cases** [4] - 20:20, 201:25, 202:5, 202:8
**cash** [18] - 10:19, 12:21, 48:20, 48:23, 48:24, 49:1, 49:16, 54:20, 56:15, 56:16, 56:18, 56:21, 64:13, 66:17, 67:7, 77:25, 229:2
**cashing** [3] - 10:6, 10:14,

16:7
**catch** [2] - 149:3, 150:8
**Caucasian** [5] - 210:4, 210:11, 212:10, 214:9, 214:19, 215:3
**Caucasians** [2] - 211:15, 211:17
**caught** [10] - 52:16, 113:14, 113:17, 113:18, 122:18, 123:11, 127:17, 148:2, 148:20, 150:12
**causing** [1] - 59:17
**caveat** [1] - 197:16
**CCR** [2] - 1:24, 230:24
**ceilings** [1] - 11:10
**cell** [40] - 9:5, 12:8, 12:9, 12:10, 12:13, 12:14, 12:25, 13:1, 13:4, 13:6, 13:10, 13:14, 14:2, 18:21, 22:7, 51:3, 99:7, 123:9, 123:24, 158:12, 159:3, 159:6, 161:12, 161:21, 162:4, 162:6, 162:8, 162:11, 175:10, 177:8, 182:23, 185:18, 185:19, 185:22, 186:6, 205:12, 206:5, 206:9, 207:4
**cells** [3] - 205:3, 205:5, 205:14
**center** [1] - 136:1
**certain** [4] - 4:14, 12:18, 16:5, 44:2, 130:20
**certainly** [3] - 21:23, 199:17, 202:25
**certificate** [1] - 54:11
**CERTIFICATION** [1] - 230:17
**certify** [1] - 230:19
**chair** [2] - 203:5, 203:7
**chamber** [3] - 223:10, 223:15, 224:18
**chance** [3] - 95:14, 154:5, 209:18
**change** [6] - 94:16, 97:4, 97:6, 97:7, 216:5
**changed** [3] - 124:17, 124:22, 124:23
**characteristics** [23] - 192:19, 193:2, 196:11, 196:13, 196:20, 196:22, 197:8, 197:25, 198:1, 198:7, 198:8, 198:9, 198:11, 198:12, 198:20, 198:22, 199:2, 199:5, 199:6, 199:10, 199:17, 200:16, 200:24
**characterization** [1] - 73:20
**charge** [2] - 22:15, 174:21
**charged** [3] - 14:11, 14:14, 14:18
**charges** [1] - 17:6

**chase** [11] - 114:19, 132:20, 145:14, 146:19, 146:20, 150:7, 151:4, 152:23, 152:24, 154:4
**chased** [2] - 129:8, 129:10
**chases** [4] - 129:14, 129:15, 129:16, 129:19
**chasing** [2] - 132:18, 171:19
**check** [3] - 10:6, 10:14, 16:7
**checked** [1] - 109:6
**checks** [1] - 54:20
**children** [4] - 206:23, 206:24, 215:21
**Childress** [3] - 2:7, 93:6, 93:8
**CHILDRESS** [1] - 92:22
**chores** [1] - 64:18
**Chris** [3] - 174:15, 178:14, 181:15
**Christmas** [1] - 6:16
**Christopher** [2] - 217:2, 217:10
**CHRISTOPHER** [1] - 217:3
**church** [2] - 111:24, 113:4
**citizens** [1] - 93:25
**claim** [1] - 22:1
**claimed** [1] - 20:3
**clarify** [3] - 104:4, 146:1, 207:3
**CLAUDE** [1] - 1:12
**clear** [2] - 44:7, 152:8
**CLERK** [1] - 3:2
**clerks** [1] - 193:25
**client** [3] - 15:20, 16:25, 17:11
**clients** [2] - 4:18, 98:21
**climbed** [1] - 11:14
**clip** [12] - 6:24, 7:4, 7:16, 7:18, 9:18, 9:19, 14:8, 27:3, 27:5, 81:25, 223:9
**close** [8] - 8:5, 13:17, 17:20, 55:6, 135:8, 146:18, 177:7, 203:16
**closed** [3] - 11:14, 66:19, 161:23
**closer** [7] - 120:15, 158:25, 159:1, 159:14, 218:16, 218:18, 218:19
**closest** [3] - 43:9, 48:10, 68:8
**closet** [12] - 219:22, 219:25, 221:12, 221:14, 221:15, 222:10, 223:2, 226:3, 226:5, 226:12, 229:3, 229:5
**closing** [2] - 6:7, 10:8
**clothes** [1] - 22:2
**clothing** [2] - 118:6, 132:9, 132:11, 132:16, 159:13, 175:9, 191:21, 191:24,

203:2, 203:4, 203:10
**clumpy** [1] - 198:19
**CMRS** [2] - 1:24, 230:24
**co** [1] - 169:23
**co-conspiracy** [1] - 169:23
**coconspirator** [6] - 168:2, 169:2, 169:12, 169:20, 169:21, 170:4
**code** [1] - 22:11
**coffee** [1] - 67:23
**coin** [1] - 94:17
**coins** [1] - 94:18
**collar** [1] - 139:21
**colleague** [1] - 124:9
**colleagues** [3] - 113:11, 123:20, 133:12
**collect** [6] - 164:20, 165:12, 175:6, 180:16, 182:6, 182:10
**collected** [11] - 176:17, 177:6, 177:7, 178:10, 178:12, 180:10, 192:2, 192:7, 192:9, 219:6, 229:18
**collecting** [2] - 184:18, 184:22
**collective** [1] - 5:22
**college** [1] - 201:21
**color** [5] - 89:19, 91:6, 165:2, 198:17, 198:23
**colored** [6] - 108:12, 110:21, 116:21, 117:10, 118:18, 119:16
**combination** [1] - 206:2
**combine** [2] - 214:7, 214:8
**comfortable** [1] - 200:22
**coming** [23] - 18:3, 41:19, 41:20, 41:25, 76:13, 81:5, 107:13, 107:14, 108:6, 109:10, 124:18, 124:20, 129:25, 130:5, 130:6, 130:12, 146:15, 166:22, 200:9, 203:6, 203:9, 207:21
**commands** [9] - 149:21, 149:22, 151:8, 151:10, 151:12, 151:16, 159:14, 159:17, 159:18
**commence** [1] - 3:23
**commerce** [1] - 14:12
**committed** [5] - 8:1, 9:25, 12:4, 14:16, 21:25
**committing** [1] - 31:24
**common** [4] - 22:11, 77:21, 209:21, 211:7
**commotion** [5] - 26:10, 32:7, 32:8, 32:11, 59:18
**communicated** [1] - 136:24
**communicating** [2] - 136:22, 137:15

6

**communication** [1] - 116:9
**communications** [2] - 116:10, 137:16
**compare** [4] - 43:20, 45:5, 194:21, 208:12
**compared** [3] - 43:21, 101:5, 192:20
**comparing** [1] - 43:17
**comparison** [5] - 192:10, 195:14, 196:7, 197:18, 209:1
**complected** [3] - 10:10, 11:3
**complete** [2] - 163:9, 182:2
**complexion** [7] - 89:23, 89:25, 90:3, 139:13, 140:10, 140:11, 144:6
**complexions** [3] - 18:24, 22:3
**complied** [1] - 149:19
**complies** [1] - 101:21
**comply** [1] - 159:20
**composed** [2] - 210:9, 210:10
**computer** [8] - 1:25, 173:17, 173:18, 181:19, 182:12, 182:14, 187:10
**computer-aided** [1] - 1:25
**conceal** [1] - 8:4
**conclude** [1] - 200:15
**concluded** [1] - 230:14
**conclusion** [3] - 14:17, 15:12, 193:10
**conclusions** [1] - 200:23
**condition** [2] - 73:9, 95:2
**conduct** [5] - 5:7, 54:17, 182:2, 191:14, 217:20
**conducted** [3] - 191:16, 191:25, 192:1
**conducting** [1] - 228:1
**conference** [1] - 168:17
**confirmed** [2] - 188:11, 197:6
**connected** [1] - 106:22
**connection** [1] - 93:17
**consequences** [1] - 17:22
**consider** [1] - 18:4
**considered** [3] - 4:15, 5:3, 138:23
**consist** [1] - 4:10
**consistent** [8] - 195:1, 196:22, 199:7, 200:21, 201:1, 202:13, 202:15, 202:16
**consistently** [1] - 124:25
**conspiracy** [5] - 14:11, 167:24, 168:1, 168:9, 169:23
**constance** [1] - 203:23
**CONSTANCE** [2] - 204:1, 204:10

**Constance** [1] - 204:9
**contact** [8] - 136:13, 136:14, 138:10, 147:19, 191:18, 203:6, 203:8, 203:9
**contain** [2] - 83:8
**contained** [3] - 12:20, 94:22, 221:3
**containers** [1] - 97:10
**context** [3] - 16:17, 35:12, 41:7
**continued** [2] - 120:22, 170:6
**control** [1] - 193:12
**controlled** [1] - 11:25
**controlling** [1] - 11:5
**conviction** [1] - 20:16
**convinced** [1] - 17:5
**cooperative** [2] - 151:15, 151:19
**coordinate** [1] - 174:21
**coordinated** [1] - 181:15
**coordinating** [1] - 112:15
**copies** [5] - 206:6, 206:9, 206:10, 207:4, 207:6
**cops** [2] - 74:22, 75:6
**copy** [8] - 55:14, 205:23, 205:25, 206:1, 206:10, 206:16, 208:3
**cordoned** [1] - 112:25
**corner** [10] - 29:3, 107:14, 107:24, 109:13, 109:17, 114:21, 120:20, 125:9, 130:11, 174:16
**correct** [145] - 24:15, 28:6, 31:21, 31:22, 32:4, 32:13, 32:14, 32:15, 32:24, 32:25, 33:6, 35:11, 35:22, 36:1, 36:12, 36:23, 37:1, 37:3, 37:9, 37:16, 37:25, 38:23, 39:20, 39:21, 40:8, 41:3, 42:15, 42:20, 42:23, 43:6, 43:11, 43:14, 43:15, 43:23, 43:25, 44:5, 44:8, 44:10, 46:6, 46:9, 49:5, 55:3, 55:21, 58:9, 58:20, 58:23, 60:2, 61:11, 61:19, 61:23, 62:3, 62:8, 62:22, 62:24, 63:7, 63:11, 63:17, 64:19, 67:3, 73:2, 77:21, 86:20, 86:23, 87:6, 87:7, 87:17, 87:22, 88:3, 89:3, 89:5, 89:24, 90:2, 90:4, 90:18, 94:11, 96:21, 97:2, 101:7, 104:14, 116:24, 117:3, 117:10, 117:18, 117:22, 118:2, 118:6, 119:3, 121:1, 123:3, 123:8, 123:25, 124:2, 124:4, 125:5, 125:25, 127:1, 127:10, 127:16, 131:4, 132:19,

132:25, 142:13, 142:20, 143:2, 143:3, 143:12, 143:15, 144:1, 145:7, 145:12, 145:15, 160:17, 161:6, 161:9, 162:7, 162:18, 162:19, 162:20, 171:16, 171:20, 172:3, 172:8, 172:9, 184:18, 184:21, 185:3, 187:24, 188:18, 188:22, 189:25, 194:19, 194:20, 194:25, 195:4, 195:5, 197:20, 201:18, 207:5, 207:8, 212:11, 212:21, 213:4, 215:20, 215:22, 230:20
**corrected** [1] - 162:15
**correctly** [3] - 214:14, 221:11, 229:6
**cortex** [2] - 198:13, 198:16
**counsel** [2] - 3:5, 157:20
**count** [3] - 14:17, 200:1, 200:8
**counted** [2] - 229:3, 229:8
**counter** [5] - 7:2, 7:8, 10:6, 81:10, 91:11
**counteractive** [1] - 99:23
**counting** [3] - 64:12, 64:16, 113:21
**countries** [1] - 54:25
**country** [2] - 210:21, 210:25
**Country** [2] - 201:17, 202:1
**County** [5] - 10:3, 10:4, 93:12, 93:22, 173:6
**couple** [6] - 20:8, 32:21, 33:23, 33:24, 44:21, 67:18
**course** [7] - 15:8, 53:9, 53:15, 53:17, 124:17, 131:13, 201:21
**COURT** [133] - 1:1, 3:10, 3:13, 3:16, 4:1, 22:17, 22:20, 28:12, 28:15, 30:24, 31:4, 31:7, 37:18, 44:16, 44:18, 44:22, 44:24, 45:25, 46:10, 46:13, 51:9, 51:23, 54:3, 54:15, 56:10, 58:4, 73:21, 79:9, 79:19, 79:24, 80:4, 80:8, 83:14, 83:17, 83:20, 83:25, 84:6, 85:2, 85:22, 85:25, 86:3, 86:5, 86:7, 86:12, 86:14, 86:16, 92:14, 92:17, 92:21, 94:6, 95:23, 95:25, 97:20, 100:21, 102:7, 103:17, 103:20, 103:22, 104:19, 108:18, 111:1, 115:2, 115:23, 116:15, 133:22, 142:7, 142:9, 155:12, 155:14, 155:16, 155:18, 155:25, 156:3, 156:6, 156:8, 156:11, 156:16,

156:19, 158:1, 158:5, 158:8, 162:24, 163:2, 163:5, 163:8, 165:19, 165:22, 167:16, 168:1, 168:6, 168:9, 169:15, 170:1, 170:17, 172:11, 176:21, 176:24, 177:12, 177:23, 177:25, 179:19, 180:8, 181:11, 184:11, 184:14, 190:4, 191:7, 191:10, 194:6, 194:10, 194:12, 203:20, 204:16, 204:19, 204:22, 208:16, 211:23, 216:19, 216:22, 216:25, 225:22, 227:6, 227:22, 228:10, 228:12, 228:14, 228:16, 228:19, 228:22, 228:24, 230:4, 230:8, 230:11
**court** [20] - 14:25, 16:9, 16:12, 21:6, 82:5, 84:8, 95:11, 100:11, 101:12, 120:7, 121:14, 141:9, 164:6, 170:7, 175:20, 220:15, 222:6, 224:5, 224:20, 225:10
**Court** [9] - 1:24, 4:6, 4:12, 5:2, 75:16, 75:18, 83:23, 168:19, 190:11
**Court's** [4] - 4:21, 5:15, 153:8, 176:10
**courtroom** [6] - 5:4, 5:6, 7:15, 108:7, 110:18, 164:13
**cousins** [1] - 215:25
**cover** [2] - 105:17, 194:5
**covered** [6] - 40:3, 91:4, 175:17, 182:17, 223:1
**covering** [3] - 18:25, 27:16, 27:18
**covers** [2] - 105:18, 173:4
**Credit** [39] - 6:17, 7:14, 9:12, 9:20, 9:24, 10:2, 12:5, 13:7, 19:19, 21:10, 23:10, 28:4, 34:15, 35:9, 46:25, 53:9, 54:7, 54:8, 54:17, 56:22, 70:11, 70:17, 70:23, 72:19, 72:24, 80:19, 96:3, 96:5, 97:2, 97:15, 98:21, 99:1, 100:2, 100:24, 100:25, 101:10, 134:18, 134:22, 173:10
**credit** [21] - 7:11, 8:2, 8:5, 10:13, 13:8, 14:12, 23:25, 24:2, 24:6, 24:16, 26:7, 29:19, 30:5, 30:20, 47:7, 47:14, 52:18, 54:7, 55:6, 99:8, 99:18
**crime** [4] - 78:22, 174:17, 180:22, 181:22

**crimes** [3] - 14:13, 14:16, 173:5
**Crimes** [1] - 173:4
**criminal** [2] - 3:2, 129:8
**criminals** [1] - 129:6
**CROSS** [31] - 31:18, 32:17, 58:5, 63:20, 76:21, 78:3, 86:17, 87:4, 90:8, 90:21, 96:15, 104:1, 116:16, 124:12, 128:16, 131:20, 142:10, 145:22, 152:6, 152:12, 160:1, 171:6, 184:15, 187:2, 189:8, 194:16, 195:7, 199:23, 202:20, 212:1, 215:11
**Cross** [1] - 2:2
**cross** [11] - 6:1, 6:5, 31:7, 46:7, 58:4, 73:21, 103:20, 116:15, 130:8, 153:10, 156:14
**CROSS-EXAMINATION** [31] - 31:18, 32:17, 58:5, 63:20, 76:21, 78:3, 86:17, 87:4, 90:8, 90:21, 96:15, 104:1, 116:16, 124:12, 128:16, 131:20, 142:10, 145:22, 152:6, 152:12, 160:1, 171:6, 184:15, 187:2, 189:8, 194:16, 195:7, 199:23, 202:20, 212:1, 215:11
**cross-examination** [3] - 46:7, 73:21, 153:10
**cross-examine** [5] - 6:5, 31:7, 58:4, 103:20, 116:15
**cross-examined** [1] - 6:1
**crossed** [5] - 8:18, 111:10, 130:10, 138:6, 153:25
**cruiser** [8] - 105:23, 121:7, 122:19, 125:3, 125:25, 126:13, 126:16, 126:24
**crumbs** [1] - 8:11
**cumulative** [3] - 194:11, 194:13, 201:14
**curb** [3] - 178:14, 179:3, 180:21
**curiousness** [1] - 19:16
**currency** [5] - 162:14, 162:15, 182:25, 183:1, 220:8
**current** [1] - 207:15
**curriculum** [2] - 194:3, 201:13
**custody** [9] - 113:20, 146:3, 146:20, 174:24, 229:14, 229:15, 229:17, 229:19, 229:20
**customer** [3] - 10:12, 51:1, 99:15
**customers** [6] - 6:18, 12:1,

13:17, 98:22, 99:3, 100:3
**cut** [3] - 18:10, 95:3, 95:4
**cuticle** [1] - 198:13
**CV** [1] - 204:21

**D**

**D.C** [14] - 8:12, 20:22, 22:6, 94:15, 94:19, 106:14, 166:14, 174:2, 174:5, 174:11, 216:13, 217:18, 227:14
**damage** [1] - 9:9
**dark** [10] - 22:2, 62:14, 62:15, 89:12, 89:13, 107:7, 107:9, 110:8, 140:9, 140:11
**dark-skinned** [3] - 107:7, 107:9, 110:8
**darker** [3] - 10:10, 11:3, 22:3
**darker-complected** [2] - 10:10, 11:3
**database** [16] - 209:21, 210:1, 210:8, 210:9, 210:12, 210:14, 211:2, 212:13, 212:14, 213:8, 213:12, 213:13, 213:16, 213:23, 214:8
**date** [4] - 10:22, 13:15, 100:1, 100:5
**Davis** [13] - 10:24, 111:10, 111:21, 113:3, 135:11, 135:12, 137:14, 138:7, 147:21, 157:13, 163:22, 174:11
**days** [8] - 6:16, 10:1, 10:22, 17:2, 20:8, 128:24, 128:25
**dealing** [3] - 199:17, 213:25, 215:7
**dealt** [3] - 32:14, 62:17, 86:19
**debris** [1] - 192:9
**December** [22] - 10:1, 10:8, 10:23, 12:7, 13:12, 16:7, 23:21, 29:20, 30:20, 47:5, 80:21, 93:16, 99:25, 102:25, 105:20, 122:9, 134:15, 157:11, 163:21, 166:13, 217:16
**decently** [1] - 41:12
**decide** [3] - 5:5, 16:17, 156:16
**decided** [3] - 174:24, 175:5, 186:23
**Defendant** [19] - 1:20, 1:21, 1:22, 1:23, 7:17, 7:20, 7:22, 8:14, 9:5, 11:6, 11:19, 11:22, 12:1, 12:10, 12:11, 12:12, 13:7, 110:25, 164:18
**defendant** [5] - 7:25, 15:9,

158:10, 158:11, 211:8
**defendants** [17] - 6:2, 7:15, 8:11, 12:3, 12:24, 13:13, 13:24, 13:25, 14:5, 15:6, 21:22, 108:17, 116:2, 133:15, 170:14, 200:10
**Defendants** [9] - 1:7, 1:19, 11:4, 11:5, 11:16, 11:23, 11:24, 12:19, 13:10
**defendants'** [1] - 12:17
**defense** [3] - 21:4, 157:20, 190:11
**definitively** [1] - 19:20
**DEJESUS** [1] - 172:15
**DeJesus** [7] - 2:14, 172:14, 172:23, 178:3, 189:10, 217:21, 217:24
**deliberate** [5] - 5:11, 18:12, 19:17, 19:25, 83:21
**deliberation** [2] - 18:6, 19:3
**deliberations** [3] - 5:19, 5:23, 6:8
**demanded** [1] - 7:1
**demanding** [1] - 7:7
**demands** [1] - 60:23
**denomination** [2] - 57:13, 162:16
**denominations** [1] - 162:17
**department** [5] - 51:21, 115:12, 124:19, 131:1, 134:10
**Department** [7] - 93:13, 105:12, 134:11, 134:24, 157:7, 163:20, 166:12
**depictions** [3] - 84:23, 85:15, 87:19
**descended** [1] - 216:14
**descent** [6] - 199:4, 199:11, 199:16, 199:18, 214:16, 215:4
**describe** [21] - 26:18, 27:7, 34:7, 34:10, 39:24, 50:22, 78:11, 91:1, 99:4, 107:6, 111:12, 115:17, 132:9, 132:11, 139:12, 140:5, 158:4, 179:7, 180:17, 183:5, 219:19
**described** [6] - 34:11, 38:5, 97:13, 124:21, 141:18, 224:12
**describing** [1] - 18:24
**description** [5] - 42:21, 79:3, 118:6, 118:9
**desk** [7] - 24:3, 24:4, 25:18, 36:13, 37:24, 38:6, 38:8
**detail** [7] - 18:23, 21:13, 35:25, 91:3, 91:7, 92:4, 163:10
**detailed** [1] - 75:15
**details** [3] - 13:18, 18:1,

163:9
**detained** [3] - 138:12, 145:6, 148:6
**detective** [1] - 167:10
**determination** [2] - 43:17, 197:3
**determine** [15] - 13:2, 19:17, 52:17, 69:20, 69:22, 69:23, 188:1, 194:24, 199:3, 199:5, 201:4, 202:15, 208:5, 209:1, 212:7
**determined** [1] - 14:3
**determining** [2] - 196:10, 196:21
**detour** [1] - 119:12
**detoured** [1] - 119:10
**develop** [1] - 208:21
**developed** [1] - 208:24
**device** [30] - 98:13, 99:10, 99:13, 99:16, 99:17, 99:20, 99:22, 99:24, 100:4, 100:16, 100:23, 101:1, 101:22, 101:23, 101:25, 102:2, 102:3, 102:19, 102:20, 102:24, 104:5, 104:12, 104:15, 106:22, 173:20, 182:21, 218:17, 219:10, 220:4, 220:22
**devices** [20] - 98:24, 100:7, 100:8, 101:16, 101:19, 101:22, 102:22, 103:7, 103:11, 135:9, 136:6, 173:17, 173:20, 181:17, 181:20, 182:15, 186:16, 186:17, 186:20, 187:7
**differ** [2] - 205:17, 208:4
**difference** [6] - 75:24, 156:11, 205:23, 205:24, 206:10, 206:14
**differences** [5] - 197:11, 197:12, 197:13, 205:20, 205:23
**different** [33] - 11:20, 20:14, 71:25, 79:24, 80:1, 80:7, 80:8, 80:9, 82:16, 82:22, 84:1, 127:12, 146:17, 162:1, 162:3, 162:9, 182:10, 189:20, 189:24, 192:4, 192:6, 192:7, 197:1, 197:23, 198:21, 201:2, 201:22, 208:4, 210:1, 213:24
**differentiate** [4] - 193:8, 197:22, 201:2, 202:5
**difficult** [1] - 213:11
**difficulty** [1] - 17:18
**Dimanche** [2] - 22:22, 23:6
**DIMANCHE** [2] - 22:23, 23:8
**dimes** [1] - 94:16
**dire** [1] - 17:8

8

**Direct** [1] - 2:2
**DIRECT** [14] - 23:1, 46:18, 80:13, 93:1, 98:4, 105:4, 134:5, 157:1, 163:14, 166:4, 172:18, 190:17, 204:4, 217:6
**direct** [7] - 45:7, 93:16, 99:25, 126:8, 175:25, 192:11, 203:8
**directed** [2] - 139:3, 147:20
**directing** [1] - 121:14
**direction** [5] - 32:23, 108:6, 130:23, 136:11, 142:19
**directly** [4] - 47:25, 84:15, 107:17, 219:24
**discrepancies** [1] - 76:1
**discuss** [2] - 5:8, 5:9
**disk** [1] - 83:5
**disks** [1] - 83:8
**dispatch** [8] - 99:19, 99:21, 99:23, 115:13, 116:11, 118:10, 137:20
**dispatched** [1] - 94:11
**dispatcher** [4] - 109:7, 134:21, 134:23, 135:6
**dispatchers** [1] - 115:12
**dispersed** [1] - 124:19
**disregard** [1] - 5:3
**distance** [15] - 58:19, 66:5, 67:16, 67:19, 153:15, 153:17, 153:19, 160:25, 161:20, 161:22, 161:23, 178:20, 178:21, 180:15
**distance-wise** [1] - 178:20
**distantly** [1] - 209:16
**distributed** [1] - 198:18
**district** [10] - 105:16, 105:17, 129:13, 134:12, 134:13, 135:3, 135:4, 135:12, 136:11, 157:9
**District** [3] - 21:5, 96:10, 173:7
**DISTRICT** [3] - 1:1, 1:2, 1:13
**diverse** [1] - 89:16
**division** [1] - 204:13
**DIVISION** [1] - 1:2
**DNA** [55] - 16:5, 16:6, 193:13, 204:12, 205:1, 205:2, 205:3, 205:4, 205:5, 205:9, 205:10, 205:15, 205:17, 205:18, 205:24, 206:2, 206:6, 206:9, 206:10, 206:11, 206:13, 206:15, 206:16, 206:17, 206:18, 206:21, 206:24, 207:2, 207:3, 207:4, 207:6, 207:10, 207:11, 207:13, 207:15, 207:16, 207:25, 208:1, 208:3, 208:5, 208:6, 208:10, 208:21, 209:12,

209:14, 209:15, 212:8, 212:20, 213:4, 214:21, 215:17, 216:10, 216:15
**DNA-type** [1] - 16:5
**documents** [1] - 4:10
**dollar** [4] - 69:14, 162:14
**dollars** [4] - 69:21, 94:16, 159:4, 162:13
**Dolley** [3] - 216:8, 216:10, 216:14
**done** [5] - 20:22, 52:17, 77:24, 165:6, 173:1
**door** [63] - 9:9, 10:16, 10:17, 11:13, 47:18, 47:24, 47:25, 48:9, 48:10, 49:24, 50:3, 58:19, 59:5, 59:6, 59:8, 59:11, 59:14, 59:17, 59:19, 59:21, 59:23, 60:25, 61:22, 61:23, 65:5, 65:8, 65:9, 65:12, 65:14, 65:15, 65:16, 65:17, 65:19, 65:21, 65:22, 65:25, 66:4, 66:7, 66:8, 66:15, 67:13, 68:9, 76:23, 81:5, 81:13, 81:14, 158:24, 161:22, 218:12, 218:13, 218:14, 218:21, 219:11, 219:12, 219:24, 220:2, 220:3, 220:4, 220:6, 220:8, 227:16
**doors** [1] - 11:10
**doubt** [6] - 14:16, 15:18, 16:18, 19:18, 20:17, 22:15
**Douglas** [3] - 1:19, 3:11, 14:20
**down** [68] - 8:17, 17:16, 37:8, 37:12, 39:2, 40:13, 40:24, 41:15, 41:16, 44:18, 46:10, 46:12, 79:19, 79:21, 81:16, 87:8, 88:3, 92:14, 92:16, 97:20, 97:22, 104:19, 104:21, 107:25, 118:12, 120:22, 125:4, 125:20, 126:5, 126:13, 129:25, 130:5, 130:13, 133:22, 133:24, 136:1, 136:22, 136:23, 138:11, 147:9, 148:7, 148:19, 148:24, 149:18, 156:4, 156:5, 158:18, 162:25, 163:3, 165:19, 165:21, 172:11, 172:13, 182:20, 190:4, 190:7, 193:12, 196:14, 200:6, 203:20, 203:22, 212:5, 212:18, 215:18, 216:19, 216:21, 223:2
**downed** [1] - 182:16
**Dr** [3] - 203:23, 204:11, 204:25
**draw** [1] - 195:23
**drawer** [2] - 49:2, 81:19

**drawn** [1] - 10:11
**dread** [4] - 42:14, 42:16, 45:8, 45:13
**dreadlock** [2] - 41:18, 44:9
**dreadlocks** [2] - 27:12, 41:6
**dreads** [9] - 27:12, 27:14, 27:21, 41:5, 41:6, 45:15, 45:18, 45:19, 140:12
**drew** [1] - 65:2
**Drive** [7] - 111:10, 111:11, 111:21, 113:3, 137:14, 138:7, 147:21
**driven** [2] - 7:12, 11:18
**driver** [1] - 11:23
**driver's** [2] - 63:1, 63:6
**drivers'** [1] - 136:23
**driving** [5] - 119:9, 125:6, 126:19, 135:21, 153:5
**drop** [5] - 119:11, 140:19, 141:6, 158:17, 160:6
**dropped** [9] - 8:19, 52:13, 52:14, 107:23, 109:17, 126:5, 136:17, 140:15, 141:16, 141:19, 154:1, 158:14, 158:16, 161:23, 161:24, 162:4, 175:4, 189:15
**dropping** [3] - 52:14, 159:22, 160:18
**drove** [2] - 63:10, 136:13
**drum** [8] - 7:4, 7:18, 9:18, 14:9, 222:25, 224:14, 224:16, 225:12
**drum-style** [4] - 7:4, 7:18, 9:18, 14:9
**duly** [14] - 22:24, 46:16, 80:11, 92:23, 98:2, 105:2, 134:3, 156:22, 163:12, 166:2, 172:16, 190:15, 204:2, 217:4
**dump** [1] - 18:10
**Dupont** [1] - 163:21
**during** [23] - 5:8, 9:22, 15:8, 26:5, 29:20, 33:22, 53:8, 55:17, 80:20, 81:3, 83:9, 85:15, 103:10, 124:23, 129:2, 129:3, 135:17, 145:15, 219:16, 220:23, 224:10, 226:14, 227:24
**duties** [2] - 64:24, 173:9
**duty** [7] - 4:4, 9:11, 122:22, 122:23, 134:15, 137:18
**DVD** [7] - 29:9, 29:16, 29:17, 29:19, 30:17, 32:23, 33:1
**Dyer** [19] - 1:23, 3:4, 3:19, 7:20, 10:9, 11:4, 11:5, 11:16, 11:23, 11:24, 12:11, 21:7, 21:23, 21:24, 22:15, 192:23, 208:19, 209:2
**Dyer's** [1] - 12:19

**E**

**e-mailed** [1] - 188:9
**ear** [3] - 158:12, 161:16, 161:21
**easily** [3] - 202:23, 203:13, 203:14
**eastbound** [4] - 93:21, 94:13, 94:15, 94:19
**EASTERN** [1] - 1:2
**Eastern** [3] - 21:4, 96:10, 173:7
**easy** [1] - 17:15
**edge** [1] - 7:17
**educational** [1] - 191:5
**effects** [4] - 164:20, 165:7, 165:10, 165:12
**egg** [6] - 205:10, 205:11, 205:25, 206:4
**eight** [3] - 9:23, 23:20
**either** [8] - 10:18, 92:1, 95:3, 99:14, 139:17, 151:7, 203:5, 203:9
**EJ** [1] - 153:25
**elapsed** [2] - 33:22, 34:3
**Eldorado** [1] - 104:22
**ELDORADO** [1] - 105:1
**eldorado** [1] - 105:9
**electronic** [1] - 99:6
**element** [1] - 22:14
**eliciting** [1] - 167:24
**Elmo** [2] - 163:4, 163:17
**ELMO** [1] - 163:11
**emphasis** [1] - 202:4
**employed** [5] - 93:11, 98:10, 163:18, 166:11, 217:13
**employee** [1] - 10:11
**employee's** [1] - 7:19
**employees** [5] - 6:18, 7:1, 11:5, 11:25, 36:22
**enable** [1] - 89:25
**enclosed** [1] - 10:15
**encounter** [1] - 22:5
**end** [17] - 5:10, 5:19, 7:20, 11:25, 12:12, 19:8, 19:10, 20:18, 20:25, 38:8, 48:1, 52:21, 53:6, 103:12, 154:17, 154:21, 174:3
**ended** [3] - 109:12, 114:19, 174:4
**ends** [1] - 57:5
**energy** [2] - 205:13, 205:16
**energy-producing** [1] - 205:16
**enforcement** [6] - 12:22, 33:15, 34:1, 34:8, 99:15, 99:23
**engaging** [3] - 152:23, 152:24, 154:3
**ENGLISH** [1] - 163:11

9

**English** [3] - 2:12, 163:4, 163:17
**ensure** [1] - 197:6
**enter** [3] - 58:23, 152:24, 170:9
**entered** [11] - 7:2, 11:4, 11:24, 13:19, 26:7, 86:11, 112:3, 112:5, 128:8, 128:11, 150:4
**enters** [4] - 3:22, 22:19, 92:18, 165:23
**entire** [10] - 68:22, 70:2, 72:4, 72:10, 86:23, 88:14, 158:20, 159:1, 179:18, 228:1
**entirely** [1] - 72:8
**entirety** [1] - 68:11
**entitled** [1] - 230:21
**entrance** [1] - 24:5
**environment** [2] - 191:24, 203:2
**EPS** [1] - 99:6
**equipment** [1] - 205:16
**Eric** [2] - 133:25, 134:9
**ERIC** [1] - 134:2
**Erin** [1] - 79:22
**ERIN** [1] - 80:10
**erin** [1] - 80:16
**ESP** [3] - 98:24, 99:5, 101:25
**Esq** [6] - 1:18, 1:18, 1:19, 1:20, 1:21, 1:22
**essentially** [3] - 146:8, 196:17, 212:7
**established** [1] - 147:4
**establishments** [2] - 16:13, 18:19
**estimate** [4] - 153:19, 209:21, 211:5, 211:12
**estimation** [1] - 153:20
**et** [1] - 1:6
**ethnically** [1] - 89:16
**evaluated** [1] - 15:9
**evening** [2] - 128:23, 129:5
**event** [2] - 86:23, 115:12
**events** [1] - 115:17
**eventually** [4] - 113:23, 126:23, 161:23, 203:5
**everywhere** [1] - 174:18
**evidence** [90] - 4:4, 4:9, 4:14, 4:16, 4:17, 4:19, 4:24, 5:3, 5:5, 5:6, 5:18, 5:22, 6:3, 6:6, 12:3, 12:4, 12:14, 12:15, 14:10, 14:15, 15:4, 15:7, 15:10, 15:21, 15:22, 15:23, 16:2, 16:5, 16:6, 16:16, 16:19, 16:21, 17:1, 17:4, 18:5, 19:1, 19:7, 20:3, 20:11, 20:25, 21:9, 22:6, 22:12, 45:24, 86:11, 93:17, 93:20, 93:23, 103:7,

138:23, 168:6, 168:25, 169:5, 169:6, 169:7, 169:11, 169:13, 169:16, 169:17, 170:2, 170:4, 174:25, 178:13, 179:2, 180:13, 182:7, 182:10, 182:11, 183:14, 184:18, 184:22, 185:10, 185:12, 185:19, 191:1, 191:19, 191:22, 192:1, 192:3, 193:12, 206:12, 207:14, 207:17, 207:18, 217:21, 219:6, 227:25, 229:15, 229:17
**Evidence** [2] - 4:20, 201:17
**exact** [6] - 113:9, 137:24, 137:25, 141:19, 150:6, 174:6
**exactly** [14] - 19:23, 26:1, 41:23, 69:5, 89:2, 91:22, 99:22, 114:9, 125:8, 165:1, 178:23, 205:17, 214:2, 229:12
**EXAMINATION** [49] - 23:1, 31:18, 32:17, 45:1, 46:18, 58:5, 63:20, 76:21, 78:3, 79:11, 80:13, 86:17, 87:4, 90:8, 90:21, 93:1, 96:15, 98:4, 104:1, 105:4, 116:16, 124:12, 128:16, 131:20, 134:5, 142:10, 145:22, 152:6, 152:12, 155:2, 155:19, 157:1, 160:1, 163:14, 166:4, 171:6, 172:18, 184:15, 187:2, 189:8, 190:17, 194:16, 195:7, 199:23, 202:20, 204:4, 212:1, 215:11, 217:6
**examination** [9] - 46:7, 73:21, 126:8, 153:10, 192:12, 192:25, 201:6, 201:8, 208:9
**examinations** [3] - 191:14, 191:16, 191:25
**examine** [10] - 6:5, 31:7, 58:4, 103:20, 116:15, 191:22, 192:13, 199:25, 207:18, 207:20
**examined** [2] - 6:1, 194:18
**examiner** [3] - 191:1, 197:5, 204:12
**examiners** [1] - 14:4
**example** [3] - 191:20, 206:20, 216:8
**except** [3] - 73:11, 76:9, 87:15
**exception** [1] - 206:3
**exchange** [1] - 191:17
**exchanged** [1] - 191:19

**exclude** [4] - 209:2, 209:4, 209:6, 215:15
**excluded** [4] - 5:2, 200:9, 209:5, 209:6
**exclusion** [2] - 193:7, 197:24
**exclusively** [1] - 150:17
**excuse** [3] - 29:5, 83:19, 205:11
**excused** [14] - 44:19, 46:11, 79:20, 92:15, 97:21, 104:20, 133:23, 156:4, 163:2, 165:20, 172:12, 190:5, 203:21, 216:20
**executive** [3] - 98:11, 98:18, 98:23
**exhibit** [18] - 71:5, 82:7, 82:15, 83:3, 100:13, 102:10, 103:4, 164:9, 222:8, 223:20, 224:6, 224:22, 225:15, 226:7, 226:22, 227:9, 229:23, 230:7
**Exhibit** [55] - 27:25, 52:24, 53:25, 71:4, 77:9, 78:6, 82:6, 82:14, 82:20, 83:2, 83:12, 83:16, 85:1, 85:7, 85:9, 85:19, 85:24, 86:11, 95:10, 95:12, 95:22, 100:12, 100:19, 101:13, 101:15, 102:6, 103:2, 103:16, 114:25, 115:21, 141:10, 164:6, 164:7, 178:5, 192:15, 193:15, 193:17, 193:24, 194:3, 204:21, 220:11, 221:4, 221:7, 222:20, 223:6, 223:12, 224:4, 224:21, 225:3, 225:21, 226:7, 226:22, 227:5, 227:9, 229:23
**exhibited** [3] - 192:18, 193:1, 200:16
**exhibits** [14] - 4:11, 18:3, 18:7, 18:14, 57:20, 74:15, 84:19, 85:10, 95:16, 101:8, 102:10, 102:15, 141:12, 196:10
**Exhibits** [2] - 28:11, 142:5
**exit** [2] - 158:24, 161:22
**exited** [2] - 50:5, 153:16
**expect** [3] - 211:13, 211:16, 216:16
**expected** [1] - 207:2
**experience** [2] - 36:10, 98:24
**experienced** [1] - 75:20
**expert** [2] - 14:2, 99:2
**expertise** [1] - 196:14
**explain** [7] - 106:21, 121:19, 168:18, 202:23, 218:10, 218:15, 222:22

**explains** [2] - 122:8, 206:11
**extended** [11] - 6:24, 7:16, 9:19, 14:8, 26:20, 27:2, 27:5, 34:11, 94:18
**extending** [1] - 94:14
**extensively** [1] - 35:4
**extracted** [1] - 208:1
**eye** [8] - 40:2, 40:4, 42:3, 108:10, 136:13, 136:14, 153:24, 196:19
**eyes** [14] - 6:22, 40:7, 40:11, 41:12, 41:13, 77:3, 77:4, 77:5, 77:7, 82:4, 89:12, 89:13, 109:16, 130:4
**eyesight** [1] - 153:18

## F

**F-I-S-H-E-R** [1] - 204:10
**face** [17] - 7:7, 7:19, 24:19, 24:20, 24:23, 25:5, 27:15, 39:14, 40:3, 40:9, 41:20, 41:21, 81:7, 81:13, 110:13, 116:6
**facedown** [1] - 81:16
**faces** [2] - 18:25, 91:4
**fact** [8] - 30:7, 72:23, 122:4, 124:16, 130:22, 188:7, 201:14, 213:5
**facts** [7] - 4:4, 4:5, 4:6, 4:9, 4:11, 4:12, 21:18
**fair** [5] - 17:11, 64:17, 68:14, 68:21, 188:14
**Fairfax** [3] - 10:3, 10:4, 173:6
**fall** [1] - 154:19
**fallen** [2] - 158:18, 160:20
**falling** [1] - 203:4
**familiar** [3] - 41:6, 96:2, 154:12
**family** [1] - 206:20
**famous** [1] - 216:11
**far** [16] - 24:22, 42:1, 66:5, 67:16, 67:20, 96:5, 109:22, 114:21, 126:17, 137:5, 152:25, 158:22, 158:23, 168:20, 178:22, 184:25
**fast** [7] - 60:8, 60:9, 67:14, 75:9, 175:6, 182:8, 216:4
**fast-moving** [1] - 182:8
**fastest** [1] - 216:4
**father** [2] - 206:1, 206:17
**FBI** [17] - 8:10, 9:1, 9:13, 14:4, 21:16, 141:4, 141:23, 172:25, 174:24, 185:15, 191:2, 192:3, 204:13, 218:24, 222:21, 222:23
**FBI's** [1] - 14:1
**feathers** [3] - 201:14, 201:15, 201:16
**February** [1] - 122:22

**Federal** [49] - 6:17, 7:14, 9:11, 9:20, 9:24, 10:2, 12:5, 13:6, 19:19, 21:10, 23:10, 28:4, 34:15, 35:8, 46:25, 53:9, 54:7, 54:17, 56:17, 56:22, 57:23, 70:11, 70:14, 70:17, 70:23, 72:19, 72:20, 72:24, 77:23, 80:18, 96:2, 96:5, 97:2, 97:14, 98:21, 99:1, 100:1, 100:6, 100:17, 100:24, 101:9, 101:16, 103:8, 134:18, 134:22, 173:10, 204:14, 217:14
**feed** [4] - 82:8, 84:14, 85:13, 92:7
**feet** [14] - 7:6, 7:19, 109:23, 126:18, 139:14, 140:9, 144:5, 153:21, 153:22, 160:21, 161:7
**fellow** [8] - 60:14, 60:16, 61:16, 119:15, 122:9, 130:8, 174:15
**felon** [1] - 14:14
**female** [2] - 167:5, 167:8
**fences** [1] - 154:15
**few** [7] - 4:2, 5:7, 113:18, 131:17, 159:4, 162:13
**fewer** [1] - 207:3
**fiber** [4] - 201:9, 201:22, 202:5, 202:8
**fibers** [2] - 192:11, 202:6
**figure** [3] - 42:2, 84:4, 216:11
**figured** [3] - 44:2, 118:2, 118:12
**figures** [1] - 53:6
**fill** [7] - 22:13, 122:2, 122:12, 122:14, 122:15, 122:17, 123:1
**filled** [2] - 122:1, 122:8
**filling** [1] - 122:2
**films** [1] - 88:21
**final** [1] - 31:8
**finally** [4] - 5:17, 14:7, 30:10, 109:12
**financial** [2] - 98:14, 99:18
**finger** [1] - 26:25
**fingerprint** [1] - 185:5
**fingerprints** [7] - 16:3, 185:14, 185:22, 186:6, 186:14, 186:20, 186:21
**finishes** [1] - 6:2
**firearm** [1] - 14:14
**first** [47] - 17:13, 24:16, 24:18, 32:22, 37:15, 43:3, 43:4, 47:14, 47:23, 49:21, 58:25, 68:10, 74:16, 75:3, 81:4, 87:7, 107:10, 109:22, 109:23, 114:19, 118:20, 123:12, 126:15, 127:13,

129:22, 130:4, 130:8, 131:6, 132:18, 132:20, 146:1, 147:18, 148:20, 148:24, 150:13, 150:14, 150:20, 151:1, 158:11, 176:9, 179:21, 222:22, 222:25
**firsthand** [1] - 98:24
**FISHER** [1] - 204:1
**Fisher** [5] - 2:16, 203:23, 204:9, 204:11, 204:25
**fit** [1] - 19:10
**fitting** [1] - 203:17
**five** [10] - 12:25, 64:22, 84:1, 95:8, 178:22, 192:4, 211:14, 211:19, 214:9, 214:11
**five-minute** [1] - 178:22
**flash** [2] - 131:10, 131:11
**flashing** [2] - 131:8, 131:10
**flat** [2] - 70:4, 111:16
**flathead** [1] - 165:1
**fled** [3] - 7:11, 10:21, 11:18
**flight** [9] - 138:22, 139:1, 140:25, 142:22, 142:23, 142:24, 143:16, 143:18, 153:13
**floor** [7] - 10:12, 39:1, 39:7, 49:20, 81:16, 87:8, 159:5
**focused** [2] - 106:16, 179:1
**focusing** [3] - 106:11, 106:12, 106:25
**follow** [9] - 4:7, 4:25, 60:25, 61:13, 67:10, 123:6, 143:21, 151:8
**followed** [8] - 60:13, 61:2, 67:11, 68:15, 121:5, 127:14, 149:21, 185:21
**following** [7] - 146:6, 146:22, 148:22, 149:15, 170:6, 196:7, 196:9
**follows** [16] - 3:24, 22:25, 46:17, 80:12, 92:24, 98:3, 105:3, 134:4, 156:23, 163:13, 166:3, 168:17, 172:17, 190:16, 204:3, 217:5
**Food** [7] - 10:23, 11:8, 13:9, 13:12, 16:8, 19:19, 21:11
**foot** [6] - 26:19, 34:11, 132:20, 152:23, 152:24, 161:4
**footage** [2] - 13:20, 30:8
**FOR** [1] - 2:3
**Force** [2] - 173:4, 201:17
**force** [4] - 22:14, 131:15, 181:16, 187:16
**foregoing** [1] - 230:20
**forensic** [4] - 14:4, 190:25, 196:25, 197:1

**forensics** [1] - 205:19
**forest** [1] - 159:5
**forever** [1] - 84:2
**forget** [3] - 110:13, 110:14, 111:4
**forgot** [1] - 8:6
**form** [3] - 5:17, 88:21, 162:15
**formed** [2] - 15:2, 17:10
**Fort** [12] - 111:10, 111:21, 113:3, 135:11, 137:14, 138:7, 147:21, 157:13, 163:21, 163:22, 174:11
**forth** [3] - 22:8, 88:11, 167:8
**forward** [1] - 37:20
**foundation** [1] - 51:25
**four** [71] - 6:18, 7:14, 8:1, 8:17, 8:22, 9:23, 9:25, 12:3, 12:19, 12:22, 12:24, 17:2, 20:21, 84:1, 84:19, 98:19, 100:4, 107:5, 107:6, 107:10, 107:17, 108:5, 110:2, 113:22, 116:1, 117:5, 117:19, 117:21, 117:24, 118:1, 118:5, 118:8, 118:12, 118:15, 118:22, 119:7, 121:7, 124:24, 125:1, 125:2, 125:4, 125:6, 129:22, 131:25, 132:1, 132:9, 132:18, 133:14, 135:22, 135:25, 136:7, 137:21, 139:6, 140:4, 140:15, 140:22, 142:20, 143:11, 146:10, 152:9, 153:11, 155:4, 155:5, 155:8, 171:2, 175:12, 192:20, 210:9
**fourth** [3] - 7:13, 7:24, 7:25
**foyer** [2] - 59:9, 61:21
**frequencies** [1] - 211:9
**frequency** [4] - 211:5, 211:6, 211:11, 212:16
**frequent** [1] - 211:5
**friend** [1] - 41:10
**friends** [1] - 130:13
**front** [45] - 6:19, 6:25, 9:6, 10:12, 11:6, 11:17, 12:1, 19:4, 24:3, 24:4, 25:17, 26:22, 28:7, 37:14, 37:24, 38:6, 38:8, 58:16, 58:19, 59:11, 61:22, 61:23, 62:8, 63:1, 63:7, 65:2, 65:23, 67:17, 69:11, 84:18, 87:16, 87:21, 87:25, 89:6, 102:9, 107:24, 126:6, 143:5, 160:17, 172:2, 172:3, 219:25, 223:3, 228:8, 229:18
**fuchsia** [4] - 108:12, 110:21, 118:18, 119:16
**fuchsia-colored** [4] - 108:12,

110:21, 118:18, 119:16
**full** [4] - 93:5, 98:8, 134:7, 213:21
**fully** [1] - 149:13
**fur** [1] - 191:21
**furnace** [1] - 219:23
**furtherance** [1] - 167:23

## G

**G-A-I-N-E-S** [1] - 166:10
**Gaines** [4] - 2:13, 166:8, 170:9, 171:8
**GAINES** [1] - 166:1
**game** [1] - 35:17
**gathering** [2] - 138:18, 138:19
**general** [4] - 117:16, 173:25, 209:15, 209:22
**generally** [1] - 99:4
**generated** [2] - 102:18, 102:20
**generations** [1] - 216:5
**genetic** [1] - 205:5
**gentleman** [14] - 45:23, 68:15, 81:1, 108:2, 108:3, 108:10, 108:11, 108:12, 108:14, 110:21, 110:22, 114:4, 127:13, 164:10
**gentlemen** [15] - 14:10, 14:19, 15:14, 15:21, 16:16, 16:20, 16:25, 17:7, 20:6, 21:3, 81:5, 81:14, 108:14, 125:4, 132:9
**getaway** [3] - 8:5, 9:8, 11:21
**Giles** [10] - 1:18, 3:7, 6:14, 18:16, 21:1, 21:19, 22:20, 32:23, 33:11, 69:10
**GILES** [102] - 3:7, 6:15, 22:21, 23:2, 26:23, 27:1, 28:10, 28:18, 30:22, 31:5, 31:8, 31:9, 31:12, 31:13, 31:16, 44:20, 44:23, 44:25, 45:2, 46:2, 46:3, 46:14, 46:19, 51:7, 51:11, 51:20, 52:2, 53:19, 53:20, 53:24, 54:4, 54:10, 54:16, 56:7, 56:11, 58:2, 73:17, 79:10, 79:12, 79:18, 104:22, 105:5, 108:16, 108:19, 110:24, 111:2, 114:24, 115:3, 115:20, 115:24, 116:13, 156:7, 156:9, 156:13, 156:18, 157:2, 157:22, 157:24, 158:2, 158:3, 158:6, 158:9, 172:14, 172:19, 175:19, 175:22, 176:19, 176:22, 176:25, 177:1, 177:10, 177:13, 177:21, 178:1,

178:2, 179:17, 179:20, 180:6, 180:9, 181:9, 181:12, 181:13, 184:9, 184:12, 190:8, 190:18, 191:12, 191:13, 193:14, 193:16, 193:21, 193:24, 194:1, 194:4, 194:7, 203:23, 204:5, 204:20, 204:23, 204:24, 208:20, 211:21

**given** [9] - 74:7, 117:4, 117:15, 135:7, 135:8, 146:6, 152:18, 153:1, 169:9

**glass** [4] - 10:15, 192:9, 193:11, 195:16

**Glebe** [1] - 96:8

**glove** [1] - 78:18

**gloves** [8] - 8:3, 175:10, 177:9, 179:2, 179:9, 188:23, 189:2, 220:16

**God** [1] - 74:14

**gold** [2] - 12:14, 18:22

**Government** [48] - 82:6, 82:14, 82:20, 83:2, 83:12, 83:16, 85:1, 85:6, 85:9, 85:19, 85:24, 86:11, 95:9, 95:11, 95:22, 100:12, 100:19, 101:13, 101:15, 102:6, 103:2, 103:16, 114:25, 115:21, 141:10, 142:5, 164:5, 164:7, 178:5, 192:15, 193:15, 193:17, 204:21, 220:10, 221:3, 221:7, 222:20, 223:6, 223:11, 224:4, 224:21, 225:3, 225:21, 226:6, 226:21, 227:5, 227:8, 229:22

**GOVERNMENT** [1] - 2:3

**government** [27] - 5:25, 6:2, 6:4, 15:18, 16:18, 18:2, 18:16, 19:5, 19:21, 19:23, 20:3, 20:10, 21:14, 22:14, 22:21, 30:22, 73:15, 73:18, 73:24, 73:25, 74:7, 74:11, 88:20, 97:23, 104:22, 190:8

**Government's** [7] - 27:24, 30:11, 52:23, 53:25, 54:11, 115:5, 179:13

**government's** [1] - 88:5

**GPS** [35] - 8:7, 9:3, 9:17, 52:11, 52:12, 98:13, 99:7, 100:16, 133:7, 135:2, 135:9, 136:4, 136:6, 169:1, 173:15, 173:17, 173:20, 181:16, 181:18, 181:23, 181:24, 182:15, 183:3, 183:24, 184:7, 187:6,

187:18, 217:23, 218:2, 218:5, 218:13, 218:16, 220:22, 220:24, 221:6

**grab** [3] - 25:14, 68:5, 182:3

**grabbed** [2] - 25:11, 49:11

**grandmother** [2] - 215:25, 216:9

**grandmothers** [1] - 216:3

**granules** [2] - 198:16, 198:17

**grass** [3] - 111:13, 111:19, 125:10

**grassy** [1] - 130:6

**gravity** [1] - 203:4

**gray** [1] - 157:21

**great** [3] - 21:5, 215:9, 216:9

**great-grandmother** [1] - 216:9

**greeter** [4] - 6:25, 26:16, 49:23, 68:8

**greg** [1] - 3:19

**Greg** [2] - 21:4, 97:23

**GREGORY** [1] - 98:1

**Gregory** [2] - 1:22, 98:9

**grooves** [1] - 196:6

**ground** [28] - 25:7, 25:13, 38:2, 43:10, 88:3, 114:6, 114:7, 128:10, 143:22, 144:4, 144:7, 144:14, 144:25, 146:2, 146:5, 146:13, 159:3, 159:24, 160:4, 160:9, 160:19, 160:20, 160:24, 161:2, 161:8, 161:24, 175:17, 207:25

**group** [5] - 14:23, 119:11, 119:12, 140:3, 175:21

**groups** [3] - 210:2, 213:24, 215:7

**growth** [1] - 203:16

**guess** [9] - 81:11, 94:18, 137:4, 153:22, 189:17, 195:22, 197:16, 215:17, 216:2

**guesstimated** [1] - 44:4

**guide** [1] - 4:3

**guidelines** [1] - 130:25

**guilty** [9] - 14:17, 14:21, 15:12, 17:5, 17:23, 19:13, 20:5, 20:24, 22:16

**gun** [42] - 6:25, 7:3, 7:6, 7:16, 7:18, 14:8, 24:18, 24:20, 25:5, 26:16, 26:18, 26:22, 26:24, 27:8, 31:10, 34:7, 34:8, 34:16, 35:12, 35:16, 35:24, 36:2, 38:13, 38:22, 39:13, 39:16, 60:14, 60:16, 60:18, 60:20, 66:12, 81:6, 81:7, 81:22, 81:24, 87:15, 222:22, 223:15, 223:16, 225:5

**guns** [12] - 9:18, 9:19, 10:11, 14:7, 34:13, 34:19, 34:20, 35:3, 222:23, 226:19, 227:18

**guy** [9] - 16:10, 16:12, 79:7, 118:17, 119:20, 120:1, 120:3, 120:6, 125:22

**guys** [11] - 20:21, 22:5, 91:11, 109:11, 110:2, 118:12, 118:15, 125:19, 126:9

# H

**H-A-B-L-E-N-K-O** [1] - 79:23

**Hablenko** [4] - 2:6, 79:22, 80:16, 84:11

**HABLENKO** [1] - 80:10

**hair** [71] - 27:23, 41:2, 41:4, 107:9, 157:21, 191:14, 191:16, 191:25, 192:17, 192:18, 192:20, 192:21, 193:1, 193:2, 193:4, 193:11, 194:19, 194:21, 194:24, 195:1, 195:3, 195:11, 196:4, 196:8, 196:15, 196:21, 197:4, 197:5, 197:22, 198:8, 198:10, 198:11, 198:15, 198:17, 199:3, 199:9, 199:10, 200:21, 201:5, 201:6, 201:8, 201:9, 201:12, 201:24, 201:25, 202:2, 202:4, 202:5, 202:6, 202:8, 203:11, 206:12, 207:14, 207:20, 207:25, 208:2, 209:3, 209:6, 209:7, 209:10, 212:25, 213:2, 213:3, 214:5, 214:21, 214:22

**hairs** [29] - 191:23, 192:11, 192:13, 193:5, 195:16, 195:18, 195:19, 196:9, 197:25, 198:5, 198:12, 199:7, 199:13, 199:25, 200:1, 200:7, 200:8, 200:11, 200:12, 200:15, 202:23, 202:25, 203:1, 203:3, 203:8, 203:10, 203:15, 203:18, 215:16

**half** [4] - 70:7, 70:9, 94:16, 134:14

**hand** [22] - 12:11, 26:24, 66:12, 66:17, 67:5, 67:6, 67:7, 99:10, 101:25, 110:9, 110:11, 111:7, 121:21, 122:5, 122:10, 123:2, 127:8, 158:17, 161:12, 161:14, 161:15

**handcuffs** [6] - 147:1, 147:6, 147:11, 148:19, 149:10,

161:5

**handed** [1] - 99:11

**handgun** [6] - 6:24, 7:3, 14:12, 222:25, 225:14, 226:10

**handheld** [4] - 182:15, 218:5, 218:17, 219:10

**handing** [1] - 66:23

**hands** [23] - 81:8, 112:19, 112:20, 114:5, 123:8, 123:9, 123:10, 123:14, 123:15, 123:22, 123:24, 124:2, 124:3, 124:5, 145:3, 149:18, 158:14, 158:16, 158:20, 159:18, 159:21, 160:18, 160:22

**handwritten** [1] - 73:1

**hanging** [2] - 41:15, 41:16

**harboring** [1] - 129:6

**Harold** [1] - 98:9

**Harry** [3] - 156:7, 156:18, 157:6

**HARRY** [1] - 156:21

**hat** [6] - 159:13, 203:12, 203:15, 203:17, 203:18

**head** [9] - 192:20, 193:1, 194:19, 194:21, 202:24, 203:9, 203:11, 203:15

**hear** [32] - 8:23, 13:1, 13:16, 13:17, 13:23, 14:1, 14:3, 15:1, 16:2, 16:9, 16:15, 18:2, 18:5, 20:17, 21:9, 21:13, 21:15, 21:16, 21:17, 22:6, 65:12, 112:9, 112:17, 127:17, 128:3, 133:2, 155:9, 160:24, 161:1, 161:8, 161:19, 163:9

**heard** [24] - 5:4, 26:10, 26:13, 32:7, 32:8, 47:16, 59:2, 59:3, 59:15, 59:16, 65:3, 81:2, 81:4, 81:12, 81:19, 81:20, 112:10, 127:21, 127:24, 137:6, 153:12, 163:10, 182:21, 205:9

**hearing** [2] - 106:8, 195:11

**hearsay** [7] - 51:6, 51:19, 94:2, 167:22, 169:19, 170:3, 170:16

**heart** [2] - 122:19, 156:19

**heavily** [3] - 139:20, 154:19

**heavy** [1] - 140:10

**height** [9] - 27:9, 43:3, 43:8, 43:16, 44:2, 44:7, 45:5, 139:14, 140:9

**held** [4] - 7:6, 7:18, 12:18, 145:6

**hello** [1] - 131:23

**help** [3] - 112:15, 164:6, 175:19

**helped** [2] - 76:6, 123:4
**herself** [2] - 170:13, 170:18
**hi** [1] - 63:23
**Hi** [2] - 46:21, 93:4
**hidden** [4] - 8:8, 70:6, 182:16, 182:18
**hiding** [2] - 8:24
**hierarchy** [1] - 90:10
**high** [2] - 43:22, 212:16
**higher** [2] - 211:4, 211:6
**highlighted** [1] - 173:19
**Highway** [1] - 10:24
**hill** [13] - 111:16, 111:17, 111:18, 111:19, 113:5, 113:16, 138:9, 138:13, 138:14, 138:20, 147:21, 148:3
**Hillcrest/Fort** [1] - 135:11
**HILTON** [1] - 1:12
**Hispanic** [7] - 210:5, 210:11, 212:10, 214:10, 214:24, 215:4
**Hispanics** [2] - 211:18, 211:20
**hit** [3] - 160:24, 161:2, 161:8
**hold** [2] - 17:17, 19:5
**holders** [1] - 94:17
**holding** [5] - 12:10, 49:25, 50:3, 50:4, 94:18
**holds** [1] - 7:5
**hole** [9] - 22:12, 42:5, 77:2, 77:3, 77:6, 77:7, 189:18, 189:24
**holes** [11] - 31:11, 31:14, 34:12, 40:2, 40:4, 40:5, 41:24, 42:3, 77:2, 77:5, 189:19
**home** [6] - 9:16, 9:21, 170:9, 170:12, 218:8, 222:17
**honestly** [1] - 201:25
**Honor** [135] - 3:7, 3:9, 3:11, 3:17, 6:15, 22:21, 28:10, 28:13, 28:14, 28:16, 28:17, 30:22, 30:25, 31:1, 31:2, 31:5, 31:17, 32:16, 37:20, 44:14, 44:20, 44:23, 45:21, 46:2, 53:19, 53:24, 54:10, 56:7, 56:9, 73:17, 78:2, 80:1, 80:6, 83:11, 83:13, 83:15, 83:19, 83:22, 84:5, 84:25, 85:18, 86:2, 86:6, 86:8, 90:20, 92:13, 92:20, 94:2, 94:3, 95:21, 95:24, 96:12, 96:13, 96:14, 97:18, 97:24, 100:18, 101:11, 102:5, 103:15, 103:21, 104:17, 104:23, 108:16, 114:24, 115:20, 116:13, 131:19, 133:25, 142:4, 142:8, 155:1, 158:2, 158:6,

162:22, 162:23, 163:1, 163:7, 164:17, 165:14, 165:15, 165:16, 165:17, 167:15, 167:23, 168:3, 168:5, 168:8, 168:15, 168:16, 168:18, 169:3, 169:7, 169:14, 169:22, 170:5, 172:10, 172:14, 175:19, 176:19, 176:25, 177:10, 177:21, 179:17, 180:6, 181:9, 184:9, 184:13, 190:3, 190:6, 190:9, 191:9, 193:14, 194:4, 194:7, 194:8, 202:19, 204:17, 204:18, 204:20, 204:23, 211:21, 216:18, 216:24, 225:20, 227:4, 227:20, 228:9, 228:11, 228:15, 228:17, 228:21, 228:23, 230:2, 230:10
**HONORABLE** [1] - 1:12
**hood** [6] - 27:19, 40:22, 40:24, 41:1, 42:8, 42:11
**hope** [2] - 4:2, 214:15
**hour** [2] - 9:11, 9:12
**hours** [1] - 135:17
**house** [32] - 107:14, 107:24, 109:17, 125:9, 126:6, 130:3, 130:5, 130:6, 130:11, 136:17, 141:15, 141:18, 166:18, 166:20, 167:1, 167:9, 167:12, 168:21, 168:22, 168:25, 169:4, 169:5, 169:11, 171:16, 172:3, 172:5, 219:7, 219:8, 220:23, 228:1, 229:14
**housekeeping** [1] - 190:9
**houses** [2] - 140:21, 169:17
**hover** [1] - 25:17
**hovering** [4] - 26:3, 26:15, 27:11, 27:13
**human** [9] - 201:5, 201:8, 201:12, 201:24, 202:2, 202:4, 202:8, 202:24, 203:11
**humans** [1] - 202:25
**hunched** [1] - 38:1
**hundred** [3] - 69:14, 69:21, 202:25
**hundred-dollar** [1] - 69:14
**hundreds** [1] - 206:8
**Hunter** [3] - 1:22, 3:19, 21:4
**HUNTER** [24] - 3:19, 21:3, 28:17, 31:3, 44:17, 78:4, 79:8, 90:22, 92:11, 97:19, 104:18, 131:21, 152:13, 153:8, 153:9, 154:23, 155:13, 155:15, 155:17,

155:20, 156:1, 165:18, 202:21, 203:19
**hurry** [2] - 67:15, 67:16
**husband** [3] - 169:9, 170:20, 170:22
**husky** [1] - 107:7

## I

**I-66** [2] - 93:24, 96:6
**I-N-N** [1] - 23:8
**ID** [6] - 110:5, 116:6, 121:11, 121:12, 121:15, 121:16
**idea** [7] - 68:14, 72:24, 73:11, 87:23, 88:1, 188:19, 189:4
**identical** [2] - 198:20, 206:3
**identification** [7] - 126:24, 127:1, 127:3, 127:5, 127:7, 193:6, 197:19
**identifications** [1] - 120:18
**identified** [28] - 74:15, 108:17, 108:18, 110:24, 111:1, 118:17, 118:23, 119:15, 119:17, 120:7, 121:13, 122:5, 122:10, 123:7, 133:14, 157:22, 158:1, 164:18, 170:18, 178:5, 192:6, 192:14, 192:21, 193:3, 207:20, 207:21, 225:6
**identifies** [1] - 72:19
**identify** [11] - 62:3, 78:21, 91:5, 91:8, 108:9, 164:15, 167:13, 170:13, 213:2, 222:7, 223:12
**identity** [2] - 8:4, 19:16
**IDs** [1] - 121:19
**ignition** [1] - 9:10
**ignore** [1] - 4:22
**illustrate** [1] - 102:24
**image** [2] - 88:10, 195:24
**immediate** [2] - 159:8, 162:4
**immediately** [9] - 8:21, 46:5, 65:19, 75:19, 80:23, 81:12, 88:9, 111:5, 219:22
**important** [10] - 14:23, 15:13, 16:16, 17:9, 17:21, 17:22, 205:19, 205:22
**improper** [1] - 4:20
**Inc** [1] - 19:19
**incident** [5] - 33:21, 34:4, 34:16, 34:24, 75:8
**incidents** [1] - 19:18
**incline** [1] - 175:3
**include** [10] - 116:23, 118:6, 123:1, 195:2, 195:3, 197:4, 197:14, 198:3, 199:13, 199:20
**included** [4] - 117:17, 198:6,

198:25, 202:11
**inclusion** [1] - 197:14
**Incorporated** [1] - 10:2
**increase** [1] - 126:20
**indeed** [1] - 69:21
**index** [1] - 26:24
**Indian** [2] - 201:17, 202:1
**indicate** [3] - 45:13, 70:17, 141:23
**indicated** [9] - 31:20, 58:7, 61:25, 83:23, 97:14, 116:18, 197:17, 220:3, 225:24
**indicating** [1] - 32:8
**indication** [1] - 188:19
**individual** [31] - 15:9, 27:8, 31:24, 32:3, 38:13, 39:19, 49:6, 101:2, 130:21, 140:11, 144:12, 144:14, 144:24, 144:25, 145:11, 145:14, 146:16, 157:20, 164:23, 172:7, 192:7, 197:7, 197:24, 198:25, 199:1, 199:7, 199:15, 201:1, 203:9, 206:2, 209:13
**individual's** [2] - 197:4, 198:1
**individuals** [73] - 9:25, 11:24, 19:12, 19:16, 19:21, 26:11, 78:22, 78:24, 118:1, 119:8, 121:8, 123:6, 126:2, 132:18, 136:10, 136:13, 136:14, 136:16, 137:3, 137:5, 137:7, 137:21, 137:22, 137:25, 138:11, 139:19, 140:2, 140:4, 141:6, 142:12, 142:16, 142:17, 142:20, 143:11, 143:22, 143:25, 146:1, 146:8, 146:9, 146:17, 146:19, 146:23, 146:25, 147:2, 147:3, 147:8, 147:10, 148:7, 148:11, 148:18, 148:20, 149:10, 149:19, 149:20, 151:7, 153:11, 154:7, 168:21, 169:25, 197:23, 201:3, 209:4, 209:5, 210:10, 210:20, 210:21, 213:22, 214:1, 214:3, 214:15, 214:16, 216:6
**indulgence** [1] - 153:8
**industry** [2] - 77:21, 99:18
**inference** [1] - 169:8
**influenced** [1] - 4:21
**information** [22] - 12:25, 13:1, 13:5, 13:6, 18:22, 20:14, 20:15, 36:13, 37:24, 39:11, 39:16, 106:1, 106:3,

124:19, 134:23, 135:2, 135:6, 136:3, 136:19, 188:10, 205:8, 205:15
**informed** [4] - 76:10, 141:4, 141:6, 148:18
**inherit** [2] - 205:25, 206:1
**inheritance** [2] - 205:24, 206:15
**inherited** [1] - 207:7
**initial** [8] - 82:18, 82:25, 83:4, 140:3, 143:3, 143:20, 171:17, 182:2
**initialed** [1] - 82:13
**initials** [4] - 29:16, 30:16, 32:24, 55:20
**initiated** [1] - 132:20
**INN** [1] - 22:23
**Inn** [5] - 2:4, 22:22, 23:6, 32:19, 45:3
**innocent** [1] - 16:25
**inside** [44] - 6:18, 6:20, 7:24, 8:8, 9:4, 9:19, 16:12, 31:20, 47:9, 48:18, 48:20, 48:25, 50:8, 50:10, 51:17, 58:15, 60:1, 61:3, 61:19, 62:7, 62:15, 62:22, 63:13, 63:16, 64:9, 102:2, 102:3, 104:12, 117:21, 141:2, 141:7, 141:19, 166:25, 174:19, 179:3, 180:22, 220:9, 220:14, 223:15, 223:21, 224:13, 227:16, 229:2
**inspect** [2] - 128:13, 188:7
**installed** [5] - 100:16, 101:3, 101:9, 101:17, 104:9
**instance** [2] - 19:15, 185:2
**instances** [1] - 197:9
**instead** [2] - 170:2, 207:9
**Institution** [1] - 201:16
**institutions** [1] - 98:14
**instruct** [3] - 4:12, 5:8, 6:7
**instructed** [2] - 4:24, 148:7
**instruction** [2] - 5:1, 205:6
**instructions** [8] - 4:2, 20:17, 87:8, 146:6, 148:22, 149:15, 149:16, 149:17
**insurance** [1] - 54:11
**insured** [1] - 54:7
**intact** [2] - 71:21, 71:23
**intelligence** [1] - 212:5
**interested** [1] - 210:2
**interior** [1] - 28:7
**internal** [1] - 198:12
**Internet** [1] - 36:3
**intersection** [1] - 163:22
**Interstate** [2] - 93:21, 95:18
**interstate** [2] - 14:11, 54:17
**interviewed** [3] - 45:8, 45:11, 45:12

**investigated** [1] - 21:17
**Investigation** [2] - 204:14, 217:15
**investigation** [6] - 5:16, 93:18, 118:13, 173:10, 217:17
**involved** [7] - 8:16, 11:21, 16:24, 113:6, 171:19, 173:9, 217:16
**involvement** [1] - 173:12
**involving** [1] - 106:1
**iPhone** [1] - 100:5
**irrelevant** [1] - 16:21
**item** [4] - 4:24, 159:13, 207:23, 207:24
**items** [39] - 9:13, 10:5, 14:5, 16:5, 162:15, 165:7, 175:9, 175:23, 176:14, 176:17, 177:3, 177:6, 178:10, 178:12, 178:13, 178:15, 179:2, 179:16, 179:21, 180:10, 180:16, 180:22, 180:24, 182:4, 183:11, 184:23, 184:24, 184:25, 186:21, 189:4, 191:22, 192:2, 192:3, 202:24, 226:4, 228:3, 229:19, 229:20, 229:25
**itself** [2] - 36:19, 104:12

## J

**jacket** [15] - 40:20, 48:8, 48:13, 78:16, 78:19, 79:7, 92:6, 92:8, 107:8, 110:8, 110:17, 114:4, 118:18, 132:12, 132:13
**Jade** [2] - 167:19, 168:18, 168:25, 172:7
**January** [1] - 230:19
**Jeep** [26] - 6:19, 7:12, 7:25, 9:8, 10:21, 11:18, 11:22, 16:2, 16:4, 16:12, 50:23, 61:25, 62:1, 62:2, 62:10, 62:18, 62:19, 62:22, 62:24, 63:4, 63:9, 63:10, 63:13, 63:17
**Jefferson** [1] - 10:24
**job** [4] - 70:11, 70:12, 202:7, 210:22
**Johnson** [12] - 2:10, 108:24, 109:1, 109:3, 109:5, 109:15, 109:16, 134:1, 134:9, 142:12, 153:25, 155:4
**JOHNSON** [1] - 134:2
**Johnson's** [1] - 109:2
**join** [1] - 120:21
**joined** [6] - 8:23, 107:24, 125:19, 130:13, 132:22,

195:15
**JR** [1] - 92:22
**Jr** [3] - 1:21, 93:6, 93:8
**Judge** [5] - 44:17, 155:13, 155:17, 156:2, 165:18
**JUDGE** [1] - 1:13
**judges** [1] - 4:5
**jumped** [4] - 7:2, 7:8, 50:18, 81:10
**jumps** [1] - 68:7
**June** [1] - 1:6
**juror** [1] - 17:18
**jurors** [2] - 5:7, 19:11
**JURY** [1] - 1:14
**jury** [21] - 3:5, 3:22, 4:1, 5:10, 22:19, 39:25, 81:2, 83:16, 83:20, 84:11, 92:18, 99:4, 101:20, 165:23, 167:6, 202:23, 204:25, 219:19, 222:22, 224:12

## K

**K-O-C-H** [2] - 190:13, 190:23
**K10** [1] - 208:18
**K14** [1] - 208:18
**K18** [1] - 208:19
**K6** [2] - 208:17, 210:13
**keep** [14] - 5:18, 10:7, 25:18, 56:18, 57:24, 101:3, 109:16, 131:16, 153:23, 154:3, 154:5, 158:20, 159:21, 216:2
**KEITH** [1] - 1:6
**Keith** [28] - 1:20, 3:3, 3:12, 7:25, 14:20, 15:6, 15:11, 15:12, 15:25, 16:4, 16:10, 16:17, 16:19, 16:22, 17:4, 17:5, 157:22, 168:19, 168:24, 170:23, 192:22, 194:22, 194:25, 195:3, 208:19, 209:3
**kept** [18] - 10:14, 11:8, 48:17, 49:4, 50:8, 53:17, 106:18, 106:19, 106:20, 106:21, 120:8, 120:9, 120:11, 124:20, 130:12, 159:22
**keys** [1] - 49:10
**kill** [1] - 26:2
**kind** [40] - 17:17, 17:25, 18:8, 18:17, 27:18, 36:24, 40:15, 40:20, 44:3, 44:10, 63:24, 63:25, 65:8, 70:6, 76:6, 107:1, 107:7, 119:8, 131:8, 138:23, 140:10, 147:24, 153:16, 188:14, 195:9, 195:23, 195:25, 196:5, 196:13, 197:1, 197:15, 197:16, 201:11, 205:3, 205:9, 207:17, 219:14,

221:17, 221:19, 225:5
**kinds** [2] - 6:21, 205:2
**knee** [1] - 39:3
**knife** [1] - 95:4
**knock** [1] - 20:7
**knowledge** [4] - 34:13, 53:13, 98:24, 128:7, 153:13, 173:6
**known** [24] - 129:6, 192:12, 192:20, 193:2, 193:8, 194:21, 196:9, 197:4, 198:2, 198:5, 199:13, 200:7, 200:17, 200:23, 201:2, 202:10, 202:14, 208:4, 208:12, 208:13, 208:17, 208:22, 209:7, 209:10
**koch** [1] - 199:25
**Koch** [4] - 2:15, 190:8, 190:13, 190:22
**KOCH** [1] - 190:14

## L

**laboratory** [8] - 14:4, 191:2, 192:2, 192:4, 204:13, 207:24, 208:14
**lack** [2] - 129:7, 215:17
**ladies** [10] - 14:10, 14:19, 15:13, 15:21, 16:16, 16:20, 16:25, 17:7, 20:6, 21:3
**lady** [1] - 110:23
**laid** [3] - 130:4, 148:18, 160:21
**lane** [1] - 94:13
**lanes** [1] - 93:21
**language** [1] - 35:10
**laptop** [1] - 181:24
**large** [5] - 6:21, 98:22, 199:18, 199:19, 220:13
**larger** [2] - 144:9, 145:11
**last** [20] - 9:17, 12:6, 37:21, 75:6, 83:22, 86:25, 88:6, 88:7, 93:7, 99:25, 103:10, 113:16, 122:18, 142:1, 143:4, 163:6, 163:7, 166:9, 169:3, 190:22
**law** [10] - 4:6, 4:7, 6:7, 12:22, 33:15, 34:1, 34:8, 90:15, 99:23, 193:25
**lawn** [1] - 125:10
**lawyer** [1] - 21:4
**lawyers** [5] - 4:11, 4:16, 4:18, 5:24, 6:6
**Lay** [23] - 139:2, 139:3, 146:6, 146:7, 147:9, 147:20, 148:2, 148:4, 148:6, 148:7, 148:9, 148:10, 148:15, 148:17, 149:4, 149:6, 149:8,

149:21, 151:10, 151:18, 151:21, 152:3
**lay** [3] - 148:7, 149:18, 149:21
**Lay's** [2] - 148:22, 149:15
**layers** [2] - 196:21, 198:13
**laying** [3] - 112:25, 138:11, 147:9
**lead** [1] - 198:15
**leading** [2] - 162:5, 220:2
**leafy** [1] - 159:5
**lean** [2] - 27:22
**learn** [3] - 100:1, 134:17, 134:20
**learned** [1] - 201:22
**least** [5] - 169:12, 209:13, 213:5, 214:4
**leave** [9] - 49:17, 50:19, 50:20, 86:25, 149:3, 160:22, 198:4, 198:24, 199:14
**leaves** [8] - 69:16, 99:20, 159:4, 175:18, 182:16, 182:23, 182:24, 183:1
**led** [14] - 8:11, 8:12, 144:16, 144:20, 145:18, 146:12, 146:14, 146:19, 147:2, 147:5, 147:7, 147:12, 151:16, 217:17
**left** [24] - 8:4, 10:21, 19:15, 19:16, 25:11, 38:20, 49:18, 60:9, 61:17, 68:9, 73:8, 94:13, 108:10, 108:13, 120:19, 120:20, 120:25, 157:20, 161:14, 172:2, 187:20, 219:25, 227:16
**length** [2] - 26:19, 34:11
**less** [8] - 8:2, 60:6, 75:13, 75:14, 153:22, 155:10, 218:20
**level** [4] - 196:14, 212:6, 212:15, 212:19
**Liberties** [1] - 16:2
**Liberty** [6] - 6:19, 7:12, 7:25, 9:9, 16:4, 16:12
**lies** [1] - 196:8
**life** [1] - 41:7
**lifted** [1] - 123:2
**light** [1] - 107:8
**light-skinned** [1] - 107:8
**lighter** [2] - 11:3, 22:3
**lighter-complected** [1] - 11:3
**lights** [9] - 130:23, 130:24, 130:25, 131:1, 131:2, 131:5, 131:7, 131:8, 131:16
**likely** [1] - 103:13
**limited** [5] - 4:25, 96:7, 122:22, 122:23, 198:2

**line** [18] - 17:16, 17:17, 48:1, 50:4, 50:6, 50:18, 50:19, 65:21, 65:22, 68:4, 68:8, 68:16, 69:4, 76:23, 206:18, 215:19, 215:23, 215:25
**lineages** [1] - 208:4
**lines** [1] - 156:13
**lineup** [1] - 78:24
**link** [2] - 18:15, 20:2
**linked** [1] - 12:15
**linking** [1] - 14:5
**links** [1] - 16:6
**list** [1] - 74:15
**listed** [1] - 211:10
**listen** [3] - 5:13, 5:21, 16:16
**listening** [1] - 137:16
**live** [4] - 13:13, 110:3, 121:18, 132:4
**lived** [3] - 89:14, 116:6, 216:11
**lives** [2] - 17:17, 216:13
**living** [2] - 80:17, 105:10
**loaded** [4] - 223:6, 223:8, 224:16, 225:14
**lobby** [19] - 47:16, 59:15, 59:16, 61:2, 61:3, 61:8, 61:10, 64:6, 65:3, 65:20, 66:3, 67:8, 67:9, 68:11, 69:1, 69:5, 69:6, 69:7
**local** [2] - 135:8, 181:16
**Locard's** [1] - 191:17
**locate** [4] - 182:15, 217:23, 220:6, 220:23
**located** [23] - 10:3, 10:23, 24:4, 106:14, 175:16, 178:7, 178:13, 178:16, 180:20, 183:8, 183:24, 184:7, 219:20, 220:8, 221:1, 221:14, 221:15, 221:20, 222:25, 225:13, 226:11, 228:4, 229:20
**location** [32] - 13:2, 14:3, 16:8, 94:11, 94:12, 96:2, 96:5, 100:6, 101:3, 104:10, 136:3, 137:20, 137:24, 140:25, 141:17, 141:19, 142:1, 150:10, 159:12, 166:17, 166:23, 166:24, 171:17, 173:19, 178:24, 179:1, 180:12, 180:18, 181:17, 188:20, 192:8, 218:3
**locations** [10] - 13:21, 56:18, 57:25, 118:4, 135:7, 135:9, 146:17, 173:23, 174:20, 182:10
**locked** [6] - 10:16, 11:9, 11:13, 49:6, 94:23, 95:5
**locks** [1] - 9:9
**log** [12] - 138:8, 147:25,

148:13, 158:15, 158:17, 158:18, 160:19, 162:1, 162:7, 162:8
**logged** [3] - 173:17, 173:25, 181:19
**look** [97] - 15:10, 15:21, 15:22, 18:6, 28:19, 29:8, 29:22, 30:10, 31:10, 33:1, 36:2, 39:22, 41:4, 43:3, 49:10, 52:25, 55:8, 55:9, 55:22, 56:12, 56:25, 59:9, 69:11, 70:20, 71:1, 71:8, 71:17, 71:18, 76:24, 81:8, 82:6, 82:14, 82:20, 83:2, 84:18, 85:9, 85:23, 88:4, 88:23, 88:24, 95:14, 96:23, 100:12, 101:12, 102:9, 114:12, 115:4, 119:18, 119:19, 119:20, 119:22, 120:1, 121:10, 121:19, 140:7, 141:10, 164:7, 164:25, 176:8, 176:9, 177:2, 177:14, 178:3, 179:5, 179:12, 179:24, 179:25, 181:1, 183:13, 183:16, 184:3, 189:21, 191:22, 192:11, 193:17, 196:15, 196:18, 197:1, 197:7, 200:25, 205:7, 213:13, 220:10, 220:14, 222:19, 222:21, 223:11, 223:19, 224:4, 224:21, 225:11, 226:6, 226:21, 227:8, 228:6, 229:22
**looked** [40] - 26:19, 27:11, 27:23, 31:11, 34:8, 36:3, 39:17, 40:1, 41:5, 41:18, 41:25, 42:14, 44:1, 44:3, 45:6, 57:9, 67:2, 69:12, 73:11, 73:13, 74:1, 81:4, 81:23, 81:24, 96:20, 110:6, 118:14, 118:15, 119:9, 128:10, 132:8, 139:12, 186:11, 196:24, 196:25, 197:9, 197:10, 223:2, 223:5, 223:17
**looking** [22] - 8:16, 16:10, 26:3, 31:23, 32:6, 39:10, 69:9, 69:10, 87:9, 104:5, 117:3, 124:22, 181:24, 182:22, 195:19, 195:22, 196:9, 196:14, 196:21, 198:10, 213:8, 213:12
**lookout** [21] - 106:5, 106:6, 106:7, 106:8, 109:3, 109:7, 116:18, 116:21, 116:23, 117:1, 117:2, 117:9, 117:10, 117:12, 117:17, 117:21, 118:3, 118:5, 125:2, 152:18, 153:1

**lookouts** [8] - 117:4, 117:15, 117:23, 117:24, 124:16, 124:17, 124:20, 124:21
**looks** [8] - 65:6, 71:9, 72:1, 74:1, 77:1, 77:11, 198:10, 222:12
**loose** [4] - 94:16, 97:4, 97:6, 97:7
**LOPEZ** [1] - 46:15
**Lopez** [8] - 2:5, 46:14, 46:23, 52:3, 58:7, 73:18, 76:23, 79:13
**lopez** [1] - 90:17
**Lopez'** [2] - 90:11, 90:15
**lose** [1] - 202:25
**losing** [2] - 182:7, 203:3
**loss** [1] - 52:17
**lost** [3] - 112:5, 127:15, 182:11
**loud** [1] - 182:21
**louder** [1] - 218:17
**loudest** [1] - 218:21
**loving** [1] - 21:13
**low** [1] - 182:22
**lower** [1] - 148:14
**Luger** [3] - 223:24, 223:25, 224:1
**Luis** [1] - 172:14
**LUIS** [1] - 172:15
**luis** [1] - 172:23
**lunch** [2] - 6:10, 92:17
**Lunch** [1] - 92:18
**lying** [5] - 39:2, 143:22, 144:3, 144:7, 146:5
**LYNCH** [1] - 98:1
**Lynch** [3] - 2:8, 97:23, 98:9

## M

**ma'am** [75] - 53:1, 55:15, 55:23, 56:12, 79:8, 85:17, 86:19, 88:15, 88:18, 88:25, 89:17, 89:21, 90:6, 92:11, 96:19, 96:22, 97:3, 97:10, 97:16, 105:14, 105:22, 105:24, 106:15, 107:20, 108:8, 109:19, 110:19, 112:8, 112:22, 113:25, 114:14, 114:16, 114:23, 115:9, 115:14, 115:16, 116:3, 116:12, 126:11, 126:22, 127:2, 127:25, 128:4, 128:6, 128:9, 128:14, 134:16, 134:25, 135:14, 136:5, 136:9, 136:23, 138:4, 138:17, 139:7, 140:24, 141:13, 141:21, 141:25, 142:3, 147:1, 147:7, 155:7, 164:4, 164:8, 164:10, 164:12,

164:22, 165:13, 190:19, 191:14, 194:2, 194:18, 204:6, 225:19
**MAC-10** [1] - 221:19
**machine** [1] - 1:25
**Madison** [3] - 216:8, 216:10, 216:14
**magazine** [15] - 7:4, 14:9, 26:20, 27:3, 27:5, 34:12, 34:22, 34:23, 35:20, 222:25, 223:9, 223:21, 224:14, 224:16, 225:12
**magazines** [7] - 35:12, 35:16, 35:17, 35:18, 226:18, 226:25, 227:18
**mail** [3] - 227:12, 227:13, 227:15
**mailed** [1] - 188:9
**Maine** [1] - 201:21
**major** [1] - 205:22
**majority** [1] - 201:9
**male** [4] - 107:9, 140:8, 140:11, 144:9
**males** [11] - 107:5, 107:6, 107:10, 107:25, 108:1, 117:5, 117:19, 135:22, 135:25, 139:13, 144:5
**man** [11] - 7:8, 7:13, 7:16, 7:18, 7:24, 10:12, 47:19, 48:10, 65:17, 76:24, 164:11
**manager** [2] - 47:4, 81:11
**manner** [1] - 183:9
**manual** [1] - 205:6
**manufactured** [1] - 223:24
**manufacturer** [1] - 225:7
**manufactures** [1] - 98:13
**map** [3] - 99:22, 102:19, 173:18
**maps** [1] - 102:22
**marked** [48] - 27:24, 28:19, 29:22, 30:10, 52:23, 55:9, 56:12, 56:25, 82:6, 82:14, 82:20, 83:2, 84:19, 85:6, 85:9, 85:23, 95:9, 100:12, 101:13, 102:10, 103:2, 114:12, 115:4, 141:10, 164:5, 174:17, 176:1, 177:2, 177:15, 179:12, 179:25, 180:21, 181:1, 220:10, 221:3, 221:7, 222:7, 222:19, 223:6, 223:11, 223:19, 224:4, 224:21, 225:3, 226:6, 226:21, 227:8, 229:22
**marker** [2] - 72:16, 72:17
**marking** [2] - 70:17, 97:2
**markings** [2] - 77:16, 97:14
**marks** [1] - 9:9
**married** [2] - 168:23, 170:19

**Maryland** [1] - 105:19
**mask** [35] - 9:15, 27:19, 27:20, 39:20, 39:22, 39:23, 39:24, 40:1, 40:5, 42:9, 48:13, 76:24, 77:1, 78:18, 78:19, 79:7, 89:7, 159:13, 160:9, 160:11, 192:13, 192:18, 193:1, 194:18, 195:4, 207:21, 209:11, 212:8, 213:1, 213:3, 214:6, 214:21, 214:22, 215:1
**masked** [1] - 10:9
**masks** [34] - 6:21, 8:3, 9:3, 9:22, 9:23, 9:24, 14:7, 18:22, 18:25, 48:7, 82:2, 133:9, 175:9, 175:11, 175:12, 176:4, 176:18, 177:8, 179:3, 179:10, 179:22, 179:23, 180:25, 188:23, 188:25, 189:17, 189:20, 189:21, 189:23
**Mass** [1] - 163:22
**Massachusetts** [4] - 111:22, 113:4, 157:14, 174:10
**match** [6] - 19:8, 88:24, 196:6, 200:18, 202:10, 202:12
**matched** [1] - 118:9
**matching** [1] - 209:10
**material** [2] - 205:5, 207:13
**maternal** [4] - 206:18, 207:1, 208:4, 209:13
**maternally** [3] - 209:16, 216:7
**matter** [4] - 94:4, 190:9, 213:5, 230:21
**mean** [17] - 22:9, 57:12, 62:12, 82:15, 85:20, 106:21, 110:11, 113:19, 150:22, 182:1, 182:18, 185:1, 197:21, 210:16, 218:11, 218:15, 219:5
**meaning** [2] - 13:3, 209:11
**means** [7] - 193:6, 197:18, 197:22, 210:17, 211:13, 219:6
**meant** [1] - 104:7
**meanwhile** [2] - 7:1, 11:15
**measure** [1] - 99:24
**measured** [1] - 43:8
**measurements** [1] - 44:6
**medium** [4] - 27:9, 139:13, 144:6, 195:17
**medulla** [1] - 198:13
**meet** [1] - 108:22
**meeting** [2] - 74:10, 74:13
**Melinda** [3] - 1:20, 3:14, 17:12
**member** [6] - 23:18, 24:7, 49:19, 51:5, 51:16, 58:13

**members** [8] - 4:1, 49:20, 81:2, 84:11, 91:13, 99:4, 167:6, 219:19
**memorialize** [1] - 122:24
**memorialized** [1] - 122:4
**memory** [5] - 75:25, 76:8, 76:16, 77:20, 89:1
**men** [37] - 6:18, 6:20, 6:23, 7:14, 8:1, 8:17, 8:22, 9:12, 9:23, 9:24, 10:9, 11:2, 14:11, 22:1, 47:19, 47:20, 47:21, 81:10, 108:5, 109:18, 129:22, 136:8, 137:21, 138:22, 139:12, 139:22, 139:23, 139:25, 140:5, 140:6, 140:8, 140:15, 140:22, 155:4, 155:5, 155:8, 171:2
**mentioned** [2] - 117:2, 168:5
**messages** [3] - 12:18, 12:23, 13:25
**met** [3] - 75:7, 109:1, 174:20
**Metropolitan** [6] - 105:11, 134:11, 134:24, 157:7, 163:19, 166:12
**microscope** [6] - 192:10, 193:11, 195:12, 195:14, 195:16
**microscopes** [1] - 195:15
**microscopic** [11] - 191:14, 191:16, 191:25, 193:2, 193:5, 196:10, 196:13, 196:20, 198:6, 199:6, 200:16
**microscopically** [1] - 195:2
**mid** [1] - 158:17
**middle** [6] - 6:9, 6:11, 64:25, 65:1, 84:14, 162:11
**might** [7] - 32:8, 78:22, 93:23, 118:13, 197:2, 216:13, 220:4
**mile** [1] - 96:8
**millimeter** [1] - 223:13
**Mills** [30] - 2:9, 104:22, 105:9, 136:11, 136:15, 137:7, 137:13, 138:6, 138:7, 138:17, 139:2, 140:14, 140:18, 141:5, 141:15, 141:18, 143:5, 143:8, 143:11, 146:22, 147:23, 148:12, 149:3, 151:22, 152:3, 153:14, 153:23, 154:7, 154:8, 155:9
**MILLS** [1] - 105:1
**mind** [2] - 5:18, 14:25
**minds** [1] - 15:2
**mine** [1] - 12:14
**minus** [3] - 210:23, 210:24, 211:3

**minute** [11] - 60:6, 75:13, 75:14, 76:3, 113:12, 113:13, 127:6, 155:10, 178:21, 178:22
**minutes** [12] - 8:3, 24:13, 64:10, 64:22, 103:10, 113:14, 113:18, 155:6, 160:15, 160:16, 168:21, 171:4
**miss** [1] - 130:22
**missed** [3] - 142:25, 143:3
**missing** [1] - 181:18
**mitochondria** [5] - 205:13, 205:15, 206:4, 206:5, 206:7
**mitochondrial** [31] - 193:13, 204:12, 204:25, 205:2, 205:17, 206:6, 206:9, 206:11, 206:17, 206:18, 206:20, 206:24, 207:2, 207:6, 207:9, 207:11, 207:16, 207:25, 208:3, 208:6, 208:10, 208:21, 209:12, 209:14, 209:15, 212:20, 213:4, 214:21, 215:17, 216:10, 216:15
**mode** [2] - 205:24, 206:15
**moment** [2] - 15:17
**momentarily** [1] - 112:6
**money** [113] - 7:1, 7:7, 7:9, 7:10, 8:8, 9:3, 9:16, 10:7, 10:15, 10:19, 11:7, 11:8, 11:11, 11:13, 11:18, 12:2, 14:8, 25:18, 25:19, 25:21, 25:23, 26:3, 48:10, 48:17, 48:18, 48:25, 52:8, 52:9, 52:11, 54:5, 55:4, 57:14, 57:17, 57:24, 60:2, 64:12, 64:17, 66:15, 66:21, 66:22, 66:23, 67:5, 67:6, 69:18, 70:25, 72:21, 81:18, 98:14, 99:9, 99:10, 102:2, 102:4, 104:5, 104:12, 106:19, 106:23, 112:25, 114:7, 114:8, 118:4, 124:4, 124:5, 133:5, 138:8, 138:25, 147:25, 148:12, 159:6, 159:13, 159:23, 160:4, 160:6, 162:1, 162:3, 162:5, 162:6, 162:8, 162:9, 164:24, 165:3, 165:4, 169:1, 175:1, 175:4, 175:6, 175:8, 175:16, 177:7, 182:5, 182:17, 183:25, 184:8, 185:1, 185:4, 185:9, 185:10, 185:11, 185:12, 185:14, 186:8, 186:11, 188:23, 221:1, 221:9, 221:10, 221:16, 221:20, 221:24, 229:5, 229:7,

229:10

**monies** [1] - 57:13

**monitor** [1] - 173:22

**monitored** [2] - 173:23, 188:16

**monitoring** [4] - 187:6, 187:12, 187:21, 188:17

**monitors** [2] - 99:19, 188:2

**months** [4] - 23:20, 33:23, 33:24, 98:17

**morning** [38] - 3:7, 3:9, 3:10, 3:11, 3:13, 3:14, 3:16, 3:17, 6:10, 6:16, 10:25, 13:11, 14:19, 14:22, 17:12, 17:15, 20:6, 21:3, 23:3, 23:4, 23:25, 24:8, 32:19, 35:9, 46:20, 47:7, 47:12, 63:22, 94:21, 105:20, 134:15, 134:17, 135:16, 135:17, 152:16, 153:4, 173:13, 230:12

**morphological** [1] - 199:6

**most** [12] - 21:6, 27:15, 91:13, 103:13, 182:17, 201:20, 201:25, 202:5, 202:8, 210:5, 210:10, 212:18

**mostly** [1] - 197:13

**mother** [9] - 206:1, 206:16, 206:19, 206:21, 206:22, 206:25, 207:7, 215:21, 215:24

**mother's** [2] - 206:22, 215:19

**motion** [3] - 110:13, 111:4, 122:10

**motioned** [3] - 110:8, 136:16, 141:15

**motioning** [1] - 140:20

**mounted** [2] - 192:9, 195:16

**mounting** [1] - 195:17

**mouth** [4] - 40:4, 40:7, 40:11, 42:5

**move** [39] - 28:10, 37:20, 53:19, 53:24, 54:11, 54:12, 56:7, 71:15, 83:11, 84:4, 84:25, 85:18, 86:9, 95:21, 100:18, 102:5, 103:15, 113:23, 114:24, 115:20, 142:4, 158:21, 159:19, 176:19, 177:10, 177:21, 179:17, 180:6, 181:9, 183:13, 184:9, 193:15, 194:4, 204:20, 225:20, 227:4, 227:20, 230:2, 230:7

**moved** [5] - 102:21, 103:8, 182:25, 187:24

**movement** [7] - 99:13, 112:10, 127:24, 127:25, 128:1, 173:22

**movements** [2] - 118:22, 173:23

**moves** [1] - 30:23

**moving** [9] - 127:23, 148:10, 148:11, 182:8, 182:23, 187:7, 187:22, 187:25, 188:17

**MPD** [9] - 8:15, 13:23, 173:24, 174:17, 174:19, 174:21, 174:25, 178:17, 181:21

**MR** [103] - 3:11, 3:17, 3:19, 14:19, 20:6, 21:3, 28:13, 28:16, 28:17, 30:25, 31:2, 31:3, 31:19, 32:16, 44:14, 44:17, 54:1, 56:9, 58:6, 63:19, 76:22, 78:2, 78:4, 79:8, 83:13, 85:3, 85:4, 85:21, 86:6, 86:13, 86:18, 87:3, 90:9, 90:19, 90:22, 92:11, 94:2, 95:24, 96:13, 97:18, 97:19, 100:20, 103:18, 103:21, 104:17, 104:18, 115:1, 115:22, 116:17, 124:11, 128:17, 131:18, 131:21, 142:6, 142:11, 145:21, 152:7, 152:11, 152:13, 153:8, 153:9, 154:23, 155:13, 155:15, 155:17, 155:20, 156:1, 160:2, 162:21, 162:23, 165:15, 165:17, 165:18, 167:15, 167:22, 167:25, 168:4, 168:15, 169:3, 169:14, 170:16, 171:7, 172:10, 177:24, 184:16, 187:1, 189:9, 190:3, 194:8, 194:11, 194:17, 195:6, 199:24, 202:18, 202:21, 203:19, 204:18, 211:24, 215:12, 216:17, 228:15, 228:23, 230:10

**MS** [229] - 3:7, 3:9, 3:14, 6:15, 17:12, 22:21, 23:2, 26:23, 27:1, 28:10, 28:14, 28:18, 30:22, 31:1, 31:5, 31:8, 31:9, 31:12, 31:13, 31:16, 32:18, 37:20, 37:22, 44:12, 44:20, 44:23, 44:25, 45:2, 45:21, 46:2, 46:3, 46:14, 46:19, 51:6, 51:7, 51:11, 51:19, 51:20, 51:24, 52:2, 53:19, 53:20, 53:24, 54:2, 54:4, 54:10, 54:14, 54:16, 56:7, 56:11, 58:2, 63:21, 71:5, 71:7, 73:17, 73:23, 76:19, 79:10, 79:12, 79:18, 79:22, 80:1, 80:6, 80:14, 83:11, 83:15, 83:19,

83:22, 84:5, 84:7, 84:9, 84:10, 84:25, 85:5, 85:18, 85:23, 86:2, 86:4, 86:8, 86:15, 87:5, 90:7, 92:13, 92:20, 93:2, 94:3, 94:8, 95:21, 96:1, 96:12, 96:14, 96:16, 97:17, 97:23, 98:5, 100:18, 100:22, 101:11, 101:14, 102:5, 102:8, 103:15, 103:19, 103:23, 104:2, 104:16, 104:22, 105:5, 108:16, 108:19, 110:24, 111:2, 114:24, 115:3, 115:20, 115:24, 116:13, 124:13, 128:15, 133:25, 134:6, 142:4, 142:8, 145:23, 152:4, 155:1, 155:3, 155:11, 156:7, 156:9, 156:13, 156:18, 157:2, 157:22, 157:24, 158:2, 158:3, 158:6, 158:9, 162:22, 163:4, 163:6, 163:15, 164:17, 164:19, 165:14, 165:16, 166:5, 167:17, 167:23, 168:2, 168:8, 168:11, 168:16, 168:18, 169:7, 169:22, 170:5, 170:8, 170:21, 170:24, 171:1, 171:5, 172:14, 172:19, 175:19, 175:22, 176:19, 176:22, 176:25, 177:1, 177:10, 177:13, 177:21, 178:1, 178:2, 179:17, 179:20, 180:6, 180:9, 181:9, 181:12, 181:13, 184:9, 184:12, 187:3, 189:7, 190:8, 190:18, 191:9, 191:12, 191:13, 193:14, 193:16, 193:21, 193:24, 194:1, 194:4, 194:7, 195:8, 199:22, 203:23, 204:5, 204:17, 204:20, 204:23, 204:24, 208:20, 211:21, 212:2, 215:9, 216:23, 217:2, 217:7, 225:20, 225:23, 227:4, 227:7, 227:20, 227:23, 228:9, 228:11, 228:13, 228:17, 228:20, 228:25, 229:1, 230:2, 230:6

**MSR** [2] - 23:18, 58:13

**MSRs** [3] - 49:18, 58:11, 64:13

**multiple** [4] - 13:21, 13:22, 89:18, 207:6

**must** [8] - 4:7, 4:14, 4:25, 5:5, 16:24, 20:15, 20:21, 20:22

**mutation** [1] - 216:4

# N

**name** [29] - 14:19, 17:12, 21:4, 23:5, 46:22, 80:15, 93:5, 93:7, 98:8, 105:8, 134:7, 157:5, 163:16, 163:17, 165:11, 166:6, 166:9, 167:19, 171:24, 172:7, 172:22, 190:21, 190:22, 204:8, 204:9, 217:8, 223:22, 227:12

**names** [3] - 133:16, 133:17, 133:19

**Nash** [12] - 106:12, 106:17, 107:1, 109:13, 109:21, 126:16, 129:23, 135:13, 135:21, 137:11, 137:13, 142:17

**National** [1] - 54:8

**naturally** [1] - 62:7

**Navy** [47] - 6:17, 7:14, 9:11, 9:20, 9:24, 10:1, 12:5, 13:6, 19:18, 21:10, 23:10, 28:4, 34:15, 35:8, 46:25, 53:9, 54:7, 54:17, 56:17, 56:21, 57:23, 70:11, 70:14, 70:17, 70:23, 72:19, 72:20, 72:24, 77:23, 80:18, 96:2, 96:5, 97:2, 97:14, 98:21, 98:25, 100:1, 100:6, 100:17, 100:24, 101:9, 101:16, 103:8, 134:18, 134:22, 173:10

**near** [14] - 8:12, 13:8, 13:12, 13:14, 24:24, 26:15, 138:8, 147:24, 162:6, 178:8, 178:13, 220:4, 220:6

**nearby** [2] - 174:5, 183:8

**nearest** [1] - 96:7

**necessarily** [2] - 160:20, 212:14

**neck** [2] - 40:13, 139:21

**needed** [6] - 88:10, 166:18, 166:23, 169:8, 172:5, 187:22

**needs** [2] - 168:22, 212:6

**negroid** [1] - 192:19

**neighborhood** [4] - 131:24, 132:2, 132:5, 152:21

**never** [12] - 44:6, 61:23, 77:24, 79:1, 122:4, 122:8, 123:9, 129:3, 144:24, 153:11, 168:5

**next** [37] - 20:8, 21:7, 25:16, 38:12, 46:13, 48:9, 71:16, 79:22, 81:7, 108:2, 108:25, 122:13, 126:14, 133:25, 143:6, 147:22, 148:1,

148:4, 148:5, 148:12, 148:16, 149:9, 156:6, 163:4, 178:11, 178:17, 178:19, 178:24, 180:11, 180:21, 181:14, 190:10, 197:15, 203:6, 208:25

**nickels** [1] - 94:16

**night** [3] - 128:22, 129:3, 184:25

**nights** [1] - 129:5

**nine** [2] - 134:14, 223:13

**nine-and-a-half** [1] - 134:14

**nine-millimeter** [1] - 223:13

**nobody** [3] - 127:5, 132:3, 132:8

**none** [4] - 13:13, 97:11, 127:3, 152:1

**normal** [7] - 52:21, 53:15, 53:17, 118:25, 120:12, 120:13, 120:14

**normally** [2] - 56:18, 57:24

**North** [1] - 23:12

**Northern** [1] - 173:5

**noted** [1] - 193:5

**notes** [2] - 5:20, 123:5

**nothing** [11] - 36:13, 86:15, 96:12, 97:3, 103:19, 142:8, 155:11, 165:14, 165:18, 171:5, 230:7

**notice** [3] - 40:20, 131:12, 168:4

**notification** [2] - 100:5, 100:7

**notifications** [1] - 173:14

**notified** [6] - 174:10, 175:1, 178:12, 182:9, 187:16, 218:2

**nuclear** [14] - 205:3, 205:8, 205:10, 205:18, 205:24, 206:2, 206:10, 206:13, 206:15, 207:3, 207:4, 207:10, 207:13, 207:14

**nucleus** [1] - 205:25

**number** [29] - 62:5, 71:6, 73:1, 73:2, 73:3, 77:14, 77:15, 101:2, 101:5, 113:9, 116:23, 117:2, 117:13, 117:17, 124:17, 124:21, 124:22, 124:23, 200:1, 200:6, 200:8, 205:23, 206:11, 208:13, 210:18, 210:20, 214:2, 216:5, 225:15

**numbered** [2] - 100:9, 193:19

**numbers** [11] - 12:17, 101:6, 102:3, 104:4, 104:6, 104:8, 104:9, 104:14, 188:6, 188:8

**numerous** [1] - 200:7

## O

**o'clock** [4] - 6:11, 10:8, 135:16, 230:12

**O-R-M-E-R-O-D** [1] - 217:12

**object** [3] - 4:19, 73:19, 191:18

**objected** [1] - 201:13

**objecting** [1] - 194:9

**objection** [47] - 4:21, 4:22, 4:23, 28:12, 30:24, 30:25, 31:1, 31:2, 31:3, 45:21, 45:25, 51:6, 51:9, 51:19, 51:23, 51:24, 54:1, 54:2, 54:14, 56:9, 73:17, 73:21, 83:13, 85:3, 85:4, 85:21, 86:5, 86:12, 94:2, 95:23, 95:24, 100:20, 103:18, 115:1, 115:22, 142:6, 167:15, 167:16, 167:22, 167:25, 168:15, 170:16, 170:17, 177:23, 194:10, 228:14, 228:22

**objections** [1] - 4:16

**objects** [1] - 56:14

**obligation** [1] - 4:18

**observant** [1] - 8:15

**observation** [1] - 196:20

**observe** [3] - 91:7, 145:1, 195:17

**observed** [13] - 95:17, 107:5, 135:22, 135:25, 136:10, 138:11, 140:2, 140:3, 141:2, 141:6, 142:16, 142:17, 142:22

**observing** [1] - 187:9

**obtain** [4] - 12:22, 12:25, 217:21, 218:24

**obviously** [1] - 31:20

**occur** [2] - 24:12, 109:20

**occurred** [10] - 10:24, 15:14, 19:18, 31:21, 80:20, 91:20, 94:21, 106:1, 122:24, 173:14

**OF** [3] - 1:2, 1:4, 1:10

**offense** [1] - 17:24

**offenses** [2] - 17:24, 19:13

**offer** [1] - 137:12

**offered** [1] - 4:19

**office** [6] - 11:9, 11:15, 33:8, 47:11, 88:5

**officer** [45] - 8:15, 8:18, 8:20, 8:22, 34:8, 35:23, 35:24, 82:5, 93:12, 93:14, 95:11, 100:11, 101:12, 105:11, 105:13, 108:22, 108:23, 108:24, 113:3, 116:18, 128:18, 132:18, 134:9, 134:10, 134:13, 136:11, 138:12, 141:9, 148:2,

152:8, 155:21, 157:6, 163:19, 164:7, 171:8, 174:21, 175:20, 180:19, 181:16, 187:17, 220:15, 222:6, 224:6, 224:20, 225:10

**Officer** [67] - 96:17, 109:1, 109:2, 109:5, 109:15, 109:16, 131:22, 133:13, 133:20, 136:11, 136:14, 137:7, 137:13, 138:6, 138:7, 138:17, 139:2, 139:3, 140:14, 140:18, 141:5, 141:15, 141:18, 142:12, 143:5, 143:8, 143:11, 146:6, 146:7, 146:22, 147:9, 147:20, 147:23, 148:2, 148:4, 148:6, 148:7, 148:9, 148:12, 148:15, 148:17, 148:22, 149:3, 149:4, 149:6, 149:8, 149:15, 149:21, 151:10, 151:18, 151:21, 151:22, 152:3, 153:14, 153:23, 154:7, 154:8, 154:24, 155:4, 155:9, 157:25, 160:3, 162:7

**officers** [39] - 8:10, 8:23, 12:11, 13:23, 21:16, 36:15, 36:17, 36:24, 88:9, 112:24, 113:1, 113:2, 113:6, 113:7, 128:7, 132:22, 137:17, 138:10, 138:13, 139:5, 139:22, 139:23, 145:19, 146:3, 146:20, 151:21, 151:22, 151:24, 152:2, 165:12, 166:18, 171:21, 172:5, 173:24, 174:17, 174:19, 175:1, 181:22

**often** [2] - 79:13, 187:25

**once** [22] - 11:12, 33:4, 33:5, 36:15, 48:16, 88:3, 112:3, 112:5, 130:10, 138:17, 150:4, 151:15, 151:18, 159:23, 172:4, 173:25, 181:5, 182:25, 184:7, 209:9, 219:6

**one** [181] - 6:21, 6:23, 7:2, 7:4, 8:6, 8:18, 8:24, 9:18, 10:10, 11:3, 12:17, 13:14, 14:2, 14:9, 14:23, 15:6, 16:7, 16:11, 17:6, 19:1, 19:5, 20:7, 24:7, 24:21, 31:8, 31:24, 32:3, 34:17, 37:15, 40:7, 41:23, 42:3, 47:19, 47:25, 48:1, 48:7, 48:22, 49:23, 50:3, 50:6, 50:10, 50:18, 58:11, 59:23, 63:6, 64:13, 68:5, 68:8,

68:15, 68:16, 68:17, 68:18, 68:19, 71:23, 77:2, 77:6, 77:7, 81:1, 81:5, 81:10, 81:14, 81:15, 83:18, 83:24, 86:20, 88:16, 96:14, 98:21, 98:22, 100:23, 101:19, 101:22, 103:23, 104:3, 107:7, 107:22, 108:1, 108:2, 110:8, 110:20, 113:12, 113:13, 113:14, 113:19, 117:4, 117:23, 117:24, 119:10, 119:14, 119:15, 119:16, 119:22, 119:25, 120:3, 120:6, 120:21, 123:2, 125:2, 125:17, 125:22, 126:2, 126:4, 126:8, 127:1, 127:7, 127:11, 130:20, 130:25, 133:14, 139:17, 139:19, 140:8, 140:15, 141:2, 143:25, 146:12, 147:1, 147:4, 147:5, 154:17, 155:10, 155:17, 156:10, 156:16, 156:20, 158:25, 162:3, 163:7, 164:1, 164:3, 167:1, 169:17, 170:12, 170:24, 171:22, 174:4, 174:5, 176:4, 177:7, 177:8, 177:14, 182:24, 183:3, 183:5, 183:8, 183:17, 186:5, 187:24, 189:18, 189:21, 189:24, 192:4, 196:4, 196:15, 197:23, 200:9, 200:10, 205:2, 205:25, 206:1, 206:16, 212:22, 216:25, 220:12, 221:18, 224:12, 224:14, 225:3, 225:5, 225:16, 225:18, 226:2, 226:11

**ones** [5] - 9:4, 10:9, 101:9, 188:3, 227:1

**open** [29] - 5:18, 10:17, 10:18, 14:25, 18:9, 18:10, 19:15, 23:25, 24:1, 29:4, 48:22, 49:8, 59:14, 65:15, 65:16, 65:19, 65:22, 66:8, 66:19, 66:20, 72:1, 81:14, 81:19, 84:8, 95:4, 170:6, 198:4, 198:24, 199:14

**opened** [22] - 6:17, 24:13, 24:14, 47:18, 47:24, 47:25, 48:9, 59:5, 59:8, 59:17, 59:19, 59:20, 59:23, 64:1, 64:4, 64:10, 65:14, 66:4, 76:23, 81:13, 179:8, 223:2

**opening** [3] - 5:25, 6:22, 11:1

**operations** [1] - 77:25

**opinion** [4] - 5:17, 15:2, 197:11, 197:12

**opinions** [1] - 17:10

**opportunity** [3] - 19:11, 33:13, 36:2
**opposite** [1] - 142:19
**optical** [1] - 195:15
**option** [2] - 198:4, 198:24
**oral** [1] - 37:7
**order** [5] - 157:14, 169:19, 185:21, 190:10, 208:5
**ordered** [1] - 158:20
**ordering** [1] - 193:18
**organization** [1] - 99:19
**origin** [1] - 192:19
**Ormerod** [7] - 2:17, 174:15, 178:15, 181:15, 217:2, 217:10, 217:11
**ORMEROD** [1] - 217:3
**out-of-state** [1] - 54:20
**outfit** [1] - 110:23
**outline** [3] - 42:14, 45:14, 45:17
**outside** [34] - 5:4, 8:9, 9:21, 16:13, 17:16, 50:23, 51:1, 51:3, 55:5, 59:9, 61:11, 61:13, 61:15, 61:17, 61:18, 61:23, 61:25, 65:6, 65:18, 66:7, 67:8, 71:15, 116:5, 141:16, 141:20, 141:21, 166:13, 166:25, 171:3, 180:10, 189:12, 189:15, 198:11, 220:2
**outstanding** [1] - 218:2
**overall** [1] - 210:9
**overhead** [2] - 130:24, 130:25
**overlap** [4] - 18:1, 198:1, 198:22, 199:10
**overlapping** [1] - 195:19
**overruled** [6] - 4:23, 46:1, 51:23, 73:22, 167:16, 170:17
**overwhelmed** [1] - 16:21
**own** [3] - 5:17, 89:1, 191:23

**P**

**P-O-P-E** [2] - 120:24, 120:25
**p.m** [5] - 92:18, 92:19, 165:23, 230:14
**pace** [1] - 126:20
**pack** [1] - 102:3
**package** [2] - 222:13, 222:14
**packaged** [1] - 219:6
**packs** [1] - 222:2
**painstaking** [1] - 15:5
**paint** [4] - 35:17, 35:20, 35:21, 198:14
**pair** [1] - 95:4
**pairs** [2] - 179:9, 179:10
**pants** [1] - 78:18
**paper** [6] - 97:11, 162:15,

186:10, 186:11, 195:23, 195:24
**pardon** [2] - 58:12, 155:14
**Park** [1] - 163:21
**park** [15] - 111:15, 114:20, 114:21, 129:6, 132:18, 152:23, 152:24, 153:3, 153:4, 154:9, 154:12, 154:15, 155:23, 156:8, 156:12
**parked** [2] - 137:12, 172:3
**part** [20] - 24:2, 40:9, 40:10, 59:12, 62:19, 66:1, 66:2, 84:12, 105:18, 116:5, 118:7, 135:13, 148:14, 168:1, 169:3, 169:23, 173:9, 197:15, 201:17, 201:25
**parted** [1] - 107:22
**partial** [4] - 51:4, 51:8, 51:13
**partially** [3] - 19:14, 175:17, 223:1
**participants** [1] - 14:24
**participate** [2] - 219:1, 219:11
**participated** [1] - 219:9
**participation** [1] - 4:3
**particular** [29] - 23:13, 33:12, 49:2, 53:21, 71:17, 97:1, 97:3, 106:16, 106:20, 122:24, 129:4, 140:21, 166:20, 167:1, 171:16, 173:3, 195:1, 196:3, 209:22, 210:13, 211:13, 211:16, 212:24, 213:2, 213:10, 214:13, 215:7, 223:22, 223:23
**particularly** [2] - 16:20, 207:20
**parts** [3] - 76:9, 76:10, 88:13
**pass** [4] - 143:8, 143:11, 143:13, 175:20
**passed** [4] - 64:16, 109:2, 136:15, 215:18
**passenger** [1] - 140:21
**passenger's** [1] - 63:1
**passing** [1] - 140:18
**passionate** [1] - 77:23
**past** [5] - 81:15, 136:13, 137:2, 150:22, 216:12
**patchy** [1] - 198:19
**path** [6] - 102:24, 138:22, 139:1, 140:25, 153:13, 187:9
**Patricia** [2] - 1:18, 3:7
**patrol** [6] - 93:14, 105:13, 128:20, 131:1, 174:18, 180:19
**patrolled** [1] - 154:14
**patrolling** [9] - 8:16, 105:20,

105:25, 107:3, 108:21, 110:1, 131:24, 152:21, 154:11
**pattern** [1] - 198:23
**Pause** [1] - 3:20
**pay** [1] - 13:17
**PC** [1] - 99:21
**peeking** [3] - 41:23, 42:2, 42:5
**pencil** [1] - 198:14
**Pennsylvania** [1] - 105:18
**people** [57] - 14:23, 16:22, 16:23, 17:9, 18:24, 20:24, 21:25, 24:6, 32:8, 32:12, 51:2, 51:3, 63:16, 79:4, 86:25, 87:25, 89:18, 116:23, 117:3, 117:13, 117:18, 117:21, 117:24, 118:5, 118:8, 124:17, 124:21, 124:24, 125:1, 125:2, 131:12, 131:25, 132:2, 132:4, 143:21, 144:3, 146:11, 148:16, 149:9, 152:18, 155:23, 171:8, 191:18, 198:21, 199:17, 200:13, 209:14, 213:6, 213:9, 213:14, 213:18, 213:19, 213:20, 214:4, 214:13, 215:5
**people's** [1] - 169:17
**per** [2] - 206:5, 206:9
**percent** [11] - 210:23, 210:24, 211:1, 211:3, 211:12, 211:15, 211:16, 211:18
**percentage** [5] - 200:20, 200:22, 201:3, 201:12, 211:1
**perfect** [6] - 8:1, 8:6, 21:19, 21:20, 21:22, 79:8
**perimeter** [1] - 166:25
**perimeters** [1] - 138:20
**period** [2] - 75:4, 120:17
**periodically** [1] - 124:22
**permission** [3] - 83:16, 176:10, 176:22
**permit** [1] - 5:9
**permitted** [3] - 83:23, 170:9, 170:12
**person** [63] - 32:14, 34:16, 38:4, 38:7, 38:9, 38:19, 38:21, 38:22, 40:12, 40:15, 42:22, 42:24, 43:3, 45:5, 45:17, 45:19, 66:6, 66:11, 67:2, 75:11, 78:11, 80:2, 87:15, 89:6, 110:15, 110:18, 116:9, 118:23, 119:22, 119:25, 120:6, 121:13, 122:4, 122:18, 123:7, 123:16, 144:17,

144:21, 145:9, 147:18, 147:22, 148:1, 148:5, 148:17, 151:9, 151:13, 165:7, 184:17, 191:18, 193:7, 197:10, 199:3, 199:10, 199:16, 203:6, 212:10, 212:11, 212:22, 214:19, 214:24, 215:4
**person's** [1] - 145:2
**person-to-person** [1] - 116:9
**personal** [4] - 164:20, 165:7, 165:9, 165:12
**personally** [2] - 151:12, 157:17
**persons** [1] - 123:2
**pets** [1] - 191:20
**phone** [40] - 12:10, 12:17, 12:23, 13:2, 13:3, 13:5, 13:7, 13:8, 13:11, 13:24, 51:21, 52:1, 94:7, 94:9, 123:9, 123:24, 158:12, 159:3, 159:6, 161:12, 161:21, 161:23, 162:4, 162:6, 162:8, 162:11, 168:20, 168:24, 175:10, 175:13, 175:15, 175:16, 177:8, 178:4, 182:23, 185:18, 185:19, 185:22, 186:6
**phones** [14] - 9:5, 12:8, 12:9, 12:13, 12:14, 12:19, 13:10, 13:14, 14:3, 18:21, 22:7, 22:8, 51:3
**photograph** [8] - 78:8, 78:11, 85:6, 115:6, 141:20, 164:11, 178:4, 228:25
**photographed** [2] - 95:17, 228:1
**photographer** [1] - 223:4
**photographs** [25] - 12:20, 15:24, 16:1, 22:8, 30:2, 30:7, 31:23, 32:6, 56:2, 56:14, 56:19, 57:25, 78:7, 78:21, 79:15, 94:25, 177:19, 180:4, 181:5, 222:16, 227:24, 228:3, 228:10, 228:21
**photos** [4] - 22:4, 57:9, 91:10, 184:7
**physical** [3] - 118:9, 190:25
**physically** [3] - 127:19, 128:12, 150:7
**pick** [1] - 185:9
**picked** [4] - 74:4, 158:11, 188:25, 203:5
**picking** [1] - 216:11
**picture** [13] - 69:13, 69:15, 69:20, 71:23, 72:4, 73:12, 73:15, 73:24, 73:25, 74:7, 77:17, 89:2, 178:4

**pictures** [9] - 28:7, 69:10, 85:25, 86:5, 88:19, 88:20, 88:24, 95:14, 175:6
**piece** [3] - 186:10, 195:24, 227:15
**pieces** [14] - 15:7, 18:7, 18:8, 18:14, 19:1, 19:4, 19:7, 19:9, 19:15, 20:2, 20:3, 20:14, 20:25, 88:14
**pigment** [2] - 198:16, 198:17
**pigmentation** [1] - 198:23
**pile** [2] - 175:16, 183:1
**piles** [2] - 114:10, 175:4
**pillow** [1] - 222:3
**pin** [1] - 200:6
**pinging** [7] - 13:8, 13:12, 13:14, 135:3, 135:9, 136:4, 136:6
**pistol** [4] - 221:18, 221:19, 224:9, 226:10
**pistols** [1] - 221:18
**place** [6] - 54:25, 73:5, 74:13, 117:16, 134:18, 134:22
**placed** [4] - 102:3, 149:10, 165:8, 165:11
**places** [1] - 162:3
**plain** [2] - 182:4, 182:19
**planning** [1] - 194:8
**plastic** [7] - 94:17, 97:10, 97:11, 97:13, 153:24, 226:18, 226:25
**plats** [1] - 107:9
**play** [1] - 84:7
**played** [1] - 84:8
**plug** [1] - 20:20
**plus** [4] - 210:23, 210:24, 211:3
**pocket** [1] - 9:6
**pockets** [1] - 164:24
**point** [44] - 38:5, 38:6, 39:10, 43:7, 43:8, 43:12, 63:24, 65:1, 65:4, 66:16, 68:2, 68:10, 80:2, 81:14, 81:21, 82:17, 82:22, 86:19, 86:22, 108:20, 108:21, 109:5, 117:19, 119:21, 120:2, 121:4, 126:21, 127:9, 127:19, 128:5, 130:15, 132:22, 133:2, 149:6, 151:6, 152:8, 158:25, 159:20, 174:8, 174:9, 174:23, 174:24, 187:19, 187:21
**pointed** [7] - 24:18, 26:24, 32:23, 39:14, 81:6, 81:22, 167:12
**pointing** [2] - 24:20, 26:23
**points** [1] - 173:19
**poke** [1] - 81:13

**police** [48] - 8:10, 8:15, 9:1, 12:7, 20:22, 21:16, 45:11, 45:12, 51:13, 51:21, 52:3, 52:5, 61:5, 61:7, 74:24, 75:1, 88:9, 91:19, 92:1, 93:12, 99:18, 99:21, 99:22, 105:11, 110:14, 115:12, 121:7, 121:23, 121:25, 122:2, 122:8, 122:12, 122:14, 122:15, 122:17, 124:19, 125:3, 125:6, 125:25, 128:7, 130:23, 131:1, 131:2, 131:12, 134:13, 145:6, 146:25, 163:19
**Police** [7] - 93:13, 105:11, 134:11, 134:24, 157:7, 163:19, 166:12
**policy** [3] - 131:14, 131:15, 197:3
**Polk** [1] - 120:23
**POLK** [1] - 120:23
**poll** [1] - 210:20
**pope** [1] - 120:24
**Pope** [39] - 106:12, 106:17, 107:1, 107:14, 107:15, 107:25, 108:6, 120:22, 120:25, 121:5, 123:13, 125:10, 125:11, 125:13, 125:14, 125:16, 125:20, 126:13, 129:23, 130:1, 130:7, 130:9, 135:13, 135:23, 135:24, 136:1, 136:9, 137:10, 140:4, 141:1, 142:18, 150:2, 150:16, 155:5, 155:8, 180:14, 189:10, 229:17, 229:24
**popular** [1] - 210:6
**population** [9] - 199:2, 199:18, 199:19, 200:21, 200:23, 209:15, 209:22, 210:2, 215:7
**populations** [1] - 211:10
**populous** [1] - 210:10
**portion** [7] - 10:4, 70:2, 70:6, 205:12, 206:5, 213:8, 223:3
**portions** [1] - 208:2
**position** [4] - 15:20, 95:6, 98:11, 131:7
**positioned** [1] - 47:23
**positioning** [1] - 37:23
**positions** [1] - 103:8
**positive** [2] - 193:6, 197:18
**possession** [2] - 14:14, 103:11
**possibility** [1] - 199:14
**possible** [14] - 130:19, 132:4, 154:17, 154:21, 154:22,

155:23, 155:25, 156:3, 199:9, 214:18, 214:23, 214:24, 215:1, 215:2
**possibly** [2] - 156:12, 180:13
**posted** [1] - 104:14
**pot** [1] - 18:22
**potential** [2] - 58:23, 198:3
**potentially** [4] - 86:19, 198:6, 203:4, 215:6
**pounds** [6] - 139:15, 140:9, 140:13, 144:1, 144:6, 144:22
**practicing** [1] - 21:5
**prefer** [1] - 5:20
**preliminary** [1] - 4:2
**premises** [2] - 166:23, 172:6
**preparation** [1] - 88:16
**prepare** [1] - 52:21
**prepared** [4] - 53:8, 53:12, 53:15, 205:20
**present** [7] - 6:1, 6:3, 6:4, 80:20, 133:15, 196:22
**presented** [2] - 5:6, 17:1
**President** [1] - 210:22
**presidential** [2] - 210:20, 210:23
**pressure** [1] - 76:2
**presumed** [1] - 16:25
**pretty** [2] - 118:14, 154:9
**previous** [1] - 12:15
**previously** [1] - 45:8
**primary** [1] - 202:4
**principle** [1] - 191:17
**priority** [3] - 137:4, 137:5, 137:10
**prisoner's** [1] - 165:8
**privilege** [1] - 21:5
**probed** [2] - 210:12, 212:12
**probing** [1] - 212:14
**problem** [4] - 152:5, 169:15, 169:22, 213:23
**procedure** [1] - 194:12
**procedures** [1] - 185:21
**proceed** [1] - 92:20
**proceeded** [12] - 49:17, 50:19, 66:16, 66:17, 67:7, 109:18, 137:13, 138:6, 138:9, 138:17, 139:20, 154:8
**proceeding** [4] - 136:9, 136:11, 137:2, 137:3
**Proceedings** [2] - 1:25, 230:14
**proceedings** [3] - 3:23, 170:6, 230:20
**process** [10] - 14:22, 15:5, 15:14, 17:8, 17:15, 64:13, 64:21, 142:25, 182:8, 195:9
**processed** [2] - 192:4, 192:5

**processing** [2] - 186:4, 192:5
**produce** [1] - 207:25
**produced** [1] - 1:25
**producing** [2] - 205:13, 205:16
**product** [3] - 99:3, 99:7, 99:17
**professionals** [1] - 21:17
**progressed** [1] - 124:23
**promise** [2] - 20:10, 163:7
**promised** [5] - 18:2, 18:16, 19:21, 19:23, 21:1
**promises** [3] - 18:20, 18:25, 19:5
**promptly** [1] - 5:15
**property** [2] - 164:23, 165:8
**protection** [1] - 99:6
**prove** [5] - 12:3, 14:15, 15:18, 22:12, 22:14
**proved** [1] - 9:6
**proven** [1] - 16:18
**provide** [6] - 13:18, 99:14, 99:17, 136:19, 137:20, 224:5
**provided** [6] - 51:13, 60:2, 71:10, 198:3, 200:24, 215:24
**proximity** [1] - 146:18
**pry** [1] - 10:18
**public** [1] - 54:12
**publish** [1] - 83:16
**pull** [6] - 88:10, 101:19, 126:12, 126:13, 176:10, 203:17
**pulled** [6] - 6:19, 40:13, 121:7, 212:8, 214:21, 214:25
**pulling** [2] - 180:20, 181:23
**pullover** [1] - 190:1
**punched** [1] - 9:10
**purified** [1] - 208:1
**purple** [3] - 157:21, 164:16
**purport** [1] - 15:11
**purpose** [4] - 4:25, 52:14, 101:17, 167:24
**purposes** [2] - 101:1, 192:14
**pursuant** [1] - 54:12
**pursue** [1] - 112:7
**pushed** [1] - 25:13
**put** [39] - 10:11, 17:17, 19:7, 20:1, 25:5, 32:24, 49:11, 81:8, 91:5, 98:14, 99:9, 102:2, 110:9, 110:11, 110:12, 112:19, 114:5, 121:21, 122:5, 122:10, 123:22, 125:17, 130:13, 147:1, 147:11, 148:19, 158:12, 159:18, 161:4, 168:9, 172:4, 185:9,

185:12, 185:19, 194:13, 195:12, 195:25, 203:15
**puts** [1] - 218:20
**putting** [3] - 169:16, 170:3, 196:5
**puzzle** [8] - 18:8, 18:9, 18:14, 19:4, 19:7, 19:8, 20:2

## Q

**Q26** [8] - 192:14, 193:1, 194:18, 194:25, 195:4, 207:21, 209:10, 209:11
**Q26.1** [5] - 207:21, 208:10, 209:3, 209:7, 210:13
**qualifications** [3] - 191:8, 194:5, 204:16
**qualified** [1] - 204:19
**quarters** [1] - 94:16
**query** [1] - 209:21
**questioned** [2] - 196:7, 202:14
**questioning** [1] - 37:18
**questions** [54] - 4:15, 4:16, 31:6, 31:16, 32:16, 32:21, 44:13, 44:15, 58:2, 63:19, 76:20, 78:2, 86:16, 87:3, 90:7, 96:13, 96:14, 97:18, 97:19, 103:21, 103:22, 104:16, 104:17, 104:18, 116:13, 118:2, 124:11, 128:15, 131:18, 142:9, 145:21, 152:11, 154:23, 155:1, 156:14, 162:22, 162:23, 165:15, 165:16, 165:17, 168:12, 172:10, 184:12, 184:14, 187:1, 189:7, 190:3, 194:15, 202:18, 211:21, 211:24, 215:10, 216:18, 230:9
**quick** [1] - 80:7
**quickly** [1] - 101:20
**quite** [3] - 104:7, 129:8, 131:17

## R

**race** [2] - 82:1, 90:1
**Rachel** [3] - 185:25, 186:1, 186:2
**racial** [1] - 199:5
**radio** [13] - 106:4, 109:6, 111:6, 113:20, 115:25, 116:8, 118:10, 124:18, 137:7, 137:15, 137:20, 138:16, 153:12
**raised** [1] - 127:8
**ramp** [1] - 96:7
**ran** [10] - 8:21, 20:22, 81:5, 111:10, 111:25, 127:13, 138:9, 146:23, 150:11,

171:18
**Randolph** [2] - 23:12, 96:3
**range** [2] - 197:25, 198:22
**rare** [2] - 209:22, 210:17
**rate** [1] - 216:4
**rating** [1] - 210:23
**Ray** [1] - 3:3
**reached** [1] - 153:15
**read** [5] - 5:13, 35:3, 35:14, 35:15, 35:18
**readily** [1] - 139:18
**reading** [2] - 35:2, 35:16
**ready** [1] - 203:16
**real** [4] - 22:5, 34:17, 102:2, 102:4
**realize** [2] - 24:16, 47:14
**realized** [1] - 24:18
**really** [11] - 22:3, 22:8, 34:20, 68:23, 81:8, 81:20, 82:3, 87:14, 89:4, 91:7, 197:14
**rear** [2] - 218:7, 218:10
**reason** [2] - 101:1, 125:23
**reasonable** [6] - 14:16, 15:18, 16:18, 19:18, 20:17, 22:15
**reasons** [2] - 9:23, 207:11
**Rebeca** [3] - 1:18, 3:8, 18:18
**receive** [2] - 105:25, 106:3
**received** [12] - 4:10, 4:25, 44:6, 101:5, 118:10, 136:3, 168:20, 173:13, 192:21, 208:13, 208:14, 208:17
**receiving** [2] - 13:4, 135:6
**recent** [2] - 201:20, 202:7
**recess** [7] - 6:9, 6:10, 6:11, 22:17, 92:17, 92:18, 165:22
**Recess** [2] - 22:19, 165:23
**recognize** [45] - 28:1, 28:25, 29:2, 29:13, 29:15, 29:25, 30:13, 30:15, 53:3, 55:11, 55:13, 55:23, 56:14, 57:17, 82:7, 82:15, 83:3, 85:10, 100:13, 102:15, 103:4, 114:15, 115:8, 115:10, 141:12, 164:9, 176:1, 176:14, 177:3, 177:16, 179:13, 180:1, 181:2, 183:21, 184:4, 194:2, 220:17, 222:8, 223:19, 224:6, 224:22, 226:7, 226:22, 227:9, 229:23
**recollection** [3] - 5:22, 118:11, 222:12
**record** [17] - 3:6, 4:11, 26:23, 53:8, 54:12, 93:5, 98:8, 108:16, 110:24, 122:23, 134:8, 163:16, 164:17, 166:7, 170:4, 217:9, 230:20

**recorded** [2] - 104:9, 115:11
**recorders** [1] - 88:22
**recording** [5] - 82:16, 82:22, 83:4, 83:9, 115:11
**recordings** [1] - 83:6
**records** [5] - 12:23, 13:24, 168:24
**recover** [4] - 93:17, 93:20, 95:7, 224:10
**recovered** [23] - 9:5, 9:8, 9:13, 9:14, 9:22, 12:8, 12:9, 14:6, 16:3, 95:8, 176:4, 181:7, 183:10, 183:11, 185:1, 185:4, 222:16, 222:21, 225:25, 226:2, 227:1, 229:7, 229:16
**recross** [2] - 155:15, 155:16
**Recross** [1] - 2:2
**RECROSS** [1] - 155:19
**recycle** [2] - 141:2, 141:22
**red** [1] - 110:22
**Redirect** [1] - 2:2
**redirect** [3] - 44:20, 44:23, 92:13
**REDIRECT** [3] - 45:1, 79:11, 155:2
**reed** [1] - 160:13
**REED** [1] - 1:6
**Reed** [53] - 1:20, 3:3, 3:12, 7:25, 9:5, 11:19, 11:22, 12:10, 14:20, 15:6, 15:11, 15:12, 15:25, 16:4, 16:6, 16:10, 16:17, 16:19, 16:22, 17:5, 110:25, 118:17, 118:24, 119:12, 119:14, 120:3, 120:6, 121:10, 121:13, 121:21, 122:5, 122:10, 122:18, 123:7, 123:16, 127:13, 132:11, 157:23, 160:3, 160:8, 164:18, 168:19, 168:24, 170:23, 192:23, 194:22, 194:25, 208:19, 209:3
**Reed's** [4] - 13:10, 160:22, 164:20, 195:3
**refer** [2] - 77:9, 208:15
**reference** [1] - 35:1
**referred** [1] - 35:5
**referring** [4] - 38:4, 138:1, 148:24, 152:25
**reflect** [10] - 26:23, 29:19, 30:4, 30:19, 56:5, 108:16, 110:24, 157:22, 164:17, 181:7
**reflected** [2] - 57:17, 57:25
**refreshed** [1] - 76:8
**regarding** [1] - 117:12
**regardless** [1] - 151:11
**regions** [1] - 208:3

**register** [1] - 10:20
**regular** [3] - 39:23, 39:24, 128:20
**regularly** [1] - 128:18
**relate** [1] - 16:22
**related** [6] - 170:13, 180:13, 209:16, 216:7
**relates** [4] - 15:9, 16:19, 16:21, 17:4
**relation** [5] - 75:2, 84:12, 94:20, 178:19, 192:17
**relative** [1] - 207:1
**relatives** [1] - 209:13
**relevancy** [1] - 37:18
**relevant** [3] - 156:12, 156:17, 158:7
**rely** [1] - 5:21
**remain** [1] - 61:3
**remained** [3] - 60:10, 61:10, 61:18
**remember** [18] - 15:5, 62:20, 62:21, 76:9, 78:17, 81:17, 81:22, 90:25, 91:3, 91:4, 91:19, 91:21, 91:23, 117:7, 126:8, 132:15, 171:12, 206:15
**remembered** [3] - 91:6, 92:3, 92:4
**remind** [1] - 76:6
**reminded** [1] - 76:16
**removed** [2] - 141:23, 193:11
**rep** [1] - 58:13
**repeat** [3] - 44:15, 120:5, 122:7
**repeatability** [1] - 197:6
**rephrase** [3] - 33:25, 125:24, 188:15
**report** [9] - 122:8, 122:12, 122:15, 122:17, 123:1, 163:21, 166:13, 166:16, 208:15
**reported** [4] - 1:25, 94:9, 189:14, 189:15
**Reporter** [1] - 1:24
**reports** [5] - 102:18, 121:23, 121:25, 122:3, 122:14
**represent** [5] - 14:20, 15:6, 20:8, 21:7, 21:23
**representative** [1] - 23:18
**representatives** [1] - 49:19
**representing** [3] - 3:12, 3:15, 15:7
**represents** [1] - 208:6
**request** [1] - 83:15
**requested** [2] - 83:22, 111:7
**requirement** [2] - 19:11, 20:4
**research** [1] - 5:16
**resemble** [1] - 183:24
**resembled** [1] - 221:19
**residence** [7] - 8:13, 179:4,

180:4, 183:12, 218:12, 218:24, 219:22
**residential** [1] - 107:2
**respect** [8] - 51:25, 140:23, 141:3, 207:23, 212:25, 214:5, 214:6
**respectfully** [1] - 212:17
**respective** [1] - 16:13
**respond** [6] - 94:11, 157:13, 166:18, 172:5, 174:10, 174:12
**responded** [3] - 94:9, 138:16, 171:17
**responding** [4] - 8:15, 122:19, 173:24, 174:9
**response** [3] - 120:3, 155:15, 227:25
**responsibility** [8] - 20:4, 98:19, 184:23, 185:7, 185:8, 186:3, 186:13, 186:19
**responsible** [3] - 184:18, 185:13, 205:13
**rest** [1] - 125:19
**result** [3] - 135:5, 208:9, 209:9
**results** [5] - 192:24, 209:11, 209:25, 210:2, 211:4
**retire** [2] - 5:10, 83:21
**return** [1] - 122:21
**review** [1] - 82:23
**reviewed** [2] - 82:25, 84:22
**reviewing** [1] - 124:18
**ripped** [1] - 72:2
**Road** [1] - 96:8
**road** [1] - 97:7
**robbed** [8] - 7:14, 10:2, 10:23, 24:11, 24:17, 32:2, 47:13, 47:15
**robber** [21] - 7:21, 10:10, 26:7, 26:15, 50:14, 52:8, 52:10, 55:24, 55:25, 58:25, 60:1, 60:4, 60:9, 61:10, 61:13, 62:17, 68:4, 78:12, 78:13, 79:5, 86:20
**robberies** [14] - 11:20, 12:4, 12:16, 12:24, 13:22, 14:13, 15:24, 16:11, 21:10, 21:12, 21:14, 21:18, 21:25, 96:24
**robbers** [17] - 7:2, 9:4, 13:18, 24:21, 26:9, 49:22, 49:25, 58:23, 59:19, 59:20, 59:23, 61:15, 62:22, 62:24, 63:9, 90:23, 98:15
**robbers'** [1] - 82:1
**robbery** [66] - 8:2, 8:17, 9:11, 9:20, 9:25, 10:24, 11:22, 11:23, 13:8, 13:10, 13:14, 13:15, 14:11, 14:12, 16:7, 21:10, 21:11, 21:19, 24:12,

29:20, 31:21, 31:25, 33:19, 34:2, 46:5, 52:5, 52:18, 52:19, 53:22, 55:6, 55:16, 55:18, 58:7, 74:17, 80:20, 80:23, 81:3, 82:9, 83:9, 83:24, 84:23, 85:16, 88:9, 91:20, 93:18, 94:21, 96:18, 98:14, 99:9, 99:10, 99:20, 100:1, 100:6, 101:18, 106:1, 106:5, 109:4, 109:8, 116:19, 134:17, 134:20, 134:21, 173:10, 173:14, 217:17
**robbing** [4] - 10:1, 47:22, 48:3, 48:4
**ROBERTSON** [29] - 3:17, 20:6, 28:16, 31:2, 44:14, 76:22, 78:2, 85:4, 90:9, 90:19, 97:18, 103:18, 104:17, 128:17, 131:18, 142:6, 152:7, 152:11, 162:23, 165:17, 189:9, 190:3, 194:8, 194:11, 199:24, 202:18, 215:12, 216:17, 230:10
**Robertson** [3] - 1:21, 3:18, 20:7
**role** [1] - 219:3
**room** [23] - 5:10, 18:6, 19:3, 40:2, 40:4, 47:18, 49:17, 49:18, 50:10, 55:17, 56:3, 78:8, 81:12, 88:12, 192:6, 213:21, 214:1, 219:12, 219:14, 219:17, 219:20, 221:12, 221:24
**rooms** [2] - 192:5, 214:12
**root** [1] - 196:8
**rope** [3] - 201:22, 202:10
**ropes** [2] - 201:21
**Rosa** [3] - 25:2, 25:3, 25:14
**round** [2] - 7:5, 81:25, 211:12, 211:15, 223:10
**routine** [1] - 64:18
**RPR** [2] - 1:24, 230:24
**Rules** [1] - 4:20
**ruling** [1] - 4:21
**run** [10] - 111:9, 121:1, 143:1, 143:3, 143:19, 150:7, 150:8, 150:13, 154:18, 154:19
**running** [27] - 8:21, 67:14, 67:25, 110:10, 111:5, 111:8, 113:1, 126:21, 127:9, 127:11, 131:2, 131:5, 137:5, 137:8, 137:21, 137:22, 137:23, 137:25, 139:4, 147:20, 147:21, 152:9, 153:11, 154:7, 154:17, 155:9
**rushed** [4] - 6:20, 10:9, 11:2,

81:14

## S

**S.E** [7] - 135:21, 135:23, 136:2, 136:10, 166:14, 174:11, 227:14
**safe** [1] - 178:16
**sales** [1] - 98:19
**sample** [19] - 193:2, 194:21, 194:24, 195:12, 196:9, 197:2, 197:4, 197:10, 199:13, 202:10, 202:14, 209:8, 210:14, 212:8, 213:1, 214:25
**samples** [17] - 192:12, 192:21, 193:8, 196:23, 197:22, 198:2, 198:5, 200:7, 200:17, 200:24, 201:2, 208:12, 208:13, 208:17, 208:22, 209:20, 215:13
**Sandra** [2] - 190:8, 190:22
**SANDRA** [1] - 190:14
**sat** [1] - 17:7
**satellite** [1] - 99:6
**Saturday** [1] - 23:24
**saves** [1] - 194:13
**saw** [158] - 8:18, 16:10, 16:12, 32:2, 39:25, 41:1, 41:17, 42:14, 42:16, 44:3, 45:7, 45:13, 45:17, 45:23, 47:19, 47:20, 48:18, 49:18, 49:23, 50:3, 50:22, 50:23, 51:2, 59:19, 68:4, 68:11, 68:16, 73:8, 73:12, 75:3, 75:6, 75:16, 76:17, 78:13, 79:4, 81:2, 81:5, 81:7, 81:14, 81:20, 86:1, 86:25, 87:20, 87:24, 88:2, 89:11, 89:12, 89:22, 89:25, 90:3, 90:5, 90:23, 91:1, 91:2, 92:2, 97:1, 97:4, 100:5, 100:8, 107:6, 107:10, 107:16, 107:19, 108:5, 109:22, 109:23, 114:4, 114:9, 118:8, 118:12, 118:20, 119:3, 123:6, 123:10, 123:12, 123:24, 124:8, 125:4, 125:6, 125:22, 125:23, 126:2, 126:9, 129:22, 130:17, 130:19, 130:20, 132:10, 139:23, 140:19, 141:4, 141:7, 142:1, 142:23, 143:4, 143:6, 144:3, 144:14, 144:20, 144:24, 145:5, 145:8, 145:9, 145:11, 145:18, 146:8, 146:11, 146:12, 146:14, 146:24, 147:4, 147:5,

147:20, 147:22, 147:23, 148:1, 148:4, 148:5, 148:17, 148:24, 150:2, 150:13, 150:14, 150:22, 151:1, 151:2, 151:11, 153:11, 153:14, 155:4, 155:5, 155:8, 156:9, 156:10, 158:10, 159:23, 160:4, 160:8, 161:11, 162:1, 162:3, 162:5, 167:6, 167:8, 179:7, 180:17, 188:2, 188:8, 214:6, 223:5, 225:2, 225:14
**scale** [1] - 11:12
**scaled** [2] - 11:11, 11:12
**scar** [1] - 139:17
**scarf** [2] - 92:2, 92:6
**scars** [1] - 139:18
**scattered** [4] - 114:10, 114:11, 138:25, 159:4
**scene** [18] - 16:11, 94:22, 94:25, 142:12, 167:10, 174:14, 174:17, 174:18, 174:21, 177:19, 178:17, 178:19, 180:13, 180:22, 181:6, 181:22, 187:18, 187:23
**scientific** [1] - 215:18
**scientist** [2] - 190:25, 196:25
**scientist/forensic** [1] - 191:1
**scientists** [1] - 197:1
**scissors** [1] - 95:4
**scooted** [1] - 81:8
**scream** [7] - 47:16, 59:2, 59:3, 59:15, 59:16, 65:3, 65:12
**screaming** [1] - 81:4
**screen** [3] - 84:12, 88:11, 187:20
**screwdriver** [4] - 9:6, 164:24, 164:25, 165:2
**seal** [1] - 54:13
**sealed** [1] - 154:15
**search** [20] - 152:18, 181:24, 182:1, 182:3, 218:24, 219:1, 219:3, 219:8, 219:11, 219:16, 219:19, 220:7, 220:23, 221:12, 224:10, 226:15, 227:24, 227:25, 228:1, 228:2
**searched** [3] - 9:15, 164:23, 166:21
**searches** [1] - 217:20
**searching** [1] - 220:7
**seated** [10] - 7:15, 7:17, 7:19, 7:22, 8:14, 9:6, 12:2, 12:12, 87:7, 157:20
**second** [7] - 7:20, 7:22, 113:14, 113:19, 182:14, 183:5, 183:8

**seconds** [3] - 113:18, 137:4, 155:10

**section** [6] - 210:15, 213:12, 213:13, 213:16, 213:22, 214:8

**secure** [11] - 36:14, 59:6, 99:8, 99:12, 112:15, 166:18, 166:23, 172:5, 184:23, 184:25, 185:18

**secured** [3] - 178:15, 181:22, 183:11

**securing** [3] - 167:9, 167:12, 178:17

**security** [14] - 82:5, 95:11, 100:11, 101:12, 141:9, 164:6, 175:20, 180:20, 181:23, 220:15, 222:6, 224:5, 224:20, 225:10

**see** [169] - 6:22, 11:14, 13:20, 13:22, 13:24, 14:7, 14:8, 15:23, 15:25, 18:15, 18:23, 20:12, 20:13, 20:25, 22:4, 25:18, 26:11, 28:23, 31:23, 32:5, 39:11, 40:10, 40:13, 40:14, 40:15, 40:18, 42:13, 42:19, 48:2, 49:21, 49:25, 50:2, 50:20, 50:24, 57:3, 58:22, 59:3, 59:11, 59:17, 59:20, 60:20, 61:15, 62:15, 63:13, 65:15, 65:23, 65:24, 66:1, 66:2, 67:2, 68:3, 68:24, 69:23, 70:2, 70:3, 70:7, 70:9, 72:4, 72:6, 72:8, 72:12, 74:4, 74:16, 77:16, 77:20, 78:24, 82:3, 83:18, 83:20, 83:21, 84:15, 87:14, 87:20, 88:16, 89:4, 89:6, 99:21, 100:4, 100:5, 107:4, 108:5, 110:18, 112:1, 112:4, 114:1, 118:1, 121:14, 121:15, 123:8, 123:13, 123:15, 124:2, 124:3, 124:4, 124:5, 124:6, 127:2, 127:19, 128:5, 130:22, 131:25, 132:3, 132:7, 132:8, 133:5, 133:7, 133:9, 133:11, 135:18, 135:20, 136:7, 138:22, 139:18, 139:22, 139:24, 140:1, 142:24, 143:19, 143:22, 144:9, 144:17, 145:2, 149:9, 149:24, 151:7, 151:12, 152:9, 153:16, 153:18, 158:13, 158:21, 159:6, 159:9, 159:18, 159:22, 160:6, 160:11, 160:22, 161:20, 164:13, 167:2, 167:4, 171:3, 175:8, 181:19, 182:20, 182:24, 183:19,

185:22, 186:6, 186:20, 186:21, 188:7, 191:22, 193:19, 194:18, 196:15, 196:19, 197:7, 199:12, 210:12, 211:13, 211:16, 218:17, 223:2

**seeing** [8] - 20:14, 90:25, 91:4, 91:6, 92:3, 92:4, 99:24, 196:5

**seem** [1] - 184:17

**seize** [1] - 219:7

**seized** [5] - 12:11, 12:12, 229:14, 229:19, 229:21

**seizing** [3] - 219:4, 222:14, 229:13

**select** [1] - 14:23

**selected** [1] - 3:23

**sell** [1] - 99:3

**sells** [1] - 10:5

**semiautomatic** [3] - 6:24, 7:3, 224:2

**semipermanent** [1] - 195:17

**send** [3] - 99:11, 186:13, 186:19

**sending** [1] - 187:17

**sense** [3] - 15:16, 22:11, 173:18

**sensor** [1] - 106:22

**sent** [6] - 173:23, 186:4, 186:6, 188:9, 193:12, 202:11

**separate** [1] - 15:24

**sequence** [32] - 37:13, 37:14, 208:21, 209:17, 209:20, 209:22, 210:13, 210:17, 211:13, 211:17, 212:7, 212:9, 212:19, 212:22, 212:24, 213:6, 213:10, 213:14, 214:3, 214:5, 214:13, 214:17, 214:20, 214:25, 215:6, 216:3, 216:6, 216:15

**sequences** [6] - 208:24, 209:7, 209:9, 209:19, 209:21, 210:6

**sergeant** [1] - 123:4

**serial** [11] - 101:2, 101:5, 101:6, 102:2, 104:4, 104:6, 104:8, 104:9, 104:14, 188:6, 188:8

**series** [7] - 29:8, 29:23, 173:13, 179:18, 193:22, 228:6, 228:7

**serve** [1] - 17:18

**served** [1] - 11:22

**server** [1] - 99:12

**service** [3] - 23:18, 49:19, 58:13

**services** [4] - 55:2, 55:4, 99:14, 99:18

**set** [1] - 100:3

**setting** [1] - 135:3

**seven** [4] - 24:7, 98:17, 173:2, 214:10

**several** [12] - 13:16, 14:5, 94:15, 113:7, 117:4, 117:15, 124:16, 158:14, 160:15, 160:16, 162:15, 179:9

**shade** [1] - 89:19

**shaft** [2] - 206:12, 207:14

**shape** [2] - 198:18, 199:6

**SHAQUINTA** [1] - 166:1

**shaquinta** [1] - 166:8

**share** [2] - 209:15, 216:6

**sharp** [2] - 111:13, 133:1

**shed** [2] - 191:23, 203:17

**sheer** [1] - 195:24

**sheet** [3] - 53:4, 53:5, 53:8

**shift** [4] - 129:2, 129:3, 129:16

**shifts** [5] - 128:22, 128:23, 129:12

**shirt** [11] - 40:15, 108:3, 108:11, 108:12, 108:13, 108:15, 110:22, 118:18, 119:16, 157:21, 164:16

**shoot** [1] - 25:25

**Shoppers** [7] - 10:23, 11:8, 13:9, 13:12, 16:8, 19:19, 21:11

**shopping** [2] - 49:12, 49:13

**short** [11] - 41:12, 104:3, 153:15, 153:17, 155:1, 157:21, 163:6, 180:15, 216:22, 216:24, 217:1

**shorter** [3] - 10:10, 11:3, 22:2

**shorthand** [1] - 1:25

**shortly** [4] - 91:21, 109:10, 112:24, 113:11

**shoulder** [1] - 94:14

**shoulders** [1] - 45:6

**show** [20] - 20:11, 21:1, 21:2, 27:24, 52:23, 74:22, 83:24, 84:3, 84:5, 88:10, 91:11, 95:9, 101:20, 102:11, 149:18, 164:5, 168:24, 169:23, 176:22, 176:24

**showed** [7] - 12:23, 69:10, 73:15, 75:24, 172:8, 181:16, 222:24

**showing** [1] - 102:20

**shown** [5] - 74:9, 78:21, 79:16, 169:20, 225:16

**shows** [2] - 168:21, 169:12

**shy** [1] - 45:6

**sic** [3] - 11:5, 11:17, 99:6

**sic]** [1] - 56:13

**side** [26] - 38:20, 41:20,

41:21, 63:1, 63:7, 84:16, 84:17, 97:7, 107:14, 125:9, 126:12, 128:12, 130:3, 130:4, 138:20, 140:20, 140:21, 180:21, 192:12, 195:15, 197:17, 219:12

**side-by-side** [2] - 192:12, 197:17

**sidebar** [1] - 168:16

**sides** [2] - 72:8, 95:5

**sidewalk** [3] - 125:7, 130:5, 130:10

**sight** [7] - 112:5, 148:20, 158:14, 158:18, 160:13, 182:3, 182:4

**sights** [2] - 150:1, 150:5

**signal** [2] - 99:12, 166:22

**signals** [1] - 135:3

**significant** [2] - 9:7, 52:9

**similar** [3] - 198:23, 210:19, 211:18

**similarities** [1] - 197:13

**similarly** [1] - 198:15

**simplistic** [1] - 212:15

**simply** [5] - 5:11, 5:21, 16:22, 143:4, 171:15

**simultaneously** [4] - 136:15, 138:19, 139:4, 154:6

**single** [2] - 13:14, 22:14

**Singleton** [3] - 2:11, 156:7, 156:18, 157:6

**SINGLETON** [1] - 156:21

**sister** [1] - 206:22

**sister's** [1] - 206:23

**sisters** [1] - 215:23

**sit** [1] - 17:16

**site** [5] - 12:25, 13:1, 13:5, 13:6, 14:2

**sites** [1] - 136:4

**sits** [1] - 15:20

**sitting** [15] - 16:23, 21:7, 37:14, 39:4, 39:5, 39:7, 69:24, 70:4, 108:14, 110:22, 125:3, 141:21, 164:16, 203:3

**situated** [3] - 38:25, 39:1, 58:15

**situation** [4] - 63:25, 99:20, 196:3, 196:24

**situations** [1] - 101:18

**six** [7] - 117:19, 117:21, 117:24, 118:5, 124:24, 125:1, 125:2

**sixth** [8] - 105:16, 105:17, 129:13, 134:11, 135:3, 135:12, 136:10, 157:9

**size** [1] - 198:17

**ski** [8] - 40:1, 77:1, 78:16, 159:13, 160:8, 160:11, 175:9, 179:10

**skin** [3] - 6:22, 40:10, 89:13
**skinned** [4] - 107:7, 107:8, 107:9, 110:8
**skinny** [1] - 27:9
**slashed** [1] - 72:1
**sleeves** [1] - 82:3
**slender** [2] - 139:15, 140:12
**slide** [5] - 193:11, 195:12, 195:16, 196:8, 205:20
**slides** [2] - 192:10, 192:11
**slightly** [1] - 195:10
**small** [2] - 10:4, 106:7
**smaller** [1] - 81:24
**smirk** [2] - 110:9, 110:12
**Smithsonian** [1] - 201:16
**software** [1] - 99:12
**sold** [3] - 98:25, 100:16, 101:16
**solely** [1] - 5:5
**someone** [14] - 51:7, 53:9, 53:12, 58:25, 59:3, 81:4, 119:12, 154:17, 165:9, 169:14, 185:7, 185:8, 185:13, 185:15
**sometime** [1] - 172:7
**sometimes** [1] - 129:14
**somewhat** [1] - 195:24
**somewhere** [1] - 229:11
**soon** [6] - 8:9, 8:18, 8:23, 155:8, 171:2, 223:2
**sorry** [11] - 28:21, 31:8, 38:15, 47:8, 57:6, 60:15, 117:8, 150:17, 174:2, 190:25, 220:12
**sort** [4] - 97:14, 116:18, 194:12, 205:6
**sound** [2] - 218:20, 218:21
**sounds** [2] - 146:12, 195:11
**source** [3] - 209:3, 209:6, 215:15
**sources** [1] - 198:3
**Southeast** [6] - 8:12, 20:22, 106:14, 174:2, 174:5, 174:11
**southeast** [1] - 105:18
**southeastern** [1] - 210:4
**southwestern** [1] - 210:5
**speaking** [2] - 91:19, 92:1
**Special** [2] - 172:14, 186:2
**special** [3] - 14:1, 172:25, 217:14
**specialized** [1] - 137:17
**specific** [3] - 101:3, 135:10, 208:3
**specifically** [9] - 19:12, 19:22, 98:25, 149:1, 156:9, 167:6, 188:24, 201:5
**specifics** [1] - 229:12
**specimen** [2] - 202:10, 207:20

**speculation** [1] - 169:5
**speed** [1] - 173:20
**spell** [4] - 23:7, 93:9, 166:9, 217:11
**spelled** [2] - 190:22, 204:9
**spend** [1] - 201:5
**spent** [2] - 201:8, 201:24
**split** [1] - 126:5
**spotted** [3] - 8:17, 114:19, 158:11
**spread** [2] - 147:10, 195:21
**squad** [3] - 173:3, 174:15, 181:16
**stage** [1] - 203:16
**stand** [16] - 22:25, 38:24, 46:17, 80:12, 92:24, 98:3, 105:3, 134:4, 156:23, 162:14, 163:13, 166:3, 172:17, 190:16, 204:3, 217:5
**standard** [2] - 194:12, 210:18
**standing** [16] - 17:16, 36:25, 38:1, 38:3, 38:12, 43:5, 43:13, 66:8, 66:12, 87:6, 87:15, 138:7, 144:15, 147:24, 174:20, 180:19
**standing/kneeling** [1] - 147:24
**stands** [15] - 45:22, 46:12, 79:21, 92:16, 97:22, 104:21, 133:24, 156:5, 163:3, 165:21, 172:13, 190:7, 203:22, 216:21
**Stanley** [16] - 1:21, 3:3, 3:15, 7:17, 17:13, 19:12, 19:22, 19:23, 20:5, 192:22, 193:3, 193:4, 208:18, 209:5, 209:8, 209:10
**stared** [1] - 110:6
**start** [10] - 12:5, 15:16, 29:9, 63:25, 99:11, 126:20, 147:20, 154:17, 168:10, 218:4
**started** [13] - 8:21, 17:15, 58:7, 111:8, 127:9, 127:11, 127:12, 137:2, 174:9, 182:22, 182:23, 218:3, 220:7
**starts** [1] - 218:17
**state** [16] - 3:6, 23:5, 46:22, 54:20, 80:15, 93:5, 98:8, 105:8, 134:7, 157:5, 163:16, 166:6, 172:22, 190:21, 204:8, 217:8
**statement** [25] - 5:25, 33:15, 33:18, 33:21, 34:1, 34:5, 34:7, 36:8, 37:2, 37:5, 37:7, 37:15, 44:9, 45:16, 45:23, 46:4, 74:23, 75:1,

75:3, 75:15, 91:5, 91:24, 92:2, 123:4, 123:5
**statements** [9] - 4:15, 36:16, 36:18, 36:24, 37:11, 37:19, 45:20, 168:10, 169:19
**STATES** [3] - 1:1, 1:4, 1:13
**states** [2] - 98:19, 100:4
**States** [3] - 1:18, 3:2, 3:8
**station** [5] - 26:16, 49:24, 52:3, 52:5, 68:8
**stations** [1] - 100:9
**statistical** [1] - 210:19
**statistics** [1] - 212:16
**stay** [4] - 51:16, 86:22, 130:25, 131:1
**stayed** [2] - 51:16, 60:1
**steadily** [1] - 159:1
**stemmed** [1] - 180:14
**step** [14] - 44:18, 46:10, 79:19, 92:14, 97:20, 104:19, 133:22, 156:4, 162:24, 165:19, 172:11, 190:4, 203:20, 216:19
**steps** [4] - 67:18, 207:24, 208:14
**sticker** [1] - 133:1
**sticking** [1] - 70:7
**still** [19] - 38:6, 88:19, 88:21, 95:5, 97:10, 110:1, 112:4, 112:12, 136:24, 137:9, 143:12, 148:12, 181:18, 181:20, 181:21, 187:22, 187:25, 218:2
**stills** [4] - 84:20, 85:13, 86:10, 88:19
**stipulate** [1] - 4:12
**stolen** [7] - 8:4, 9:7, 10:21, 11:18, 11:21, 12:21, 54:5
**stomach** [1] - 39:2
**stood** [7] - 18:17, 26:6, 36:13, 110:5, 120:4, 120:7, 172:2
**stop** [10] - 109:11, 109:18, 111:5, 111:6, 112:19, 113:2, 133:2, 187:12, 187:14, 187:15
**stopped** [15] - 45:22, 103:13, 113:4, 120:15, 123:13, 123:16, 123:18, 123:20, 126:15, 126:18, 126:23, 187:15, 187:16, 187:18, 187:19
**stopping** [1] - 109:13
**store** [4] - 10:4, 10:6, 10:25, 11:6
**stored** [1] - 205:8
**stores** [1] - 205:15
**story** [1] - 109:17
**strand** [5] - 27:23, 41:2, 41:4, 41:17, 41:18

**strap** [1] - 69:14
**strapped** [1] - 57:13
**straps** [5] - 57:10, 57:11, 57:12, 57:14
**Street** [62] - 8:13, 10:3, 23:12, 106:12, 106:17, 107:1, 107:15, 107:25, 108:6, 109:13, 109:21, 120:22, 120:23, 120:25, 121:5, 123:13, 125:10, 125:11, 125:13, 125:14, 125:17, 125:20, 126:13, 126:16, 129:23, 129:24, 129:25, 130:2, 130:7, 130:9, 135:13, 135:21, 135:23, 135:24, 136:2, 136:10, 137:10, 137:11, 137:13, 141:1, 142:17, 142:18, 150:16, 155:5, 155:9, 166:14, 171:3, 174:4, 174:6, 178:25, 180:14, 183:12, 189:10, 218:7, 218:22, 227:14, 229:17, 229:18, 229:24
**street** [15] - 8:17, 8:18, 107:23, 125:5, 125:7, 126:6, 130:9, 130:10, 130:18, 130:21, 136:1, 142:22, 148:25, 178:14, 180:14
**streets** [1] - 111:21
**stretch** [1] - 169:3
**strike** [1] - 152:17
**structures** [1] - 205:12
**stuck** [1] - 113:15
**studied** [1] - 34:19
**stuff** [5] - 18:10, 35:2, 64:23, 87:24, 219:23
**style** [5] - 7:4, 7:18, 9:18, 14:9, 190:1
**subjects** [6] - 139:9, 139:11, 152:9, 163:23, 163:25, 164:2
**submit** [2] - 15:10, 185:4
**submitted** [2] - 94:3, 192:2
**substance** [1] - 12:18
**sufficient** [1] - 169:13
**summary** [1] - 16:14
**Sunday** [2] - 10:25, 13:11
**supervisor** [5] - 80:18, 90:11, 90:12, 90:13, 90:15, 90:17
**supplied** [1] - 12:17
**supported** [1] - 98:25
**supposed** [2] - 53:7, 131:6
**supposedly** [1] - 76:17
**surprised** [1] - 75:23
**surrendering** [1] - 124:8
**surrounding** [1] - 133:12
**surveillance** [10] - 11:14,

13:20, 15:24, 15:25, 22:4, 30:8, 31:23, 32:6, 74:20, 84:20

**suspect** [5] - 113:17, 165:6, 171:22, 171:23, 172:4

**suspects** [10] - 8:16, 78:22, 106:9, 109:3, 109:7, 114:19, 129:8, 139:6, 157:15, 171:18

**suspicious** [16] - 118:14, 118:15, 118:21, 118:24, 119:1, 119:5, 119:10, 119:18, 119:19, 119:21, 119:23, 120:1, 120:2, 120:9, 126:10

**sustained** [2] - 4:22, 51:10

**SUV** [1] - 106:7

**sworn** [16] - 3:23, 4:2, 22:24, 46:16, 80:11, 92:23, 98:2, 105:2, 134:3, 156:22, 163:12, 166:2, 172:16, 190:15, 204:2, 217:4

**system** [4] - 99:5, 99:7, 101:4, 104:9

**Systems** [3] - 98:12, 98:13, 99:14

**systems** [1] - 98:25

## T

**tab** [5] - 57:3, 57:4, 102:12, 193:19, 193:22

**table** [5] - 7:20, 7:23, 18:11, 21:8, 227:17

**tabs** [1] - 193:18

**tag** [7] - 51:4, 51:5, 51:8, 51:13, 62:5, 62:8

**talks** [2] - 201:14

**tall** [5] - 10:9, 42:24, 44:4, 45:3, 79:7

**taller** [2] - 11:2, 22:2

**tape** [2] - 174:17, 180:22

**task** [2] - 181:16, 187:16

**Task** [2] - 173:4, 201:17

**tattoo** [2] - 108:10, 108:13

**tattooed** [1] - 139:20

**tattoos** [2] - 139:18, 139:20

**taylor** [1] - 171:3

**Taylor** [6] - 167:19, 168:19, 168:20, 168:25, 170:9, 172:8

**tea** [1] - 67:22

**teach** [2] - 43:1, 43:2

**team** [1] - 227:25

**technologies** [1] - 207:15

**telephone** [2] - 169:10, 173:24

**teller** [26] - 7:2, 7:8, 26:10, 43:21, 44:1, 48:1, 50:4, 50:6, 50:18, 61:1, 65:21,

65:22, 66:1, 68:4, 68:7, 68:16, 69:4, 76:23, 80:24, 80:25, 81:15, 86:22, 87:10, 100:9

**teller's** [2] - 7:6, 7:19

**tellers** [9] - 13:17, 47:18, 48:25, 56:23, 58:16, 58:18, 58:19, 65:24, 65:25

**tellers'** [1] - 65:23

**temporarily** [1] - 138:12

**ten** [7] - 64:10, 70:15, 103:10, 113:8, 213:18, 213:19, 214:4

**tend** [2] - 91:13, 200:19

**term** [4] - 129:7, 200:19, 202:12, 215:18

**terminal** [1] - 203:16

**terms** [5] - 35:18, 35:19, 35:20, 37:23, 39:19

**terrific** [1] - 21:13

**test** [1] - 184:24

**tested** [1] - 16:5

**testified** [28] - 22:25, 45:7, 45:23, 46:17, 49:8, 52:8, 80:12, 87:18, 90:23, 92:24, 98:3, 105:3, 132:17, 134:4, 140:14, 153:10, 153:23, 156:23, 163:13, 166:3, 172:17, 187:6, 190:16, 197:16, 204:3, 217:5, 219:10, 230:6

**testify** [5] - 14:4, 76:13, 80:5, 188:25, 202:16

**testimony** [20] - 4:10, 5:2, 5:21, 18:3, 18:7, 18:14, 32:22, 45:9, 45:21, 45:22, 45:24, 73:19, 75:21, 78:7, 88:17, 126:3, 126:4, 130:17, 152:16, 168:19

**text** [3] - 12:18, 12:23, 13:24

**texts** [1] - 22:7

**THE** [143] - 1:12, 2:3, 3:2, 3:10, 3:13, 3:16, 4:1, 22:17, 22:20, 28:12, 28:15, 30:24, 31:4, 31:7, 37:18, 44:16, 44:18, 44:22, 44:24, 45:25, 46:10, 46:13, 51:9, 51:23, 54:3, 54:15, 56:10, 58:4, 73:21, 79:9, 79:19, 79:24, 80:4, 80:8, 83:14, 83:17, 83:20, 83:25, 84:6, 85:2, 85:22, 85:25, 86:3, 86:5, 86:7, 86:12, 86:14, 86:16, 92:12, 92:14, 92:17, 92:21, 94:6, 95:23, 95:25, 97:20, 100:21, 102:7, 103:17, 103:20, 103:22, 104:19, 108:18, 111:1, 115:2, 115:23, 116:15, 133:22, 142:7, 142:9,

152:5, 154:25, 155:12, 155:14, 155:16, 155:18, 155:25, 156:3, 156:6, 156:8, 156:11, 156:16, 156:19, 158:1, 158:5, 158:8, 162:24, 163:1, 163:2, 163:5, 163:8, 165:19, 165:22, 167:16, 168:1, 168:6, 168:9, 169:15, 170:1, 170:17, 170:19, 172:11, 176:21, 176:24, 177:12, 177:23, 177:25, 179:19, 180:8, 181:11, 184:11, 184:14, 190:4, 190:6, 191:7, 191:10, 193:22, 194:6, 194:10, 194:12, 203:20, 204:16, 204:19, 204:22, 208:16, 208:17, 211:23, 216:19, 216:22, 216:25, 225:22, 227:6, 227:22, 228:10, 228:12, 228:14, 228:16, 228:19, 228:22, 228:24, 230:4, 230:8, 230:11

**the..** [1] - 132:16

**thereafter** [1] - 5:25

**therein** [1] - 219:20

**thereupon** [1] - 170:6

**they've** [2] - 18:20, 22:9

**thin** [1] - 10:9

**thinking** [2] - 20:14, 20:19

**thinner** [1] - 22:2

**third** [2] - 10:12, 221:18

**thorough** [2] - 181:24, 182:1

**thousands** [1] - 206:8

**threatened** [2] - 6:25, 25:25

**three** [53] - 6:16, 6:20, 8:6, 8:7, 9:3, 9:4, 9:17, 9:22, 10:9, 11:2, 11:20, 12:4, 12:9, 15:24, 17:2, 18:19, 21:10, 21:25, 40:6, 40:7, 62:24, 63:16, 86:25, 95:14, 95:19, 95:20, 98:17, 100:8, 102:10, 102:22, 107:23, 107:25, 119:22, 120:20, 125:16, 125:19, 126:5, 127:14, 140:21, 146:9, 146:11, 146:12, 178:21, 178:22, 179:10, 179:21, 179:23, 196:21, 198:13, 210:7, 214:12, 221:15, 225:24

**three-minute** [1] - 178:21

**throughout** [8] - 21:6, 86:23, 138:25, 174:25, 175:1, 175:7, 200:7, 203:1

**throw** [4] - 133:5, 133:7, 133:9, 144:25

**throwing** [2] - 151:8, 151:12

**tie** [7] - 108:4, 108:11, 110:21, 110:22, 119:16, 157:21, 164:16

**tight** [1] - 203:17

**tight-fitting** [1] - 203:17

**timing** [1] - 169:9

**tinted** [3] - 62:10, 62:13, 62:14

**tip** [1] - 196:8

**Tobias** [9] - 1:23, 3:4, 3:19, 7:20, 10:9, 21:7, 192:23, 208:18, 209:2

**today** [11] - 17:14, 18:17, 19:6, 21:6, 32:19, 45:9, 75:21, 76:13, 83:6, 108:7, 164:13

**together** [13] - 12:4, 18:16, 19:7, 19:9, 19:14, 20:1, 146:15, 146:16, 148:10, 148:15, 149:6, 149:8

**Tommy** [2] - 81:24

**tomorrow** [2] - 230:11, 230:12

**tone** [1] - 182:21

**took** [44] - 6:24, 17:8, 22:25, 36:15, 36:24, 37:11, 39:16, 46:17, 52:8, 52:10, 80:12, 92:24, 94:4, 94:6, 98:3, 102:24, 105:3, 109:10, 110:9, 111:5, 119:12, 134:4, 134:22, 138:22, 142:22, 148:15, 156:23, 163:13, 166:3, 172:4, 172:17, 177:19, 180:4, 181:5, 185:12, 190:16, 204:3, 217:5, 218:7, 218:10, 229:14, 229:17, 229:19, 229:20

**tool** [1] - 10:18

**top** [15] - 11:10, 72:2, 72:12, 81:19, 91:6, 91:11, 111:23, 113:4, 113:16, 138:13, 138:20, 179:9, 179:10, 183:17, 196:5

**total** [3] - 146:10, 175:12, 222:4

**touch** [2] - 25:8, 81:17

**touched** [2] - 17:25, 186:21

**touching** [1] - 5:13

**tour** [2] - 137:18

**toward** [1] - 111:9, 140:20

**towards** [30] - 26:22, 27:6, 47:18, 48:1, 66:17, 67:13, 94:15, 94:19, 105:19, 107:12, 107:17, 110:12, 110:13, 111:10, 111:25, 119:3, 119:7, 119:8, 119:9, 120:11, 120:12, 122:11, 125:10, 125:11, 130:1, 130:6, 135:25, 136:10,

143:1, 167:9
**trace** [4] - 191:1, 191:18, 192:3, 195:25
**traced** [2] - 207:1, 215:13
**tracing** [1] - 195:23
**track** [4] - 103:7, 103:12, 127:15
**tracked** [1] - 8:10
**tracker** [8] - 173:15, 174:4, 181:23, 183:3, 218:5, 218:13, 220:3, 221:6
**trackers** [26] - 8:7, 8:8, 8:10, 9:3, 9:17, 133:7, 169:1, 169:6, 173:25, 181:18, 181:25, 182:15, 183:10, 183:11, 183:24, 184:8, 187:18, 187:25, 188:1, 188:7, 188:11, 188:13, 188:16, 188:20, 217:23
**tracking** [18] - 98:13, 98:24, 99:15, 99:22, 99:24, 100:16, 102:18, 181:17, 186:16, 186:17, 186:20, 187:6, 187:9, 218:3, 218:4, 218:13, 218:14, 220:22
**tracks** [1] - 99:12
**Tracy** [2] - 1:24, 230:24
**trail** [2] - 102:20, 113:1
**training** [6] - 43:24, 201:15, 201:16, 201:21, 202:7, 202:22
**transcript** [3] - 1:10, 1:25, 230:20
**transcription** [1] - 1:25
**transfer** [2] - 191:23, 203:8
**transferred** [2] - 202:23, 203:1
**transfers** [1] - 55:4
**transmission** [6] - 115:13, 115:25, 116:4, 116:7, 153:12
**transmissions** [1] - 116:10
**transmitters** [1] - 135:2
**transmitting** [1] - 116:8
**transpired** [1] - 83:9
**transport** [1] - 172:4
**transported** [5] - 164:3, 164:10, 164:11, 164:22, 203:11
**transporting** [3] - 164:1, 164:21
**trapped** [1] - 132:24
**trash** [31] - 9:21, 50:6, 50:7, 50:11, 50:13, 50:15, 68:6, 125:17, 136:18, 140:19, 141:16, 141:20, 141:24, 154:1, 178:14, 178:17, 179:3, 179:5, 179:8, 179:9, 179:11, 179:16, 180:5, 180:10, 180:21, 217:20,

217:21, 229:18
**traveling** [1] - 187:7
**trays** [1] - 97:13
**treat** [1] - 4:23
**tree** [5] - 125:10, 160:20, 182:16, 182:19, 183:2
**trees** [3] - 111:13, 112:11, 182:24
**trial** [7] - 3:5, 4:3, 5:8, 5:24, 15:16, 17:11, 21:13
**TRIAL** [1] - 1:10
**tried** [2] - 8:20, 10:17
**trunk** [2] - 178:16
**truth** [3] - 15:17, 94:4
**try** [8] - 5:14, 5:16, 6:10, 15:11, 18:15, 109:12, 212:5
**trying** [9] - 39:11, 42:2, 62:12, 168:25, 169:10, 169:17, 182:10, 212:6, 212:15
**tuck** [1] - 41:25
**tucked** [1] - 183:1
**turn** [8] - 103:2, 120:19, 120:20, 120:25, 143:9, 143:14, 184:24
**turn-around** [1] - 143:14
**turned** [14] - 92:8, 119:10, 125:13, 125:16, 126:2, 126:9, 135:23, 135:24, 137:9, 137:11, 138:2, 143:25, 147:13, 153:14
**turning** [3] - 142:21, 142:25, 154:6
**twice** [1] - 11:12
**twins** [1] - 206:3
**two** [87] - 7:2, 8:3, 9:3, 10:9, 10:10, 10:22, 11:2, 11:9, 11:25, 12:17, 17:2, 21:13, 40:7, 47:19, 47:20, 47:21, 57:9, 58:14, 62:21, 74:14, 76:12, 77:2, 77:5, 79:25, 81:5, 90:25, 91:1, 96:14, 107:8, 113:13, 138:11, 139:8, 139:10, 139:12, 140:2, 140:5, 140:6, 140:8, 143:22, 144:3, 144:5, 144:7, 146:1, 146:13, 146:15, 146:16, 147:8, 147:10, 148:6, 148:11, 148:18, 148:20, 149:20, 149:24, 162:3, 163:8, 181:18, 181:20, 182:15, 186:16, 187:25, 189:19, 189:22, 190:10, 191:17, 195:14, 196:22, 201:15, 205:2, 205:19, 205:22, 206:9, 206:14, 207:11, 209:19, 209:20, 211:17, 214:10, 217:23, 221:18,

222:2, 224:12, 226:18, 226:25
**type** [28] - 11:21, 16:5, 35:9, 35:15, 70:16, 94:24, 96:21, 97:1, 99:20, 118:6, 118:9, 124:6, 127:5, 166:22, 180:24, 198:9, 206:12, 206:13, 207:2, 207:13, 207:16, 207:25, 208:6, 208:11, 209:14, 213:23, 217:17
**types** [3] - 206:12, 206:14, 209:16
**typically** [1] - 207:12

## U

**U-turn** [1] - 143:14
**U.S** [5] - 162:14, 162:15, 182:25, 183:1, 220:8
**ultimately** [3] - 174:3, 174:4, 188:20
**unbiased** [1] - 17:9
**uncommon** [1] - 22:5
**uncovered** [1] - 12:15
**under** [8] - 4:20, 46:7, 54:13, 57:3, 76:1, 108:10, 226:4, 227:1
**underneath** [10] - 27:6, 27:7, 42:7, 42:11, 81:25, 182:16, 182:18, 182:19, 182:23, 182:24, 183:2, 222:2, 226:14
**unindicted** [1] - 168:2
**Union** [41] - 6:17, 7:14, 9:12, 9:20, 9:25, 10:2, 10:6, 12:5, 13:7, 19:19, 21:10, 23:10, 28:4, 34:15, 35:9, 46:25, 53:10, 54:7, 54:8, 54:17, 55:2, 56:22, 70:11, 70:17, 70:23, 72:19, 72:24, 80:19, 96:3, 96:5, 97:2, 97:15, 98:21, 99:1, 100:2, 100:24, 100:25, 101:10, 134:18, 134:22, 173:10
**union** [20] - 7:11, 8:2, 8:5, 10:13, 13:8, 14:12, 23:25, 24:2, 24:6, 24:16, 26:7, 29:19, 30:5, 30:20, 47:8, 47:14, 52:18, 54:7, 55:6, 99:8
**unions** [1] - 99:18
**unique** [3] - 206:2, 207:3, 209:12
**unit** [7] - 191:1, 192:3, 193:12, 193:13, 197:5, 204:13, 218:3
**UNITED** [3] - 1:1, 1:4, 1:13
**United** [3] - 1:18, 3:2, 3:8
**units** [7] - 112:15, 134:21,

137:17, 138:18, 138:19, 187:17
**unless** [2] - 163:10, 182:20
**unsolved** [1] - 20:20
**unusual** [4] - 24:8, 47:12, 91:12, 165:3
**up** [85] - 6:19, 10:12, 11:17, 15:13, 15:19, 16:24, 18:9, 18:10, 20:3, 25:19, 25:23, 36:2, 37:14, 37:24, 38:17, 40:24, 40:25, 41:1, 43:13, 70:4, 70:7, 74:4, 75:7, 81:4, 81:21, 84:15, 88:11, 88:24, 100:3, 101:3, 108:22, 109:12, 110:9, 110:11, 110:12, 112:20, 112:25, 113:23, 114:5, 121:7, 121:21, 122:5, 122:10, 123:2, 123:22, 126:5, 126:12, 126:14, 138:9, 138:14, 144:15, 146:7, 147:20, 148:2, 148:3, 148:9, 148:22, 149:4, 149:20, 150:8, 150:12, 158:11, 161:16, 161:21, 162:5, 168:21, 172:8, 174:3, 174:4, 175:20, 181:16, 182:21, 185:9, 188:25, 191:20, 192:3, 196:6, 203:5, 207:25, 211:12, 213:24, 220:11, 228:7
**uphill** [1] - 154:19
**upper** [1] - 211:11
**upper-bound** [1] - 211:11
**usual** [1] - 6:17
**utility** [1] - 219:22

## V

**vacuuming** [1] - 203:6
**VanLowe** [4] - 1:20, 3:14, 17:13, 44:14
**VANLOWE** [41] - 3:14, 17:12, 28:14, 31:1, 32:18, 37:20, 37:22, 44:12, 45:21, 51:6, 51:19, 51:24, 54:2, 54:14, 63:21, 71:5, 71:7, 73:23, 76:19, 87:5, 90:7, 96:14, 96:16, 97:17, 103:23, 104:2, 104:16, 124:13, 128:15, 145:23, 152:4, 162:22, 165:16, 187:3, 189:7, 191:9, 195:8, 199:22, 204:17, 212:2, 215:9
**vantage** [7] - 80:1, 80:7, 80:9, 82:16, 82:22, 86:19, 86:22
**various** [6] - 103:8, 135:7, 135:8, 138:24, 147:24,

174:20

**vault** [44] - 7:9, 7:21, 47:9, 47:10, 47:18, 47:19, 48:11, 48:14, 48:19, 49:4, 49:17, 49:18, 50:5, 50:10, 52:8, 55:17, 56:3, 56:24, 58:8, 58:15, 58:22, 59:1, 59:4, 59:24, 60:4, 60:9, 60:10, 60:21, 61:16, 64:9, 64:11, 65:5, 66:17, 66:18, 66:19, 68:5, 68:21, 68:22, 68:24, 75:12, 75:24, 78:8, 81:12, 88:12

**vehicle** [28] - 62:8, 106:9, 110:2, 116:5, 116:21, 117:1, 117:5, 117:20, 117:22, 125:6, 135:23, 136:1, 136:24, 136:25, 137:2, 137:9, 137:11, 137:12, 138:1, 140:21, 153:5, 153:15, 153:16, 154:6, 167:1, 172:5, 178:15

**vehicles** [4] - 131:10, 131:11, 136:20, 153:25

**venire** [1] - 3:22

**verdict** [1] - 5:11

**version** [1] - 81:24

**versus** [2] - 197:13, 197:14

**via** [1] - 173:24

**vicinity** [4] - 135:8, 174:5, 177:7, 220:8

**victim** [1] - 13:17

**victims** [2] - 21:15, 22:1

**video** [50] - 33:3, 33:7, 33:10, 33:13, 33:16, 35:17, 55:14, 55:15, 74:15, 74:16, 74:20, 75:2, 75:3, 75:5, 75:19, 75:20, 75:25, 76:6, 76:12, 76:14, 80:2, 80:5, 82:8, 82:10, 82:12, 82:13, 82:15, 82:22, 82:23, 83:4, 83:24, 84:8, 84:12, 84:14, 84:20, 85:13, 85:25, 86:2, 86:10, 87:24, 88:2, 88:4, 88:7, 88:14, 88:16, 88:21, 88:24, 91:10, 92:7, 92:9

**videos** [3] - 80:8, 84:2, 87:18

**videotape** [1] - 22:4

**view** [7] - 62:8, 65:23, 83:6, 99:21, 114:18, 182:19, 196:19

**viewed** [2] - 82:10, 82:12

**vines** [6] - 111:13, 111:19, 113:15, 127:17, 132:24, 133:1

**violence** [1] - 14:13

**Violent** [1] - 173:4

**violent** [1] - 173:5

**VIRGINIA** [1] - 1:2

**Virginia** [15] - 1:5, 13:13, 21:5, 23:12, 55:5, 93:12, 96:3, 96:10, 100:2, 106:1, 106:5, 134:22, 173:5, 173:7

**Virginias** [1] - 98:20

**visual** [5] - 149:24, 197:17, 197:18, 198:10, 198:11

**visually** [1] - 149:25

**vitae** [3] - 194:3, 201:13, 202:3

**voice** [2] - 67:1, 115:15

**voices** [1] - 128:3

**voir** [1] - 17:8

**Volume** [1] - 1:11

**VVM** [5] - 10:2, 10:4, 13:13, 19:19, 21:11

## W

**wads** [1] - 12:21

**wait** [1] - 170:24

**waiting** [4] - 7:12, 7:24, 16:13, 50:23

**walk** [5] - 20:12, 65:20, 119:3, 178:22, 220:1

**walked** [15] - 43:4, 47:19, 48:11, 81:6, 120:21, 130:17, 130:21, 140:24, 153:6, 153:7, 154:13, 159:1, 164:22, 182:14, 182:21

**walking** [50] - 8:17, 67:14, 67:17, 67:25, 68:1, 91:11, 107:12, 107:17, 107:25, 108:5, 118:1, 118:12, 118:25, 119:7, 119:8, 120:3, 120:8, 120:9, 120:11, 120:12, 120:22, 120:23, 125:4, 125:9, 125:11, 125:20, 125:22, 126:13, 126:20, 129:23, 130:1, 130:5, 130:13, 135:22, 135:25, 138:14, 142:17, 143:4, 143:12, 148:24, 155:5, 155:8, 159:12, 161:7, 167:5, 167:8, 178:21, 180:15, 182:12

**walks** [2] - 66:15, 120:6

**wall** [2] - 11:11, 220:1

**wallet** [1] - 169:8

**walls** [1] - 154:15

**wants** [3] - 48:22, 169:4, 169:5

**Warehouse** [7] - 10:23, 11:8, 13:9, 13:12, 16:8, 19:20, 21:11

**warrant** [3] - 166:19, 172:6, 218:24

**Washington** [4] - 166:14, 174:2, 217:18, 227:14

**watch** [6] - 29:17, 33:7, 75:5, 76:12, 76:14, 171:15

**watched** [8] - 30:17, 33:16, 74:20, 75:2, 75:19, 82:13, 85:14

**watching** [6] - 27:15, 33:9, 130:14, 154:3, 154:5, 188:2

**ways** [2] - 65:20, 148:3

**wealth** [1] - 18:21

**weapon** [12] - 50:3, 50:4, 222:9, 222:11, 222:16, 222:24, 223:3, 223:5, 223:21, 223:22, 224:2, 225:2

**weapons** [7] - 49:25, 124:6, 145:2, 221:15, 221:17, 225:24, 225:25

**wear** [1] - 160:11

**wearing** [21] - 6:20, 9:4, 22:2, 40:16, 40:20, 48:6, 48:7, 48:12, 48:13, 76:24, 78:15, 78:17, 78:18, 79:7, 89:6, 107:7, 110:15, 132:10

**week** [11] - 21:7, 21:9, 23:23, 33:2, 33:5, 33:16, 74:14, 83:23, 88:6, 88:7, 88:16

**weeks** [2] - 74:14, 76:13

**welcome** [2] - 91:18, 92:12

**Western** [2] - 10:6, 55:2

**Westfall** [2] - 1:24, 230:24

**whatnot** [1] - 182:6

**whereas** [1] - 206:9

**white** [4] - 108:11, 108:13, 205:12, 206:4

**whole** [5] - 29:8, 29:23, 38:24, 118:22, 175:1

**wife** [1] - 168:19

**Willie** [1] - 3:3

**WILLIE** [1] - 1:6

**wind** [2] - 175:5, 182:4

**window** [14] - 26:10, 43:21, 44:1, 66:1, 80:24, 80:25, 81:1, 81:6, 81:7, 84:14, 84:15, 84:16, 86:23, 87:10

**windows** [6] - 62:10, 62:13, 65:5, 65:10, 136:22, 136:23

**windy** [1] - 175:3

**Winston** [25] - 1:21, 3:3, 3:15, 7:17, 11:4, 11:16, 11:23, 11:25, 12:12, 17:13, 17:21, 19:12, 19:22, 19:23, 20:5, 192:22, 193:3, 193:4, 208:18, 209:5, 209:8, 209:10, 210:14, 213:1, 214:6

**Winston's** [4] - 12:19, 13:7, 213:3, 216:9

**wire** [1] - 54:24

**wires** [1] - 54:22

**wise** [1] - 178:20

**wishful** [2] - 20:14, 20:19

**Witness** [14] - 46:12, 79:21, 92:16, 97:22, 101:21, 104:21, 133:24, 156:5, 163:3, 165:21, 172:13, 190:7, 203:22, 216:21

**WITNESS** [8] - 92:12, 152:5, 154:25, 163:1, 170:19, 190:6, 193:22, 208:17

**witness** [20] - 16:9, 16:11, 18:2, 45:23, 58:3, 79:22, 86:16, 97:19, 101:12, 104:18, 116:14, 133:25, 163:4, 163:5, 163:6, 184:13, 194:15, 211:22, 216:22, 230:9

**witnesses** [10] - 4:10, 6:1, 6:4, 6:13, 13:16, 22:1, 37:10, 84:1, 163:8, 190:10

**Wolford** [3] - 185:25, 186:1, 186:2

**woman** [5] - 10:16, 85:6, 167:13, 167:18, 214:19

**wood** [6] - 17:25, 65:4, 65:9, 147:4, 147:14, 198:14

**WOOD** [50] - 3:11, 14:19, 28:13, 30:25, 31:19, 32:16, 54:1, 56:9, 58:6, 63:19, 83:13, 85:3, 85:21, 86:6, 86:13, 86:18, 87:3, 94:2, 95:24, 96:13, 100:20, 103:21, 115:1, 115:22, 116:17, 124:11, 142:11, 145:21, 160:2, 162:21, 165:15, 167:15, 167:22, 167:25, 168:4, 168:15, 169:3, 169:14, 170:16, 171:7, 172:10, 177:24, 184:16, 187:1, 194:17, 195:6, 204:18, 211:24, 228:15, 228:23

**Wood** [3] - 1:19, 3:11, 14:20

**wooded** [42] - 8:21, 69:18, 111:11, 111:12, 111:23, 111:25, 112:3, 112:5, 112:7, 112:17, 127:18, 129:9, 145:15, 145:18, 154:19, 157:13, 174:16, 174:19, 174:20, 174:25, 175:2, 175:3, 175:7, 175:11, 175:12, 175:17, 176:4, 176:17, 177:6, 177:20, 178:13, 181:20, 181:21, 184:8, 184:19, 184:20, 184:22, 185:1,

217:20, 229:21

**woods** [113] - 8:24, 9:2, 9:14, 12:8, 69:17, 113:24, 116:1, 122:19, 123:11, 123:17, 123:18, 127:16, 127:17, 127:21, 127:24, 128:8, 128:11, 128:12, 128:13, 137:14, 137:23, 137:25, 138:1, 138:3, 138:6, 138:8, 138:11, 138:18, 138:21, 138:24, 138:25, 139:3, 139:4, 139:6, 139:23, 139:24, 139:25, 140:4, 140:24, 142:13, 143:1, 143:6, 143:21, 143:22, 144:10, 144:16, 144:21, 145:5, 145:7, 145:9, 145:11, 146:1, 146:7, 146:9, 146:10, 146:13, 146:14, 146:18, 146:20, 146:22, 146:23, 147:2, 147:4, 147:5, 147:7, 147:12, 147:16, 147:19, 147:23, 148:8, 148:11, 148:14, 148:19, 148:23, 148:25, 150:4, 150:8, 150:16, 150:18, 150:24, 151:1, 151:2, 151:5, 151:23, 152:2, 152:3, 153:17, 155:5, 159:12, 163:5, 163:6, 163:9, 163:10, 171:21, 172:2, 178:7, 178:10, 178:19, 184:1, 185:10, 185:11, 185:12, 186:17, 188:3, 188:24, 189:2, 189:5, 189:17, 217:23, 229:7, 229:10

**word** [2] - 57:14, 200:19

**words** [1] - 5:7

**worker** [1] - 25:4

**workers** [1] - 24:7

**works** [2] - 99:5, 205:7

**world** [2] - 54:25, 55:5

**wrapped** [3] - 97:5, 97:9, 97:11

**wrapping** [1] - 186:11

**wrist** [1] - 108:13

**write** [2] - 37:5, 91:23

**writing** [1] - 92:2

**written** [3] - 72:16, 104:11

**wrote** [6] - 37:2, 37:7, 45:16, 73:3, 123:4, 123:5

## Y

**yards** [2] - 94:14, 94:18

**year** [1] - 99:25

**years** [9] - 70:15, 89:15, 98:17, 131:17, 134:14,

154:11, 173:2, 191:4, 201:15

**yelling** [5] - 50:6, 50:8, 50:14, 68:5, 81:13

**yellow** [14] - 48:13, 78:16, 78:19, 79:7, 91:4, 91:6, 92:2, 92:3, 92:5, 92:8, 108:3, 108:15, 132:13

**yolk** [2] - 205:11, 205:25

**you-all** [5] - 5:20, 55:2, 194:15, 228:14, 230:9

**young** [2] - 7:6, 109:18

**yourself** [2] - 58:10, 205:10