RECORD NOS. 13-4835(L), 13-4836, 13-4837, 13-4839

In The

# United States Court Of Appeals
## For The Fourth Circuit

### UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

### KEITH WILLIE REED;
### STANLEY RAY WINSTON, a/k/a Stanley Wilson,
### a/k/a Rashaad Winston; ANTHONY CANNON;
### TOBIAS RICHARD DYER,

*Defendants – Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT ALEXANDRIA

———————————

JOINT APPENDIX
Volume III of VII
(Pages 789 – 1125)

———————————

Lawrence H. Woodward, Jr.
SHUTTLEWORTH, RULOFF,
 SWAIN, HADDAD
 & MORECOCK, PC
4525 South Boulevard
Suite 300
Virginia Beach, VA  23452
(757) 671-6000

*Counsel for Appellant
 Keith Willie Reed*

Abram J. Pafford
PAFFORD, LAWRENCE
 & CHILDRESS, PLLC
1100 Commerce Street
Lynchburg, VA  24504
(434) 528-6504

*Counsel for Appellant
 Tobias Richard Dyer*

Melinda L. VanLowe
LAW OFFICE OF
 MELINDA L. VANLOWE
10476 Armstrong Street
Fairfax, VA  22030
(703) 865-5555

*Counsel for Appellant
 Stanley Ray Winston*

Alfred L. Robertson, Jr.
ROBERTSON LAW OFFICE, PLLC
500 North Washington Street
Alexandria, VA  22314
(571) 482-5133

*Counsel for Appellant
 Anthony Cannon*

Rebecca H. Bellows
Office of the
 United States Attorney
2100 Jamieson Avenue
Alexandria, VA  22314
(703) 299-3748

*Counsel for Appellee*

*Gibson*Moore Appellate Services, LLC
421 East Franklin Street ♦ Suite 230 ♦ Richmond, VA  23219
804-249-7770 ♦ www.gibsonmoore.net

## TABLE OF CONTENTS
### Volume I of VII

Page:

Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Second Superseding Indictment
      filed April 23, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Defendant's Motion for Severance of
Counts and Defendants (Reed)
      filed April 30, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Government's Opposition to
Defendant's Motion for Severance of
Counts and Defendants (Reed)
      filed May 13, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Transcript of Motions Hearing before
The Honorable Claude M. Hilton (Reed)
      on June 7, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Order
Denying Defendant's Motion for Severance of
Counts and Defendants (Reed)
      filed June 7, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

**Transcript of Trial Preceding before**
**The Honorable Claude M. Hilton**

on June 17, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

**Testimony of <u>Dimanche Inn</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . 99
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . 107
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . . . . 108
**Redirect Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . 121

**Testimony of <u>Abigail Lopez</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . 122
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . 134
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . . . . 139
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . . 152
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . . . . 154
**Redirect Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . 155

**Testimony of <u>Erin Hablenko</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . . 156
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . 162
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . . . . 163
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . . 166
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . . . . 166

**Testimony of <u>Carl Childress, Jr.</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . . 169
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . . . . 172

**Transcript of Trial Preceding before**
**The Honorable Claude M. Hilton**
**on June 17, 2013, Continued:**

**Testimony of <u>Gregory Lynch</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . **174**
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . . . **180**

**Testimony of <u>Eldorado Mills</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . **181**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . **192**
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . . . **200**
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . **204**
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . . . **207**

**Testimony of <u>Eric Johnson</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . **210**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . **218**
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . . . **221**
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . **228**
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . . . **228**
**Redirect Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . **231**
**Recross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . **231**

**Testimony of <u>Harry Singleton</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . **233**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . **236**

**Transcript of Trial Preceding before**
**The Honorable Claude M. Hilton**
            **on June 17, 2013, Continued:**

**Testimony of <u>Elmo English</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . . . **239**

**Testimony of <u>Shaquinta Gaines</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . **242**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . **247**

**Testimony of <u>Luis Dejesus</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . **248**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . **260**
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . . . **263**
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . **265**

**Testimony of <u>Sandra Koch</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . **266**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . **270**
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . . . **271**
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . **275**
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . . **278**

Transcript of Trial Preceding before
The Honorable Claude M. Hilton
        on June 17, 2013, Continued:

Testimony of <u>Constance Fischer</u>:

Direct Examination by Ms. Giles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 280
Cross Examination by Ms. VanLowe  . . . . . . . . . . . . . . . . . . . . . . . 288
Cross Examination by Mr. Robertson . . . . . . . . . . . . . . . . . . . . . . . 291

Testimony of <u>Christopher Ormerod</u>:

Direct Examination by Ms. Bellows  . . . . . . . . . . . . . . . . . . . . . . . . 293

# TABLE OF CONTENTS
## Volume II of VII

Page:

**Transcript of Trial Preceding before
The Honorable Claude M. Hilton
on June 18, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 334

**Testimony of <u>Christopher Ormerod</u>, continued:**

**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . 338
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . 341

**Testimony of <u>Donald Misele</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . 345
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . 348

**Testimony of <u>Joseph Sierra</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . 350
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . 358
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . 363
**Redirect Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . 365

**Testimony of <u>Joseph Trawicki</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . 366
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . 372
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . 375

**Transcript of Trial Preceding before
The Honorable Claude M. Hilton
      on June 18, 2013, Continued:**

**Testimony of <u>Robert Wenmoth</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **376**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . . **379**
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . . . . . **380**

**Testimony of <u>Christopher Derks</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . **381**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . . **392**
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . . . **393**
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . . . . . **394**

**Testimony of <u>Amanda Romek</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . **395**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . . **399**

**Testimony of <u>Felicia Williams</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . **401**
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . . . . **404**

**Testimony of <u>Michele Miller</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . **408**

**Transcript of Trial Preceding before
The Honorable Claude M. Hilton
        on June 18, 2013, Continued:**

**Testimony of <u>Kirsten Montoya</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . **412**

**Testimony of <u>Kirsten Henault</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . **413**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . **417**
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . . **419**
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . . . . **425**

**Testimony of <u>Susannah Kehl</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . **426**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . **434**
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . . **442**
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . . . . **445**
**Redirect Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . **451**

**Testimony of <u>Yu Jin Kang</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . . **453**
**Cross Examination by Mr. VanLowe** . . . . . . . . . . . . . . . . . . . . . . . **458**
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . . . . **460**

**Transcript of Trial Preceding before
The Honorable Claude M. Hilton
        on June 18, 2013, Continued:**

**Testimony of <u>Kira Glass</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **462**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . . **470**
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . . **471**
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . . . . **473**

**Testimony of <u>Marc Hess</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . . **475**
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . . . . **495**
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . . **501**
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . . . . **502**
**Redirect Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . **506**

**Testimony of <u>Rodney Jiggetts</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **507**

**Testimony of <u>Thomas Reddick</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . . **514**
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . . **519**
**Redirect Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . **520**

**Testimony of <u>Lynette Jones</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **525**

**Transcript of Trial Preceding before**
**The Honorable Claude M. Hilton**
　　　**on June 18, 2013, Continued:**

Testimony of <u>Latoya Freeman</u>:

Direct Examination by Ms. Bellows  . . . . . . . . . . . . . . . . . . . . . . . . . 532
Cross Examination by Ms. VanLowe  . . . . . . . . . . . . . . . . . . . . . . . 535

Testimony of <u>Gary Jameson</u>:

Direct Examination by Ms. Giles . . . . . . . . . . . . . . . . . . . . . . . . . . . . 537

Testimony of <u>Bobby Tabron</u>:

Direct Examination by Ms. Bellows  . . . . . . . . . . . . . . . . . . . . . . . . . 543
Cross Examination by Mr. Wood . . . . . . . . . . . . . . . . . . . . . . . . . . . 545

Testimony of <u>Shawn Casey</u>:

Direct Examination by Ms. Bellows  . . . . . . . . . . . . . . . . . . . . . . . . . 546
Cross Examination by Mr. Wood . . . . . . . . . . . . . . . . . . . . . . . . . . . 550
Cross Examination by Ms. VanLowe  . . . . . . . . . . . . . . . . . . . . . . . 550
Cross Examination by Mr. Robertson . . . . . . . . . . . . . . . . . . . . . . . 551

Testimony of <u>James Bright</u>:

Direct Examination by Ms. Bellows  . . . . . . . . . . . . . . . . . . . . . . . . . 552
Cross Examination by Mr. Robertson . . . . . . . . . . . . . . . . . . . . . . . 554

**Transcript of Trial Preceding before
The Honorable Claude M. Hilton
        on June 18, 2013, Continued:**

**Testimony of <u>Romedan Hassen</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . . . **555**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . **564**

**Testimony of <u>Margarita Damian</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . **567**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . **572**

**Testimony of <u>Nana Donkoh</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . **573**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . **581**

**Testimony of <u>Yousuf Ashraf</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . . . **583**

**Testimony of <u>Jorge Vergara</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . **588**

**Testimony of <u>Sherry O'Brien</u>:**

**Direct Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . . **591**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . **593**

**Transcript of Trial Preceding before**
**The Honorable Claude M. Hilton**

on June 19, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 634

**Testimony of <u>Andrea Mattia</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . 637
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . 640
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . 642

**Testimony of <u>Paul Lee</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . 645
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . 658
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . 660
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . 661
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . 662
**Redirect Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . 669

**Testimony of <u>Richard Fennern</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . 670
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . 683
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . 686
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . 687
**Redirect Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . 688

**Testimony of <u>John Marsh</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . 689
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . 697
**Cross Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . 700

**Transcript of Trial Preceding before**
**The Honorable Claude M. Hilton**
        **on June 19, 2013, Continued:**


**Testimony of <u>Kevin Horan</u>:**

**Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . . . . **702**
**Cross Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . . . . . **730**
**Cross Examination by Ms. VanLowe** . . . . . . . . . . . . . . . . . . . . . . . **740**
**Cross Examination by Mr. Hunter** . . . . . . . . . . . . . . . . . . . . . . . . . . **752**
**Redirect Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . **760**

## TABLE OF CONTENTS
### Volume III of VII

**Page:**

**Transcript of Trial Preceding before**
**The Honorable Claude M. Hilton**
     **on June 20, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **789**

     **Testimony of <u>Ramon Calderon</u>:**

     **Direct Examination by Ms. Bellows** . . . . . . . . . . . . . . . . . . . . . . . . **795**
     **Cross Examination by Ms. Giles** . . . . . . . . . . . . . . . . . . . . . . . . . . **801**
     **Redirect Examination by Mr. Wood** . . . . . . . . . . . . . . . . . . . . . . . **803**

     **Testimony of <u>Richard Fennern</u>:**

     **Direct Examination by Mr. Robertson** . . . . . . . . . . . . . . . . . . . . . **805**

**Transcript of Trial Preceding before**
**The Honorable Claude M. Hilton**
     **on June 21, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **922**

     **GOVERNMENT'S EXHIBITS:**

     **17.1   Photograph of Keith Willie Reed** . . . . . . . . . . . . . . . . . . . . . **927**

     **17.2   Phone Examination Report** . . . . . . . . . . . . . . . . . . . . . . . . . . **928**

     **17.3   Text Messages #321 and #322** . . . . . . . . . . . . . . . . . . . . . . . . **938**

     **17.4   List of Incoming and Outgoing Phone Calls** . . . . . . . . . . . . **940**

**GOVERNMENT'S EXHIBITS, Continued:**

17.5    Alexandria Detention Center Call Records (Reed)  . . . . . . . 945

18.10 )Photograph of Stanley Winston . . . . . . . . . . . . . . . . . . . . . . . . 952

18.11 Photograph of Stanley Winston . . . . . . . . . . . . . . . . . . . . . . . . 953

45      Diagrams Illustrating Cellular Analysis of
         (202) 510-4853, (202) 239-9022, (202) 594-4127,
         (240) 355-8256
                  on December 7, December 9,
                  and December 22, 2012  . . . . . . . . . . . . . . . . . . . . . . . . . . 954

Defendant's Motion for Judgment of Acquittal (Winston)
         filed July 5, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1019

Defendant's Memorandum in Support of
Motion for Judgment of Acquittal (Winston)
         filed July 5, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1023

Defendant's Motion for Judgment of Acquittal (Cannon)
         filed July 7, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1031

Defendant's Memorandum in Support of
Motion for Judgment of Acquittal (Cannon)
         filed July 7, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1034

Government's Memorandum of Law in Support of
Motion for Preliminary Order of Forfeiture (Dyer)
         filed October 11, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1042

**Defendant's Sentencing Memorandum (Winston)**
   **filed October 14, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1050**

**Government's Position with Respect to Sentencing (Dyer)**
   **filed October 17, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1055**

**Defendant's Position on Sentencing (Dyer)**
   **filed October 23, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1063**

**Transcript of Sentencing Hearing before**
**The Honorable Claude M. Hilton (Reed)**
   **on October 25, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1067**

**Transcript of Sentencing Hearing before**
**The Honorable Claude M. Hilton (Winston)**
   **on October 25, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1073**

**Transcript of Sentencing Hearing before**
**The Honorable Claude M. Hilton (Cannon)**
   **on October 25, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1081**

**Minute Entry Regarding Sentencing Proceedings (Dyer)**
   **filed October 25, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1088**

**Transcript of Sentencing Hearing before**
**The Honorable Claude M. Hilton (Dyer)**
   **on October 25, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1089**

**Notice of Appeal (Reed)**
   **filed October 30, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1095**

**Judgment (Reed)**
   **filed October 31, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1096**

**Judgment (Winston)**
> **filed October 31, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1102**

**Judgment (Cannon)**
> **filed October 31, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1108**

**Judgment (Dyer)**
> **filed October 31, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1114**

**Notice of Appeal (Cannon)**
> **filed October 31, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1120**

**Notice of Appeal (Winston)**
> **filed November 1, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1122**

**Notice of Appeal (Dyer)**
> **filed November 1, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1124**

# **TABLE OF CONTENTS**
## Volume IV of VII - UNDER SEAL

**Page:**

**Presentence Investigation Report (Dyer)**

    **filed August 22, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1126**

# TABLE OF CONTENTS
## Volume V of VII - UNDER SEAL

**Page:**

**Presentence Investigation Report (Reed)**

    **filed September 16, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1159**

# **<u>TABLE OF CONTENTS</u>**
## **Volume VI of VII - UNDER SEAL**

**Page:**

**Presentence Investigation Report (Cannon)**

**filed September 16, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1197**

# <u>TABLE OF CONTENTS</u>
## Volume VII of VII - UNDER SEAL

                                                                    **Page:**

**Presentence Investigation Report (Winston)**
    **filed October 16, 2013** ...................................... **1239**

```
 1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF VIRGINIA
 2                     ALEXANDRIA DIVISION

 3  _____

                              )
 4  UNITED STATES OF AMERICA   )
                              ) Case No. 1:13-cr-48
 5            v.               ) Alexandria, Virginia
                              )
 6  KEITH WILLIE REED, et al., ) June 20, 2013
                              ) 10:20 a.m.
 7         Defendants.         )
                              )
 8  _____

 9

10                  TRANSCRIPT OF TRIAL
                        (Volume IV)
11
            BEFORE THE HONORABLE CLAUDE M. HILTON
12
                UNITED STATES DISTRICT JUDGE
13
                        AND A JURY
14

15

16
    APPEARANCES:
17
    For the United States:   Patricia T. Giles, Esq.
18                           Rebeca H. Bellows, Esq.

19  For the Defendants:      Douglas J. Wood, Esq.
                               Defendant Keith W. Reed
20                           Melinda L. VanLowe, Esq.
                               Defendant Stanley R. Winston
21                           Alfred L. Robertson, Jr., Esq.
                               Defendant Anthony Cannon
22                           Gregory T. Hunter, Esq.
                               Defendant Tobias R. Dyer
23
     Court Reporter:         Tracy L. Westfall, RPR, CMRS, CCR
24
    Proceedings reported by machine shorthand, transcript produced
25  by computer-aided transcription.
```

634

```
                         I N D E X

                    Direct    Cross    Redirect    Recross

FOR THE DEFENDANTS:

R. Calderon          639       645       647         --

R. Fennern           649       --        --          --
```

635

```
1                    P R O C E E D I N G S
2          THE CLERK:  Criminal No. 2013-48, United States of
3   America v. Keith Willie Reed, et al.
4          THE COURT:  Mr. Hunter, I understand that you've been
5   appointed in a case before me tomorrow morning.
6          MR. HUNTER:  Excited to be here, Judge.
7          THE COURT:  And the government is somewhat concerned
8   about those motions going forward.  I suppose you want some time
9   to take a look at those motions and --
10         MR. HUNTER:  We can start on the very first --
11         THE COURT:  Well, that will be fine.  I won't require
12  you to go to hearing on Friday.  I'll give you another week to
13  talk -- look at the motions and talk with --
14         MR. HUNTER:  Perfect.
15         THE COURT:  -- the defendant in this case.  And I'll
16  give you -- if you want them the following Friday, or the Friday
17  after that, just tell me which Friday you want them set.
18         MR. HUNTER:  That would be fantastic.  Thank you for
19  your consideration.  I promise I will move as quickly as I can.
20         THE COURT:  I'm sure you will.
21      (Pause.)
22         THE COURT:  Mr. Hunter, it's going to be the week
23  after.  I am not going to be here next week.
24         MR. HUNTER:  That will be fine.
25         THE COURT:  So it will be two weeks from today.
```

1          That's the 5th.  I don't think I'm going to be here
2    then either.
3          MR. HUNTER:  Judge, if I might --
4          THE COURT:  I may come back to work sometime.
5          MR. HUNTER:  -- we'll figure something out.  Let me
6    talk with the government first and then we can contact chambers.
7          THE COURT:  All right.  Anytime, but I believe -- I've
8    got to go down to a conference next week, and I don't think that
9    I'm going to have any motions on the 5th.
10          MR. HUNTER:  I can't imagine you would.
11          THE COURT:  That week -- the 4th is on a Thursday so no
12    motions on Friday.  So anytime after I think will be --
13          MR. HUNTER:  We'll get it figured out, Judge.
14          THE COURT:  All right.
15          MR. HUNTER:  Thank you.
16          THE COURT:  Now, did you-all have some motions that I
17    need to address?
18          MR. WOOD:  Yes, Your Honor.  On behalf of Keith Reed,
19    I'll make a motion for a judgment of acquittal on all counts,
20    and I'll simply rest on the evidence.
21          THE COURT:  All right.  Thank you.  I'll deny that
22    motion.  I believe there's ample evidence to go forward on all
23    of these counts.
24          MS. VANLOWE:  Good morning, Your Honor.  Melinda
25    VanLowe with Stanley Winston.

1          I would make the same motion on all counts.  I would

2   specifically draw Your Honor's attention to Count 2, which is

3   the robbery of VVM.  Specifically, the government was required

4   to prove that the money taken from the VVM was in fact property

5   of VVM, Inc.

6          While there was testimony about -- the outside of the

7   building says VVM, Inc.  It's certainly the address there.  But

8   there was testimony about multiple businesses within the same

9   building, and the same room as a matter of fact, and there was

10  indication that there was money taken from different registers.

11  There was no testimony as to exactly what VVM is as an entity.

12         One of the witnesses testified that they sell phone

13  cards.  There was certainly testimony, I believe, that the

14  government was establishing that this was done in interstate

15  commerce.  There were talks about wire transfers, but we never

16  really did get any information as to specifically what VVM is,

17  what the business is, and whose money was taken from which of

18  these different businesses.  So in particular, I draw your

19  attention to that blank issue, unproven element.

20         And then in addition to that, Your Honor, very

21  specifically, Charges 9, 10, 11, and 12, the 922(g)(1) elements,

22  the fact that they were affecting interstate commerce -- those

23  are the gun charges -- I don't believe that we heard anything

24  about the guns, where they were in fact manufactured, and how

25  they affect interstate commerce.

1          And so especially with respect to those two counts, I
2   would ask for a motion.  Thank you.
3          THE COURT:  All right.  Your motion will be denied as
4   well.  I believe there's ample evidence to go forward on those
5   counts.
6          MR. ROBERTSON:  Your Honor, even though you've made a
7   prior ruling on Ms. VanLowe's motion, I join her motion for the
8   same reasons she stated.
9          Further, Your Honor, I'm going to ask that you strike a
10  paragraph from the indictment.  Specifically under overt acts in
11  the indictment, there's paragraph 14, which says on or about
12  December 18, 2012, at 3555 Georgia Avenue, N.W., Defendant
13  Cannon purchased four masks for the purpose of using them in an
14  armed robbery.
15         There was no evidence that my client purchased any
16  masks.  There was none submitted to this jury at any point.
17         I think that paragraph -- I know the jury is going to
18  have a copy of the indictment.  I would like that paragraph
19  struck from the indictment before they receive it.  Thank you.
20         MS. GILES:  We have no objection to that, Your Honor.
21         THE COURT:  All right.  That will be done.  And your
22  motion for a directed verdict will be denied for the reasons
23  I've stated.  I find there's ample evidence to go forward on all
24  of those counts.
25         MR. HUNTER:  Again, Your Honor, I don't have very much

1   to say because my colleagues have already presented that to the

2   Court, but I would like to adopt and conform to their motions as

3   well.

4           THE COURT:  Very well.  And I'll deny your motion as

5   well for the reasons stated.

6           MR. HUNTER:  Thank you, Judge.

7           THE COURT:  Are you-all ready to go forward with your

8   witnesses at this time?

9           MR. WOOD:  Yes, Your Honor.

10          THE COURT:  All right.  Bring in the jury.

11      (The jury enters at 10:28 a.m.)

12          THE COURT:  You-all can have a seat.

13          All right.  Call your first witness.

14          MR. WOOD:  Your Honor, we would call, on behalf of

15  Mr. Reed, Ramon Calderon.

16                      **RAMON A. CALDERON,**

17          after having been duly sworn or affirmed,

18          took the stand and testified as follows:

19                      **DIRECT EXAMINATION**

20  BY MR. WOOD:

21  Q.  Sir, in a loud and clear voice, could you please state your

22  full name, and make sure you keep your voice up.  Okay?

23  A.  Ramon Antonio Calderon.

24  Q.  Do you want to spell your last name for the record?

25  A.  C-A-L-D-E-R-O-N.

R. Calderon - Direct                                          640

1   Q.  And your first name for the record?

2   A.  R-A-M-O-N.

3   Q.  Now, Mr. Calderon, I want to direct your attention back to

4   December 22, 2012.  Were you in the vicinity of a Navy Federal

5   Credit Union in the early morning hours of that day?

6   A.  I was outside.

7   Q.  Do you work in the area?

8   A.  Yes.  I was a manager of a pizzeria.

9   Q.  A manager of a what?

10  A.  Pizzeria.

11  Q.  Okay.  Around 9 o'clock, in the early morning hours of

12  December 22nd, did you notice anything unusual happening while

13  you were standing outside the Navy Federal Credit Union?

14  A.  Well, technically, I was walking towards it when I saw an

15  elderly lady run, like, towards me because she almost bumped

16  into me.  She was hesitant to like even stop.  So --

17  Q.  What did you say?  Someone tried -- bumped into you?

18  A.  No, she almost bumped into me.  Somebody was running -- they

19  hit the corner where North Quincy is from Randolph.  And then

20  that's when I kept walking forward because I had to go make a

21  deposit.

22  Q.  At the bank?

23  A.  At Capital One at Ballston Mall.

24  Q.  Okay.  So you were on your way to make a deposit at a bank.

25  Okay.  Now, after this lady almost bumped into you, what

1   happened next?

2   A.  I mean, I wanted to know, like, where she was running from.

3   I thought there was like a fight or something.  So I was

4   interested.  You know, maybe something would make my day in the

5   morning.

6   Q.  All right.  And did you move closer to the Navy Federal

7   Credit Union?

8   A.  Yeah, I did, but I heard -- a car kept beeping.

9   Q.  Okay.

10  A.  From there I crossed the street because -- I mean, something

11  was obviously wrong.

12  Q.  You saw a car beeping?

13  A.  Yeah, a black Jeep.

14  Q.  Okay.  And then what else did you see?

15  A.  When I crossed the street, like I stood looking into it.

16  Then I was like, oh, something is going on in there.

17  Q.  It being the credit union?

18  A.  Yes.

19  Q.  Okay.  Did you know what was going on inside the credit

20  union at the time you looked in?

21  A.  From -- yeah.  When I looked in, yeah.

22  Q.  Okay.  And what did you see?

23  A.  I mean, they were getting held up right there.  And the

24  person in the car was just beeping.

25  Q.  What did you see next after you heard the person in the car

1   beeping and something happening inside the credit union?

2   A.  There was a lady in the red car and she pulled up.  I guess

3   she -- she peeped inside and then she just drove off.  She

4   peeled out afterwards.

5        And like a minute or two later, like they came out.  And I

6   just stood there.  I was like -- I just stood just because I was

7   like, wow.  I was like, this is more than what I expected to

8   see.

9   Q.  This is more than the fight you expected, right?

10  A.  Yeah.

11  Q.  And when you said they came out, where did they go?

12  A.  They hopped into the Jeep.

13  Q.  Okay.  And what did the Jeep do?

14  A.  They just peeled out.  They hit like North Fairfax, and like

15  they passed the light and they almost got hit by a car.  So I

16  was like -- so what I saw.

17  Q.  Did you stick around after the Jeep left the scene?

18  A.  My intentions were go make this deposit.  So I wanted to go

19  make the deposit first before I even came back.

20  Q.  Did you end up doing that?

21  A.  Yeah, because, like, they saw me.  Then they were like, we

22  just called the police; like you need to stick around because

23  you know what happened.  I was like, no, I don't.  I got to make

24  this deposit.

25       I went there and then I came back.  Then they spotted me so

R. Calderon - Direct                                           643

1    they told me to come inside.

2    Q.  Now, when you say they spotted you, are you referring to the

3    police?

4    A.  Yes.

5    Q.  Okay.  Now, on that morning did you give the police a

6    description of the person who was driving that black Jeep?

7    A.  Yeah.  From I thought, yes.

8    Q.  Okay.  And what was the description you gave of the person?

9    A.  It was a scarf, like a black or white -- black and white

10   scarf.

11   Q.  Okay.  The person -- I'm talking about the driver of the

12   Jeep.

13   A.  Yes.  Yeah.

14   Q.  He was wearing a black and white scarf?

15   A.  Yeah, around the face.

16   Q.  And could tell us the pattern?

17   A.  It was like -- it was an Arab -- an Arab-like scarf.  Like

18   what they wear -- like a turban.

19   Q.  Like a Muslim-type scarf?

20   A.  Yes.

21   Q.  Okay.  So that was black and white.  And could you describe

22   the hairstyle of the person driving the Jeep?

23   A.  Not really.

24   Q.  Did you tell the -- did you give the police a hairstyle of

25   the person driving the Jeep?

R. Calderon - Direct                                          644

1   A.  I mean, I was being badgered by them, for them, like to give

2   them information.  So I just, you know, I was like maybe he had

3   long hair, like maybe he had his hair tied up.  I don't know.

4   Q.  Okay.  Did you ever describe the person as having dreads?

5   A.  Yes.

6   Q.  Okay.  And that's -- so you described to the police that the

7   person who was driving the car had dreads?

8   A.  Yes.

9   Q.  Okay.  And did you describe the jacket the person was

10  wearing to the police?

11  A.  I just said it was a black jacket.

12  Q.  Did you describe it with any type of color other than being

13  a black jacket?

14  A.  No.

15  Q.  Did you describe that it was a black jacket with some red in

16  it?

17  A.  No.

18  Q.  Okay.  With the court's assistance, I want to show you

19  what's been marked as Defense Exhibit 1, and ask you to take a

20  look at that statement and see if you can -- or take a look at

21  Defense Exhibit No. 1 and see if you can identify that.

22  A.  Yeah, but I tried -- I tried to scratch it out, but he was

23  like just leave it as it is.

24  Q.  Okay.  Is that your statement?

25  A.  Yes.

R. Calderon - Cross                                          645

1   Q.  Okay.  And is that in your handwriting?

2   A.  Yes.

3   Q.  Okay.  And in that statement you provide the police a

4   description of the driver, correct?

5   A.  Yes.

6   Q.  Okay.  Does that description include the word dreads in

7   terms of the driver's hairstyle?

8   A.  Yes.

9   Q.  Pardon me?

10  A.  Yes.

11  Q.  Okay.  And does it include the black- and white-checkered

12  scarf, like a Muslim-type scarf?

13  A.  Yes.

14  Q.  And does it include the person was wearing a black jacket

15  with red?

16  A.  Yes.

17  Q.  Okay.  And when you were giving the police a description, it

18  was actually the driver, correct?

19  A.  Yes.

20        MR. WOOD:  Thank you.  I have no further questions,

21  Your Honor.

22                   **CROSS-EXAMINATION**

23  BY MS. GILES:

24  Q.  Good morning, Mr. Calderon.

25  A.  Good morning.

1   Q.  Now, at the time that you -- you still have that statement

2   in front of you, do you not?

3   A.  Yes.

4   Q.  And this is what you wrote when you were at the bank that

5   day?

6   A.  Yes.

7   Q.  Did you also state at that time in writing your statement

8   that you noticed that the driver was masked?

9   A.  He had his face covered, yes.

10  Q.  But in your statement did you actually write down, I noticed

11  that the driver was masked?

12      Do you see that?  It's the -- one, two, three, four -- fifth

13  line down:  I noticed the driver was masked.

14  A.  Yeah, but masked to me is just face covered.

15  Q.  Okay.

16  A.  I explained that to them as well.

17  Q.  And later on did you also say that he was wearing a knitted

18  hat?

19  A.  Yes.  That's why I put next to it with like a side of

20  dreads.  So I don't know whether it was a knitted hat or dreads.

21  Q.  Okay.  Now, you said that that day the police were badgering

22  you, right?

23  A.  Yeah.

24  Q.  That's what you say.  Have you been interviewed since that

25  time, since you wrote the statement?

1   A.  No.

2   Q.  You weren't telephonically interviewed on April 4, 2013,

3   where you were called?  There was a special agent from the

4   FBI --

5   A.  Oh, yeah.

6   Q.  -- on the phone as well as the prosecutors in the case.

7   A.  Yes, I do remember.

8   Q.  And at that time did you not state that although you

9   mentioned that the driver may have had dreads, you clarified and

10  said you did not necessarily see a dread and that it could have

11  been a part of the scarf or the jacket?

12  A.  Yep.

13  Q.  Were you being badgered at that time?

14  A.  No.

15          MS. GILES:  Thank you.

16                  **REDIRECT EXAMINATION**

17  BY MR. WOOD:

18  Q.  Mr. Calderon, you indicated you had a conversation with, I

19  guess, the prosecutors and the police on April 14, 2013?

20  A.  On April 14th?

21  Q.  Well, they gave you a date.  I think it was April 14th.

22          MS. GILES:  4th.

23          THE WITNESS:  4th.

24  BY MR. WOOD:

25  Q.  April 4, 2013.  When she just asked you about a conversation

R. Calderon - Recross                                              648

1   you had on the phone with the prosecutor and maybe some police

2   officers?

3   A.  Yes.

4   Q.  They just asked you about that conversation, correct?

5   A.  Yes.

6   Q.  Was your memory better on the day it happened,

7   December 22nd, or was your memory better on April 4th, some five

8   months after it happened?

9   A.  I can still remember what happened.

10  Q.  But on December 22, 2012, is it fair to say the events of

11  that day were fresh in your mind?

12  A.  From that day, yeah.

13  Q.  Okay.  And so your memory was good because you were

14  describing something that just happened minutes before you gave

15  the description to the police, correct?

16  A.  Yes.

17         MR. WOOD:  I have no further questions, Your Honor.

18         THE COURT:  Thank you.  You may step down and may be

19  excused.

20      (Witness stands down.)

21         MR. WOOD:  That's our evidence, Your Honor.

22         MR. ROBERTSON:  Your Honor, I'd like to talk to Agent

23  Fennern, if we could.

24                  **RICHARD FENNERN,**

25      after having been previously duly sworn or affirmed,

1          took the stand and testified as follows:

2                       **DIRECT EXAMINATION**

3   BY MR. ROBERTSON:

4   Q.  Agent Fennern, you did the examination -- you did the

5   Cellebrite examination on a Sanyo Boost Mobile phone?

6   A.  Correct.

7   Q.  You previously talked about it and Exhibit 17.2 was admitted

8   into evidence.  Do you remember that?

9   A.  I believe so, yes.

10  Q.  With the assistance of the court security officer, I'd ask

11  that you take a look at 17.2.

12      Do you know who this phone was -- this phone came from?

13  A.  Mr. Reed.

14  Q.  Okay.  I'd ask you to take a look at the contacts list.  It

15  would be page 8 of 36, and number 63, please.

16  A.  Okay.

17  Q.  Could you tell us who that contact name is?

18  A.  It says Tobe, T-O-B-E.

19  Q.  And what's the phone number?

20  A.  202-510-4853.

21  Q.  I'd also like you to take a look at Plaintiff's Exhibit -- I

22  mean, Government's Exhibit 18.4, I believe.

23      You also did the Cellebrite examination of an iPhone 5.  Do

24  you recall that?

25  A.  Yes.

1    Q.   And who was that phone -- who did that phone belong to?

2    A.   I'm sorry.   iPhone 4 belonging to --

3    Q.   iPhone 4.

4    A.   -- belonged to Stanley Winston.

5    Q.   Right.   And you testified that in that exhibit, one of the

6    contacts, number 33 -- who was that listed for?

7    A.   Cannon.

8    Q.   And what was the phone number?

9    A.   202-510-4853.

10   Q.   And in the subsequent investigation of this case, you

11   understood that Mr. Cannon's phone number was the 510-4853

12   number?

13   A.   Correct.

14   Q.   Why not the -- Tobe's number?

15   A.   Tobe's number?

16   Q.   Why not call it Tobe's number instead of Cannon's number?

17   A.   You can't look at it in a vacuum.   You have to look at it

18   with the records and analysis of everything else that we had.

19           MR. ROBERTSON:   Okay.   I don't have any other

20   questions, Your Honor.

21           THE COURT:   Do you have any questions?

22           MS. BELLOWS:   I don't have any questions, Your Honor.

23           THE COURT:   All right.   Thank you.   You may step down

24   and may be excused.

25           (Witness stands down.)

 1              THE COURT:  Do you have anything else?

 2              MR. WOOD:  Not on behalf of Mr. Reed.

 3              MR. ROBERTSON:  I don't have anything further.

 4              MS. VANLOWE:  Not for Mr. Winston.

 5              MR. HUNTER:  Not for Mr. Dyer.

 6              THE COURT:  Anything else from the government?

 7              MS. GILES:  No, Your Honor.

 8              THE COURT:  All right.  Thank you.

 9              All right.  Ladies and gentlemen of the jury, I'll let

10    you retire to the jury room.  I have some matters of

11    instructions to deal with with counsel, and we'll come out

12    shortly for closing arguments.

13         (The jury exits at 10:42 a.m.)

14              THE COURT:  All right.  As far as the instructions are

15    concerned, I'll run through what I'm going to give, and then at

16    the end, when I finish instructing the jury -- at the conclusion

17    of my instructing the jury, you-all can tell me if you've got

18    any objection to them.  I'll give you a chance, after I go

19    through here, and you can tell me if there's anything else you

20    want me to give.

21              I'll tell them about the nature of the offense in

22    Count 1, the statute defining the offense in Counts 1, 2, 3, and

23    4, the essential elements of the offense in Count 1.  Tell them

24    about a conspiracy, the existence of an agreement, membership in

25    the agreement.  Tell them about the nature of the charges in

1    Count 2 and Count 3 and Count 4.  Tell them the essential

2    elements of the offense in those counts.

3           Define obstructs, delays, or affects commerce.  Define

4    robbery.  Define property.  Tell them the nature of the offense

5    in Count 5, statute in regards to Count 5, the essential

6    elements of the offense that the government must prove.  I'll

7    define puts in jeopardy the life of a person by use of a weapon.

8    Define assaults any person.  Define force, violence by

9    intimidation.  Define custody, control, management, or

10   possession.

11          Define the term credit union.  Tell them about the

12   nature of the offenses involved in 6, 7, and 8, the statute

13   involved, the essential elements of the offense that the

14   government must prove.

15          Define firearm.  Define use or carries a firearm.

16   Define crime of violence.  Explain aiding and abetting to them.

17   Also, responsibility for the substantive offense.  And the

18   nature of the offenses charged in Counts 9 through 12, the

19   statute, the essential elements of the offense that the

20   government must prove in those counts.

21          And then define felony for them.

22          This instruction that the government has presented

23   about proof required, I don't believe that that's a proper

24   instruction.  That states the law, but I don't believe it's an

25   instruction that should be given to the jury.

1    I should tell them that the conviction of the --

2  conviction for a prior offense should be used only in connection

3  with the gun charges and not any of the other charges in this

4  case, and I will tell them that in so many words.

5    And then define knowingly.  Define possession, in or

6  affecting commerce, and tell them that the proof may be

7  disjunctive.

8    Now, I'll also give my general instructions which talk

9  about burden of proof, credibility of witnesses, and those good

10  things.

11    Is there anything else that I've missed by way of

12  substantive instructions here?

13    MS. GILES:  Your Honor, it's one of the instructions we

14  requested, the one on immediate flight or concealment.  In this

15  case you have the evidence that will be coming in about the

16  defendants fleeing from Officer Mills.  So we would like that

17  instruction.  It is instruction 14.08 in O'Malley's.  We can

18  print that out if -- and provide it to the Court.

19    MS. VANLOWE:  I am standing because I have an

20  objection, Your Honor, to that.

21    THE COURT:  All right.

22    MS. VANLOWE:  The evidence was not actually that there

23  was immediate flight.  The evidence was that there were four men

24  walking down the street.  One separated to put something in the

25  trash can.  They kept walking even after the police car --

1    Officer Mills was sitting there with his lights on.  They walked

2    towards Pope Street, turned onto Pope Street and walked.  Police

3    officer -- Officer Mills then kept following them.  Officer

4    Mills got out of the car.  He asked them if they lived there.

5    They answered that question.  Then Keith Reed motioned and

6    started running, and then the others followed.

7         The way that the government has made it seem is if the

8    police -- they immediately saw the police and then took off

9    running, and that's also what this instruction seems to suggest.

10   It's not a proper instruction and shouldn't be given as it

11   doesn't reflect the evidence in the case.

12        THE COURT:  You know, I believe that's correct.  I

13   think this is a little short.  They did stand around for quite a

14   while.  The officer followed them, and I think there's a real

15   question of whether or not that's immediate flight.  I don't

16   think I'm prepared to make that determination.

17        They obviously didn't stay around and talk to the

18   officer, but to make that an incident involving this robbery --

19   you know, it's certainly not immediate flight to the robbery.  I

20   think I better leave that out.

21        Anything else?

22        MR. WOOD:  Not on behalf of Mr. Reed, Your Honor.

23        THE COURT:  All right.  How long do you-all want to

24   argue?  Ten minutes apiece?

25        MR. WOOD:  Can I have 15 to 20, Your Honor?  15

1   probably.

2         THE COURT:  Boy, that's a long time.

3         MR. WOOD:  15.

4         THE COURT:  Four times 15 is what?  60.

5         MR. ROBERTSON:  Your Honor, I know that when I'm

6   sitting here listening to Mr. Wood's argument, Ms. VanLowe's

7   argument, that I'm going to be really careful not to repeat what

8   they say, but I don't want to be cut off.  I mean, I want to be

9   able to argue.  I don't think I would take longer than

10  15 minutes if I was doing it by myself.

11        THE COURT:  See, that's one of the reasons why I have a

12  time limit, so that I can cut people off.  If not, you know,

13  it's open-ended, fair game, keep talking.

14        MR. ROBERTSON:  Your Honor, I think we've been pretty

15  good.

16        THE COURT:  Yes, you have.  But the longer you talk --

17  nothing can happen until you stop talking.

18        MS. VANLOWE:  Your Honor, I think we've also observed

19  the jury, and I think that they would probably cut us off after

20  15 minutes.  I think it's very clear that we need to keep it

21  concise.

22        But I know Mr. Wood -- I've had to follow him

23  throughout this entire case, and I've been trying to be very

24  careful about not duplicating his arguments.  So I have also, in

25  going through my closing, made very sure that I am only -- but I

1  can't guarantee that that's going to be less than 15 minutes,

2  although I have timed it to make sure that it is.

3       THE COURT:  All right.  Well, I'll help you on that

4  score.

5       MS. VANLOWE:  Thank you.

6       MR. HUNTER:  The best advice I ever got on closing

7  arguments, Judge, I got from you in this courtroom.  That's that

8  there's a reason why the most successful shows on television are

9  30 minutes or less.  And I -- I try to be as short as I can be

10  because, as Ms. VanLowe said, the jury will cut me off

11  themselves whether you do or not.

12       THE COURT:  Well, I think in this circumstance

13  15 minutes for each of you.  That will give you an hour total

14  for the four defendants.  You're talking about exactly the same

15  facts, and I don't really think you can talk that long without

16  repeating yourself.  I'll give you that.

17       How about 20 minutes and 10 rebuttal for you-all?

18       MS. BELLOWS:  That's fine, Your Honor.  That's plenty

19  of time.  Yes.  Thank you.

20       THE COURT:  All right.  Let's see.  If we start at

21  11:00, we could finish the closing arguments by -- what? --

22  12:30, in that neighborhood.  Then let's think about letting the

23  jury go to lunch and then come back and me instruct them instead

24  of my instructing them and letting them go to lunch.  Because if

25  the instructions are fresh in their mind, there's less likely to

1   be some question about them.  So let's plan to do that.

2          I'll just take a brief recess now so you-all can get

3   your thoughts together, and then we'll come back.

4          MS. BELLOWS:  Your Honor, may I use two or three pieces

5   of evidence that have been introduced just to show the jury from

6   here, and I also have some blow-ups that I'd like to just put on

7   this table?

8          THE COURT:  If you think it's necessary.

9          MS. BELLOWS:  Thank you, Your Honor.

10          THE COURT:  All right.

11      (Recess taken at 10:53 a.m.; the jury enters at 11:05 a.m.)

12          THE COURT:  All right.

13          MS. BELLOWS:  May it please the Court.  Good morning,

14   ladies and gentlemen.  This is my first opportunity to speak

15   directly to you in this case.  And it is only appropriate that I

16   take this moment to thank you for your attentiveness during the

17   trial.  Ms. Giles and I know that throughout this case, which

18   has taken a good part of the whole week, you have been committed

19   to hearing, seeing, and understanding the evidence that has been

20   presented.

21          We recognize that none of you volunteered for this

22   assignment, and yet you've done it with a good attitude and with

23   devotion, and for that we both thank you.

24          Now, the defendants in this case have been charged with

25   one count of conspiracy, three counts of interference with

1  commerce by robbery, one count of armed robbery of a federal

2  credit union, and three counts of possessing or using and

3  carrying a firearm during and in relation to a crime of

4  violence.

5          Each defendant is also charged with one count of

6  possession of a firearm by a prohibited person, namely a person

7  who has previously been convicted of a crime that carries a term

8  of imprisonment of over one year.  And all these charges stem

9  from three robberies: the one that occurred at the Navy Federal

10 Credit Union on December 22nd, the one that occurred at the

11 Shoppers Food Warehouse on December 9th, and the armed robbery

12 that occurred at the VVM on December 7th, in that same month,

13 2012.

14         And I don't think that there's any dispute that these

15 armed robberies took place at these locations at those times on

16 those dates.  And I don't think there's any dispute that the

17 robbers who committed these crimes used force and intimidation

18 to take money from these businesses.  And I don't think that

19 there's any dispute that these robberies affected interstate

20 commerce.

21         There's only one real issue and dispute in this case,

22 and that is who committed these three robberies.  And I submit

23 to you, ladies and gentlemen, that in the last three days you

24 have heard and taken in overwhelming evidence that establishes

25 that Keith Reed, Stanley Winston, Anthony Cannon, and Tobias

1    Dyer committed each and every one of these robberies.

2         Let's first turn to the Navy Federal Credit Union.

3    After hearing the evidence, I think there can be no doubt, let

4    alone reasonable doubt, that these four committed that robbery.

5    First, Stanley Winston's phone was right by the credit union

6    before the robbery.  Then the GPS trackers that are taken from

7    the Navy Federal Credit Union lead law enforcement to Anthony

8    Cannon's neighborhood, not only that, to his back door.

9         Then when Officer Mills encountered these four

10   defendants, they run, and all he asked was for ID.  And after

11   they're all apprehended in the woods, and the FBI responds

12   within minutes, what does the FBI find in the woods?  $19,000 in

13   cash, two of the GPS trackers that belong to the bank, black

14   masks, black gloves, just like the robbers were wearing.  And

15   Officer Mills and Officer Johnson, who were the two MPD

16   officers, they told you no one else was around that day, no one

17   else was at the woods, no one else was on Pope Street or Nash

18   Street.

19        And that's only what happened in the woods.  You add to

20   the fact that Cannon, Dyer, and Winston all fit the description

21   of the three robbers who went inside the Navy Federal Credit

22   Union to a tee.  Then Keith Reed, when he's apprehended, he's

23   found with a screwdriver.  You heard that the robbers used a

24   stolen Jeep Liberty that when it was recovered within hours of

25   the robbery, it had a punched ignition.

1          Now, all this evidence, that would be enough for you to
2     convict these four defendants of that robbery, but yet there's
3     more.
4          You heard that the FBI recovered four masks in the
5     woods, and you also heard from the DNA expert that on two --
6     that on all those masks there was a mixture of DNA.  But on two
7     of them she was able to identify the main contributor and she
8     could do that to the exclusion of all others.
9          And what the DNA expert told you that was on one of
10    those masks found in the woods, Keith Reed was the major
11    contributor to the exclusion of everyone else in the world.  And
12    that on another mask, Cannon, right over here, was the
13    main or the -- yeah -- the major contributor to the exclusion of
14    all people in the world.  And what does that tell you?  That
15    they wore those masks.
16         Then let's not forget the masks in the trash can
17    outside of Cannon's house.  Remember, masks were also recovered
18    there.  And what do we find there?  We found Tobias Dyer's DNA
19    on that mask.
20         And not wanting to be left out, Mr. Winston over here
21    made sure that he left his DNA on a mask too.  Remember the blue
22    bag that was dropped on Pope Street?  Well, a mask was found in
23    that blue bag and a hair was recovered from that mask, and
24    mitochondrial DNA that was found on that hair shared the same
25    sequence as Mr. Winston.

1          Now, you heard that unlike nuclear DNA, mitochondrial

2    DNA does not exclude people, but you also heard that five out of

3    a thousand African-Americans would share that same sequence of

4    mitochondrial DNA.  But there weren't a thousand people on that

5    street that day.  There were four people.  And there weren't a

6    thousand people dropping that blue bag.  It was one of these

7    defendants who dropped that blue bag, and it was Mr. Winston's

8    hair.

9          And yet, if you can believe it, there's still more

10   evidence of their guilt for this robbery.  The FBI searched

11   Mr. Cannon's house.  There's no dispute.  It's 1501 38th Street.

12   The probation officer told you that Mr. Cannon told him such on

13   December 20th, the last time he saw him.

14         And at that house they find in his room, where he has

15   mail at that address, the last remaining GPS device, $10,000 of

16   the bank's -- $10,000 of the bank's money, a box with over

17   $7,800, and three firearms, all of which were loaded and ready

18   to fire.

19         And Reed, he knew that money was left back at that

20   house.  How do we know this?  You heard Officer Singleton, who

21   apprehended Mr. Reed, and he said that right before they

22   apprehended him, he was on the phone.  Then you heard Officer

23   Gaines testify that within minutes of the apprehension, she went

24   to the house with other officers to secure the perimeter of

25   Mr. Cannon's house.  And there, who does she happen to find but

1    Reed's wife who's trying to get into the house.  She obviously

2    had spoken to Mr. Reed because she was asking officers whether

3    her husband had been arrested, and he had been arrested blocks

4    away, not at the house.

5          And last, but certainly not least, another piece of

6    evidence of these defendants' crime and that it was these four

7    defendants are these two guns that were recovered from

8    Mr. Cannon's house.  Here's the Luger semiautomatic.  You can

9    see that it has holes in the barrel, just like Dimanche Inn told

10   you.  He was the young man who was the greeter at the Navy

11   Federal Credit Union.

12         And then there was the silver gun that had this very

13   unusual drum as a magazine.  You heard Ms. Hablenko tell you

14   that that was the gun and the magazine that was pointed at her.

15   And you will see it for yourself on the surveillance video, and

16   after you do, there will be no doubt in your mind that these

17   were the guns that were used to commit that robbery.

18         So, ladies and gentlemen, the evidence proves beyond a

19   reasonable doubt, and it's so clear, that these four defendants

20   were -- they committed that robbery.  Mr. Reed was in the car,

21   honking, hurrying them up, and he's the one that sped away with

22   three of them -- the other three in there.

23         Now, because these four committed this robbery, it

24   necessarily proves Counts 8 through 12 which charges them with

25   being a prohibited person.  Mr. Cannon, his probation officer

1    testified that he had been convicted of an offense that carried

2    more than a one-year term of imprisonment. He, I believe, was

3    sentenced to four years' imprisonment. You will see that

4    certified conviction. And the other three defendants, they

5    stipulated to the fact that they're felons.

6         The Court will instruct you that the substantive

7    criminal acts of a conspirator may be attributed to other

8    members of a conspiracy. So even if Mr. Reed did not have a

9    gun -- and we don't know whether he did or not in the car --

10   even if he didn't have a gun, the fact that his co-conspirators

11   used guns can be attributed to him and he can be found guilty of

12   possessing a firearm.

13        Lastly, to prove felon in possession, the government

14   also has to prove that that possession was in and affecting

15   interstate commerce. Well, you'll know from the video, and you

16   know from the testimony of Mr. Dimanche and Ms. Hablenko, that

17   those were the guns that were used at the Navy Federal Credit

18   Union in Virginia. Those guns were recovered later that day in

19   Cannon's house in D.C. Clearly, they traveled in interstate

20   commerce.

21        So now let's turn to Shoppers. How did we know they

22   robbed -- these four men robbed the Shoppers on December 9th?

23   Well, first of all, two of their phones, Mr. Cannon's and

24   Mr. Reed's, are there at 6:00 in the morning on a Sunday at

25   Shoppers. They live in D.C., but they're both there.

1          This is a pie chart that you're going to have in
2     evidence that Mr. Horan testified about yesterday.  And that
3     shows, here's the robbery, and here is -- Mr. Cannon's phone is
4     in this area and Mr. Reed's phone is in this area from 6:08 to
5     6:20.

6          Now, Stanley Winston and Tobias Dyer's phones were not
7     active around the time of the robbery, but there's plenty of
8     evidence putting them there.

9          First, they both match the physical description of two
10    of the robbers.  Remember, there was one robber who scaled the
11    wall, and he was thin and had thin legs.  And then there were
12    two others: one was taller, one was shorter, a little thicker
13    than the one who jumped -- who scaled the wall.

14         Well, Mr. Dyer fits the description of the tall,
15    medium-sized, lighter-skinned robber, and Mr. Winston fits the
16    description of the shorter, darker-skinned robber.  But you also
17    heard from Ms. Freeman that the shorter, darker-skinned robber
18    had dreads.  She knew what dreads looked like, and she could
19    tell by the impressions in the mask that the man had dreads,
20    just like Mr. Winston.

21         But there's even more than just that, ladies and
22    gentlemen.  You will see on the surveillance tape that
23    Mr. Winston wore jeans that were very distinctive.  You can see
24    right here, this picture of the robber, and he's wearing jeans
25    with a little silver button and a flap in the back of his pants.

1        Well, later that same day, December 9th, here he is

2   partying with Mr. Cannon and Mr. Dyer.  And here's Mr. Winston

3   -- you'll see other photos of him turned around -- wearing

4   exactly the same pants.

5        You'll also see that on that same day, December 9th, on

6   Mr. Winston's phone are photos of him wearing those same

7   clothes, those same pants, and taking a bite out of a big wad of

8   cash.  Where did he get that wad of cash?  From the Shoppers.

9        But Mr. Winston wasn't the only one who was flagrant

10  enough to document his crimes with pictures.  Mr. Dyer took

11  pictures of himself as well.  On the day of the Shoppers

12  robbery, he takes photos of himself with large stacks of money,

13  including handing some -- holding some and then a big stack

14  between his feet, and then he or somebody posts these pictures

15  on Instagram.  Here's Mr. Dyer posted on Instagram,

16  December 9th, holding cash, a big wad of cash between his feet.

17        Now Cannon.  In addition to his phone being there, you

18  can tell by the video that it's him.  Mr. Cannon is limber and

19  spry.  You see him flying over the teller counter.  He was the

20  one wearing the yellow jacket.  He has no trouble getting over

21  that teller jacket [sic].  Mr. Dyer, who does the other teller

22  counter, he has a little bit more trouble getting up, but not

23  thin Mr. Cannon.

24        And then what does he do at Shoppers?  He scales the

25  wall with -- not once, but twice.  You can see in this video,

1    and there will be no question after you review this video, that

2    the robber who goes after the big money is always Mr. Cannon.

3    He wears skinny jeans that accentuate his skinny legs.  He also

4    carries his loot out like this.  When he has loot, he's all

5    hunched over.  And Mr. Cannon takes pride in being the one who

6    goes after the big money.  Days after the Shoppers robbery, this

7    picture of Cannon is posted on Instagram.

8           So how do we know Mr. Reed is there?  Well, first, look

9    at the video.  You'll see that there's a waiting Jeep outside

10   the Shoppers.  And right before it bolts away, you'll see one of

11   the passenger doors open.  Now, it's dark, but you can clearly

12   see a door opening.  Nobody gets on the driver's side.  There's

13   clearly a driver to that car.

14          And how do we know that it's Mr. Reed?  Well, first,

15   his cell phone activates in that area at 6:00 in the morning, as

16   I previously stated, and it's activating from 6:15 to 6:20.  And

17   how do we know that that phone is Mr. Reed's phone?  Because

18   that's the one he was carrying with him when he ran from the

19   police on December 22nd, and that's the one he dropped, and

20   that's the one he used to call his wife.  Because the phones

21   that he's -- that that phone is speaking to on December 9th

22   around 6:00 in the morning is the same phone he's calling right

23   before he's apprehended.

24          Now, the phone activity between these defendants also

25   is compelling evidence that they all committed this robbery.

1    Starting at 4:23 in the morning -- now, remember, the robbery

2    happens at 6:00 in the morning on a Sunday morning.  At 4:23,

3    Reed and Dyer's phones are all calling each other.  And you'll

4    see this summary chart of these phone communications.

5         Then the calls between Reed and Dyer stop at 5:20, but

6    then Reed's phone calls Cannon's phone.  Then there's no

7    communications between 5:21 in the morning and 12:31 p.m.  And

8    as Mr. Wood pointed out, when people are together, they're not

9    calling each other.

10        Finally, let's turn to VVM.  You'll look at that video

11   as well.  You'll see that the three robbers fit the same

12   description and they use the same MO as they did in the other --

13   the subsequent robberies.

14        They use a stolen Jeep.  They abandon it nearby.  They

15   always target locations that are near interstates to allow them

16   to have a quick getaway.

17        But you'll also see on December 7th a summary chart of

18   the phone calls, and there are a lot of communications between

19   the four defendants that day.  They begin around -- they

20   begin -- they're in the morning and they end around 5:32 that

21   day.  And why is there all this activity on their phones?

22   Because they're plotting the robbery that evening of the VVM at

23   8 o'clock on a Friday night.

24        And then when you look at the summary of the phone

25   activities -- and you can double check, the phone records are in

1    evidence, you can double check yourself -- you'll see that

2    there's no communications between these four between 5:32 and

3    9:33.  The robbery occurs around 8 o'clock.

4         These four, they're not communicating between 5:32 and

5    9:33.  Why?  Because as Mr. Wood has suggested, they're probably

6    together.  And not -- but we don't even have to surmise or guess

7    that they're together.  We know they're together because their

8    cell phones all hit off -- from 6:30 to 8:04, their cell phones

9    were all in the area around the robbery, on Beauregard in

10   Alexandria, Virginia.

11        Now, ladies and gentlemen, Ms. VanLowe told you in the

12   opening that my colleague, Ms. Giles, she told you a bedtime

13   story.  The evidence has proven this was no bedtime story.  This

14   was a terrifying, real nightmare.  A nightmare for Mr. Dimanche

15   [sic], the young man who was at the greeter station who had a

16   gun pushed in his face, who was forced to the ground, and who

17   was told he was going to be shot.  A nightmare for Ms. Hablenko,

18   the teller, who had this gun -- not this one, sorry -- this gun,

19   this silver gun with this loaded magazine shoved in her face,

20   and she was told to get down and not push any buttons.

21        A nightmare for Ms. Jones, the bookkeeper at Shoppers,

22   who saw what was happening and ran to the back for cover.

23        A nightmare for Mr. Hassen at VVM who also had a gun

24   pointed at his face and was ordered to get down on the ground,

25   and who you will see on the video is like this, trying to

1  protect himself because he's so afraid that he's going to be

2  shot.

3         And a nightmare for Ms. Margarita Damian, the young

4  lady -- the one who needed an interpreter -- who was in the back

5  of the check cashing establishment.  She said that she believed

6  the men were going to get in.  They were prying the locked door,

7  and she was sure they were going to get in.  She ran in the back

8  and tried to find a door, a basement door, to get out.  She

9  couldn't find one so she locked herself in the bathroom, turned

10 the lights off, threw the cell phone in the trash, and pushed

11 against the wall as if that would have helped.  Luckily, they

12 didn't get in, but it was still an incredible nightmare for that

13 woman.

14        Every armed robbery in this case was a nightmare for

15 these victims.

16        THE COURT:  Time to finish up.

17        MS. BELLOWS:  Okay.  And all three of these nightmares

18 were perpetrated by these four men.  So the time has now come,

19 ladies and gentlemen, to hold them accountable for their violent

20 and cowardly crimes.

21        So I ask you, on behalf of the United States, to return

22 the only verdict that the evidence supports and that justice

23 demands, and that is a verdict of guilty on all counts.  Thank

24 you.

25        MR. WOOD:  Good morning, ladies and gentlemen.

1          I want to thank you for the time and attention you've

2     paid to this case.  And if I had my preference, I guess I could

3     speak for a couple of hours about the evidence, but it's not my

4     preference.

5          I want to highlight some of the evidence in this case,

6     but I want to talk to you first about the standard of proof in a

7     case, and the standard of proof is that the government has to

8     prove each and every element of each and every crime beyond a

9     reasonable doubt.

10         Now, that is the highest standard possible in the

11    judicial system in the United States, and that's a system and

12    that's a standard of proof that protects all of us.  It just

13    doesn't protect Mr. Reed and it wasn't created for Mr. Reed's

14    benefit so that he could get a big break in a trial like this.

15    That's a standard of proof that protects everyone in the

16    courtroom, from the front of the courtroom to the back.

17         And if anyone in the back of the courtroom was ever

18    charged with a crime, they would insist on the same standard of

19    proof.  And why do you have that standard of proof?  Because

20    when you make an accusation and an allegation against someone,

21    that's a serious matter and you have to prove it.

22         Not to get too sentimental, sometimes people say that

23    people come to this country because they can make money.  They

24    want to -- the immigrants come to this country because they can

25    make a lot of money in this country, and I disagree with that.

1   You can make money anywhere.  You can go to North Korea, Russia,

2   Cambodia and make money.

3        You come to this country because the system of justice,

4   I submit, protects everyone who's in this country.  And that's

5   the system and that's the standard of proof you have to have in

6   this case.  And when you apply the standard of proof in this

7   case to Mr. Reed, you will be convinced that he is not guilty of

8   all these charges.

9        Now, ladies and gentlemen, look at the way the

10  government has presented their case.  You know, I was always

11  taught that you do first things first.  You have the VVM robbery

12  on December 7th, you have the Shoppers Food Warehouse on

13  December 9th, and then you have the Navy Federal Credit Union on

14  December 22nd.  And they try to prove their case backwards.

15       Why do they do that?  Well, you see, in the Shoppers

16  Food Warehouse, they have some evidence that they want to have

17  you transfer to those other charges against Mr. Reed.

18       They don't go first things first.  They go last and

19  say, well, you know, we have some evidence, we have some DNA, we

20  have some guns, we have some money, and we want you to transfer

21  that proof, essentially, to the other charges, to the

22  December 7th robbery, to the December 9th robbery.  And I submit

23  to you you can't do that.  You have to take these things one at

24  a time.

25       And remember, Mr. Reed, he sits in this courtroom

1    charged with other people simply for almost a matter of

2    convenience.  Rather than have four separate trials, everybody

3    having four trials times, different robberies, having 12 total

4    trials, we all do this together, and it's primarily for a matter

5    of convenience.

6         But deciding this case, ladies and gentlemen, can't be

7    done in a convenient way.  It has to be done in accordance with

8    the law.  And so when you look at the VVM robbery, what is the

9    proof that Mr. Reed was involved in that robbery?  Because they

10   can talk about what a nightmare it was for every individual and

11   that the robberies definitely occurred, and it certainly was a

12   nightmare and the robberies did occur.

13        But the question in this case is identification.  Have

14   they established for your benefit, have they established beyond

15   a reasonable doubt that they can identify Keith Reed as one the

16   people who was there on December 7th.

17        Now, how do you make an identification?  How do you

18   identify someone as being involved in a robbery or an event?

19   Well, you can have an eyewitness say I saw you and I know it was

20   you who was there.  That's enough to get someone convicted.  Or

21   you can say, well, you know, you look like the guy.  You have a

22   unique physical characteristic.  And I remember that the robber

23   walked with a limp, and I see that the defendant, when he's

24   presented to me and I'm asked to identify him, walks with a limp

25   or has an unusual characteristic.  That's an identification.

1          You can have an identification by a fingerprint,

2    because everybody knows from watching CSI, if you don't get the

3    sense from this courtroom, that everybody's fingerprints are

4    different.  So if a fingerprint is found at the scene -- what

5    they call a latent lift -- and it's matched up to a known print,

6    say, attributed to a defendant, that's an identification.

7          If you have the proceeds of a crime, that's a way of

8    identifying.  If you have maybe some money that matches the

9    amount of money taken in a robbery, that's the way to identify

10   you in a crime.  So there are ways to identify people as having

11   committed a crime.

12         In this case when you look at the VVM robbery, what is

13   the evidence that identifies Mr. Reed as having been involved in

14   that robbery?  DNA?  No.  Fingerprints?  No.  Proceeds of a

15   crime in his possession?  No.  People saying, oh, I could see

16   that you were the guy?  Remember, the person who was outside the

17   VVM robbery says, well, three people dropped in a -- hopped in a

18   black Jeep, but I don't know if there was a fourth person in

19   there, and I certainly didn't get -- be able to see that fourth

20   person.

21         So what is the identifying thing that puts Mr. Reed --

22   or they try to put Mr. Reed with the robbery of the VVM?  Simply

23   this.  Cell phone records.  Well, what do the cell phone records

24   show?  In and about around -- they show that a phone with the

25   number 240-355-8256 was around, nearby.  What was the phone

1  doing and was the person holding the phone doing?  You don't

2  know.

3          Maybe the phone was nearby, within some distance of the

4  VVM robbery.  What was the person doing?  Was the person

5  knowledgeable about what was going on?  Did that person

6  participate in it?  No.

7          So you see, the cell phone records, all they show is

8  that the cell phone is nearby, might have been, maybe.  That's

9  all it shows, ladies and gentlemen.  So when you're talking

10 about what identifies Keith Reed as participating in the VVM

11 robbery, it's simply a cell phone number.

12         And you compare that type of identification with the

13 type of identification that you can get from fingerprints, that

14 you can get from DNA, that you can get from eyewitness

15 testimony, and you see it pales in comparison, because those

16 things are the types of things that can assure you, yes, we have

17 the right person as opposed to, well, you know, the cell phone

18 was in and about the area.  What was the person holding the

19 cell phone doing?  We don't know.

20         And remember, ladies and gentlemen, what is Keith

21 Reed's alleged role as attributed to him by the government

22 throughout these robberies?  He's allegedly the getaway car

23 driver.  He is the guy who, when he's arrested on December 22nd,

24 has a screwdriver in his pocket.

25         And they say by inference, well, we can't say that the

1    screwdriver was used to do anything.  But I guess what they're

2    trying to tell you is the screwdriver was used to get in the

3    cars and steal the cars and pop the ignition.  So that was the

4    role they have given to Mr. Reed.

5         Well, then we should have records, ladies and

6    gentlemen, because as Officer Horan -- or Agent Horan said, you

7    know, these cell phone records are a way of pinpointing people's

8    location.  They have within their control cell phone records

9    that go in the one day before each robbery: on December 7th and

10   the 24-hour period before, December 9th and the 24-hour period

11   before, and then December 22nd and the 24-hour period before.

12        And if they're saying that Mr. Reed is the type of

13   person who uses his cell phone a lot, then we can pinpoint where

14   Mr. Reed was when the cars were actually stolen.

15        Because as you remember, the car stolen in the VVM

16   robbery was stolen in Virginia, the car stolen in the Shoppers

17   Food Warehouse was stolen in D.C., and the one for the Navy

18   Federal Credit Union is stolen in District Heights, Maryland.

19        So from the records, if the cell phones are so

20   accurate, then they should be able to pinpoint for you-all where

21   he was when the cars were stolen and pinpoint that he's in and

22   around the scene of those stolen cars.  They haven't done that,

23   ladies and gentlemen.

24        You know, the absence of proof is as powerful as proof,

25   because the absence of proof means the government has not met

1    their burden.  So for the VVM robbery, you have cell phone

2    records, but those records don't and haven't been explained to

3    you to show where he was when the black Jeep that was used in

4    that robbery was stolen.

5         And the similar argument is for the Shoppers Food

6    Warehouse, Shoppers Food Warehouse robbery.  What identifies him

7    as being in the Shoppers Food Warehouse?  You know, they tell

8    you to look at the video.  Well, look at the video, see if you

9    can identify who, if anyone, was in a car that someone allegedly

10   got into after the robbery.

11        Again, no fingerprints, no DNA, no proceeds.  They're

12   saying that -- you know, they're attributing him to having a

13   weapon in all of these.  I mean, the counts in the indictment

14   say that he was in possession of a weapon.  They're saying,

15   well, the other guys had the weapon.  What proof is there in the

16   VVM robbery and in the Shoppers Food Warehouse robbery that he

17   had a gun?  Nothing.

18        What identifies him as being in the Shoppers Food

19   Warehouse robbery?  Nothing.  And remember, when they've shown

20   you these pictures, when they showed you those documents or

21   poster boards during the government's initial closing argument,

22   they said, well, look, there are two people who are showing off

23   days after the Shoppers Food Warehouse with -- flashing money,

24   showing that these are the -- and I guess they were attributing

25   those to the proceeds of the Shoppers Food Warehouse.

1    Well, you know, if these guys are so close and if

2    Mr. Reed is such a close associate with these individuals and

3    the one who is participating in the wealth that they obtained

4    from these robberies, you would think that there would be some

5    pictures of Mr. Reed showing him with his take.  Because I

6    imagine what the scheme that the government is going to say is

7    that they rob a place, they divide it up, everybody gets their

8    share.

9        Well, where is the share that's attributable to

10   Mr. Reed as to the Shoppers Food Warehouse robbery?  You don't

11   see him in any cell phone records.  You don't see him on any

12   pictures.  You don't see him in any situation where he's

13   flashing money around showing, oh, yeah, look what I got from

14   the Shoppers Food Warehouse.  Nothing.

15       So again, when you're talking about the Shoppers Food

16   Warehouse, you're going back to the cell phone records.  And the

17   Court is not going to instruct you, well, beyond a reasonable

18   doubt means you can sort of have a maybe, maybe the guy is in

19   the area, maybe the government has proven that he's close or his

20   cell phone is close to an area, maybe that's enough.  Shoppers

21   Food Warehouse, absolutely no evidence.

22       Then you turn to the Navy Federal Credit Union.  You

23   see why they highlight the Navy Federal Credit Union and why we

24   spend most of the trial, when you compare the amount of time, we

25   spent most of the time on Navy Federal Credit Union.  We started

1    with that first because they want that evidence to sort of

2    overwhelm your consideration, at least as to Mr. Reed, as to the

3    other two robberies.  I ask you and I tell you, you cannot do

4    that.

5           So when you look at the Navy Federal Credit Union,

6    well, we have someone, the last witness, Ramon Calderon, who

7    said he is standing outside.  And this is the statement -- he

8    didn't give this statement to Mr. Wood to help Mr. Reed on

9    December 22, 2012.  He didn't give it to my investigator.  He

10   said the police were badgering him.  The police were just doing

11   their job.

12          And what was the description he gave the police on

13   December 22nd of the person who was in the car and is the

14   getaway driver?  He says the person has dreads.  Mr. Reed -- you

15   can look at his arrest photograph -- does not have dreads.

16          He says that the person had a black and white

17   Muslim-type scarf on his head.  Well, when Mr. Reed is arrested

18   by the police, there's no black and white Muslim-type scarf with

19   him.

20          He says that the person who's driving that car has a

21   black jacket with red in it.  There's a picture in the

22   government's evidence, in those booklets they'll present to you,

23   and you can look at the black jacket that Mr. Reed is wearing at

24   the time of his arrest and there is no red in it.  So there you

25   have the only witness who gives a description of a getaway

1  driver in any of the three robberies, and sure enough, the

2  description doesn't match Mr. Reed.  That, I submit, ladies and

3  gentlemen, right away should give you pause.

4      Then look at the other thing in the robbery.  I mean,

5  in the cell phone records for the first two robberies, they want

6  to say, well, the activation of the cell phone 240-355-8256

7  shows that the cell phone is near the scene; by inference,

8  Mr. Reed.  He is not the registered owner of that cell phone.

9  We don't know if this cell phone is shared among a number of

10  people.  But sure enough, there's no cell phone usage by

11  Mr. Reed around the time of the Navy Federal Credit Union

12  robbery.

13      And if we listen to Officer Horan -- or Agent Horan, he

14  says, you know, I've exonerated people because I found that

15  their cell phones weren't used at the time they committed a

16  homicide in D.C. or a bunch of burglaries in Ohio.

17      So we don't have the cell phone records in the Navy

18  Federal Credit Union robbery.

19      Now, they're telling you, ladies and gentlemen, that

20  they have other evidence in terms of the Navy Federal Credit

21  Union.  Well, one key piece of evidence which -- I don't know if

22  the government overlooked this; they probably didn't, but they

23  didn't want to mention it -- is that in the Navy Federal Credit

24  Union, how much money was taken in the robbery?  As I recall, it

25  was 60,000 plus.

1          How much money was recovered?  I think there's $10,000

2     in the woods and there's like $19,000 in the house, a house for

3     which, ladies and gentlemen, you have no association with

4     Mr. Reed.  It's not his house.  There's no mail matter belonging

5     to him in that house.  There's not one witness who's ever seen

6     him in that house.  But in those two locations, we have money

7     amounting to about $30,000 and $60,000 was taken in the robbery.

8     So where did the other $30,000 go?  Where did it go?  Did it

9     just disappear?  Just walk away from the area of 38th Street?

10    Or did the $30,000 leave the scene with the getaway driver?

11         Because, you know, we know from the Navy Federal Credit

12    Union that a car is used.  It's found abandoned, running, by the

13    police, I think, on that day or maybe later in that day.  So we

14    know that a car was taken from where the black Jeep was

15    abandoned on December 22nd.  Another car must have been used as

16    they're going along Route 66 back toward the 38th Street

17    address.  So that's a different car.

18         That car is driven by the getaway driver.  That getaway

19    driver had dreadlocks, that getaway driver had a black jacket

20    with red on it.  And that getaway driver has $30,000 that he

21    left with on that day.  That's what the evidence shows.  That's

22    what the evidence shows.

23         So the $30,000 -- you know, you hear this phrase all

24    the time: follow the money.  Any criminal investigator goes,

25    follow the money.  The money will lead you to someone who's

1    involved in the robbery.

2          So you follow the missing $30,000, and you know it's

3    not found on Mr. Reed because when Mr. Reed is arrested by the

4    police, he has a gun?  No.  He has a screwdriver allegedly found

5    on him and he has some dollars.  That's it.  That's the evidence

6    against Mr. Reed.

7          And they talk about, well, we have some DNA.  Because

8    they don't have fingerprints.  They don't have -- again,

9    consistent with all these robberies, they don't have him with

10   any weapons.  They have some -- allegedly have some DNA, and

11   what you find is that the DNA is on a mask and some gloves.  The

12   DNA is on the mask and the gloves.  The interesting thing about

13   that is that on the DNA, they're labeling him a major

14   contributor with minor contributors.

15         The DNA expert says, well, I can't tell you when it got

16   there, I can't tell you how much of it is there, I can't tell

17   you who wore the hat or the gloves more than another person, I

18   can't tell you who had it first.  I can't tell you any of that.

19   I can tell -- basically, they can say Mr. Reed's DNA found its

20   way on a mask and some gloves.  In relationship to the robbery?

21   Did they have anyone identify, oh, this is something that

22   Mr. Reed was wearing?  These were gloves that Mr. Reed was

23   wearing?  No.

24         So what they want you to do in these cases, ladies and

25   gentlemen, is take a leap of faith.  And not to criticize a leap

1  of faith.  I think in a religious context it's probably the way

2  to go, to make the leap of faith from a fact to a belief.  In a

3  criminal context, you can't make a leap of faith.  You have to

4  have facts that lead you one by one to guilt beyond a reasonable

5  doubt.

6         There's no leap of faith in the law.  It's evidence

7  proving guilt.  If you don't have facts, you can't make the

8  leap.  But they want you to make the leap by saying, well, you

9  know, Mr. Reed is found with three other people.  Mr. Reed is

10 arrested in the woods.  Therefore, we want you to make the leap

11 of faith that he must have done the VVM robbery, that he must

12 have done the Shoppers Food Warehouse robbery, that he must have

13 been in possession of a gun during all these events.

14        I submit, ladies and gentlemen, that when you analyze

15 this case -- and please, when you go back and begin to

16 deliberate, take your time.  I mean, I know the case has moved

17 along, actually, pretty fast for a three-robbery case with four

18 individuals charged and a lot of lawyers doing a lot of

19 questioning, but take your time back there.

20        We ask you to give Mr. Reed individual attention, not

21 because he's a special guy, but that's what he deserves.  That's

22 what anyone deserves, special consideration of the counts

23 against him.  And we think and we know that when you do that,

24 you will be convinced that my client is not guilty of all the

25 charges.  Thank you very much.

1          MS. VANLOWE:  Good morning, members of the jury.  As I

2     said to you before when we began, Mr. Winston and I do really

3     appreciate your attention to this matter.  It's not easy being a

4     juror, and we appreciate you sitting for us throughout this

5     trial.

6          It's a difficult situation to be a juror because you

7     sit kind of in judgment of someone, and you've never met them

8     before and you've never spoken to them.  And in Mr. Winston's

9     case, you'll see that he's a 21-year-old gentleman who this case

10    affects a great deal.  Your decision today is going to have a

11    great deal of effect -- or decision tomorrow, whenever, take

12    your time -- is going to have a great deal of effect on

13    Mr. Winston's future and is going to have a great deal of effect

14    on Mr. Winston's family's future.  So it's very important in

15    this particular case for you to consider all of the evidence and

16    to take everything into consideration.

17         Now, the way that the government has presented this

18    case, they've kind of said that there are four individuals.  And

19    we've heard from -- we've heard different identifications of

20    people that seem to be taller than others or shorter than

21    others, and we have brown skin around the eyes where the masks

22    were seen, and we have a person coming in saying that they were

23    black, and we have another person coming in that says that they

24    sounded black, their voices sounded black.  We have someone that

25    came in and said -- two people that came in and said that they

1    thought that they saw an outline of dreads underneath a mask and

2    underneath a hood.  And we have cell phone records and we have

3    DNA evidence.  So therefore, when you listen to Ms. Bellows,

4    wow, that's a lot of stuff.

5         And you could certainly take that approach if you like,

6    but that wouldn't really be upholding the duty that you have as

7    jurors, and it would also be kind of ignoring the entirety of

8    the evidence that's behind the witness chair there, the

9    notebooks of exhibits, and the number of people that have come

10   before you over the last two to three days and testified in this

11   case.

12        Ms. Bellows talks about descriptions, that these

13   individuals fit the descriptions to a tee, and she keeps talking

14   about fitting the description.  You hear that phrase on the

15   news.  You hear this kind of generalized -- the race of the

16   person, they're like 5 foot to 6 foot, and they fit the

17   description, and this person fits the -- if you find somebody

18   that fits that description.

19        That's not the way you analyze a case if you're looking

20   at it under the standard that you're required to, which is

21   beyond a reasonable doubt.

22        You're not looking at whether or not these four people

23   could fit the description of the individuals that were talked

24   about in the robberies or that you saw in the robberies.  We're

25   not asking whether they could fit the description.  That's not

1    what we do to determine what is beyond a reasonable doubt.

2            What you have to determine in that type of standard is

3    whether or not these four people, and specifically Stanley

4    Winston, is the person that committed the offense beyond the

5    exclusion of everyone else.  You have to know that beyond a

6    reasonable doubt.

7            You can't say, well, he fits the description maybe of a

8    person.  You have to say he's the one that did it and I believe

9    he did it beyond a reasonable doubt.  I don't have any thoughts

10   that somebody else did it.  I don't think that there are other

11   people in pictures that also fit the description.  It was him.

12   That's what you have to come to a conclusion about.

13           Now, what did the government give you?  And as I said,

14   these pieces of evidence, the testimony that you have before

15   you, they are pieces to a larger puzzle, and the puzzle is

16   the something that the government has to prove and has to

17   assemble for you.  They have to put all of that evidence

18   together and make it work and put it into three different

19   puzzles that are VVM, Shoppers Food Warehouse, and Navy Federal

20   Credit Union.

21           The puzzle pieces can't be almost there.  They can't

22   kind of fit.  To make a puzzle work, they have to fit.  And when

23   you look at this evidence, you are going to find in trying to

24   put these puzzle pieces together, this evidence together and

25   make it work, that there's a big gaping hope in each of these

1    puzzles, and that is, who committed this offense?  Ms. Bellows

2    was exactly right.  This is about identification.  Who did it?

3        So the government comes before you and they give you

4    evidence that's supposed to say who did it.  Right?  They put on

5    Mr. Inn, the very first witness that came before you.  And what

6    did he say?  He said there was a person standing over him near

7    the information desk, that he was hovered over them.  Didn't say

8    the race of the person.  Said that they were probably about --

9    the skin color of the person.  Said they were about 5-foot-5 and

10   said that they had -- he had a dread hanging down.

11       And I asked him, well, did you see the hair?  Well, no,

12   I didn't see the hair.  I said, well, was it -- he said that the

13   person was wearing a mask with three holes in it.

14       Now, you remember, if you remember back to the opening

15   statement, Ms. Giles promised you that you were going to hear

16   nothing but masks with a big hole in them in the front.  Right?

17       But Mr. Inn actually testified that this was a mask

18   with three holes in it, two eyes and the mouth.  And I said,

19   well, you saw a dread.  Was it poking outside of the eye hole?

20   Well, no.  Well, was it poking outside of the mouth?  Well, no.

21   Well, then where did you see it?  Well, it was underneath the

22   mask that was underneath a hood and so I saw a little outline

23   there.

24       Well, you've heard that Mr. Winston has a tattoo on his

25   eye, right, that would have been exposed in an eye hole.  Did

1  Mr. Inn tell you about that particular detail?  No, he didn't.

2  Supposedly, Mr. Winston was leaning right over him, but we

3  didn't hear about that.

4        Interestingly, you also heard the very last witness of

5  the trial today talk about a man with dreadlocks, and he was

6  apparently outside in the car.

7        So where was the guy with the dreadlocks?  Was he

8  inside at the information desk?  Was he outside in the car?

9  Where was he?  Do we really have an understanding of what the

10  individual looked like in that?  No.

11        Then we talk about VVM.  Did anybody give you any

12  description of the skin color of the individuals in the VVM?

13  Not a single person.  Did they talk to you about the heights of

14  these individuals?  Did they talk to you about the builds of

15  these individuals?  No.

16        Shoppers Food Warehouse, same thing.  And this is kind

17  of the difficulty that the government has when they go about

18  making arguments but are not keyed into what the evidence is.

19  Because Ms. Bellows told you that the woman that came in and

20  talked about the skin colors said one was darker than the other,

21  one was darker and one was lighter.  That's not what she said.

22        She said that all of them were African-American.  That

23  was her testimony.  She didn't get into skin colors and shades.

24  She was asked if they were African-American, and she said, yes,

25  they were.  And when she was asked to describe anything else

1  about them, she said that one was climbing the wall.  She said

2  there were two down below, and she said they were differing

3  heights.

4          Does that allow you to have a description of who came

5  in the Shoppers Food Warehouse on this day?  Do you think there

6  are other black individuals in this courtroom that may be of

7  different heights that are sitting here besides the one at the

8  table here?  Yes.  You've seen them walking around as you came

9  here to the courthouse today, as you left the courthouse, as you

10  go in your average life.  You've seen individuals that fit this,

11  quote/unquote, description, and they're not sitting here at the

12  table.

13          So then you have kind of an absence of an actual real

14  identification here.  You have the government that's going to

15  promise you that there are other ways that you can identify

16  these people.  Okay.  First they talk to you about the guns, and

17  they say you're going to know who had the guns when.  They start

18  with the Navy Federal Credit Union and they say, well,

19  Mr. Winston is the one at the information desk and he has the

20  long magazine.  Then the other two have the other guns, and one

21  of them has a big barrel.

22          You watch the video, see that video again, because when

23  you look at the VVM video and you look at the Shoppers Food

24  Warehouse video, you're going to notice that you don't ever see

25  those guns again, never again.  But they have got 924(c) charges

1  that require them to prove that each one of these individuals,

2  especially Stanley Winston, had a gun in their hand and that

3  you're going to be able to identify which gun with which person,

4  because that's what you have to do to be able to convict them of

5  these gun crimes.  You have to make sure that you can know that

6  the person that they're saying had the gun had -- actually had a

7  gun.

8           You had the woman at the Shoppers Food Warehouse.  When

9  she was talking about the guns and she was describing them, she

10 said that they were silver.  Well, see if, when you look at

11 these guns, you see any silver guns in the evidence.

12          And then in the VVM case, was there any description of

13 any gun?  Well, no.  They said they had guns.  Did they describe

14 any of these guns?  No, they didn't.  So those are the guns that

15 they said they were going to attribute to each of these

16 individuals.

17          Then they said, well, you'll know that it's them

18 because these individuals immediately started running when the

19 police came.  Right?  Well, it didn't really happen like that

20 either.  Right?

21          The four guys walked down the street.  They were

22 walking towards Pope Street.  One deviated to throw something in

23 the trash, returned.  Police officer sitting right there, lights

24 going.  Right?

25          When they got to Pope Street, they turned, they walked

1    on Pope Street.  The officer followed them.  Parks his car, gets

2    out.  Says do you guys live around here?  Did they take off

3    running at that point?  No.  They stood; they answered his

4    questions.

5          He asked for ID.  Mr. Reed motioned and started

6    running, and after that, the three of them followed.  They said

7    that there was going to be a flight path with money on the

8    flight path.  The only person that was found with money on the

9    flight path was Mr. Reed.  He was the one with the money.  He

10   was the one with the GPS tracker in it that was supposedly

11   linked to the Navy Federal Credit Union.

12         Mr. Winston wasn't found with any money on the -- on

13   that supposed flight path.  And did they show you a flight path?

14   Did they show you a path through the woods?  No, they didn't.

15   And when the officer testified about what he did when he saw

16   Mr. Winston, he said that he was cooperative and he got on the

17   ground as he was asked to do.

18         So this immediate running from the police as an

19   indication that they did it, that also didn't happen.

20         And, oh, by the way, remember when Mr. Hunter asked

21   Mr. Mills if people are -- if this is the only time that people

22   have gone through those woods to be able to evade the police?

23   And what was his answer?  No.  They chase people through those

24   woods all the time.  And what did they find in those woods?  A

25   glove that had DNA that didn't belong to any of the individuals

1   in this case.

2        Is it possible that somebody else could have been

3   involved in dropping these masks and things in the woods?  It

4   certainly is.  Can you say beyond a reasonable doubt that it

5   wasn't?  No, you can't.

6        Now, they also said that they were going to give you

7   DNA.  You'll be able to tell because of the DNA.  Ms. Bellows

8   even today said, well, DNA -- Mr. Winston didn't want to be left

9   out of the party and so he left his DNA there too.  Very snarky.

10  Right?

11       Well, what did the -- if you listened to the witness

12  that came in and talked about mitochondrial DNA, one of the

13  first things she said was mitochondrial DNA is not identifying.

14  Let me say it again.  Mitochondrial DNA is not identifying.  She

15  said that the hair had characteristics of a person with African

16  descent, and then she went on to say that that DNA could have

17  belonged to at least 12 other people.

18       Well, in the gallery in the back here, sitting all the

19  way in the rear, we have a man with hair of African descent that

20  has braids in his hair and that is of dark complexion.  Did he

21  commit these robberies?  Do you know that he didn't, except for

22  the fact that the government says he did and that he's been

23  indicted and sitting at this table?

24       THE COURT:  Ms. VanLowe, it's time to finish up.

25       MS. VANLOWE:  I will.

1           And finally we get to the cell phones.  Now, Mr. Wood
2    has gone over the cell phones, but I will just say this.
3    Mr. Horan came in and he talked about how the cell phones are
4    exact science, and he was only really relating this because he
5    wanted to see where the phones were and it didn't have anything
6    to do with people.
7           And they were trying to sell you that, you know, we're
8    just doing these phones because -- we're just talking about this
9    information because we're just talking about the phones, we're
10   not talking about the people.  And then he presents you this
11   exhibit with all of the accuseds' names on it and starts talking
12   about, well, this is their phone.
13          You don't know whether it was Mr. Winston's phone or
14   not because there's subscriber information in the evidence that
15   you have that said it was a prepaid phone that didn't belong to
16   anyone.  But I'd like you to look at those exhibits that the
17   government gives you because Mr. Horan talked about a pie piece.
18   He talked about cell phone towers and pinging in the general
19   vicinity.
20          THE COURT:  Ms. VanLowe, you're not finishing up.
21          MS. VANLOWE:  I'm finishing up right now.
22          The important thing to remember is that in the VVM --
23   excuse me -- in the Shoppers Food Warehouse robbery,
24   Mr. Winston's phone was not there at all.
25          So we ask for you to find Mr. Winston not guilty of all

1  of the charges.  Thank you.

2        MR. ROBERTSON:  Ladies and gentlemen, I echo what

3  everybody has said, and thank you for your service.  Thank you

4  for doing this.  I know it takes a lot out of your life, and if

5  your office is anything like mine, everything is going crazy,

6  but you'll get to it.  You'll get back to it and will hopefully

7  get back to it quickly.

8        I want to touch a little bit on the phones, and

9  obviously you know what I'm going to touch on.  You heard me

10  bring the witness in who pointed out -- Exhibit 18.4, remember

11  that number.  18.4 is Stanley Winston's iPhone 4 records where

12  my client, Mr. Cannon, is listed as having the 212-510 number.

13  Well, it doesn't say Anthony Cannon.  It just says Cannon.

14  That's important, and we'll talk about that in a minute.

15        But then also look at 17.2.  Exhibit 17.2 directly

16  contradicts Exhibit 18.4.  17.2 has that same phone number, the

17  202-510 number, listed under Tobe, T-O-B-E.  I asked the agent

18  and the agent says, oh, well, you can't look at this stuff in a

19  vacuum.

20        Have you heard any other evidence that links that phone

21  to my client?  I haven't.  There wasn't any evidence introduced

22  that that 510 number belongs to Mr. Cannon.  The government

23  thinks it's Mr. Cannon's phone.  They want to accept that, and

24  that's why they made the pie charts and that's why the pie

25  charts have names and they don't have numbers.  That's why all

1    of those things, they say, oh, it's Cannon's phone, it's
2    Cannon's phone.  They brush over it like it didn't matter, but
3    it's an important point.  Their own evidence directly
4    contradicts their conclusion that that 510 number belongs to
5    Mr. Cannon.
6            And, oh, yeah, you have to look at it in a vacuum.
7    Mr. Hunter in his opening talked about code, and I'd say that
8    that's a nice gigantic piece of code.  That you need to fill in
9    the blanks, jury, get a conviction.
10           Don't take that.  They didn't prove it to you.  They
11   didn't prove that element.  But they didn't prove so many other
12   elements in this case.
13           They didn't tell you which business in VVM, Inc., was
14   robbed.  You heard evidence that there were three businesses.  I
15   don't -- the evidence doesn't -- isn't clear as to which one of
16   those three businesses was robbed.  I don't know if VVM is the
17   landlord and has subleased these other three businesses to open
18   in there.
19           But you heard the purse lady.  She goes home at 6:30.
20   She wasn't there.  You heard that Mr. Hassen said, well, I don't
21   work with the woman behind the counter.  She works for a
22   different company than me.
23           He says I work for or I work with.  We don't even know
24   what business he works for.  All we know is that they're in a
25   building.  They're in a space where, not the outside says VVM,

1   but the inside door says VVM, Inc.  That picture is in evidence

2   and you can see it.

3        Look at the videos of the robberies, and all three

4   robberies have gigantic differences.  In the VVM robbery and in

5   the Shoppers Food Warehouse robbery, completely different

6   firearms.  I was in the military, and I like to look at firearms

7   and I take my kids out shooting every once in a while.  And you

8   know, I like to think that I know a little bit more than the

9   average person about firearms.

10       One of the firearms in the VVM robbery has a silver

11  slide on the top of it and the rest of it is black.  None of

12  these match that description.

13       In the Shoppers Food Warehouse robbery -- if I can hold

14  up one of these exhibits, Your Honor -- you don't see this in

15  the VVM and Shoppers Food.  And I have news, if you were robbed

16  with this, you would know it.  You would be able to say that

17  this was the gun.  It's not in the VVM.  It's not in the

18  Shoppers Food.  It's a pretty distinctive weapon, and they knew

19  it.

20       But let's get to Navy Federal because I want to just

21  hit on the big things.  The Navy Federal robbery, they follow

22  the GPS tracker back to 1501.  No, I'm not conceding that 1501

23  is Mr. Cannon's house.  He told his probation officer -- and the

24  exhibit that you have for that is 22-6.  It says his conviction

25  date was in April of 2010.

1          The interviews and when he interviewed with his

2    probation officer and what he said at his probation officer's

3    interviews, I don't know exactly when they occurred.  I'll leave

4    that to your memory as to what you remember the probation

5    officer saying.

6          But if my client lived at 1501, wouldn't there be more

7    than one piece of mail?  Is everybody that assiduous that would

8    go through all their mail and throw it away if it's junk mail

9    and make sure it's all gone?  Is it conceivable that two years

10   later some mail at one of your old addresses is still there?  It

11   is.

12         Mr. Winston, when he's arrested, says, well, I pulled

13   up to 1501, and there were six other men there when I got there.

14   And he gets there at 11:00, after the robbery occurs.

15         They didn't contradict that testimony.  The way they

16   contradicted that testimony is trying to say, well, he was

17   really with the robbery at Navy Federal Credit Union, but they

18   really don't contradict his assertion that there were six people

19   there when I got there.  There were six guys there.

20         Now, out of the seven guys that were at 1501, have they

21   really shown that these particular four were involved in the

22   Navy Federal robbery?  Did they show you what flight paths each

23   one took?  Ms. VanLowe kind of touched on that just to -- they

24   don't know who went where in the woods except for Mr. Reed.

25   Mr. Reed was the only one who looked like he was hiding

1    anything.  They -- none of them really hit anything very well.

2          I wanted to also point out something that Mr. Horan

3    said that I thought was very interesting.  Mr. Horan likes to

4    talk -- talked about how out of the hundreds of cases he had, he

5    did two exonerations, and one was really only a partial

6    exoneration because it only excluded the guy from some of the

7    crimes, not all of the crimes in the case.

8          Well, Mr. Horan -- Agent Horan -- let me point out he's

9    an agent -- exonerates every single one of these defendants at

10   one point or another in this case.  If you want to use the

11   language he used, he exonerates Dyer, Winston, and Cannon from

12   each of -- one of those robberies.  And the first question the

13   government had when they came up to redirect him was, well, were

14   they anywhere else?

15         It kind of reminds me -- and this is an old story.  I'm

16   sure you-all have heard me say this before.  I use an example

17   called -- from the movie *Dumb and Dumber* where Jim Carrey is

18   talking to his love interest and he says, will you ever go out

19   with me?  And she says, I wouldn't go out with you unless you

20   were the last man on Earth.  And he says, oh, so you're telling

21   me there's a chance.

22         That's what the government has kind of done.  They've

23   kind of -- they've taken disjointed pieces of evidence and

24   they've kind of lumped it together to say this is what it must

25   be.

1          Well, that's not proof beyond a reasonable doubt.  That

2    doesn't prove anything that we've got.  You have to wonder if

3    that house is where my client lives.  25 different items -- this

4    is what Ms. Kehl testified -- that 25 different items were

5    tested for DNA, yet there was only really a DNA match on one

6    item.  I don't know if that was the only number that she did,

7    and 25 seemed a little bit low.

8          Kira Glass said she looked at 60 -- 60 fingerprint

9    examples collected at various places in this case and only eight

10   matched any of the defendants, seven for Mr. Winston, one for my

11   client.  If my client lived at 1501, wouldn't there be more

12   fingerprints?  Wouldn't there be more DNA?  Wouldn't there have

13   been more of everything?

14         Those are the -- I don't want to take too much time.  I

15   just kind of want to put it out there.  But there's no

16   fingerprints from the scenes, there's no shoe print matches from

17   the scenes, there's no DNA from the scenes.  Ms. Jones from

18   Shoppers Food Warehouse, the woman who testified very

19   compellingly as to what happened to her, didn't ever see skin.

20   Ms. Freeman tells you they all had silver guns.  Ms. VanLowe

21   touched on that.

22         And so I am going to -- I'm going to close up and

23   simply ask you that the evidence here isn't enough.  They

24   haven't linked that phone to my client.  They can't, therefore,

25   say, oh, well, that must be his phone and he must have been

1    there.  Because that phone doesn't match my client.  Their own

2    evidence contradicts it.

3           They can't prove that the robberies were committed by

4    these guys.  They can prove that it might have happened with

5    seven guys who might have been around the Navy Federal Credit

6    Union robbery, but they have nothing to show.  The robberies are

7    so very different when you look at what they're wearing and how

8    they're wearing it.  The mask that they found my client's DNA on

9    isn't a one-hole mask like the masks that were used in the

10   robberies.  Where's the yellow jacket?  I mean, I keep on

11   thinking of all these things I want to say, and I know you heard

12   it all.

13          But with so much stuff that they haven't proved, you

14   can't say that these men committed this crime beyond a

15   reasonable doubt.  That's what it means.  That's the protection

16   that the U.S. Constitution -- not some legal technicality -- the

17   U.S. Constitution says you have to prove this by.

18          Thank you very much.

19          MR. HUNTER:  Good afternoon, ladies and gentlemen.

20          I'll introduce myself again.  I'm Greg Hunter.  I

21   practice here in this court and other courts around.  This court

22   is the great privilege that I have as a lawyer.

23          I know it looks like we've been fighting this week, and

24   we have, but these two attorneys and this terrific judge are

25   really a big reason -- and all the rest of the staff here -- why

1  it's such a privilege for me to practice in this court.  They

2  really are that good.

3       The government though started this case with a promise.

4  They told you a story about a robbery and a chase, and then an

5  investigation that led to two more robberies.  There's no doubt

6  that these three robberies occurred.  We've all said that to

7  you.  I told you that when we started.  Ms. Bellows told you

8  that today on closing.

9       Their burden was to prove not just that the robberies

10 occurred, but that my client, Tobias Dyer, sitting here in the

11 back row, is guilty beyond a reasonable doubt.

12      Their promise was that they would show you evidence

13 that would leave you absolutely convinced not just that he's

14 guilty, but the promise she made, Ms. Giles made, was that you

15 would know that Mr. Dyer was the man standing on the teller

16 counter of the Navy Federal Credit Union, holding that

17 distinctive-looking gun that's in this box, and that the GPS

18 trackers would lead to him like a trail of bread crumbs.

19      That promise doesn't mean much.  First of all, it's not

20 evidence, and the judge is going to tell you that in the jury

21 instructions.  The testimony of the witnesses and the items

22 they've brought with them are the evidence.

23      The fact is they just didn't deliver.  And I'll take

24 this story from the back end.  It's easier to explain that way.

25 They have my client being arrested in a park in D.C. after the

1  Navy Federal Credit Union robbery.

2        He's lying on the ground.  He's answering the

3  instructions of the police officers.  He's not fighting anybody.

4  Officer Mills testifies that before that he had encountered four

5  men on Pope Street, seen them walk down 38th Street, turn left

6  on Pope, and that after a brief encounter, when one of them

7  started to run -- not my client -- this chase ensued.  He wasn't

8  able to keep up.  He only heard running once he entered the

9  park.  He identified the defendants in the courtroom, which I

10  guarantee you every one of you did before this case even

11  started.  It's not a real tough thing to do.

12        And when I asked him do you know my client's name, do

13  you know which one is which, he was absolutely unable to tell us

14  that.  All he could say was that one of these guys was husky and

15  tall, which is not my client, one was shorter with braids, which

16  is not my client, and that there were two others.

17        Officer Johnson didn't see them run, and he couldn't

18  identify my client either.  He only sees them later, lying on

19  the ground, listening to another officer's instructions.

20  Interestingly enough, Officer Mills tells you that this distance

21  here is about 2,000 feet, and Officer Johnson tells you that

22  it's something less than 300.

23        Both officers testified that they had chased other

24  people through this park before, that they hadn't inspected the

25  park earlier that day, that the park was not secured by other

1    officers until after this chase had started -- other officers

2    had to secure the back side of the park -- and that people can

3    run up the hill and escape across the street.

4         Neither of these officers saw Mr. Dyer, or really

5    anybody else, tossing any money or hiding things under logs.

6    There was some allegation that Mr. Reed did some of that, but

7    nothing from Mr. Dyer.  And neither of them ever saw my client

8    with a mask or a GPS tracker or money or anything associated

9    with this Navy Federal robbery.

10        Remember, the GPS trackers that they said would be the

11   line of bread crumbs, if that's true -- and I would ask you to

12   look, when you're back there, at 3-4, which is the final map of

13   these trackers -- why doesn't this map, with men walking with

14   GPS trackers, as they're alleging, go down 38th Street and up

15   Pope Street towards the park the way they say it happened?

16        That's a problem that I have.  Why is that line on the

17   map different than the path that Mills and Johnson describe?  Is

18   it possible that other people carrying this money ran along this

19   line and that it's not these four men?  Or that Mr. Reed started

20   running that direction knowing that the real robbers were in the

21   park?

22        It might explain why the gloves they find in the park

23   have somebody else's DNA on the inside of them.  And then the

24   house gets searched.  My client doesn't live there.  Not his

25   house.  No one ever said that he's lived there.  Money is found

1   without fingerprints or anything else that link it to Mr. Dyer.

2         The guns are found.  No fingerprints or anything else

3   that link them to Mr. Dyer.  Sure, it's a very distinctive

4   weapon.  It's almost certainly the same weapon used in the Navy

5   Federal robbery, but there's no evidence of it.

6         And when asking their fingerprint technician, she says,

7   well, we don't really get guns having fingerprints on them, the

8   slides go in and out and there's surfaces, but we've all heard

9   of guns being identified with fingerprints and there just aren't

10  any here.

11        They collect a lot of other things that day.  They have

12  this army of policemen and FBI agents and crime scene

13  investigators, these dedicated professionals who can pick up

14  everything, but they don't really pick up anything else.  They

15  find eight masks, and they keep telling us -- she told you the

16  first day that it's eight masks, four men, three robberies.

17  That's the explanation.

18        But one of them has a mixed DNA print that ties it to

19  Dyer, and that's about it.  Their hair expert testifies that a

20  stretchy cloth hat, like these masks, would likely have hairs in

21  it if it's worn.  My client, as you can clearly see, has hair on

22  his head and hair on his beard, and there are no hairs found

23  despite the fact that dozens of hairs are recovered and tested.

24        The DNA expert -- and we expect DNA experts to give us

25  numbers like 1 in 6 trillion.  That's the number she said.  1 in

1    6 trillion is that number they're looking for.  But, you know,

2    you look at these samples and the numbers are so much smaller.

3    She's got lots of mixed samples.

4         She testified on my cross-examination and other

5    cross-examination about the contamination of things touching

6    each other, of multiple items being packed in the same boxes, of

7    not being able to tell where on an item that DNA came from

8    because you just swabbed all over it, of having problems like

9    two people could handle an item for differing amounts of time

10   and one could deposit a lot more DNA on it than another.

11        She gave us numbers that left a lot of these samples

12   consistent, not just with one or more of our clients, but with

13   broad majorities of white people, of African-Americans, of

14   southeastern Hispanics and others.

15        And this blue bag Officer Mills testifies that he found

16   and they have fingerprints.  Remember when I asked the

17   fingerprint examiner about those partials and how she knows

18   those partials match my client's fingerprints?  She said, well,

19   I prepared a report, prepared a comparison sheet.

20        They never thought it was important enough to bring it.

21   Why is that?  Did they just not want you to see this

22   inconvenient fact, take their word for it?

23        When we look at what happens at the bank, Ms. Lopez,

24   the bank manager, and the teller, Ms. Hablenko, both testified

25   that the man on the counter, the man Giles claims is Mr. Dyer

1    was on the counter, which is why Officer Wenmoth recovered the

2    shoe prints.  They never asked him about the shoe prints.

3    They've had them in evidence.  They didn't think it was

4    important.  It's five more pieces of paper.  It's another few

5    seconds from a witness.

6              You know who thought it was important?  All of these

7    agents out here who seized literally dozens of pairs of shoes

8    looking for those prints.  Wenmoth told you, you find the man

9    who wore those shoes, you've got your robber.  And they never

10   found those shoes.

11             What we have here is the government trying to say we

12   caught this guy at the bank.  It has to be him.  It has to be

13   him because we have this stuff in the woods.  It has to be him

14   because he's wearing a white T-shirt, and the man who jumps off

15   the counter is wearing a white T-shirt.  Please tell me that's

16   not all of their case.  I'm wearing a white T-shirt.  How many

17   of the rest of us in here are wearing white undershirts today?

18             Do they have prints on the gun?  That would be great.

19   Do they have the shoe print?  That would be fantastic.  Do they

20   have another piece of clothing putting him there?  Do they have

21   his cell phone putting him in Arlington at the time?  They do

22   not.

23             So you look at the other robberies.  You don't have any

24   cell phone activity placing my client at Shoppers Food

25   Warehouse.  For hours he's not even in Virginia.

1       Their expert says, well, if he's not there, he's not

2   leaving any cell phone data.  They tell you, well, that's

3   because he's with these other people.  Is it possible that at

4   6 o'clock in the morning on a Sunday to 11 o'clock in the

5   morning on a Sunday that maybe he's at home in bed?

6       And this cell phone stuff, to begin with they tell you

7   that this phone just kind of appears.  She thinks that Officer

8   English recovered it, but Officer English is the officer who

9   transported Mr. Reed and recovered his phone.  The evidence also

10  supports showing that somebody else owned that phone, that it

11  was in somebody else's name on the account.

12      So what we're left with here is an allegation that the

13  MO is the same, the MO was the same.  Well, the guy in the

14  yellow jacket isn't here.  The fingerprints, the shoe prints,

15  they aren't here.  I have to ask you, is the MO the same?

16      Stolen Jeeps were used.  Three men entered with guns.

17  Two men took care of the crowd, another man went for the -- for

18  the big money, but the weapons are different.  One is a bank in

19  an Arlington office building.  One is a grocery store in a strip

20  mall in Alexandria.  One is a check cashing store in Annandale.

21  One of the robberies is in the middle the day.  One is at the

22  crack of dawn.  One is at 8 o'clock at closing time.  Witnesses

23  saw different guns.

24      And while all three Jeeps were found abandoned with

25  punched ignitions, the car theft detective noted that was

1    common.  And while two of the Jeeps were abandoned near the

2    robberies, one of them is taken back to the same street in D.C.

3    where it was robbed from, where it was stolen from.  They are

4    telling you that these crimes are common, but they're really

5    not.

6            So what I'm asking you to do is wonder about the phone.

7    How can they have it that the phones prove they're there and

8    when they're not there?  Well, obviously, that lack of evidence

9    is also evidence that they're not there.  It's really tough.

10           When I asked about the records, I asked their expert

11   about the records that proved who sent what text and who owned

12   each phone.  I asked him about numbers sending texts and numbers

13   that received texts from the phone they say belongs to my client

14   indicating that other people used it.  He didn't bring that part

15   of the report with him.  Maybe he didn't even read that far.

16           Why didn't the government ask you about that?  I'm

17   sorry.  Why didn't the government tell you about that?  Doesn't

18   help.

19           So I would ask you to ask yourself if you're convinced

20   beyond a reasonable doubt, not just that he committed every

21   element of every crime, but that he's the one standing on the

22   counter in the bank that day holding that distinctive-looking

23   gun.

24           Ask yourself if those photos show you that it's him and

25   no one else possibly in the world.  If you think it's him, ask

1   why there's no shoe prints to match the shoe prints recovered by

2   the police and why the government never mentioned those shoe

3   prints.  The agent sure thought those were important.

4        Ask yourself if the white shirt that a black man is

5   wearing in both the photos and the arrest photos is enough to

6   make him the same man when they don't have the phone records

7   placing him in the bank, the hair, the DNA, the fingerprints, or

8   other evidence that would place him there.

9        Wonder where that yellow coat is and how that man got

10  away with the 30,000 missing dollars and in what vehicle.

11       Ask yourself why that tracker map of the GPS trackers

12  doesn't go up Pope Street the way the D.C. police described

13  these men going if they were carrying the money.

14       Ask why they didn't produce the fingerprint comparison

15  sheet if it's so clearly Mr. Dyer's prints.  One more piece of

16  paper from a witness that they already had on the stand.  They

17  are not afraid of producing paper.  We're sitting under

18  mountains of paper.  We spent three-and-a-half days so far

19  listening to people talk.  They don't mention that at all.

20       Ask why there weren't more prints to examine, more DNA

21  to examine, more hairs to examine if these are their items.  If

22  gloves are the answer, why are other people's DNA recovered in

23  those gloves?

24       Ask why they didn't do a better job of showing you that

25  chain of custody, why the phone they say is his just kind of

1  magically appears at the D.C. police station.  They can't tell

2  you if it was taken from him, from his person, out of his

3  pocket, found in the park, found in the house.  They have no

4  idea.

5      Ask yourself if all of this evidence and all of these

6  questions that I've suggested to you, and any other questions

7  that you've heard from counsel or thought of yourself, ask

8  yourself if you can get beyond that.  I sure hope you can.  I

9  sure hope there's something in each one of your minds that's

10  saying, you know, I wish they had answered that.  I wish I know

11  why they didn't tell me that.  And not just on one element and

12  not just on one crime, but all of them.

13      And I thank you.  I cannot say it enough.  I thank you

14  for your time and attention in this case.

15      MS. GILES:  Let's just start with the misstatements.

16  These defense attorneys have completely misstated the law.

17  These individuals, these defendants, are charged with a

18  conspiracy, and they're charged with being aiders and abettors

19  as well.  They are responsible for every single weapon that was

20  used in this case.  It doesn't matter if it's a weapon they held

21  in their hand or if it's a matter -- the weapon their

22  codefendant wielded.  They are responsible for each and every

23  weapon in each and every count.

24      It's only one robbery that we have charged specific

25  weapons, and that is Navy Federal Credit Union.  That is

1  because, just as they stated, these weapons look distinctive.

2  The barrel with the hole, that big drum-style magazine.  Yes,

3  when you see those weapons in the surveillance video, you will

4  know that those are the weapons that were used in that robbery.

5  They are charged specifically only with those two guns and only

6  as to the felon in possession charges.

7       Now, about these other guns.  You're going to have the

8  surveillance with you in the back.  You'll be able to see them

9  holding guns.  And, no, we're not arguing or suggesting that

10  these two distinctive weapons were the ones that were used in

11  those other robberies, but look at the photographs on their

12  phones.  They show other weapons as well.  These are in

13  evidence.  Even at Anthony Cannon's house there was a plastic

14  bag with other magazines in them for other weapons.

15       This is the photograph, the exhibit -- sorry it's so

16  small -- of that Smith & Wesson black handgun that was recovered

17  from the closet in Anthony Cannon's house.  And in those

18  surveillance videos, when you look at them, ask yourself, don't

19  you see a black gun?  They're charged with each and every

20  weapon.

21       Mr. Reed doesn't get a pass because he didn't go inside

22  of these locations.  He doesn't get a pass because he sat in the

23  car.  He was responsible for those weapons as well.

24       Now, Mr. Reed is not here as a matter of convenience.

25  He's here because he's a conspirator with everybody else.  They

1   talk about identification.  His DNA is on a mask that's in the
2   woods, and it's also -- he was a potential source of mask -- of
3   the DNA on a mask in the trash can outside of Anthony Cannon's
4   house.  Two masks, his DNA.
5           They talk about, well, there are no fingerprints.
6   They're in the robberies with gloves.  You see them in the
7   surveillance.  They're masked up, they're gloved, and they're
8   dressed, and they're covered.  There's not going to be DNA and
9   fingerprints everywhere.
10          But you've got some in this case still.  You have every
11  one of them linked to a mask.  You have Tobias Dyer's
12  fingerprints on that blue bag that is seen dropped on Pope
13  Street.  Then you have their fingerprints, Anthony Cannon's and
14  Tobias Dyer's fingerprints, on that other plastic bag that
15  contained the additional magazines.
16          No -- and he also doesn't -- yes, he was smarter.  He
17  didn't take a lot of pictures with him and his money like
18  everybody else did.  But he is the one, as Ms. VanLowe pointed
19  out, immediately right around him in that area -- I lost my
20  picture.
21          Immediately in the area around him, this is the
22  photograph of where that phone is recovered and the money.
23  Officer Singleton told you how that phone and that money was
24  right there.  So, yes, there are -- there is evidence of him
25  with proceeds of his crime.

1         As to Stanley Winston and this discussion about

2    ownership of the phones, let's not be silly about this.  The man

3    is arrested.  He's taken to the police station.  A phone is

4    recovered from his person.  During the course of his interview,

5    he asks the officers to make a phone call to his sister.  They

6    get the phone out of his evidence bag.  He gives them the pass

7    code to unlock the phone.

8         This is the same phone that has photographs of

9    Mr. Winston.  It's the same phone where he has texted people,

10   and in it he said, my name is Stanley, dummy.

11        I mean, this is his phone.  It is ridiculous to think

12   that just because someone purchases a prepaid phone that the

13   phone does not belong to them.

14        We all know that people may subscribe and purchase

15   phones for other individuals and the subscriber information may

16   belong to someone else, as in the case of the cell phone that is

17   ascribed to Tobias Dyer.  But, again, even in his phone, the

18   text messages, repeatedly he says his name, Tobias, Tobias,

19   Tobe.  In the phone there are countless photographs of him, and

20   this is the same phone that was recovered from him at the time

21   of his arrest.

22        They completely mischaracterize Agent Horan's

23   testimony.  He didn't exonerate or say that anyone wasn't at the

24   location of these robberies.  What he said was, in relation to

25   the Shoppers Food Warehouse robbery, that Stanley Winston's

1  phone and Tobias Dyer's phones were not active.  That doesn't
2  mean that those individuals were not in Virginia.  That just
3  means their phones weren't active so they can't tell where they
4  were.  He testified from the stand if he had had evidence that
5  could have exonerated them, he would have given that.  You did
6  not see that in this case.

7          You hear a lot about the fingerprints and the woods and
8  the foot path and why don't the trackers match the path.  Ladies
9  and gentlemen, this is that map that Mr. Hunter just showed you.
10 This is the tracker at the residence.  This is the woods area,
11 and you see two additional trackers there.  This is totally
12 consistent with what happened.

13         At the beginning of this case -- and, ladies and
14 gentlemen, the phones that these individuals have did contain a
15 lot of information.  They show photographs of them with proceeds
16 of the robberies.  They place them at certain robberies, at VVM.
17 Every last one of them is at a robbery.

18         Now, Mr. Hunter just stood up before you and said,
19 well, my client's phone wasn't there.  He was probably at home
20 in bed.  But that robbery happened at 6 o'clock in the morning.
21 At 4 o'clock their phones start talking to each other.

22         This is one of the charts that -- the summary chart
23 that is in evidence.  It shows the communications between these
24 defendants prior to that robbery.  4 o'clock in the morning,
25 they're up and they're all talking.  So, no, he wasn't at home

1  and asleep.  They're getting together and they're getting their

2  plan together.  His phone shows him the same day of the robbery

3  with proceeds from that robbery.

4       This is the conversation -- reflects the records and

5  the conversations these defendants had on December 7th, the day

6  of the VVM robbery.  Do you see all that -- all that

7  communicating?  And there's all this talk about, well, in

8  Stanley Winston's phone, you know, Anthony Cannon's number is

9  listed as -- in one place as Cannon, in someplace else this

10 phone is listed as belonging to Tobe.

11      The number of the phone that Tobias Dyer was found

12 with, the last four digits are 9022, and that phone calls the

13 number that is ascribed to Anthony Cannon.

14      Tobias Dyer would not be calling himself.  That phone

15 number belonged to Anthony Cannon.  It is listed in Stanley

16 Winston's phone as Anthony Cannon.  How someone else listed it,

17 we don't -- may not understand, but this we do know.  That it

18 was listed in Stanley's phone as Anthony Cannon, and that phone

19 was pinging at all these robberies.

20      We don't need to talk about how many other black men

21 may fit the description of the robbers.  Ask yourself, are those

22 other men, are they -- is their DNA on any of those masks?

23 Because we've proven that theirs is.  We've proven -- were their

24 phones pinging at these robberies?  Because we've shown you that

25 theirs were.

1       These are the defendants that are on trial.  This is

2   the evidence that we have presented you, and what we stood up

3   here and told you on day one we would present we have presented.

4   You will see the surveillance tapes.  You can judge for

5   yourself.

6       Witnesses on the stand, these nervous witnesses, scared

7   with these guns in their face.  Dimanche Inn may have thought he

8   saw a mask with two holes.  Look at the video.  You'll see it.

9   It is one hole.  In Shoppers, you'll see the robbers as they

10  enter.  You'll see two light-complected males and one darker

11  male.

12      You've heard repeatedly about these dreads and what

13  they -- Mr. Calderon did not testify from that stand that the

14  person that he saw in that car definitely had dreads.  He said I

15  told the police that.  He stated something else later on.  And

16  then he's up -- from the stand he said I really don't remember

17  the hairstyle.

18      What we do know is that this was the man in the woods,

19  and this is the first one who ran, and this is the one -- and

20  I'm pointing to Keith Reed -- with the screwdriver in his pocket

21  and his phone on the ground with a lot of money.

22      Mr. Hunter said that sometimes common sense is used as

23  a buzz word when the government just wants you to think about

24  the absence of evidence.  Sometimes common sense is just common

25  sense, and it is what you should bring to this case.  It's what

1    we all function on every day in our lives, common sense, logic

2    and reason.

3          And it would defy all three of them for you to believe

4    that four other men robbed Navy Federal Credit Union, went

5    tip-toeing through the woods sprinkling money and GPSs, and

6    somehow managed to sneak a GPS in Anthony Cannon's house along

7    with these two weapons, and just disappeared and somehow framed

8    these men and left these phones there linking them back to all

9    these other robberies when these are the men who fit the

10   description of the people who were inside those establishments.

11         Ladies and gentlemen, now is the time for a little bit

12   of justice.  You have the evidence, and it's time to find them

13   guilty of every count charged in this indictment.

14         THE COURT:  All right.  Ladies and gentlemen, it's now

15   time for me to give you instructions.  And I think the best

16   thing for us to do is to recess for lunch.  We've been sitting

17   here for a long time.  We'll come back and I'll instruct you.

18   It will probably take me 30 minutes to do that, I suspect.

19         The one thing I will do is, when we picked the jury

20   initially, since we were going over several nights, two of you

21   were picked as alternates in case someone should have some

22   problem or difficulty.  And now that we've finished the case,

23   you-all are not going to be able to take part in the

24   deliberations with the rest of the jurors.

25         Now, the two of you that were selected as alternates

1  were Anna Rhymes and Aria Aliaskari, if I'm pronouncing that

2  correctly.  Your service has been as important as anyone else's

3  to this case, but I will excuse the two of you now.  If you want

4  to come back later on and see what happens, that's perfectly

5  fine.  If you want to go, that's fine too.  But thank you very

6  much for your service in this case.

7        And the rest of you, why don't we try to come back at

8  1:45 and I'll instruct you and you can begin your deliberations.

9        (Lunch recess taken at 12:37 p.m.; the jury enters at

10  1:47 p.m.)

11        THE COURT:  Ladies and gentlemen of the jury, I hope

12  you can give me a little more attention.  I know you've listened

13  to a lot of arguments and a lot of discussion this morning, but

14  I will instruct you orally.  I will not give you instructions in

15  writing.

16        Now, it's your duty to the follow the instruction on

17  the law as stated by the Court and to apply the rules of law so

18  given as to the facts as you find them from the evidence in the

19  case.

20        You're not to single out one instruction alone as

21  stating the law, but must consider the instructions as a whole.

22  Neither are you to be concerned with the wisdom of any rule of

23  law as stated by court.  Regardless of any opinion you may have

24  as to what you think the law ought to be, it would be a

25  violation of your sworn duty if you ignore the law as I give it

1   to you and apply some other law.

2          It would also be a violation of your sworn duty as

3   judges of the facts to base your verdict upon anything but the

4   evidence in this case.

5          Now, Count 1 of this indictment charges that Keith

6   Reed, Stanley Winston, Anthony Cannon, and Tobias Dyer did

7   conspire to obstruct, delay, and affect commerce by robbery in

8   violation of the United States Code.

9          Now, Section 1951 of Title 18 of the United States Code

10  provides, in part, that whoever in any way or degree obstructs,

11  delays, or affects commerce or the movement of any article or

12  commodity in commerce, by robbery, or attempts or conspires to

13  do so, or commits or threatens physical violence to any person

14  or property in furtherance of a plan or purpose to do anything

15  shall be guilty of an offense against the United States.

16         Now, there are three essential elements of this offense

17  that the government must prove beyond a reasonable doubt.

18         The first is that two or more persons agreed to commit

19  a robbery encompassed within the Hobbs Act, which sets forth the

20  robbery statute;

21         Two, that the defendant knew of the conspiratorial

22  goal; and

23         Three, that the defendant voluntarily participated in

24  helping to accomplish the goal.

25         Now, a criminal conspiracy is an agreement or a mutual

1  understanding knowingly made or knowingly entered into by at
2  least two people to violate the law by some joint or common plan
3  or course of action.

4      A conspiracy is, in a very true sense, a partnership in
5  crime.  A conspiracy or agreement to violate the law, like any
6  other kind of an agreement, need not be formal, written, or even
7  expressed directly in every detail.

8      However, the government must prove that the defendant
9  and at least one other person knowingly and deliberately arrived
10 at an agreement or understanding that they, and perhaps others,
11 would violate some law by means of some common plan or course of
12 action as alleged in Count 1.  It is the proof of this conscious
13 understanding and deliberate agreement by the alleged members
14 that should be central to your consideration of the charge of
15 conspiracy.

16     Unless the government proves beyond a reasonable doubt
17 that a conspiracy, as I have just explained, existed, then you
18 must acquit the defendant of the charge in Count 1 of the
19 indictment.

20     Now, before the jury may find that the defendant or any
21 other person became a member of the conspiracy as charged in
22 Count 1, the evidence in the case must show beyond a reasonable
23 doubt that the defendant knew the purpose or goal of the
24 agreement or understanding and deliberately entered into the
25 agreement intending, in some way, to accomplish the goal or

1    purpose by this common plan or joint action.

2         If the evidence establishes beyond a reasonable doubt

3    that the defendant knowingly and deliberately entered into an

4    agreement to commit robbery, the fact that the defendant did not

5    join the agreement at its beginning, or did not know all of the

6    details of the agreement, or did not participate in each act of

7    the agreement, or did not play a major role in accomplishing the

8    unlawful goal is not important to your decision regarding

9    membership in the conspiracy.

10        However, merely associating with others and discussing

11   common goals, mere similarity of conduct among or between such

12   persons, or merely being present at the place where a crime

13   takes place or is discussed, or even knowing about criminal

14   conduct does not, of itself, make someone a member of a

15   conspiracy.

16        Now, Count 2 of this indictment charges these four

17   defendants with the robbery that occurred at VVM, Inc., on

18   Beauregard Street in Fairfax.

19        Count 3 charges the four defendants with the robbery at

20   Shoppers Food Warehouse on Jefferson Davis Highway.

21        Count 4 charges the four defendants with the robbery of

22   the Navy Federal Credit Union in Arlington.

23        And I'll send the -- you'll have the indictment back

24   there with you so you can read it in detail.  I'm just

25   paraphrasing it for you.

1        Now, the essential elements that the government must

2   prove beyond a reasonable doubt as to Counts 2, 3, and 4 are:

3        One, that the defendant took or attempted to take and

4   obtain personal property consisting of cash from the presence of

5   employees of the business identified in each of these counts,

6   respectively, against their will by means of actual and

7   threatened force and violence and fear of injury; and

8        Two, that the defendant did so knowingly and

9   deliberately by robbery; and

10        Three, that, in so acting, interstate commerce was

11   obstructed, delayed, or affected.

12        Now, the term obstructs, delays, or affects commerce

13   means any action which, in any manner or to any degree,

14   interferes with, changes, or alters the movement or

15   transportation or flow of goods, merchandise, money, or other

16   property in commerce.

17        A mere depletion of assets of a firm engaged in

18   interstate commerce will meet the requirement.

19        It's not necessary that the government prove that the

20   intended -- the defendant actually intended to delay, obstruct,

21   or affect commerce.  The government must prove beyond a

22   reasonable doubt, however, that the defendant deliberately

23   performed an act, the ordinary and natural consequences of which

24   would be to obstruct, delay, or affect commerce, and that

25   commerce was, in fact, obstructed, delayed, or affected.  Only a

1  de minimis or minimal effect on interstate commerce is needed.

2         Now, to affect interstate commerce, a business need

3  only to be actively engaged in a commercial activity.  The

4  direct customers or suppliers for that business may not need to

5  come from out-of-state sources.  However, it addition to the

6  foregoing, you may consider evidence showing that the businesses

7  served customers that lived outside of Virginia.  You may also

8  consider whether any of the products sold at the business were

9  manufactured outside of Virginia.  You may find that commerce

10 was affected by considering whether the business had to close

11 for a period of time after the robberies occurred, and that the

12 foreclosure -- that the closure impeded the business' ability to

13 engage in commercial activity.

14        Now, the term robbery means the unlawful taking or

15 obtaining of personal property from the person or in the

16 presence of another, against his or her will, by means of actual

17 or threatened force, or violence, or fear of injury, immediate

18 or future, to his or her person or property, or property in his

19 or her custody or possession, or of anyone in his or her company

20 at the time of the taking or obtaining.

21        The term property means money or anything of value.

22        The term property is not limited to tangible, physical

23 items, but may include the right to conduct a business free from

24 wrongful force, coercion, or fear.

25        Now, Count 5 of the indictment charges the four

1  defendants with the robbery from the Navy Federal Credit Union

2  in Arlington.

3         Section 2113(a) and (d) of Title 18, United States

4  Code, provides, in part, that whoever, by force and violence, or

5  by intimidation, takes, or attempts to take, from the person or

6  presence of another, any property belonging to, or in the care,

7  custody, control, management, or possession of, any bank, credit

8  union, or any savings and loan association; and whoever, in

9  committing, or attempting to commit, an offense as defined in

10  this section assaults any person, or puts in jeopardy the life

11  of any person by the use of a dangerous weapon or device, shall

12  be guilty of an offense against the United States.

13         There are four essential elements of this offense which

14  the government must prove beyond a reasonable doubt.

15         One is that the defendant took money from a federal

16  credit union employee while that money was in the care, custody,

17  or possession of the Navy Federal Credit Union;

18         Two, the taking was by force and violence, or by

19  intimidation;

20         Three, that the defendant deliberately put the lives of

21  the employees and customers of the Navy Federal Credit Union in

22  jeopardy by the use of a dangerous weapon while taking the

23  money; and

24         Four, that the deposits of the federal -- Navy Federal

25  Credit Union were insured by the National Credit Union

1   Administration.

2        The phrase puts in jeopardy the life of any person

3   means to knowingly do an act which exposes a person to a risk of

4   death.  The term dangerous weapon means any object that can be

5   used by one person to inflict severe bodily harm or injury upon

6   another.

7        The phrase assaults any person means a deliberate

8   attempt to inflict bodily harm or injury upon the person of

9   another.  The phrase assaults any person also means a threat to

10  inflict bodily harm or injury upon the person of another when

11  that attempt or that threat is coupled with the apparent present

12  ability to do so.

13       An assault may be committed without actually touching,

14  striking, or doing bodily harm to another.  Any intentional

15  display of such force that would give a person reason to fear or

16  expect immediate bodily harm may constitute an assault.

17       An individual, therefore, who has the apparent ability

18  to inflict bodily harm on another and voluntarily attempts to

19  inflict bodily harm on that person may be found to have

20  assaulted that person.  Similarly, an individual who threatens

21  to inflict bodily harm on another may be found to have assaulted

22  that person.

23       The phrase by force and violence or by intimidation

24  means by either: one, the use of actual physical strength or

25  actual physical force; or, two, do some act or making some

1    statement to put someone in fear of bodily harm.

2         The intimidation must be caused by an act knowingly and

3    deliberately done or a statement knowingly and deliberately made

4    by the defendant which was done or made in a manner or under

5    such circumstances that would have produced such a reaction or

6    such fear of bodily harm in a reasonable person.  The government

7    need not prove actual fear on the part of any person.

8         The government must prove beyond a reasonable doubt,

9    however, that the defendant knowingly and deliberately did

10   something or knowingly and deliberately said something that

11   would reasonably cause a person under those circumstances to be

12   fearful of bodily harm.

13        The phrase custody, control, management, or possession

14   means money or funds that are physically within the credit union

15   or within its power to control.  When a federal credit union

16   holds money that has been deposited by its customers, for

17   example, the credit union may be said to have custody, control,

18   and management of these funds.

19        The term credit union means any federal credit union or

20   any state-chartered credit union, the accounts of which are

21   insured by the administrator of the National Credit Union

22   Administration.

23        Now, Count 6 charges that these four defendants did

24   knowingly carry and use firearms during the -- during and in

25   relation to a crime of violence; that is, the VVM robbery on

1    Beauregard Street.

2         Count 7 charges that these four defendants carried and

3    used a firearm in connection with the robbery at the Shoppers

4    Food Warehouse.

5         Count 8 charges that these four defendants knowingly

6    and unlawfully carried firearms during and in relation to the

7    robbery at the Navy Federal Credit Union.

8         Now, Section 924(c)(1)(A)(ii), (iii) of Title 18,

9    United States Code, provides that any person who, during and in

10   relation to any crime of violence, uses or carries a firearm,

11   shall be guilty of an offense against the United States.

12         There are two essential elements that the government

13   must prove beyond a reasonable doubt in regard to this charge.

14         First, that the defendant committed the crime of

15   interference with commerce by robbery as charged in Counts 2, 3,

16   and 4, and the crime of armed robbery of a credit union as

17   charged in Count 5; and

18         Two, that during and in relation to the commission of

19   that crime, the defendant knowingly used and carried a firearm.

20         The term firearm means any weapon, including a starter

21   gun, which will or is designed to or may readily be converted to

22   expel a projectile by the action of an explosive; the frame of

23   which or receiver of any such weapon; or any firearm muffler or

24   firearm silencer; or any destructive device.  The term firearm

25   does not include antique firearm.

1          The phrase uses or carries a firearm means having a
2    firearm, or firearms, available to assist or aid in the
3    commission of the crimes alleged in 2 through 5 of the
4    indictment.
5          In determining whether a defendant used or carried a
6    firearm, or aided or abetted in the carrying or use of a
7    firearm, you may consider all of the facts received in evidence,
8    including the nature of the underlying crime, the proximity of
9    the defendant to the firearm in question, the usefulness of the
10   firearm to the crime alleged, and the circumstances surrounding
11   the presence of the firearm.
12         The government is not required to show that the
13   defendants actually displayed or fired the weapon.  The
14   government is required, however, to prove beyond a reasonable
15   doubt that the firearm was in the defendants' possession or
16   under the defendants' control at the time the crime of violence
17   was committed.
18         Now, a crime of violence means an offense that is a
19   felony and has as one of its essential elements the use,
20   attempted use, or threatened use of physical force against the
21   person or property of another, or an offense that by its very
22   nature involves a substantial risk that physical force may be
23   used in committing the offense.  The offenses alleged in Counts
24   2, 3, 4, and 5 are crimes of violence.
25         Now, a person may violate the law even though he or she

1   does not personally do each and every act constituting the

2   offense if that person has aided and abetted the commission of

3   the offense.

4          Section 2(a) of Title 18, United States Code, provides

5   that whoever commits an offense against the United States or

6   aids, abets, counsels, commands, induces or procures its

7   commission, is punishable as a principal.

8          Now, before a defendant may be held responsible for

9   aiding and abetting others in the commission of the crime, it is

10  necessary that the government prove beyond a reasonable doubt

11  that the defendant knowingly and deliberately associated himself

12  in some way with the crime charged and participated in it with

13  the intent to commit the crime.

14         In order to be found guilty of aiding and abetting the

15  commission of the crimes charged in Counts 2 through 8 of the

16  indictment, the government must prove beyond a reasonable doubt

17  that a defendant:

18         One, knew that the crime charged was to be committed or

19  was being committed;

20         Two, knowingly did some act for the purpose of aiding

21  the commission of that crime; and

22         Three, acted with the intention of causing the crime to

23  be -- crime charged to be committed.

24         Now, before a defendant may be guilty as an aider or

25  abettor of the crime, the government must also prove, beyond a

1    reasonable doubt, that someone committed each and every

2    essential element of the offense as charged as detailed in these

3    instructions.

4         Merely being present at the scene of a crime or merely

5    knowing that a crime is being committed or is about to be

6    committed is not sufficient for you to find that a defendant

7    aided and abetted.

8         The government must prove that a defendant knowingly

9    associated himself with the crime in some way as a participant,

10   someone who wanted the crime to be committed, and not as a mere

11   spectator.

12        Now, a member of a conspiracy who commits another crime

13   during the existence or life of the conspiracy and commits this

14   crime in order to further or somehow advance the goals of the

15   conspiracy may be considered by you as acting as the agent of

16   the other members of a conspiracy.  The illegal actions of this

17   conspirator in committing this other crime may be attributed to

18   other individuals who are then members of the conspiracy.  Under

19   certain conditions, therefore, a defendant may be found guilty

20   of this other crime even though he or she did not participate

21   directly in the acts constituting that offense.

22        If you find the government has proven a defendant

23   guilty of conspiracy as charged in Count 1, beyond a reasonable

24   doubt, you may also find the defendant guilty of the same crime

25   alleged in any other count of the indictment in which he is

730

1   charged, provided you find that the essential elements of that

2   count as defined in these instructions have been established

3   beyond a reasonable doubt and, provided further, that you find

4   beyond a reasonable doubt the following:

5        One, the substantive offense interfered with commerce

6   by robbery, armed robbery of a credit union, and use of a

7   firearm during a crime of violence as described in Counts 2

8   through 8 of the superseding indictment, were committed by a

9   member of the conspiracy as detailed in Count 1;

10       Two, that the substantive crimes of interference with

11  commerce by robbery, armed robbery, use of a firearm during a

12  crime of violence were committed during the existence or life or

13  in furtherance of the goals or objectives of the conspiracy as

14  set out in Count 1; and

15       Three, that at the time this offense was committed, the

16  defendant was a member of the conspiracy.

17       Now, Counts 9 through 12 charge these four defendants

18  with possession of -- unlawful possession of a firearm; that is,

19  possessing a firearm after having been convicted of a felony

20  offense.

21       Now, Section 922(g)(1) of Title 18, United States Code,

22  provides that it shall be unlawful for any person who has been

23  convicted in any court of a crime punishable by imprisonment for

24  a term exceeding one year to possess in or affecting commerce

25  any firearm.

731

1          There are three essential elements for this offense

2    that the government must prove beyond a reasonable doubt.

3          First, that the defendant has been convicted in any

4    court of a crime punishable by imprisonment for a term exceeding

5    one year;

6          Two, that after this conviction, the defendant

7    knowingly possessed the firearm as described in Counts 9, 10,

8    11, and 12 of the indictment; and

9          Third, that such possession was in or affecting

10   interstate or foreign commerce.

11         Now, the phrase crime punishable by a term of

12   imprisonment exceeding one year generally means a crime which is

13   a felony.  The phrase does not include any state offense

14   classified by the laws as a misdemeanor and punishable by a term

15   of two years or less, but doesn't apply in this situation.

16         These offenses here -- the only evidence in the case is

17   that they were for a term of more than one year.

18         Now, the term knowingly, as used in these instructions

19   to describe the state of mind of a defendant, means that he was

20   conscious and aware of his actions, realized what he was doing,

21   and did not act because of ignorance, mistake, or accident.

22         The word possession means to own or to exert control

23   over.  The word possession can take on different but related

24   meanings.

25         The law recognizes two kinds of possession, actual

1  possession and constructive possession.  A person who knowingly

2  has direct physical control over a thing at a given time is then

3  in actual possession of it.  A person who, although not in

4  actual possession, knowingly has both the power and the

5  intention at a given time to exercise dominion or control over a

6  thing, either directly or through another person or persons, is

7  then in constructive possession of it.

8       The law also recognizes that possession may be sole or

9  joint.  If one person alone has actual possession of a thing,

10  then possession is sole.  If two or more persons share a

11  possession of a thing, then the possession is joint.

12       Now, the phrase in or affecting commerce means commerce

13  between any place in a state and any place outside of that

14  state.

15       The government may meet its burden of proof on the

16  question of being in or affecting commerce by proving to you,

17  beyond a reasonable doubt, that the firearm identified in the

18  indictment, at any time, traveled across a state boundary line.

19       Now, although the indictment may charge a defendant

20  with committing an offense in several ways using the conjunctive

21  language, I would instruct you that it is not necessary for the

22  government to prove that the defendant did each of those things.

23  It is sufficient if the government proves beyond a reasonable

24  doubt that the defendant did any of those alternate acts as

25  charged.

1          Now, there are two types of evidence from which you may

2    find the truth as to the facts of this case, direct and

3    circumstantial.  Direct evidence is the testimony of one who

4    asserts actual knowledge of a fact, such as an eyewitness.

5    Circumstantial evidence is proof of a chain of facts or

6    circumstances indicating the guilt or innocence of a defendant.

7          The law makes no distinction between the weight to be

8    given to either direct or circumstantial evidence.  Nor is a

9    greater degree of certainty required of circumstantial than of

10   direct.  You should weigh all of the evidence in the case.

11         The burden is always on the prosecution to prove guilt

12   beyond a reasonable doubt.  This burden never shifts to a

13   defendant, for the law never imposes upon a defendant in a

14   criminal case the burden of calling any witnesses or producing

15   any evidence.

16         The law presumes a defendant to be innocent.  Thus, a

17   defendant, although accused, begins the trial with a clean

18   slate, with no evidence against him.  And the law permits

19   nothing but legal evidence presented before the jury to be

20   considered in support of any charge against him.

21         A defendant has the right to remain silent.  And since

22   the defendant has that right, the law prohibits you in arriving

23   at your verdict from considering that a defendant may not have

24   testified.  So the presumption of innocence alone is sufficient

25   to acquit a defendant unless you are satisfied beyond a

1  reasonable doubt of the defendant's guilt after a careful and

2  impartial consideration of all the evidence in the case.

3         It's not required that the government prove guilt

4  beyond all possible doubt.  The test is one of reasonable doubt.

5         Now, the punishment provided for the offense or

6  offenses charged is a matter exclusively within the province of

7  the Court and should never be considered by you in any way in

8  arriving at a fair and impartial verdict.

9         The indictment returned by the grand jury in this case

10 is not to be considered by you as any evidence of guilt.  An

11 indictment is simply the formal means by which a case is

12 processed initially to bring about a trial.

13        Now, the arguments and statements of counsel are not

14 evidence in the case.  The attorneys have entered into

15 stipulations, and those stipulations become proper evidence.

16        Now, from time to time in their arguments the lawyers

17 may have stated what law was applicable to the case.  If they

18 made a reference, as they had a right to do, that is contrary to

19 what I state the law to be, you must disregard what the lawyers

20 said and abide by what the Court states the law to be.

21        The lawyers from time to time have referred to certain

22 facts that came out in evidence.  If your recollection of those

23 facts is different from the lawyers, your recollection prevails

24 because you are the sole judges of the facts.

25        Now, from time to time during the trial the lawyers

1   made objections to the introduction of certain evidence or to

2   the form of questions.  If I sustained those objections, you

3   cannot consider any evidence that I sustained an objection to or

4   facts contained in a question to which an objection was

5   sustained.

6           Now, you, as jurors, are the sole judges of the

7   credibility of the witnesses and the weight their testimony

8   deserves.  You may be guided by the appearance and conduct of

9   the witness, or by the manner in which the witness testifies, or

10  by the manner in which the testimony is given.

11          You should carefully scrutinize all of the testimony,

12  the circumstances under which each witness has testified, and

13  every matter in evidence which tends to show whether a witness

14  is worthy of belief.

15          Consider each witness' intelligence, motive and state

16  of mind, and demeanor and manner while on the stand.  Consider

17  the witness' ability to observe the matter as to which he has

18  testified and whether he impresses you as having an accurate

19  recollection of those matters.

20          Consider also any relation each witness may bear to

21  either side of the case, the manner in which each witness might

22  be affected by the verdict, and the extent to which, if at all,

23  each witness is either supported or contradicted by other

24  evidence in the case.

25          After making your own judgment, you will give the

1  testimony of each witness such weight, if any, as you may think

2  it deserves.

3         And remember, your verdict cannot be based upon

4  surmise, speculation, or sympathy for either party.  It must be

5  based solely upon the evidence presented here in the courtroom

6  and the instructions of the Court.

7         Now, as you-all retire to deliberate on your verdict,

8  your first duty will be that of selecting a foreperson and

9  proceed -- can't say that word -- proceed with your

10 deliberations involving a rational discussion of all of the

11 evidence and the law for the purpose of reaching a unanimous

12 verdict.

13        Reconsider your views if persuaded by a rational

14 discussion, but don't do so just for the sake of reaching a

15 unanimous verdict.

16        Your verdict must be unanimous as to each defendant and

17 each count.

18        I'm going to send to you -- to the jury room a verdict

19 form, and there's one for each of the defendants.  It has the

20 style, the number of the case, and we, the jury, find as to

21 Count 1, 2, 3, right on through 9, and there's a blank there for

22 you to write guilty or not guilty.

23        There's a place at the bottom for your foreperson's

24 signature and the date.  You know, once you've reached your

25 verdict, it should be filled out by the foreperson and returned

1    to the Court.

2         Now, remember once you've retired to deliberate on your

3    verdict, any communication you have with the Court must be in

4    writing and signed by your foreperson.

5         If you do need to communicate for any reason, please

6    don't indicate numerically how you stand on any issue that you

7    have under consideration.

8         I will let you-all retire now to the jury room.  The

9    marshal will bring in the -- I'll get to you -- the marshal will

10   bring in the exhibits and verdict form.  You may begin your

11   deliberations when you go in, but very shortly the marshal will

12   bring in the verdict forms and the exhibits.

13        And you-all may retire to the jury room.

14        MR. WOOD:  Can we have a sidebar for one second, Your

15   Honor?

16     (Conference at the bench, as follows:)

17        MR. WOOD:  I think the Court indicated when we were

18   talking about instructions that you would tell them that the

19   felonies for the prohibited person offense does not apply to the

20   evidence in this case.

21        THE COURT:  Oh, that's right.  I will tell them that.

22        MR. WOOD:  And one other thing -- and I don't know if

23   the Court does this -- the statements of one defendant is not to

24   be considered against the others.

25        MS. GILES:  Earlier on, this Court -- during the trial,

1   Your Honor, you mentioned you'd give that curative instruction.

2        I think it will be -- I think it will be -- I'm sorry.

3   Here -- I think -- it could be 1408 -- 14.08 from O'Malley's or

4   there's also 11.06.  Either one of those.

5        It could be -- I'm sorry.  This one.  Oh, Lord.  I'm so

6   sorry.  I can't find it now.  Right here.  14.04, if you think

7   that applies.

8        THE COURT:  What statements were made that --

9        MR. WOOD:  There was the statement by Mr. Winston I

10  objected to where he waived his rights and made certain

11  statements.  I think they argued that they were in furtherance

12  of the conspiracy and I said they weren't.

13       THE COURT:  That's right.  But I don't know that he

14  incriminated anybody.

15       MR. WOOD:  Circumstantially he incriminated them

16  because he said they ran, consistent with what the police said.

17       THE COURT:  There isn't any dispute about that.

18  Whether he said it or not, it wouldn't make any difference.  I'm

19  not sure we ought to get into that.

20       But I will tell them about the convictions.  I don't

21  believe that's justified based on that statement or that it's

22  necessary to do it even.

23       MR. WOOD:  Okay.

24       MS. VANLOWE:  Your Honor, could I make one request?  I

25  know that you said that you were not going to send the

1    instructions back to the jury.  I'm just thinking, given the
2    number of counts and the number of elements, it might be helpful
3    for them to have it.

4         THE COURT:  Juries do this every day here and have no
5    problem.  I'll send the indictment back to them.

6       (Thereupon, the following proceedings continued in open
7    court:)

8         THE COURT:  Counsel reminded me that there's one thing
9    that I was going to tell you-all that I neglected to tell you.

10        You've heard the evidence that these defendants were
11   convicted of a prior felony offense, and that evidence you may
12   consider as far as the gun possession charges are concerned.
13   But the fact that they've been previously convicted of an
14   offense should not be considered in any way when you're
15   considering the robbery and the conspiracy charges.  That only
16   goes to the gun offenses.

17        Now you-all may retire and begin your deliberations.
18      (The jury exits at 2:28 p.m.)

19        THE COURT:  I assume after the sidebar there's no other
20   objections to the instructions or the manner in which I gave
21   them.

22        MR. WOOD:  Not from Mr. Reed, Your Honor.

23        THE COURT:  We'll stand in recess till the jury
24   returns.

25      (Recess taken at 2:29 p.m.)

1          * * *

2      (Question at 4:15 p.m.; the jury is not present.)

3          THE COURT:  I understand there was no specific exhibit

4    related to the DNA so I will just tell them that.

5          Bring them out.

6          MR. WOOD:  We waived our clients' presence, but I

7    thought that's maybe because the Court would just answer by

8    writing a note.

9          THE COURT:  Well, I can do that.

10         MR. WOOD:  That's fine with us.  Since we're waiving

11   their presence, if the Court would just write them a note.

12         THE COURT:  All right.  I'll be glad to do that.

13         MS. GILES:  Your Honor, can you also add to just allow

14   their recollection of the testimony?

15         THE COURT:  Well, yeah.  I mean, I'll have to tell them

16   that they'll have to rely on their collective recollection as to

17   the testimony regarding the -- regarding DNA.

18         MS. GILES:  Thank you, Your Honor.

19         MR. HUNTER:  I can't think of another solution than

20   that.

21         THE COURT:  All right.  I've said there is no numbered

22   exhibit or material admitted into evidence, and you must rely on

23   your collective recollection of the evidence regarding DNA

24   testimony.

25         MR. WOOD:  That's good, Your Honor.

1        MS. GILES:  That makes it sound like it didn't come in,

2    Your Honor, but those materials are numbered and in evidence.

3    They may not be able to figure out or recall which DNA items or

4    which --

5        MR. HUNTER:  Data.

6        MS. GILES:  -- items of evidence were examined and the

7    results, but the items are in evidence.

8        MR. ROBERTSON:  Your Honor, I think that misstates

9    what's going on.

10       THE COURT:  Well, now, wait a minute.  Wait a minute.

11       They asked for the number of the exhibits or material

12   or data referring to DNA findings.  And I understood that

13   you-all agreed that there was nothing admitted that's back there

14   by number.

15       MR. ROBERTSON:  That's correct, Your Honor.

16       THE COURT:  Well, wait a minute then.  Why are you

17   telling me there are exhibits back there that refer to this when

18   you told me there wasn't?

19       MS. GILES:  I just wanted to make it clear, Your Honor.

20   For each item of evidence that was examined at the lab, the

21   question number, what that number is, like Q26, it's written on

22   the mask.  They may not -- what I understand -- what I

23   understand is they want --

24       THE COURT:  I see what you're thinking about doing.  I

25   am not going to get involved in that at all.

1          MS. BELLOWS:  Your Honor, the only concern -- if I may
2    speak too -- the only concern I have is the way I heard your
3    response is it says there's no material, and they may interpret
4    that to mean that the mask --
5          THE COURT:  I said there is no numbered exhibit or
6    material admitted into evidence --
7          And you-all agreed with it.  Right?
8          MS. BELLOWS:  So far.
9          THE COURT:  -- and you must rely on your collective
10   recollection of the evidence regarding DNA testimony.
11         MS. VANLOWE:  They asked about results, Your Honor, so
12   that is exactly why that is appropriate.
13         MS. BELLOWS:  That's why I think there should be some
14   reference in there to no materials regarding findings, which was
15   their question.  The way it's written, Your Honor, suggests --
16         THE COURT:  That wasn't their question.  No.  I'm
17   answering their question.  Their question is provide the
18   evidence number or material data referring to DNA findings.
19         MS. BELLOWS:  Right.
20         THE COURT:  And you say there are none.
21         MS. BELLOWS:  I do.  But the way the Court has written
22   that response, the way I hear it, Your Honor, is that you're
23   saying there's no material.  And it can be -- I just think the
24   word findings should be included in there somewhere since
25   that's --

```
1              THE COURT:  There's no numbered material.  There's no
2    numbered exhibit.  And that's what I've said.
3              MS. BELLOWS:  Right, but there's no reference to
4    findings.  And because there's no reference to findings --
5              THE COURT:  They didn't ask about findings, did they?
6              MS. BELLOWS:  That's the last word they used.
7              THE COURT:  Well, I guess it is.
8              MR. WOOD:  But the findings are encompassed by the
9    testimony.  There's no exhibit that can indicate what the
10   findings are.  The findings are encompassed by the testimony.
11             MS. BELLOWS:  Then put that in there, the word
12   findings.
13             MR. WOOD:  The Court did put that in.
14             MS. VANLOWE:  That's exactly what the statement says.
15             THE COURT:  What if I put DNA testimony and findings?
16             MS. VANLOWE:  I think it should remain exactly how it
17   is, Your Honor.
18             MS. BELLOWS:  Your Honor --
19             THE COURT:  I don't think it makes any difference,
20   frankly, but maybe it does.
21             Rely on your collective recollection of the evidence
22   regarding -- why don't I say findings testimony, DNA findings
23   testimony?
24             MS. VANLOWE:  That's fine.
25             MS. BELLOWS:  That's fine.
```

```
1              THE COURT:  Is that all right?

2              MS. VANLOWE:  That's fine.

3              THE COURT:  DNA -- all right.  Fine.  Everybody is

4    satisfied.  That never happens.  All right.  Take that on back.

5              We'll stand in recess till they return.

6       (Recess taken at 4:21 p.m.; back on the record at 5:31 p.m.)

7              THE COURT:  I've got a note from the jury.  There's

8    nothing of substance.  They want to recess because somebody

9    wants to go somewhere.  Then they want to know about the jury

10   room being secured and what time they can report tomorrow.

11             So we'll deal with all that stuff when they come out,

12   but nothing of substance.

13             All right.  Bring out the jury.

14      (The jury enters at 5:35 p.m.)

15             THE COURT:  You-all can have a seat.

16             It's kind of in response to your note.  I was coming in

17   anyway.  It's time for us to recess for the day.

18             Now, you-all want to start at 9 o'clock tomorrow

19   morning instead of 10?

20             THE FOREPERSON:  Yes, sir, if it's possible.

21             THE COURT:  That's fine.  Sure.  That's no problem at

22   all.  I'll be here doing motions at 9 o'clock.

23             As far as securing things in that room, that can't

24   really be done.  That's going to have to be taken down, secured

25   downstairs.
```

1              THE FOREPERSON:  Okay.

2              THE COURT:  But it will be up here for you when you get

3   here at 9 o'clock.

4              THE FOREPERSON:  Yes, sir.

5              THE COURT:  So you're excused, and we'll adjourn till

6   9 o'clock tomorrow morning.

7        * * *

8        (Proceedings concluded at 5:38 p.m.)

9

10

11

12

13

14

15   _____

16                        CERTIFICATION

17

18        I certify, this 22nd day of January 2014, that the

19   foregoing is a correct transcript from the record of proceedings

20   in the above-entitled matter to the best of my ability.

21

22                        /s/
                     _____
23                       Tracy Westfall, RPR, CMRS, CCR

24

25

## $

**$10,000** [3] - 661:15, 661:16, 680:1
**$19,000** [2] - 659:12, 680:2
**$30,000** [6] - 680:7, 680:8, 680:10, 680:20, 680:23, 681:2
**$60,000** [1] - 680:7
**$7,800** [1] - 661:17

## /

**/s** [1] - 745:22

## 1

**1** [15] - 644:19, 644:21, 651:22, 651:23, 703:25, 718:5, 719:12, 719:18, 719:22, 729:23, 730:9, 730:14, 736:21
**10** [4] - 637:21, 656:17, 731:7, 744:19
**10:20** [1] - 633:6
**10:28** [1] - 639:11
**10:42** [1] - 651:13
**10:53** [1] - 657:11
**11** [3] - 637:21, 706:4, 731:8
**11.06** [1] - 738:4
**11:00** [2] - 656:21, 696:14
**11:05** [1] - 657:11
**12** [7] - 637:21, 652:18, 662:24, 672:3, 691:17, 730:17, 731:8
**12:30** [1] - 656:22
**12:31** [1] - 667:7
**12:37** [1] - 717:9
**14** [2] - 638:11, 647:19
**14.04** [1] - 738:6
**14.08** [2] - 653:17, 738:3
**1408** [1] - 738:3
**14th** [2] - 647:20, 647:21
**15** [8] - 654:25, 655:3, 655:4, 655:10, 655:20, 656:1, 656:13
**1501** [7] - 661:11, 695:22, 696:6, 696:13, 696:20, 698:11
**17.2** [5] - 649:7, 649:11, 693:15, 693:16
**18** [6] - 638:12, 718:9, 723:3, 726:8, 728:4, 730:21
**18.4** [4] - 649:22, 693:10, 693:11, 693:16
**1951** [1] - 718:9
**1:13-cr-48** [1] - 633:4
**1:45** [1] - 717:8
**1:47** [1] - 717:10

## 2

**2** [11] - 637:2, 651:22, 652:1, 720:16, 721:2, 726:15, 727:3, 727:24, 728:15, 730:7, 736:21
**2(a** [1] - 728:4
**2,000** [1] - 701:21
**20** [3] - 633:6, 654:25, 656:17
**2010** [1] - 695:25
**2012** [5] - 638:12, 640:4, 648:10, 658:13, 678:9
**2013** [4] - 633:6, 647:2, 647:19, 647:25
**2013-48** [1] - 635:2
**2014** [1] - 745:18
**202-510** [1] - 693:17
**202-510-4853** [2] - 649:20, 650:9
**20th** [1] - 661:13
**21-year-old** [1] - 683:9
**2113(a** [1] - 723:3
**212-510** [1] - 693:12
**22** [3] - 640:4, 648:10, 678:9
**22-6** [1] - 695:24
**22nd** [10] - 640:12, 648:7, 658:10, 666:19, 671:14, 674:23, 675:11, 678:13, 680:15, 745:18
**24-hour** [3] - 675:10, 675:11
**240-355-8256** [2] - 673:25, 679:6
**25** [3] - 698:3, 698:4, 698:7
**2:28** [1] - 739:18
**2:29** [1] - 739:25

## 3

**3** [7] - 651:22, 652:1, 720:19, 721:2, 726:15, 727:24, 736:21
**3-4** [1] - 702:12
**30** [2] - 656:9, 716:18
**30,000** [1] - 708:10
**300** [1] - 701:22
**33** [1] - 650:6
**3555** [1] - 638:12
**36** [1] - 649:15
**38th** [2] - 661:11, 680:9, 680:16, 701:5, 702:14

## 4

**4** [13] - 647:2, 647:25, 650:2, 650:3, 651:23, 652:1, 693:11, 713:21, 713:24, 720:21, 721:2, 726:16, 727:24
**4:15** [1] - 740:2
**4:21** [1] - 744:6
**4:23** [2] - 667:1, 667:2
**4th** [4] - 636:11, 647:22, 647:23, 648:7

## 5

**5** [8] - 649:23, 652:5, 684:16, 722:25, 726:17, 727:3, 727:24
**5-foot-5** [1] - 686:9
**510** [2] - 693:22, 694:4
**510-4853** [1] - 650:11
**5:20** [1] - 667:5
**5:21** [1] - 667:7
**5:31** [1] - 744:6
**5:32** [3] - 667:20, 668:2, 668:4
**5:35** [1] - 744:14
**5:38** [1] - 745:8
**5th** [2] - 636:1, 636:9

## 6

**6** [7] - 652:12, 684:16, 703:25, 704:1, 706:4, 713:20, 725:23
**60** [3] - 655:4, 698:8
**60,000** [1] - 679:25
**63** [1] - 649:15
**639** [1] - 634:4
**645** [1] - 634:4
**647** [1] - 634:4
**649** [1] - 634:5
**66** [1] - 680:16
**6:00** [4] - 663:24, 666:15, 666:22, 667:2
**6:08** [1] - 664:4
**6:15** [1] - 666:16
**6:20** [2] - 664:5, 666:16
**6:30** [2] - 668:8, 694:19

## 7

**7** [2] - 652:12, 726:2
**7th** [7] - 658:12, 667:17, 671:12, 671:22, 672:16, 675:9, 714:5

## 8

**8** [9] - 649:15, 652:12, 662:24, 667:23, 668:3, 706:22, 726:5, 728:15, 730:8
**8:04** [1] - 668:8

## 9

**9** [10] - 637:21, 640:11, 652:18, 730:17, 731:7, 736:21, 744:18, 744:22,
745:3, 745:6
**9022** [1] - 714:12
**922(g)(1** [2] - 637:21, 730:21
**924(c** [1] - 688:25
**924(c)(1)(A)(ii** [1] - 726:8
**9:33** [2] - 668:3, 668:5
**9th** [9] - 658:11, 663:22, 665:1, 665:5, 665:16, 666:21, 671:13, 671:22, 675:10

## A

**a.m** [5] - 633:6, 639:11, 651:13, 657:11
**abandon** [1] - 667:14
**abandoned** [4] - 680:12, 680:15, 706:24, 707:1
**abets** [1] - 728:6
**abetted** [3] - 727:6, 728:2, 729:7
**abetting** [3] - 652:16, 728:9, 728:14
**abettor** [1] - 728:25
**abettors** [1] - 709:18
**abide** [1] - 734:20
**ability** [5] - 722:12, 724:12, 724:17, 735:17, 745:20
**able** [14] - 655:9, 660:7, 673:19, 675:20, 689:3, 689:4, 690:22, 691:7, 695:16, 701:8, 704:7, 710:8, 716:23, 741:3
**above-entitled** [1] - 745:20
**absence** [4] - 675:24, 675:25, 688:13, 715:24
**absolutely** [3] - 677:21, 700:13, 701:13
**accentuate** [1] - 666:3
**accept** [1] - 693:23
**accident** [1] - 731:21
**accomplish** [2] - 718:24, 719:25
**accomplishing** [1] - 720:7
**accordance** [1] - 672:7
**account** [1] - 706:11
**accountable** [1] - 669:19
**accounts** [1] - 725:20
**accurate** [2] - 675:20, 735:18
**accusation** [1] - 670:20
**accused** [1] - 733:17
**accuseds'** [1] - 692:11
**acquit** [2] - 719:18, 733:25
**acquittal** [1] - 636:19
**Act** [1] - 718:19
**act** [8] - 720:6, 721:23, 724:3, 724:25, 725:2, 728:1, 728:20, 731:21
**acted** [1] - 728:22
**acting** [2] - 721:10, 729:15

**action** [5] - 719:3, 719:12, 720:1, 721:13, 726:22

**actions** [2] - 729:16, 731:20

**activates** [1] - 666:15

**activating** [1] - 666:16

**activation** [1] - 679:6

**active** [3] - 664:7, 713:1, 713:3

**actively** [1] - 722:3

**activities** [1] - 667:25

**activity** [5] - 666:24, 667:21, 705:24, 722:3, 722:13

**acts** [4] - 638:10, 663:7, 729:21, 732:24

**actual** [11] - 688:13, 721:6, 722:16, 724:24, 724:25, 725:7, 731:25, 732:3, 732:4, 732:9, 733:4

**add** [2] - 659:19, 740:13

**addition** [3] - 637:20, 665:17, 722:5

**additional** [2] - 711:15, 713:11

**address** [4] - 636:17, 637:7, 661:15, 680:17

**addresses** [1] - 696:10

**adjourn** [1] - 745:5

**Administration** [2] - 724:1, 725:22

**administrator** [1] - 725:21

**admitted** [4] - 649:7, 740:22, 741:13, 742:6

**adopt** [1] - 639:2

**advance** [1] - 729:14

**advice** [1] - 656:6

**affect** [5] - 637:25, 718:7, 721:21, 721:24, 722:2

**affected** [5] - 658:19, 721:11, 721:25, 722:10, 735:22

**affecting** [7] - 637:22, 653:6, 663:14, 730:24, 731:9, 732:12, 732:16

**affects** [4] - 652:3, 683:10, 718:11, 721:12

**affirmed** [2] - 639:17, 648:25

**afraid** [1] - 669:1, 708:17

**African** [6] - 661:3, 687:22, 687:24, 691:15, 691:19, 704:13

**African-American** [2] - 687:22, 687:24

**African-Americans** [2] - 661:3, 704:13

**afternoon** [1] - 699:19

**afterwards** [1] - 642:4

**agent** [6] - 647:3, 693:17, 693:18, 697:9, 708:3, 729:15

**Agent** [6] - 648:22, 649:4, 675:6, 679:13, 697:8,

712:22

**agents** [2] - 703:12, 705:7

**agreed** [3] - 718:18, 741:13, 742:7

**agreement** [13] - 651:24, 651:25, 718:25, 719:5, 719:6, 719:10, 719:13, 719:24, 719:25, 720:4, 720:5, 720:6, 720:7

**aid** [1] - 727:2

**aided** [4] - 633:25, 727:6, 728:2, 729:7

**aider** [1] - 728:24

**aiders** [1] - 709:18

**aiding** [4] - 652:16, 728:9, 728:14, 728:20

**aids** [1] - 728:6

**al** [2] - 633:6, 635:3

**ALEXANDRIA** [1] - 633:2

**Alexandria** [3] - 633:5, 668:10, 706:20

**Alfred** [1] - 633:21

**Aliaskari** [1] - 717:1

**allegation** [3] - 670:20, 702:6, 706:12

**alleged** [7] - 674:21, 719:12, 719:13, 727:3, 727:10, 727:23, 729:25

**allegedly** [4] - 674:22, 676:9, 681:4, 681:10

**alleging** [1] - 702:14

**allow** [3] - 667:15, 688:4, 740:13

**almost** [7] - 640:15, 640:18, 640:25, 642:15, 672:1, 685:21, 703:4

**alone** [4] - 659:4, 717:20, 732:9, 733:24

**alternate** [1] - 732:24

**alternates** [2] - 716:21, 716:25

**alters** [1] - 721:14

**America** [1] - 635:3

**AMERICA** [1] - 633:4

**American** [2] - 687:22, 687:24

**Americans** [2] - 661:3, 704:13

**amount** [2] - 673:9, 677:24

**amounting** [1] - 680:7

**amounts** [1] - 704:9

**ample** [3] - 636:22, 638:4, 638:23

**analysis** [1] - 650:18

**analyze** [2] - 682:14, 684:19

**AND** [1] - 633:13

**Anna** [1] - 717:1

**Annandale** [1] - 706:20

**answer** [3] - 690:23, 708:22, 740:7

**answered** [3] - 654:5, 690:3, 709:10

**answering** [2] - 701:2, 742:17

**Anthony** [15] - 633:21, 658:25, 659:7, 693:13, 710:13, 710:17, 711:3, 711:13, 714:8, 714:13, 714:15, 714:16, 714:18, 716:6, 718:6

**antique** [1] - 726:25

**Antonio** [1] - 639:23

**anytime** [2] - 636:7, 636:12

**anyway** [1] - 744:17

**apiece** [1] - 654:24

**apparent** [2] - 724:11, 724:17

**appearance** [1] - 735:8

**APPEARANCES** [1] - 633:16

**applicable** [1] - 734:17

**applies** [1] - 738:7

**apply** [5] - 671:6, 717:17, 718:1, 731:15, 737:19

**appointed** [1] - 635:5

**appreciate** [2] - 683:3, 683:4

**apprehended** [5] - 659:11, 659:22, 661:21, 661:22, 666:23

**apprehension** [1] - 661:23

**approach** [1] - 684:5

**appropriate** [2] - 657:15, 742:12

**April** [7] - 647:2, 647:19, 647:20, 647:21, 647:25, 648:7, 695:25

**Arab** [2] - 643:17

**Arab-like** [1] - 643:17

**area** [12] - 640:7, 664:4, 666:15, 668:9, 674:18, 677:19, 677:20, 680:9, 711:19, 711:21, 713:10

**argue** [2] - 654:24, 655:9

**argued** [1] - 738:11

**arguing** [1] - 710:9

**argument** [4] - 655:6, 655:7, 676:5, 676:21

**arguments** [8] - 651:12, 655:24, 656:7, 656:21, 687:18, 717:13, 734:13, 734:16

**Aria** [1] - 717:1

**Arlington** [4] - 705:21, 706:19, 720:22, 723:2

**armed** [8] - 638:14, 658:1, 658:11, 658:15, 669:14, 726:16, 730:6, 730:11

**army** [1] - 703:12

**arrest** [4] - 678:15, 678:24, 708:5, 712:21

**arrested** [9] - 662:3, 674:23,

678:17, 681:3, 682:10, 696:12, 700:25, 712:3

**arrived** [1] - 719:9

**arriving** [2] - 733:22, 734:8

**article** [1] - 718:11

**ascribed** [2] - 712:17, 714:13

**asleep** [1] - 714:1

**assault** [2] - 724:13, 724:16

**assaulted** [2] - 724:20, 724:21

**assaults** [4] - 652:8, 723:10, 724:7, 724:9

**assemble** [1] - 685:17

**assertion** [1] - 696:18

**asserts** [1] - 733:4

**assets** [1] - 721:17

**assiduous** [1] - 696:7

**assignment** [1] - 657:22

**assist** [1] - 727:2

**assistance** [2] - 644:18, 649:10

**associate** [1] - 677:2

**associated** [3] - 702:8, 728:11, 729:9

**associating** [1] - 720:10

**association** [2] - 680:3, 723:8

**assume** [1] - 739:19

**assure** [1] - 674:16

**attempt** [2] - 724:8, 724:11

**attempted** [2] - 721:3, 727:20

**attempting** [1] - 723:9

**attempts** [3] - 718:12, 723:5, 724:18

**attention** [8] - 637:2, 637:19, 640:3, 670:1, 682:20, 683:3, 709:14, 717:12

**attentiveness** [1] - 657:16

**attitude** [1] - 657:22

**attorneys** [3] - 699:24, 709:16, 734:14

**attributable** [1] - 677:9

**attribute** [1] - 689:15

**attributed** [5] - 663:7, 663:11, 673:6, 674:21, 729:17

**attributing** [2] - 676:12, 676:24

**available** [1] - 727:2

**Avenue** [1] - 638:12

**average** [2] - 688:10, 695:9

**aware** [1] - 731:20

## B

**backwards** [1] - 671:14

**badgered** [2] - 644:1, 647:13

**badgering** [2] - 646:21, 678:10

**bag** [9] - 660:22, 660:23, 661:6, 661:7, 704:15, 710:14, 711:12, 711:14, 712:6

**Ballston** [1] - 640:23

**bank** [11] - 640:22, 640:24, 646:4, 659:13, 704:23, 704:24, 705:12, 706:18, 707:22, 708:7, 723:7

**bank's** [2] - 661:16

**barrel** [3] - 662:9, 688:21, 710:2

**base** [1] - 718:3

**based** [3] - 736:3, 736:5, 738:21

**basement** [1] - 669:8

**bathroom** [1] - 669:9

**bear** [1] - 735:20

**beard** [1] - 703:22

**Beauregard** [3] - 668:9, 720:18, 726:1

**became** [1] - 719:21

**become** [1] - 734:15

**bed** [2] - 706:5, 713:20

**bedtime** [2] - 668:12, 668:13

**beeping** [4] - 641:8, 641:12, 641:24, 642:1

**began** [1] - 683:2

**begin** [7] - 667:19, 667:20, 682:15, 706:6, 717:8, 737:10, 739:17

**beginning** [2] - 713:13, 720:5

**begins** [1] - 733:17

**behalf** [5] - 636:18, 639:14, 651:2, 654:22, 669:21

**behind** [2] - 684:8, 694:21

**belief** [2] - 682:2, 735:14

**Bellows** [4] - 633:18, 687:19, 691:7, 700:7

**BELLOWS** [16] - 650:22, 656:18, 657:4, 657:9, 657:13, 669:17, 742:1, 742:8, 742:13, 742:19, 742:21, 743:3, 743:6, 743:11, 743:18, 743:25

**bellows** [3] - 684:3, 684:12, 686:1

**belong** [6] - 650:1, 659:13, 690:25, 692:15, 712:13, 712:16

**belonged** [3] - 650:4, 691:17, 714:15

**belonging** [4] - 650:2, 680:4, 714:10, 723:6

**belongs** [3] - 693:22, 694:4, 707:13

**below** [1] - 688:2

**bench** [1] - 737:16

**benefit** [2] - 670:14, 672:14

**best** [3] - 656:6, 716:15, 745:20

**better** [4] - 648:6, 648:7, 654:20, 708:24

**between** [13] - 665:14, 665:16, 666:24, 667:5, 667:7, 667:18, 668:2, 668:4, 713:23, 720:11, 732:13, 733:7

**beyond** [38] - 662:18, 670:8, 672:14, 677:17, 682:4, 684:21, 685:1, 685:4, 685:5, 685:9, 691:4, 698:1, 699:14, 700:11, 707:20, 709:8, 718:17, 719:16, 719:22, 720:2, 721:2, 721:21, 723:14, 725:8, 726:13, 727:14, 728:10, 728:16, 728:25, 729:23, 730:3, 730:4, 731:2, 732:17, 732:23, 733:12, 733:25, 734:4

**big** [13] - 665:7, 665:13, 665:16, 666:2, 666:6, 670:14, 685:25, 686:16, 688:21, 695:21, 699:25, 706:18, 710:2

**bit** [5] - 665:22, 693:8, 695:8, 698:7, 716:11

**bite** [1] - 665:7

**black** [30] - 641:13, 643:6, 643:9, 643:14, 643:21, 644:11, 644:13, 644:15, 645:11, 645:14, 659:13, 659:14, 673:18, 676:3, 678:16, 678:18, 678:21, 678:23, 680:14, 680:19, 683:23, 683:24, 688:6, 695:11, 708:4, 710:16, 710:19, 714:20

**blank** [2] - 637:19, 736:21

**blanks** [1] - 694:9

**blocks** [1] - 662:3

**blow** [1] - 657:6

**blow-ups** [1] - 657:6

**blue** [5] - 660:21, 660:23, 661:6, 661:7, 704:15, 711:12

**boards** [1] - 676:21

**bodily** [11] - 724:5, 724:8, 724:10, 724:14, 724:16, 724:18, 724:19, 724:21, 725:1, 725:6, 725:12

**bolts** [1] - 666:10

**bookkeeper** [1] - 668:21

**booklets** [1] - 678:22

**Boost** [1] - 649:5

**bottom** [1] - 736:23

**boundary** [1] - 732:18

**box** [2] - 661:16, 700:17

**boxes** [1] - 704:6

**boy** [1] - 655:2

**braids** [2] - 691:20, 701:15

**bread** [2] - 700:18, 702:11

**break** [1] - 670:14

**brief** [2] - 657:2, 701:6

**bring** [11] - 639:10, 693:10, 704:20, 707:14, 715:25, 734:12, 737:9, 737:10, 737:12, 740:5, 744:13

**broad** [1] - 704:13

**brought** [1] - 700:22

**brown** [1] - 683:21

**brush** [1] - 694:2

**building** [4] - 637:7, 637:9, 694:25, 706:19

**builds** [1] - 687:14

**bumped** [4] - 640:15, 640:17, 640:18, 640:25

**bunch** [1] - 679:16

**burden** [7] - 653:9, 676:1, 700:9, 732:15, 733:11, 733:12, 733:14

**burglaries** [1] - 679:16

**business** [9] - 637:17, 694:13, 694:24, 721:5, 722:2, 722:4, 722:8, 722:10, 722:23

**business'** [1] - 722:12

**businesses** [7] - 637:8, 637:18, 658:18, 694:14, 694:16, 694:17, 722:6

**button** [1] - 664:25

**buttons** [1] - 668:20

**buzz** [1] - 715:23

**BY** [5] - 639:20, 645:23, 647:17, 647:24, 649:3

## C

**C-A-L-D-E-R-O-N** [1] - 639:25

**calderon** [2] - 634:4, 640:3

**Calderon** [6] - 639:15, 639:23, 645:24, 647:18, 678:6, 715:13

**CALDERON** [1] - 639:16

**Cambodia** [1] - 671:2

**Cannon** [27] - 633:21, 638:13, 650:7, 658:25, 659:20, 660:12, 661:12, 662:25, 665:2, 665:17, 665:18, 665:23, 666:2, 666:5, 666:7, 693:12, 693:13, 693:22, 694:5, 697:11, 714:9, 714:13, 714:15, 714:16, 714:18, 718:6

**Cannon's** [21] - 650:11, 650:16, 659:8, 660:17,

661:11, 661:25, 662:8, 663:19, 663:23, 664:3, 667:6, 693:23, 694:1, 694:2, 695:23, 710:13, 710:17, 711:3, 711:13, 714:8, 716:6

**cannot** [4] - 678:3, 709:13, 735:3, 736:3

**Capital** [1] - 640:23

**car** [29] - 641:8, 641:12, 641:24, 641:25, 642:2, 642:15, 644:7, 653:25, 654:4, 662:20, 663:9, 666:13, 674:22, 675:15, 675:16, 676:9, 678:13, 678:20, 680:12, 680:14, 680:15, 680:17, 680:18, 687:6, 687:8, 690:1, 706:25, 710:23, 715:14

**cards** [1] - 637:13

**care** [3] - 706:17, 723:6, 723:16

**careful** [2] - 655:7, 655:24, 734:1

**carefully** [1] - 735:11

**Carrey** [1] - 697:17

**carried** [5] - 663:1, 726:2, 726:6, 726:19, 727:5

**carries** [5] - 652:15, 658:7, 666:4, 726:10, 727:1

**carry** [1] - 725:24

**carrying** [5] - 658:3, 666:18, 702:18, 708:13, 727:6

**cars** [5] - 675:3, 675:14, 675:21, 675:22

**Case** [1] - 633:4

**case** [68] - 635:5, 635:15, 647:6, 650:10, 653:4, 653:15, 654:11, 655:23, 657:15, 657:17, 657:24, 658:21, 669:14, 670:2, 670:5, 670:7, 671:6, 671:7, 671:10, 671:14, 672:6, 672:13, 673:12, 682:15, 682:16, 682:17, 683:9, 683:15, 683:18, 684:11, 684:19, 689:12, 691:1, 694:12, 697:7, 697:10, 698:9, 700:3, 701:10, 705:16, 709:14, 709:20, 711:10, 712:16, 713:6, 713:13, 715:25, 716:21, 716:22, 717:3, 717:6, 717:19, 718:4, 719:22, 731:16, 733:2, 733:10, 733:14, 734:2, 734:9, 734:11, 734:14, 734:17, 735:21, 735:24, 736:20, 737:20

**cases** [2] - 681:24, 697:4

**cash** [6] - 659:13, 665:8, 665:16, 721:4
**cashing** [2] - 669:5, 706:20
**caught** [1] - 705:12
**caused** [1] - 725:2
**causing** [1] - 728:22
**CCR** [2] - 633:23, 745:23
**cell** [37] - 666:15, 668:8, 669:10, 673:23, 674:7, 674:8, 674:11, 674:17, 674:19, 675:7, 675:8, 675:13, 675:19, 676:1, 677:11, 677:16, 677:20, 679:5, 679:6, 679:7, 679:8, 679:9, 679:10, 679:15, 679:17, 684:2, 692:1, 692:2, 692:3, 692:18, 705:21, 705:24, 706:2, 706:6, 712:16
**Cellebrite** [2] - 649:5, 649:23
**central** [1] - 719:14
**certain** [5] - 713:16, 729:19, 734:21, 735:1, 738:10
**certainly** [9] - 637:7, 637:13, 654:19, 662:5, 672:11, 673:19, 684:5, 691:4, 703:4
**certainty** [1] - 733:9
**CERTIFICATION** [1] - 745:16
**certified** [1] - 663:4
**certify** [1] - 745:18
**chain** [2] - 708:25, 733:5
**chair** [1] - 684:8
**chambers** [1] - 636:6
**chance** [2] - 651:18, 697:21
**changes** [1] - 721:14
**characteristic** [2] - 672:22, 672:25
**characteristics** [1] - 691:15
**charge** [6] - 719:14, 719:18, 726:13, 730:17, 732:19, 733:20
**charged** [24] - 652:18, 657:24, 658:5, 670:18, 672:1, 682:18, 709:17, 709:18, 709:24, 710:5, 710:19, 716:13, 719:21, 726:15, 726:17, 728:12, 728:15, 728:18, 728:23, 729:2, 729:23, 730:1, 732:25, 734:6
**Charges** [1] - 637:21
**charges** [23] - 637:23, 651:25, 653:3, 658:8, 662:24, 671:8, 671:17, 671:21, 682:25, 688:25, 693:1, 710:6, 718:5, 720:16, 720:19, 720:21, 722:25, 725:23, 726:2, 726:5, 739:12, 739:15

**chart** [4] - 664:1, 667:4, 667:17, 713:22
**chartered** [1] - 725:20
**charts** [3] - 693:24, 693:25, 713:22
**chase** [4] - 690:23, 700:4, 701:7, 702:1
**chased** [1] - 701:23
**check** [4] - 667:25, 668:1, 669:5, 706:20
**checkered** [1] - 645:11
**circumstance** [1] - 656:12
**circumstances** [5] - 725:5, 725:11, 727:10, 733:6, 735:12
**circumstantial** [4] - 733:3, 733:5, 733:8, 733:9
**circumstantially** [1] - 738:15
**claims** [1] - 704:25
**clarified** [1] - 647:9
**classified** [1] - 731:14
**CLAUDE** [1] - 633:11
**clean** [1] - 733:17
**clear** [5] - 639:21, 655:20, 662:19, 694:15, 741:19
**clearly** [4] - 666:11, 666:13, 703:21, 708:15
**Clearly** [1] - 663:19
**CLERK** [1] - 635:2
**client** [21] - 638:15, 682:24, 693:12, 693:21, 696:6, 698:3, 698:11, 698:24, 699:1, 700:10, 700:25, 701:7, 701:15, 701:16, 701:18, 702:7, 702:24, 703:21, 705:24, 707:13
**client's** [4] - 699:8, 701:12, 704:18, 713:19
**clients** [1] - 704:12
**clients'** [1] - 740:6
**climbing** [1] - 688:1
**close** [6] - 677:1, 677:2, 677:19, 677:20, 698:22, 722:10
**closer** [1] - 641:6
**closet** [1] - 710:17
**closing** [7] - 651:12, 655:25, 656:6, 656:21, 676:21, 700:8, 706:22
**closure** [1] - 722:12
**cloth** [1] - 703:20
**clothes** [1] - 665:7
**clothing** [1] - 705:20
**CMRS** [2] - 633:23, 745:23
**co** [1] - 663:10
**co-conspirators** [1] - 663:10
**coat** [1] - 708:9
**code** [3] - 694:7, 694:8, 712:7
**Code** [6] - 718:8, 718:9,

723:4, 726:9, 728:4, 730:21
**codefendant** [1] - 709:22
**coercion** [1] - 722:24
**colleague** [1] - 668:12
**colleagues** [1] - 639:1
**collect** [1] - 703:11
**collected** [1] - 698:9
**collective** [4] - 740:16, 740:23, 742:9, 743:21
**color** [3] - 644:12, 686:9, 687:12
**colors** [2] - 687:20, 687:23
**coming** [4] - 653:15, 683:22, 683:23, 744:16
**commands** [1] - 728:6
**commerce** [30] - 637:15, 637:22, 637:25, 652:3, 653:6, 658:1, 658:20, 663:15, 663:20, 718:7, 718:11, 718:12, 721:10, 721:12, 721:16, 721:18, 721:21, 721:24, 721:25, 722:1, 722:2, 722:9, 726:15, 730:5, 730:11, 730:24, 731:10, 732:12, 732:16
**commercial** [2] - 722:3, 722:13
**commission** [7] - 726:18, 727:3, 728:2, 728:7, 728:9, 728:15, 728:21
**commit** [6] - 662:17, 691:21, 718:18, 720:4, 723:9, 728:13
**commits** [4] - 718:13, 728:5, 729:12, 729:13
**committed** [28] - 657:18, 658:17, 658:22, 659:1, 659:4, 662:20, 662:23, 666:25, 673:11, 679:15, 685:4, 686:1, 699:3, 699:14, 707:20, 724:13, 726:14, 727:17, 728:18, 728:19, 728:23, 729:1, 729:5, 729:6, 729:10, 730:8, 730:12, 730:15
**committing** [4] - 723:9, 727:23, 729:17, 732:20
**commodity** [1] - 718:12
**common** [10] - 707:1, 707:4, 715:22, 715:24, 716:1, 719:2, 719:11, 720:1, 720:11
**communicate** [1] - 737:5
**communicating** [2] - 668:4, 714:7
**communication** [1] - 737:3
**communications** [5] - 667:4, 667:7, 667:18, 668:2,

713:23
**company** [2] - 694:22, 722:19
**compare** [2] - 674:12, 677:24
**comparison** [3] - 674:15, 704:19, 708:14
**compelling** [1] - 666:25
**compellingly** [1] - 698:19
**complected** [1] - 715:10
**completely** [3] - 695:5, 709:16, 712:22
**complexion** [1] - 691:20
**computer** [1] - 633:25
**computer-aided** [1] - 633:25
**concealment** [1] - 653:14
**conceding** [1] - 695:22
**conceivable** [1] - 696:9
**concern** [2] - 742:1, 742:2
**concerned** [4] - 635:7, 651:15, 717:22, 739:12
**concise** [1] - 655:21
**concluded** [1] - 745:8
**conclusion** [3] - 651:16, 685:12, 694:4
**conditions** [1] - 729:19
**conduct** [4] - 720:11, 720:14, 722:23, 735:8
**conference** [2] - 636:8, 737:16
**conform** [1] - 639:2
**conjunctive** [1] - 732:20
**connection** [2] - 653:2, 726:3
**conscious** [2] - 719:12, 731:20
**consequences** [1] - 721:23
**consider** [10] - 683:15, 717:21, 722:6, 722:8, 727:7, 735:3, 735:15, 735:16, 735:20, 739:12
**consideration** [7] - 635:19, 678:2, 682:22, 683:16, 719:14, 734:2, 737:7
**considered** [6] - 729:15, 733:20, 734:7, 734:10, 737:24, 739:14
**considering** [3] - 722:10, 733:23, 739:15
**consistent** [4] - 681:9, 704:12, 713:12, 738:16
**consisting** [1] - 721:4
**conspiracy** [23] - 651:24, 657:25, 663:8, 709:18, 718:25, 719:4, 719:5, 719:15, 719:17, 719:21, 720:9, 720:15, 729:12, 729:13, 729:15, 729:16, 729:18, 729:23, 730:9, 730:13, 730:16, 738:12, 739:15

**conspirator** [3] - 663:7, 710:25, 729:17

**conspiratorial** [1] - 718:21

**conspirators** [1] - 663:10

**conspire** [1] - 718:7

**conspires** [1] - 718:12

**constitute** [1] - 724:16

**constituting** [2] - 728:1, 729:21

**Constitution** [2] - 699:16, 699:17

**constructive** [1] - 732:1, 732:7

**contact** [2] - 636:6, 649:17

**contacts** [2] - 649:14, 650:6

**contain** [1] - 713:14

**contained** [2] - 711:15, 735:4

**contamination** [1] - 704:5

**context** [2] - 682:1, 682:3

**continued** [1] - 739:6

**contradict** [2] - 696:15, 696:18

**contradicted** [2] - 696:16, 735:23

**contradicts** [3] - 693:16, 694:4, 699:2

**contrary** [1] - 734:18

**contributor** [4] - 660:7, 660:11, 660:13, 681:14

**contributors** [1] - 681:14

**control** [10] - 652:9, 675:8, 723:7, 725:13, 725:15, 725:17, 727:16, 731:22, 732:2, 732:5

**convenience** [3] - 672:2, 672:5, 710:24

**convenient** [1] - 672:7

**conversation** [4] - 647:18, 647:25, 648:4, 714:4

**conversations** [1] - 714:5

**converted** [1] - 726:21

**convict** [2] - 660:2, 689:4

**convicted** [8] - 658:7, 663:1, 672:20, 730:19, 730:23, 731:3, 739:11, 739:13

**conviction** [6] - 653:1, 653:2, 663:4, 694:9, 695:24, 731:6

**convictions** [1] - 738:20

**convinced** [4] - 671:7, 682:24, 700:13, 707:19

**cooperative** [1] - 690:16

**copy** [1] - 638:18

**corner** [1] - 640:19

**correct** [9] - 645:4, 645:18, 648:4, 648:15, 649:6, 650:13, 654:12, 741:15, 745:19

**correctly** [1] - 717:2

**counsel** [4] - 651:11, 709:7,

734:13, 739:8

**counsels** [1] - 728:6

**Count** [24] - 637:2, 651:22, 651:23, 652:1, 652:5, 718:5, 719:12, 719:18, 719:22, 720:16, 720:19, 720:21, 722:25, 725:23, 726:2, 726:5, 726:17, 729:23, 730:9, 730:14, 736:21

**count** [8] - 657:25, 658:1, 658:5, 709:23, 716:13, 729:25, 730:2, 736:17

**counter** [8] - 665:19, 665:22, 694:21, 700:16, 704:25, 705:1, 705:15, 707:22

**countless** [1] - 712:19

**country** [5] - 670:23, 670:24, 670:25, 671:3, 671:4

**Counts** [10] - 651:22, 652:18, 662:24, 721:2, 726:15, 727:23, 728:15, 730:7, 730:17, 731:7

**counts** [15] - 636:19, 636:23, 637:1, 638:1, 638:5, 638:24, 652:2, 652:20, 657:25, 658:2, 669:23, 676:13, 682:22, 721:5, 739:2

**couple** [1] - 670:3

**coupled** [1] - 724:11

**course** [3] - 712:4, 719:3, 719:11

**COURT** [77] - 633:1, 635:4, 635:7, 635:11, 635:15, 635:20, 635:22, 635:25, 636:4, 636:7, 636:11, 636:14, 636:16, 636:21, 638:3, 638:21, 639:4, 639:7, 639:10, 639:12, 648:18, 650:21, 650:23, 651:1, 651:6, 651:8, 651:14, 653:21, 654:12, 654:23, 655:2, 655:4, 655:11, 655:16, 656:3, 656:12, 656:20, 657:8, 657:10, 657:12, 669:16, 691:24, 692:20, 716:14, 717:11, 737:21, 738:8, 738:13, 738:17, 739:4, 739:8, 739:19, 739:23, 740:3, 740:9, 740:12, 740:15, 740:21, 741:10, 741:16, 741:24, 742:5, 742:9, 742:16, 742:20, 743:1, 743:5, 743:7, 743:15, 743:19, 744:1, 744:3, 744:7, 744:15, 744:21, 745:2, 745:5

**court** [8] - 649:10, 699:21,

700:1, 717:23, 730:23, 731:4, 739:7

**Court** [19] - 633:23, 639:2, 653:18, 657:13, 663:6, 677:17, 717:17, 734:7, 734:20, 736:6, 737:1, 737:3, 737:17, 737:23, 737:25, 740:7, 740:11, 742:21, 743:13

**court's** [1] - 644:18

**courthouse** [2] - 688:9

**courtroom** [9] - 656:7, 670:16, 670:17, 671:25, 673:3, 688:6, 701:9, 736:5

**courts** [1] - 699:21

**cover** [1] - 668:22

**covered** [3] - 646:9, 646:14, 711:8

**cowardly** [1] - 669:20

**crack** [1] - 706:22

**crazy** [1] - 693:5

**created** [1] - 670:13

**credibility** [2] - 653:9, 735:7

**credit** [16] - 641:17, 641:19, 642:1, 652:11, 658:2, 659:5, 723:7, 723:16, 725:14, 725:15, 725:17, 725:19, 725:20, 726:16, 730:6

**Credit** [37] - 640:5, 640:13, 641:7, 658:10, 659:2, 659:7, 659:21, 662:11, 663:17, 671:13, 675:18, 677:22, 677:23, 677:25, 678:5, 679:11, 679:18, 679:20, 679:23, 680:11, 685:20, 688:18, 690:11, 696:17, 699:5, 700:16, 701:1, 709:25, 716:4, 720:22, 723:1, 723:17, 723:21, 723:25, 725:21, 726:7

**crime** [49] - 652:16, 658:3, 658:7, 662:6, 670:8, 670:18, 673:7, 673:10, 673:11, 673:15, 699:14, 703:12, 707:21, 709:12, 711:25, 719:5, 720:12, 725:25, 726:10, 726:14, 726:16, 726:19, 727:8, 727:10, 727:16, 727:18, 728:9, 728:12, 728:13, 728:18, 728:21, 728:22, 728:23, 728:25, 729:4, 729:5, 729:9, 729:10, 729:12, 729:14, 729:17, 729:20, 729:24, 730:7, 730:12, 730:23, 731:4, 731:11, 731:12

**crimes** [11] - 658:17, 665:10,

669:20, 689:5, 697:7, 707:4, 727:3, 727:24, 728:15, 730:10

**criminal** [7] - 635:2, 663:7, 680:24, 682:3, 718:25, 720:13, 733:14

**criticize** [1] - 681:25

**cross** [2] - 704:4, 704:5

**Cross** [1] - 634:2

**CROSS** [1] - 645:22

**cross-examination** [2] - 704:4, 704:5

**CROSS-EXAMINATION** [1] - 645:22

**crossed** [2] - 641:10, 641:15

**crowd** [1] - 706:17

**crumbs** [2] - 700:18, 702:11

**CSI** [1] - 673:2

**curative** [1] - 738:1

**custody** [7] - 652:9, 708:25, 722:19, 723:7, 723:16, 725:13, 725:17

**customers** [4] - 722:4, 722:7, 723:21, 725:16

**cut** [4] - 655:8, 655:12, 655:19, 656:10

**D**

**D.C** [8] - 663:19, 663:25, 675:17, 679:16, 700:25, 707:2, 708:12, 709:1

**Damian** [1] - 669:3

**dangerous** [3] - 723:11, 723:22, 724:4

**dark** [2] - 666:11, 691:20

**darker** [5] - 664:16, 664:17, 687:20, 687:21, 715:10

**darker-skinned** [2] - 664:16, 664:17

**data** [4] - 706:2, 741:5, 741:12, 742:18

**date** [3] - 647:21, 695:25, 736:24

**dates** [1] - 658:16

**Davis** [1] - 720:20

**dawn** [1] - 706:22

**days** [5] - 658:23, 666:6, 676:23, 684:10, 708:18

**de** [1] - 722:1

**deal** [6] - 651:11, 683:10, 683:11, 683:12, 683:13, 744:11

**death** [1] - 724:4

**December** [30] - 638:12, 640:4, 640:12, 648:7, 648:10, 658:10, 658:11, 658:12, 661:13, 663:22, 665:1, 665:5, 665:16, 666:19, 666:21, 667:17,

671:12, 671:13, 671:14, 671:22, 672:16, 674:23, 675:9, 675:10, 675:11, 678:9, 678:13, 680:15, 714:5
**deciding** [1] - 672:6
**decision** [3] - 683:10, 683:11, 720:8
**dedicated** [1] - 703:13
**Defendant** [5] - 633:19, 633:20, 633:21, 633:22, 638:12
**defendant** [51] - 635:15, 658:5, 672:23, 673:6, 718:21, 718:23, 719:8, 719:18, 719:20, 719:23, 720:3, 720:4, 721:3, 721:8, 721:20, 721:22, 723:15, 723:20, 725:4, 725:9, 726:14, 726:19, 727:5, 727:9, 728:8, 728:11, 728:17, 728:24, 729:6, 729:8, 729:19, 729:22, 729:24, 730:16, 731:3, 731:6, 731:19, 732:19, 732:22, 732:24, 733:6, 733:13, 733:16, 733:17, 733:21, 733:22, 733:23, 733:25, 736:16, 737:23
**defendant's** [1] - 734:1
**defendants** [29] - 653:16, 656:14, 657:24, 659:10, 660:2, 661:7, 662:7, 662:19, 663:4, 666:24, 667:19, 697:9, 698:10, 701:9, 709:17, 713:24, 714:5, 715:1, 720:17, 720:19, 720:21, 723:1, 725:23, 726:2, 726:5, 727:13, 730:17, 736:19, 739:10
**DEFENDANTS** [1] - 634:3
**Defendants** [2] - 633:7, 633:19
**defendants'** [3] - 662:6, 727:15, 727:16
**Defense** [2] - 644:19, 644:21
**defense** [1] - 709:16
**define** [14] - 652:3, 652:4, 652:7, 652:8, 652:9, 652:11, 652:15, 652:16, 652:21, 653:5
**defined** [2] - 723:9, 730:2
**defining** [1] - 651:22
**definitely** [2] - 672:11, 715:14
**defy** [1] - 716:3
**degree** [3] - 718:10, 721:13, 733:9
**delay** [3] - 718:7, 721:20,

721:24
**delayed** [2] - 721:11, 721:25
**delays** [3] - 652:3, 718:11, 721:12
**deliberate** [5] - 682:16, 719:13, 724:7, 736:7, 737:2
**deliberately** [11] - 719:9, 719:24, 720:3, 721:9, 721:22, 723:20, 725:3, 725:9, 725:10, 728:11
**deliberations** [5] - 716:24, 717:8, 736:10, 737:11, 739:17
**deliver** [1] - 700:23
**demands** [1] - 669:23
**demeanor** [1] - 735:16
**denied** [2] - 638:3, 638:22
**deny** [2] - 636:21, 639:4
**depletion** [1] - 721:17
**deposit** [6] - 640:21, 640:24, 642:18, 642:19, 642:24, 704:10
**deposited** [1] - 725:16
**deposits** [1] - 723:24
**descent** [2] - 691:16, 691:19
**describe** [9] - 643:21, 644:4, 644:9, 644:12, 644:15, 687:25, 689:13, 702:17, 731:19
**described** [4] - 644:6, 708:12, 730:7, 731:7
**describing** [2] - 648:14, 689:9
**description** [28] - 643:6, 643:8, 645:4, 645:6, 645:17, 648:15, 659:20, 664:9, 664:14, 664:16, 667:12, 678:12, 678:25, 679:2, 684:14, 684:17, 684:18, 684:23, 684:25, 685:7, 685:11, 687:12, 688:4, 688:11, 689:12, 695:12, 714:21, 716:10
**descriptions** [2] - 684:12, 684:13
**deserves** [4] - 682:21, 682:22, 735:8, 736:2
**designed** [1] - 726:21
**desk** [3] - 686:7, 687:8, 688:19
**despite** [1] - 703:23
**destructive** [1] - 726:24
**detail** [3] - 687:1, 719:7, 720:24
**detailed** [2] - 729:2, 730:9
**details** [1] - 720:6
**detective** [1] - 706:25
**determination** [1] - 654:16
**determine** [2] - 685:1, 685:2

**determining** [1] - 727:5
**deviated** [1] - 689:22
**device** [3] - 661:15, 723:11, 726:24
**devotion** [1] - 657:23
**difference** [2] - 738:18, 743:19
**differences** [1] - 695:4
**different** [18] - 637:10, 637:18, 672:3, 673:4, 680:17, 683:19, 685:18, 688:7, 694:22, 695:5, 698:3, 698:4, 699:7, 702:17, 706:18, 706:23, 731:23, 734:23
**differing** [2] - 688:2, 704:9
**difficult** [1] - 683:6
**difficulty** [2] - 687:17, 716:22
**digits** [1] - 714:12
**Dimanche** [4] - 662:9, 663:16, 668:14, 715:7
**DIRECT** [2] - 639:19, 649:2
**Direct** [1] - 634:2
**direct** [7] - 640:3, 722:4, 732:2, 733:2, 733:3, 733:8, 733:10
**directed** [1] - 638:22
**direction** [1] - 702:20
**directly** [6] - 657:15, 693:15, 694:3, 719:7, 729:21, 732:6
**disagree** [1] - 670:25
**disappear** [1] - 680:9
**disappeared** [1] - 716:7
**discussed** [1] - 720:13
**discussing** [1] - 720:10
**discussion** [4] - 712:1, 717:13, 736:10, 736:14
**disjointed** [1] - 697:23
**disjunctive** [1] - 653:7
**display** [1] - 724:15
**displayed** [1] - 727:13
**dispute** [6] - 658:14, 658:16, 658:19, 658:21, 661:11, 738:17
**disregard** [1] - 734:19
**distance** [2] - 674:3, 701:20
**distinction** [1] - 733:7
**distinctive** [7] - 664:23, 695:18, 700:17, 703:3, 707:22, 710:1, 710:10
**distinctive-looking** [2] - 700:17, 707:22
**DISTRICT** [3] - 633:1, 633:1, 633:12
**District** [1] - 675:18
**divide** [1] - 677:7
**DIVISION** [1] - 633:2
**DNA** [59] - 660:5, 660:6, 660:9, 660:18, 660:21,

660:24, 661:1, 661:2, 661:4, 671:19, 673:14, 674:14, 676:11, 681:7, 681:10, 681:11, 681:12, 681:13, 681:15, 681:19, 684:3, 690:25, 691:7, 691:8, 691:9, 691:12, 691:13, 691:14, 691:16, 698:5, 698:12, 698:17, 699:8, 702:23, 703:18, 703:24, 704:7, 704:10, 708:7, 708:20, 708:22, 711:1, 711:3, 711:4, 711:8, 714:22, 740:4, 740:17, 740:23, 741:3, 741:12, 742:10, 742:18, 743:15, 743:22, 744:3
**document** [1] - 665:10
**documents** [1] - 676:20
**dollars** [2] - 681:5, 708:10
**dominion** [1] - 732:5
**done** [12] - 637:14, 638:21, 657:22, 672:7, 675:22, 682:11, 682:12, 697:22, 725:3, 725:4, 744:24
**door** [6] - 659:8, 666:12, 669:6, 669:8, 695:1
**doors** [1] - 666:11
**double** [2] - 667:25, 668:1
**doubt** [41] - 659:3, 659:4, 662:16, 662:19, 670:9, 672:15, 677:18, 682:5, 684:21, 685:1, 685:6, 685:9, 691:4, 698:1, 699:15, 700:5, 700:11, 707:20, 718:17, 719:16, 719:23, 720:2, 721:2, 721:22, 723:14, 725:8, 726:13, 727:15, 728:10, 728:16, 729:1, 729:24, 730:3, 730:4, 731:2, 732:17, 732:24, 733:12, 734:1, 734:4
**Douglas** [1] - 633:19
**down** [16] - 636:8, 646:10, 646:13, 648:18, 648:20, 650:23, 650:25, 653:24, 668:20, 668:24, 686:10, 688:2, 689:21, 701:5, 702:14, 744:24
**downstairs** [1] - 744:25
**dozens** [2] - 703:23, 705:7
**draw** [2] - 637:2, 637:18
**dread** [3] - 647:10, 686:10, 686:19
**dreadlocks** [3] - 680:19, 687:5, 687:7
**dreads** [14] - 644:4, 644:7, 645:6, 646:20, 647:9, 664:18, 664:19, 678:14,

678:15, 684:1, 715:12, 715:14
**dressed** [1] - 711:8
**driven** [1] - 680:18
**driver** [16] - 643:11, 645:4, 645:18, 646:8, 646:11, 646:13, 647:9, 666:13, 674:23, 678:14, 679:1, 680:10, 680:18, 680:19, 680:20
**driver's** [2] - 645:7, 666:12
**driving** [5] - 643:6, 643:22, 643:25, 644:7, 678:20
**dropped** [5] - 660:22, 661:7, 666:19, 673:17, 711:12
**dropping** [2] - 661:6, 691:3
**drove** [1] - 642:3
**drum** [2] - 662:13, 710:2
**drum-style** [1] - 710:2
**duly** [2] - 639:17, 648:25
**Dumb** [1] - 697:17
**Dumber** [1] - 697:17
**dummy** [1] - 712:10
**duplicating** [1] - 655:24
**during** [16] - 657:16, 658:3, 676:21, 682:13, 712:4, 725:24, 726:6, 726:9, 726:18, 729:13, 730:7, 730:11, 730:12, 734:25, 737:25
**duty** [5] - 684:6, 717:16, 717:25, 718:2, 736:8
**Dyer** [23] - 633:22, 651:5, 659:1, 659:20, 664:14, 665:2, 665:10, 665:15, 665:21, 667:5, 697:11, 700:10, 700:15, 702:4, 702:7, 703:1, 703:3, 703:19, 704:25, 712:17, 714:11, 714:14, 718:6
**Dyer's** [7] - 660:18, 664:6, 667:3, 708:15, 711:11, 711:14, 713:1

## E

**early** [2] - 640:5, 640:11
**Earth** [1] - 697:20
**easier** [1] - 700:24
**EASTERN** [1] - 633:1
**easy** [1] - 683:3
**echo** [1] - 693:2
**effect** [4] - 683:11, 683:12, 683:13, 722:1
**eight** [3] - 698:9, 703:15, 703:16
**either** [10] - 636:2, 689:20, 701:18, 724:24, 732:6, 733:8, 735:21, 735:23, 736:4, 738:4

**elderly** [1] - 640:15
**element** [6] - 637:19, 670:8, 694:11, 707:21, 709:11, 729:2
**elements** [15] - 637:21, 651:23, 652:2, 652:6, 652:13, 652:19, 694:12, 718:16, 721:1, 723:13, 726:12, 727:19, 730:1, 731:1, 739:2
**employee** [1] - 723:16
**employees** [2] - 721:5, 723:21
**encompassed** [3] - 718:19, 743:8, 743:10
**encounter** [1] - 701:6
**encountered** [2] - 659:9, 701:4
**end** [4] - 642:20, 651:16, 667:20, 700:24
**ended** [1] - 655:13
**enforcement** [1] - 659:7
**engage** [1] - 722:13
**engaged** [2] - 721:17, 722:3
**English** [2] - 706:8
**ensued** [1] - 701:7
**enter** [1] - 715:10
**entered** [6] - 701:8, 706:16, 719:1, 719:24, 720:3, 734:14
**enters** [4] - 639:11, 657:11, 717:9, 744:14
**entire** [1] - 655:23
**entirety** [1] - 684:7
**entitled** [1] - 745:20
**entity** [1] - 637:11
**escape** [1] - 702:3
**especially** [2] - 638:1, 689:2
**Esq** [6] - 633:17, 633:18, 633:19, 633:20, 633:21, 633:22
**essential** [13] - 651:23, 652:1, 652:5, 652:13, 652:19, 718:16, 721:1, 723:13, 726:12, 727:19, 729:2, 730:1, 731:1
**essentially** [1] - 671:21
**established** [3] - 672:14, 730:2
**establishes** [2] - 658:24, 720:2
**establishing** [1] - 637:14
**establishment** [1] - 669:5
**establishments** [1] - 716:10
**et** [2] - 633:6, 635:3
**evade** [1] - 690:22
**evening** [1] - 667:22
**event** [1] - 672:18
**events** [2] - 648:10, 682:13
**everywhere** [1] - 711:9

**evidence** [116] - 636:20, 636:22, 638:4, 638:15, 638:23, 648:21, 649:8, 653:15, 653:22, 653:23, 654:11, 657:5, 657:19, 658:24, 659:3, 660:1, 661:10, 662:6, 662:18, 664:2, 664:8, 666:25, 668:1, 668:13, 669:22, 670:3, 670:5, 671:16, 671:19, 673:13, 677:21, 678:1, 678:22, 679:20, 679:21, 680:21, 680:22, 681:5, 682:6, 683:15, 684:3, 684:8, 685:14, 685:17, 685:23, 685:24, 686:4, 687:18, 689:11, 692:14, 693:20, 693:21, 694:3, 694:14, 694:15, 695:1, 697:23, 698:23, 699:2, 700:12, 700:20, 700:22, 703:5, 705:3, 706:9, 707:8, 707:9, 708:8, 709:5, 710:13, 711:24, 712:6, 713:4, 713:23, 715:2, 715:24, 716:12, 717:18, 718:4, 719:22, 720:2, 722:6, 727:7, 731:16, 733:1, 733:3, 733:5, 733:8, 733:10, 733:15, 733:18, 733:19, 734:2, 734:10, 734:14, 734:15, 734:22, 735:1, 735:3, 735:13, 735:24, 736:5, 736:11, 737:20, 739:10, 739:11, 740:22, 740:23, 741:2, 741:6, 741:7, 741:20, 742:6, 742:10, 742:18, 743:21
**exact** [1] - 692:4
**exactly** [8] - 637:11, 656:14, 665:4, 686:2, 696:3, 742:12, 743:14, 743:16
**EXAMINATION** [4] - 639:19, 645:22, 647:16, 649:2
**examination** [5] - 649:4, 649:5, 649:23, 704:4, 704:5
**examine** [3] - 708:20, 708:21
**examined** [2] - 741:6, 741:20
**examiner** [1] - 704:17
**example** [2] - 697:16, 725:17
**examples** [1] - 698:9
**exceeding** [3] - 730:24, 731:4, 731:12
**except** [2] - 691:21, 696:24
**excited** [1] - 635:6
**exclude** [1] - 661:2
**excluded** [1] - 697:6
**exclusion** [4] - 660:8,

660:11, 660:13, 685:5
**exclusively** [1] - 734:6
**excuse** [2] - 692:23, 717:3
**excused** [3] - 648:19, 650:24, 745:5
**exercise** [1] - 732:5
**exert** [1] - 731:22
**Exhibit** [8] - 644:19, 644:21, 649:7, 649:21, 649:22, 693:10, 693:15, 693:16
**exhibit** [9] - 650:5, 692:11, 695:24, 710:15, 740:3, 740:22, 742:5, 743:2, 743:9
**exhibits** [7] - 684:9, 692:16, 695:14, 737:10, 737:12, 741:11, 741:17
**existed** [1] - 719:17
**existence** [3] - 651:24, 729:13, 730:12
**exits** [2] - 651:13, 739:18
**exonerate** [1] - 712:23
**exonerated** [2] - 679:14, 713:5
**exonerates** [2] - 697:9, 697:11
**exoneration** [1] - 697:6
**exonerations** [1] - 697:5
**expect** [2] - 703:24, 724:16
**expected** [2] - 642:7, 642:9
**expel** [1] - 726:22
**expert** [7] - 660:5, 660:9, 681:15, 703:19, 703:24, 706:1, 707:10
**experts** [1] - 703:24
**explain** [3] - 652:16, 700:24, 702:22
**explained** [3] - 646:16, 676:2, 719:17
**explanation** [1] - 703:17
**explosive** [1] - 726:22
**exposed** [1] - 686:25
**exposes** [1] - 724:3
**expressed** [1] - 719:7
**extent** [1] - 735:22
**eye** [3] - 686:19, 686:25
**eyes** [2] - 683:21, 686:18
**eyewitness** [3] - 672:19, 674:14, 733:4

## F

**face** [7] - 643:15, 646:9, 646:14, 668:16, 668:19, 668:24, 715:7
**fact** [16] - 637:4, 637:9, 637:22, 637:24, 659:20, 663:5, 663:10, 682:2, 691:22, 700:23, 703:23, 704:22, 720:4, 721:25,

733:4, 739:13
**facts** [12] - 656:15, 682:4, 682:7, 717:18, 718:3, 727:7, 733:2, 733:5, 734:22, 734:23, 734:24, 735:4
**fair** [3] - 648:10, 655:13, 734:8
**Fairfax** [2] - 642:14, 720:18
**faith** [6] - 681:25, 682:1, 682:2, 682:3, 682:6, 682:11
**family's** [1] - 683:14
**fantastic** [2] - 635:18, 705:19
**far** [6] - 651:14, 707:15, 708:18, 739:12, 742:8, 744:23
**fast** [1] - 682:17
**FBI** [6] - 647:4, 659:11, 659:12, 660:4, 661:10, 703:12
**fear** [7] - 721:7, 722:17, 722:24, 724:15, 725:1, 725:6, 725:7
**fearful** [1] - 725:12
**Federal** [40] - 640:4, 640:13, 641:6, 658:9, 659:2, 659:7, 659:21, 662:11, 663:17, 671:13, 675:18, 677:22, 677:23, 677:25, 678:5, 679:11, 679:18, 679:20, 679:23, 680:11, 685:19, 688:18, 690:11, 695:20, 695:21, 696:17, 696:22, 699:5, 700:16, 701:1, 702:9, 703:5, 709:25, 716:4, 720:22, 723:1, 723:17, 723:21, 723:24, 726:7
**federal** [5] - 658:1, 723:15, 723:24, 725:15, 725:19
**feet** [3] - 665:14, 665:16, 701:21
**felon** [2] - 663:13, 710:6
**felonies** [1] - 737:19
**felons** [1] - 663:5
**felony** [5] - 652:21, 727:19, 730:19, 731:13, 739:11
**FENNERN** [1] - 648:24
**Fennern** [3] - 634:5, 648:23, 649:4
**few** [1] - 705:4
**fifth** [1] - 646:12
**fight** [2] - 641:3, 642:9
**fighting** [2] - 699:23, 701:3
**figure** [2] - 636:5, 741:3
**figured** [1] - 636:13
**fill** [1] - 694:8
**filled** [1] - 736:25
**final** [1] - 702:12

**finally** [2] - 667:10, 692:1
**findings** [14] - 741:12, 742:14, 742:18, 742:24, 743:4, 743:5, 743:8, 743:10, 743:12, 743:15, 743:22
**fine** [11] - 635:11, 635:24, 656:18, 717:5, 740:10, 743:24, 743:25, 744:2, 744:3, 744:21
**fingerprint** [6] - 673:1, 673:4, 698:8, 703:6, 704:17, 708:14
**fingerprints** [21] - 673:3, 673:14, 674:13, 676:11, 681:8, 698:12, 698:16, 703:1, 703:2, 703:7, 703:9, 704:16, 704:18, 706:14, 708:7, 711:5, 711:9, 711:12, 711:13, 711:14, 713:7
**finish** [4] - 651:16, 656:21, 669:16, 691:24
**finished** [1] - 716:22
**finishing** [2] - 692:20, 692:21
**fire** [1] - 661:18
**firearm** [28] - 652:15, 658:3, 658:6, 663:12, 726:3, 726:10, 726:19, 726:20, 726:23, 726:24, 726:25, 727:1, 727:2, 727:6, 727:7, 727:9, 727:10, 727:11, 727:15, 730:7, 730:11, 730:18, 730:19, 730:25, 731:7, 732:17
**firearms** [8] - 661:17, 695:6, 695:9, 695:10, 725:24, 726:6, 727:2
**fired** [1] - 727:13
**firm** [1] - 721:17
**first** [31] - 635:10, 636:6, 639:13, 640:1, 642:19, 657:14, 659:2, 659:5, 663:23, 664:9, 666:8, 666:14, 670:6, 671:11, 671:18, 678:1, 679:5, 681:18, 686:5, 688:16, 691:13, 697:12, 700:19, 703:16, 715:19, 718:18, 726:14, 731:3, 736:8
**fit** [12] - 659:20, 667:11, 684:13, 684:16, 684:23, 684:25, 685:11, 685:22, 688:10, 714:21, 716:9
**fits** [5] - 664:14, 664:15, 684:17, 684:18, 685:7
**fitting** [1] - 684:14
**five** [3] - 648:7, 661:2, 705:4
**flagrant** [1] - 665:9
**flap** [1] - 664:25

**flashing** [2] - 676:23, 677:13
**fleeing** [1] - 653:16
**flight** [10] - 653:14, 653:23, 654:15, 654:19, 690:7, 690:8, 690:9, 690:13, 696:22
**flow** [1] - 721:15
**flying** [1] - 665:19
**follow** [6] - 655:22, 680:24, 680:25, 681:2, 695:21, 717:16
**followed** [4] - 654:6, 654:14, 690:1, 690:6
**following** [4] - 635:16, 654:3, 730:4, 739:6
**follows** [3] - 639:18, 649:1, 737:16
**Food** [16] - 658:11, 671:12, 671:16, 675:17, 676:5, 676:6, 676:7, 676:16, 676:18, 676:23, 676:25, 677:10, 677:14, 677:15, 677:21, 682:12, 685:19, 687:16, 688:5, 688:23, 689:8, 692:23, 695:5, 695:13, 695:15, 695:18, 698:18, 705:24, 712:25, 720:20, 726:4
**foot** [3] - 684:16, 713:8
**FOR** [1] - 634:3
**force** [12] - 652:8, 658:17, 721:7, 722:17, 722:24, 723:4, 723:18, 724:15, 724:23, 724:25, 727:20, 727:22
**forced** [1] - 668:16
**foreclosure** [1] - 722:12
**foregoing** [2] - 722:6, 745:19
**foreign** [1] - 731:10
**foreperson** [3] - 736:8, 736:25, 737:4
**FOREPERSON** [3] - 744:20, 745:1, 745:4
**foreperson's** [1] - 736:23
**forget** [1] - 660:16
**form** [3] - 735:2, 736:19, 737:10
**formal** [2] - 719:6, 734:11
**forms** [1] - 737:12
**forth** [1] - 718:19
**forward** [6] - 635:8, 636:22, 638:4, 638:23, 639:7, 640:20
**four** [42] - 638:13, 646:12, 653:23, 655:4, 656:14, 659:4, 659:9, 660:2, 660:4, 661:5, 662:6, 662:19, 662:23, 663:3, 663:22, 667:19, 668:2, 668:4, 669:18, 672:2, 672:3,

682:17, 683:18, 684:22, 685:3, 689:21, 696:21, 701:4, 702:19, 703:16, 714:12, 716:4, 720:16, 720:19, 720:21, 722:25, 723:13, 723:24, 725:23, 726:2, 726:5, 730:17
**fourth** [2] - 673:18, 673:19
**frame** [1] - 726:22
**framed** [1] - 716:7
**frankly** [1] - 743:20
**free** [1] - 722:23
**Freeman** [2] - 664:17, 698:20
**fresh** [2] - 648:11, 656:25
**Friday** [6] - 635:12, 635:16, 635:17, 636:12, 667:23
**front** [3] - 646:2, 670:16, 680:14
**full** [1] - 639:22
**function** [1] - 716:1
**funds** [2] - 725:14, 725:18
**furtherance** [3] - 718:14, 730:13, 738:11
**future** [3] - 683:13, 683:14, 722:18

### G

**Gaines** [1] - 661:23
**gallery** [1] - 691:18
**game** [1] - 655:13
**gaping** [1] - 685:25
**general** [2] - 653:8, 692:18
**generalized** [1] - 684:15
**generally** [1] - 731:12
**gentleman** [1] - 683:9
**gentlemen** [26] - 651:9, 657:14, 658:23, 662:18, 664:22, 668:11, 669:19, 669:25, 671:9, 672:6, 674:9, 674:20, 675:6, 675:23, 679:3, 679:19, 680:3, 681:25, 682:14, 693:2, 699:19, 713:9, 713:14, 716:11, 716:14, 717:11
**Georgia** [1] - 638:12
**getaway** [9] - 667:16, 674:22, 678:14, 678:25, 680:10, 680:18, 680:19, 680:20
**gigantic** [2] - 694:8, 695:4
**GILES** [13] - 638:20, 645:23, 647:15, 647:22, 651:7, 653:13, 709:15, 737:25, 740:13, 740:18, 741:1, 741:6, 741:19
**Giles** [6] - 633:17, 657:17, 668:12, 686:15, 700:14, 704:25
**given** [10] - 652:25, 654:10,

675:4, 713:5, 717:18,
732:2, 732:5, 733:8,
735:10, 739:1
**glad** [1] - 740:12
**Glass** [1] - 698:8
**glove** [1] - 690:25
**gloved** [1] - 711:7
**gloves** [10] - 659:14, 681:11,
681:12, 681:17, 681:20,
681:22, 702:22, 708:22,
708:23, 711:6
**goal** [5] - 718:22, 718:24,
719:23, 719:25, 720:8
**goals** [3] - 720:11, 729:14,
730:13
**goods** [1] - 721:15
**government** [57] - 635:7,
636:6, 637:3, 637:14,
651:6, 652:6, 652:14,
652:20, 652:22, 654:7,
663:13, 670:7, 671:10,
674:21, 675:25, 677:6,
677:19, 679:22, 683:17,
685:13, 685:16, 686:3,
687:17, 688:14, 691:22,
692:17, 693:22, 697:13,
697:22, 700:3, 705:11,
707:16, 707:17, 708:2,
715:23, 718:17, 719:8,
719:16, 721:1, 721:19,
721:21, 723:14, 725:6,
725:8, 726:12, 727:12,
727:14, 728:10, 728:16,
728:25, 729:8, 729:22,
731:2, 732:15, 732:22,
732:23, 734:3
**government's** [2] - 676:21,
678:22
**Government's** [1] - 649:22
**GPS** [11] - 659:6, 659:13,
661:15, 690:10, 695:22,
700:17, 702:8, 702:10,
702:14, 708:11, 716:6
**GPSs** [1] - 716:5
**grand** [1] - 734:9
**great** [6] - 683:10, 683:11,
683:12, 683:13, 699:22,
705:18
**greater** [1] - 733:9
**greeter** [2] - 662:10, 668:15
**Greg** [1] - 699:20
**Gregory** [1] - 633:22
**grocery** [1] - 706:19
**ground** [6] - 668:16, 668:24,
690:17, 701:2, 701:19,
715:21
**guarantee** [2] - 656:1,
701:10
**guess** [7] - 642:2, 647:19,
668:6, 670:2, 675:1,

676:24, 743:7
**guided** [1] - 735:8
**guilt** [8] - 661:10, 682:4,
682:7, 733:6, 733:11,
734:1, 734:3, 734:10
**guilty** [18] - 663:11, 669:23,
671:7, 682:24, 692:25,
700:11, 700:14, 716:13,
718:15, 723:12, 726:11,
728:14, 728:24, 729:19,
729:23, 729:24, 736:22
**gun** [28] - 637:23, 653:3,
662:12, 662:14, 663:9,
663:10, 668:16, 668:18,
668:19, 668:23, 676:17,
681:4, 682:13, 689:2,
689:3, 689:5, 689:6, 689:7,
689:13, 695:17, 700:17,
705:18, 707:23, 710:19,
726:21, 739:12, 739:16
**guns** [27] - 637:24, 662:7,
662:17, 663:11, 663:17,
663:18, 671:20, 688:16,
688:17, 688:20, 688:25,
689:9, 689:11, 689:13,
689:14, 698:20, 703:2,
703:7, 703:9, 706:16,
706:23, 710:5, 710:7,
710:9, 715:7
**guy** [9] - 672:21, 673:16,
674:23, 677:18, 682:21,
687:7, 697:6, 705:12,
706:13
**guys** [9] - 676:15, 677:1,
689:21, 690:2, 696:19,
696:20, 699:4, 699:5,
701:14

---

# H

**Hablenko** [3] - 662:13,
663:16, 704:24
**hablenko** [1] - 668:17
**hair** [14] - 644:3, 660:23,
660:24, 661:8, 686:11,
686:12, 691:15, 691:19,
691:20, 703:19, 703:21,
703:22, 708:7
**hairs** [4] - 703:20, 703:22,
703:23, 708:21
**hairstyle** [4] - 643:22,
643:24, 645:7, 715:17
**half** [1] - 708:18
**hand** [2] - 689:2, 709:21
**handgun** [1] - 710:16
**handing** [1] - 665:13
**handle** [1] - 704:9
**handwriting** [1] - 645:1
**hanging** [1] - 686:10
**harm** [11] - 724:5, 724:8,

724:10, 724:14, 724:16,
724:18, 724:19, 724:21,
725:1, 725:6, 725:12
**Hassen** [2] - 668:23, 694:20
**hat** [4] - 646:18, 646:20,
681:17, 703:20
**head** [2] - 678:17, 703:22
**hear** [7] - 680:23, 684:14,
684:15, 686:15, 687:3,
713:7, 742:22
**heard** [30] - 637:23, 641:8,
641:25, 658:24, 659:23,
660:4, 660:5, 661:1, 661:2,
661:20, 661:22, 662:13,
664:17, 683:19, 686:24,
687:4, 693:9, 693:20,
694:14, 694:19, 694:20,
697:16, 699:11, 701:8,
703:8, 709:7, 715:12,
739:10, 742:2
**hearing** [3] - 635:12, 657:19,
659:3
**heights** [3] - 687:13, 688:3,
688:7
**Heights** [1] - 675:18
**held** [3] - 641:23, 709:20,
728:8
**help** [3] - 656:3, 678:8,
707:18
**helped** [1] - 669:11
**helpful** [1] - 739:2
**helping** [1] - 718:24
**herself** [1] - 669:9
**hesitant** [1] - 640:16
**hiding** [2] - 696:25, 702:5
**highest** [1] - 670:10
**highlight** [2] - 670:5, 677:23
**Highway** [1] - 720:20
**hill** [1] - 702:3
**HILTON** [1] - 633:11
**himself** [6] - 665:11, 665:12,
669:1, 714:14, 728:11,
729:9
**Hispanics** [1] - 704:14
**hit** [6] - 640:19, 642:14,
642:15, 668:8, 695:21,
697:1
**Hobbs** [1] - 718:19
**hold** [2] - 669:19, 695:13
**holding** [7] - 665:13, 665:16,
674:1, 674:18, 700:16,
707:22, 710:9
**holds** [1] - 725:16
**hole** [6] - 686:16, 686:19,
686:25, 699:9, 710:2,
715:9
**holes** [4] - 662:9, 686:13,
686:18, 715:8
**home** [4] - 694:19, 706:5,
713:19, 713:25

**homicide** [1] - 679:16
**honking** [1] - 662:21
**Honor** [44] - 636:18, 636:24,
637:20, 638:6, 638:9,
638:20, 638:25, 639:9,
639:14, 645:21, 648:17,
648:21, 648:22, 650:20,
650:22, 651:7, 653:13,
653:20, 654:22, 654:25,
655:5, 655:14, 655:18,
656:18, 657:4, 657:9,
695:14, 737:15, 738:1,
738:24, 739:22, 740:13,
740:18, 740:25, 741:2,
741:8, 741:15, 741:19,
742:1, 742:11, 742:15,
742:22, 743:17, 743:18
**Honor's** [1] - 637:2
**HONORABLE** [1] - 633:11
**hood** [2] - 684:2, 686:22
**hope** [4] - 685:25, 709:8,
709:9, 717:11
**hopefully** [1] - 693:6
**hopped** [2] - 642:12, 673:17
**Horan** [10] - 664:2, 675:6,
679:13, 692:3, 692:17,
697:3, 697:8
**horan** [1] - 697:2
**Horan's** [1] - 712:22
**hour** [1] - 656:13
**hours** [5] - 640:5, 640:11,
659:24, 670:3, 705:25
**house** [24] - 660:17, 661:11,
661:14, 661:20, 661:24,
661:25, 662:1, 662:4,
662:8, 663:19, 680:2,
680:4, 680:5, 680:6,
695:23, 698:3, 702:24,
702:25, 709:3, 710:13,
710:17, 711:4, 716:6
**hovered** [1] - 686:7
**hunched** [1] - 666:5
**hundreds** [1] - 697:4
**Hunter** [9] - 633:22, 635:4,
635:22, 690:20, 694:7,
699:20, 713:9, 713:18,
715:22
**HUNTER** [17] - 635:6,
635:10, 635:14, 635:18,
635:24, 636:3, 636:5,
636:10, 636:13, 636:15,
638:25, 639:6, 651:5,
656:6, 699:19, 740:19,
741:5
**hurrying** [1] - 662:21
**husband** [1] - 662:3
**husky** [1] - 701:14

# I

**ID** [2] - 659:10, 690:5
**idea** [1] - 709:4
**identification** [10] - 672:13, 672:17, 672:25, 673:1, 673:6, 674:12, 674:13, 686:2, 688:14, 711:1
**identifications** [1] - 683:19
**identified** [4] - 701:9, 703:9, 721:5, 732:17
**identifies** [4] - 673:13, 674:10, 676:6, 676:18
**identify** [12] - 644:21, 660:7, 672:15, 672:18, 672:24, 673:9, 673:10, 676:9, 681:21, 688:15, 689:3, 701:18
**identifying** [4] - 673:8, 673:21, 691:13, 691:14
**ignition** [2] - 659:25, 675:3
**ignitions** [1] - 706:25
**ignorance** [1] - 731:21
**ignore** [1] - 717:25
**ignoring** [1] - 684:7
**iii** [1] - 726:8
**illegal** [1] - 729:16
**imagine** [2] - 636:10, 677:6
**immediate** [7] - 653:14, 653:23, 654:15, 654:19, 690:18, 722:17, 724:16
**immediately** [4] - 654:8, 689:18, 711:19, 711:21
**immigrants** [1] - 670:24
**impartial** [2] - 734:2, 734:8
**impeded** [1] - 722:12
**important** [10] - 683:14, 692:22, 693:14, 694:3, 704:20, 705:4, 705:6, 708:3, 717:2, 720:8
**imposes** [1] - 733:13
**impresses** [1] - 735:18
**impressions** [1] - 664:19
**imprisonment** [6] - 658:8, 663:2, 663:3, 730:23, 731:4, 731:12
**Inc** [5] - 637:5, 637:7, 694:13, 695:1, 720:17
**incident** [1] - 654:18
**include** [6] - 645:6, 645:11, 645:14, 722:23, 726:25, 731:13
**included** [1] - 742:24
**including** [3] - 665:13, 726:20, 727:8
**inconvenient** [1] - 704:22
**incredible** [1] - 669:12
**incriminated** [2] - 738:14, 738:15
**indicate** [2] - 737:6, 743:9

**indicated** [2] - 647:18, 737:17
**indicating** [2] - 707:14, 733:6
**indication** [2] - 637:10, 690:19
**indicted** [1] - 691:23
**indictment** [21] - 638:10, 638:11, 638:18, 638:19, 676:13, 716:13, 718:5, 719:19, 720:16, 720:23, 722:25, 727:4, 728:16, 729:25, 730:8, 731:8, 732:18, 732:19, 734:9, 734:11, 739:5
**individual** [5] - 672:10, 682:20, 687:10, 724:17, 724:20
**individuals** [19] - 677:2, 682:18, 683:18, 684:13, 684:23, 687:12, 687:14, 687:15, 688:6, 688:10, 689:1, 689:16, 689:18, 690:25, 709:17, 712:15, 713:2, 713:14, 729:18
**induces** [1] - 728:6
**inference** [2] - 674:25, 679:7
**inflict** [6] - 724:5, 724:8, 724:10, 724:18, 724:19, 724:21
**information** [9] - 637:16, 644:2, 686:7, 687:8, 688:19, 692:9, 692:14, 712:15, 713:15
**initial** [1] - 676:21
**injury** [5] - 721:7, 722:17, 724:5, 724:8, 724:10
**Inn** [5] - 662:9, 686:5, 686:17, 687:1, 715:7
**innocence** [2] - 733:6, 733:24
**innocent** [1] - 733:16
**inside** [10] - 641:19, 642:1, 642:3, 643:1, 659:21, 687:8, 695:1, 702:23, 710:21, 716:10
**insist** [1] - 670:18
**inspected** [1] - 701:24
**Instagram** [3] - 665:15, 666:7
**instead** [3] - 650:16, 656:23, 744:19
**instruct** [7] - 656:23, 663:6, 677:17, 716:17, 717:8, 717:14, 732:21
**instructing** [3] - 651:16, 651:17, 656:24
**instruction** [10] - 652:22, 652:24, 652:25, 653:17, 654:9, 654:10, 717:16, 717:20, 738:1

**instructions** [19] - 651:11, 651:14, 653:8, 653:12, 653:13, 656:25, 700:21, 701:3, 701:19, 716:15, 717:14, 717:21, 729:3, 730:2, 731:18, 736:6, 737:18, 739:1, 739:20
**insured** [2] - 723:25, 725:21
**intelligence** [1] - 735:15
**intended** [2] - 721:20
**intending** [1] - 719:25
**intent** [1] - 728:13
**intention** [2] - 728:22, 732:5
**intentional** [1] - 724:14
**intentions** [1] - 642:18
**interest** [1] - 697:18
**interested** [1] - 641:4
**interesting** [2] - 681:12, 697:3
**interestingly** [2] - 687:4, 701:20
**interfered** [1] - 730:5
**interference** [2] - 657:25, 726:15, 730:10
**interferes** [1] - 721:14
**interpret** [1] - 742:3
**interpreter** [1] - 669:4
**interstate** [11] - 637:14, 637:22, 637:25, 658:19, 663:15, 663:19, 721:10, 721:18, 722:1, 722:2, 731:10
**interstates** [1] - 667:15
**interview** [1] - 712:4
**interviewed** [3] - 646:24, 647:2, 696:1
**interviews** [2] - 696:1, 696:3
**intimidation** [6] - 652:9, 658:17, 723:5, 723:19, 724:23, 725:2
**introduce** [1] - 699:20
**introduced** [2] - 657:5, 693:21
**introduction** [1] - 735:1
**investigation** [2] - 650:10, 700:5
**investigator** [2] - 678:9, 680:24
**investigators** [1] - 703:13
**involved** [9] - 652:12, 652:13, 672:9, 672:18, 673:13, 681:1, 691:3, 696:21, 741:25
**involves** [1] - 727:22
**involving** [2] - 654:18, 736:10
**iPhone** [2] - 649:23, 650:2, 650:3, 693:11
**issue** [3] - 637:19, 658:21, 737:6

**item** [4] - 698:6, 704:7, 704:9, 741:20
**items** [9] - 698:3, 698:4, 700:21, 704:6, 708:21, 722:23, 741:3, 741:6, 741:7
**itself** [1] - 720:14
**IV** [1] - 633:10

# J

**jacket** [13] - 644:9, 644:11, 644:13, 644:15, 645:14, 647:11, 665:20, 665:21, 678:21, 678:23, 680:19, 699:10, 706:14
**January** [1] - 745:18
**jeans** [3] - 664:23, 664:24, 666:3
**Jeep** [14] - 641:13, 642:12, 642:13, 642:17, 643:6, 643:12, 643:22, 643:25, 659:24, 666:9, 667:14, 673:18, 676:3, 680:14
**Jeeps** [3] - 706:16, 706:24, 707:1
**Jefferson** [1] - 720:20
**jeopardy** [4] - 652:7, 723:10, 723:22, 724:2
**Jim** [1] - 697:17
**job** [2] - 678:11, 708:24
**Johnson** [4] - 659:15, 701:17, 701:21, 702:17
**join** [2] - 638:7, 720:5
**joint** [4] - 719:2, 720:1, 732:9, 732:11
**Jones** [2] - 668:21, 698:17
**Jr** [1] - 633:21
**judge** [3] - 699:24, 700:20, 715:4
**Judge** [5] - 635:6, 636:3, 636:13, 639:6, 656:7
**JUDGE** [1] - 633:12
**judges** [3] - 718:3, 734:24, 735:6
**judgment** [3] - 636:19, 683:7, 735:25
**judicial** [1] - 670:11
**jumped** [1] - 664:13
**jumps** [1] - 705:14
**June** [1] - 633:6
**junk** [1] - 696:8
**juries** [1] - 739:4
**juror** [2] - 683:4, 683:6
**jurors** [3] - 684:7, 716:24, 735:6
**jury** [36] - 638:16, 638:17, 639:10, 639:11, 651:9, 651:10, 651:13, 651:16, 651:17, 652:25, 655:19,

656:10, 656:23, 657:5, 657:11, 683:1, 694:9, 700:20, 716:19, 717:9, 717:11, 719:20, 733:19, 734:9, 736:18, 736:20, 737:8, 737:13, 739:1, 739:18, 739:23, 740:2, 744:7, 744:9, 744:13, 744:14

**JURY** [1] - 633:13

**justice** [3] - 669:22, 671:3, 716:12

**justified** [1] - 738:21

## K

**keep** [6] - 639:22, 655:13, 655:20, 699:10, 701:8, 703:15

**keeps** [1] - 684:13

**Kehl** [1] - 698:4

**KEITH** [1] - 633:6

**Keith** [12] - 633:19, 635:3, 636:18, 654:5, 658:25, 659:22, 660:10, 672:15, 674:10, 674:20, 715:20, 718:5

**kept** [4] - 640:20, 641:8, 653:25, 654:3

**key** [1] - 679:21

**keyed** [1] - 687:18

**kids** [1] - 695:7

**kind** [17] - 683:7, 683:18, 684:7, 684:15, 685:22, 687:16, 688:13, 696:23, 697:15, 697:22, 697:23, 697:24, 698:15, 706:7, 708:25, 719:6, 744:16

**kinds** [1] - 731:25

**Kira** [1] - 698:8

**knitted** [2] - 646:17, 646:20

**knowing** [3] - 702:20, 720:13, 729:5

**knowingly** [21] - 653:5, 719:1, 719:9, 720:3, 721:8, 724:3, 725:2, 725:3, 725:9, 725:10, 725:24, 726:5, 726:19, 728:11, 728:20, 729:8, 731:7, 731:18, 732:1, 732:4

**knowledge** [1] - 733:4

**knowledgeable** [1] - 674:5

**known** [1] - 673:5

**knows** [2] - 673:2, 704:17

**Korea** [1] - 671:1

## L

**lab** [1] - 741:20

**labeling** [1] - 681:13

**lack** [1] - 707:8

**ladies** [26] - 651:9, 657:14, 658:23, 662:18, 664:21, 668:11, 669:19, 669:25, 671:9, 672:6, 674:9, 674:20, 675:5, 675:23, 679:2, 679:19, 680:3, 681:24, 682:14, 693:2, 699:19, 713:8, 713:13, 716:11, 716:14, 717:11

**lady** [5] - 640:15, 640:25, 642:2, 669:4, 694:19

**landlord** [1] - 694:17

**language** [2] - 697:11, 732:21

**large** [1] - 665:12

**larger** [1] - 685:15

**last** [13] - 639:24, 658:23, 661:13, 661:15, 662:5, 671:18, 678:6, 684:10, 687:4, 697:20, 713:17, 714:12, 743:6

**lastly** [1] - 663:13

**latent** [1] - 673:5

**law** [27] - 652:24, 659:7, 672:8, 682:6, 709:16, 717:17, 717:21, 717:23, 717:24, 717:25, 718:1, 719:2, 719:5, 719:11, 727:25, 731:25, 732:8, 733:7, 733:13, 733:16, 733:18, 733:22, 734:17, 734:19, 734:20, 736:11

**laws** [1] - 731:14

**lawyer** [1] - 699:22

**lawyers** [6] - 682:18, 734:16, 734:19, 734:21, 734:23, 734:25

**lead** [4] - 659:7, 680:25, 682:4, 700:18

**leaning** [1] - 687:2

**leap** [8] - 681:25, 682:2, 682:3, 682:6, 682:8, 682:10

**least** [6] - 662:5, 678:2, 691:17, 719:2, 719:9

**leave** [5] - 644:23, 654:20, 680:10, 696:3, 700:13

**leaving** [1] - 706:2

**led** [1] - 700:5

**left** [12] - 642:17, 660:20, 660:21, 661:19, 680:21, 688:9, 691:8, 691:9, 701:5, 704:11, 706:12, 716:8

**legal** [2] - 699:16, 733:19

**legs** [2] - 664:11, 666:13

**less** [5] - 656:1, 656:9, 656:25, 701:22, 731:15

**letting** [2] - 656:22, 656:24

**Liberty** [1] - 659:24

**life** [7] - 652:7, 688:10,

693:4, 723:10, 724:2, 729:13, 730:12

**lift** [1] - 673:5

**light** [2] - 642:15, 715:10

**light-complected** [1] - 715:10

**lighter** [2] - 664:15, 687:21

**lighter-skinned** [1] - 664:15

**lights** [3] - 654:1, 669:10, 689:23

**likely** [2] - 656:25, 703:20

**limber** [1] - 665:18

**limit** [1] - 655:12

**limited** [1] - 722:22

**limp** [2] - 672:23, 672:24

**line** [5] - 646:13, 702:11, 702:16, 702:19, 732:18

**link** [2] - 703:1, 703:3

**linked** [3] - 690:11, 698:24, 711:11

**linking** [1] - 716:8

**links** [1] - 693:20

**list** [1] - 649:14

**listed** [3] - 650:6, 693:12, 693:17, 714:9, 714:10, 714:15, 714:16, 714:18

**listen** [2] - 679:13, 684:3

**listened** [2] - 691:11, 717:12

**listening** [3] - 655:6, 701:19, 708:19

**literally** [1] - 705:7

**live** [3] - 663:25, 690:2, 702:24

**lived** [5] - 654:4, 696:6, 698:11, 702:25, 722:7

**lives** [3] - 698:3, 716:1, 723:20

**loaded** [2] - 661:17, 668:19

**loan** [1] - 723:8

**location** [2] - 675:8, 712:24

**locations** [4] - 658:15, 667:15, 680:6, 710:22

**locked** [2] - 669:6, 669:9

**logic** [1] - 716:1

**logs** [1] - 702:5

**look** [43] - 635:9, 635:13, 644:20, 649:11, 649:14, 649:21, 650:17, 666:8, 667:10, 667:24, 671:9, 672:8, 672:21, 673:12, 676:8, 676:22, 677:13, 678:5, 678:15, 678:23, 679:4, 685:23, 688:23, 689:10, 692:16, 693:15, 693:18, 694:6, 695:3, 695:6, 699:7, 702:12, 704:2, 704:23, 705:23, 710:1, 710:11, 710:18, 715:8

**looked** [6] - 641:20, 641:21,

664:18, 687:10, 696:25, 698:8

**looking** [7] - 641:15, 684:19, 684:22, 700:17, 704:1, 705:8, 707:22

**looks** [1] - 699:23

**loot** [2] - 666:4

**Lopez** [1] - 704:23

**Lord** [1] - 738:5

**lost** [1] - 711:19

**loud** [1] - 639:21

**love** [1] - 697:18

**low** [1] - 698:7

**luckily** [1] - 669:11

**Luger** [1] - 662:8

**lumped** [1] - 697:24

**lunch** [3] - 656:23, 656:24, 716:16

**Lunch** [1] - 717:9

**lying** [2] - 701:2, 701:18

## M

**machine** [1] - 633:24

**magazine** [5] - 662:13, 662:14, 668:19, 688:20, 710:2

**magazines** [2] - 710:14, 711:15

**magically** [1] - 709:1

**mail** [6] - 661:15, 680:4, 696:7, 696:8, 696:10

**main** [2] - 660:7, 660:13

**major** [4] - 660:10, 660:13, 681:13, 720:7

**majorities** [1] - 704:13

**male** [1] - 715:11

**males** [1] - 715:10

**Mall** [1] - 640:23

**mall** [1] - 706:20

**man** [17] - 662:10, 664:19, 668:15, 687:5, 691:19, 697:20, 700:15, 704:25, 705:8, 705:14, 706:17, 708:4, 708:6, 708:9, 712:2, 715:18

**managed** [1] - 716:6

**management** [4] - 652:9, 723:7, 725:13, 725:18

**manager** [3] - 640:8, 640:9, 704:24

**manner** [7] - 721:13, 725:4, 735:9, 735:10, 735:16, 735:21, 739:20

**manufactured** [2] - 637:24, 722:9

**map** [5] - 702:12, 702:13, 702:17, 708:11, 713:9

**Margarita** [1] - 669:3

**marked** [1] - 644:19

**marshal** [3] - 737:9, 737:11
**Maryland** [1] - 675:18
**mask** [23] - 660:12, 660:19, 660:21, 660:22, 660:23, 664:19, 681:11, 681:12, 681:20, 684:1, 686:13, 686:17, 686:22, 699:8, 699:9, 702:8, 711:1, 711:2, 711:3, 711:11, 715:8, 741:22, 742:4
**masked** [5] - 646:8, 646:11, 646:13, 646:14, 711:7
**masks** [18] - 638:13, 638:16, 659:14, 660:4, 660:6, 660:10, 660:15, 660:16, 660:17, 683:21, 686:16, 691:3, 699:9, 703:15, 703:16, 703:20, 711:4, 714:22
**match** [8] - 664:9, 679:2, 695:12, 698:5, 699:1, 704:18, 708:1, 713:8
**matched** [2] - 673:5, 698:10
**matches** [2] - 673:8, 698:16
**material** [7] - 740:22, 741:11, 742:3, 742:6, 742:18, 742:23, 743:1
**materials** [2] - 741:2, 742:14
**matter** [14] - 637:9, 670:21, 672:1, 672:4, 680:4, 683:3, 694:2, 709:20, 709:21, 710:24, 734:6, 735:13, 735:17, 745:20
**matters** [2] - 651:10, 735:19
**mean** [15] - 641:2, 641:10, 641:23, 644:1, 649:22, 655:8, 676:13, 679:4, 682:16, 699:10, 700:19, 712:11, 713:2, 740:15, 742:4
**meanings** [1] - 731:24
**means** [25] - 675:25, 677:18, 699:15, 713:3, 719:11, 721:6, 721:13, 722:14, 722:16, 722:21, 724:3, 724:4, 724:7, 724:9, 724:24, 725:14, 725:19, 726:20, 727:1, 727:18, 731:12, 731:19, 731:22, 732:12, 734:11
**medium** [1] - 664:15
**medium-sized** [1] - 664:15
**meet** [2] - 721:18, 732:15
**Melinda** [2] - 633:20, 636:24
**member** [5] - 719:21, 720:14, 729:12, 730:9, 730:16
**members** [5] - 663:8, 683:1, 719:13, 729:16, 729:18
**membership** [2] - 651:24, 720:9

**memory** [4] - 648:6, 648:7, 648:13, 696:4
**men** [18] - 653:23, 663:22, 669:6, 669:18, 696:13, 699:14, 701:5, 702:13, 702:19, 703:16, 706:16, 706:17, 708:13, 714:20, 714:22, 716:4, 716:8, 716:9
**mention** [2] - 679:23, 708:19
**mentioned** [3] - 647:9, 708:2, 738:1
**merchandise** [1] - 721:15
**mere** [3] - 720:11, 721:17, 729:10
**merely** [4] - 720:10, 720:12, 729:4
**messages** [1] - 712:18
**met** [2] - 675:25, 683:7
**middle** [1] - 706:21
**might** [7] - 636:3, 674:8, 699:4, 699:5, 702:22, 735:21, 739:2
**military** [1] - 695:6
**Mills** [10] - 653:16, 654:1, 654:3, 654:4, 659:9, 659:15, 701:4, 701:20, 702:17, 704:15
**mills** [1] - 690:21
**mind** [5] - 648:11, 656:25, 662:16, 731:19, 735:16
**minds** [1] - 709:9
**mine** [1] - 693:5
**minimal** [1] - 722:1
**minimis** [1] - 722:1
**minor** [1] - 681:14
**minute** [5] - 642:5, 693:14, 741:10, 741:16
**minutes** [11] - 648:14, 654:24, 655:10, 655:20, 656:1, 656:9, 656:13, 656:17, 659:12, 661:23, 716:18
**mischaracterize** [1] - 712:22
**misdemeanor** [1] - 731:14
**missed** [1] - 653:11
**missing** [2] - 681:2, 708:10
**misstated** [1] - 709:16
**misstatements** [1] - 709:15
**misstates** [1] - 741:8
**mistake** [1] - 731:21
**mitochondrial** [6] - 660:24, 661:1, 661:4, 691:12, 691:13, 691:14
**mixed** [2] - 703:18, 704:3
**mixture** [1] - 660:6
**MO** [4] - 667:12, 706:13, 706:15
**Mobile** [1] - 649:5
**moment** [1] - 657:16

**money** [46] - 637:4, 637:10, 637:17, 658:18, 661:16, 661:19, 665:12, 666:2, 666:6, 670:23, 670:25, 671:1, 671:2, 671:20, 673:8, 673:9, 676:23, 677:13, 679:24, 680:1, 680:6, 680:24, 680:25, 690:7, 690:8, 690:9, 690:12, 702:5, 702:8, 702:18, 702:25, 706:18, 708:13, 711:17, 711:22, 711:23, 715:21, 716:5, 721:15, 722:21, 723:15, 723:16, 723:23, 725:14, 725:16
**month** [1] - 658:12
**months** [1] - 648:8
**morning** [26] - 635:5, 636:24, 640:5, 640:11, 641:5, 643:5, 645:24, 645:25, 657:13, 663:24, 666:15, 666:22, 667:1, 667:2, 667:7, 667:20, 669:25, 683:1, 706:4, 706:5, 713:20, 713:24, 717:13, 744:19, 745:6
**most** [2] - 656:8, 677:24, 677:25
**motion** [9] - 636:19, 636:22, 637:1, 638:2, 638:3, 638:7, 638:22, 639:4
**motioned** [2] - 654:5, 690:5
**motions** [8] - 635:8, 635:9, 635:13, 636:9, 636:12, 636:16, 639:2, 744:22
**motive** [1] - 735:15
**mountains** [1] - 708:18
**mouth** [2] - 686:18, 686:20
**move** [2] - 635:19, 641:6
**moved** [1] - 682:16
**movement** [2] - 718:11, 721:14
**movie** [1] - 697:17
**MPD** [1] - 659:15
**MR** [53] - 635:6, 635:10, 635:14, 635:18, 635:24, 636:3, 636:5, 636:10, 636:13, 636:15, 636:18, 638:6, 638:25, 639:6, 639:9, 639:14, 639:20, 645:20, 647:17, 647:24, 648:17, 648:21, 648:22, 649:3, 650:19, 651:2, 651:3, 651:5, 654:22, 654:25, 655:3, 655:5, 655:14, 656:6, 669:25, 693:2, 699:19, 737:14, 737:17, 737:22, 738:9, 738:15, 738:23, 739:22,

740:6, 740:10, 740:19, 740:25, 741:5, 741:8, 741:15, 743:8, 743:13
**MS** [44] - 636:24, 638:20, 645:23, 647:15, 647:22, 650:22, 651:4, 651:7, 653:13, 653:19, 653:22, 655:18, 656:5, 656:18, 657:4, 657:9, 657:13, 669:17, 683:1, 691:25, 692:21, 709:15, 737:25, 738:24, 740:13, 740:18, 741:1, 741:6, 741:19, 742:1, 742:8, 742:11, 742:13, 742:19, 742:21, 743:3, 743:6, 743:11, 743:14, 743:16, 743:18, 743:24, 743:25, 744:2
**muffler** [1] - 726:23
**multiple** [2] - 637:8, 704:6
**Muslim** [4] - 643:19, 645:12, 678:17, 678:18
**Muslim-type** [4] - 643:19, 645:12, 678:17, 678:18
**must** [31] - 652:6, 652:14, 652:20, 680:15, 682:11, 682:12, 697:24, 698:25, 717:21, 718:17, 719:8, 719:18, 719:22, 721:1, 721:21, 723:14, 725:2, 725:8, 726:13, 728:16, 728:25, 729:8, 731:2, 734:19, 736:4, 736:16, 737:3, 740:22, 742:9
**mutual** [1] - 718:25

## N

**N.W** [1] - 638:12
**name** [8] - 639:22, 639:24, 640:1, 649:17, 701:12, 706:11, 712:10, 712:18
**namely** [1] - 658:6
**names** [2] - 692:11, 693:25
**Nash** [1] - 659:17
**National** [2] - 723:25, 725:21
**natural** [1] - 721:23
**nature** [7] - 651:21, 651:25, 652:4, 652:12, 652:18, 727:8, 727:22
**Navy** [40] - 640:4, 640:13, 641:6, 658:9, 659:2, 659:7, 659:21, 662:10, 663:17, 671:13, 675:17, 677:22, 677:23, 677:25, 678:5, 679:11, 679:17, 679:20, 679:23, 680:11, 685:19, 688:18, 690:11, 695:20, 695:21, 696:17, 696:22, 699:5, 700:16, 701:1, 702:9, 703:4, 709:25,

716:4, 720:22, 723:1, 723:17, 723:21, 723:24, 726:7

**near** [4] - 667:15, 679:7, 686:6, 707:1

**nearby** [4] - 667:14, 673:25, 674:3, 674:8

**necessarily** [2] - 647:10, 662:24

**necessary** [5] - 657:8, 721:19, 728:10, 732:21, 738:22

**need** [10] - 636:17, 642:22, 655:20, 694:8, 714:20, 719:6, 722:2, 722:4, 725:7, 737:5

**needed** [2] - 669:4, 722:1

**neglected** [1] - 739:9

**neighborhood** [2] - 656:22, 659:8

**nervous** [1] - 715:6

**never** [12] - 637:15, 683:7, 683:8, 688:25, 704:20, 705:2, 705:9, 708:2, 733:12, 733:13, 734:7, 744:4

**news** [2] - 684:15, 695:15

**next** [5] - 635:23, 636:8, 641:1, 641:25, 646:19

**nice** [1] - 694:8

**night** [1] - 667:23

**nightmare** [10] - 668:14, 668:17, 668:21, 668:23, 669:3, 669:12, 669:14, 672:10, 672:12

**nightmares** [1] - 669:17

**nights** [1] - 716:20

**nobody** [1] - 666:12

**none** [5] - 638:16, 657:21, 695:11, 697:1, 742:20

**North** [3] - 640:19, 642:14, 671:1

**note** [4] - 740:8, 740:11, 744:7, 744:16

**notebooks** [1] - 684:9

**noted** [1] - 706:25

**nothing** [11] - 655:17, 676:17, 676:19, 677:14, 686:16, 699:6, 702:7, 733:19, 741:13, 744:8, 744:12

**notice** [2] - 640:12, 688:24

**noticed** [3] - 646:8, 646:10, 646:13

**nuclear** [1] - 661:1

**number** [35] - 649:15, 649:19, 650:6, 650:8, 650:11, 650:12, 650:14, 650:15, 650:16, 673:25, 674:11, 679:9, 684:9,

693:11, 693:12, 693:16, 693:17, 693:22, 694:4, 698:6, 703:25, 704:1, 714:8, 714:11, 714:13, 714:15, 736:20, 739:2, 741:11, 741:14, 741:21, 742:18

**numbered** [5] - 740:21, 741:2, 742:5, 743:1, 743:2

**numbers** [6] - 693:25, 703:25, 704:2, 704:11, 707:12

**numerically** [1] - 737:6

## O

**o'clock** [13] - 640:11, 667:23, 668:3, 706:4, 706:22, 713:20, 713:21, 713:24, 744:18, 744:22, 745:3, 745:6

**O'Malley's** [2] - 653:17, 738:3

**object** [1] - 724:4

**objected** [1] - 738:10

**objection** [5] - 638:20, 651:18, 653:20, 735:3, 735:4

**objections** [3] - 735:1, 735:2, 739:20

**objectives** [1] - 730:13

**observe** [1] - 735:17

**observed** [1] - 655:18

**obstruct** [3] - 718:7, 721:20, 721:24

**obstructed** [2] - 721:11, 721:25

**obstructs** [3] - 652:3, 718:10, 721:12

**obtain** [1] - 721:4

**obtained** [1] - 677:3

**obtaining** [2] - 722:15, 722:20

**obviously** [5] - 641:11, 654:17, 662:1, 693:9, 707:8

**occur** [1] - 672:12

**occurred** [9] - 658:9, 658:10, 658:12, 672:11, 696:3, 700:6, 700:10, 720:17, 722:11

**occurs** [2] - 668:3, 696:14

**OF** [3] - 633:1, 633:4, 633:10

**offense** [37] - 651:21, 651:22, 651:23, 652:2, 652:4, 652:6, 652:13, 652:17, 652:19, 653:2, 663:1, 685:4, 686:1, 718:15, 718:16, 723:9, 723:12, 723:13, 726:11,

727:18, 727:21, 727:23, 728:2, 728:3, 728:5, 729:2, 729:21, 730:5, 730:15, 730:20, 731:1, 731:13, 732:20, 734:5, 737:19, 739:11, 739:14

**offenses** [6] - 652:12, 652:18, 727:23, 731:16, 734:6, 739:16

**office** [2] - 693:5, 706:19

**officer** [16] - 649:10, 654:3, 654:14, 654:18, 661:12, 662:25, 689:23, 690:1, 690:15, 695:23, 696:2, 696:5, 701:17, 706:8, 711:23

**Officer** [17] - 653:16, 654:1, 654:3, 659:9, 659:15, 661:20, 661:22, 675:6, 679:13, 701:4, 701:20, 701:21, 704:15, 705:1, 706:7, 706:8

**officer's** [2] - 696:2, 701:19

**officers** [10] - 648:2, 659:16, 661:24, 662:2, 701:3, 701:23, 702:1, 702:4, 712:5

**Ohio** [1] - 679:16

**old** [2] - 696:10, 697:15

**once** [5] - 665:25, 695:7, 701:8, 736:24, 737:2

**One** [1] - 640:23

**one** [130] - 637:12, 646:12, 650:5, 653:13, 653:14, 653:24, 655:11, 657:25, 658:1, 658:5, 658:8, 658:9, 658:10, 658:21, 659:1, 659:16, 659:17, 660:9, 661:6, 662:21, 663:2, 664:10, 664:12, 664:13, 665:9, 665:20, 666:5, 666:10, 666:18, 666:19, 666:20, 668:18, 669:4, 669:9, 671:23, 672:15, 675:9, 675:17, 677:3, 679:21, 680:5, 682:4, 685:8, 687:20, 687:21, 688:1, 688:7, 688:19, 688:20, 689:1, 689:22, 690:9, 690:10, 691:12, 694:15, 695:10, 695:14, 696:7, 696:10, 696:23, 696:25, 697:5, 697:9, 697:10, 697:12, 698:5, 698:10, 699:9, 701:6, 701:10, 701:13, 701:14, 701:15, 702:25, 703:18, 704:10, 704:12, 706:18, 706:19, 706:20, 706:21, 706:22, 707:2, 707:21,

707:25, 708:15, 709:9, 709:11, 709:12, 709:24, 711:11, 711:18, 713:17, 713:22, 714:9, 715:3, 715:9, 715:10, 715:19, 716:19, 717:20, 719:9, 721:3, 723:15, 724:5, 724:24, 727:19, 728:18, 730:5, 730:24, 731:5, 731:12, 731:17, 732:9, 733:3, 734:4, 736:19, 737:14, 737:22, 737:23, 738:4, 738:5, 738:24, 739:8

**one-hole** [1] - 699:9

**one-year** [1] - 663:2

**ones** [1] - 710:10

**open** [4] - 655:13, 666:11, 694:17, 739:6

**open-ended** [1] - 655:13

**opening** [4] - 666:12, 668:12, 686:14, 694:7

**opinion** [1] - 717:23

**opportunity** [1] - 657:14

**opposed** [1] - 674:17

**orally** [1] - 717:14

**order** [2] - 728:14, 729:14

**ordered** [1] - 668:24

**ordinary** [1] - 721:23

**ought** [2] - 717:24, 738:19

**out-of-state** [1] - 722:5

**outline** [2] - 684:1, 686:22

**outside** [16] - 637:6, 640:6, 640:13, 660:17, 666:9, 673:16, 678:7, 686:19, 686:20, 687:6, 687:8, 694:25, 711:3, 722:7, 722:9, 732:13

**overlooked** [1] - 679:22

**overt** [1] - 638:10

**overwhelm** [1] - 678:2

**overwhelming** [1] - 658:24

**own** [4] - 694:3, 699:1, 731:22, 735:25

**owned** [2] - 706:10, 707:11

**owner** [1] - 679:8

**ownership** [1] - 712:2

## P

**p.m** [10] - 667:7, 717:9, 717:10, 739:18, 739:25, 740:2, 744:6, 744:14, 745:8

**packed** [1] - 704:6

**page** [1] - 649:15

**paid** [1] - 670:2

**pairs** [1] - 705:7

**pales** [1] - 674:15

**pants** [3] - 664:25, 665:4,

665:7
**paper** [4] - 705:4, 708:16, 708:17, 708:18
**paragraph** [4] - 638:10, 638:11, 638:17, 638:18
**paraphrasing** [1] - 720:25
**pardon** [1] - 645:9
**park** [10] - 700:25, 701:9, 701:24, 701:25, 702:2, 702:15, 702:21, 702:22, 709:3
**parks** [1] - 690:1
**part** [7] - 647:11, 657:18, 707:14, 716:23, 718:10, 723:4, 725:7
**partial** [1] - 697:5
**partials** [2] - 704:17, 704:18
**participant** [1] - 729:9
**participate** [3] - 674:6, 720:6, 729:20
**participated** [2] - 718:23, 728:12
**participating** [2] - 674:10, 677:3
**particular** [4] - 637:18, 683:15, 687:1, 696:21
**partnership** [1] - 719:4
**party** [2] - 691:9, 736:4
**partying** [1] - 665:2
**pass** [3] - 710:21, 710:22, 712:6
**passed** [1] - 642:15
**passenger** [1] - 666:11
**path** [9] - 690:7, 690:8, 690:9, 690:13, 690:14, 702:17, 713:8
**paths** [1] - 696:22
**Patricia** [1] - 633:17
**pattern** [1] - 643:16
**Pause** [1] - 635:21
**pause** [1] - 679:3
**peeled** [2] - 642:4, 642:14
**peeped** [1] - 642:3
**people** [44] - 655:12, 660:14, 661:2, 661:4, 661:5, 661:6, 667:8, 670:22, 670:23, 672:1, 672:16, 673:10, 673:15, 673:17, 676:22, 679:10, 679:14, 682:9, 683:20, 683:25, 684:9, 684:22, 685:3, 685:11, 688:16, 690:21, 690:23, 691:17, 692:6, 692:10, 696:18, 701:24, 702:2, 702:18, 704:9, 704:13, 706:3, 707:14, 708:19, 712:9, 712:14, 716:10, 719:2
**people's** [2] - 675:7, 708:22
**perfect** [1] - 635:14

**perfectly** [1] - 717:4
**performed** [1] - 721:23
**perhaps** [1] - 719:10
**perimeter** [1] - 661:24
**period** [4] - 675:10, 675:11, 722:11
**permits** [1] - 733:18
**perpetrated** [1] - 669:18
**person** [82] - 641:24, 641:25, 643:6, 643:8, 643:11, 643:22, 643:25, 644:4, 644:7, 644:9, 645:14, 652:7, 652:8, 658:6, 662:25, 673:16, 673:18, 673:20, 674:1, 674:4, 674:5, 674:17, 674:18, 675:13, 678:13, 678:14, 678:16, 678:20, 681:17, 683:22, 683:23, 684:16, 684:17, 685:4, 685:8, 686:6, 686:8, 686:9, 686:13, 687:13, 689:3, 689:6, 690:8, 691:15, 695:9, 709:2, 712:4, 715:14, 718:13, 719:9, 719:21, 722:15, 722:18, 723:5, 723:10, 723:11, 724:2, 724:3, 724:5, 724:7, 724:8, 724:9, 724:10, 724:15, 724:19, 724:20, 724:22, 725:6, 725:7, 725:11, 726:9, 727:21, 727:25, 728:2, 730:22, 732:1, 732:3, 732:6, 732:9, 737:19
**personal** [2] - 721:4, 722:15
**personally** [1] - 728:1
**persons** [4] - 718:18, 720:12, 732:6, 732:10
**persuaded** [1] - 736:13
**phone** [108] - 637:12, 647:6, 648:1, 649:5, 649:12, 649:19, 650:1, 650:8, 650:11, 659:5, 661:22, 664:3, 664:4, 665:6, 665:17, 666:15, 666:17, 666:21, 666:22, 666:24, 667:4, 667:6, 667:18, 667:24, 667:25, 669:10, 673:23, 673:24, 673:25, 674:1, 674:3, 674:7, 674:8, 674:11, 674:17, 674:19, 675:7, 675:8, 675:13, 676:1, 677:11, 677:16, 677:20, 679:5, 679:6, 679:7, 679:8, 679:9, 679:10, 679:17, 684:2, 692:12, 692:13, 692:15, 692:18, 692:24, 693:16, 693:20, 693:23, 694:1,

694:2, 698:24, 698:25, 699:1, 705:21, 705:24, 706:2, 706:6, 706:7, 706:9, 706:10, 707:6, 707:12, 707:13, 708:6, 708:25, 711:22, 711:23, 712:3, 712:5, 712:6, 712:7, 712:8, 712:9, 712:11, 712:12, 712:13, 712:16, 712:17, 712:19, 712:20, 713:1, 713:19, 714:2, 714:8, 714:10, 714:11, 714:12, 714:14, 714:16, 714:18, 715:21
**phones** [26] - 663:23, 664:6, 666:20, 667:3, 667:21, 668:8, 675:19, 679:15, 692:1, 692:2, 692:3, 692:5, 692:8, 692:9, 693:8, 707:7, 710:12, 712:2, 712:15, 713:1, 713:3, 713:14, 713:21, 714:24, 716:8
**photograph** [3] - 678:15, 710:15, 711:22
**photographs** [4] - 710:11, 712:8, 712:19, 713:15
**photos** [6] - 665:3, 665:6, 665:12, 707:24, 708:5
**phrase** [11] - 680:23, 684:14, 724:2, 724:7, 724:9, 724:23, 725:13, 727:1, 731:11, 731:13, 732:12
**physical** [9] - 664:9, 672:22, 718:13, 722:22, 724:24, 724:25, 727:20, 727:22, 732:2
**physically** [1] - 725:14
**pick** [2] - 703:13, 703:14
**picked** [2] - 716:19, 716:21
**picture** [5] - 664:24, 666:7, 678:21, 695:1, 711:20
**pictures** [8] - 665:10, 665:11, 665:14, 676:20, 677:5, 677:12, 685:11, 711:17
**pie** [4] - 664:1, 692:17, 693:24
**piece** [7] - 662:5, 679:21, 692:17, 694:8, 696:7, 705:20, 708:15
**pieces** [7] - 657:4, 685:14, 685:15, 685:21, 685:24, 697:23, 705:4
**pinging** [3] - 692:18, 714:19, 714:24
**pinpoint** [3] - 675:13, 675:20, 675:21
**pinpointing** [1] - 675:7
**pizzeria** [2] - 640:8, 640:10
**place** [10] - 658:15, 677:7, 708:8, 713:16, 714:9,

720:12, 720:13, 732:13, 736:23
**places** [1] - 698:9
**placing** [2] - 705:24, 708:7
**Plaintiff's** [1] - 649:21
**plan** [6] - 657:1, 714:2, 718:14, 719:2, 719:11, 720:1
**plastic** [2] - 710:13, 711:14
**play** [1] - 720:7
**plenty** [2] - 656:18, 664:7
**plotting** [1] - 667:22
**plus** [1] - 679:25
**pocket** [3] - 674:24, 709:3, 715:20
**point** [6] - 638:16, 690:3, 694:3, 697:2, 697:8, 697:10
**pointed** [5] - 662:14, 667:8, 668:24, 693:10, 711:18
**pointing** [1] - 715:20
**poking** [2] - 686:19, 686:20
**police** [34] - 642:22, 643:3, 643:5, 643:24, 644:6, 644:10, 645:3, 645:17, 646:21, 647:19, 648:1, 648:15, 653:25, 654:2, 654:8, 666:19, 678:10, 678:12, 678:18, 680:13, 681:4, 689:19, 689:23, 690:18, 690:22, 701:3, 708:2, 708:12, 709:1, 712:3, 715:15, 738:16
**policemen** [1] - 703:12
**pop** [1] - 675:3
**Pope** [12] - 654:2, 659:17, 660:22, 689:22, 689:25, 690:1, 701:5, 701:6, 702:15, 708:12, 711:12
**possess** [1] - 730:24
**possessed** [1] - 731:7
**possessing** [3] - 658:2, 663:12, 730:19
**possession** [31] - 652:10, 653:5, 658:6, 663:13, 663:14, 673:15, 676:14, 682:13, 710:6, 722:19, 723:7, 723:17, 725:13, 727:15, 730:18, 731:9, 731:22, 731:23, 731:25, 732:1, 732:3, 732:4, 732:7, 732:8, 732:9, 732:10, 732:11, 739:12
**possible** [6] - 670:10, 691:2, 702:18, 706:3, 734:4, 744:20
**possibly** [1] - 707:25
**posted** [2] - 665:15, 666:7
**poster** [1] - 676:21
**posts** [1] - 665:14

**potential** [1] - 711:2
**power** [2] - 725:15, 732:4
**powerful** [1] - 675:24
**practice** [2] - 699:21, 700:1
**preference** [2] - 670:2, 670:4
**prepaid** [2] - 692:15, 712:12
**prepared** [3] - 654:16, 704:19
**presence** [6] - 721:4, 722:16, 723:6, 727:11, 740:6, 740:11
**present** [6] - 678:22, 715:3, 720:12, 724:11, 729:4, 740:2
**presented** [10] - 639:1, 652:22, 657:20, 671:10, 672:24, 683:17, 715:2, 715:3, 733:19, 736:5
**presents** [1] - 692:10
**presumes** [1] - 733:16
**presumption** [1] - 733:24
**pretty** [3] - 655:14, 682:17, 695:18
**prevails** [1] - 734:23
**previously** [5] - 648:25, 649:7, 658:7, 666:16, 739:13
**pride** [1] - 666:5
**primarily** [1] - 672:4
**principal** [1] - 728:7
**print** [5] - 653:18, 673:5, 698:16, 703:18, 705:19
**prints** [10] - 705:2, 705:8, 705:18, 706:14, 708:1, 708:3, 708:15, 708:20
**privilege** [2] - 699:22, 700:1
**probation** [6] - 661:12, 662:25, 695:23, 696:2, 696:4
**problem** [4] - 702:16, 716:22, 739:5, 744:21
**problems** [1] - 704:8
**proceed** [2] - 736:9
**proceedings** [2] - 739:6, 745:19
**Proceedings** [2] - 633:24, 745:8
**proceeds** [7] - 673:7, 673:14, 676:11, 676:25, 711:25, 713:15, 714:3
**processed** [1] - 734:12
**procures** [1] - 728:6
**produce** [1] - 708:14
**produced** [2] - 633:24, 725:5
**producing** [2] - 708:17, 733:14
**products** [1] - 722:8
**professionals** [1] - 703:13
**prohibited** [3] - 658:6, 662:25, 737:19

**prohibits** [1] - 733:22
**projectile** [1] - 726:22
**promise** [6] - 635:19, 688:15, 700:3, 700:12, 700:14, 700:19
**promised** [1] - 686:15
**pronouncing** [1] - 717:1
**proof** [21] - 652:23, 653:6, 653:9, 670:6, 670:7, 670:12, 670:15, 670:19, 671:5, 671:6, 671:21, 672:9, 675:24, 675:25, 676:15, 698:1, 719:12, 732:15, 733:5
**proper** [3] - 652:23, 654:10, 734:15
**property** [12] - 637:4, 652:4, 718:14, 721:4, 721:16, 722:15, 722:18, 722:21, 722:22, 723:6, 727:21
**prosecution** [1] - 733:11
**prosecutor** [1] - 648:1
**prosecutors** [2] - 647:6, 647:19
**protect** [2] - 669:1, 670:13
**protection** [1] - 699:15
**protects** [3] - 670:12, 670:15, 671:4
**prove** [38] - 637:4, 652:6, 652:14, 652:20, 663:13, 663:14, 670:8, 670:21, 671:14, 685:16, 689:1, 694:10, 694:11, 698:2, 699:3, 699:4, 699:17, 700:9, 707:7, 718:17, 719:8, 721:2, 721:19, 721:21, 723:14, 725:7, 725:8, 726:13, 727:14, 728:10, 728:16, 728:25, 729:8, 731:2, 732:22, 733:11, 734:3
**proved** [2] - 699:13, 707:11
**proven** [5] - 668:13, 677:19, 714:23, 729:22
**proves** [4] - 662:18, 662:24, 719:16, 732:23
**provide** [3] - 645:3, 653:18, 742:17
**provided** [3] - 730:1, 730:3, 734:5
**provides** [5] - 718:10, 723:4, 726:9, 728:4, 730:22
**province** [1] - 734:6
**proving** [2] - 682:7, 732:16
**proximity** [1] - 727:8
**prying** [1] - 669:6
**pulled** [2] - 642:2, 696:12
**punched** [2] - 659:25, 706:25
**punishable** [5] - 728:7, 730:23, 731:4, 731:11,

731:14
**punishment** [1] - 734:5
**purchase** [1] - 712:14
**purchased** [2] - 638:13, 638:15
**purchases** [1] - 712:12
**purpose** [6] - 638:13, 718:14, 719:23, 720:1, 728:20, 736:11
**purse** [1] - 694:19
**push** [1] - 668:20
**pushed** [2] - 668:16, 669:10
**put** [14] - 646:19, 653:24, 657:6, 673:22, 685:17, 685:18, 685:24, 686:4, 698:15, 723:20, 725:1, 743:11, 743:13, 743:15
**puts** [4] - 652:7, 673:21, 723:10, 724:2
**putting** [3] - 664:8, 705:20, 705:21
**puzzle** [5] - 685:15, 685:21, 685:22, 685:24
**puzzles** [2] - 685:19, 686:1

## Q

**Q26** [1] - 741:21
**questioning** [1] - 682:19
**questions** [9] - 645:20, 648:17, 650:20, 650:21, 650:22, 690:4, 709:6, 735:2
**quick** [1] - 667:16
**quickly** [2] - 635:19, 693:7
**Quincy** [1] - 640:19
**quite** [1] - 654:13
**quote/unquote** [1] - 688:11

## R

**R-A-M-O-N** [1] - 640:2
**race** [2] - 684:15, 686:8
**Ramon** [3] - 639:15, 639:23, 678:6
**RAMON** [1] - 639:16
**ran** [6] - 666:18, 668:22, 669:7, 702:18, 715:19, 738:16
**Randolph** [1] - 640:19
**rather** [1] - 672:2
**rational** [2] - 736:10, 736:13
**reached** [1] - 736:24
**reaching** [2] - 736:11, 736:14
**reaction** [1] - 725:5
**read** [2] - 707:15, 720:24
**readily** [1] - 726:21
**ready** [2] - 639:7, 661:17
**real** [6] - 654:14, 658:21, 668:14, 688:13, 701:11,

702:20
**realized** [1] - 731:20
**really** [24] - 637:16, 643:23, 655:7, 656:15, 683:2, 684:6, 687:9, 689:19, 692:4, 696:17, 696:18, 696:21, 697:1, 697:5, 698:5, 699:25, 700:2, 702:4, 703:7, 703:14, 707:4, 707:9, 715:16, 744:24
**rear** [1] - 691:19
**reason** [5] - 656:8, 699:25, 716:2, 724:15, 737:5
**reasonable** [38] - 659:4, 662:19, 670:9, 672:15, 677:17, 682:4, 684:21, 685:1, 685:6, 685:9, 691:4, 698:1, 699:15, 700:11, 707:20, 718:17, 719:16, 719:22, 720:2, 721:2, 721:22, 723:14, 725:6, 725:8, 726:13, 727:14, 728:10, 728:16, 729:1, 729:23, 730:3, 730:4, 731:2, 732:17, 732:23, 733:12, 734:1, 734:4
**reasonably** [1] - 725:11
**reasons** [4] - 638:8, 638:22, 639:5, 655:11
**Rebeca** [1] - 633:18
**rebuttal** [1] - 656:17
**receive** [1] - 638:19
**received** [2] - 707:13, 727:7
**receiver** [1] - 726:23
**recess** [7] - 657:2, 716:16, 717:9, 739:23, 744:5, 744:8, 744:17
**Recess** [3] - 657:11, 739:25, 744:6
**recognize** [1] - 657:21
**recognizes** [2] - 731:25, 732:8
**recollection** [8] - 734:22, 734:23, 735:19, 740:14, 740:16, 740:23, 742:10, 743:21
**reconsider** [1] - 736:13
**record** [4] - 639:24, 640:1, 744:6, 745:19
**records** [21] - 650:18, 667:25, 673:23, 674:7, 675:5, 675:7, 675:8, 675:19, 676:2, 677:11, 677:16, 679:5, 679:17, 684:2, 693:11, 707:10, 707:11, 708:6, 714:4
**recovered** [17] - 659:24, 660:4, 660:17, 660:23, 662:7, 663:18, 680:1,

703:23, 705:1, 706:8, 706:9, 708:1, 708:22, 710:16, 711:22, 712:4, 712:20
**Recross** [1] - 634:2
**red** [6] - 642:2, 644:15, 645:15, 678:21, 678:24, 680:20
**redirect** [1] - 697:13
**Redirect** [1] - 634:2
**REDIRECT** [1] - 647:16
**reed** [5] - 661:21, 670:13, 675:4, 696:25, 710:24
**REED** [1] - 633:6
**Reed** [60] - 633:19, 635:3, 636:18, 639:15, 649:13, 651:2, 654:5, 654:22, 658:25, 659:22, 660:10, 661:19, 662:2, 662:20, 663:8, 666:8, 666:14, 667:3, 667:5, 671:7, 671:17, 671:25, 672:9, 672:15, 673:13, 673:21, 673:22, 674:10, 675:12, 675:14, 677:2, 677:5, 677:10, 678:2, 678:8, 678:14, 678:17, 678:23, 679:2, 679:8, 679:11, 680:4, 681:3, 681:6, 681:22, 682:9, 682:20, 690:5, 690:9, 696:24, 702:6, 702:19, 706:9, 710:21, 715:20, 718:6, 739:22
**Reed's** [8] - 662:1, 663:24, 664:4, 666:17, 667:6, 670:13, 674:21, 681:19
**refer** [1] - 741:17
**reference** [4] - 734:18, 742:14, 743:3, 743:4
**referred** [1] - 734:21
**referring** [3] - 643:2, 741:12, 742:18
**reflect** [1] - 654:11
**reflects** [1] - 714:4
**regard** [1] - 726:13
**regarding** [7] - 720:8, 740:17, 740:23, 742:10, 742:14, 743:22
**regardless** [1] - 717:23
**regards** [1] - 652:5
**registered** [1] - 679:8
**registers** [1] - 637:10
**related** [2] - 731:23, 740:4
**relating** [1] - 692:4
**relation** [7] - 658:3, 712:24, 725:25, 726:6, 726:10, 726:18, 735:20
**relationship** [1] - 681:20
**religious** [1] - 682:1

**rely** [4] - 740:16, 740:22, 742:9, 743:21
**remain** [2] - 733:21, 743:16
**remaining** [1] - 661:15
**remember** [24] - 647:7, 648:9, 649:8, 660:17, 660:21, 664:10, 667:1, 671:25, 672:22, 673:16, 674:20, 675:15, 676:19, 686:14, 690:20, 692:22, 693:10, 696:4, 702:10, 704:16, 715:16, 736:3, 737:2
**reminded** [1] - 739:8
**reminds** [1] - 697:15
**repeat** [1] - 655:7
**repeatedly** [2] - 712:18, 715:12
**repeating** [1] - 656:16
**report** [3] - 704:19, 707:15, 744:10
**reported** [1] - 633:24
**Reporter** [1] - 633:23
**request** [1] - 738:24
**requested** [1] - 653:14
**require** [2] - 635:11, 689:1
**required** [7] - 637:3, 652:23, 684:20, 727:12, 727:14, 733:9, 734:3
**requirement** [1] - 721:18
**residence** [1] - 713:10
**respect** [1] - 638:1
**respectively** [1] - 721:6
**responds** [1] - 659:11
**response** [3] - 742:3, 742:22, 744:16
**responsibility** [1] - 652:17
**responsible** [2] - 709:19, 709:22, 710:23, 728:8
**rest** [6] - 636:20, 695:11, 699:25, 705:17, 716:24, 717:7
**results** [2] - 741:7, 742:11
**retire** [5] - 651:10, 736:7, 737:8, 737:13, 739:17
**retired** [1] - 737:2
**return** [2] - 669:21, 744:5
**returned** [3] - 689:23, 734:9, 736:25
**returns** [1] - 739:24
**review** [1] - 666:1
**Rhymes** [1] - 717:1
**RICHARD** [1] - 648:24
**ridiculous** [1] - 712:11
**rights** [1] - 738:10
**risk** [2] - 724:3, 727:22
**rob** [1] - 677:7
**robbed** [7] - 663:22, 694:14, 694:16, 695:15, 707:3, 716:4

**robber** [8] - 664:10, 664:15, 664:16, 664:17, 664:24, 666:2, 672:22, 705:9
**robberies** [40] - 658:9, 658:15, 658:19, 658:22, 659:1, 667:13, 672:3, 672:11, 672:12, 674:22, 677:4, 678:3, 679:1, 679:5, 681:9, 684:24, 691:21, 695:3, 695:4, 697:12, 699:3, 699:6, 699:10, 700:5, 700:6, 700:9, 703:16, 705:23, 706:21, 707:2, 710:11, 711:6, 712:24, 713:16, 714:19, 714:24, 716:9, 722:11
**robbers** [9] - 658:17, 659:14, 659:21, 659:23, 664:10, 667:11, 702:20, 714:21, 715:9
**robbery** [103] - 637:3, 638:14, 652:4, 654:18, 654:19, 658:1, 658:11, 659:4, 659:6, 659:25, 660:2, 661:10, 662:17, 662:20, 662:23, 664:3, 664:7, 665:12, 666:6, 666:25, 667:1, 667:22, 668:3, 668:9, 669:14, 671:11, 671:22, 672:8, 672:9, 672:18, 673:9, 673:12, 673:14, 673:17, 673:22, 674:4, 674:11, 675:9, 675:16, 676:1, 676:4, 676:6, 676:10, 676:16, 676:19, 677:10, 679:4, 679:12, 679:18, 679:24, 680:7, 681:1, 681:20, 682:11, 682:12, 682:17, 692:23, 695:4, 695:5, 695:10, 695:13, 695:21, 696:14, 696:17, 696:22, 699:6, 700:4, 701:1, 702:9, 703:5, 709:24, 710:4, 712:25, 713:17, 713:20, 713:24, 714:2, 714:3, 714:6, 718:7, 718:12, 718:19, 718:20, 720:4, 720:17, 720:19, 720:21, 721:9, 722:14, 723:1, 725:25, 726:3, 726:7, 726:15, 726:16, 730:6, 730:11, 739:15
**ROBERTSON** [10] - 638:6, 648:22, 649:3, 650:19, 651:3, 655:5, 655:14, 693:2, 741:8, 741:15
**Robertson** [1] - 633:21
**role** [3] - 674:21, 675:4, 720:7

**room** [8] - 637:9, 651:10, 661:14, 736:18, 737:8, 737:13, 744:10, 744:23
**Route** [1] - 680:16
**row** [1] - 700:11
**RPR** [2] - 633:23, 745:23
**rule** [1] - 717:22
**rules** [1] - 717:17
**ruling** [1] - 638:7
**run** [6] - 640:15, 651:15, 659:10, 701:7, 701:17, 702:3
**running** [11] - 640:18, 641:2, 654:6, 654:9, 680:12, 689:18, 690:3, 690:6, 690:18, 701:8, 702:20
**Russia** [1] - 671:1

## S

**sake** [1] - 736:14
**samples** [3] - 704:2, 704:3, 704:11
**Sanyo** [1] - 649:5
**sat** [1] - 710:22
**satisfied** [2] - 733:25, 744:4
**savings** [1] - 723:8
**saw** [18] - 640:14, 641:12, 642:16, 642:21, 654:8, 661:13, 668:22, 672:19, 684:1, 684:24, 686:19, 686:22, 690:15, 702:4, 702:7, 706:23, 715:8, 715:14
**scaled** [2] - 664:10, 664:13
**scales** [1] - 665:24
**scared** [1] - 715:6
**scarf** [10] - 643:9, 643:10, 643:14, 643:17, 643:19, 645:12, 647:11, 678:17, 678:18
**scene** [7] - 642:17, 673:4, 675:22, 679:7, 680:10, 703:12, 729:4
**scenes** [3] - 698:16, 698:17
**scheme** [1] - 677:6
**science** [1] - 692:4
**score** [1] - 656:4
**scratch** [1] - 644:22
**screwdriver** [6] - 659:23, 674:24, 675:1, 675:2, 681:4, 715:20
**scrutinize** [1] - 735:11
**searched** [1] - 661:10, 702:24
**seat** [2] - 639:12, 744:15
**second** [1] - 737:14
**seconds** [1] - 705:5
**Section** [4] - 718:9, 723:3, 726:8, 730:21

**section** [2] - 723:10, 728:4
**secure** [2] - 661:24, 702:2
**secured** [3] - 701:25, 744:10, 744:24
**securing** [1] - 744:23
**security** [1] - 649:10
**see** [66] - 641:14, 641:22, 641:25, 642:8, 644:20, 644:21, 646:12, 647:10, 655:11, 656:20, 662:9, 662:15, 663:3, 664:22, 664:23, 665:3, 665:5, 665:19, 665:25, 666:9, 666:10, 666:12, 667:4, 667:11, 667:17, 668:1, 668:25, 671:15, 672:23, 673:15, 673:19, 674:7, 674:15, 676:8, 677:11, 677:12, 677:23, 683:9, 686:11, 686:12, 686:21, 688:22, 688:24, 689:10, 689:11, 692:5, 695:2, 695:14, 698:19, 701:17, 703:21, 704:21, 710:3, 710:8, 710:19, 711:6, 713:6, 713:11, 714:6, 715:4, 715:8, 715:9, 715:10, 717:4, 741:24
**seeing** [1] - 657:19
**seem** [2] - 654:7, 683:20
**sees** [1] - 701:18
**seized** [1] - 705:7
**selected** [1] - 716:25
**selecting** [1] - 736:8
**sell** [2] - 637:12, 692:7
**semiautomatic** [1] - 662:8
**send** [4] - 720:23, 736:18, 738:25, 739:5
**sending** [1] - 707:12
**sense** [6] - 673:3, 715:22, 715:24, 715:25, 716:1, 719:4
**sent** [1] - 707:11
**sentenced** [1] - 663:3
**sentimental** [1] - 670:22
**separate** [1] - 672:2
**separated** [1] - 653:24
**sequence** [2] - 660:25, 661:3
**serious** [1] - 670:21
**served** [1] - 722:7
**service** [3] - 693:3, 717:2, 717:6
**set** [2] - 635:17, 730:14
**sets** [1] - 718:19
**seven** [3] - 696:20, 698:10, 699:5
**several** [2] - 716:20, 732:20
**severe** [1] - 724:5
**shades** [1] - 687:23
**shall** [4] - 718:15, 723:11,

726:11, 730:22
**share** [4] - 661:3, 677:8, 677:9, 732:10
**shared** [2] - 660:24, 679:9
**sheet** [2] - 704:19, 708:15
**shifts** [1] - 733:12
**shirt** [4] - 705:14, 705:15, 705:16, 708:4
**shoe** [8] - 698:16, 705:2, 705:19, 706:14, 708:1, 708:2
**shoes** [3] - 705:7, 705:9, 705:10
**shooting** [1] - 695:7
**Shoppers** [41] - 658:11, 663:21, 663:22, 663:25, 665:8, 665:11, 665:24, 666:6, 666:10, 668:21, 671:12, 671:15, 675:16, 676:5, 676:6, 676:7, 676:16, 676:18, 676:23, 676:25, 677:10, 677:14, 677:15, 677:20, 682:12, 685:19, 687:16, 688:5, 688:23, 689:8, 692:23, 695:5, 695:13, 695:15, 695:18, 698:18, 705:24, 712:25, 715:9, 720:20, 726:3
**short** [2] - 654:13, 656:9
**shorter** [5] - 664:12, 664:16, 664:17, 683:20, 701:15
**shorthand** [1] - 633:24
**shortly** [2] - 651:12, 737:11
**shot** [2] - 668:17, 669:2
**shoved** [1] - 668:19
**show** [17] - 644:18, 657:5, 673:24, 674:7, 676:3, 690:13, 690:14, 696:22, 699:6, 700:12, 707:24, 710:12, 713:15, 719:22, 727:12, 735:13
**showed** [2] - 676:20, 713:9
**showing** [7] - 676:22, 676:24, 677:5, 677:13, 706:10, 708:24, 722:6
**shown** [3] - 676:19, 696:21, 714:24
**shows** [8] - 656:8, 664:3, 674:9, 679:7, 680:21, 680:22, 713:23, 714:2
**sic** [1] - 668:15
**sic]** [1] - 665:21
**side** [4] - 646:19, 666:12, 702:2, 735:21
**sidebar** [2] - 737:14, 739:19
**signature** [1] - 736:24
**signed** [1] - 737:4
**silencer** [1] - 726:24
**silent** [1] - 733:21

**silly** [1] - 712:2
**silver** [7] - 662:12, 664:25, 668:19, 689:10, 689:11, 695:10, 698:20
**similar** [1] - 676:5
**similarity** [1] - 720:11
**similarly** [1] - 724:20
**simply** [6] - 636:20, 672:1, 673:22, 674:11, 698:23, 734:11
**single** [4] - 687:13, 697:9, 709:19, 717:20
**Singleton** [2] - 661:20, 711:23
**sister** [1] - 712:5
**sit** [1] - 683:7
**sits** [1] - 671:25
**sitting** [11] - 654:1, 655:6, 683:4, 688:7, 688:11, 689:23, 691:18, 691:23, 700:10, 708:17, 716:16
**situation** [3] - 677:12, 683:6, 731:15
**six** [3] - 696:13, 696:18, 696:19
**sized** [1] - 664:15
**skin** [6] - 683:21, 686:9, 687:12, 687:20, 687:23, 698:19
**skinned** [3] - 664:15, 664:16, 664:17
**skinny** [2] - 666:3
**slate** [1] - 733:18
**slide** [1] - 695:11
**slides** [1] - 703:8
**small** [1] - 710:16
**smaller** [1] - 704:2
**smarter** [1] - 711:16
**Smith** [1] - 710:16
**snarky** [1] - 691:9
**sneak** [1] - 716:6
**sold** [1] - 722:8
**sole** [4] - 732:8, 732:10, 734:24, 735:6
**solely** [1] - 736:5
**solution** [1] - 740:19
**someone** [17] - 640:17, 670:20, 672:18, 672:20, 676:9, 678:6, 680:25, 683:7, 683:24, 712:12, 712:16, 714:16, 716:21, 720:14, 725:1, 729:1, 729:10
**someplace** [1] - 714:9
**sometime** [1] - 636:4
**sometimes** [3] - 670:22, 715:22, 715:24
**somewhat** [1] - 635:7
**somewhere** [2] - 742:24, 744:9

**sorry** [7] - 650:2, 668:18, 707:17, 710:15, 738:2, 738:5, 738:6
**sort** [2] - 677:18, 678:1
**sound** [1] - 741:1
**sounded** [2] - 683:24
**source** [1] - 711:2
**sources** [1] - 722:5
**southeastern** [1] - 704:14
**space** [1] - 694:25
**speaking** [1] - 666:21
**special** [3] - 647:3, 682:21, 682:22
**specific** [2] - 709:24, 740:3
**specifically** [7] - 637:2, 637:3, 637:16, 637:21, 638:10, 685:3, 710:5
**spectator** [1] - 729:11
**speculation** [1] - 736:4
**sped** [1] - 662:21
**spell** [1] - 639:24
**spend** [1] - 677:24
**spent** [2] - 677:25, 708:18
**spoken** [2] - 662:2, 683:8
**spotted** [2] - 642:25, 643:2
**sprinkling** [1] - 716:5
**spry** [1] - 665:19
**stack** [1] - 665:13
**stacks** [1] - 665:12
**staff** [1] - 699:25
**stand** [12] - 639:18, 649:1, 654:13, 708:16, 713:4, 715:6, 715:13, 715:16, 735:16, 737:6, 739:23, 744:5
**standard** [11] - 670:6, 670:7, 670:10, 670:12, 670:15, 670:18, 670:19, 671:5, 671:6, 684:20, 685:2
**standing** [6] - 640:13, 653:19, 678:7, 686:6, 700:15, 707:21
**stands** [2] - 648:20, 650:25
**Stanley** [15] - 633:20, 636:25, 650:4, 658:25, 659:5, 664:6, 685:3, 689:2, 693:11, 712:1, 712:10, 712:25, 714:8, 714:15, 718:6
**Stanley's** [1] - 714:18
**start** [6] - 635:10, 656:20, 688:17, 709:15, 713:21, 744:18
**started** [10] - 654:6, 677:25, 689:18, 690:5, 700:3, 700:7, 701:7, 701:11, 702:1, 702:19
**starter** [1] - 726:20
**starting** [1] - 667:1
**starts** [1] - 692:11

**state** [12] - 639:21, 646:7, 647:8, 722:5, 725:20, 731:13, 731:19, 732:13, 732:14, 732:18, 734:19, 735:15

**state-chartered** [1] - 725:20

**statement** [15] - 644:20, 644:24, 645:3, 646:1, 646:7, 646:10, 646:25, 678:7, 678:8, 686:15, 725:1, 725:3, 738:9, 738:21, 743:14

**statements** [4] - 734:13, 737:23, 738:8, 738:11

**STATES** [3] - 633:1, 633:4, 633:12

**states** [2] - 652:24, 734:20

**States** [14] - 633:17, 635:2, 669:21, 670:11, 718:8, 718:9, 718:15, 723:3, 723:12, 726:9, 726:11, 728:4, 728:5, 730:21

**stating** [1] - 717:21

**station** [3] - 668:15, 709:1, 712:3

**statute** [5] - 651:22, 652:5, 652:12, 652:19, 718:20

**stay** [1] - 654:17

**steal** [1] - 675:3

**stem** [1] - 658:8

**step** [2] - 648:18, 650:23

**stick** [2] - 642:17, 642:22

**still** [6] - 646:1, 648:9, 661:9, 669:12, 696:10, 711:10

**stipulated** [1] - 663:5

**stipulations** [2] - 734:15

**stolen** [13] - 659:24, 667:14, 675:14, 675:15, 675:16, 675:17, 675:18, 675:21, 675:22, 676:4, 706:16, 707:3

**stood** [6] - 641:15, 642:6, 690:3, 713:18, 715:2

**stop** [3] - 640:16, 655:17, 667:5

**store** [2] - 706:19, 706:20

**story** [5] - 668:13, 697:15, 700:4, 700:24

**street** [7] - 641:10, 641:15, 653:24, 661:5, 689:21, 702:3, 707:2

**Street** [19] - 654:2, 659:17, 659:18, 660:22, 661:11, 680:9, 680:16, 689:22, 689:25, 690:1, 701:5, 702:14, 702:15, 708:12, 711:13, 720:18, 726:1

**strength** [1] - 724:24

**stretchy** [1] - 703:20

**strike** [1] - 638:9

**striking** [1] - 724:14

**strip** [1] - 706:19

**struck** [1] - 638:19

**stuff** [6] - 684:4, 693:18, 699:13, 705:13, 706:6, 744:11

**style** [2] - 710:2, 736:20

**subleased** [1] - 694:17

**submit** [5] - 658:22, 671:4, 671:22, 679:2, 682:14

**submitted** [1] - 638:16

**subscribe** [1] - 712:14

**subscriber** [2] - 692:14, 712:15

**subsequent** [2] - 650:10, 667:13

**substance** [2] - 744:8, 744:12

**substantial** [1] - 727:22

**substantive** [5] - 652:17, 653:12, 663:6, 730:5, 730:10

**successful** [1] - 656:8

**sufficient** [3] - 729:6, 732:23, 733:24

**suggest** [1] - 654:9

**suggested** [2] - 668:5, 709:6

**suggesting** [1] - 710:9

**suggests** [2] - 742:15

**summary** [4] - 667:4, 667:17, 667:24, 713:22

**Sunday** [4] - 663:24, 667:2, 706:4, 706:5

**superseding** [1] - 730:8

**suppliers** [1] - 722:4

**support** [1] - 733:20

**supported** [1] - 735:23

**supports** [2] - 669:22, 706:10

**suppose** [1] - 635:8

**supposed** [2] - 686:4, 690:13

**supposedly** [2] - 687:2, 690:10

**surfaces** [1] - 703:8

**surmise** [2] - 668:6, 736:4

**surrounding** [1] - 727:10

**surveillance** [7] - 662:15, 664:22, 710:3, 710:8, 710:18, 711:7, 715:4

**suspect** [1] - 716:18

**sustained** [3] - 735:2, 735:3, 735:5

**swabbed** [1] - 704:8

**sworn** [4] - 639:17, 648:25, 717:25, 718:2

**sympathy** [1] - 736:4

**system** [4] - 670:11, 671:3, 671:5

**T**

**T-O-B-E** [2] - 649:18, 693:17

**T-shirt** [3] - 705:14, 705:15, 705:16

**table** [4] - 657:7, 688:8, 688:12, 691:23

**talks** [2] - 637:15, 684:12

**tall** [2] - 664:14, 701:15

**taller** [2] - 664:12, 683:20

**tangible** [1] - 722:22

**tape** [1] - 664:22

**tapes** [1] - 715:4

**target** [1] - 667:15

**tattoo** [1] - 686:24

**taught** [1] - 671:11

**technicality** [1] - 699:16

**technically** [1] - 640:14

**technician** [1] - 703:6

**tee** [2] - 659:22, 684:13

**telephonically** [1] - 647:2

**television** [1] - 656:8

**teller** [6] - 665:19, 665:21, 668:18, 700:15, 704:24

**ten** [1] - 654:24

**tends** [1] - 735:13

**term** [17] - 652:11, 658:7, 663:2, 721:12, 722:14, 722:21, 722:22, 724:4, 725:19, 726:20, 726:24, 730:24, 731:4, 731:11, 731:14, 731:17, 731:18

**terms** [2] - 645:7, 679:20

**terrific** [1] - 699:24

**terrifying** [1] - 668:14

**test** [1] - 734:4

**tested** [2] - 698:5, 703:23

**testified** [18] - 637:12, 639:18, 649:1, 650:5, 663:1, 664:2, 684:10, 686:17, 690:15, 698:4, 698:18, 701:23, 704:4, 704:24, 713:4, 733:24, 735:12, 735:18

**testifies** [4] - 701:4, 703:19, 704:15, 735:9

**testify** [2] - 661:23, 715:13

**testimony** [26] - 637:6, 637:8, 637:11, 637:13, 663:16, 674:15, 685:14, 687:23, 696:15, 696:16, 700:21, 712:23, 733:3, 735:7, 735:10, 735:11, 736:1, 740:14, 740:17, 740:24, 742:10, 743:9, 743:10, 743:15, 743:22, 743:23

**text** [2] - 707:11, 712:18

**texted** [1] - 712:9

**texts** [2] - 707:12, 707:13

**THE** [83] - 633:11, 634:3, 635:2, 635:4, 635:7, 635:11, 635:15, 635:20, 635:22, 635:25, 636:4, 636:7, 636:11, 636:14, 636:16, 636:21, 638:3, 638:21, 639:4, 639:7, 639:10, 639:12, 647:23, 648:18, 650:21, 650:23, 651:1, 651:6, 651:8, 651:14, 653:21, 654:12, 654:23, 655:2, 655:4, 655:11, 655:16, 656:3, 656:12, 656:20, 657:8, 657:10, 657:12, 669:16, 691:24, 692:20, 716:14, 717:11, 737:21, 738:8, 738:13, 738:17, 739:4, 739:8, 739:19, 739:23, 740:3, 740:9, 740:12, 740:15, 740:21, 741:10, 741:16, 741:24, 742:5, 742:9, 742:16, 742:20, 743:1, 743:5, 743:7, 743:15, 743:19, 744:1, 744:3, 744:7, 744:15, 744:20, 744:21, 745:1, 745:2, 745:4, 745:5

**theft** [1] - 706:25

**theirs** [2] - 714:23, 714:25

**themselves** [1] - 656:11

**therefore** [5] - 682:10, 684:3, 698:24, 724:17, 729:19

**thereupon** [1] - 739:6

**they've** [8] - 676:19, 683:18, 697:22, 697:23, 697:24, 700:22, 705:3, 739:13

**thicker** [1] - 664:12

**thin** [3] - 664:11, 665:23

**thinking** [3] - 699:11, 739:1, 741:24

**thinks** [2] - 693:23, 706:7

**third** [1] - 731:9

**thoughts** [2] - 657:3, 685:9

**thousand** [3] - 661:3, 661:4, 661:6

**threat** [2] - 724:9, 724:11

**threatened** [3] - 721:7, 722:17, 727:20

**threatens** [2] - 718:13, 724:20

**three** [40] - 646:12, 657:4, 657:25, 658:2, 658:9, 658:22, 658:23, 659:21, 661:17, 662:22, 663:4, 667:11, 669:17, 673:17, 679:1, 682:9, 682:17, 684:10, 685:18, 686:13, 686:18, 690:6, 694:14, 694:16, 694:17, 695:3,

700:6, 703:16, 706:16, 706:24, 708:18, 716:3, 718:16, 718:23, 721:10, 723:20, 728:22, 730:15, 731:1

**three-and-a-half** [1] - 708:18

**three-robbery** [1] - 682:17

**threw** [1] - 669:10

**throughout** [4] - 655:23, 657:17, 674:22, 683:4

**throw** [2] - 689:22, 696:8

**Thursday** [1] - 636:11

**tied** [1] - 644:3

**ties** [1] - 703:18

**timed** [1] - 656:2

**tip** [1] - 716:5

**tip-toeing** [1] - 716:5

**Title** [5] - 718:9, 723:3, 726:8, 728:4, 730:21

**Tobe** [4] - 649:18, 693:17, 712:19, 714:10

**Tobe's** [3] - 650:14, 650:15, 650:16

**Tobias** [14] - 633:22, 658:25, 660:18, 664:6, 700:10, 711:11, 711:14, 712:17, 712:18, 713:1, 714:11, 714:14, 718:6

**today** [7] - 635:25, 683:10, 687:5, 688:9, 691:8, 700:8, 705:17

**toeing** [1] - 716:5

**together** [12] - 657:3, 667:8, 668:6, 668:7, 672:4, 685:18, 685:24, 697:24, 714:1, 714:2

**tomorrow** [5] - 635:5, 683:11, 744:10, 744:18, 745:6

**took** [9] - 639:18, 649:1, 654:8, 658:15, 665:10, 696:23, 706:17, 721:3, 723:15

**top** [1] - 695:11

**tossing** [1] - 702:5

**total** [2] - 656:13, 672:3

**totally** [1] - 713:11

**touch** [2] - 693:8, 693:9

**touched** [2] - 696:23, 698:21

**touching** [2] - 704:5, 724:13

**tough** [2] - 701:11, 707:9

**toward** [1] - 680:16

**towards** [5] - 640:14, 640:15, 654:2, 689:22, 702:15

**towers** [1] - 692:18

**tracker** [5] - 690:10, 695:22, 702:8, 708:11, 713:10

**trackers** [9] - 659:6, 659:13, 700:18, 702:10, 702:13, 702:14, 708:11, 713:8,

713:11

**Tracy** [2] - 633:23, 745:23

**trail** [1] - 700:18

**transcript** [3] - 633:10, 633:24, 745:19

**transcription** [1] - 633:25

**transfer** [2] - 671:17, 671:20

**transfers** [1] - 637:15

**transportation** [1] - 721:15

**transported** [1] - 706:9

**trash** [5] - 653:25, 660:16, 669:10, 689:23, 711:3

**traveled** [2] - 663:19, 732:18

**trial** [10] - 657:17, 670:14, 677:24, 683:5, 687:5, 715:1, 733:17, 734:12, 734:25, 737:25

**TRIAL** [1] - 633:10

**trials** [3] - 672:2, 672:3, 672:4

**tried** [4] - 640:17, 644:22, 669:8

**trillion** [2] - 703:25, 704:1

**trouble** [2] - 665:20, 665:22

**true** [2] - 702:11, 719:4

**truth** [1] - 733:2

**try** [4] - 656:9, 671:14, 673:22, 717:7

**trying** [8] - 655:23, 662:1, 668:25, 675:2, 685:23, 692:7, 696:16, 705:11

**turban** [1] - 643:18

**turn** [5] - 659:2, 663:21, 667:10, 677:22, 701:5

**turned** [4] - 654:2, 665:3, 669:9, 689:25

**twice** [1] - 665:25

**two** [55] - 635:25, 638:1, 642:5, 646:12, 657:4, 659:13, 659:15, 660:5, 660:6, 662:7, 663:23, 664:9, 664:12, 676:22, 678:3, 679:5, 680:6, 683:25, 684:10, 686:18, 688:2, 688:20, 696:9, 697:5, 699:24, 700:5, 701:16, 704:9, 706:17, 707:1, 710:5, 710:10, 711:4, 713:11, 715:8, 715:10, 716:7, 716:20, 716:25, 717:3, 718:18, 718:21, 719:2, 721:8, 723:18, 724:25, 726:12, 726:18, 728:20, 730:10, 731:6, 731:15, 731:25, 732:10, 733:1

**type** [9] - 643:19, 644:12, 645:12, 674:12, 674:13, 675:12, 678:17, 678:18, 685:2

**types** [2] - 674:16, 733:1

---

# U

**U.S** [2] - 699:16, 699:17

**unable** [1] - 701:13

**unanimous** [3] - 736:11, 736:15, 736:16

**under** [11] - 638:10, 684:20, 693:17, 702:5, 708:17, 725:4, 725:11, 727:16, 729:18, 735:12, 737:7

**underlying** [1] - 727:8

**underneath** [4] - 684:1, 684:2, 686:21, 686:22

**undershirts** [1] - 705:17

**understood** [2] - 650:11, 741:12

**union** [16] - 641:17, 641:20, 642:1, 652:11, 658:2, 659:5, 723:8, 723:16, 725:14, 725:15, 725:17, 725:19, 725:20, 726:16, 730:6

**Union** [37] - 640:5, 640:13, 641:7, 658:10, 659:2, 659:7, 659:22, 662:11, 663:18, 671:13, 675:18, 677:22, 677:23, 677:25, 678:5, 679:11, 679:18, 679:21, 679:24, 680:12, 685:20, 688:18, 690:11, 696:17, 699:6, 700:16, 701:1, 709:25, 716:4, 720:22, 723:1, 723:17, 723:21, 723:25, 725:21, 726:7

**unique** [1] - 672:22

**UNITED** [3] - 633:1, 633:4, 633:12

**United** [14] - 633:17, 635:2, 669:21, 670:11, 718:8, 718:9, 718:15, 723:3, 723:12, 726:9, 726:11, 728:4, 728:5, 730:21

**unlawful** [4] - 720:8, 722:14, 730:18, 730:22

**unlawfully** [1] - 726:6

**unless** [3] - 697:19, 719:16, 733:25

**unlike** [1] - 661:1

**unlock** [1] - 712:7

**unproven** [1] - 637:19

**unusual** [3] - 640:12, 662:13, 672:25

**up** [29] - 639:22, 641:23, 642:2, 642:20, 644:3, 662:21, 665:22, 669:16, 673:5, 677:7, 691:24, 692:20, 692:21, 695:14,

696:13, 697:13, 698:22, 701:8, 702:3, 702:14, 703:13, 703:14, 708:12, 711:7, 713:18, 713:25, 715:2, 715:16, 745:2

**upholding** [1] - 684:6

**ups** [1] - 657:6

**usage** [1] - 679:10

**usefulness** [1] - 727:9

**uses** [3] - 675:13, 726:10, 727:1

---

# V

**vacuum** [3] - 650:17, 693:19, 694:6

**value** [1] - 722:21

**VanLowe** [9] - 633:20, 636:25, 656:10, 668:11, 691:24, 692:20, 696:23, 698:20, 711:18

**VANLOWE** [15] - 636:24, 651:4, 653:19, 653:22, 655:18, 656:5, 683:1, 691:25, 692:21, 738:24, 742:11, 743:14, 743:16, 743:24, 744:2

**VanLowe's** [1] - 638:7

**vanLowe's** [1] - 655:6

**various** [1] - 698:9

**vehicle** [1] - 708:10

**verdict** [17] - 638:22, 669:22, 669:23, 718:3, 733:23, 734:8, 735:22, 736:3, 736:7, 736:12, 736:15, 736:16, 736:18, 736:25, 737:3, 737:10, 737:12

**vicinity** [2] - 640:4, 692:19

**victims** [1] - 669:15

**video** [16] - 662:15, 663:15, 665:18, 665:25, 666:1, 666:9, 667:10, 668:25, 676:8, 688:22, 688:23, 688:24, 710:3, 715:8

**videos** [2] - 695:3, 710:18

**views** [1] - 736:13

**violate** [4] - 719:2, 719:5, 719:11, 727:25

**violation** [3] - 717:25, 718:2, 718:8

**violence** [16] - 652:8, 652:16, 658:4, 718:13, 721:7, 722:17, 723:4, 723:18, 724:23, 725:25, 726:10, 727:16, 727:18, 727:24, 730:7, 730:12

**violent** [1] - 669:19

**VIRGINIA** [1] - 633:1

**Virginia** [8] - 633:5, 663:18, 668:10, 675:16, 705:25,

713:2, 722:7, 722:9
**voice** [2] - 639:21, 639:22
**voices** [1] - 683:24
**Volume** [1] - 633:10
**voluntarily** [2] - 718:23, 724:18
**volunteered** [1] - 657:21
**VVM** [39] - 637:3, 637:4, 637:5, 637:7, 637:11, 637:16, 658:12, 667:10, 667:22, 668:23, 671:11, 672:8, 673:12, 673:17, 673:22, 674:4, 674:10, 675:15, 676:1, 676:16, 682:11, 685:19, 687:11, 687:12, 688:23, 689:12, 692:22, 694:13, 694:16, 694:25, 695:1, 695:4, 695:10, 695:15, 695:17, 713:16, 714:6, 720:17, 725:25

## W

**wad** [3] - 665:7, 665:8, 665:16
**wait** [3] - 741:10, 741:16
**waiting** [1] - 666:9
**waived** [2] - 738:10, 740:6
**waiving** [1] - 740:10
**walk** [2] - 680:9, 701:5
**walked** [5] - 654:1, 654:2, 672:23, 689:21, 689:25
**walking** [7] - 640:14, 640:20, 653:24, 653:25, 688:8, 689:22, 702:13
**walks** [1] - 672:24
**wall** [5] - 664:11, 664:13, 665:25, 669:11, 688:1
**wants** [2] - 715:23, 744:9
**Warehouse** [29] - 658:11, 671:12, 671:16, 675:17, 676:6, 676:7, 676:16, 676:19, 676:23, 676:25, 677:10, 677:14, 677:16, 677:21, 682:12, 685:19, 687:16, 688:5, 688:24, 689:8, 692:23, 695:5, 695:13, 698:18, 705:25, 712:25, 720:20, 726:4
**watch** [1] - 688:22
**watching** [1] - 673:2
**ways** [3] - 673:10, 688:15, 732:20
**wealth** [1] - 677:3
**weapon** [18] - 652:7, 676:13, 676:14, 676:15, 695:18, 703:4, 709:19, 709:20, 709:21, 709:23, 710:20, 723:11, 723:22, 724:4,

726:20, 726:23, 727:13
**weapons** [11] - 681:10, 706:18, 709:25, 710:1, 710:3, 710:4, 710:10, 710:12, 710:14, 710:23, 716:7
**wear** [1] - 643:18
**wearing** [20] - 643:14, 644:10, 645:14, 646:17, 659:14, 664:24, 665:3, 665:6, 665:20, 678:23, 681:22, 681:23, 686:13, 699:7, 699:8, 705:14, 705:15, 705:16, 705:17, 708:5
**wears** [1] - 666:3
**week** [7] - 635:12, 635:22, 635:23, 636:8, 636:11, 657:18, 699:23
**weeks** [1] - 635:25
**weigh** [1] - 733:10
**weight** [3] - 733:7, 735:7, 736:1
**Wenmoth** [2] - 705:1, 705:8
**Wesson** [1] - 710:16
**Westfall** [2] - 633:23, 745:23
**white** [13] - 643:9, 643:14, 643:21, 645:11, 678:16, 678:18, 704:13, 705:14, 705:15, 705:16, 705:17, 708:4
**white-checkered** [1] - 645:11
**whole** [2] - 657:18, 717:21
**wielded** [1] - 709:22
**wife** [2] - 662:1, 666:20
**Willie** [1] - 635:3
**WILLIE** [1] - 633:6
**winston** [1] - 651:4
**Winston** [30] - 633:20, 636:25, 650:4, 658:25, 659:20, 660:20, 660:25, 664:6, 664:15, 664:20, 664:23, 665:2, 665:9, 683:2, 685:4, 686:24, 687:2, 688:19, 689:2, 690:12, 690:16, 691:8, 692:25, 696:12, 697:11, 698:10, 712:1, 712:9, 718:6, 738:9
**Winston's** [12] - 659:5, 661:7, 665:6, 683:8, 683:13, 683:14, 692:13, 692:24, 693:11, 712:25, 714:8, 714:16
**wire** [1] - 637:15
**wisdom** [1] - 717:22
**wish** [2] - 709:10
**WITNESS** [1] - 647:23
**witness** [19] - 639:13, 678:6,

678:25, 680:5, 684:8, 686:5, 687:4, 691:11, 693:10, 705:5, 708:16, 735:9, 735:12, 735:13, 735:20, 735:21, 735:23, 736:1
**Witness** [2] - 648:20, 650:25
**witness'** [2] - 735:15, 735:17
**witnesses** [9] - 637:12, 639:8, 653:9, 700:21, 706:22, 715:6, 733:14, 735:7
**woman** [5] - 669:13, 687:19, 689:8, 694:21, 698:18
**wonder** [3] - 698:2, 707:6, 708:9
**WOOD** [26] - 636:18, 639:9, 639:14, 639:20, 645:20, 647:17, 647:24, 648:17, 648:21, 651:2, 654:22, 654:25, 655:3, 669:25, 737:14, 737:17, 737:22, 738:9, 738:15, 738:23, 739:22, 740:6, 740:10, 740:25, 743:8, 743:13
**wood** [5] - 655:22, 667:8, 668:5, 678:8, 692:1
**Wood** [1] - 633:19
**wood's** [1] - 655:6
**woods** [20] - 659:11, 659:12, 659:17, 659:19, 660:5, 660:10, 680:2, 682:10, 690:14, 690:22, 690:24, 691:3, 696:24, 705:13, 711:2, 713:7, 713:10, 715:18, 716:5
**word** [9] - 645:6, 704:22, 715:23, 731:22, 731:23, 736:9, 742:24, 743:6, 743:11
**words** [1] - 653:4
**wore** [4] - 660:15, 664:23, 681:17, 705:9
**works** [2] - 694:21, 694:24
**world** [3] - 660:11, 660:14, 707:25
**worn** [1] - 703:21
**worthy** [1] - 735:14
**wow** [2] - 642:7, 684:4
**write** [3] - 646:10, 736:22, 740:11
**writing** [4] - 646:7, 717:15, 737:4, 740:8
**written** [4] - 719:6, 741:21, 742:15, 742:21
**wrongful** [1] - 722:24
**wrote** [2] - 646:4, 646:25

## Y

**year** [6] - 658:8, 663:2, 730:24, 731:5, 731:12, 731:17
**years** [2] - 696:9, 731:15
**years'** [1] - 663:3
**yellow** [4] - 665:20, 699:10, 706:14, 708:9
**yesterday** [1] - 664:2
**you-all** [19] - 636:16, 639:7, 639:12, 651:17, 654:23, 656:17, 657:2, 675:20, 697:16, 716:23, 736:7, 737:8, 737:13, 739:9, 739:17, 741:13, 742:7, 744:15, 744:18
**young** [3] - 662:10, 668:15, 669:3
**yourself** [13] - 656:16, 662:15, 668:1, 707:19, 707:24, 708:4, 708:11, 709:5, 709:7, 709:8, 710:18, 714:21, 715:5

```
1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF VIRGINIA
2                 ALEXANDRIA DIVISION
3    _____
                              )
4    UNITED STATES OF AMERICA  )
                              ) Case No. 1:13-cr-48
5              v.             ) Alexandria, Virginia
                              )
6    KEITH WILLIE REED, et al., ) June 21, 2013
                              ) 9:00 a.m.
7         Defendants.          )
                              )
8    _____
9
10                 TRANSCRIPT OF TRIAL
                     (Volume V)
11
          BEFORE THE HONORABLE CLAUDE M. HILTON
12
            UNITED STATES DISTRICT JUDGE
13
                   AND A JURY
14
15
16
     APPEARANCES:
17
     For the United States:   Patricia T. Giles, Esq.
18                            Rebeca H. Bellows, Esq.
19   For the Defendants:      Douglas J. Wood, Esq.
                               Defendant Keith W. Reed
20                            Melinda L. VanLowe, Esq.
                               Defendant Stanley R. Winston
21                            Alfred L. Robertson, Jr., Esq.
                               Defendant Anthony Cannon
22                            Gregory T. Hunter, Esq.
                               Defendant Tobias R. Dyer
23
      Court Reporter:         Tracy L. Westfall, RPR, CMRS, CCR
24
     Proceedings reported by machine shorthand, transcript produced
25   by computer-aided transcription.
```

```
 1                    P R O C E E D I N G S

 2       (Jury deliberations begin at 9:00 a.m.; verdict reached at

 3   4:40 p.m.; the jury enters at 4:45 p.m.)

 4              THE COURT:  You-all can have a seat.

 5              THE CLERK:  Mr. Foreman, has the jury agreed upon the

 6   verdict?

 7              THE FOREPERSON:  Yes, Your Honor, we have.

 8              THE CLERK:  Will you hand it to the marshal, please.

 9              THE COURT:  Okay.

10              THE CLERK:  Will the defendants please stand and face

11   the jury.

12              We, the jury, find the defendant, Anthony Cannon,

13   guilty as to Count 1; guilty as to Count 2; guilty as to

14   Count 3; guilty as to Count 4; guilty as to Count 5; guilty as

15   to Count 6; guilty as to Count 7; guilty as to Count 8; and

16   guilty as to Count 11; signed by the foreperson and dated

17   June 21, 2013.

18              Ladies and gentlemen of the jury, is this your

19   unanimous verdict?

20       (Affirmative responses.)

21              THE CLERK:  We, the jury, find the defendant, Tobias

22   Richard Dyer, guilty as to Count 1; guilty as to Count 2; guilty

23   as to Count 3; guilty as to Count 4; guilty as to Count 5;

24   guilty as to Count 6; guilty as to Count 7; guilty as to

25   Count 8, and guilty as to Count 12; signed by the foreperson and
```

1  dated June 21, 2013.

2          Ladies and gentlemen of the jury, is your unanimous

3  verdict?

4      (Affirmative responses.)

5          THE CLERK:  We, the jury, the defendant, Keith Willie

6  Reed, guilty as to Count 1; guilty as to Count 2; guilty as to

7  Count 3; guilty as to Count 4; guilty as to Count 5; guilty as

8  to Count 6; guilty as to Count 7; guilty as to Count 8; guilty

9  as to Count 9; signed by the foreperson and dated June 21, 2013.

10          Ladies and gentlemen of the jury, is your unanimous

11  verdict?

12      (Affirmative responses.)

13          THE CLERK:  We, the jury, find the defendant, Stanley

14  Ray Winston, guilty as to Count 1; guilty as to Count 2; guilty

15  as to Count 3; guilty as to Count 4; guilty as to Count 5;

16  guilty as to Count 6; guilty as to Count 7; guilty as to

17  Count 8; and guilty as to Count 10; signed by the foreperson and

18  dated June 21, 2013.

19          Ladies and gentlemen of the jury, is this your

20  unanimous verdict?

21      (Affirmative responses.)

22          THE COURT:  All right.  Ladies and gentlemen, I thank

23  you very much for your service in this case.  You're excused

24  until you're next scheduled to appear here.  Thank you.

25      (The jury exits at 4:50 p.m.)

1           THE COURT:  September the 27th be a good day for

2    sentencing?

3           MR. WOOD:  That's fine for Mr. Reed, Your Honor.

4           MR. HUNTER:  That's fine for Dyer, Judge.

5           MS. VANLOWE:  That's fine for Mr. Winston.

6           MR. ROBERTSON:  That's fine for Mr. Cannon.

7           THE COURT:  All right.  Then it will be continued to

8    September 27th at 9 a.m. for sentencing.  It is referred to the

9    probation office for preparation of a presentence report.

10          All right.  I'm going to sign this order returning the

11   exhibits to your custody and control.

12          All right.  That's been entered.

13          We'll adjourn until Monday morning at 9:30.

14          * * *

15   (Proceedings concluded at 4:51 p.m.)

16

17

18

19

20

21

22

23

24

25

CERTIFICATION

1

2

3        I certify, this 22nd day of January 2014, that the

4   foregoing is a correct transcript from the record of proceedings

5   in the above-entitled matter to the best of my ability.

6

7                              /s/

8              _____
                   Tracy Westfall, RPR, CMRS, CCR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GOVERNMENT
EXHIBIT
17-1



# Phone Examination Report Properties

| | |
|---|---|
| Selected Manufacturer: | Sanyo CDMA |
| Selected Model: | SCP-2700 Juno |
| Detected Manufacturer: | KYOCERA Corporation |
| Detected Model (GMM): | SCP2700BT |
| Revision: | 1.000BT ,31009 |
| MEID: | 268435457808872526 (HEX: A000001287624E) |
| CDMA MIN: | 3013077300 |
| MDN: | 2403558256 |
| User Code: | 8256 |
| Extraction start date/time: | 01/09/13 02:02:48 PM |
| Extraction end date/time: | 01/09/13 02:04:15 PM |
| Phone Date/Time: | 01/09/13 06:41:42 PM (GMT) |
| Connection Type: | USB Cable |
| UFED Version: | Software: 1.2.1.0 UFED , Full Image: 1.0.2.9 , Tiny Image: 1.0.2.1 |
| UFED S/N: | 5568557 |
| Examiner's name: | mejames |

# Phone Examination Report Index

| | |
|---|---|
| Contacts | Selected |
| SMS - Text Messages | Selected |
| Calendar/Notes/Tasks | Not Supported |
| Call Logs | Selected |
| MMS - Multimedia Messages | Not Supported |
| Instant Messages | Not Supported |
| Images | Selected |
| Ringtones | Not Selected |
| Audio | Not Selected |
| Video | Not Supported |

GOVERNMENT
EXHIBIT
17-2
1:13CR48

## Phone Contacts

Total Entries: 80
PBB MD5 Hash: 9648B22E076B27DFB1C077E0CE7886EC
PBB SHA256 Hash: 01317148 C4C3B68 E5DF140 33E0462 7F78031 38C194C C6E8EE5
8A56748 FDE04A6

| #1 | CALL BALANCE (Memory: Phone) |
|----|------------------------------|
| General: | 225 |
| General: | #225 |
| General: | *225 |

| #2 | CALL CARE (Memory: Phone) |
|----|---------------------------|
| General: | 611 |
| General: | #611 |
| General: | *611 |

| #3 | CALL RE-BOOST (Memory: Phone) |
|----|-------------------------------|
| General: | 233 |
| General: | #233 |
| General: | *233 |

| #4 | Blacks (Memory: Phone) |
|----|------------------------|
| Mobile: | 2022002815 |
| Web: | |

| #5 | Sid (Memory: Phone) |
|----|---------------------|
| Mobile: | 2025537830 |

| #6 | Mom (Memory: Phone) |
|----|---------------------|
| Mobile: | 2023167295 |

Examination Report

| #7 | G (Memory: Phone) |
|---|---|
| Mobile: | 3012223823 |

| #8 | My Baby Girl (Memory: Phone) |
|---|---|
| Mobile: | 2405017192 |

| #9 | Ms.Taylor (Memory: Phone) |
|---|---|
| Mobile: | 2022461752 |

| #10 | Erika (Memory: Phone) |
|---|---|
| Mobile: | 2022150047 |

| #11 | Stoa (Memory: Phone) |
|---|---|
| Mobile: | *3005 |

| #12 | Iv (Memory: Phone) |
|---|---|
| Mobile: | 3012223084 |

| #13 | Gmom (Memory: Phone) |
|---|---|
| Mobile: | 2023905884 |

| #14 | Ledos (Memory: Phone) |
|---|---|
| Mobile: | 2027265336 |

| #15 | Richard (Memory: Phone) |
|---|---|
| Mobile: | 5402953800 |

| #16 | Dillonpsa (Memory: Phone) |
|---|---|
| Mobile: | 2022205561 |

| #17 | Gy (Memory: Phone) |
|---|---|
| Mobile: | 2026954217 |

| #18 | Head (Memory: Phone) |
|---|---|
| Mobile: | 2027058211 |

| #19 | Gugu (Memory: Phone) |
|---|---|
| Mobile: | 2024227666 |

| #20 | Minkgirl (Memory: Phone) |
|---|---|
| Mobile: | 2027188678 |

| #21 | Ant (Memory: Phone) |
|---|---|
| Mobile: | 2025917174 |

| #22 | Dufo (Memory: Phone) |
|---|---|
| Mobile: | 2026573172 |

| #23 | Daniel (Memory: Phone) |
|---|---|
| Mobile: | 2026411862 |

| #24 | Du (Memory: Phone) |
|---|---|
| Mobile: | 5714210181 |

| #25 | Lile64 (Memory: Phone) |
|---|---|
| Mobile: | 2406027335 |

| #26 | Gecio (Memory: Phone) |
|---|---|
| Mobile: | 7037382188 |
| Work: | 0299989120101187 |

| #27 | Walt (Memory: Phone) |
|---|---|
| Mobile: | 2024219771 |

Appeal: 13-4835    Doc: 47-3    Filed: 05/07/2014    Pg: 166 of 359

| #28 | April (Memory: Phone) |
|-----|-----|
| Mobile: | 2024552651 |

| #29 | Ironw Union (Memory: Phone) |
|-----|-----|
| Mobile: | 3015990940 |

| #30 | Charls (Memory: Phone) |
|-----|-----|
| Mobile: | 2022100216 |

| #31 | Coach (Memory: Phone) |
|-----|-----|
| Mobile: | 2022343900 |

| #32 | Danyboy (Memory: Phone) |
|-----|-----|
| Mobile: | 3012727247 |

| #33 | Roberson (Memory: Phone) |
|-----|-----|
| Mobile: | 2022714726 |
| Mobile: | 2022234472 |

| #34 | Stanly (Memory: Phone) |
|-----|-----|
| Mobile: | 8047613721 |

| #35 | Does (Memory: Phone) |
|-----|-----|
| Mobile: | 2026985099 |

| #36 | Dre (Memory: Phone) |
|-----|-----|
| Mobile: | 2026442077 |

| #37 | Christan (Memory: Phone) |
|-----|-----|
| Mobile: | 5712520302 |

| #38 | Lil D (Memory: Phone) |
|-----|-----|

Examination Report

| Mobile: | 3018288481 |
|---|---|

| #39 | Pwal (Memory: Phone) |
|---|---|
| Mobile: | 2023006232 |

| #40 | Lex (Memory: Phone) |
|---|---|
| Mobile: | 2027052213 |

| #41 | Up (Memory: Phone) |
|---|---|
| Mobile: | 3019521857 |

| #42 | Raymond (Memory: Phone) |
|---|---|
| Mobile: | 2022133227 |

| #43 | Lj (Memory: Phone) |
|---|---|
| Mobile: | 2029055977 |

| #44 | Karen (Memory: Phone) |
|---|---|
| Mobile: | 2028417320 |
| Home: | 3019271236 |

| #45 | Juicy (Memory: Phone) |
|---|---|
| Mobile: | 2025842789 |

| #46 | Dipo (Memory: Phone) |
|---|---|
| Mobile: | 2028953500 |

| #47 | Callasapvolvo (Memory: Phone) |
|---|---|
| Mobile: | 3016559013 |
| Work: | 3013402078 |

| #48 | Fresh (Memory: Phone) |
|---|---|

Examination Report

| Mobile: | 2024250923 |
|---|---|

| #49 | Tif (Memory: Phone) |
|---|---|
| Mobile: | 2025531497 |

| #50 | Shaly (Memory: Phone) |
|---|---|
| Mobile: | 2029977490 |

| #51 | Bost (Memory: Phone) |
|---|---|
| Mobile: | 18005464597 |

| #52 | Flippo (Memory: Phone) |
|---|---|
| Mobile: | 3019676801 |

| #53 | Nif (Memory: Phone) |
|---|---|
| Mobile: | 2024219147 |

| #54 | Mr.Feilds (Memory: Phone) |
|---|---|
| Mobile: | 2404243333 |

| #55 | Autorepair (Memory: Phone) |
|---|---|
| Mobile: | 2403968495 |

| #56 | Ms.juicy (Memory: Phone) |
|---|---|
| Mobile: | 2024598374 |

| #57 | Shugoll (Memory: Phone) |
|---|---|
| Mobile: | 3012157248 |

| #58 | Ebsong (Memory: Phone) |
|---|---|
| Mobile: | 4346076923 |

Examination Report                                    Page 8 of 36

| #59 | Goopi (Memory: Phone) |
|-----|-----------------------|
| Mobile: | 4438024767 |

| #60 | Bufus (Memory: Phone) |
|-----|-----------------------|
| Mobile: | 2025773670 |

| #61 | Grease (Memory: Phone) |
|-----|------------------------|
| Mobile: | 2026640720 |

| #62 | Jezzy (Memory: Phone) |
|-----|-----------------------|
| Mobile: | 2024224978 |

| #63 | Tobe (Memory: Phone) |
|-----|----------------------|
| Mobile: | 2025104853 |

| #64 | Blaze (Memory: Phone) |
|-----|-----------------------|
| Mobile: | 2022467482 |

| #65 | Mover1 (Memory: Phone) |
|-----|------------------------|
| Mobile: | 2024408376 |

| #66 | Dman (Memory: Phone) |
|-----|----------------------|
| Mobile: | 2026792889 |

| #67 | Rob (Memory: Phone) |
|-----|---------------------|
| Mobile: | 2026742171 |

| #68 | Upo (Memory: Phone) |
|-----|---------------------|
| Mobile: | 2026292002 |

| #69 | Joy (Memory: Phone) |
|-----|---------------------|
| Mobile: | 2022866214 |

Examination Report

| #70 | Tfoool (Memory: Phone) |
|---|---|
| Mobile: | 2022399022 |

| #71 | Pooh (Memory: Phone) |
|---|---|
| Mobile: | 3014039023 |

| #72 | 4wheva (Memory: Phone) |
|---|---|
| Mobile: | 7036750844 |

| #73 | Mover2 (Memory: Phone) |
|---|---|
| Mobile: | 2027092191 |

| #74 | Mo (Memory: Phone) |
|---|---|
| Mobile: | 2403544175 |

| #75 | Grodi (Memory: Phone) |
|---|---|
| Mobile: | 2025699302 |

| #76 | Bo (Memory: Phone) |
|---|---|
| Mobile: | 2404190068 |

| #77 | 8 (Memory: Phone) |
|---|---|
| Mobile: | 18773214143 |

| #78 | Midnight (Memory: Phone) |
|---|---|
| Mobile: | 2024227057 |

| #79 | Foolaqdd (Memory: Phone) |
|---|---|
| Mobile: | 2027542847 |

| #80 | Cannonbm (Memory: Phone) |
|---|---|

Appeal: 13-4835    Doc: 47-3    Filed: 05/07/2014    Pg: 171 of 359

| Mobile: | 2404350450 |
|---------|------------|

# Phone SMS - Text Messages

SMS MD5 Hash: 96007888AE6DC8338AC098B6FA2F4403

SMS SHA256 Hash: EB7247E4 8702CE1 28F2918 E2AD506 5087879 CABA044 CCC2017 B4909EC 6044EF8

| # | Number | Name | Date & Time | SMSC | Status | Folder | Storage | Type | Text |
|---|--------|------|-------------|------|--------|--------|---------|------|------|
| 1 | 2024227666 | * Gugu | 08/13/12 11:22:19 PM | | Read | Inbox | Phone | Incoming | Lls |
| 2 | 5402953800 | * Richard | 08/15/12 08:10:40 AM | | Read | Inbox | Phone | Incoming | I need the harness |
| 3 | 2024227666 | * Gugu | 08/15/12 07:37:52 PM | | Read | Inbox | Phone | Incoming | Tell that nigga call me |
| 4 | 2022864463 | N/A | 08/16/12 11:24:23 AM | | Read | Inbox | Phone | Incoming | Pac |
| 5 | 2024552851 | * April | 08/16/12 09:23:16 PM | | Sent | Sent | Phone | Outgoing | Hav u seen my buddy cuz i havent |
| 6 | 2024552851 | * April | 08/16/12 09:23:47 PM | | Read | Inbox | Phone | Incoming | Who is dis |
| 7 | 2024552851 | * April | 08/16/12 09:24:21 PM | | Sent | Sent | Phone | Outgoing | Ohhh ok dis is KEITH |
| 8 | 2024552851 | * April | 08/16/12 09:24:55 PM | | Read | Inbox | Phone | Incoming | R u lookin 4 scherrod lol |
| 9 | 2024552851 | * April | 08/16/12 09:25:39 PM | | Sent | Sent | Phone | Outgoing | I guess i havent seen dude n a min |
| 10 | 2024552851 | * April | 08/16/12 09:27:15 PM | | Read | Inbox | Phone | Incoming | Yea join da club...I jus saw him for da 1st time nd a wk 1/2 yesterday...smdh but he lost his phone on da bike so he is bacially mia... |
| 11 | 2024552851 | * April | 08/16/12 09:28:44 PM | | Sent | Sent | Phone | Outgoing | Oh ok i see thanks for da info |

Examination Report

| 305 | 2405017192 | * My Baby Girl | 12/20/12 02:08:13 PM | Read | Inbox | Phone | Incoming | Take your time |
| 306 | 2022461752 | * Ms.Taylor | 12/20/12 04:02:01 PM | Sent | Sent | Phone | Outgoing | Why u hang up |
| 307 | 2022461752 | * Ms.Taylor | 12/20/12 04:02:38 PM | Read | Inbox | Phone | Incoming | You said u on your way and I said ok |
| 308 | 2022461752 | * Ms.Taylor | 12/20/12 04:03:35 PM | Sent | Sent | Phone | Outgoing | Aite call u when i get up there |
| 309 | 2022461752 | * Ms.Taylor | 12/20/12 04:04:10 PM | Read | Inbox | Phone | Incoming | Ok I'm down stairs |
| 310 | 2405017192 | * My Baby Girl | 12/21/12 12:34:44 PM | Sent | Sent | Phone | Outgoing | Coming out now |
| 311 | 2405017192 | * My Baby Girl | 12/21/12 12:38:03 PM | Read | Inbox | Phone | Incoming | Looking at the door and still dont see ya |
| 312 | 2405017192 | * My Baby Girl | 12/21/12 12:38:29 PM | Sent | Sent | Phone | Outgoing | N three mins lol |
| 313 | 2405017192 | * My Baby Girl | 12/21/12 12:39:15 PM | Read | Inbox | Phone | Incoming | Ok see you at 1:03 |
| 314 | 2025699302 | * Grodi | 12/21/12 06:33:30 PM | Sent | Sent | Phone | Outgoing | Fool |
| 315 | 2022399022 | * Tfoool | 12/21/12 09:38:21 PM | Sent | Sent | Phone | Outgoing | Im outside |
| 316 | 2022002815 | * Blacks | 12/22/12 12:45:28 AM | Sent | Sent | Phone | Outgoing | Lets go |
| 317 | 2022399022 | * Tfoool | 12/22/12 12:47:28 AM | Read | Inbox | Phone | Incoming | Wya fool |
| 318 | 2022002815 | * Blacks | 12/22/12 02:12:33 AM | Sent | Sent | Phone | Outgoing | U good |
| 319 | 2022002815 | * Blacks | 12/22/12 02:13:03 AM | Read | Inbox | Phone | Incoming | Yea |
| 320 | 9329 | N/A | 12/22/12 03:51:02 AM | Read | Inbox | Phone | Incoming | BST FreeMsg: Low Balance Alert: Your balance is $0! To add money, log in to My Account. |
| 321 | 2022399022 | * Tfoool | 12/22/12 05:30:05 | Read | Inbox | Phone | Incoming | I am out front Fool |

GOVERNMENT EXHIBIT

17-3

1:13CR48

| | | | AM | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 322 | 2022399022 | * Tfoool | 12/22/12 05:30:45 AM | | Sent | Sent | Phone | Outgoing | K |
| 323 | 9329 | N/A | 12/22/12 09:17:59 AM | | Unread | Inbox | Phone | Incoming | BSTFreeMsg: Low Balance Alert: Your balance is $5 or less! To check your balance or add money, log in to My Account. |
| 324 | 9329 | N/A | 12/22/12 09:18:00 AM | | Unread | Inbox | Phone | Incoming | 1/2 As of 12/22/2012, your account balance is $0 and your service may be interrupted. Please add money to continue service.* State and |
| 325 | 9329 | N/A | 12/22/12 09:18:00 AM | | Unread | Inbox | Phone | Incoming | 2/2 local taxes may apply. |
| 326 | 2025340021 | N/A | 12/22/12 02:31:47 PM | | Unread | Inbox | Phone | Incoming | Hit me if y'all want dem shoes b4 dey gone |
| 327 | 2025340021 | N/A | 12/22/12 04:12:41 PM | | Unread | Inbox | Phone | Incoming | I had the Jordan's for you they gone now |

\* Phonebook name lookup used to retrieve names

## Phone Incoming Calls List

CLOG MD5 Hash: FBC3400815C8CC758AC2717E852953D5

CLOG SHA256 Hash: 378072C9 026094D DD4B14C 00F4DC9 DD8C03A E10F665 C591001 E0992DC 924CAF4

| # | Type | Number | Name | Date & Time | Duration |
|---|---|---|---|---|---|
| 1 | Incoming | 2022399022 | Tfoool | 12/22/12 01:12:26 AM | N/A |
| 2 | Incoming | 2022399022 | Tfoool | 12/22/12 01:14:09 AM | N/A |
| 3 | Incoming | 3013402078 | Callasapvolvo | 12/22/12 10:37:25 AM | N/A |
| 4 | Incoming | 2405017192 | My Baby Girl | 12/22/12 11:01:31 AM | N/A |

Examination Report

| | | | AM | | | | | |
|---|---|---|---|---|---|---|---|---|
| 322 | 2022399022 | * Tfoool | 12/22/12 05:30:45 AM | Sent | Sent | Phone | Outgoing | K |
| 323 | 9329 | N/A | 12/22/12 09:17:59 AM | Unread | Inbox | Phone | Incoming | BSTFreeMsg: Low Balance Alert: Your balance is $5 or less! To check your balance or add money, log in to My Account. |
| 324 | 9329 | N/A | 12/22/12 09:18:00 AM | Unread | Inbox | Phone | Incoming | 1/2 As of 12/22/2012, your account balance is $0 and your service may be interrupted. Please add money to continue service.* State and |
| 325 | 9329 | N/A | 12/22/12 09:18:00 AM | Unread | Inbox | Phone | Incoming | 2/2 local taxes may apply. |
| 326 | 2025340021 | N/A | 12/22/12 02:31:47 PM | Unread | Inbox | Phone | Incoming | Hit me if y'all want dem shoes b4 dey gone |
| 327 | 2025340021 | N/A | 12/22/12 04:12:41 PM | Unread | Inbox | Phone | Incoming | I had the Jordan's for you they gone now |

\* Phonebook name lookup used to retrieve names

## Phone Incoming Calls List

CLOG MD5 Hash: FBC3400815C8CC758AC2717E852953D5

CLOG SHA256 Hash: 378072C9 026094D DD4B14C 00F4DC9 DD8C03A E10F665 C591001 E0992DC 924CAF4

| # | Type | Number | Name | Date & Time | Duration |
|---|---|---|---|---|---|
| 1 | Incoming | 2022399022 | Tfoool | 12/22/12 01:12:26 AM | N/A |
| 2 | Incoming | 2022399022 | Tfoool | 12/22/12 01:14:09 AM | N/A |
| 3 | Incoming | 3013402078 | Callasapvolvo | 12/22/12 10:37:25 AM | N/A |
| 4 | Incoming | 2405017192 | My Baby Girl | 12/22/12 11:01:31 AM | N/A |

GOVERNMENT
EXHIBIT

17-4
1:13CR48

| 5 | Incoming | 2405017192 | My Baby Girl | 12/22/12 01:33:48 AM | N/A |
| 6 | Incoming | 2405017192 | My Baby Girl | 12/22/12 01:42:53 AM | N/A |
| 7 | Incoming | 2025699302 | Grodi | 12/22/12 10:33:36 AM | N/A |
| 8 | Incoming | 2022399022 | Tfoool | 12/22/12 01:01:11 AM | N/A |
| 9 | Incoming | 2022399022 | Tfoool | 12/22/12 05:13:16 AM | N/A |
| 10 | Incoming | 2022399022 | Tfoool | 12/21/12 11:54:29 PM | N/A |
| 11 | Incoming | 2022002815 | Blacks | 12/22/12 12:28:05 AM | N/A |
| 12 | Incoming | 2025699302 | Grodi | 12/21/12 09:48:17 PM | N/A |
| 13 | Incoming | 2405017192 | My Baby Girl | 12/22/12 01:39:13 AM | N/A |
| 14 | Incoming | 2022399022 | Tfoool | 12/21/12 09:52:36 PM | N/A |
| 15 | Incoming | 2025699302 | Grodi | 12/22/12 01:39:54 AM | N/A |
| 16 | Incoming | 2024227057 | Midnight | 12/22/12 12:45:56 AM | N/A |
| 17 | Incoming | 2022399022 | Tfoool | 12/22/12 12:52:13 AM | N/A |
| 18 | Incoming | 2022399022 | Tfoool | 12/21/12 09:53:15 PM | N/A |
| 19 | Incoming | 3012223823 | G | 12/21/12 10:23:21 PM | N/A |

# Phone Outgoing Calls List

CLOG MD5 Hash: FBC3400815C8CC758AC2717E852953D5

CLOG SHA256 Hash: 378072C9 026094D DD4B14C 00F4DC9 DD8C03A E10F665 C591001 E0992DC 924CAF4

| # | Type | Number | Name | Date & Time | Duration |
|---|------|--------|------|-------------|----------|
| 1 | Outgoing | 2022399022 | Tfoool | 12/22/12 01:10:38 AM | N/A |
| 2 | Outgoing | 2405017192 | My Baby Girl | 12/22/12 01:50:42 AM | N/A |
| 3 | Outgoing | 2022399022 | Tfoool | 12/22/12 02:08:38 AM | N/A |

| 4 | Outgoing | 2025699302 | Grodi | 12/22/12 02:13:07 AM | N/A |
| 5 | Outgoing | 2405017192 | My Baby Girl | 12/22/12 10:58:53 AM | N/A |
| 6 | Outgoing | 2405017192 | My Baby Girl | 12/22/12 11:00:29 AM | N/A |
| 7 | Outgoing | 2405017192 | My Baby Girl | 12/22/12 11:00:46 AM | N/A |
| 8 | Outgoing | 2405017192 | My Baby Girl | 12/22/12 11:01:27 AM | N/A |
| 9 | Outgoing | 2405017192 | My Baby Girl | 12/22/12 11:02:16 AM | N/A |
| 10 | Outgoing | 2405017192 | My Baby Girl | 12/22/12 01:48:03 AM | N/A |
| 11 | Outgoing | 2022399022 | Tfoool | 12/21/12 09:40:03 PM | N/A |
| 12 | Outgoing | 2022399022 | Tfoool | 12/21/12 09:42:12 PM | N/A |
| 13 | Outgoing | 2025699302 | Grodi | 12/21/12 11:20:15 PM | N/A |
| 14 | Outgoing | 2025699302 | Grodi | 12/22/12 03:23:10 AM | N/A |
| 15 | Outgoing | 2405017192 | My Baby Girl | 12/21/12 11:42:38 PM | N/A |
| 16 | Outgoing | 2025699302 | Grodi | 12/22/12 06:52:41 AM | N/A |
| 17 | Outgoing | 2022399022 | Tfoool | 12/22/12 01:41:32 AM | N/A |
| 18 | Outgoing | 2024227057 | Midnight | 12/22/12 12:01:55 AM | N/A |
| 19 | Outgoing | 2024227057 | Midnight | 12/22/12 12:10:46 AM | N/A |
| 20 | Outgoing | 2022399022 | Tfoool | 12/22/12 01:04:28 AM | N/A |
| 21 | Outgoing | 2022002815 | Blacks | 12/22/12 12:32:04 AM | N/A |
| 22 | Outgoing | 2022399022 | Tfoool | 12/22/12 01:38:43 AM | N/A |
| 23 | Outgoing | 2022002815 | Blacks | 12/22/12 12:44:45 AM | N/A |

# Phone Missed Calls List

CLOG MD5 Hash: FBC3400815C8CC758AC2717E852953D5

CLOG SHA256 Hash: 378072C9 026094D DD4B14C 00F4DC9 DD8C03A E10F665 C591001 E0992DC 924CAF4

| # | Type | Number | Name | Date & Time | Duration |
|---|------|--------|------|-------------|----------|
| 1 | Missed | 2025699302 | Grodi | 12/22/12 12:36:14 PM | N/A |
| 2 | Missed | 3016559013 | Callasapvolvo | 12/22/12 01:00:19 PM | N/A |
| 3 | Missed | 2025699302 | Grodi | 12/22/12 01:03:13 PM | N/A |
| 4 | Missed | 2025699302 | Grodi | 12/22/12 01:50:40 PM | N/A |
| 5 | Missed | 2022150047 | Erika | 12/22/12 02:03:55 PM | N/A |
| 6 | Missed | 2022002815 | Blacks | 12/22/12 02:27:45 PM | N/A |
| 7 | Missed | 2025340021 | N/A | 12/22/12 02:30:21 PM | N/A |
| 8 | Missed | 3016559013 | Callasapvolvo | 12/22/12 04:27:09 PM | N/A |
| 9 | Missed | 2025699302 | Grodi | 12/22/12 11:16:43 AM | N/A |
| 10 | Missed | 2023167295 | Mom | 12/22/12 11:27:22 AM | N/A |
| 11 | Missed | 2022002815 | Blacks | 12/22/12 11:29:57 AM | N/A |
| 12 | Missed | 2024227057 | Midnight | 12/22/12 11:32:10 AM | N/A |
| 13 | Missed | 2022002815 | Blacks | 12/22/12 11:33:22 AM | N/A |
| 14 | Missed | 2022002815 | Blacks | 12/22/12 11:35:25 AM | N/A |
| 15 | Missed | 2022461752 | Ms.Taylor | 12/22/12 11:53:40 AM | N/A |
| 16 | Missed | 2022150047 | Erika | 12/22/12 12:07:14 PM | N/A |
| 17 | Missed | 3013402078 | Callasapvolvo | 12/22/12 12:18:09 PM | N/A |
| 18 | Missed | 2022399022 | Tfoool | 12/21/12 11:53:06 PM | N/A |

*  Phonebook name lookup used to retrieve names

# Images

Examination Report

| # | Information | MetaData | Image |
|---|------------|----------|-------|
| 1 | File Name: 270A0028.jpg<br>File Path: brew/shared/fmgr/My Albums/270A0028.jpg<br>File Size: 198639 Bytes<br>File Date/Time: 12/17/12 01:47:34 AM (GMT)<br>MD5: 52ABAB3F509F20D782DD D0B16636A87D<br>SHA256: AA0F1A33 EFF6032 2942E15 8C76798 383A423 544E653 9A66595 B5BDF18 F3A562B | Resolution: 72x72 (unit: inch)<br>Pixel Resolution: 1280x960<br>Camera Make: Boost Mobile<br>Camera Model: Juno<br>Date/Time: 2012:12:16 20:47:17 |  |

Folder Name: Keith Reed 10222013    Customer: Alexandria Detention Center, VA    Creation Date: 2013-01-22 12:58:53

| | SITE NAME | CALL TIME | CALLED PARTY | DUR (S) | ORIGINATING PORT | NAME | ACCOUNT # | TERM CODE |
|---|---|---|---|---|---|---|---|---|
| | Alexandria Detention Center | 01-22-2013 12:16:09 | 2405017192 | 1763 | 4CF-8 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-22-2013 09:00:33 | 2405017192 | 60 | 4CF-7 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-21-2013 21:22:01 | 2405017192 | 1414 | 4CF-9 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-21-2013 20:51:14 | 2405017192 | 1773 | 4CF-9 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-21-2013 20:08:49 | 2405017192 | 584 | 4CF-10 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-21-2013 10:07:18 | 2405017192 | 1782 | 4CF-6 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-20-2013 22:36:09 | 2405017192 | 606 | 4CF-7 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-20-2013 22:05:33 | 2405017192 | 1778 | 4CF-7 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-20-2013 21:35:14 | 2405017192 | 1763 | 4CF-7 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-20-2013 15:00:53 | 2405017192 | 1770 | 4CF-6 | KEITH REED | 242683 | Called party hangup |
| | Alexandria Detention Center | 01-20-2013 14:09:07 | 800097370122 | 1034 | Inmate 26 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-20-2013 14:08:42 | 800097370122 | 11 | Inmate 26 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-20-2013 14:06:31 | 800097370124 | 1173 | Inmate 27 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-20-2013 13:39:23 | 800097370122 | 1749 | Inmate 26 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-20-2013 13:10:02 | 800097370122 | 1749 | Inmate 26 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-20-2013 10:22:24 | 2405017192 | 1772 | 4CF-1 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-20-2013 09:51:14 | 2405017192 | 1756 | 4CF-1 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-20-2013 09:19:48 | 2405017192 | 1800 | 4CF-1 | KEITH REED | 242683 | Call duration limit exceeded |
| | Alexandria Detention Center | 01-20-2013 08:49:01 | 2405017192 | 1786 | 4CF-1 | KEITH REED | 242683 | Called party hangup |
| | Alexandria Detention Center | 01-19-2013 21:52:35 | 2405017192 | 381 | 4CF-1 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-19-2013 21:21:19 | 2024830182 | 1800 | 4CF-1 | KEITH REED | 242683 | Call duration limit exceeded |
| | Alexandria Detention Center | 01-19-2013 21:18:17 | 2405017192 | 49 | 4CF-1 | KEITH REED | 242683 | Caller Hang up |



GOVERNMENT EXHIBIT
17-5
1:13CR48

| | Alexandria Detention Center | 01-19-2013 19:42:09 | 2405017192 | 1777 | 4CF-6 | KEITH REED | 242683 | Caller Hang up |
|---|---|---|---|---|---|---|---|---|
| | Alexandria Detention Center | 01-19-2013 15:34:18 | 2405017192 | 1557 | 4CF-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-19-2013 15:11:52 | 2405017192 | 1261 | 4CF-3 | KEITH REED | 242683 | Called party hangup |
| | Alexandria Detention Center | 01-19-2013 14:37:12 | 2405017192 | 1757 | 4CF-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-19-2013 10:25:14 | 2405017192 | 1800 | 4CF-7 | KEITH REED | 242683 | Call duration limit exceeded |
| | Alexandria Detention Center | 01-19-2013 09:54:41 | 2405017192 | 1768 | 4CF-7 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-18-2013 22:08:00 | 2405017192 | 1800 | 4CF-4 | KEITH REED | 242683 | Call duration limit exceeded |
| | Alexandria Detention Center | 01-18-2013 21:53:56 | 3012223823 | 768 | 4CF-4 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-18-2013 21:35:41 | 2405017192 | 992 | 4CF-4 | KEITH REED | 242683 | Called party hangup |
| | Alexandria Detention Center | 01-18-2013 21:21:51 | 2405017192 | 752 | 4CF-4 | KEITH REED | 242683 | 3-way call detected |
| | Alexandria Detention Center | 01-18-2013 19:17:24 | 2405017192 | 1775 | 4CF-7 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-18-2013 15:21:39 | 2405017192 | 1765 | 4CF-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-18-2013 14:28:42 | 2405017192 | 941 | 4CF-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-18-2013 10:18:13 | 2405017192 | 1705 | 4CF-1 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-18-2013 09:46:23 | 2405017192 | 1770 | 4CF-1 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-17-2013 22:26:53 | 2405017192 | 1146 | 4CF-1 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-17-2013 21:56:39 | 2405017192 | 1757 | 4CF-1 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-17-2013 21:26:33 | 2405017192 | 1752 | 4CF-1 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-17-2013 20:55:16 | 2405017192 | 1800 | 4CF-1 | KEITH REED | 242683 | Call duration limit exceeded |
| | Alexandria Detention Center | 01-17-2013 20:24:05 | 2405017192 | 1765 | 4CF-1 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-17-2013 19:53:13 | 2405017192 | 1775 | 4CF-9 | KEITH REED | 242683 | Called party hangup |
| | Alexandria Detention Center | 01-17-2013 16:06:52 | 2405017192 | 501 | 4AB-3 | KEITH REED | 242683 | Called party hangup |
| | Alexandria Detention Center | 01-17-2013 15:52:53 | 800097370108 | 514 | Inmate 19 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-17-2013 15:23:32 | 800097370108 | 1749 | Inmate 19 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-17-2013 14:54:00 | 800097370108 | 1748 | Inmate 19 | KEITH REED | 242683 | Caller Hang up |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Alexandria Detention Center | 01-17-2013 00:42:35 | 2405017192 | 351 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-17-2013 00:06:40 | 2405017192 | 1800 | 4AB-3 | KEITH REED | 242683 | Call duration limit exceeded |
| | Alexandria Detention Center | 01-16-2013 23:36:37 | 2405017192 | 1750 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-16-2013 23:06:12 | 2405017192 | 1762 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-16-2013 00:43:28 | 2405017192 | 1653 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-16-2013 00:13:25 | 2405017192 | 1746 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-15-2013 23:42:18 | 2405017192 | 1767 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-15-2013 23:12:05 | 2405017192 | 1756 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-15-2013 00:06:58 | 2405017192 | 980 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-14-2013 23:36:17 | 2405017192 | 1776 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-14-2013 23:05:59 | 2405017192 | 1754 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-14-2013 00:37:30 | 2405017192 | 1376 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-14-2013 00:07:28 | 2405017192 | 1746 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-13-2013 23:36:44 | 2405017192 | 1779 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-13-2013 23:05:33 | 2405017192 | 1800 | 4AB-3 | KEITH REED | 242683 | Call duration limit exceeded |
| | Alexandria Detention Center | 01-13-2013 16:06:32 | 2405017192 | 525 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-13-2013 15:36:19 | 2405017192 | 1752 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-13-2013 15:06:06 | 2405017192 | 1751 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-13-2013 10:08:05 | 800097370110 | 703 | Inmate 20 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-13-2013 09:38:38 | 800097370110 | 1752 | Inmate 20 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-13-2013 00:48:37 | 3012223823 | 799 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-13-2013 00:23:39 | 2405017192 | 629 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-13-2013 00:06:54 | 2405017192 | 936 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-12-2013 23:35:15 | 2405017192 | 1755 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-12-2013 23:04:20 | 2405017192 | 1755 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |

| | Alexandria Detention Center | 01-12-2013 00:38:17 | 2405017192 | 789 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
|---|---|---|---|---|---|---|---|---|
| | Alexandria Detention Center | 01-12-2013 00:07:49 | 2405017192 | 1768 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-11-2013 23:36:33 | 2405017192 | 1787 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-11-2013 23:05:27 | 2405017192 | 1800 | 4AB-3 | KEITH REED | 242683 | Call duration limit exceeded |
| | Alexandria Detention Center | 01-11-2013 13:24:31 | 2022150047 | 1800 | 4AB-3 | KEITH REED | 242683 | Call duration limit exceeded |
| | Alexandria Detention Center | 01-11-2013 12:57:39 | 2405017192 | 1399 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-10-2013 15:28:47 | 800097370108 | 557 | Inmate 19 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-10-2013 14:59:27 | 800097370108 | 1749 | Inmate 19 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-10-2013 12:53:56 | 2405017192 | 1365 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-10-2013 12:23:30 | 2405017192 | 1754 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-10-2013 11:52:09 | 2405017192 | 1777 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-10-2013 11:20:33 | 2405017192 | 1787 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-10-2013 00:11:07 | 2405017192 | 1800 | 4G-9 | KEITH REED | 242683 | Call duration limit exceeded |
| | Alexandria Detention Center | 01-09-2013 23:40:42 | 2405017192 | 1767 | 4G-9 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-09-2013 23:09:57 | 2405017192 | 1749 | 4G-9 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-09-2013 00:01:23 | 2405017192 | 1800 | 4AB-3 | KEITH REED | 242683 | Call duration limit exceeded |
| | Alexandria Detention Center | 01-08-2013 23:30:26 | 2405017192 | 1800 | 4AB-3 | KEITH REED | 242683 | Call duration limit exceeded |
| | Alexandria Detention Center | 01-08-2013 00:34:01 | 2405017192 | 712 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-08-2013 00:03:32 | 2405017192 | 1768 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-07-2013 23:36:21 | 2405017192 | 1546 | 4AB-1 | KEITH REED | 242683 | 3-way call detected |
| | Alexandria Detention Center | 01-07-2013 23:05:15 | 2405017192 | 1800 | 4AB-1 | KEITH REED | 242683 | Call duration limit exceeded |
| | Alexandria Detention Center | 01-07-2013 09:59:11 | 2405017192 | 562 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-07-2013 00:13:00 | 2405017192 | 1294 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-06-2013 23:40:05 | 2405017192 | 1768 | 4AB-3 | KEITH REED | 242683 | Called party hangup |
| | Alexandria Detention Center | 01-06-2013 23:08:59 | 2405017192 | 1800 | 4AB-3 | KEITH REED | 242683 | Call duration limit exceeded |

| | Alexandria Detention Center | 01-06-2013 00:38:08 | 2405017192 | 1268 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
|---|---|---|---|---|---|---|---|---|
| | Alexandria Detention Center | 01-06-2013 00:16:36 | 2405017192 | 1223 | 4AB-3 | KEITH REED | 242683 | 3-way call detected |
| | Alexandria Detention Center | 01-05-2013 23:44:39 | 2405017192 | 1800 | 4AB-3 | KEITH REED | 242683 | Call duration limit exceeded |
| | Alexandria Detention Center | 01-05-2013 23:37:20 | 2405017192 | 367 | 4AB-3 | KEITH REED | 242683 | Called party hangup |
| | Alexandria Detention Center | 01-05-2013 23:06:45 | 2405017192 | 1767 | 4AB-3 | KEITH REED | 242683 | Called party hangup |
| | Alexandria Detention Center | 01-05-2013 09:28:27 | 800097370108 | 166 | Inmate 19 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-05-2013 09:28:02 | 800097370108 | 12 | Inmate 19 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-05-2013 08:58:34 | 800097370108 | 1754 | Inmate 19 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-05-2013 00:47:35 | 2405017192 | 833 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-05-2013 00:17:13 | 2405017192 | 1761 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-05-2013 00:14:03 | 2405017192 | 93 | 4AB-3 | KEITH REED | 242683 | Called party hangup |
| | Alexandria Detention Center | 01-05-2013 00:10:48 | 3012223823 | 142 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-04-2013 23:44:01 | 2405017192 | 1526 | 4AB-3 | KEITH REED | 242683 | 3-way call detected |
| | Alexandria Detention Center | 01-04-2013 23:35:08 | 2405017192 | 475 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-04-2013 23:04:43 | 2405017192 | 1759 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-04-2013 10:27:10 | 2405017192 | 526 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-04-2013 00:21:48 | 2405017192 | 1800 | 4AB-3 | KEITH REED | 242683 | Call duration limit exceeded |
| | Alexandria Detention Center | 01-03-2013 23:51:10 | 2405017192 | 1780 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-03-2013 23:20:12 | 2405017192 | 1795 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-03-2013 16:40:10 | 2405017192 | 1800 | 4AB-3 | KEITH REED | 242683 | Call duration limit exceeded |
| | Alexandria Detention Center | 01-03-2013 15:43:24 | 800097370108 | 1242 | Inmate 19 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-03-2013 15:13:54 | 800097370108 | 1756 | Inmate 19 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-03-2013 14:43:30 | 800097370108 | 1804 | Inmate 19 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-03-2013 12:41:03 | 2405017192 | 680 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| | Alexandria Detention Center | 01-03-2013 12:10:21 | 2405017192 | 1782 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 🔊 | Alexandria Detention Center | 01-02-2013 17:24:28 | 2405017192 | 570 | 4AB-3 | KEITH REED | 242683 | Called party hangup |
| 🔊 | Alexandria Detention Center | 01-02-2013 00:38:43 | 2405017192 | 1399 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| 🔊 | Alexandria Detention Center | 01-02-2013 00:08:14 | 2405017192 | 1767 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| 🔊 | Alexandria Detention Center | 01-01-2013 23:37:52 | 2405017192 | 1761 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| 🔊 | Alexandria Detention Center | 01-01-2013 23:07:14 | 2405017192 | 1775 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| 🔊 | Alexandria Detention Center | 01-01-2013 17:36:37 | 2405017192 | 471 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| 🔊 | Alexandria Detention Center | 01-01-2013 00:49:26 | 2405017192 | 804 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| 🔊 | Alexandria Detention Center | 01-01-2013 00:19:11 | 2405017192 | 1755 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| 🔊 | Alexandria Detention Center | 12-31-2012 23:39:02 | 2405017192 | 1765 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| 🔊 | Alexandria Detention Center | 12-31-2012 23:07:29 | 2405017192 | 1794 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| 🔊 | Alexandria Detention Center | 12-31-2012 00:39:50 | 2405017192 | 1244 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| 🔊 | Alexandria Detention Center | 12-31-2012 00:09:32 | 2405017192 | 1757 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| 🔊 | Alexandria Detention Center | 12-30-2012 23:38:34 | 2405017192 | 1790 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| 🔊 | Alexandria Detention Center | 12-30-2012 23:05:40 | 2405017192 | 1777 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| 🔊 | Alexandria Detention Center | 12-30-2012 00:36:39 | 2405017192 | 1481 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| 🔊 | Alexandria Detention Center | 12-30-2012 00:06:32 | 2405017192 | 1748 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| 🔊 | Alexandria Detention Center | 12-29-2012 23:35:29 | 2405017192 | 1781 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| 🔊 | Alexandria Detention Center | 12-29-2012 23:04:40 | 2405017192 | 1789 | 4AB-3 | KEITH REED | 242683 | Caller Hang up |
| 🔊 | Alexandria Detention Center | 12-28-2012 23:42:08 | 2405017192 | 767 | Booking 2 | KEITH REED | 242683 | Caller Hang up |
| 🔊 | Alexandria Detention Center | 12-28-2012 23:11:39 | 2405017192 | 1760 | Booking 2 | KEITH REED | 242683 | Caller Hang up |
| 🔊 | Alexandria Detention Center | 12-28-2012 22:41:13 | 2405017192 | 1762 | Booking 2 | KEITH REED | 242683 | Caller Hang up |
| 🔊 | Alexandria Detention Center | 12-28-2012 18:07:07 | 2405017192 | 610 | Booking 2 | KEITH REED | 242683 | Caller Hang up |
| 🔊 | Alexandria Detention Center | 12-28-2012 17:36:01 | 2405017192 | 1761 | Booking 2 | KEITH REED | 242683 | Caller Hang up |
| 🔊 | Alexandria Detention Center | 12-28-2012 17:27:56 | 2405017192 | 297 | Booking A | KEITH REED | 242683 | Caller Hang up |
| 🔊 | Alexandria Detention Center | 12-28-2012 17:20:12 | 2405017192 | 259 | Booking A | KEITH REED | 242683 | Caller Hang up |

| Alexandria Detention Center | 12-28-2012 17:14:35 | 2405017192 | 268 | Booking A | KEITH REED | 242683 | Caller Hang up |



GOVERNMENT
EXHIBIT
18-10
1:13CR48



GOVERNMENT
EXHIBIT
18-11
1:13CR48

GOVERNMENT EXHIBIT 45

FEDERAL BUREAU OF INVESTIGATION
CELLULAR ANALYSIS SURVEY TEAM



Cellular Analysis

240-355-8256
202-239-9022
202-594-4127
202-510-4853

Special Agent Kevin R. Horan
FBI HQ CID, Violent Crimes Unit
Cellular Analysis Survey Team (CAST)

Report for the United States Attorney's Office, Eastern District of Virginia

June 2, 2013

June 2, 20__

## INVESTIGATIVE INFORMATION

CASE FACTS: There are three separate incidents that were analyzed for this report. According to information provided by the United States Attorney's Office, the following events occurred:

1). On December 7, 2012, at approximately 8:03 PM, three armed masked men entered Abdul Communications (VVM Incorporated), 4810 Beauregard St, Apt. 103, Fairfax County, VA. The subjects took money from the business and fled the area in a silver Jeep Cherokee. Keith Reed, Tobias Dyer, Stanley Winston and Anthony Cannon are suspects in this crime.

2). On December 9, 2012, at approximately 6:15 AM, three armed masked men entered Shoppers Food Warehouse, 3801 Jefferson Davis Highway, Alexandria, VA. The subjects took money from the business and fled the area in a blue Jeep Liberty. Keith Reed, Tobias Dyer, Stanley Winston and Anthony Cannon are suspects in this crime.

3). On December 22, 2012, at approximately 9:57 AM, three armed masked men entered the Navy Federal Credit Union located at 875 N. Randolph St, Arlington, VA and announced a bank robbery. The subjects took funds from the teller area and the bank vault before fleeing in a dark colored Jeep Liberty. Included with the funds taken from the bank were three GPS tracking devices. The tracking devices lead authorities to the area of 1501 38th Street SE, Washington, DC, where four subjects were arrested. The following cell phones were located on each subject at the time of their arrest; 240-355-8256 (Keith Reed), 202-239-9022 (Tobias Dyer), 202-594-4127 (Stanley Winston). The forth subject, Anthony Cannon, did not have a cell phone on him when arrested.

## TARGET CELL PHONE INFORMATION

SERVICE PROVIDER: The phones relevant to this investigation received service from the following:

SPRINT WIRELESS
6480 Sprint Parkway
Overland Park, Kansas 66251

VERIZON WIRELESS
180 Washington Valley Road
Bedminster, NJ 07921

T-MOBILE
4 Sylvan Way
Parsippany, NJ 07054

2

June 2, 20⌐⌐

SUBSCRIBER INFORMATION: (Parentheses indicate service provider & subscriber)

    240-355-8256 – (Sprint) [Unavailable]
    202-239-9022 – (Sprint) [Unavailable]
    202-594-4127 – (T-Mobile) [Prepaid]
    202-510-4853 – (Verizon) [Prepaid]

TYPE OF RECORDS BEING ANALYZED: Call Detail Records (CDRs)

SOURCE FROM WHICH RECORDS ACQUIRED: Call detail records relevant to this investigation were provided (in electronic format) to SA Kevin Horan by the United States Attorney's Office, Eastern District of Virginia, on March 7, 2013.

DATE & TIME RANGE USED FOR ANALYSIS: 1), December 7, 2012, 5:00 PM – 9:00 PM; 2), December 9, 2012, 5:00 AM – 7:00 AM; 3), December 22, 2012, 5:00 AM-11:00 AM.

REQUESTING INFORMATION

PURPOSE OF ANALYSIS: The United States Attorney's Office requested that call detail records for four (4) cellular phones belonging to subjects of this investigation be analyzed to show where the phones were geolocated at the date(s) and time(s) used for this analysis.

BASIC PRINCIPALS UTILIZED IN RECORD ANALYSIS

TECHNOLOGY

Cell phones are RADIOS that use RADIO FREQUENCIES to communicate. Some additional facts:

- Cell phones (when "on") constantly scan their environment looking for the best signal from the tower.
- The best signal generally comes from the tower that is CLOSEST to the phone, or in its direct LINE OF SIGHT.
- The tower with the best signal is the one the handset will use for service, this is the serving cell and will be used to make and receive calls.
- The phone will use the serving cell to make/receive calls.
- The phone "sees" other towers around the SERVING CELL and will constantly measure those signal strengths. However, the phone will not randomly reselect to an adjacent tower unless the tower is on its "neighbor list" which is controlled by the network service

3

June 2, 20...

- provider. This allows the network to accurately manage and control the subscribers.
- As the phone moves, it will choose a new serving cell based on signal strength and neighbor list. If this occurs while the phone is in a call, the phone will "handoff" the call to the next cell site/sector. Therefore some service providers, such as SPRINT and AT&T, show a "beginning cell site" (call originated) and an "ending cell site" (call ended) in their records.

*CELL SITES AND SECTORS*

Cell towers (also known as CELL SITES or BASE TRANSCEIVER STATIONS) come in all shapes and sizes and can be located anywhere (church steeples, water towers, sides of buildings, etc.).

- A typical cell tower has THREE, $120^0$ sectors. The service provider sometimes labels the sectors numerically, such as 1, 2, 3, or ALPHA, BETA, GAMMA. Sector 1 (or Alpha) usually covers the NORTHERN sector of the tower, 2 (EAST), 3 (WEST).
- It is important to note that each BTS has its own unique identifier, this identifier is used to track which towers the handsets use and is like a fingerprint on the network. It is not duplicated anywhere else.
- The location of a cell tower is often determined by sales/marketing, capacity, improvement of coverage, or expansion/growth of a service provider. Generally there are more towers with overlapping coverage in urban areas; less towers (less coverage) in rural areas.
- Antennas on cell towers have downward tilt and are pointed towards the earth. The antenna arrays are fine tuned to provide a specific area of coverage. As RF travels away from the tower, their strength (and distance) diminishes. A good illustration of this principle is to think of a cell tower and the area that it covers as an upside down funnel. As a GENERAL RULE, most towers (depending on the environment) have a radius of approximately ONE or TWO MILES (greater or less distances are also common).

ANALYSIS SECTION

*METHOD OF CALL DETAIL RECORD ANALYSIS*

The Analysis of the Call Detail Records (CDR) for the target phones was conducted March 7 through June 2, 2013. It should be noted the analysis conducted only placed the phones in specific locations, not a specific individual in a location.

The call activity on the target phones were analyzed using the CDRs provided by the service providers using the following methods:

1. The CDRs provided to SA Horan were viewed to determine the following:

4

June 2, 2013

    A. Date and time of the call activity
    B. Direction of travel (Incoming or outgoing)
    C. The serving cell site for all calls made or received during the requested time period
    D. Sector information
    E. Relationship (if any) between the target phones and other known phones relevant to this investigation
    F. SMS (Short Message Service) Text activity (if provided)
    G. MMS (Multimedia Messaging Service) activity (if provided)
    H. Data transactions (if provided)

2.  All cell towers in the area for December 2012, were provided by the service providers to the FBI and then plotted on publicly available software (Microsoft Map Point, 2013 version) based on the latitude and longitude coordinates

3.  The serving cell site for specific calls identified on the CDRs were located and identified on the mapping software

4.  Sector information was determined for the specific calls as necessary including azimuth and beamwidth

5.  Specific cell site areas of coverage were **estimated** and drawn on Map Point where applicable. Cell site sectors that correspond with cell phone activity are HIGHLIGHTED in COLOR on the map (EACH TARGET PHONE WILL HAVE A DIFFERENT COLOR).

5

-958-

## ROBBERY NUMBER ONE

Abdul Communications (VVM, Inc), 4810 Beauregard St, 103, Fairfax County, VA

DECEMBER 7, 2012   8:03 PM

6

June 2, 2013



June 2, 2013

Figure 1: Abdul Communications (VVM Incorporated), 4810 Beauregard St., 103, Fairfax County, VA.

7



Figure 2: December 7, 2012 between 5:30 and 5:33 PM, four (4) OUTGOING CALLS to DYER.



Figure 3:  December 7, 2012 between 6:04:04 and 6:09 PM.



Figure 4: December 7, 2012 between 6:27 and 6:28 PM.

10



Figure 5: December 7, 2012 at 7:07, 8:03 and 8:04 PM.

11



Figure 6: December 7, 2012 between 8:13 and 8:14PM.

12



Figure 7: December 7, 2012 between 9:03 and 9:29 PM. At 9:03 PM, OUTGOING CALL to DYER; 9:06 PM INCOMING CALL from DYER; 9:10 PM OUTGOING CALL to DYER.

13


Figure 8: December 7, 2012 between 5:30 and 5:34 PM, four (4) INCOMING CALLS from REED.

14

June 2, 20..3



Figure 9: December 7, 2012 between 5:44 and 5:45 PM.

15



Figure 10:  December 7, 2012 between 6:15 and 6:16 PM.

16



Figure 11: December 7, 2012 between 6:31 and 6:35 PM. There were no cell site registrations between 6:35 and 7:50 PM, however SMS TEXT MESSAGES were sent/received during this period, including a 7:36 PM INCOMING TEXT from CANNON, and a 7:38 PM OUTGOING TEXT to CANNON.

17



Figure 12:  December 7, 2012 between 8:21 and 9:10 PM.  At 9:03 PM, INCOMING CALL from REED;  9:06 PM OUTGOING CALL to REED.

18

June 2, 2013



Figure 13: December 7, 2012 between 5:03 and 6:02 PM.

19



Figure 14: December 7, 2012 at 6:10 PM.

20

June 2, 201₃



Figure 15: December 7, 2012 between 6:22 and 7:10 PM.

21



Figure 16: December 7, 2012 at 7:24 PM.

22



Figure 17: December 7, 2012 between 8:16 and 8:43 PM.

Figure 18: December 7, 2012 between 9:06 and 9:09 PM.

June 2, 2013

24



Figure 19: December 7, 2012 between 5:11 and 6:07 PM.

25



Figure 20: December 7, 2012 between 6:17 and 6:19 PM.



Figure 21: December 7, 2012 between 6:20 and 8:00 PM.

27



Figure 22. December 7, 2012 at 8:12 PM.

28

**-981-**



Figure 23: December 7, 2012 between 8:26 – 9:11 PM.



Figure 24: December 7, 2012 – Combined slide showing approximate locations of target phones prior to the robbery.

30

June 2, 2013



Figure 25: December 7, 2012 – Combined slide showing approximate locations of target phones at or near the time of the robbery.

31

**-984-**



Figure 26: December 7, 2012 – Combined slide showing approximate locations of target phones after the robbery.

32

June 2, 20__

# ROBBERY NUMBER TWO

Food Shoppers Warehouse, 3801 Jefferson Davis Hwy., Alexandria, VA

DECEMBER 9, 2012   6:15 AM

33



June 2, 2013

Figure 27: Shoppers Food Warehouse, 3801 Jefferson Davis Highway, Alexandria, VA.

34



Figure 28: December 9, 2012 between 5:02 and 5:21 AM. At 5:00 and 5:10 AM, OUTGOING CALLS to DYER; 5:10 AM, INCOMING CALL from DYER; 5:19 AM and 5:20 AM, OUTGOING CALLS to DYER; 5:21 AM, OUTGOING CALL to CANNON.

35



Figure 29: December 9, 2012 between 6:15 and 6:20 AM.



Figure 30: December 9, 2012 between 6:33 and 7:11 AM.

37

June 2, 2013



Figure 31: December 9, 2012 between 5:02 and 5:21 AM. At 5:10 AM, OUTGOING CALL to REED; 5:19 AM and 5:20 AM, INCOMING CALLS from REED (routed to VOICEMAIL). The next cell site registration is 11:15 AM (5 hours after the robbery). It should be noted that this is consistent with WINSTON's phone, which did not record any cell site activity between 4:45 and 11:10 AM.

38



Figure 32: December 9, 2012 at 4:45 AM. The next cell site registration is 11:10 AM (Over 5 hours after the robbery). It should be noted that this is consistent with DYER's phone, which did not record any cell site activity between 5:20 and 11:15 AM.

39

Figure 33: December 9, 2012 between 5:03 and 5:11 AM.

June 2, 2015



41

Figure 34: December 9, 2012 between 5:21 and 5:28 AM. At 5:21 AM, INCOMING CALL from REED.



Figure 35: December 9, 2012 at 6:08 AM.

42

**-995-**



Figure 36: December 7, 2012 – Combined slide showing approximate locations of target phones prior to the robbery.

43

**-996-**



Figure 37: December 7, 2012 – Combined slide showing approximate locations of target phones at or near the time of the robbery.

44

## ROBBERY NUMBER THREE

Navy Federal Credit Union, 875 North Randolph St., Arlington, VA

DECEMBER 22, 2012   9:75 AM

45

June 2, 201⌐

June 2, 20__



Figure 38: Navy Federal Credit Union, 875 N. Randolph St, Arlington, VA.

46



Figure 39. Anthony Cannon Residence, 1501 38th Street SE, Washington, D.C. (Location of arrest and search).

47



Figure 40: December 22, 2012 between 5:14 and 6:54 AM, INCOMING CALL from DYER. At 5:14 AM, INCOMING CALL. Between 6:54 AM and 10:33 AM, the phone received a number of INCOMING CALLS, all routed to voicemail, which would suggest the target phone was off. Routed calls do not show cell tower information.

48



Figure 41: December 22, 2012 between 10:33 and 11:02 AM.

49

June 2, 2013



Figure 42: December 22, 2012 between 5:03 and 5:14 AM. At 5:12 AM, OUTGOING CALL to REED.

50

**-1003-**



Figure 43: December 22, 2012 between 7:01 and 7:04 AM.

51

**-1004-**



Figure 43: December 22, 2012 between 7:59 and 8:24 AM. At 7:59 AM, OUTGOING CALL to WINSTON; 8:18 AM, INCOMING CALL from WINSTON; 8:19, 8:20:07, 8:20:23 and 8:24 AM, four (4) OUTGOING CALLS to WINSTON. It should be noted that there were no calls or texts between 8:24 and 10:32 AM.

52



Figure 43:  December 22, 2012 between 10:32 and 10:56 AM.

53



Figure 44: December 22, 2012 between 7:59 and 8:28 AM.

54

**-1007-**



Figure 45: December 22, 2012 between 9:32 and 9:52 AM.

**-1008-**



Figure 45: December 22, 2012 between 10:12 and 10:27AM.

56



Figure 46: December 22, 2012 – Combined slide showing approximate locations of target phones prior to the robbery.

57

Figure 47: December 22, 2012 – Combined slide showing approximate locations of target phones prior to the robbery.

58



Figure 49.  December 22, 2012 – Combined slide showing approximate locations of target phones prior to the robbery.

59



Figure 50: December 22, 2012 – Combined slide showing approximate locations of target phones after the robbery.

60

**-1013-**

# GPS TRACKING DEVICE LOCATIONS

DECEMBER 22, 2012   9:57 AM START, 3:33 PM FINISH

61

June 2, 2013



Figure 51: December 22, 2012 – Overall view of the GPS "hits" from three tracking devices taken during the robbery. The red arrow indicates the direction of travel (WEST to EAST).

62

**-1015-**

June 2, 2013



Figure 51: December 22, 2012 – GPS device locations in relation to known target cell phone activity. The robbery occurred at approximately 9:57 AM, which is when the GPS devices began recording information.

63



Figure 52: December 22, 2012 – GPS device locations in relation to known target cell phone activity.

64

June 2, 2013



Figure 53: December 22, 2012 – GPS device locations in relation to known target cell phone activity.

65

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | Criminal No. 1:13cr48 |
| | : | |
| KEITH WILLIE REED, et al., | : | |
| | : | |
| Defendants. | : | |

<u>MOTION FOR JUDGMENT OF ACQUITTAL OF STANLEY RAY WINSTON</u>

COMES NOW, the Defendant, Stanley Winston, by counsel, and moves this Court for a judgment of acquittal, reversing the jury's verdict finding Mr. Winston guilty of all counts despite the insufficient evidence to convict him of these crimes, and in support of his Motion Mr. Winston states as follows:

1.      Federal Rule of Criminal Procedure 29(a) provides, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. Pro. 29(a) 2013.  "In considering a claim that the evidence was insufficient to support a conviction, we view the evidence in the light most favorable to the government and 'sustain the jury's verdict if *any* rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt.'" <u>United States v. Penniegraft</u>, 641 F.3d 566, 571 (4th Cir. 2011).

2.      In this case, the Government failed to prove that Stanley Winston robbed the VVM, Inc., Shoppers Food Warehouse and Navy Federal Credit Union, beyond a reasonable doubt.  No rational trier of fact could find, based upon the limited description

Appeal: 13-4835   Doc: 47-3      Filed: 05/07/2014    Pg: 254 of 359

of the individuals that robbed the three establishments, that Mr. Winston committed the offenses beyond a reasonable doubt.

      3.     The Government failed to prove that the robbers stole property of VVM, Inc.  None of the evidence explained what VVM, Inc. is or described their property. Rather, the Government presented testimony about three different businesses sharing one space.

      4.     Regarding Counts Nine, Ten, Eleven and Twelve, the Government failed to prove, beyond a reasonable doubt, that the guns used by the robbers traveled across state lines at any time, an essential element of 18 U.S.C. section 922(g)(1).

      5.     In addition to these arguments, Mr. Winston also adopts any and all arguments presented by his co-defendants that challenge the sufficiency of the evidence against him in this case.

      WHEREFORE, these premises considered, the Defendant Stanley Winston, moves this Court for a Judgment of Acquittal on all counts.

STANLEY RAY WINSTON
By Counsel

THE LAW OFFICE OF MELINDA L. VANLOWE, P.C.

BY:            /s/
      Melinda L. VanLowe, Esquire
      Virginia State Bar I.D. Number 51143
      Counsel for Stanley Winston
      10476 Armstrong Street
      Fairfax, VA 22030
      (703) 865-5555
      (703) 763-2372 (fax)
      melinda@vanlowelaw.com

Case 1:13-cr-00048-CMH   Document 70   Filed 07/05/13   Page 3 of 4 PageID# 325

Case 1:13-cr-00048-CMH   Document 70   Filed 07/05/13   Page 4 of 4 PageID# 326

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 5th day of July, 2013, I will electronically file the Motion for Judgment of Acquittal with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Rebecca Bellows, Esquire
Patricia Giles, Esquire
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314

_____/s/_____
Melinda L. VanLowe, Esquire
Virginia State Bar I.D. Number 51143
Counsel for Stanley Winston
The Law Office of Melinda L. VanLowe, P.C.
10476 Armstrong Street
Fairfax, VA 22030
(703) 865-5555
(703) 763-2372 (fax)
melinda@vanlowelaw.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | Criminal No. 1:13cr48 |
| | : | |
| KEITH WILLIE REED, et al., | : | |
| | : | |
| Defendants. | : | |

<u>MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL</u>

The Government presented insufficient circumstantial evidence to allow a reasonable trier of fact to find Defendant, Stanley Ray Winston guilty of all counts listed in the Second Superceding Indictment.  The key issue before the jury was the identity of the individuals that robbed the VVM, Inc., Shoppers Food Warehouse and Navy Federal Credit Union.  The Government presented scant eyewitness evidence of the identity of the robbers.  The circumstantial evidence presented did not prove Mr. Winston robbed the VVM, Inc., Shoppers Food Warehouse or Navy Federal Credit Union, beyond a reasonable doubt.  The Government also failed to present evidence that the robbers stole property of VVM, Inc. and that the gun supposedly possessed by Stanley Winston traveled across state lines.  Accordingly, no reasonable trier of fact could have found Mr. Winston guilty of any counts within the indictment.   A judgment of acquittal, therefore, must be ordered.

I.    <u>STANDARD.</u>

Federal Rule of Criminal Procedure 29(a) provides, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is

insufficient to sustain a conviction." Fed. R. Crim. Pro. 29(a) 2013. "In considering a claim that the evidence was insufficient to support a conviction, we view the evidence in the light most favorable to the government and 'sustain the jury's verdict if *any* rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt.'" United States v. Penniegraft, 641 F.3d 566, 571 (4th Cir. 2011). "Although the United States may rely on inferences and circumstantial evidence, it 'nevertheless must establish proof of each element' of the crime 'beyond a reasonable doubt.' *United States v. Burgos*, 94 F.3d 849, 858 (4th Cir.1996) (*en banc* ). As Judge Williams recently explained for the *en banc* court, '[t]o require less of the Government would eviscerate its burden to prove all elements of a crime beyond a reasonable doubt and relieve it of its burden of vigilance in prosecuting crimes-thereby violating bedrock principles of our Anglo-American jurisprudence.' *Id.* (citing *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970))." U.S. v. Ismail, 97 F.3d 50 (4th Cir. 1996).

II. THE EVIDENCE DID NOT IDENTIFY STANLEY WINSTON AS ONE OF THE VVM, INC., SHOPPERS FOOD WAREHOUSE OR NAVY FEDERAL CREDIT UNION ROBBERS, BEYOND A REASONABLE DOUBT.

The Government failed to prove that Stanley Winston robbed the VVM, Inc., Shoppers Food Warehouse and Navy Federal Credit Union, beyond a reasonable doubt. None of the witnesses from VVM, Inc. could describe the robbers. Latoya Freeman, a witness at Shoppers Food Warehouse testified that she saw three men in masks and one appeared to have dreadlocks. Dimance Inn, a witness at the Navy Federal Credit Union testified in similar fashion about seeing a loose dreadlock under a robber's mask and hood. The Court, however, admitted several pictures of individuals holding large stacks of money into eviddence. At least two of the pictures presented

contained images of black males, other than Stanley Winston, with dreadlocks, holding what appear to be large stacks of money.  No reasonable trier of fact could distinguish Mr. Winston, from the other individuals, beyond a reasonable doubt, based upon the vague eyewitness descriptions.  Knowing the inadequacy of the eyewitness testimony, the Government argued that evidence of mitochondrial DNA and historical cell phone data provide circumstantial evidence of Mr. Winston's presence at the robberies.

The Government argued that one of the masks found in a trash on Pope Street contained mitochondrial DNA of an African American with the same sequence as Mr. Winston and this evidence coupled with the eyewitness descriptions sufficiently identify Mr. Winston.  The DNA evidence, however, does not establish Mr. Winston's presence at any of the robberies.  As a preliminary matter, the mask was not found at the location of any of the robberies or in the Jeeps linked to each of the robberies; police found the mask in the garbage.  In addition, Constance Fisher, the government's expert on mitochondrial DNA stated that, unlike nuclear DNA that is unique to a specific person, mitochondrial DNA is not identifying.  She went on to add that at least twelve (12) other people have the same mitochondrial DNA sequence found in the mask.  Ms. Fisher explained that anyone that can be traced through Mr. Winston's maternal line can have the same mitochondrial DNA.  When presented with Ms. Fisher's testimony, no reasonable trier of fact could determine that the DNA found in the mask belongs to Stanley Winston alone, beyond a reasonable doubt.  Rather, Ms. Fisher's testimony makes such a conclusion impossible.

The Government presented analysis of the historic cell phone data of the IPhone4 through Agent Kevin Horan and used this information to place Mr. Winston at

two of the three robberies.   First, the Government did not establish, beyond a reasonable doubt that Mr. Winston owned the IPhone4 seized or that he was in possession of the phone at the time of the VVM, Inc., and Navy Federal Credit Union robberies. The Government's own evidence established that the IPhone4 is a prepaid phone.   The cellular telephone company providing service for the phone, T-Mobile, lacked any information about the owner of the telephone.   Also, the Government offered no evidence that at the time of the VVM, Inc. and Navy Federal Credit Union robberies, Mr. Winston physically held the IPhone4 or that the phone was within his power to control.

Agent Horan testified that historic cell phone data can establish a person's location with specificity.   He also testified, however, that Mr. Winston's telephone was not pinging near the Shoppers Food Warehouse at the time of the robbery.   In addition, despite Agent Horan's claims of specificity, based on testimony of a DEA agent, a court within the Fourth Circuit found that the longitude and latitude of a cell phone ping can locate a phone within a radius of 3 to 5,000 meters or up to three (3) miles.  See U.S. v. Wilford, 2013 WL 2552446 *4 (D. Md. 2013).

III.    THE GOVERNMENT DID NOT PRESENT SUFFICIENT EVIDENCE THAT THE ROBBERS STOLE PROPERTY OF VVM, INC.

The Government failed to prove that the robbers stole property of VVM, Inc.  The government presented witness Rahnadou Hassan who testified that he sells prepaid phones and telephone cards.  He also testified that he shares space with a check cashing establishment.  Margarita testified that she processes wire transfers.  She also testified about another vendor who sold handbags and other accessories.  None of the witnesses, however, described VVM, Inc., the nature of the business or the corporate

structure.  This evidence was necessary as VVM, Inc., unlike Navy Federal Credit Union and Shoppers Food Warehouse, is not a readily identifiable business.  While VVM, Inc. appears on the door of the commercial space, the evidence did not identify what property contained in the building, constituted property of VVM, Inc., beyond a reasonable doubt.

IV.    THE GOVERNMENT NEVER PRESENTED EVIDENCE THAT THE GUNS USED IN ALL THREE ROBBERIES TRAVELED ACROSS STATE LINES.

None of the evidence presented by the Government established that the guns used in each robbery traveled across state lines.  Section 922(g)(1) provides, that "[i]t shall be unlawful for any person-- (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1) (2013).  Courts have found evidence sufficient to confirm that the firearm in question travelled through interstate commerce.  See U.S. v. Japanese Rifle, 571 F. Supp.2d 685 (E.D. Va. 2008) (fact that all firearms subject to forfeiture were manufactured in Japan or Germany was sufficient to establish requisite interstate commerce nexus, for purposes of statute prohibiting possession of a firearm by a convicted felon); U.S. v. Howe, 538 F.3d 842 (8th Cir. 2008) (sufficient evidence supported determination that .22 caliber pistol that defendant possessed traveled in interstate commerce, as required on a conviction for being a felon in possession of a firearm; government used picture of .22 caliber pistol as demonstrative evidence when it questioned several witnesses to establish that the pistol defendant possessed was, in fact, a .22 caliber pistol, and a special agent testified that the .22 caliber pistol portrayed in picture could not have been manufactured in forum state, and therefore would have had to have traveled in interstate commerce); U.S. v. Gatlin, 613 F.3d 374 (3rd Cir. 2010) (evidence was

sufficient to prove that the handgun found in defendant's possession in Delaware had traveled in interstate commerce, as required to support conviction for being a felon in possession of a firearm; the gun was marked with a "Miami, Florida" engraving and the manufacturer's name, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) database indicated that the gun had been purchased in Virginia, and evidence was presented that no handguns had been manufactured in Delaware in nearly 100 years; Evidence was sufficient to enable jury to rationally conclude that weapon seized in defendant's motel room was possessed in or affected interstate commerce so as to establish interstate commerce element of felon in possession of a firearm offense); U.S. v. Clay, 355 F.3d 1281, certiorari denied 125 S.Ct. 626, 543 U.S. 999, 160 L.Ed.2d 456 (2004) (firearm, which was seized in Georgia, bore an imprint indicating that it had been manufactured in Connecticut, and there was neither an objection made nor a contrary argument made to the jury as to location of manufacturing company).    The Government's case contained none of this type of evidence.

None of the VVM, Inc. witnesses described the guns used during the robbery. Latoya Freeman, a bystander present in the Shoppers Food Warehouse, described the robbers as having "silver" guns.  While the government showed pictures of guns found in the house on 1501 38th Street, SE, Washington D.C., none of the evidence established that the robbers used the guns depicted.  Finally, while it housed a distinctive magazine clip, the Government did not present evidence that the handgun allegedly held by Stanley Winston in the Navy Federal Credit Union robbery matched any of the hand guns found at 1501 38th Street.

-1028-

Case 1:13-cr-00048-CMH   Document 71   Filed 07/05/13   Page 7 of 8 PageID# 333

V.    <u>CONCLUSION.</u>

Based upon the Government's evidence, no reasonable trier of fact could have identified Stanley Winston as a perpetrator of the VVM, Inc., Shoppers Food Warehouse or Navy Federal Credit Union robberies.  In addition, no reasonable trier of fact could have considered the circumstantial DNA and cell phone evidence as sufficient to convict Mr. Winston.  Finally, the Government did not prove that the robbers stole property of VVM, Inc. or that the guns involved in the robbery traveled through interstate commerce.

WHEREFORE, these premises considered, the Defendant Stanley Winston, moves this Court for a Judgment of Acquittal on all counts.

                                        STANLEY RAY WINSTON
                                        By Counsel

THE LAW OFFICE OF MELINDA L. VANLOWE, P.C.

BY: _____/s/_____
        Melinda L. VanLowe, Esquire
        Virginia State Bar I.D. Number 51143
        Counsel for Stanley Winston
        10476 Armstrong Street
        Fairfax, VA 22030
        (703) 865-5555
        (703) 763-2372 (fax)
        melinda@vanlowelaw.com

Case 1:13-cr-00048-CMH   Document 71   Filed 07/05/13   Page 8 of 8 PageID# 334

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on the 5th day of July, 2013, I will electronically file the Memorandum in Support of Motion for Judgment of Acquittal of Accused Stanley Winston with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Rebecca Bellows, Esquire
Patricia Giles, Esquire
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314

                 _____/s/_____
                 Melinda L. VanLowe, Esquire
                 Virginia State Bar I.D. Number 51143
                 Counsel for Stanley Winston
                 The Law Office of Melinda L. VanLowe, P.C.
                 10476 Armstrong Street
                 Fairfax, VA 22030
                 (703) 865-5555
                 (703) 763-2372 (fax)
                 melinda@vanlowelaw.com

Appeal: 13-4835    Doc: 47-3    Filed: 05/07/2014    Pg: 265 of 359

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:11CR00261 |
| | ) | The Honorable C.M. Hilton |
| Keith Willie Reed, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**********************************************************************

**MOTION FOR JUDGMENT OF ACQUITTAL BY ANTHONY CANNON**

COMES NOW the Defendant, Anthony Cannon, by and through counsel, and moves for a judgment of acquittal, revering the jury's verdict finding Mr. Cannon guilty of all counts despite the insufficient evidence to convict him of these crimes, and in support of his motion states as follows:

1. Federal Rule of Criminal Procedure 29(a) provides, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. Pro. 29(a) 2013. "In considering a claim that the evidence was insufficient to support a conviction, we view the evidence in the light most favorable to the government and 'sustain the jury's verdict if *any* rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt.'" *United States v. Penniegraft,* 641 F.3d 566, 571 (4th Cir. 2011).

2. In this case, the Government failed to prove that Anthony Cannon robbed the VVM, Inc., Shoppers Food Warehouse and Navy Federal Credit Union,

Appeal: 13-4835    Doc: 47-3    Filed: 05/07/2014    Pg: 266 of 359

beyond a reasonable doubt. No rational trier of fact could find, based upon the limited description of the individuals that robbed the three establishments, that Mr. Cannon committed the offenses beyond a reasonable doubt.

3. The Government failed to prove that the robbers stole property of VVM, Inc. None of the evidence explained what VVM, Inc. is or described their property. Rather, the Government presented testimony about three different businesses sharing one space.

4. Regarding Counts Nine, Ten, Eleven and Twelve, the Government failed to prove, beyond a reasonable doubt, that the guns used by the robbers traveled across state lines at any time, an essential element of 18 U.S.C. section 922(g)(1).

5. In addition to these arguments, Mr. Cannon also adopts any and all arguments presented by his co-defendants that challenge the sufficiency of the evidence against him in this case.

WHEREFORE, these premises considered, the Defendant Anthony Cannon, moves this Court for a Judgment of Acquittal on all counts.

Respectfully submitted

Anthony Cannon

By Counsel

_____/s/_____
Alfred L. Robertson, Jr.
VSB # 45000
Robertson Law Office, PLLC
500 N. Washington St.
Alexandria, VA 22314
(571) 492-5133
(703) 842-6196 (facsimile)
rob@robertsonlawoffice.com
Counsel for Anthony Cannon

**-1032-**

Case 1:13-cr-00048-CMH   Document 72   Filed 07/07/13   Page 3 of 3 PageID# 337

**CERTIFICATE OF SERVICE**

I hereby certify that on the 5th day of July, 2013, I will electronically file the

Motion for Judgment of Acquittal with the Clerk of Court using the CM/ECF system,

which will then send a notification of such filing (NEF) to the following:

Rebecca Bellows, Esquire
Patricia Giles, Esquire
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314

And all other counsel of record.


                              _____/s/_____
                              Alfred L. Robertson, Jr.
                              VSB # 45000
                              Robertson Law Office, PLLC
                              500 N. Washington St.
                              Alexandria, VA 22314
                              (571) 492-5133
                              (703) 842-6196 (facsimile)
                              rob@robertsonlawoffice.com
                              Counsel for Anthony Cannon

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:11CR00261 |
| | ) | The Honorable C.M. Hilton |
| Keith Willie Reed, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

*************************************************************************

**MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL OF ANTHONY CANNON**

The Government presented insufficient circumstantial evidence to allow a reasonable trier of fact to find Defendant, Anthony Cannon guilty of all counts listed in the Second Superseding Indictment. The key issue before the jury was the identity of the individuals that robbed the VVM, Inc., Shoppers Food Warehouse and Navy Federal Credit Union. The Government presented scant eyewitness evidence of the identity of the robbers. The circumstantial evidence presented did not prove Mr. Cannon robbed the VVM, Inc., Shoppers Food Warehouse or Navy Federal Credit Union, beyond a reasonable doubt. The Government also failed to present evidence that the robbers stole property of VVM, Inc. and that the gun supposedly possessed by Anthony Cannon traveled across state lines. Accordingly, no reasonable trier of fact could have found Mr. Cannon guilty of any counts within the indictment. A judgment of acquittal, therefore, must be ordered.

## I. STANDARD.

Federal Rule of Criminal Procedure 29(a) provides, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's

motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. Pro. 29(a) 2013. "In considering a claim that the evidence was insufficient to support a conviction, we view the evidence in the light most favorable to the government and 'sustain the jury's verdict if *any* rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt.'" *United States v. Penniegraft,* 641 F.3d 566, 571 (4th Cir. 2011).

"Although the United States may rely on inferences and circumstantial evidence, it nevertheless must establish proof of each element' of the crime 'beyond a reasonable doubt.' *United States v. Burgos,* 94 F.3d 849, 858 (4th Cir.1996) (*en banc* ). As Judge Williams recently explained for the *en banc* court, '[t]o require less of the Government would eviscerate its burden to prove all elements of a crime beyond a reasonable doubt and relieve it of its burden of vigilance in prosecuting crimes-thereby violating bedrock principles of our Anglo-American jurisprudence.' *Id.* (citing *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970))." U.S. v. Ismail, 97 F.3d 50 (4th Cir. 1996).

## II. THE EVIDENCE DID NOT IDENTIFY ANTHONY CANNON AS ONE OF THE VVM, INC., SHOPPERS FOOD WAREHOUSE OR NAVY FEDERAL CREDIT UNION ROBBERS, BEYOND A REASONABLE DOUBT.

The Government failed to prove that Anthony Cannon robbed the VVM, Inc., Shoppers Food Warehouse and Navy Federal Credit Union, beyond a reasonable doubt. None of the witnesses from VVM, Inc. could describe the robbers. Latoya Freeman, a witness at Shoppers Food Warehouse testified that she saw three men in masks and one appeared to have dreadlocks. Dimance Inn, a witness at the Navy Federal Credit Union testified in similar fashion about seeing a loose dreadlock under a robber's mask and

**-1035-**

hood. The Court, however, admitted several pictures of individuals holding large stacks of money into evidence. At least two of the pictures presented contained images of black males, other than Anthony Cannon, holding what appear to be large stacks of money. No reasonable trier of fact could distinguish Mr. Cannon, from the other individuals, beyond a reasonable doubt, based upon the vague eyewitness descriptions. Knowing the inadequacy of the eyewitness testimony, the Government argued that evidence of mitochondrial DNA and historical cell phone data provide circumstantial evidence of Mr. Cannon's presence at the robberies.

The Government argued that one of the masks found in a trash on Pope Street contained mitochondrial DNA of an African American with the same sequence as Mr. Cannon and this evidence coupled with the eyewitness descriptions sufficiently identify Mr. Cannon. The DNA evidence, however, does not establish Mr. Cannon's presence at any of the robberies. As a preliminary matter, the mask was not found at the location of any of the robberies or in the Jeeps linked to each of the robberies; police found the mask in the garbage. In addition, Constance Fisher, the government's expert on mitochondrial DNA stated that, unlike nuclear DNA that is unique to a specific person, mitochondrial DNA is not identifying. She went on to add that at least twelve (12) other people have the same mitochondrial DNA sequence found in the mask. Ms. Fisher explained that anyone that can be traced through Mr. Cannon's maternal line can have the same mitochondrial DNA. When presented with Ms. Fisher's testimony, no reasonable trier of fact could determine that the DNA found in the mask belongs to Anthony Cannon alone, beyond a reasonable doubt. Rather, Ms. Fisher's testimony makes such a conclusion impossible.

The Government introduced evidence that the perpetrators of the Navy Federal Credit Union Robbery went to 1501 S. 38 St., SE after the robbery. Government evidence indicated that at that time there were 7 other men there at the time of their arrival. The police later arrest the four defendants in this case, without any explanation as to what happened to the other people in the house. The Police did not check the house upon arrival, and  the only reason these defendants were arrested were because they were the ones walking down Pope Street when the police arrived.

The Government presented analysis of the historic cell phone data through Agent Kevin Horan and used this information to place Mr. Cannon at two of the three robberies. First, the Government did not establish, beyond a reasonable doubt that Mr. Cannon owned or was responsible for, any of the phones analyzed. In fact, the Government's evidence contradicted itself. One of the phones allegedly used by one co-defendant purportedly identified a phone number for Mr. Cannon, and the Government used that number as a phone attributable to Mr. Cannon. Yet, another co-defendant's phone identified a different number for Mr. Cannon, and that phone number was not included in the analysis conducted by Agent Horan. There was no explanation as to why one phone number was Mr. Cannon's and the other was not. There was no explanation why the second number was not included in the analysis. The only explanation for the assignment of that number to Mr. Cannon was that it fit the Government's theory of the case.  There was no other evidence linking any phone in this case to Mr. Cannon- no proof that he possessed it, or used it. Further, when questioning another co-defendant at the time of arrest, the Government received evidence that Mr. Cannon did not have a cell phone at all.

Agent Horan testified that historic cell phone data can establish a person's location with specificity. He also testified, however, that the phone he attributed to Mr. Cannon was not pinging near VVM, Inc. at the time of the robbery. In addition, despite Agent Horan's claims of specificity, based on testimony of a DEA agent, a court within the Fourth Circuit found that the longitude and latitude of a cell phone ping can locate a phone within a radius of 3 to 5,000 meters or up to three (3) miles. See *U.S. v. Wilford*, 2013 WL 2552446 *4 (D. Md. 2013).

### III. THE GOVERNMENT DID NOT PRESENT SUFFICIENT EVIDENCE THAT THE ROBBERS STOLE PROPERTY OF VVM, INC.

The Government failed to prove that the robbers stole property of VVM, Inc. The government presented witness Rahnadou Hassan who testified that he sells prepaid phones and telephone cards. He also testified that he shares space with a check cashing establishment. Margarita testified that she processes wire transfers. He also testified about another vendor who sold handbags and other accessories. None of the witnesses, however, described VVM, Inc., the nature of the business or the corporate structure. This evidence was necessary as VVM, Inc., unlike Navy Federal Credit Union and Shoppers Food Warehouse, is not a readily identifiable business. While VVM, Inc. appears on the door of the commercial space, the evidence did not identify what property contained in the building, constituted property of VVM, Inc., beyond a reasonable doubt.

### IV. THE GOVERNMENT NEVER PRESENTED EVIDENCE THAT THE GUNS USED IN ALL THREE ROBBERIES TRAVELED ACROSS STATE LINES.

None of the evidence presented by the Government established that the guns used in each robbery traveled across state lines. Section 922(g)(1) provides, that "[i]t shall be

unlawful for any person-- (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1) (2013). Courts have found evidence sufficient to confirm that the firearm in question travelled through interstate commerce. See *U.S. v. Japanese Rifle*, 571 F. Supp.2d 685 (E.D. Va. 2008) (fact that all firearms subject to forfeiture were manufactured in Japan or Germany was sufficient to establish requisite interstate commerce nexus, for purposes of statute prohibiting possession of a firearm by a convicted felon); *U.S. v. Howe*, 538 F.3d 842 (8th Cir. 2008) (sufficient evidence supported determination that .22 caliber pistol that defendant possessed traveled in interstate commerce, as required on a conviction for being a felon in possession of a firearm; government used picture of .22 caliber pistol as demonstrative evidence when it questioned several witnesses to establish that the pistol defendant possessed was, in fact, a .22 caliber pistol, and a special agent testified that the .22 caliber pistol in picture could not have been manufactured in forum state, and therefore would have had to have traveled in interstate commerce); *U.S. v. Gatlin*, 613 F.3d 374 (3rd Cir. 2010) (evidence was sufficient to prove that the handgun found in defendant's possession in Delaware had traveled in interstate commerce, as required to support conviction for being a felon in possession of a firearm; the gun was marked with a "Miami, Florida" engraving and the manufacturer's name, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) database indicated that the gun had been purchased in Virginia, and evidence was presented that no handguns had been manufactured in Delaware in nearly 100 years; Evidence was sufficient to enable jury to rationally conclude that weapon seized in defendant's motel room was possessed in or affected interstate commerce so as to establish interstate commerce element of felon in

possession of a firearm offense); *U.S. v. Clay, 355* F.3d 1281, certiorari denied 125 S.Ct. 626, 543 U.S. 999, 160 L.Ed.2d 456 (2004) (firearm, which was seized in Georgia, bore an imprint indicating that it had been manufactured in Connecticut, and there was neither an objection made nor a contrary argument made to the jury as to location of manufacturing company). The Government's case contained none of this type of evidence.

None of the VVM, Inc. witnesses described the guns used during the robbery. Latoya Freeman, a bystander present in the Shoppers Food Warehouse, described the robbers as having "silver" guns. While the government showed pictures of guns found in the house on 1501 38th Street, SE, Washington D.C., none of the evidence established that the robbers used the guns depicted. Finally, while it housed a distinctive magazine clip, the Government did not present evidence that Anthony Cannon possessed any type of handgun in the Navy Federal Credit Union robbery.

V. CONCLUSION.

Based upon the Government's evidence, no reasonable trier of fact could have identified Anthony Cannon as a perpetrator of the VVM, Inc., Shoppers Food Warehouse or Navy Federal Credit Union robberies. In addition, no reasonable trier of fact could have considered the circumstantial DNA and cell phone evidence as sufficient to convict Mr. Cannon. Finally, the Government did not prove that the robbers stole property of VVM, Inc. or that the guns involved in the robbery traveled through interstate commerce. WHEREFORE, these premises considered, the Defendant Anthony Cannon, moves this Court for a Judgment of Acquittal on all counts.

Respectfully submitted

Anthony Cannon

By Counsel

_____/s/_____
Alfred L. Robertson, Jr.
VSB # 45000
Robertson Law Office, PLLC
500 N. Washington St.
Alexandria, VA 22314
(571) 492-5133
(703) 842-6196 (facsimile)
rob@robertsonlawoffice.com
Counsel for Anthony Cannon

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of July, 2013, I will electronically file the

Motion for Judgment of Acquittal with the Clerk of Court using the CM/ECF system,

which will then send a notification of such filing (NEF) to the following:

Rebecca Bellows, Esquire
Patricia Giles, Esquire
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314

And all other counsel of record.

_____/s/_____
Alfred L. Robertson, Jr.
VSB # 45000
Robertson Law Office, PLLC
500 N. Washington St.
Alexandria, VA 22314
(571) 492-5133
(703) 842-6196 (facsimile)
rob@robertsonlawoffice.com
Counsel for Anthony Cannon

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:13CR48 - 004 |
| | ) | |
| TOBIAS RICHARD DYER, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR PRELIMINARY ORDER OF FORFEITURE

The United States has moved this Honorable Court for entry of a preliminary order of

forfeiture that would include a money judgment for the United States against Defendant Tobias

Richard Dyer in the amount of $76,915.15, the forfeiture of $38,068 in partial satisfaction of said

money judgment, and the forfeiture of two firearms that the defendant and his co-defendants used

and carried during the commission of some of the offenses of conviction.   This memorandum of

law is submitted in support of that motion.

Statement of Facts

In December 2012, Defendant Tobias Richard Dyer and co-defendants Anthony Cannon,

Stanley Ray Winston, and Keith Willie Reed committed three armed robberies in the Eastern

District of Virginia.   Specifically, on December 7, 2012, the defendants robbed VVM, Inc. in

Fairfax County, Virginia, of approximately $800; on December 9, 2012, the defendants robbed

Shoppers Food Warehouse in Alexandria, Virginia, of $15,704; and on December 22, 2012, the

defendants robbed the Navy Federal Credit Union in Arlington, Virginia, of $60,411.15.   During

all three robberies, Defendant Dyer and co-defendant Winston were armed with handguns.

The defendants were apprehended soon after the Navy Federal Credit Union robbery because three GPS devices hidden in the stolen money alerted law enforcement as to their location. In the wooded area where all four defendants were apprehended, law enforcement officers recovered $19,631 in cash and two of the GPS devices.   During a search of Anthony Cannon's residence, law enforcement recovered another GPS device, an additional $18,437, and three firearms.   Two of the three firearms -- a Luger Model AP9 9 mm firearm with serial number 021572 and one Federal Ordnance .45 caliber handgun with partial serial number F8801623 – were used by the defendants to commit the Navy Federal Credit Union robbery.

<u>Procedural Background</u>

On April 23, 2013, a federal grand jury returned a twelve-count Second Superseding Indictment against Dyer, Reed, Winston, and Cannon.   (Docket Entry "DE" # 43).   Count 1 charged all four defendants with conspiracy to affect commerce by robbery, in violation of 18 U.S.C. §1951.   Counts 2 through 4 charged the defendants with interference with commerce by robbery, in violation of 18 U.S.C. §§ 2 and 1951(a).   Count 5 charged the defendants with armed robbery of a federal credit union, in violation of 18 U.S.C. §§ 2 and 2113(a) & (d). Counts 6 through 8 charged the defendants with using and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 2 and 924(c)(1)(A).   Each defendant was also charged with possession of a firearm after having been convicted of an offense punishable by a term of imprisonment exceeding one year, in violation of 18 U.S.C. § 922(g)(l) (Counts 9-12).

The Second Superseding Indictment also included a forfeiture notice, wherein the defendants were notified that if convicted of Counts 2 through 5, they shall forfeit to the United States any property, real or personal, that constitutes or is derived from proceeds of the offenses charged in those counts, including but not limited to:    (a) approximately $700 in United States

currency taken from VVM, Inc. on December 7, 2012;   (b) approximately $15,704 in United

States currency taken from the Shoppers Warehouse on December 9, 2012; and approximately

$60,411.15 in United States currency taken from the Navy Federal Credit Union on December

22, 2012.   The forfeiture notice also apprised the defendants that if convicted of Counts 2

through 5, they would forfeit substitute property pursuant to 21 U.S.C. § 853(p) and 28 U.S.C. §

2461(c), and would forfeit two firearms that the defendants used during and in relation to an

armed robbery charged in the Second Superseding Indictment.

        The jury trial in this case began on June 17, 2013.   At trial, the United States presented

evidence that the defendants obtained approximately $76,915.15 in proceeds from the armed

robberies.   Specifically, the evidence established that the defendants took by force and

intimidation approximately $800 from VVM, Inc. on December 7, 2012, $15,704 from Shoppers

Food Warehouse on December 9, 2012, and $60,411.15 from the Navy Federal Credit Union on

December 22, 2012.   The government also presented evidence establishing that shortly after the

defendants were arrested on December 22, 2012, law enforcement officers recovered $19,631 at

Fort Davis Park, where the defendants had been apprehended.   In addition, the evidence

established that law enforcement seized, among other things, the following items from Anthony

Cannon's residence (1501 38th Street, S.E., Washington, D.C.):   $18,437 in United States

currency; one Lugar Model AP9 9mm firearm with serial number 021572; and one Federal

Ordnance .45 caliber handgun with partial serial number F8801623.   The evidence also proved

that the defendants used and carried those two firearms during and in relation to the December

22, 2012 armed robbery of the Navy Federal Credit Union.

        On June 21, 2013, the jury returned a verdict of guilty on all counts charged in the

Second Superseding Indictment. (DE 64 to 68).

<u>Argument</u>

Pursuant to Fed. R. Crim. P. 32.2, 21 U.S.C. § 853(p), 18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461(c), the United States is entitled to the entry of a money judgment against Defendant Dyer and his co-defendants in the amount of $76,915, which amount represents the proceeds the defendants obtained from the armed robberies of which they have been convicted.

Title 18, United States Code, Section 981(a)(1)(C) mandates forfeiture as part of the sentence for the bank robbery offenses of which the defendant stands convicted.   *See United States v. Monsanto*, 491 U.S. 600, 607 (1989) ("Congress could not have chosen stronger words to express its intent that the forfeiture be mandatory in cases where the statute applied"); *United States v. Alamoudi*, 452 F.3d 310, 313 (4th Cir. 2006) (if the defendant is convicted of any offense covered by 18 U.S.C. § 981(a)(1)(C), the court must order the forfeiture of the proceeds of that offense); *United States v. Maxwell*, 189 F. Supp.2d 395, 399 n.2 (E.D.Va. 2002) (because criminal forfeiture is mandatory, the primary issue before the trial court is not whether to issue a forfeiture order, but its size and scope).   Furthermore, Rule 32.2(b)(2) provides that once the court determines that property is subject to forfeiture, the court must "promptly enter a preliminary order of forfeiture . . . directing the forfeiture of specific property without regard to any third party's interest in it."   *See also United States v. Andrews*, 530 F.3d 1232, 1236 (10th Cir. 2008) (when the court determines the forfeitability of the property pursuant to Rule 32.2(b)(1), it does not – "and indeed may not" – determine the rights of third parties in the property; the ownership issue is deferred to the ancillary proceeding).[1]

It is well-established that the order of forfeiture in a criminal case may take the form of a personal money judgment for an amount of money equal to the value of the proceeds a defendant

---

[1]   Rule 32.2(b)(3) provides that the preliminary order of forfeiture authorizes the Attorney General to seize the specific property; to conduct discovery needed to identify, locate or dispose of the property; and to commence an ancillary proceeding to resolve any third party claims to the property.   The preliminary order becomes final as to the defendant and must be included in the judgment.   *See United States v. Bennett*, 423 F.3d 271, 275 (3d Cir. 2005) (describing the procedures required by Rule 32.2(b) in detail).

obtained as a result of his offense.    *See*, *e.g.*, Fed. R. Crim. P. 32.2(b)(2) (providing that the

preliminary order of forfeiture must "set[] forth the amount of any money judgment"); *United*

*States v. Padron*, 527 F.3d 1156, 1162 (11th Cir. 2008) (authority to issue a forfeiture order in

the form of a money judgment is clear from the cross reference in Section 2461(c) to Rule 32.2,

which "explicitly" contemplates the entry of a money judgment); *United States v. Vampire*

*Nation*, 451 F.3d 189, 202 (3d Cir. 2006) (holding that a forfeiture order may take the form of a

judgment for a sum of money equal to the proceeds the defendant obtained from the offense,

even if he no longer has those proceeds, or any other assets, at the time he is sentenced); *United*

*States v. Farkas*, 2011 WL 5101752 (E.D.Va. Oct. 26, 2011) (holding the defendant is liable to

forfeit the proceeds of his fraud whether he retained them, spent them, or held them only

momentarily before transferring them to a third party).

      The term "proceeds" is defined as "property of any kind obtained directly or indirectly, as

the result of the commission of the offense giving rise to forfeiture, and any property traceable

thereto, and is not limited to the net gain or profit realized from the offense."    18 U.S.C. §

981(a)(2)(A).    Accordingly, in this case, the proceeds subject to forfeiture (and a money

judgment) are the $76,915 that the defendants stole during the three armed robberies.

      Moreover, Defendant Dyer and his co-defendants should be required to forfeit, in partial

satisfaction of the money judgment, the $19,631 recovered at Fort Davis Park and the $18,437

found during the search of co-defendant Anthony Cannon's residence.    That money is subject to

forfeiture as proceeds of the offenses of conviction and/or substitute assets pursuant to 18 U.S.C.

§ 981(a)(1)(C), 28 U.S.C. § 2461(c), and 21 U.S.C. § 853(p).    *See United States v. McGinty*,

610 F.3d 1242, 1248 (10th Cir. 2010) (a forfeiture order may include both a money judgment

and specific assets); *United States v. Lewis*, 791 F. Supp. 2d 81, 94-95 (D.D.C. 2011) (court

orders a money judgment and the forfeiture of all of defendant's assets in partial satisfaction).

Appeal: 13-4835    Doc: 47-3    Filed: 05/07/2014    Pg: 281 of 359

Lastly, the firearms recovered from Anthony Cannon's residence were used by the defendants to commit the robbery of the Navy Federal Credit Union on December 22, 2012.    As a result, they are subject to forfeiture pursuant to 18 U.S.C. § 924(d)(1), which permits the forfeiture of any firearm used in furtherance of a crime of violence.

<u>Conclusion</u>

For the foregoing reasons, the United States requests entry of a preliminary order of forfeiture that includes a money judgment for the United States and against the defendant in the amount of $76,915, an amount that constitutes proceeds of the three armed robberies of which the defendant has been convicted, and an amount for which the defendant and his three co-defendants shall be jointly and severally liable.    In partial satisfaction of said money judgment, it is requested that United States currency in the amounts of $18,437 and $19,631 be ordered forfeited to the United States as property constituting or derived from proceeds the defendant and his co-defendants obtained from the commission of the offenses of conviction, or as a substitute thereof.    It is further requested that the Luger Model AP9 9 mm firearm with serial number 021572 and the Federal Ordnance .45 caliber handgun with partial serial number F8801623 also be ordered forfeited to the United States as firearms possessed and used by the defendants, all previously convicted felons, during and in relation to the armed robberies of which they were convicted.

The United States requests entry of the proposed Preliminary Order of Forfeiture submitted herewith.    In the proposed order, the Government has listed the specific assets for forfeiture and has set forth the usual directions to the Government regarding seizure of the property,

Appeal: 13-4835    Doc: 47-3    Filed: 05/07/2014    Pg: 282 of 359

post-conviction discovery, and the commencement of the ancillary proceeding in accordance with

Rule 32.2(b)(3).

Respectfully submitted,

Dana J. Boente
Acting United States Attorney

By:      _____/s/_____
Patricia T. Giles
Rebeca H. Bellows
Assistant United States Attorneys
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia   22314
Phone:   703-299-3700
Fax:   703-299-3982
Patricia.Giles@usdoj.gov
Becky.Bellows@usdoj.gov

Appeal: 13-4835    Doc: 47-3    Filed: 05/07/2014    Pg: 283 of 359

<u>CERTIFICATE OF SERVICE</u>

I hereby certify on this 11th day of October, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Gregory Todd Hunter, Esq.
2055 North 15th Street, Suite 302
Arlington, VA   22201
greghunter@mail.com
*Counsel for Defendant Tobias Richard Dyer*

Terrell N. Roberts III, Esq.
Douglas J. Wood
67801 Kenilworth Avenue, Suite 202
Riverdale, MD 20737
troberts@robertsandwood.com
*Counsel for Defendant Keith Willie Reed*

Melinda L. VanLowe, Esq.
10476 Armstrong Street
Fairfax, VA   22030
melinda@vanlowelaw.com
*Counsel for Defendant Stanley Ray Winston*

Alfred Lincoln Robertson, Jr.
500 N. Washington St.
Alexandria, VA   22314
rob@robertsonlawoffice.com
*Counsel for Defendant Anthony Cannon*

_____/s/_____
Rebeca H. Bellows
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia   22314
Phone:   703-299-3700
Fax:   703-299-3982
Becky.Bellows@usdoj.gov

8

Appeal: 13-4835    Doc: 47-3    Filed: 05/07/2014    Pg: 284 of 359

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | Criminal No. 1:13cr48 |
| | : | |
| KEITH WILLIE REED, et al., | : | The Honorable Claude M. Hilton |
| | : | |
| Defendants. | : | |

<u>SENTENCING MEMORANDUM</u>

COMES NOW the Defendant, Stanley Winston, by counsel, before this Court for sentencing upon a jury verdict of guilty on the following nine (9) counts:

1. Conspiracy in violation of Title 18, Section 1951(a) of the United States Code;

2. Interference with Commerce By Robbery (Navy Federal Credit Union) in violation of Title 18, Sections 2 and 1951(a) of the United States Code;

3. Interference with Commerce By Robbery (VVM, Inc.) in violation of Title 18, Sections 2 and 1951(a) of the United States Code;

4. Interference with Commerce By Robbery (Shopper's Food Warehouse) in violation of Title 18, Sections 2 and 1951(a) of the United States Code;

5. Armed Robbery of a Federal Credit Union in violation of Title 18, Sections 2 and 2113 (a) and (d) of the United States Code;

6. Using and Carrying a Firearm During and in Relation to a Crime of Violence (Navy Federal Credit Union) in violation of Title 18, Sections 2 and 924(c)(1)(A) of the United States Code;

Appeal: 13-4835    Doc: 47-3    Filed: 05/07/2014    Pg: 285 of 359

7. Using and Carrying a Firearm During and in Relation to a Crime of Violence (VVM, Inc.) in violation of Title 18, Sections 2 and 924(c)(1)(A) of the United States Code;

8. Using and Carrying a Firearm During and in Relation to a Crime of Violence (Shopper's Food Warehouse) in violation of Title 18, Sections 2 and 924(c)(1)(A) of the United States Code; and

10. Possession of a Firearm by a Prohibited Person in violation of Title 18, Section 922(g)(1) of the United States Code.

While the applicable guideline range referenced on Worksheet D of the Presentence Investigation Report recommends a sentence of seventy-eight (78) to ninety-seven (97) months (or approximately six and one half (6 1/2) to eight (8) years) of incarceration, Counts 6, 7, and 8 carry a mandatory minimum sentences of five (5), twenty-five (25) and twenty-five (25) years, respectively.   These mandatory minimum sentences, therefore, substantially elevate his sentence.   Because the government did not prove Mr. Winston's possession of any of the guns in this case, beyond a reasonable doubt, as argued in Mr. Winston's Motion for Judgment of Acquittal, Mr. Winston asserts that the mandatory minimum sentences should not be imposed.

Mr. Winston, therefore, asks this Court to enter a disposition excluding the mandatory minimum sentences and impose a sentence consistent with recommended sentencing guidelines in this case, seventy-eight (78) to ninety-seven (97) months. Alternatively, Mr. Winston respectfully asks the Court to impose a sentence no more than the mandatory minimum sentence required.

FACTUAL BACKGROUND

On December 22, 2012, federal and state law enforcement orchestrated a collaborative investigation of four (4) individuals responsible for allegedly robbing an Arlington, Virginia branch of Navy Federal Credit Union.  Following pursuit of the four (4) individuals into Fort Dupont Park in Washington, D.C., law enforcement apprehended Keith Willie Reed, Stanley Winston, Anthony Cannon, and Tobias Dyer.   The government charged each with robbery of the Navy Federal Credit Union and then, pursuant to superceding Indictments, charged them with robbery of VVM, Inc., and a Shopper's Food Warehouse in Alexandria, Virginia.  While Mr. Winston admits that the government presented sufficient evidence that the three robberies occurred, the evidence did not prove that he committed the robberies, beyond a reasonable doubt.

ACCEPTANCE OF RESPONSIBILITY

Stanley Winston maintains his innocence of all charges and therefore, does not accept responsibility for the crimes alleged.

ADVISORY SENTENCING GUIDELINES CALCULATION AND
OTHER FACTORS AND CONSIDERATION

While the sentencing guidelines calculation provided by Probation Officer Glover is correct, Mr. Winston respectfully asks this Court for a sentence within the recommended sentencing guidelines range, without imposition of the mandatory minimum sentences for the gun related charges.  As the Presentence Investigation Report states, Mr. Winston is one of six (6) brothers and sisters.  Unfortunately Mr. Winston has had to endure the death and incarceration of many of his family members, including his Mother, who is currently held at the Fluvana Correctional Facility for

Appeal: 13-4835     Doc: 47-3     Filed: 05/07/2014     Pg: 287 of 359

Women in Virginia.  In addition, Mr. Winston suffers from bi-polar disorder, for which he is now receiving treatment.

Without taking into account any of Mr. Winston's background and mental health history, the sentencing guideline in this case is enhanced due to Mr. Winston's alleged violation of Tile 18, Sections 924(C)(1)(A) and 922(g)(1) of the United States Code. Considering the minimal evidence presented by the government to prove that Stanley Winston possessed a gun in this case, imposition of a sentence that includes the severe enhancement required by Sections 924(C)(1)(A) and 922(g)(1) of the United States Code is inappropriate.  As previously argued, the witnesses called upon to testify regarding the Navy Federal Credit Union, VVM Inc., and Shopper's Food Warehouse robberies provided vary little information to identify Mr. Winston, thereby preventing the jury from concluding, beyond a reasonable doubt, that Mr. Winston possessed a firearm.  In addition, the government failed to produce any evidence that the guns traveled through interstate commerce, a necessary element of a charge under Section 922(g)(1).  It is therefore improper to impose fifty-five (55) years of incarceration where there is little to any evidence to support these substantial sentencing enhancements.

<u>CONCLUSION</u>

Mr. Winston, respectfully requests that this Court impose a sentence within the guideline range of seventy-eight (78) to ninety-seven (97) months.

STANLEY WINSTON
By Counsel

Appeal: 13-4835    Doc: 47-3    Filed: 05/07/2014    Pg: 288 of 359

THE LAW OFFICE OF MELINDA L. VANLOWE


BY:  _____/s/_____
        Melinda L. VanLowe, Esquire
        Virginia State Bar I.D. Number 51143
        Counsel for Stanley Winston
        10476 Armstrong Street
        Fairfax, VA 22030
        (703) 865-5555
        (703) 763-2372 (fax)
        melinda@vanlowelaw.com

### CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of October, 2013, I will electronically file this Sentencing Memorandum with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Patricia Giles, Esquire
Rebecca Bellows, Esquire
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Patricia.Giles@usdoj.gov
Becky.Bellows@usdoj.gov


                          _____/s/_____
                          Melinda L. VanLowe, Esquire
                          Virginia State Bar I.D. Number 51143
                          Counsel for Stanley Winston
                          The Law Office of Melinda L. VanLowe
                          10476 Armstrong Street
                          Fairfax, VA 22030
                          (703) 865-5555
                          (703) 763-2372 (fax)
                          melinda@vanlowelaw.com

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL NO. 1:13cr48 |
| v. | ) | |
| | ) | The Honorable Claude M. Hilton |
| TOBIAS RICHARD DYER, | ) | |
| | ) | Sentencing: October 25, 2013 |
| Defendant. | ) | |

## POSITION OF THE UNITED STATES
## WITH RESPECT TO SENTENCING

The United States of America, through its attorneys, Dana J. Boente, Acting United

States Attorney, and Patricia T. Giles and Rebeca H. Bellows, Assistant United States Attorneys,

in accord with 18 U.S.C. § 3553(a) and the United States Sentencing Commission, Guidelines

Manual, §6A1.2 (Nov. 2012), files this Position of the United States With Respect to Sentencing.

The United States has no objection to the Presentence Report and Addendum, which calculated

the defendant's sentencing guidelines as 87 to 108 months as to Counts One through Five, and

Twelve.  The Presentence Report and Addendum also accurately reflect that the defendant,

Tobias Richard Dyer, is subject to consecutive, mandatory minimum terms of 5 years as to

Count Six, 25 years as to Count Seven, and 25 years as to Count Eight, for a total of 55 years.

The United States respectfully requests this Court to impose a sentence of 24 months as to

Counts One through Five, and Twelve, followed by 55 years for Counts Six, Seven, and Eight, as

it appropriately accounts for each of the factors set forth in 18 U.S.C. § 3553(a).

1

**Argument**

Even though the Sentencing Guidelines are advisory, <u>United States v. Booker</u> provides

that sentencing courts "must consult those Guidelines and take them into account when

sentencing."  543 U.S. 220, 125 S. Ct. 738, 767 (2005).  "[A] district court shall first calculate

(after making the appropriate findings of fact) the range prescribed by the guidelines.  Then, the

court shall consider that range as well as other relevant factors set forth in the guidelines and

those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence."  <u>United States v.</u>

<u>Hughes</u>, 401 F.3d 540, 546 (4th Cir. 2005).

Section 3553 states that the court should consider the nature and circumstances of the

offense and characteristics of the defendant.  In addition, it states that the court must consider

other factors, including the need for the sentence "to reflect the seriousness of the offense, to

promote respect for the law, and to provide just punishment for the offense; [and] to afford

adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(A) & (B).  In addition, the

sentence should protect the public from further crimes of the defendant, and provide the

defendant with needed correctional treatment. 18 U.S.C. § 3553(a)(2) (C) & (D).

**A.     A Sentence of 57 Years Would Account for the
        Serious Nature and Circumstances of the Offense.**

In just two weeks, this defendant, along with his co-defendants, committed three armed

robberies in Northern Virginia:  the December 7, 2012 robbery of VVM, Inc. in Fairfax County;

the December 9, 2012 robbery of the Shoppers Food Warehouse in Alexandria; and the

December 22, 2012 robbery of the Navy Federal Credit Union in Arlington.[1]  During every

_____

[1]Defendant Dyer is also charged with killing a witness in Prince George's County,
Maryland, and indicted for participating in an additional armed robbery in Maryland, during

robbery, defendant Dyer served as one of the gunman who entered the establishments and held the employees and customers at gunpoint.  In the VVM, Inc. robbery, defendant Dyer put his gun to a customer's back and forced him to the ground.  Government Exhibits ("GEXs") 14-3, 14-3E, 14-3F.  In the Shoppers Food Warehouse robbery, Dyer is seen pointing his gun at an employee and ordering him to the ground.  GEXs 12-3, 12-3A.  In the Navy Federal Credit Union robbery, defendant Dyer wielded a .45 caliber handgun with a drum-style magazine, which is capable of holding additional bullets.  GEXs 1-2, 1-2B.  He pointed this weapon at a young teller, holding it just a couple feet from her face.  GEX 1-2A.  When this gun was recovered just hours after the robbery, it was fully loaded and there was also a bullet chambered, meaning it was ready to be fired.  Fortunately, no guns were fired during the course of these Virginia robberies.  However, this defendant and his co-defendants were willing and ready to do so.

Defendant Dyer had no appreciation for the terror he inflicted on the employees and customers in these businesses.  In fact, he reveled in his crimes.  During trial, the government introduced several pictures taken after the robberies, with defendant Dyer celebrating and, at times, even showcasing the money he and his co-defendants had taken.  *See* GEXs 19-11, 19-11A, 19-12, 19-12A 19-19, 19-19A, 19-20, 19-20A (photos of defendants Dyer, Cannon and Winston celebrating at the club); GEXs 19-22, 20-2 (photo of Dyer with a large bundle of currency between his feet; also posted on Instagram on December 9, 2012).

A sentence of 57 years appropriately accounts for the serious and dangerous nature of the defendant's crimes.

---

which the victim was shot.

Appeal: 13-4835    Doc: 47-3    Filed: 05/07/2014    Pg: 293 of 359

**B.      The History and Characteristics of the Defendant Necessitate a Sentence of 57 Years.**

This is not the defendant's first conviction for a crime of violence.  In 2009, defendant Dyer was convicted of armed robbery and use of a handgun in the commission of a felony in the Circuit Court of Montgomery County, Maryland.  In that case, the defendant, along with two others, committed an armed robbery of a business.  He was sentenced to eight years in prison with all but five years suspended.  Obviously, the defendant did not learn his lesson.  He was on probation from that conviction at the time he committed the instant robberies.  In addition, the defendant has other arrests for crimes of violence– also involving handguns.

The fact that the defendant is currently charged in two other jurisdictions for violent crimes is further indication of his dangerous nature.  First, in March 2013, the defendant was charged in Prince George's County Circuit Court for the December 19, 2012 murder of a witness and shooting of the witness' two-year-old son.  Dyer's current co-defendants, Keith Reed, Anthony Cannon, and Stanley Winston, are also his co-defendants in that case.  That incident occurred just days before the Navy Federal Credit Union robbery.  Second, defendant Dyer was indicted for conspiracy; interference with interstate commerce by robbery; using, carrying, and discharging a firearm during and in relation to a crime of violence; and two counts of interstate transportation of a stolen vehicle in U.S. District Court in Maryland.  These charges stem from the December 11, 2012 robbery of a Loomis armored car guard during which the guard was shot.  Co-defendants Reed and Cannon are also charged for this robbery.

Defendant Dyer has proven that he is a dangerous man with no intention of stopping his criminal activities.  Thus, a sentence of 57 years is necessary to account for both his criminal history and conduct.

**C.    A Sentence of 57 years is Necessary to Protect the Public From Future Crimes of the Defendant and Promote Respect for the Law.**

This defendant has demonstrated an utter disrespect for the law and the justice system. He has repeated arrests for crimes of violence and a prior felony conviction for armed robbery and use of a firearm during the commission of a felony.  In fact, the defendant had just been released from serving his sentence and began his supervised probation on October 25, 2012. Less than two months later, he began a crime spree.  In the instant case alone, the defendant committed three armed robberies in a mere two weeks –  while on probation for the exact same offense.  Clearly, he was not deterred by his prior sentence.   A sentence of 57 years serves to protect the public from this defendant, promote respect for the law, and deter him as well as others.

**Conclusion**

For the reasons stated, the United States asks this Court to impose a sentence of 24 months as to Counts One through Five, and Twelve followed by consecutive, mandatory minimum terms of 5 years as to Count Six, 25 years as to Count Seven, and 25 years as to Count Eight.

Respectfully submitted,

Dana J. Boente
Acting United States Attorney

By:    _____/s/_____
       Patricia T. Giles, Esq.
       Virginia Bar No.: 43257
       Rebeca H. Bellows
       Attorney for the United States of America
       United States Attorney's Office

Appeal: 13-4835    Doc: 47-3    Filed: 05/07/2014    Pg: 295 of 359

Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone:  703-299-3700
Fax: 703-299-3982
Email Address: Patricia.Giles@usdoj.gov
Email Address: Becky.Bellows@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 17th, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of that electronic filing (NEF) to the following:

Douglas J. Wood, Esq.
Terrell Roberts, Esq.
6801 Kenilworth Avenue, Suite 202
Riverdale, Maryland 20737
*Counsel for Defendant Keith Willie Reed*

Melinda VanLowe, Esq.
10476 Armstrong Street
Fairfax, Virginia 22030
*Counsel for Defendant Stanley Ray Winston*

Alfred "Rob" Robertson, Jr., Esq.
Robertson Law Office, PLLC
500 N. Washington St.
Alexandria, VA 22314
*Counsel for Defendant Anthony Cannon*

Gregory Todd Hunter, Esquire
Law Office of Gregory Hunter
2055 North 15th Street, Suite 302
Arlington, Virginia 22201
*Counsel for Defendant Tobias Richard Dyer*

An electronic copy was also sent to:  Quentin Lowe, U.S. Probation Office.

By:    _____/s/_____
       Patricia T. Giles, Esq.
       Virginia Bar No.: 43257
       Attorney for the United States of America
       United States Attorney's Office
       Justin W. Williams U.S. Attorney's Building
       2100 Jamieson Avenue
       Alexandria, Virginia 22314
       Phone:  703-299-3700
       Fax: 703-299-3982
       Email Address: Patricia.Giles@usdoj.gov

8

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL No. 1:13CR48-004 |
| v. | ) | |
| | ) | Sentencing Date: October 25, 2013 |
| Tobias Richard Dyer | ) | |
| Defendant | ) | The Honorable Claude M. Hilton |
| _____ | ) | |

<u>DEFENDANT'S POSTION ON SENTENCING</u>

In accordance with this Court's policy regarding guideline sentencing and §6A1.2 of the United States Sentencing Guidelines and Policy Statements, Counsel for the Defendant hereby represents that he and his client have reviewed the Probation Officer's report and that we have no objection to the calculation of sentencing factors. In his computation of the Offense Level for Counts One through Five and Twelve, the Probation Officer correctly assessed a 27 point Adjusted Offense Level total and a Criminal History Category of III, resulting in a Guideline Range of 87-108 months.

The Probation Officer also notes that the Defendant is subject to consecutive, mandatory minimum sentences totaling 684 months (a total of 57 years) for violations of 18 U.S.C. §924(c) in Counts Six, Seven and Eight. Though the Probation Officer correctly notes that these sentences are consecutive to any other sentence and are mandatory, the total calculation is incorrect. The United States Supreme Court recently held that the jury would have to make a specific finding that Mr. Dyer brandished the firearm in Count Six to make the seven year sentence mandatory, leaving the mandatory minimum sentence at only five years for Count Six. *See, e.g., Allenye v.United States, 133 S. Ct. 2151 (2013).* The consecutive, mandatory minimum prison sentence for Counts Six, Seven and Eight, pursuant to 18 U.S.C. §924(c), is 660 months (a total of 55 years).

Were it not for these mandatory minimum sentences, the Guideline Commission would suggest that the Court add an additional 5 points for the possession or brandishing of a gun under U.S.S.C. §2B3.1(b)(2)(C), which would result in an Adjusted Offense

Level of 32 and a Guideline Range of 151 to 188 months. The Government, however, would have this Court impose both the mandatory minimums for Counts Six, Seven and Eight and add on an additional 24 month sanction for Counts One through Five and Twelve, for a total sentence of 684 months. The Defense respectfully argues that a sentence of 55 years, let alone the 57 years requested by the Government, is excessive.

*The Impact of Multiple 924(c) Counts*

The Honorable Paul Cassell, formerly an Assistant United States Attorney in this District, has noted on several occasions as both a Federal District Court judge and as a law professor that this so-called 'stacking' of multiple §924(c) counts results in "lengthy sentences that do not distinguish between first-time offenders…and recidivist offenders." Indeed, as Judge Cassell noted in his testimony before the House Judiciary Subcommittee on Crime, Terrorism and Homeland Security in 2007, and again in a 2010 Cardozo Law Review article, the Judicial Conference has "steadfastly" opposed mandatory minimum sentences of more than 50 years because these sentences are "simply irrational," diminishing judicial discretion, increasing the number and cost of trials and appeals, and prolonging the sentencing process. Judge Cassell notes that a 660 month sentence exceeds the sentences of aircraft hijackers (293 months), terrorists who detonate a bomb in a public place (235 months), second-degree murderers (168 months) and kidnappers (151 months).  *See,* Erik Luna and Paul G. Cassell, *Mandatory Minimalism,* 32 Cardozo L. Rev. 1 (2010).

And Judge Cassell is not alone. Attorney General Eric Holder recently told the American Bar Association's House of Delegates that "too many Americans go to too many prisons for far too long," and that excessive incarceration has become an "ineffective and unsustainable" part of our system. *See,* www.cnn.com/2013/08/12/politics/holder-mandatory-minimums. The Senate has also started to act, with Senators Patrick Leahy (D-Vermont) and Rand Paul (R-Kentucky) co-sponsoring the Justice Safety Valve Act of 2013, which would allow judges more leeway when deciding whether to hand down a mandatory minimum sentence. Clearly there is strong and growing support for the notion that a mandatory sentence in excess of half a century is less than sensible.

*Summary*

Though the Defendant maintains his innocence in this case, and indeed in the charged (but not proven) conduct referenced by the government in their sentencing position, the Defense agrees that the Probation Officer's guideline calculation for Counts One through Five and Twelve, combined with the 5 point sanction suggested by U.S.S.C. §2B3.1(b)(2)(C) for a total of 151 to 188 months, is a proper measure of both the severity of the conduct alleged in the indictment and the Defendant's culpability in this crime relative to other offenders given his criminal record. A sentence of 151 to 188 months, combined with the five years of suspended time from his prior conviction in Maryland and followed by a significant term of Supervised Release, would properly reflect the seriousness of the offense, promote respect for the law, and provide a just punishment while affording adequate deterrence, protecting the public and providing all of the educational and vocational training, medical care and correctional treatment available in the federal prison system. *See, e.g. 18 U.S.C. §3553(a).* We respectfully suggest that the additional, mandatory minimum sentences do nothing to accomplish these goals, and that imposing them violates this Court's duty to set aside this statute as a violation of Mr. Dyer's 8th Amendment right to be free from cruel and unusual punishment. Alternatively, if the Court does feel obligated to impose the 660 months pursuant to Counts Six, Seven and Eight and 18 U.S.C. §924(c), we respectfully ask that the Court find this sanction to be far in excess of what is needed to accomplish the goals of §3553(a) and not impose the additional 24 months requested by the Government.

Furthermore, the Defendant respectfully requests that the Court recommend designation to a facility as near as possible to his family in the Washington, D.C. area.

Respectfully Submitted,

_____/S/_____
Gregory T. Hunter
Virginia State Bar Number 45489
Attorney for the Defendant
2055 North 15th Street, Suite 302
Arlington, Virginia 22201
(703) 527-0808 telephone
(703) 527-0810 facsimile
greghunter@mail.com

Case 1:13-cr-00048-CMH   Document 105   Filed 10/23/13   Page 4 of 4 PageID# 898

<u>CERTIFICATE OF SERVICE</u>

   I HEREBY CERTIFY that on the 10th day of October, 2013, an exact copy of the foregoing Position of the Defense with Respect to Sentencing Factors was filed with the Clerk of the Court using the CM/ECF system, causing a Notice of Electronic Filing to be served upon:

   Rebecca Bellows
   Assistant United States Attorney
   2100 Jamieson Avenue
   Alexandria, Virginia 22314
   (703) 299-3700 telephone
   (703) 299-3980 facsimile
   Rebecca.Bellows@usdoj.gov

   Patricia Giles
   Assistant United States Attorney
   2100 Jamieson Avenue
   Alexandria, Virginia 22314
   (703) 299-3700 telephone
   (703) 299-3980 facsimile
   Patricia.Giles@usdoj.gov

Copies of this document have been forwarded to the following non-filing users:
By electronic mail:
   Quentin T. Lowe
   United States Probation Officer
   United States Probation Office for the Eastern District of Virginia
   401 Courthouse Square
   Third Floor
   Alexandria, Virginia 22314
   (703) 299-2300 telephone
   Quentin_Lowe@vaep.uscourts.gov

By personal service:
   Tobias Richard Dyer
   Defendant

       _____/S/_____
       Gregory T. Hunter
       Virginia State Bar Number 45489
       Attorney for the Defendant
       2055 North 15th Street, Suite 302
       Arlington, Virginia 22201
       (703) 527-0808 telephone
       (703) 527-0810 facsimile
       greghunter@mail.com

1                    UNITED STATES DISTRICT COURT
2                    EASTERN DISTRICT OF VIRGINIA
                         ALEXANDRIA DIVISION
3   _____

4                                )
    UNITED STATES OF AMERICA      )
5                                 )  Case No. 1:13-cr-48
              v.                  )  Alexandria, Virginia
6                                 )
    KEITH WILLIE REED,            )  October 25, 2013
7                                 )  9:29 a.m.
              Defendant.          )
8                                 )
9   _____

10                      TRANSCRIPT OF SENTENCING

11            BEFORE THE HONORABLE CLAUDE M. HILTON

12                   UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20  APPEARANCES:

21  For the United States:   Patricia T. Giles, Esq.

22  For the Defendants:      Douglas J. Wood, Esq.
                             Defendant Keith W. Reed, in person
23
     Court Reporter:         Tracy L. Westfall, RPR, CMRS, CCR
24
    Proceedings reported by machine shorthand, transcript produced
25  by computer-aided transcription.

```
 1                    P R O C E E D I N G S
 2          THE CLERK:  Criminal No. 2013-48, United States of
 3  America v. Keith Willie Reed.
 4          MS. GILES:  Good morning, Your Honor.  Patricia Giles
 5  for the United States.
 6          MR. WOOD:  Good morning, Your Honor.  Douglas Wood
 7  representing Keith Reed.
 8          THE COURT:  Good morning.  Counsel, have you and your
 9  client had an opportunity to review this presentence report?
10          MR. WOOD:  We have, Your Honor.
11          THE COURT:  Any corrections you wish to make to it?
12          MR. WOOD:  No, Your Honor.
13          THE COURT:  Is there anything you want to say at this
14  time?
15          MR. WOOD:  Your Honor, what I would point out to the
16  Court is that my client's role in this offense is somewhat
17  unlike the other codefendants, that his apparent role was the
18  getaway driver.
19          Now, under accomplice liability, that doesn't minimize
20  his culpability for the offenses, but I think it's a fact this
21  Court can take into consideration that in every offense that he
22  was convicted of, he was -- I would say had the lesser role.
23          But given the time that he's facing, I would simply ask
24  the Court to impose the minimum amount of time that's
25  appropriate in this case.
```

1          Mr. Reed does come from a very supportive family.

2     They've stood by him throughout all this, and he understands

3     that he's going to be facing a lengthy jail sentence.

4          Thank you, Your Honor.

5          THE COURT:  Okay.

6          MS. GILES:  Thank you, Your Honor.

7          The defendant was the getaway driver in these

8     robberies, Your Honor, but at the same time, at the age of 24,

9     he's already a career offender.  This isn't his first time

10     committing crimes of violence.  He has two prior felony

11     convictions, both crimes of violence, both robbery and attempted

12     robbery.

13          In addition to those convictions, he has numerous

14     arrests.  In fact, now he stands indicted in Prince George's

15     County for killing a witness and shooting that witness' son.  In

16     addition, he's been charged with an additional robbery in

17     District Court in Maryland.

18          This is someone who -- the mandatory minimum is met to

19     address defendants such as Mr. Reed.  In addition to that

20     mandatory minimum time, we are also asking for two additional

21     years that would address the substantive robberies in this case.

22     We believe it speaks to both this defendant's conduct in the

23     instant offenses as well as his general characteristics and his

24     past criminal conduct.

25          THE COURT:  All right.  Mr. Reed, would you come to the

4

1  podium.

2      Is there anything you want to say at this time before I

3  impose sentence?

4      THE DEFENDANT:  No, Your Honor.

5      THE COURT:  All right.  Well, I find the guideline

6  factors in this case to be properly assessed at a range of 922

7  to 987 months.

8      Because of your financial condition, the imposition of

9  any fine or cost is not warranted.

10      Considering your age and the nature of this offense and

11  the other factors under Section 3553, I find that a sentence

12  below the guideline range to be appropriate.

13      It will be the sentence of the Court, Mr. Reed, that as

14  to Counts 1, 2, 3, 4, 5, and 9, that you be committed to the

15  custody of the Attorney General to serve a term of 60 months, a

16  3-year period of supervised release, and pay a special

17  assessment fine of a hundred dollars.

18      As to Count 6, committed to the custody of the Attorney

19  General to serve a term of 60 months, a 5-year period of

20  supervised release, pay a special assessment fine of a hundred

21  dollars.

22      As to Counts 7 and 8, that you be committed to the

23  custody of the Attorney General to serve a term of 300 months, a

24  5-year period of supervised release, pay a special assessment

25  fine as to each of those counts.

5

```
1              Now, the sentences in Counts 1, 2, 3, 4, 5, and 9 will
2     run concurrently with another but consecutively to the other
3     sentences imposed here.  All right.
4              MR. WOOD:  Thank you, Your Honor.
5              MS. GILES:  Your Honor, we also have the preliminary
6     order of forfeiture and the restitution judgment to hand up.
7              THE COURT:  All right.  I'll enter that.
8              MS. GILES:  Your Honor, I just want to be clear.  For
9     Count 7 and 8, are those consecutive to each other too?
10             THE COURT:  I didn't make them concurrent.
11             MS. GILES:  Okay.
12             MR. WOOD:  Thank you.
13             THE COURT:  I just made the counts that I stated
14    concurrent.
15             MS. GILES:  Thank you, Your Honor.
16             * * *
17             (Proceedings concluded at 9:43 a.m.)
18
19
20
21
22
23
24
25
```

1                         <u>CERTIFICATION</u>

2

3           I certify, this 23rd day of January 2014, that the

4    foregoing is a correct transcript from the record of proceedings

5    in the above-entitled matter to the best of my ability.

6

7                              /s/
                    _____
8                    Tracy Westfall, RPR, CMRS, CCR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              UNITED STATES DISTRICT COURT
2              EASTERN DISTRICT OF VIRGINIA
                    ALEXANDRIA DIVISION
3    ─────────────────────────────────────────────────
4                                  )
     UNITED STATES OF AMERICA      )
5                                  )  Case No. 1:13-cr-48
             v.                    )  Alexandria, Virginia
6                                  )
     STANLEY RAY WINSTON,          )  October 25, 2013
7                                  )  9:34 a.m.
             Defendant.            )
8                                  )
     ─────────────────────────────────────────────────
9

10

                  TRANSCRIPT OF SENTENCING
11
            BEFORE THE HONORABLE CLAUDE M. HILTON
12
               UNITED STATES DISTRICT JUDGE
13

14

15

16

17

18

19

20   APPEARANCES:

21   For the United States:   Patricia T. Giles, Esq.

22   For the Defendants:      Melinda L. VanLowe, Esq.
                              Defendant Stanley Ray Winston,
23                            in person

24    Court Reporter:        Tracy L. Westfall, RPR, CMRS, CCR

25   Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription.
```

1                      P R O C E E D I N G S

2              THE CLERK:  Criminal No. 2013-48, *United States of*

3    *America v. Stanley Ray Winston.*

4              THE COURT:  All right.  Give me just a minute here.

5              MS. GILES:  Patricia Giles for the United States.

6              MS. VANLOWE:  Good morning, Your Honor.  Melinda

7    VanLowe here with Stanley Winston.

8              THE COURT:  Good morning.  Give me just a minute and

9    I'll finish signing this order.  (Pause.)

10             I believe that there's an outstanding Rule 29 motion

11   here, a motion for judgment of acquittal?

12             MS. VANLOWE:  That's correct, Your Honor.

13             THE COURT:  I've looked at that motion, and it will be

14   denied.  I find that there's ample evidence to go forward to the

15   jury and ample evidence for the conviction in this case.

16             Now, have you and your client had an opportunity to

17   review the presentence report?

18             MS. VANLOWE:  We have.

19             THE COURT:  Any corrections you wish to make to it?

20             MS. VANLOWE:  No.

21             THE COURT:  Anything you want to say at this time?

22             MS. VANLOWE:  Yes, Your Honor.

23             I understand that there's a substantial mandatory

24   minimum sentence.  As you saw in my sentencing memorandum, I

25   argued against the imposition of that sentence.

Tracy L. Westfall  OCR-USDC/EDVA

Appeal: 13-4835    Doc: 47-3    Filed: 05/07/2014    Pg: 309 of 359

1          Certainly in light of the sentence that you just gave

2    to the prior defendant, I understand likely what your ruling

3    will be.  I will, however, make the argument that in this

4    particular case, unlike the prior defendant, Mr. Winston does

5    not have the extensive background history of prior robberies

6    that the prior defendant had.  In fact, he has a prior gun

7    charge, and his guidelines actually reflect the dramatic

8    difference between his criminal history.

9          In this particular case, his sentence is being guided

10   by the gun charges.  I appreciate that Your Honor denied the

11   motion for judgment of acquittal, but the gun charges,

12   especially considering that the government never really proved

13   the possession of those guns with a case that had four

14   defendants in it, is significant because he is essentially now

15   being punished for evidence that was not sufficiently proven at

16   trial.

17         That being said, I assume that Ms. Giles is also going

18   to raise the issues in Maryland with respect to Mr. Winston as

19   well.  I would argue that because they have not been even sent

20   to trial yet, there's been no determination of the quality of

21   the evidence in that case and that they are merely charges, they

22   certainly shouldn't be part of this Court's consideration in

23   terms of a sentencing.

24         You know that this was a very contested trial.  It was

25   a long trial.  We put on a substantial amount of evidence.

1  Mr. Winston does maintain his innocence of these charges.

2          We, again, would ask that you consider the disparity

3  between the guidelines range that he should receive versus the

4  amount of time that he would receive simply because of the

5  mandatory minimum sentences on the gun charges.  Thank you.

6          THE COURT:  Thank you.

7          MS. GILES:  Thank you, Your Honor.

8          Mr. Winston doesn't have the same number or type of

9  criminal convictions as his codefendant, Mr. Reed, but at the

10 same time, he is equally dangerous, Your Honor.

11         The illegal possession of a firearm charge that he was

12 convicted of, the backdrop of that is the car that he was

13 arrested in, there was a lookout on that car because it was

14 associated with carjackings.  When that car is pulled over,

15 Mr. Winston is arrested --

16         MS. VANLOWE:  Your Honor, I would really object.

17         There's no indication that the facts being proffered

18 are accurate or correct.  They've never been presented to this

19 Court.  The Court can consider the conviction.  I have never

20 heard of the background that Ms. Giles is talking about, and I

21 contest it.

22         MS. GILES:  That background is contained in the

23 presentence report.

24         THE COURT:  Objection overruled.

25         MS. GILES:  Thank you, Your Honor.

```
 1              And he has a loaded firearm with a bullet chambered
 2     on -- in his possession.  He may not have a number of
 3     convictions, but he still has several arrests and they also
 4     involve crimes of violence: a robbery, he has three other
 5     arrests involving illegal possession of handguns, as well as
 6     possession with the intent to distribute a controlled substance.
 7     These are his arrests.  This is part of what is before the
 8     Court.
 9              In addition, just like Mr. Reed, he is indicted for
10     that case involving killing a witness.  It's part of the
11     presentence report.  It's just a part of the fabric of this
12     defendant, and it's properly before the Court for consideration.
13              And we ask for the same defendant -- sentence for
14     Mr. Winston as Mr. Reed.
15              THE COURT:  All right.  Mr. Winston, would you come to
16     the podium.
17              Is there anything you want to say before I impose
18     sentence?
19              THE DEFENDANT:  Nah.
20              THE COURT:  Well, I find the guideline factors in this
21     case to be properly assessed at a range of 78 to 97 months, plus
22     an additional 55 years of mandatory minimum sentences.
23              I also find that because of your financial condition,
24     the imposition of any fine or cost would not be warranted.
25              And considering your age and the nature of this
```

Appeal: 13-4835    Doc: 47-3    Filed: 05/07/2014    Pg: 312 of 359

1   offense, it will be the sentence of the Court that as to Counts

2   1, 2, 3, 4, 5, and 10, that you be committed to the custody of

3   the Attorney General to serve a term of 60 months, a 3-year

4   period of supervised release, pay a special assessment fine of a

5   hundred dollars.

6           As to Count 6, committed to the custody of the Attorney

7   General to serve a term of 60 months, a 5-year period of

8   supervised release, pay a special assessment fine of a hundred

9   dollars.

10          As to Counts 7 and 8, each of those counts, committed

11  to the custody of the Attorney General to serve a term of

12  300 months, a 5-year period of supervised release, pay a special

13  assessment fine of a hundred dollars.

14          The sentences in Counts 1, 2, 3, 4, 5, and 10 will run

15  concurrently with another but consecutively to any of the other

16  sentences imposed here.

17          Is there also a motion for forfeiture --

18          MS. GILES:  Yes.

19          THE COURT:  -- and so forth in this case?

20          MS. GILES:  Forfeiture and restitution.  Thank you,

21  Your Honor.

22      (Pause.)

23          THE COURT:  All right.  Those have been entered.

24          MS. VANLOWE:  Thank you, Your Honor.

25          THE COURT:  I'm going to make the supervised release

Appeal: 13-4835    Doc: 47-3    Filed: 05/07/2014    Pg: 313 of 359

1    concurrent in all of these cases.  That's true with Reed as

2    well.  I didn't say that, but they'll all be concurrent.

3         * * *

4         (Proceedings concluded at 9:43 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Appeal: 13-4835   Doc: 47-3    Filed: 05/07/2014    Pg: 314 of 359

<div align="center">

CERTIFICATION

</div>

1
2
3        I certify, this 23rd day of January 2014, that the
4   foregoing is a correct transcript from the record of proceedings
5   in the above-entitled matter to the best of my ability.
6
7                         /s/
8            _____
             Tracy Westfall, RPR, CMRS, CCR

Tracy L. Westfall   OCR-USDC/EDVA

```
 1                    UNITED STATES DISTRICT COURT
 2                    EASTERN DISTRICT OF VIRGINIA
                           ALEXANDRIA DIVISION
 3   _____

 4                                  )
     UNITED STATES OF AMERICA        )
 5                                   ) Case No. 1:13-cr-48
                 v.                  ) Alexandria, Virginia
 6                                   )
     ANTHONY CANNON,                 ) October 25, 2013
 7                                   ) 9:43 a.m.
                 Defendant.          )
 8                                   )
     _____
 9

10                      TRANSCRIPT OF SENTENCING

11            BEFORE THE HONORABLE CLAUDE M. HILTON

12               UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20   APPEARANCES:

21   For the United States:   Patricia T. Giles, Esq.

22   For the Defendants:      Alfred L. Robertson, Jr., Esq.
                              Defendant Anthony Cannon, in person
23
      Court Reporter:       Tracy L. Westfall, RPR, CMRS, CCR
24
     Proceedings reported by machine shorthand, transcript produced
25   by computer-aided transcription.
```

```
1                    P R O C E E D I N G S
2         THE CLERK:  Criminal No. 2013-48, United States of
3    America v. Anthony Cannon.
4         MR. ROBERTSON:  Good morning, Your Honor.  Alfred
5    Robertson for Anthony Cannon.
6         MS. GILES:  Patricia Giles for the United States.
7         THE COURT:  Have you and your client had an opportunity
8    to review this presentence report?
9         MR. ROBERTSON:  We have, Your Honor.
10        THE COURT:  Any corrections you wish to make to it?
11        MR. ROBERTSON:  No, Your Honor.
12        THE COURT:  Anything you want to say at this time?
13        MR. ROBERTSON:  Yes, Your Honor.
14             As I outlined in my memo, I would like to adopt the
15    arguments of Defendant Winston and Defendant Dyer into my
16    presentence position as well -- into my sentencing memo as well.
17             I would ask the Court to grant that motion just to make
18    sure I'm clear on the record.
19        THE COURT:  That will be granted.
20        MR. ROBERTSON:  Thank you.  Your Honor, essentially,
21    what I've argued in my presentence -- in my sentencing
22    memorandum went more to Defendant Dyer and to what Mr. Winston
23    argued.
24             The Court has already, in the other cases, has already
25    seemed to have accepted the proposition that a 5-year minimum
```

Appeal: 13-4835    Doc: 47-3    Filed: 05/07/2014    Pg: 317 of 359

1   should apply for Count 6 instead of a 7-year minimum because the

2   jury needs to make a specific finding that my client brandished

3   a firearm.  That seems to be already taken care of.

4          However, for the remaining counts, 7 and 8, the 55

5   would end up being 50 years, 25 on each count.  I think having

6   him serve 55 years is already beyond what is necessary to

7   sentence this defendant for this crime.  It's already beyond the

8   mandate of 3553(a), and it's also violating the Eighth

9   Amendment.

10          I want to make that argument just to make sure it's

11   clear on the record that it is the defendant's belief that a

12   55-year sentence is cruel and unusual punishment for this

13   particular case.  I understand case law is against me.  I

14   understand that.  I'm arguing that the law should be changed.

15   I'm arguing that the 924(c) as applied in this case is

16   unconstitutional.

17          Thank you, Your Honor.

18          THE COURT:  All right.  I should have ruled on your

19   Rule 29 motion.  That motion is still outstanding, motion for

20   judgment of acquittal, and that motion will be denied.  I find

21   that there was ample evidence to go forward to the jury and

22   ample evidence for the convictions in this case.

23          MR. ROBERTSON:  I understand, Your Honor.

24          THE COURT:  Ms. Giles, anything you want to say?

25          MS. GILES:  Just briefly, Your Honor.

4

1            That this defendant, like his codefendants, also has a

2    prior criminal history that includes crimes of violence.  We

3    have a 2006 conviction for conspiracy to commit carjacking, as

4    well as a 2009 conviction for unauthorized use of a vehicle.

5            Although that was what the conviction was for, the

6    offense conduct included was a carjacking where the victim was

7    carjacked at gunpoint and then later identified the defendant as

8    the person who carjacked her.

9            Each time he committed offenses, Your Honor, he was on

10   supervised release or supervised probation, even at the time he

11   committed the robberies in this case.  This is someone who has

12   shown a proclivity for violence and has no intention of

13   stopping, because all of the firearms that were used in this

14   case were recovered in his home, and at that time there was

15   additional ammunition there.  He had no intention of slowing

16   down.

17           A hefty sentence in this case is necessary to, not only

18   deter him and punish his conduct, but also to protect the

19   community.

20           THE COURT:  All right.  Mr. Cannon, would you come to

21   the podium.

22           Is there anything you want to say before I impose

23   sentence?

24           THE DEFENDANT:  Nah.

25           THE COURT:  Well, I find the guideline factors in this

Tracy L. Westfall  OCR-USDC/EDVA

**-1084-**

1    case to be properly assessed at a range of 100 to 125 months,

2    plus the 660-month mandatory sentence that must be imposed.

3         I also find that because of your financial condition,

4    the imposition of any fine or cost is not warranted.

5         Considering the factors which I must under Section

6    3553, it's going to be the sentence of the Court that as to

7    Counts 1, 2, 3, 4, 5, and 11, that you be committed to the

8    custody of the Attorney General to serve a term of 60 months, a

9    3-year period of supervised release, pay a special assessment

10   fine of a hundred dollars.

11        As to Count 6, you be committed to the custody of the

12   Attorney General to serve a term of 60 months, 5-year period of

13   supervised release, pay a special assessment fine of a hundred

14   dollars.

15        As to each of Count 7 and 8, that you be committed to

16   the custody of the Attorney General to serve a term of

17   300 months, a 5-year period of supervised release, pay a special

18   assessment fine of a hundred dollars as to each count.

19        The sentences in Counts 1, 2, 3, 4, 5, and 11 will run

20   concurrently with one another but consecutive to any of the

21   other sentences imposed.

22        Is there also --

23        MS. GILES:  Yes, Your Honor.

24        THE COURT:  -- orders I need to sign in this case?

25        MS. GILES:  Restitution and a preliminary order of

Appeal: 13-4835    Doc: 47-3    Filed: 05/07/2014    Pg: 320 of 359

```
 1   forfeiture.

 2        (Pause.)

 3            THE COURT:  All right.  They've been entered.

 4            * * *

 5            (Proceedings concluded at 9:50 a.m.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Appeal: 13-4835    Doc: 47-3    Filed: 05/07/2014    Pg: 321 of 359

CERTIFICATION

I certify, this 23rd day of January 2014, that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter to the best of my ability.

/s/
_____
Tracy Westfall, RPR, CMRS, CCR

Case 1:13-cr-00048-CMH   Document 119   Filed 10/25/13   Page 1 of 1 PageID# 934

| Judge: Hilton | **SENTENCING** | Date: 10/25/2013 |
|---|---|---|
| Reporter: Westfall | | Time: 9:45 to 9:55 |
| Interpreter: | | Language: |

**Cr. #**  1:13CR00048-004                    AUSA:  Patricia Giles
**U.S. v.**  Tobias Richard Dyer            Defense:  Gregory Hunter

Court finds the guidelines to be properly assessed at a range of 87 to 108 months, plus 660 months of mandatory time

**Sentence Imposed:**
60 months on each of Counts 1, 2, 3, 4, 5 and 12 to run concurrently w/each other and consecutive to all other counts; 60 months on Count 6 (consecutive); 300 months on Count 7 (consecutive); and 300 months on Count 8 (consecutive) - 720 months total

3 year supervised release term imposed on each of Counts 1, 2, 3, 4, 5, and 12 and a 5 year term imposed on each of Counts 6, 7, and 8 to run concurrently with each other.

**Conditions of Supervised Release/Probation:**
_____ Substance abuse testing/treatment at direction of PO
_____ Cooperate w/any orders/directives of the Bureau of Immigration and Customs Enforcement
_____ Pay the restitution in monthly installments of $          to commence within 60 days after release from confinement.
_____ No new credit
_____ Allow PO access to financial info.
_____ Serve a term of          months home confinement:  (        ) with electronic monitoring
_____ Mental health testing/treatment        (      ) with work release
_____ Mandatory drug testing is waived
Other: _____

**Monetary penalties:**
$100.00        Assessment on each of Counts 1-8 and 12 = $900.00 $_____0_____ Fine
$76,915.15     Restitution Ordered pursuant to the Restitution Judgment entered and filed in open court.
Preliminary Order of Forfeiture entered and filed in open court.

**Recommendations to BOP:**
__ Court rec. that the dft be incarcerated in a facility where he/she can receive drug treatment.
__ Court rec. that the dft be allowed to participate in the 500 hour drug treatment program
__ Court rec. that the dft be incarcerated: _____

Defendant:  ✓ Remanded _____ To voluntarily surrender once space is available.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION
_____

)
UNITED STATES OF AMERICA        )
                                )  Case No. 1:13-cr-48
            v.                  )  Alexandria, Virginia
                                )
TOBIAS RICHARD DYER,            )  October 25, 2013
                                )  9:50 a.m.
            Defendant.          )
                                )
_____


TRANSCRIPT OF SENTENCING

BEFORE THE HONORABLE CLAUDE M. HILTON

UNITED STATES DISTRICT JUDGE










APPEARANCES:

For the United States:   Patricia T. Giles, Esq.

For the Defendants:      Gregory T. Hunter, Esq.
                         Defendant Tobias Richard Dyer,
                         in person

 Court Reporter:         Tracy L. Westfall, RPR, CMRS, CCR

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

2

```
 1                   P R O C E E D I N G S

 2          THE CLERK:  Criminal No. 2013-48, United States of

 3   America v. Tobias Richard Dyer.

 4          MS. GILES:  Patricia Giles for the United States.

 5          MR. HUNTER:  Good morning, Your Honor.  Greg Hunter on

 6   behalf of Mr. Dyer, who I believe is coming out shortly.

 7          THE COURT:  Good morning.

 8          Mr. Hunter, have you and your client had an opportunity

 9   to review this presentence report?

10          MR. HUNTER:  We have, Your Honor.

11          THE COURT:  Any corrections you wish to make to it?

12          MR. HUNTER:  No corrections that have not already been

13   made by the probation officer.

14          THE COURT:  Anything you want to say at this time?

15          MR. HUNTER:  There is, Your Honor.

16          And I don't mean to belabor the points already made by

17   my cocounsel.  But the defendant here today faces time for the

18   substantive counts involved with the robbery and the three

19   924(c) gun charges.

20          The guideline time, while already a high number,

21   doesn't compare to the 660 months he's facing on the gun

22   charges.  The government has asked for an additional 24 months

23   above and beyond the 55 years required in this case.

24          I would simply ask the Court to consider the fact that

25   at the present time the defendant's 21 years old.  55 years
```

1    minus the current 12-and-a-half percent off that he would get in

2    the federal system would get him past this sentence when he's

3    approximately 70 years old.

4            The government's made a fair amount of noise this

5    morning about the outstanding indictments in Maryland and the

6    prior records of the other defendants.  It's something my client

7    shares with them.

8            The amount of time he's facing in those other

9    indictments and the amount of time, the backup time from the

10   previous convictions, would have him in prison well after his

11   70th birthday.

12           Simply argued, that 55 years, though I still maintain

13   it's -- that Judge Cassell, as I put in the paper, it's twice

14   what he would get if he were a terrorist blowing up a bomb in a

15   public square, twice that sentence.

16           It's far and away excessive for what the aims of

17   3553(a) require, and I would ask that the Court limit the

18   sentence in this case to the 55 years of mandatory time.

19           THE COURT:  Ms. Giles.

20           MS. GILES:  Thank you, Your Honor.

21           Again, Your Honor, Mr. Dyer's the type of defendant

22   that the mandatory minimums were meant to address.  He is a

23   recidivist.  He's just been convicted and released from serving

24   an armed robbery conviction.  He wasn't out for two months

25   before he engaged in this crime spree: three robberies here just

1   in Northern Virginia, indicted for another armed robbery in

2   Maryland, and also indicted for killing a witness and shooting a

3   child.

4           This defendant is deserving of a substantial sentence.

5   It is not just about punishing him.  It's about protecting the

6   community.  We ask for that substantial sentence.

7           THE COURT:  All right.  Mr. Dyer, would you come to the

8   podium.

9           Is there anything you want to say before I impose

10   sentence?

11          THE DEFENDANT:  Yeah.  I just want to say, Your Honor,

12   I maintained my innocence from day one.  I understand nothing

13   I'm going to say here today is going to change your perception.

14   I just want to thank my family and friends for coming out to

15   support me.  That's it.

16          THE COURT:  All right.  Well, I find the guideline

17   factors in this case to be properly assessed at a range of 87 to

18   108 months, plus the 660 months of mandatory time.

19          I also find that because of your financial condition,

20   the imposition of any fine or cost is not warranted.

21          It will be the sentence of the Court, Mr. Dyer, that on

22   Counts 1, 2, 3, 4, 5, and 12, that you be committed to the

23   custody of the Attorney General to serve a term of 60 months, a

24   3-year period of supervised release, pay a special assessment

25   fine of a hundred dollars.

Tracy L. Westfall  OCR-USDC/EDVA

1          As to Count 6, that you be committed to the custody of

2     the Attorney General to serve a term of 60 months, a 5-year

3     period of supervised release, pay a special assessment fine of a

4     hundred dollars.

5          As to each Count 7 and 8, that you be committed to the

6     custody of the Attorney General to serve a term of 300 months,

7     5-year period of supervised release, and pay a special

8     assessment fine of a hundred dollars as to each of those counts.

9          Now, the sentences in Counts 1, 2, 3, 4, 5, and 12 will

10    run concurrently with one another but consecutive to any other

11    sentences that I've imposed.  And the supervised release terms

12    that have been imposed will run concurrently with one another.

13         Is there also forfeiture orders in this?

14         MS. GILES:  Yes, Your Honor.  Thank you.

15    (Pause.)

16         THE COURT:  All right.  They've been entered.

17         MR. HUNTER:  Thank you, Judge.

18         MS. GILES:  Thank you, Your Honor.

19         * * *

20         (Proceedings concluded at 9:56 a.m.)

21

22

23

24

25

1                    CERTIFICATION

2

3        I certify, this 23rd day of January 2014, that the

4   foregoing is a correct transcript from the record of proceedings

5   in the above-entitled matter to the best of my ability.

6

7                    /s/
                     _____
8                    Tracy Westfall, RPR, CMRS, CCR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Tracy L. Westfall  OCR-USDC/EDVA

Appeal: 13-4835    Doc: 47-3    Filed: 05/07/2014    Pg: 329 of 359

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**UNITED STATES OF AMERICA**          :
                                      :
          **v.**                      :          **Criminal No. 1:12CR48 (CMH)**
                                      :
**KEITH REED**                        :

<u>**NOTICE OF APPEAL**</u>

The defendant does hereby note an appeal of his judgment and conviction entered

on October 25, 2013, in the above captioned case. The defendant is indigent and would

request that an attorney be provided for him in this case. This notice is filed by his trial

counsel but trial counsel will not represent him on appeal.

Respectfully submitted,

___/s/_____
Terrell N. Roberts
Roberts & Wood
6801 Kenilworth Avenue, Suite 202
Riverdale, MD 20737
(301) 699-0764

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was has been mailed and
e-mailed, this 30th day of October, 2013 to: Ms. Patricia Giles, Assistant United States
Attorney, Office of the United States Attorney, 2100 Jamieson Avenue, Alexandria, VA
22314.

___/s/_____
Terrell N. Roberts

AO 245B (Rev. 09/11)(VAED rev. 2) Sheet 1 - Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## Eastern District of Virginia
### Alexandria Division

UNITED STATES OF AMERICA

v.                                                    Case Number:   1:13CR00048-001

KEITH WILLIE REED                                     USM Number:   45927-007
                                                      Defendant's Attorney:   Terrell Roberts, Esquire
Defendant.                                                                    Douglas Wood, Esquire

## JUDGMENT IN A CRIMINAL CASE

The defendant was found guilty on Counts 1, 2, 3, 4, 5, 6, 7, 8, and 9 of the Second Superseding Indictment after a plea of not guilty.

Accordingly, the defendant is adjudicated guilty of the following counts involving the indicated offenses.

| Title and Section | Nature of Offense | Offense Class | Offense Ended | Count |
|---|---|---|---|---|
| 18 U.S.C. § 1951(a) | Conspiracy to Affect Commerce by Robbery | Felony | 12/22/2012 | 1 |
| 18 U.S.C §§ 2 and 1951 | Interference with Commerce by Robbery | Felony | 12/07/2012 | 2 |
| 18 U.S.C. §§ 2 and 1951 | Interference with Commerce by Robbery | Felony | 12/09/2012 | 3 |
| 18 U.S.C. §§ 2 and 1951 | Interference with Commerce by Robbery | Felony | 12/22/2012 | 4 |
| 18 U.S.C. §§ 2 and 2113(a) and (d) | Armed Robbery of a Credit Union | Felony | 12/22/2012 | 5 |
| 18 U.S.C. §§ 2 and 924(c)(1)(A) | Using and Carrying a Firearm During and in Relation to a Crime of Violence | Felony | 12/07/2012 | 6 |
| 18 U.S.C. §§ 2 and 924(c)(1)(A) | Using and Carrying a Firearm During and in Relation to a Crime of Violence | Felony | 12/09/2012 | 7 |
| 18 U.S.C. §§ 2 and 924(c)(1)(A) | Using and Carrying a Firearm During and in Relation to a Crime of Violence | Felony | 12/22/2012 | 8 |
| 18 U.S.C § 922(g)(1) | Possession of a Firearm by a Prohibited Person | Felony | 12/22/2012 | 9 |

AO 245B (Rev. 12/03)(VAED rev. 2) Sheet 1 - Judgment in a Criminal Case                                    Page 2 of 6

| Defendant's Name: | REED, KEITH WILLIE |
|---|---|
| Case Number: | 1:13CR00048-001 |

As pronounced on October 25, 2013, the defendant is sentenced as provided in pages 3 through 6 of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

Signed this 31st day of October, 2013.


_____
/s/
Claude M. Hilton
United States District Judge

AO 245B (Rev. 09/11)(VAEB rev. 2) Judgment in a Criminal Case
Sheet 2 - Imprisonment

| | |
|---|---|
| **Defendant's Name:** | **REED, KEITH WILLIE** |
| **Case Number:** | **1:13CR00048-001** |

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of SEVEN HUNDRED TWENTY (720) MONTHS, consisting of:

60 months on each of Counts 1, 2, 3, 4, 5 and 9 to run concurrently with each other and consecutively to all other counts; 60 months consecutive on Count 6; 300 months consecutive on Count 7; and 300 months consecutive on Count 8.

The defendant is remanded to the custody of the United States Marshal.

# RETURN

I have executed this judgment as follows: _____

_____

Defendant delivered on _____ to_____

at_____, with a certified copy of this Judgment.

_____

UNITED STATES MARSHAL

By      _____

DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/11)(VAED rev. 2) Judgment in a Criminal Case
Sheet 3 – Supervised Release

| | |
|---|---|
| Defendant's Name: | **REED, KEITH WILLIE** |
| Case Number: | **1:13CR00048-001** |

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of FIVE (5) YEARS.

This term consists of a term of THREE (3) YEARS on each of Counts 1, 2, 3, 4, 5, and 9, and a term of FIVE (5) YEARS on each of Counts 6, 7, and 8 to run concurrently with each other.

The Probation Office shall provide the defendant with a copy of the standard conditions and any special conditions of Supervised Release.

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and periodic drug tests thereafter, as determined by the court.

The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.

If this judgment imposes a fine or restitution obligation, it is a condition of Supervised Release that the defendant pay any such fine or restitution in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

# STANDARD CONDITIONS OF SUPERVISION

The defendant shall comply with the standard conditions that have been adopted by this court set forth below:

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;
2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;
3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) the defendant shall support his or her dependents and meet other family responsibilities;
5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance or any paraphernalia related to such substances, except as prescribed by a physician;
8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) the defendant shall not enter into any agreement to act as an informer for a special agent of a law enforcement agency without the permission of the court;
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

Appeal: 13-4835    Doc: 47-3    Filed: 05/07/2014    Pg: 334 of 359

AO 245B (Rev. 09/11)(VAED rev. 2) Judgment in a Criminal Case
Sheet 5 – Criminal Monetary Penalties

| Defendant's Name: | REED, KEITH WILLIE |
|---|---|
| Case Number: | 1:13CR00048-001 |

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the Schedule of Payments on Sheet 6.

| Count | Assessment | Fine | Restitution |
|---|---|---|---|
| 1 | $100.00 | $0.00 | $76,915.15 |
| 2 | $100.00 | $0.00 | $0.00 |
| 3 | $100.00 | $0.00 | $0.00 |
| 4 | $100.00 | $0.00 | $0.00 |
| 5 | $100.00 | $0.00 | $0.00 |
| 6 | $100.00 | $0.00 | $0.00 |
| 7 | $100.00 | $0.00 | $0.00 |
| 8 | $100.00 | $0.00 | $0.00 |
| 9 | $100.00 | $0.00 | $0.00 |
| **TOTALS:** | **$900.00** | **$0.00** | **$76,915.15** |

## FINES

No fines have been imposed in this case.

## RESTITUTION

The defendant shall pay restitution in the amount of $76,915.15, pursuant to the Restitution Judgment entered October 25, 2013.

AO 245B (Rev. 09/11) (VAED rev. 2) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments

| | |
|---|---|
| Defendant's Name: | REED, KEITH WILLIE |
| Case Number: | 1:13CR00048-001 |

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

The special assessment and restitution shall be due in full immediately.

Interest on the restitution is waived. On any unpaid balance, the defendant shall pay to the Clerk at least $200.00 per month beginning 60 days after release from confinement.

The defendant shall forfeit his interest in property to the United States pursuant to the Preliminary Order of Forfeiture entered by the Court on October 25, 2013.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the Clerk of the Court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed. Payments shall be applied in the following order: (1) assessment (2) restitution principal (3) restitution interest (4) fine principal (5) fine interest (6) community restitution (7) penalties and (8) costs, including cost of prosecution and court costs.

Nothing in the court's order shall prohibit the collection of any judgment, fine, or special assessment by the United States.

Case 1:13-cr-00048-CMH   Document 127   Filed 10/31/13   Page 1 of 6 PageID# 959
AO 245B (Rev. 09/11)(VAED rev. 2) Sheet 1 - Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## Eastern District of Virginia
### Alexandria Division

UNITED STATES OF AMERICA

v.

Case Number:   1:13CR00048-002

STANLEY RAY WINSTON
a/k/a Stanley Wilson
a/k/a Rashaad Winston
Defendant.

USM Number:   81443-083

Defendant's Attorney:   Melinda VanLowe, Esquire

## JUDGMENT IN A CRIMINAL CASE

The defendant was found guilty on Counts 1, 2, 3, 4, 5, 6, 7, 8, and 10 of the Second Superseding Indictment after a plea of not guilty.

Accordingly, the defendant is adjudicated guilty of the following counts involving the indicated offenses.

| Title and Section | Nature of Offense | Offense Class | Offense Ended | Count |
|---|---|---|---|---|
| 18 U.S.C. § 1951(a) | Conspiracy to Affect Commerce by Robbery | Felony | 12/22/2012 | 1 |
| 18 U.S.C §§ 2 and 1951 | Interference with Commerce by Robbery | Felony | 12/07/2012 | 2 |
| 18 U.S.C. §§ 2 and 1951 | Interference with Commerce by Robbery | Felony | 12/09/2012 | 3 |
| 18 U.S.C. §§ 2 and 1951 | Interference with Commerce by Robbery | Felony | 12/22/2012 | 4 |
| 18 U.S.C. §§ 2 and 2113(a) and (d) | Armed Robbery of a Credit Union | Felony | 12/22/2012 | 5 |
| 18 U.S.C. §§ 2 and 924(c)(1)(A) | Using and Carrying a Firearm During and in Relation to a Crime of Violence | Felony | 12/07/2012 | 6 |
| 18 U.S.C. §§ 2 and 924(c)(1)(A) | Using and Carrying a Firearm During and in Relation to a Crime of Violence | Felony | 12/09/2012 | 7 |
| 18 U.S.C. §§ 2 and 924(c)(1)(A) | Using and Carrying a Firearm During and in Relation to a Crime of Violence | Felony | 12/22/2012 | 8 |
| 18 U.S.C § 922(g)(1) | Possession of a Firearm by a Prohibited Person | Felony | 12/22/2012 | 10 |

AO 245B (Rev. 12/03)(VAEB rev. 2) Sheet 2 - Judgment in a Criminal Case    Case 1:13-cr-00048-CMH    Document 127    Filed 10/31/13    Page 2 of 6 PageID# 960    Page 2 of 6

| Defendant's Name: | WINSTON, STANLEY RAY |
| Case Number: | 1:13CR00048-002 |

As pronounced on October 25, 2013, the defendant is sentenced as provided in pages 3 through 6 of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

Signed this _31ˢᵗ_ day of _October_____, 2013.


_____/s/_____
Claude M. Hilton
United States District Judge

Appeal: 13-4835    Doc: 47-3    Filed: 05/07/2014    Pg: 338 of 359

| | |
|---|---|
| Defendant's Name: | WINSTON, STANLEY RAY |
| Case Number: | 1:13CR00048-002 |

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of SEVEN HUNDRED TWENTY (720) MONTHS, consisting of:

60 months on each of Counts 1, 2, 3, 4, 5 and 10 to run concurrently with each other and consecutively to all other counts; 60 months consecutive on Count 6; 300 months consecutive on Count 7; and 300 months consecutive on Count 8.

The defendant is remanded to the custody of the United States Marshal.

## RETURN

I have executed this judgment as follows: _____

_____

Defendant delivered on _____ to_____

at_____, with a certified copy of this Judgment.


_____

UNITED STATES MARSHAL


By      _____

DEPUTY UNITED STATES MARSHAL

| | |
|---|---|
| Defendant's Name: | WINSTON, STANLEY RAY |
| Case Number: | 1:13CR00048-002 |

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of FIVE (5) YEARS.

This term consists of a term of THREE (3) YEARS on each of Counts 1, 2, 3, 4, 5, and 10, and a term of FIVE (5) YEARS on each of Counts 6, 7, and 8 to run concurrently with each other.

The Probation Office shall provide the defendant with a copy of the standard conditions and any special conditions of Supervised Release.

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and periodic drug tests thereafter, as determined by the court.

The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.

If this judgment imposes a fine or restitution obligation, it is a condition of Supervised Release that the defendant pay any such fine or restitution in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

## STANDARD CONDITIONS OF SUPERVISION

The defendant shall comply with the standard conditions that have been adopted by this court set forth below:

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;
2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;
3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) the defendant shall support his or her dependents and meet other family responsibilities;
5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance or any paraphernalia related to such substances, except as prescribed by a physician;
8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) the defendant shall not enter into any agreement to act as an informer for a special agent of a law enforcement agency without the permission of the court;
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

Appeal: 13-4835    Doc: 47-3    Filed: 05/07/2014    Pg: 340 of 359

AO 245B (Rev. 09/11)(VAED rev. 2) Judgment in a Criminal Case
Sheet 5 – Criminal Monetary Penalties

| | |
|---|---|
| **Defendant's Name:** | **WINSTON, STANLEY RAY** |
| **Case Number:** | **1:13CR00048-002** |

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the Schedule of Payments on Sheet 6.

| Count | Assessment | Fine | Restitution |
|---|---|---|---|
| 1 | $100.00 | $0.00 | $76,915.15 |
| 2 | $100.00 | $0.00 | $0.00 |
| 3 | $100.00 | $0.00 | $0.00 |
| 4 | $100.00 | $0.00 | $0.00 |
| 5 | $100.00 | $0.00 | $0.00 |
| 6 | $100.00 | $0.00 | $0.00 |
| 7 | $100.00 | $0.00 | $0.00 |
| 8 | $100.00 | $0.00 | $0.00 |
| 10 | $100.00 | $0.00 | $0.00 |
| **TOTALS:** | **$900.00** | **$0.00** | **$76,915.15** |

## FINES

No fines have been imposed in this case.

## RESTITUTION

The defendant shall pay restitution in the amount of $76,915.15, pursuant to the Restitution Judgment entered October 25, 2013.

AO 245B (Rev. 09/11) (VAED rev. 2) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments
Case 1:13-cr-00048-CMH   Document 127   Filed 10/31/13   Page 6 of 6 PageID# 964    Page 6 of 6

| | |
|---|---|
| Defendant's Name: | WINSTON, STANLEY RAY |
| Case Number: | 1:13CR00048-002 |

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

The special assessment and restitution shall be due in full immediately.

Interest on the restitution is waived. On any unpaid balance, the defendant shall pay to the Clerk at least $200.00 per month beginning 60 days after release from confinement.

The defendant shall forfeit his interest in property to the United States pursuant to the Preliminary Order of Forfeiture entered by the Court on October 25, 2013.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the Clerk of the Court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed. Payments shall be applied in the following order: (1) assessment (2) restitution principal (3) restitution interest (4) fine principal (5) fine interest (6) community restitution (7) penalties and (8) costs, including cost of prosecution and court costs.

Nothing in the court's order shall prohibit the collection of any judgment, fine, or special assessment by the United States.

AO 245B (Rev. 09/11)(VAED rev. 2) Sheet 1 - Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## Eastern District of Virginia
### Alexandria Division

**FILED**

OCT 31 2013

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA

    v.

Case Number:   1:13CR00048-003

ANTHONY CANNON

USM Number:  39023-007

Defendant's Attorney:  Alfred Robertson Jr., Esquire

Defendant.

## JUDGMENT IN A CRIMINAL CASE

The defendant was found guilty on Counts 1, 2, 3, 4, 5, 6, 7, 8, and 11 of the Second Superseding Indictment after a plea of not guilty.

Accordingly, the defendant is adjudicated guilty of the following counts involving the indicated offenses.

| Title and Section | Nature of Offense | Offense Class | Offense Ended | Count |
|---|---|---|---|---|
| 18 U.S.C. § 1951(a) | Conspiracy to Affect Commerce by Robbery | Felony | 12/22/2012 | 1 |
| 18 U.S.C §§ 2 and 1951 | Interference with Commerce by Robbery | Felony | 12/07/2012 | 2 |
| 18 U.S.C. §§ 2 and 1951 | Interference with Commerce by Robbery | Felony | 12/09/2012 | 3 |
| 18 U.S.C. §§ 2 and 1951 | Interference with Commerce by Robbery | Felony | 12/22/2012 | 4 |
| 18 U.S.C. §§ 2 and 2113(a) and (d) | Armed Robbery of a Credit Union | Felony | 12/22/2012 | 5 |
| 18 U.S.C. §§ 2 and 924(c)(1)(A) | Using and Carrying a Firearm During and in Relation to a Crime of Violence | Felony | 12/07/2012 | 6 |
| 18 U.S.C. §§ 2 and 924(c)(1)(A) | Using and Carrying a Firearm During and in Relation to a Crime of Violence | Felony | 12/09/2012 | 7 |
| 18 U.S.C. §§ 2 and 924(c)(1)(A) | Using and Carrying a Firearm During and in Relation to a Crime of Violence | Felony | 12/22/2012 | 8 |
| 18 U.S.C § 922(g)(1) | Possession of a Firearm by a Prohibited Person | Felony | 12/22/2012 | 11 |

AO 245B (Rev. 9/08)(VAED rev. 2) Sheet 9 - Judgment in a Criminal Case

| | |
|---|---|
| **Defendant's Name:** | **CANNON, ANTHONY** |
| **Case Number:** | **1:13CR00048-003** |

As pronounced on October 25, 2013, the defendant is sentenced as provided in pages 3 through 6 of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

Signed this 31ˢᵗ day of October, 2013.

/s/

Claude M. Hilton
United States District Judge

Appeal: 13-4835    Doc: 47-3    Filed: 05/07/2014    Pg: 344 of 359

| | |
|---|---|
| Defendant's Name: | **CANNON, ANTHONY** |
| Case Number: | **1:13CR00048-003** |

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of SEVEN HUNDRED TWENTY (720) MONTHS, consisting of:

60 months on each of Counts 1, 2, 3, 4, 5 and 11 to run concurrently with each other and consecutively to all other counts; 60 months consecutive on Count 6; 300 months consecutive on Count 7; and 300 months consecutive on Count 8.

The defendant is remanded to the custody of the United States Marshal.

# RETURN

I have executed this judgment as follows: _____

_____

Defendant delivered on _____ to _____

at_____, with a certified copy of this Judgment.

_____
UNITED STATES MARSHAL

By      _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/11)(VAED rev. 2) Judgment in a Criminal Case
Sheet 3 – Supervised Release

| | |
|---|---|
| Defendant's Name: | CANNON, ANTHONY |
| Case Number: | 1:13CR00048-003 |

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of FIVE (5) YEARS.

This term consists of a term of THREE (3) YEARS on each of Counts 1, 2, 3, 4, 5, and 11, and a term of FIVE (5) YEARS on each of Counts 6, 7, and 8 to run concurrently with each other.

The Probation Office shall provide the defendant with a copy of the standard conditions and any special conditions of Supervised Release.

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and periodic drug tests thereafter, as determined by the court.

The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.

If this judgment imposes a fine or restitution obligation, it is a condition of Supervised Release that the defendant pay any such fine or restitution in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

## STANDARD CONDITIONS OF SUPERVISION

The defendant shall comply with the standard conditions that have been adopted by this court set forth below:

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;
2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;
3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) the defendant shall support his or her dependents and meet other family responsibilities;
5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance or any paraphernalia related to such substances, except as prescribed by a physician;
8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) the defendant shall not enter into any agreement to act as an informer for a special agent of a law enforcement agency without the permission of the court;
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B (Rev. 09/11)(VAED rev. 2) Judgment in a Criminal Case
Sheet 5 – Criminal Monetary Penalties

| Defendant's Name: | CANNON, ANTHONY |
|---|---|
| Case Number: | 1:13CR00048-003 |

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the Schedule of Payments on Sheet 6.

| Count | Assessment | Fine | Restitution |
|:---:|:---:|:---:|:---:|
| 1 | $100.00 | $0.00 | $76,915.15 |
| 2 | $100.00 | $0.00 | $0.00 |
| 3 | $100.00 | $0.00 | $0.00 |
| 4 | $100.00 | $0.00 | $0.00 |
| 5 | $100.00 | $0.00 | $0.00 |
| 6 | $100.00 | $0.00 | $0.00 |
| 7 | $100.00 | $0.00 | $0.00 |
| 8 | $100.00 | $0.00 | $0.00 |
| 11 | $100.00 | $0.00 | $0.00 |
| **TOTALS:** | **$900.00** | **$0.00** | **$76,915.15** |

## FINES

No fines have been imposed in this case.

## RESTITUTION

The defendant shall pay restitution in the amount of $76,915.15, pursuant to the Restitution Judgment entered October 25, 2013.

AO 245B (Rev. 09/11) (VAED rev. 2) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments

Page 6 of 6

| Defendant's Name: | CANNON, ANTHONY |
| Case Number: | 1:13CR00048-003 |

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

The special assessment and restitution shall be due in full immediately.

Interest on the restitution is waived.  On any unpaid balance, the defendant shall pay to the Clerk at least $200.00 per month beginning 60 days after release from confinement.

The defendant shall forfeit his interest in property to the United States pursuant to the Preliminary Order of Forfeiture entered by the Court on October 25, 2013.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the Clerk of the Court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed. Payments shall be applied in the following order: (1) assessment (2) restitution principal (3) restitution interest (4) fine principal (5) fine interest (6) community restitution (7) penalties and (8) costs, including cost of prosecution and court costs.

Nothing in the court's order shall prohibit the collection of any judgment, fine, or special assessment by the United States.

AO 245B (Rev. 09/11)(VAED rev. 2) Sheet 1 - Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## Eastern District of Virginia
### Alexandria Division

FILED

OCT 31 2013

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA

v.                                    Case Number:   1:13CR00048-004

TOBIAS RICHARD DYER                    USM Number:  49240-007

Defendant.                             Defendant's Attorney:   Gregory Hunter, Esquire

## JUDGMENT IN A CRIMINAL CASE

The defendant was found guilty on Counts 1, 2, 3, 4, 5, 6, 7, 8, and 12 of the Second Superseding Indictment after a plea of not guilty.

Accordingly, the defendant is adjudicated guilty of the following counts involving the indicated offenses.

| Title and Section | Nature of Offense | Offense Class | Offense Ended | Count |
|---|---|---|---|---|
| 18 U.S.C. § 1951(a) | Conspiracy to Affect Commerce by Robbery | Felony | 12/22/2012 | 1 |
| 18 U.S.C §§ 2 and 1951 | Interference with Commerce by Robbery | Felony | 12/07/2012 | 2 |
| 18 U.S.C. §§ 2 and 1951 | Interference with Commerce by Robbery | Felony | 12/09/2012 | 3 |
| 18 U.S.C. §§ 2 and 1951 | Interference with Commerce by Robbery | Felony | 12/22/2012 | 4 |
| 18 U.S.C. §§ 2 and 2113(a) and (d) | Armed Robbery of a Credit Union | Felony | 12/22/2012 | 5 |
| 18 U.S.C. §§ 2 and 924(c)(1)(A) | Using and Carrying a Firearm During and in Relation to a Crime of Violence | Felony | 12/07/2012 | 6 |
| 18 U.S.C. §§ 2 and 924(c)(1)(A) | Using and Carrying a Firearm During and in Relation to a Crime of Violence | Felony | 12/09/2012 | 7 |
| 18 U.S.C. §§ 2 and 924(c)(1)(A) | Using and Carrying a Firearm During and in Relation to a Crime of Violence | Felony | 12/22/2012 | 8 |
| 18 U.S.C § 922(g)(1) | Possession of a Firearm by a Prohibited Person | Felony | 12/22/2012 | 12 |

Appeal: 13-4835    Doc: 47-3    Filed: 05/07/2014    Pg: 349 of 359

AO 245B (Rev. 12/03)(VAEB rev. 2) Sheet P- Judgment in a Criminal Case    Case 1:13-cr-00048-CMH   Document 131   Filed 10/31/13   Page 2 of 6 PageID# 982   Page 2 of 6

| Defendant's Name: | DYER, TOBIAS RICHARD |
| Case Number: | 1:13CR00048-004 |

As pronounced on October 25, 2013, the defendant is sentenced as provided in pages 3 through 6 of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

Signed this 31 st day of October, 2013.

/s/
_____
Claude M. Hilton
United States District Judge

AO 245B (Rev. 09/11)(VAED rev. 2) Judgment in a Criminal Case    Page 3 of 6
Sheet 2 - Imprisonment

| | |
|---|---|
| **Defendant's Name:** | **DYER, TOBIAS RICHARD** |
| **Case Number:** | **1:13CR00048-004** |

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of SEVEN HUNDRED TWENTY (720) MONTHS, consisting of:

60 months on each of Counts 1, 2, 3, 4, 5 and 12 to run concurrently with each other and consecutively to all other counts; 60 months consecutive on Count 6; 300 months consecutive on Count 7; and 300 months consecutive on Count 8.

The defendant is remanded to the custody of the United States Marshal.

## RETURN

I have executed this judgment as follows: _____

_____

Defendant delivered on _____ to_____

at_____, with a certified copy of this Judgment.


_____
UNITED STATES MARSHAL

By      _____
DEPUTY UNITED STATES MARSHAL

| Defendant's Name: | DYER, TOBIAS RICHARD |
|---|---|
| Case Number: | 1:13CR00048-004 |

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of FIVE (5) YEARS.

This term consists of a term of THREE (3) YEARS on each of Counts 1, 2, 3, 4, 5, and 12, and a term of FIVE (5) YEARS on each of Counts 6, 7, and 8 to run concurrently with each other.

The Probation Office shall provide the defendant with a copy of the standard conditions and any special conditions of Supervised Release.

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and periodic drug tests thereafter, as determined by the court.

The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.

If this judgment imposes a fine or restitution obligation, it is a condition of Supervised Release that the defendant pay any such fine or restitution in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

# STANDARD CONDITIONS OF SUPERVISION

The defendant shall comply with the standard conditions that have been adopted by this court set forth below:

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;
2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;
3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) the defendant shall support his or her dependents and meet other family responsibilities;
5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance or any paraphernalia related to such substances, except as prescribed by a physician;
8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) the defendant shall not enter into any agreement to act as an informer for a special agent of a law enforcement agency without the permission of the court;
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B (Rev. 09/11)(VAED rev. 2) Judgment in a Criminal Case
Sheet 5 – Criminal Monetary Penalties

| Defendant's Name: | DYER, TOBIAS RICHARD |
|---|---|
| Case Number: | 1:13CR00048-004 |

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the Schedule of Payments on Sheet 6.

| Count | Assessment | Fine | Restitution |
|---|---|---|---|
| 1 | $100.00 | $0.00 | $76,915.15 |
| 2 | $100.00 | $0.00 | $0.00 |
| 3 | $100.00 | $0.00 | $0.00 |
| 4 | $100.00 | $0.00 | $0.00 |
| 5 | $100.00 | $0.00 | $0.00 |
| 6 | $100.00 | $0.00 | $0.00 |
| 7 | $100.00 | $0.00 | $0.00 |
| 8 | $100.00 | $0.00 | $0.00 |
| 12 | $100.00 | $0.00 | $0.00 |
| **TOTALS:** | **$900.00** | **$0.00** | **$76,915.15** |

## FINES

No fines have been imposed in this case.

## RESTITUTION

The defendant shall pay restitution in the amount of $76,915.15, pursuant to the Restitution Judgment entered October 25, 2013.

| Defendant's Name: | DYER, TOBIAS RICHARD |
|---|---|
| Case Number: | 1:13CR00048-004 |

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

The special assessment and restitution shall be due in full immediately.

Interest on the restitution is waived.  On any unpaid balance, the defendant shall pay to the Clerk at least $200.00 per month beginning 60 days after release from confinement.

The defendant shall forfeit his interest in property to the United States pursuant to the Preliminary Order of Forfeiture entered by the Court on October 25, 2013.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the Clerk of the Court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed. Payments shall be applied in the following order: (1) assessment (2) restitution principal (3) restitution interest (4) fine principal (5) fine interest (6) community restitution (7) penalties and (8) costs, including cost of prosecution and court costs.

Nothing in the court's order shall prohibit the collection of any judgment, fine, or special assessment by the United States.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:11CR00261 |
| | ) | The Honorable C.M. Hilton |
| Keith Willie Reed, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### NOTICE OF APPEAL BY ANTHONY CANNON

COMES NOW the Defendant, Anthony Cannon, by and through counsel, and notes his appeal to the United States Court Appeals for the Fourth Circuit of his judgment and conviction in the above captioned case. Defendant is indigent, and counsel is appointed.

Respectfully submitted

Anthony Cannon

By Counsel

_____/s/_____
Alfred L. Robertson, Jr.
VSB # 45000
Robertson Law Office, PLLC
500 N. Washington St.
Alexandria, VA 22314
(571) 492-5133
(703) 842-6196 (facsimile)
rob@robertsonlawoffice.com
Counsel for Anthony Cannon

Case 1:13-cr-00048-CMH   Document 112   Filed 10/31/13   Page 2 of 2 PageID# 915

### CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of October, 2013, I will electronically file the

Motion for Judgment of Acquittal with the Clerk of Court using the CM/ECF system,

which will then send a notification of such filing (NEF) to the following:

Rebecca Bellows, Esquire
Patricia Giles, Esquire
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314

And all other counsel of record.


_____/s/_____
Alfred L. Robertson, Jr.
VSB # 45000
Robertson Law Office, PLLC
500 N. Washington St.
Alexandria, VA 22314
(571) 492-5133
(703) 842-6196 (facsimile)
rob@robertsonlawoffice.com
Counsel for Anthony Cannon

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA,          :
                                   :
v.                                 :          Criminal No. 1:13cr48-02
                                   :
STANELY RAY WINSTON,               :
                                   :
          Defendants.              :

<u>NOTICE OF APPEAL</u>

Notice is hereby given that Stanley Ray Winston, the defendant in the above named case, hereby appeals to the United States Court of Appeals for the Fourth Circuit from the final judgment of conviction and sentence imposed therefrom announced in court on the 25th day of October, 2013.

Respectfully submitted,
STANLEY RAY WINSTON
By Counsel

THE LAW OFFICE OF MELINDA L. VANLOWE, P.C.

BY: _____/s/_____
Melinda L. VanLowe, Esquire
Virginia State Bar I.D. Number 51143
Counsel for Stanley Winston
10476 Armstrong Street
Fairfax, VA 22030
(703) 865-5555
(703) 763-2372 (fax)
melinda@vanlowelaw.com

Case 1:13-cr-00048-CMH   Document 123   Filed 11/01/13   Page 2 of 2 PageID# 945

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 1st day of November, 2013, I will electronically file the Notice of Appeal with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Rebecca Bellows, Esquire
Patricia Giles, Esquire
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314

_____/s/_____
Melinda L. VanLowe, Esquire
Virginia State Bar I.D. Number 51143
Counsel for Stanley Winston
The Law Office of Melinda L. VanLowe, P.C.
10476 Armstrong Street
Fairfax, VA 22030
(703) 865-5555
(703) 763-2372 (fax)
melinda@vanlowelaw.com

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 1:13CR48-004 |
| Tobias Richard Dyer | ) | |
| Defendant | ) | The Honorable Claude M. Hilton |
| _____ | ) | |

<u>NOTICE OF APPEAL</u>

Notice is hereby given that the Defendant, Tobias Richard Dyer, hereby

appeals the sentence issued by this Court on October 25, 2013, to the United States Court

of Appeals for the Fourth Circuit.

Respectfully Submitted,

Tobias Richard Dyer
By Counsel

_____/S/_____
Gregory T. Hunter
Virginia State Bar Number 45489
Attorney for the Defendant
2055 North 15th Street
Suite 302
Arlington, Virginia 22201
(703) 527-0808 telephone
(703) 527-0810 facsimile
greghunter@mail.com

Case 1:13-cr-00048-CMH   Document 124   Filed 11/01/13   Page 2 of 2 PageID# 947

<u>CERTIFICATE OF SERVICE</u>

I certify that on the 1st day of November, 2013, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Rebecca Bellows
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700 telephone
(703) 299-3980 facsimile
Rebecca.Bellows@usdoj.gov

Patricia Giles
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700 telephone
(703) 299-3980 facsimile
Patricia.Giles@usdoj.gov

_____/S/_____
Gregory T. Hunter
Virginia State Bar Number 45489
Attorney for the Defendant
2055 North 15th Street
Suite 302
Arlington, Virginia 22201
(703) 527-0808 telephone
(703) 527-0810 facsimile
greghunter@mail.com